# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
450 5th Street, NW, Suite 4100
Washington, DC 20530

STATE OF CALIFORNIA
300 South Spring Street, Suite 1720
Los Angeles, CA 90013

STATE OF COLORADO
1300 Broadway, 7th Floor
Denver, CO 80203

STATE OF CONNECTICUT
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120

DISTRICT OF COLUMBIA
441 4th Street, NW
Washington, DC 20001

STATE OF GEORGIA
40 Capitol Square, SW
Atlanta, GA 30334-1300

STATE OF IOWA
1305 East Walnut Street, 2nd Floor
Des Moines, IA 50319

STATE OF MAINE
6 State House Station
Augusta, ME 04333-0006

STATE OF MARYLAND
200 Saint Paul Place
Baltimore, MD 21202

STATE OF NEW HAMPSHIRE
33 Capitol Street
Concord, NH 03301

STATE OF NEW YORK
120 Broadway
New York, NY 10271-0332

STATE OF TENNESSEE
500 Charlotte Avenue
Nashville, TN 37202

and

COMMONWEALTH OF VIRGINIA
202 North 9th Street
Richmond, VA 23219

        *Plaintiffs,*

v.

ANTHEM, INC.
120 Monument Circle
Indianapolis, IN 46204

and

CIGNA CORP.
900 Cottage Grove Road
Bloomfield, CT 06002

        *Defendants.*

# COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the States of California, Colorado, Connecticut, Georgia, Iowa, Maine,

Maryland, New Hampshire, New York, and Tennessee, the Commonwealth of Virginia, and the

District of Columbia ("Plaintiff States"), acting by and through their respective Attorneys

General, bring this civil antitrust action to prevent Anthem, Inc. from acquiring Cigna Corp.

## I.   INTRODUCTION

1.     Anthem's proposed $54 billion acquisition of Cigna would be the largest merger in the history of the health-insurance industry. It would combine two of the few remaining commercial health-insurance options for businesses and individuals in markets throughout the country. And in doing so, it would substantially lessen competition, harming millions of American consumers, as well as doctors and hospitals.

2.     The U.S. healthcare system—including commercial health insurance—affects the lives and pocketbooks of virtually every citizen. Each year, Americans visit the doctor or hospital more than a billion times and spend more than $3 trillion on healthcare. Half of all Americans obtain healthcare through their employers, which purchase plans from insurance companies such as Anthem and Cigna. Millions more citizens purchase health insurance on public exchanges established by the Affordable Care Act.

3.     Competition among insurance companies like Anthem and Cigna ensures that employers and individuals can purchase high-quality policies at affordable prices. Employers seek competitive bids when selecting plans to offer their employees. Individuals choose among competing insurers when purchasing policies on the public exchanges. And competition is critical for doctors and hospitals who obtain access to most of their commercial health-insurance patients by contracting with insurers to be "in-network" providers.

4.     This competition is now at risk. Today, the industry is dominated by five large insurers commonly referred to as "the big five." In a scramble to become even bigger, four of the big five now propose to merge: Anthem seeks to buy Cigna for $54 billion, and Aetna seeks to acquire Humana for $37 billion. These mergers would reshape the industry, eliminating two innovative competitors—Cigna and Humana—at a time when the industry is experimenting with new ways to lower healthcare costs. Other insurers lack the scope and scale to fill this

competitive void. As one Anthem executive vice president explained in 2015, this "very consolidated" industry is "really down to a big five and then, it gets much more smaller in terms of players that are available after that." After the mergers, the big five would become the big three, each of which would have almost twice the revenue of the next largest insurer.

5.      Today, the United States and a number of states have filed lawsuits in this Court to enjoin both mergers. This complaint seeks to block Anthem's attempt to buy Cigna. If allowed to proceed, this merger would enhance Anthem's power to profit at the expense of both consumers and the doctors and hospitals providing their medical care.

6.      Anthem is the largest member of the Blue Cross and Blue Shield Association. It competes in 14 states as the Blue licensee and partners with other Blue plans to compete throughout the country. Anthem admits in business documents that its share is already "dominant in most of [its] markets," a position that gives it "a clear advantage and provides opportunities to drive margin growth." But Anthem has also earned a reputation in many markets for having poor customer service, being slow to innovate, and being difficult to work with for doctors and hospitals. The president of Anthem's Indiana business conceded, "There are some customers, some prospects who loathe us."

7.      Cigna increasingly competes head to head with Anthem by finding innovative ways to lower its customers' medical costs. Cigna offers sophisticated wellness programs that improve the health of its members, provides highly-regarded customer service, and works closely with doctors and hospitals to improve the quality and lower the cost of care. These efforts have been well received by consumers and healthcare providers, pressuring Anthem to respond. Without the merger, Cigna expects to double in size in the next seven to eight years.

8. Anthem's purchase of Cigna would eliminate it as a competitive threat and substantially lessen competition in numerous markets around the country. The harm to competition in any one of these markets is sufficient to enjoin the transaction.

(a) ***National accounts.*** Of the big five, only four insurers offer a nationwide commercial network sufficient to serve the country's largest employers, known as "national accounts." Anthem, working together with its fellow Blues, is one; Cigna is another. Anthem and Cigna view each other as close competitors for these accounts and have adopted strategies for winning national business from each other.

(b) ***Local commercial markets.*** Anthem and Cigna are often two of few remaining options for large-group employers in at least 35 metropolitan areas, including New York, Los Angeles, San Francisco, Atlanta, and Indianapolis. In some of these areas, Cigna has won most of its new accounts from Anthem, and Anthem has described Cigna as "aggressive" and "our number one competitor."

(c) ***Individual exchanges.*** In at least two metropolitan areas—St. Louis and Denver—Anthem and Cigna are key competitors selling policies to individuals and families on the public exchanges. Cigna has grown rapidly in these markets. For example, in the two years Cigna has participated on the exchange in St. Louis, it has captured nearly 25 percent of the market—with much of that growth coming at Anthem's expense. Without the merger, Cigna plans to continue to expand on the exchanges.

(d) ***Purchase of healthcare services by commercial health insurers.*** Anthem's high market shares already give it significant bargaining leverage with doctors and hospitals. In the same 35 metropolitan areas referenced above, this merger would substantially increase Anthem's ability to dictate the reimbursement rates it pays providers, threatening the availability and quality of medical care. The merger also would deprive both providers and consumers of Cigna's innovative efforts to work cooperatively with providers and enter into "value-based" contracts that reward them for improving patient health and lowering cost.

9. If permitted to proceed, Anthem's purchase of Cigna likely would lead to higher prices and reduced benefits, and would deprive consumers and healthcare providers of the innovation and collaboration necessary to improve care outcomes. Because this merger threatens to reduce competition across the country, it violates Section 7 of the Clayton Act. To prevent this unlawful harm, the Court should enjoin this merger.

## II.  THE DEFENDANTS AND THE MERGER

10.     Anthem competes in all 50 states and the District of Columbia either directly or through the Blue Cross and Blue Shield Association, a joint venture of insurance companies that partner to offer their members access to a nationwide network of healthcare providers. Anthem controls the Blue license in all or part of 14 states, covering 39 percent of the U.S. population: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the DC suburbs), and Wisconsin. In all these states but California and New York, Anthem has the exclusive right to bid for new business under both the Blue Cross and Blue Shield brands. In 2015, Anthem had approximately 39 million members nationwide and earned $78 billion in revenue.

11.     Cigna also competes in all 50 states and the District of Columbia. In 2015, it had approximately 13 million U.S. members and earned $38 billion in revenue. Cigna has earned a reputation as an innovator in the industry by developing wellness programs to improve the health of its members and by collaborating with healthcare providers to improve patient health and lower the overall cost of medical care. Cigna has enjoyed compound revenue growth of 13 percent annually over the last six years.

12.     In early 2014, Anthem's leadership reflected on a decade of consolidation in the health-insurance industry and determined that there was "perhaps a single significant transaction remaining." Soon after, Anthem began talks to acquire Cigna. The companies were well aware of the competitive problems the deal would create: In October 2014, Cigna's chief financial officer warned the CEO to stop using words like "dominant" and "market share" when analyzing the potential deal because they are "both sensitive words from a post deal review perspective." Anthem and Cigna also realized that the value of their combined company would be limited by the Blue Cross and Blue Shield Association's "best-efforts" rules, which cap the proportion of

revenue that Anthem can earn from brands not affiliated with the Blue network, including Cigna. In February 2015, Anthem's board of directors called off the deal.

13.     But just a few months later, Anthem's interest in acquiring Cigna was renewed when Humana began seeking a buyer. This sparked a bidding frenzy in the industry. In a two-month period, Anthem made several bids for Cigna; Cigna made two bids for Humana; UnitedHealthcare made bids for Aetna and Cigna; and Aetna made a bid for Humana, which after only weeks of negotiation resulted in an agreement on July 2, 2015. Just a few weeks later, on July 23, 2015, Anthem agreed to acquire Cigna for $54 billion.

14.     Anthem's acquisition of Cigna was contentious from the start. In mid-June 2015, Cigna's board of directors rejected an offer from Anthem in a letter pointing to "a number of major issues," including complications relating to Anthem's membership in the Blue Cross and Blue Shield Association. The insurers also fought publicly about which CEO would lead the combined company. In the months since the agreement was signed, Anthem and Cigna have continued to quarrel over how they should integrate their two companies.

15.     Anthem has also been unable to explain how the combined company would address problems created by Anthem's membership in the Blue Cross and Blue Shield Association. For example, Anthem calls other Blue plans "comrades in arms" and works closely with them to win national accounts from Cigna and other insurers. But after this merger, Anthem would also own Cigna. Anthem would thus be competing with—and against—its fellow "Blues brethren" for the same national accounts. Anthem's CEO testified that he did not know how the company would resolve this conflict of interest.

### III. BACKGROUND ON COMMERCIAL HEALTH INSURANCE

16.     Anthem and Cigna compete vigorously in the sale of both "large group" and "individual" commercial health insurance. Group insurance sold to employers with more than 50 employees (or in four states, more than 100 employees) is called "large group" insurance. Within large groups, the industry recognizes a subset of the largest employers with employees in more than one state called "national accounts." Most large employers buy self-insured plans (also known as administrative-services-only or "ASO" contracts), under which the employer retains most of the risk of its employees' healthcare costs and pays the insurer an administrative fee for access to the insurer's network of doctors and hospitals and for processing medical claims. For employers of any size, health-insurance costs are a significant expense, and even large employers are increasingly shifting more of the costs of healthcare to their employees. Anthem and Cigna also sell "individual" insurance, which individuals and their families most commonly purchase on the public exchanges.

17.     To sell plans to employers and individuals, commercial health insurers compete on price, customer service, care management, wellness programs, and reputation. Insurers also compete on the breadth of their network of healthcare providers, including doctors and hospitals, as most people seek medical care close to where they live or work.

18.     Traditionally, insurance companies reimburse providers on a "fee-for-service" basis whereby providers receive compensation for all, or almost all, services provided. But insurers are increasingly experimenting with—and competing with each other to create— contractual arrangements that reward doctors and hospitals for better health outcomes and lower total costs. Instead of reimbursing providers based solely on the quantity of services they perform, this value-focused movement gives providers incentives to improve their patients' overall health and perform fewer, but more effective, services. Industry participants call these

arrangements "provider collaborations" or "value-based arrangements," and refer to this shift in approach as the "volume-to-value" movement. Competition is a key ingredient to the volume-to-value movement's continued success, and Cigna has been particularly innovative in advancing these provider collaborations.

## IV. THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION FOR THE SALE OF HEALTH INSURANCE TO NATIONAL ACCOUNTS

19.     Anthem and Cigna vigorously compete against each other to sell commercial health insurance to national accounts. The proposed merger would eliminate that competition and leave national accounts with only three meaningful options.

**A.     The sale of health insurance to national accounts is a relevant product market.**

20.     The typical starting point for merger analysis is defining the relevant market. Courts define relevant product markets to help determine which customers are most likely to be affected by the merger. The sale of commercial health insurance to national accounts is one such relevant product market and line of commerce under Section 7 of the Clayton Act.

21.     National accounts are distinct customers with unique characteristics. They typically require a provider network covering multiple states; undergo a lengthier, more resource-intensive purchasing process involving requests for proposals; are more likely to hire a large consulting firm to aid them in evaluating and selecting an insurer or insurers; and are more likely to want flexible and customized benefit designs. Anthem and Cigna have dedicated business units focused on selling and marketing to national accounts, and each insurer is able to charge those accounts different prices and offer different plan benefits than they do for other types of accounts.

22.     The sale of commercial health insurance to national accounts satisfies the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice and Federal

Trade Commission 2010 Horizontal Merger Guidelines. Under the Guidelines, relevant markets may be defined as a group of customers that could be profitably targeted for price increases. A hypothetical monopolist of commercial health insurance sold to national accounts likely would impose a small but significant and non-transitory price increase because an insufficient number of national accounts would stop purchasing commercial health insurance to make that price increase unprofitable. Because health insurance is a significant employment benefit, and national accounts offer it to recruit and retain highly qualified employees, very few national accounts will stop buying health insurance for their employees in the event of a small but significant price increase. Nor are a sufficient number of national accounts likely to build their own provider networks by contracting directly with doctors and hospitals or attempt to process all of their employees' healthcare claims themselves. And arbitrage (the reselling of a product from one customer to another) is impossible, so national employers could not avoid a price increase by buying health insurance from other employers.

**B.     This merger would harm national accounts in two relevant geographic markets.**

23.     The proposed merger would harm national accounts in (1) the parts of the 14 states where Anthem sells under a Blue license; and (2) the United States generally.

**(1)     The 14 Anthem states are a relevant geographic market.**

24.     Anthem and Cigna compete directly for national accounts headquartered in the Anthem states, and national accounts headquartered in those states have similar options for health insurance. Therefore, it is appropriate to consider these 14 states together as a single relevant geographic market and section of the country under Section 7 of the Clayton Act.

25.     This geographic market satisfies the hypothetical monopolist test. National accounts headquartered in the Anthem states do not have reasonable substitutes to purchasing

commercial health insurance from insurers doing business in these states. National accounts would not close their headquarters and move them to different states in response to a small but significant and non-transitory price increase.

**(2)    The United States is a relevant geographic market.**

26.    It is also appropriate to consider the United States as a single relevant geographic market and section of the country under Section 7 of the Clayton Act. National accounts headquartered throughout the United States have similar options for health insurance. And, in addition to competing in the 14 Anthem states, Anthem and Cigna compete for national accounts headquartered throughout the rest of the country. Cigna has a nationwide provider network and competes throughout the United States, and Anthem competes for national accounts headquartered in the 36 states in which it does not have a Blue license in at least two ways.

27.    First, Anthem bids directly for national accounts headquartered outside its 14 states when other Blue plans "cede" that right to Anthem. The Association's rules generally permit only one Blue plan to bid on an account—the plan holding the license in the territory where the national account is headquartered. For example, only BlueCross BlueShield of Tennessee can submit a bid for a national account based in Tennessee. But Blue plans can cede that right to each other on an account-by-account basis. Anthem has received hundreds of cedes from its fellow Blue plans.

28.    Second, even when Anthem is not ceded an account, it competes indirectly as part of the bid submitted by the local Blue plan. For example, when BlueCross BlueShield of Tennessee bids for a national account based in Nashville, that account evaluates the strength of the Blues' provider network in other states where it has employees, including the 14 states that Anthem's network covers. And Anthem profits when the Tennessee Blue wins the account because Anthem receives "BlueCard fees" when any of that account's employees obtain medical

care in Anthem's territories. Because almost 40 percent of the U.S. population lives in the 14 Anthem states, Anthem earns significant BlueCard revenue—$450 million in 2014 alone, much of it from national accounts.

29.     This geographic market satisfies the hypothetical monopolist test, as national accounts headquartered in the United States do not have reasonable substitutes to purchasing commercial health insurance from insurers doing business in this country. National accounts would not close their offices and move their companies to different countries in response to a small but significant and non-transitory increase in the price of commercial health insurance.

**C.     This merger is presumptively unlawful in both the 14 Anthem states and across the entire United States.**

30.     The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl–Hirschman Index ("HHI") as described in the Merger Guidelines. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has a 100 percent market share. According to the Guidelines, mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive.

31.     For national accounts headquartered in the 14 Anthem states, Anthem and Cigna have a combined market share of at least 40 percent. For national accounts in the United States as a whole, Anthem (together with the other Blues) and Cigna have a combined market share of at least 30 percent. In these markets, the merger is presumptively unlawful under Supreme Court precedent and the Merger Guidelines.

32.     These measures of market concentration understate the competitive harm likely to result from the proposed merger, in part, because they include so-called "slice" insurers—local

insurers that compete for only a portion of a national account's business. Such "slice" insurers cannot compete to fully replace Anthem, Cigna, Aetna, or UnitedHealthcare nationwide. Among national accounts in the 14 Anthem states seeking to buy a nationwide plan from one of these four insurers, Anthem and Cigna would have a combined market share of at least 50 percent. Among national accounts across the country seeking a nationwide plan from one of these four insurers, Anthem (together with the other Blues) and Cigna would similarly have a combined market share of at least 50 percent.

**D.   This merger likely would harm national accounts in the Anthem states and throughout the country.**

33.     In the 14 Anthem states, the proposed merger would combine Anthem and Cigna and thus eliminate Cigna as a competitor for national accounts. Anthem and Cigna have frequently been the two finalists when these national accounts seek competitive bids for commercial health insurance, and those accounts have been able to use the competition between Anthem and Cigna to obtain lower prices and better terms. This merger would end that competition.

34.     For example, in a 2013 bid, Anthem feared that Cigna would aggressively market the benefits of its clinical programs, and Anthem ended up lowering its fees to the customer to ward off a competitive bid. In another bid that year, Cigna won what its executives called a "dogfight with Anthem" by offering better overall value to the customer. In 2014, Anthem targeted a longtime Cigna customer as a "good opportunity to continue to pick off Cigna accounts." Anthem made a competitive offer and won the account.

35.     Anthem has introduced strategies specifically designed to win national accounts from Cigna and Aetna, another national rival. For example, Anthem has offered flexible renewal pricing, which allows its sales teams to adjust pricing for accounts in which "Aetna or Cigna is

an incumbent for at least one-third of the [account]"; trend guarantees, which cap the rate of increase of medical costs for national customers "where Aetna or Cigna is the alternate carrier and/or the account is significantly increasing [its] clinical offering"; and a "bounty" program that compensated Anthem sales agents who won new accounts from Cigna or Aetna. These and other initiatives reflect Anthem's view that Cigna and Aetna "should not exist."

36.    In the 36 non-Anthem states, the proposed merger would also substantially harm competition in at least three ways. First, as explained above, Anthem often competes directly with Cigna for national accounts that other Blue plans have ceded to Anthem. That competition would be lost. Second, after the merger, Cigna would not compete as hard against other Blue plans for national accounts because Cigna (through its owner, Anthem) would likely receive significant BlueCard fees if a Blue plan won the account. Third, Anthem would have a reduced incentive to compete aggressively with the Cigna brand because the Blue Cross and Blue Shield Association's best-efforts rules would limit Cigna's growth relative to Anthem's. Anthem has already conceded that it would violate one of the best-efforts rules if it acquires Cigna's substantial commercial membership, meaning Anthem may have to limit Cigna's competitiveness throughout the country.

37.    In both the Anthem states and in the United States as a whole, the merger also would enhance coordination among insurers competing for national accounts. For example, after the merger, Anthem, the biggest of the Blue plans, would also own Cigna—one of the Blues' most formidable competitors—making coordination among the Blue plans and Cigna significantly more likely.

### V.  THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION FOR THE SALE OF HEALTH INSURANCE TO LARGE-GROUP EMPLOYERS

38.     In local markets throughout the country, head-to-head competition between Anthem and Cigna has created substantial benefits for large-group employers. In many of these markets, Anthem and Cigna are two of very few competitive options. The proposed merger would eliminate the valuable benefits of this competition and leave large groups with even fewer options.

**A.      The sale of health insurance to large groups is a relevant product market.**

39.     The sale of commercial health insurance to large groups (employers with more than 50 employees or, in four states, more than 100 employees) is a relevant product market and line of commerce under Section 7 of the Clayton Act. Large-group employers are distinct customers, and insurers that sell to them do not need to follow various regulatory requirements applicable to small groups, including limitations on the factors that can be used in determining rates and other licensing and rate-filing requirements. Anthem, Cigna, and other insurers have dedicated business units focused on selling and marketing to large groups, charge those accounts different prices, and offer them different plan benefits than they do for other types of accounts.

40.     Large-group employers are a relevant market for assessing the competitive effects of this merger because an insufficient number of large groups would stop buying commercial health insurance to make a small but significant and non-transitory price increase unprofitable. Nor are large groups likely to build their own provider networks and administer their health plans themselves. And, as with national accounts, large-group employers cannot avoid a price increase by purchasing commercial health insurance from other employers.

**B.** **This merger would harm large groups in 35 relevant geographic markets.**

41.    The proposed merger would harm large-group employers in at least the 35

metropolitan areas listed on the map below. More than 65 million people live in these areas. Each

area is a relevant geographic market and section of the country under Section 7 of the Clayton

Act.



42.    Patients typically seek medical care close to where they live or work, so they

strongly prefer health plans offering a network of doctors and hospitals in those same areas.

Thus, when purchasing commercial health insurance, large-group employers want insurers to

provide access to healthcare provider networks in the areas where their employees are located. In

each of the 35 metropolitan areas listed above, large groups do not view insurance companies

that lack a meaningful provider network in that area as reasonable substitutes for those that offer

such a network.

43.     Each of these markets satisfies the hypothetical monopolist test. In each area,

large groups are unlikely to move their offices to a different area in response to a small but

significant and non-transitory increase in the price of commercial health insurance.

**C.     This merger is presumptively unlawful in most of the relevant geographic markets.**

44.     Anthem already has a large share in many of these local markets, which would

increase further if it acquired Cigna. Even when treating each Blue plan as a separate competitor

and including all other insurers in these markets, the proposed merger is presumptively unlawful

under Supreme Court precedent and the Merger Guidelines in at least 20 of the relevant markets.

But that understates the merger's effect on concentration for two reasons. First, the Blue plans

effectively compete as a single entity; with very few exceptions, only one Blue plan at a time

competes for an employer's business. When accounting for this market reality, the merger is

presumptively unlawful in nearly all of the 35 markets listed above. Second, some insurers

included in these market-share calculations are not close competitors to Anthem and Cigna. For

example, in California, Kaiser's share is significant but its integrated business model and its

"closed network" of providers is very different from Anthem's and Cigna's. One Cigna executive

in California testified that he did not believe Cigna had "ever lost an ASO customer to Kaiser."

**D.     This merger likely would harm large-group employers by eliminating competition
        between Anthem and Cigna.**

45.     For some large groups in local markets, Anthem and Cigna are the only two

competitive options. For many others, Anthem and Cigna are two of very few competitive

options. In each of the 35 relevant markets, Anthem and Cigna are close competitors. In each

market, Anthem has a substantial market share and competes using its well-known Blue brand

and low provider reimbursement rates. Cigna is able in some of these markets to compete with

Anthem on the basis of reimbursement rates. But even where its reimbursement rates are not as

attractive, Cigna competes vigorously with Anthem for large groups by offering exceptional customer service, innovative wellness programs that lower its members' utilization of healthcare, and provider-collaboration programs with hospitals and doctors. By contrast, many large-group employers believe that Anthem provides poor customer service and is far less innovative. Soon after the merger was announced, two prospective customers complained to Cigna: "We hate Anthem and you guys are about to become them."

46.     In company documents, Anthem has frequently viewed Cigna as a close competitor in these 35 markets:

- In 2015, Anthem's Georgia sales force described Cigna as "aggressive" and "our toughest competition in a number of situations."

- In 2014, an Anthem sales executive wrote, "Cigna continues to present a very strong clinical/care management story, coupled with a great deal of financial flexibility. They remain our number one competitor in the 1,000+ arena."

- In a 2015 strategy document for its New Hampshire business, Anthem stated that it "remains the dominant carrier in New Hampshire, with among the highest total market shares [of any region] in the company." Despite that dominance, one of its points of strategic focus for the large-group business was to "focus on Cigna groups."

- A 2014 presentation to investors noted that in Indiana, Anthem held "a 42% to 12% [market-share] advantage over our closest competitor (FYI—Cigna)."

47.     Cigna has similar views of Anthem in these same markets:

- In 2015, a Cigna executive referring to Maine, New Hampshire, and Connecticut wrote, "we have Anthem in 3 of the New England states. Over the past 4 years 40% of our new business growth has come from these Anthem plans. Those companies primarily chose Cigna, to move away from the Anthem service model, to reduce plan spend and to become more engaged consumers."

- In 2015, a Cigna executive in California estimated that "60% of our 1/1/16 regional pre sale opportunities are coming from Anthem."

48.     Cigna has been particularly effective in using its innovative wellness programs to compete with Anthem. For example, in September 2015, an Anthem sales account executive noted that Cigna was offering a large municipal account in New Hampshire up to $70,000 in wellness dollars, compared to Anthem's $6,000. In response, his boss replied, "What? That's absurd. What are their current admin rates?" Around that same time, Anthem learned that Cigna was competing hard for a bid in California by selling its care management and wellness programs. An Anthem executive complained to the broker handling the bid, asking: "Does [the client] realize we are going to own Cigna in about a year anyways?"

49.     Competition between Anthem and Cigna has also spurred innovation and led both companies to develop new products for large-group employers. For example, Cigna has expanded its popular "level funded" product. This product allows smaller large-group employers to pay fixed monthly installments with a chance to get money back at the end of year if claims costs fall below the anticipated level. A survey of brokers conducted by Anthem confirmed that "Cigna is the strongest competitor in this space" with "the most robust alternative funding options." Anthem further noted that, in California, Cigna was "[d]ominating the down-market ASO product sales, taking 31 clients from Anthem." To respond to Cigna, Anthem introduced its own similar product, which it made a strategic priority in California. In 2015, as Anthem rolled out several enhancements to that product, Cigna recognized that Anthem had "created a product that is a much greater threat."

50.     Anthem and Cigna also compete to offer customers value-based programs and provider collaborations. An Anthem executive explained that "since we tend to have the best overall discount position in the market…our competitors have a strong incentive to be more aggressive and flexible with their [value-based] programs than Anthem." Indeed, Cigna has been

particularly focused on investing time and resources in value-based arrangements as a way to gain share against Anthem and other larger competitors. Cigna's internal plans show that absent the merger it would continue to aggressively develop its provider collaborations. The proposed merger, however, would eliminate Cigna as a competitor against Anthem and significantly reduce the incentives of the combined Anthem–Cigna to develop these innovative and beneficial programs.

## VI.  THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION IN THE SALE OF HEALTH INSURANCE ON THE PUBLIC EXCHANGES

51.     Anthem and Cigna compete head to head in the sale of individual health insurance on the public exchanges. Anthem's CEO has testified that the company is "committed to expanding our presence in the exchange marketplace." Likewise, Cigna's CEO has testified that the company is "committed to the public exchanges" and is expanding into at least three new states next year. Anthem and Cigna are close competitors on the exchange in local areas in Colorado and Missouri. The proposed merger would eliminate that competition and the important benefits it offers for individuals and families seeking affordable health insurance.

## A.     The sale of health insurance on the public exchanges is a relevant product market.

52.     The sale of commercial health insurance on the public exchanges is a relevant product market and line of commerce under Section 7 of the Clayton Act. The majority of consumers who purchase individual health-insurance plans purchase them through the public exchanges. Through these exchanges, consumers can learn about their coverage options, compare health plans, and enroll in one. Financial assistance in the form of tax credits and cost-sharing reductions is available for many individuals and families who purchase through the public exchanges.

53.     Anthem, Cigna, and other insurers recognize individuals purchasing health insurance on the public exchanges as a separate group of customers. These customers have distinct characteristics, and insurers may offer them different provider networks and different sets of benefits than other customers. Insurers consider different factors when setting prices for the public exchanges, both because most consumers receive financial assistance and because insurers selling on public exchanges incur additional fees and costs, such as user fees and the cost of technology required to connect with the exchange platform.

54.     The sale of health insurance on the public exchanges satisfies the hypothetical monopolist test because consumers who use the exchanges have no reasonable substitutes that they could turn to in response to a small but significant and non-transitory increase in price. Individuals below certain income thresholds are eligible for tax credits and cost-sharing reductions, but only if they purchase their health insurance through a public exchange. Approximately 85 percent of consumers who purchase health insurance on the public exchanges receive some financial assistance. And purchasing healthcare directly from doctors and hospitals is prohibitively expensive for individuals and their families.

**B.     This merger would harm individuals and families in 22 relevant geographic markets.**

55.     Individuals may only enroll in exchange plans that have been approved for sale in their county. Therefore, competition in each county is limited to the insurers that have been approved to operate in that county, and individuals cannot practicably switch to a plan offered in another county. Likewise, the amount of any financial assistance is calculated based on the plans available to a consumer in their county. Each of the following counties is a relevant geographic market and section of the country under Section 7 of the Clayton Act:

(a) *Colorado:* Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Eagle, Jefferson, La Plata, Lake, Montezuma, and Summit counties; and

(b) *Missouri:* Franklin, Jefferson, Lincoln, Saint Charles, Saint Francois, Saint Louis, Saint Louis City, Sainte Genevieve, Warren, and Washington counties.

**C.      This merger is presumptively unlawful in each of the relevant geographic markets.**

**(1)      Colorado**

56.      Anthem and Cigna are the second- and third-largest insurers on the Colorado public exchange. Combined, they insure almost 55,000 lives—more than one-third of all enrollees on the exchange.

57.      In 12 counties in Colorado, in which more than 95,000 people rely on the public exchange for health insurance, the proposed merger is presumptively unlawful under Supreme Court precedent and the Merger Guidelines. Notably, current market concentration levels understate the competitive harm likely to result from the proposed merger because both Humana and UnitedHealthcare—the fourth- and fifth-largest insurers in the Denver area—have announced that they will not offer individual health-insurance plans in Colorado in 2017, leaving Kaiser as Anthem and Cigna's only significant competitor.

**(2)      Missouri**

58.      In the counties surrounding St. Louis, Cigna and Anthem are the second- and third-largest insurers on the public exchange. Combined, they insure over 81,000 lives on the Missouri public exchange—over 25 percent of all enrollees on the exchange.

59.      In 10 counties in Missouri, in which more than 112,000 people rely on the public exchanges for health insurance, the proposed merger is presumptively unlawful. As in Colorado, current market concentration levels understate the competitive harm likely to result from the proposed merger because UnitedHealthcare—the fourth-largest insurer on the exchange in the St.

Louis area—has announced that it will withdraw from the Missouri public exchange next year, leaving Aetna as Anthem and Cigna's only significant competitor.

**D.      This merger would harm individuals and families who buy health insurance on the public exchanges.**

60.      Anthem and Cigna compete head to head to sell insurance to individuals and families who use public exchanges. Anthem competes on public exchanges in all 14 states where it controls the Blue license. Cigna has begun expanding its sale of individual insurance by focusing first on certain markets, including the relevant counties. More than 200,000 people buy their health insurance on the public exchanges in these 22 counties. These consumers have benefited from Cigna's efforts to compete with Anthem; consumers in other markets would similarly benefit as Cigna follows through on its plans to aggressively expand in the next few years. The proposed merger harms these individuals and families who depend on competition to keep the price of their health insurance affordable.

61.      As with other types of commercial health insurance, Cigna competes effectively for enrollment from individuals and families through its innovative products and customer service, helping to offset Anthem's bargaining leverage with providers. For example, Cigna's approach in Colorado has been to "leverage the strength of its provider relationships" to "drive superior products & manage risk." In 2016, Cigna introduced two new provider networks in the Denver area that built on its relationships with doctors and hospitals to provide prices competitive with Anthem's. As a result, Cigna's market share increased substantially.

62.      In Missouri, Anthem planned to "dominate the [exchange] marketplace for a long time" by creating "a competitive advantage around network, pricing, marketing, and distribution." But since entering the Missouri public exchange in 2015, Cigna has been an

important competitive constraint on Anthem's dominance. Cigna considers its success in St. Louis a "success recipe" for future growth in other public-exchange markets across the country.

63.     Anthem and Cigna are likely to be even stronger competitors on the public exchanges in the future. Absent the merger, both companies would continue to compete on the public exchanges in Colorado and Missouri, as well as to grow their business on the public exchanges in other states. The proposed merger would eliminate that competition, to the detriment of individuals and their families that rely on health insurance purchased on the public exchanges. It likely would also lead to increases in the amount of financial assistance offered through the public exchanges, harming taxpayers as well.

## VII. THIS MERGER LIKELY WOULD SUBSTANTIALLY LESSEN COMPETITION FOR THE PURCHASE OF HEALTHCARE SERVICES

64.     Anthem and Cigna, like other commercial health insurers, compete to sign up doctors, hospitals, and other healthcare providers for their networks. Competition in this market is the mirror image of competition in the markets discussed above. Insurers compete by offering healthcare providers access to greater numbers of patients, more generous reimbursement terms, better service, and more innovative collaborations. The proposed merger will eliminate this competition between Anthem and Cigna and likely lead to lower reimbursement rates, less access to medical care, reduced quality, and fewer value-based provider collaborations.

### A.     The purchase of healthcare services by commercial health insurers is a relevant product market.

65.     The purchase of healthcare services by commercial health insurers is a relevant product market and line of commerce under Section 7 of the Clayton Act. Because healthcare providers in each relevant market face similar competitive conditions when selling services to

commercial insurers, it is appropriate to aggregate these services into a single relevant product market for analytical convenience.

66.     Anthem, Cigna, and other insurers view the purchase of healthcare services for commercial patients as a distinct line of business. They have separate business units for negotiating such purchases, employ staff dedicated to those negotiations, and develop provider-specific reimbursement strategies.

67.     This market satisfies the hypothetical monopsonist test (a "monopsonist" is a buyer that controls the purchases in a given market), the buyer-side counterpart to the hypothetical monopolist test. For doctors, hospitals, and other healthcare providers, there are no reasonable substitutes for the sale of their services to commercial health insurers. In response to a reduction in reimbursement rates from those insurers, few providers would be able to compensate for the loss of revenue by selling more services to government programs such as Medicare Advantage, Medicare, or Medicaid. Those government programs generally reimburse providers at far lower rates than do commercial health insurers, and it is difficult for providers to greatly increase the number of their Medicare Advantage, Medicare, or Medicaid patients because the total number of enrollees in those programs is relatively fixed. Most people also cannot afford to pay for many healthcare services directly, making direct sales to patients a poor substitute for sales to commercial health insurers. In response to a small but significant and non-transitory reduction in reimbursement rates, an insufficient number of providers would start selling their services to other purchasers to make that rate reduction unprofitable.

**B.      The relevant geographic markets for identifying harm to competition for the purchase of healthcare services are the same 35 markets in which large groups would be harmed.**

68.      The purchase of healthcare services by commercial health insurers in each of the 35 metropolitan areas identified in the map in paragraph 41 above satisfies the hypothetical monopsonist test and constitutes a relevant geographic market and section of the country under Section 7 of the Clayton Act. The markets for the purchase of these services are local because in the vast majority of cases patients seek care from doctors and hospitals in the same area where they live and work. In response to lower reimbursement rates by local insurers, very few healthcare providers would move their practice or facilities to a different metropolitan area.

**C.      This merger is presumptively unlawful in most of the relevant geographic markets.**

69.      The proposed merger would substantially increase concentration for the purchase of healthcare services by commercial health insurers in each of the relevant markets. In at least 25 of these markets, the merger is presumptively unlawful under Supreme Court precedent and the Merger Guidelines.

**D.      This merger would harm doctors, hospitals, and their patients by eliminating competition between Anthem and Cigna.**

70.      Anthem already has substantial bargaining leverage when negotiating with doctors and hospitals because it represents a large share of their commercial patients and revenue. As one Anthem executive put it: "[T]he more patients doctors and hospitals see from [an insurance] carrier, the more leverage that carrier has to negotiate the best arrangements in the market." Noting that in California more than half of consumers "have an Anthem logo on their ID card," the executive added: "I hope this data helps support the argument about the leverage we have in the market."

– 26 –

71.     The proposed merger would enhance Anthem's leverage—both over physician practices that receive "take-it-or-leave-it" terms (without any negotiation) and over hospitals and physician groups that individually negotiate their contracts and rates with Anthem. As a result of the merger, Anthem likely would reduce the rates that both types of providers earn by providing medical care to their patients.

72.     This reduction in reimbursement rates likely would lead to a reduction in consumers' access to medical care. For example, lower reimbursement rates likely would cause some physician practices to limit their hours of operation or reduce their staff. It may become more difficult to recruit new physicians to many of these markets. Other more experienced doctors may decide to retire early. This would exacerbate the shortage of certain doctors—such as those providing primary care—that plagues many of these markets.

73.     As Anthem has recognized, these rate reductions would not result from any additional efficiencies or potentially procompetitive volume discounts. Rather, as noted by Anthem's head of provider contracting, the rate reductions from this merger would be perceived by many providers as "an incremental discount with no corresponding incremental value (no new members)."

74.     The merger also likely would slow down the much-needed transition to value-based contracting. Historically, with its larger market share and lower reimbursement rates, Anthem has had fewer incentives to collaborate with providers. In many markets, it has acknowledged that it has lagged behind its competition—particularly Cigna, which it identified as "our closest competitor" for value-based contracts—and that providers view it as being "slow to respond, cumbersome, and not nimble." The merger would make that situation worse, eliminating Cigna and further reducing Anthem's incentives to enter into value-based contracts.

75.     The merger would also jeopardize Cigna's existing provider collaborations. Anthem plans to lower reimbursement rates by applying its generally lower rates to the Cigna membership it acquires, which would threaten Cigna's value-based contracts with doctors and hospitals. As Cigna's executive in charge of provider contracting testified, "if you're going to have mostly a discount-based discussion with the hospital, you're not going to have [] provider collaboration coming out of that discussion." Even Anthem recognizes this tension. One of its top executives alerted Anthem's CEO that the company may "have two, conflicting strategies— collaborate in new models on the one hand, and 'drop the hammer' on the other."

## VIII.   ABSENCE OF COUNTERVAILING FACTORS

76.     Entry of new commercial health insurers or expansion of existing commercial health insurers is unlikely to prevent or remedy the proposed merger's likely anticompetitive effects.

77.     The proposed merger would be unlikely to generate verifiable, merger-specific efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur. To the extent the merging parties anticipate cutting the reimbursement rates paid to doctors and hospitals for their services as a result of the merger, these reductions stem from a reduction in competition and may not be treated as efficiencies.

## IX.  THE DEFENDANTS HAVE NOT PROPOSED A REMEDY THAT WOULD FIX THE MERGER'S ANTICOMPETITIVE EFFECTS

78.     Restoring competition is the key to any effective antitrust remedy. The only acceptable remedy for an anticompetitive merger is one that completely resolves the competitive problems created by the merger. Proposed remedies including divestitures must give the buyer both the means and the incentive to effectively compete. Defendants bear the burden of showing

that any remedy they propose meets these standards. The Defendants have not proposed any remedy that would negate the anticompetitive effects of this merger.

## X.  VIOLATION ALLEGED

79.     The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

80.     The Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their citizens and the general economy of each of their states.

81.     The Defendants are engaged in, and their activities substantially affect, interstate commerce. Anthem and Cigna sell commercial health insurance to national accounts with a substantial number of employees located in several different states, and that insurance covers enrollees when they travel across state lines. Anthem and Cigna also purchase healthcare services in several different states, as well as healthcare products and services (such as pharmaceuticals) in interstate commerce.

82.     This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22. Anthem and Cigna both transact business in this district.

83.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

84.     The effect of the proposed merger, if approved, likely would be to lessen competition substantially, and to tend to create monopoly, in interstate trade and commerce in each of the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

85.     Among other things, the transaction would likely have the following effects:

(a)  eliminating significant present and future head-to-head competition between Anthem and Cigna in the relevant markets;

(b)  reducing competition generally in the relevant markets;

(c)  causing prices to rise for customers in the relevant markets;

(d)  causing reimbursements to drop for healthcare providers in the relevant markets;

(e)  causing a reduction in quality in the relevant markets; and

(f)  reducing competition over innovation and new product development.

## XI.  REQUEST FOR RELIEF

86.     Plaintiffs request:

(a)  that Anthem's proposed acquisition of Cigna be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)  that the Defendants be permanently enjoined and restrained from carrying out the planned acquisition or any other transaction that would combine the two companies;

(c)  that Plaintiffs be awarded their costs of this action, including attorneys' fees to Plaintiff States; and

(d)  that Plaintiffs be awarded such other relief as the Court may deem just and proper.

Dated: July 21, 2016

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**


_____
SONIA K. PFAFFENROTH (D.C. Bar #467946)
Deputy Assistant Attorney General

_____
PATRICIA A. BRINK
Director of Civil Enforcement

_____
ERIC MAHR (D.C. Bar #459350)
Director of Litigation

_____
PETER J. MUCCHETTI (D.C. Bar #463202)
Chief, Litigation I

_____
RYAN M. KANTOR
Assistant Chief, Litigation I

_____
SCOTT I. FITZGERALD
JESÚS M. ALVARADO-RIVERA
BRYSON L. BACHMAN (D.C. Bar #988125)
SHOBITHA BHAT
DANDO CELLINI
AARON COMENETZ (D.C. Bar #479572)
ALVIN H. CHU
BARRY L. CREECH (D.C. Bar #421070)
JENNIFER HANE
HENRY J. HAUSER
JON B. JACOBS (D.C. Bar #412249)
KATHLEEN KIERNAN (D.C. Bar #1003748)
LAUREN G.S. RIKER
NATALIE ROSENFELT
DEBORAH A. ROY (D.C. Bar #452573)
PETER SCHWINGLER
ADAM T. SEVERT
DAVID L. SNYDER
JULIE A. TENNEY

U.S. Department of Justice, Antitrust Division
Litigation I Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Phone: (202) 353-3863
Facsimile: (202) 307-5802
E-mail: scott.fitzgerald@usdoj.gov

Attorneys for the United States

**FOR PLAINTIFF STATE OF CALIFORNIA:**

KAMALA D. HARRIS
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
Supervising Deputy Attorney General

PAULA LAUREN GIBSON
PATRICIA L. NAGLER
Deputy Attorneys General

PAULA LAUREN GIBSON
Deputy Attorney General
California State Bar No. 100780
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-897-0014
Facsimile: 213-897-2801
E-mail: paula.gibson@doj.ca.gov

**FOR PLAINTIFF STATE OF COLORADO:**

CYNTHIA H. COFFMAN
Attorney General


DEVIN LAIHO
Senior Assistant Attorney General
Colorado Department of Law
Consumer Protection Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Phone: 720-508-6219
Facsimile: 720-508-6040
E-mail: devin.laiho@coag.gov

FOR PLAINTIFF STATE OF CONNECTICUT

GEORGE JEPSEN
Attorney General


_____
MICHAEL E. COLE
Chief, Antitrust and Government Program Fraud
Department
RACHEL O. DAVIS
Assistant Attorney General
CHRISTOPHER M. HADDAD
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033
Rachel.Davis@ct.gov

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE (D.C. Bar # 186585)
Deputy Attorney General
Public Interest Division

CATHERINE A. JACKSON (D.C. Bar # 1005415)
Assistant Attorney General
441 Fourth Street, N.W., Suite 630-South
Washington, DC  20001
Phone:  (202) 442-9864
Facsimile:  (202) 741-0655
Email:  catherine.jackson@dc.gov

**FOR PLAINTIFF STATE OF GEORGIA:**

SAMUEL S. OLENS
Attorney General

DANIEL WALSH
Georgia Bar No. 735040
Senior Assistant Attorney General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
Phone: 404-657-2204
Facsimile: 404-656-0677
E-mail: dwalsh@law.ga.gov

FOR PLAINTIFF STATE OF IOWA

THOMAS J. MILLER
Attorney General

LAYNE M. LINDEBAK
Assistant Attorney General

Iowa Department of Justice
Special Litigation Division
1305 East Walnut Street, 2nd Floor
Des Moines, Iowa 50319
Ph: 515-281-7054
Fax: 515-281-4902
Layne.Lindebak@iowa.gov

FOR PLAINTIFF STATE OF MAINE

JANET T. MILLS
Attorney General


CHRISTINA M. MOYLAN
Assistant Attorney General
Office of Maine Attorney General
Consumer Protection Division
6 State House Station
Augusta, ME 04333-0006
Ph: 207-626-8800
Fax: 207-624-7730
christina.moylan@maine.gov

**FOR PLAINTIFF STATE OF MARYLAND:**

BRIAN E. FROSH
Attorney General

ELLEN S. COOPER
Assistant Attorney General
Chief, Antitrust Division
200 Saint Paul Place
Baltimore, Maryland 21202
Phone: 410-576-6470
Facsimile: 410-576-7830
E-mail: ecooper@oag.state.md.us

**FOR PLAINTIFF STATE OF NEW HAMPSHIRE:**

JOSEPH A. FOSTER
Attorney General

ANN RICE
Deputy Attorney General
New Hampshire Department of Justice
33 Capitol Street
Concord, New Hampshire 03301
Phone: 603-271-1202
Facsimile: 603 271-2110
E-mail: ann.rice@doj.nh.gov

**FOR PLAINTIFF STATE OF NEW YORK:**

ERIC T. SCHNEIDERMAN
Attorney General

MANISHA M. SHETH
Executive Deputy Attorney General
Division of Economic Justice

ELINOR R. HOFFMANN
Deputy Chief, Antitrust Bureau

IRINA C. RODRIGUEZ
Assistant Attorney General
Antitrust Bureau
Office of the New York State Attorney General
120 Broadway
New York, New York 10271-0332
Telephone: (212) 416-8288
Facsimile: (212) 416-6015
E-mail: irina.rodriguez@ag.ny.gov

**FOR PLAINTIFF STATE OF TENNESSEE:**

HERBERT H. SLATERY III
Attorney General and Reporter

CYNTHIA KINSER
Deputy Attorney General

VICTOR J. DOMEN, JR.
Senior Counsel
ERIN MERRICK
Assistant Attorney General
Tennessee Attorney General's Office
500 Charlotte Avenue
Nashville, Tennessee  37202
Phone: 615-253-3327
Facsimile: 615-532-6951
E-mail: Vic.Domen@ag.tn.gov
         Cynthia.Kinser@ag.tn.gov
         Erin.Merrick@ag.tn.gov

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

MARK R. HERRING
Attorney General

CYNTHIA E. HUDSON
Chief Deputy Attorney General

RHODES B. RITENOUR
Deputy Attorney General
Civil Litigation Division

RICHARD S. SCHWEIKER, JR.
Senior Assistant Attorney General and Chief
Consumer Protection Section

SARAH OXENHAM ALLEN
Senior Assistant Attorney General and Unit Manager
Antitrust Unit
Consumer Protection Section
Virginia State Bar No. 33217
Phone: 804-786-6557
Facsimile: 804-786-0122
E-mail: SOAllen@oag.state.va.us


TYLER T. HENRY
Assistant Attorney General
Antitrust Unit
Consumer Protection Section
Virginia State Bar No. 87621
202 North 9th Street
Richmond, Virginia 23219
Phone: 804-692-0485
Facsimile: 804-786-0122
E-mail: THenry@oag.state.va.us