IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:16-cv-01493-ABJ |
| ANTHEM, INC. and CIGNA CORP., | ~~XXXXXXXXXXXXX~~ |
| | ~~XXXXXXXXXXXXXXXX~~ |
| *Defendants*. | **REDACTED** |

## ANTHEM'S POST-TRIAL PROPOSED FINDINGS OF FACT
## PHASE I: "NATIONAL ACCOUNTS"

**WHITE & CASE**LLP
701 Thirteenth Street, NW
Washington, DC 20005

1155 Avenue of the Americas
New York, New York 10036

ARNOLD & PORTER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

December 15, 2016

*Counsel for Anthem, Inc.*

REDACTED FOR PUBLIC FILING

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

I.   EXECUTIVE SUMMARY .................................................................................... 6

    A.   The Evidence Has Shown That The Product Markets Alleged Are Not Properly Defined ................................................................................................ 7

    B.   The Evidence Has Shown That The Geographic Markets Alleged Are Not Properly Defined ................................................................................................ 8

    C.   Plaintiffs' Market Share Calculations Are Flawed, And In Any Case Do Not Reflect The Competitive Dynamics Of The Industry ......................................... 9

    D.   The Evidence Established That There Will Not Be Any Substantial Lessening Of Competition ................................................................................................. 11

II.   THE PROPOSED MERGER AND PLAINTIFFS' CHALLENGE .................................. 13

    A.   The Parties ....................................................................................................... 13

    B.   Transaction Structure ...................................................................................... 14

    C.   Transaction Rationale ...................................................................................... 14

    D.   The Division's Investigation And This Lawsuit ................................................ 18

III.   NUMEROUS FIRM TYPES PROVIDE HEALTHCARE SOLUTIONS TO "NATIONAL ACCOUNTS" ................................................................................... 19

    A.   Employer-Provided Healthcare In The U.S. .................................................... 20

    B.   Employers Use Consultants To Identify And Select Competitive Healthcare Solutions That Best Match Employer Needs, Including Private Exchanges ......... 21

    C.   Employers May Obtain Healthcare Solutions From Insurance Carriers Through Single Carrier And Slice Arrangements ........................................................... 23

        1.   United ...................................................................................................... 26

        2.   Aetna ....................................................................................................... 27

        3.   The Individual Blue Cross Blue Shield Competitors ............................... 27

            a.   Blues Compete Directly With Other Blues .................................... 28

            b.   Anthem Competes With Blues In Non-Anthem States Using Non-Blue Brands Through Direct Daily Competition ................... 29

            c.   Anthem Competes with Other Blues Through Ceding ................. 30

        4.   ConnectiCare ........................................................................................... 31

REDACTED FOR PUBLIC FILING

|     | 5.  | EmblemHealth ................................................................. | 31 |
|     | 6.  | Harvard Pilgrim ............................................................. | 32 |
|     | 7.  | Humana ......................................................................... | 33 |
|     | 8.  | Minuteman Health ......................................................... | 34 |
|     | 9.  | MVP Health Care .......................................................... | 34 |
|     | 10. | Tufts Health Plan .......................................................... | 35 |
|     | 11. | Medical Mutual of Ohio................................................. | 36 |
|     | 12. | Centene/Health Net ....................................................... | 36 |

D.   Third-Party Administrators Compete For "National Account" Customers ...........36

|     | 1.  | CoreSource .................................................................... | 38 |
|     | 2.  | Imagine Health............................................................... | 38 |
|     | 3.  | AmeriBen ...................................................................... | 39 |
|     | 4.  | Collective Health .......................................................... | 40 |
|     | 5.  | Health Plans, Inc. ......................................................... | 40 |
|     | 6.  | HealthSCOPE Benefits ................................................. | 41 |
|     | 7.  | HealthSmart .................................................................. | 42 |
|     | 8.  | Key Benefit Administrators, Inc. (KBA).................... | 42 |
|     | 9.  | Meritain Health ............................................................. | 43 |
|     | 10. | United Medical Resources, Inc. (UMR) ...................... | 44 |

E.   Healthcare Providers Have Launched Their Own Health Plans To Disintermediate "Traditional" Insurance Companies ...........................................44

|     | 1.  | Innovation Health.......................................................... | 45 |
|     | 2.  | Kaiser ............................................................................ | 45 |
|     | 3.  | Optima (Sentara) Health ............................................... | 46 |
|     | 4.  | Sutter Health ................................................................. | 47 |
|     | 5.  | Tufts Health Freedom Plan ........................................... | 48 |

F.   Rental Networks Are Available To Expand The Reach Of Entities Lacking A Proprietary Provider Network...........................................................................48

|     | 1.  | MultiPlan, Inc. .............................................................. | 49 |

2. Cofinity .................................................................. 50

3. First Choice ............................................................ 51

G. "National Accounts" Can Exercise Self-Help By Direct Contracting .................. 51

H. Specialty Competitors Also Serve Large Employers And "National Accounts" Customers ............................................................................. 53

1. Accolade ................................................................ 53

2. Castlight ............................................................... 53

3. Quantum ................................................................ 54

I. "National Accounts" Customers Take Advantage Of The Varied, Numerous Solutions Available .............................................................. 54

IV. PLAINTIFFS' ALLEGED "NATIONAL ACCOUNTS" PRODUCT MARKET FAILS ...................................................................................... 56

A. Plaintiffs' "National Accounts" Allegations Are Inconsistent ...................... 56

B. Professor Dranove Failed To Conduct An Appropriate SSNIP Test Or Any Analysis To Quantify The Extent Of Substitution In The Relevant Market ........ 58

C. There Is No Separate "National Accounts" Product Market Because There Is Reasonable Interchangeability .................................................. 59

D. Dr. Fowdur's Critical Loss Analysis Demonstrates That A Competitive Option Need Only Be Able To Serve 9.2% Of The Employees Of A "National Account" To Impose Competitive Discipline ...................................... 60

E. "National Accounts" Are Sensitive To Price Changes And Able To Switch Payors ........................................................................... 62

F. Plaintiffs' Numeric Threshold For "National Accounts" Fails To Identify Customers That Have Unique Or Peculiar Characteristics Relevant To Their Choice of Healthcare Solutions .................................................. 63

1. "National Accounts" Do Not Have Unique Provider Network Needs ..... 64

2. "National Accounts" Do Not Undertake A Unique Or Peculiar Vendor Selection Process ................................................. 65

3. "National Accounts" Do Not Require Unique Vendor Capabilities Or Specialized Vendors ............................................... 66

G. There Is No Industry-Recognized Definition Of "National Accounts" ................ 68

H. "National Accounts" Do Not Have Distinct Pricing .............................. 71

REDACTED FOR PUBLIC FILING

V.    PLAINTIFFS' ALLEGED "NATIONAL ACCOUNTS" GEOGRAPHIC MARKET
      DEFINITIONS FAIL ................................................................................... 73

      A.    Plaintiffs' 14-State Geographic Market Is Inappropriately Gerrymandered
            Based On Only A Single Common Condition — Anthem's Presence ................. 73

      B.    Plaintiffs' 50-State Geographic Market Takes No Account Of Widely Varying
            Regional Competitive Differences ........................................................ 75

VI.   PLAINTIFFS' MARKET SHARE CALCULATIONS ARE UNRELIABLE AND
      NOT APPROPRIATE TO ASSESS THIS MERGER ...................................... 75

      A.    Market Share Concentrations Are Inappropriate Tools To Measure Industries
            Comprising Differentiated Products ...................................................... 77

      B.    Prof. Dranove's Market Share Calculations Are The Result Of Misleading
            Methodologies And Insufficient Data .................................................... 79

            1.    Prof. Dranove's Denominator "Plug" For Slicing Discredits Its
                  Previously Identified Market Shares .......................................... 80

            2.    Attributing Members Of Other Blues To Anthem Overstates Anthem's
                  Competitive Significance ......................................................... 81

            3.    The "Build-up Approach" Improperly Excludes Market Participants
                  From Total Market Size ........................................................... 84

            4.    The "Census" Denominator Method Used Unreliable Inferences To
                  Estimate Market Size .............................................................. 86

VII.  MERGER-SPECIFIC EFFICIENCIES WILL GENERATE COST SAVINGS THAT
      SWAMP ANY ALLEGED ANTICOMPETITIVE EFFECTS ......................... 86

      A.    The Efficiencies Will Lead Directly To Consumer Savings Through Medical
            Cost Savings ...................................................................................... 86

            1.    Plaintiffs Admit That Substantial Medical Cost Savings Will Result
                  From The Merger .................................................................... 86

            2.    Industry Participants Recognize That Self-Insured Or ASO Customers
                  Directly Save When Discount Rates Are Lowered .......................... 86

            3.    Medical Cost Savings From The Merger Will Be Passed-Through To
                  Consumers ............................................................................. 87

            4.    Increased Patient Volume Drives Improved Discount Rates ............. 88

            5.    Dr. Israel's Best-of-Best Model Conservatively Finds That $2.4 Billion
                  In Medical Cost Savings Will Flow To The New Company's
                  Customers .............................................................................. 89

            6.    Discounts Are The Relevant Metric To Compare Prices .................. 93

iv

B.   The Anthem And Cigna Joint Integration Planning Team Identified Between $2.6 And $3.3 Billion In Medical Cost Savings And Between $2.2 And $2.4 Billion In G&A Savings.................................................................94

   1.   The Objectives Of Integration Planning Have Been To Lower Costs And Maximize Product Choice For Customers .........................................94

   2.   The Integration Planning And Synergies Calculation Work Was Robust With Extensive Involvement By Both Companies ......................................95

   3.   The Anthem and Cigna Joint Integration Planning Team Separately Calculated Medical And Network Savings Of $2.6 To $3.3 Billion ........97

   4.   G&A Cost Savings Amount To $2.36 Billion .............................................100

   5.   Anthem Has Developed Near-Term And Long-Term Go-To-Market Plans For Membership Growth Post-Close.............................................101

   6.   Anthem Plans To Accelerate Value-Based Collaborations ....................103

   7.   Anthem Is Ready To Begin Capturing Cost Savings Day 1 Post-Close. 104

   8.   The Medical Cost Savings, G&A Cost Savings And Membership Growth Synergies Are Merger-Specific ..................................................105

C.   Alleged Discord Between The Parties Will Not Stop The Efficiencies From Being Realized .........................................................................................106

D.   Merger Efficiencies Do Not Demonstrate Monopsony Power ............................108

   1.   Reimbursement Rates Will Remain Substantially Higher Than The Cost of Care And Output Will Not Be Reduced......................................109

   2.   The Merger Will Not Reduce Output .......................................................109

   3.   The Merger Will Yield Only A Small Reduction In Provider Revenue. 112

VIII.   THE MERGER WILL NOT ADVERSELY AFFECT COMPETITION .......................112

A.   There Is No Evidence Of Possible "Enhanced Coordination" Post-Merger And Cigna Will Continue To Compete (Coordinated Interaction)..............................112

   1.   Cigna Will Continue To Compete Against The Blue Licensees ............113

   2.   The National "Best Efforts" Rule Will Not Constrain Growth Or Competition Post-Merger.......................................................................114

   3.   BlueCard Will Not Diminish Anthem's Incentive To Compete As Cigna In The Anthem Non-Blue Service Areas ....................................117

B.   There Is No Evidence That The Merged Company Will Profitably Raise Prices (Unilateral Effects)...............................................................................119

REDACTED FOR PUBLIC FILING

1. Anthem And Cigna Are Not Considered Next Best Substitutes............. 120

2. Economic Analysis Shows No Anticompetitive Effects ........................ 123

    a. Diversion Ratios And Econometric Analyses Show That Anthem And Cigna Are Not Close Competitors ........................ 123

    b. Merger Simulation Models Demonstrate That The Merger Will Not Result In Anticompetitive Effects......................................... 125

    c. Even Using Professor Dranove's Faulty Assumptions, His Merger Simulation Shows That The Merger Is Procompetitive. 127

3. Market Features Restrain Anticompetitive Pricing................................ 128

    a. "National Accounts" Are Sophisticated Power Buyers And Have The Ability To Disintermediate Insurers........................... 128

    b. The Credible Threat Of Disintermediation And Slicing Prevents Selective Targeting Of "National Accounts" For Price Increases 130

    c. Private Exchanges Offer Employers Additional Solutions And Would Constrain The Merged Firm From Raising Prices .......... 131

C. Barriers to Entry are Low ................................................................................134

1. Significant, Recent Entry By Provider-Sponsored Plans, TPAs, Smaller Insurers, And Other Firms ..................................................... 135

2. Legal And Regulatory Requirements To Serve ASO Customers Are Minimal......................................................................................... 138

3. Provider Networks Can Be Rented Or Created Quickly ........................ 139

4. Partnerships With Providers Of Specialty Services Facilitate Entry ...... 141

5. Consultants And Brokers Facilitate Entry Directly As Intermediaries On Behalf Of Their Clients And By Operating Private Exchanges........ 142

IX. INNOVATION WILL BE ENHANCED BY THE MERGER .......................................143

A. Anthem Is A Successful Innovator ....................................................................144

B. Anthem Will Have Every Incentive To Continue Innovating Post Merger.........147

C. Industry-Wide Trends Support Continued Innovation .........................................147

1. The Shift To Value-Based Care And Provider Collaborations Is An Industry-Wide Trend Leading To Increased Competition...................... 147

2. Innovative Programs Are Offered By A Wide Variety Of Insurers, TPAs, And Other Vendors...................................................................... 148

D. There Is Nothing Uniquely Innovative About Cigna...........................................150

## INTRODUCTION

Anthem offers the following additional proposed findings to address a question that was raised during Prof. Dranove's rebuttal testimony, and then during the closing argument session: the merger-specificity of the projected medical cost savings.

1.     The key feature of the efficiencies, as quantified by Dr. Israel and used in his merger simulation, is an *improvement in the product offered by Cigna* (and to a lesser degree Anthem) due to reduced medical costs. Israel Tr. 1873:18-24 (emphasis added). Due to these lower medical costs — which pass through directly to ASO buyers — Cigna's (and sometimes Anthem's) offerings will become stronger competitive options for buyers and thus more effective competitors in the market. *Id.* at 1839:24-1840:2. Dr. Israel quantified the size of the savings using a conservative best-of-best approach. *Id.* at 1852:19-1854:1.

2.     Efficiencies are merger-specific if, "for a given quantity and quality of product," they are "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects." Merger Guidelines § 10; Conclusions of Law, ¶ 65. While increased volume provided to suppliers can be a merger-specific efficiency, there is no requirement in the Merger Guidelines that efficiencies add volume. Indeed, the Merger Guidelines recognize that a "primary benefit" of merger efficiencies is to enhance competition "*by combining complementary assets,*" and to bring about "*lower prices, improved quality, enhanced service, or new products.*" Merger Guidelines § 10 (emphasis added); Conclusions of Law, ¶¶ 60, 65.

3.     The Court raised the question of whether the efficiencies can be achieved absent the merger by customers switching to the payor with the better discounts. Trial Tr. 2681:10-18. Given that the efficiencies derive from new, improved product offerings by Anthem and Cigna, the answer is clearly no. Israel Tr. 1871:21-1872:2. More generally, the ability to switch

1

between Cigna and Anthem as they exist today does not replicate the competitive benefit of the creation of improved post-merger Cigna and Anthem products, as those improved products cannot be purchased by *any* customers today. *Id.* at 1838:15-23. The new products will be made possible by the merger, a result that neither party could achieve alone.

4.      The heart of the improved Cigna product offering created by the merger is a coupling of improved provider discounts with the features that make Cigna's current offerings unique. Israel Tr. 1841:1-17; Cordani (Cigna) Tr. 511:8-19 (merger benefits include offering Anthem customers Cigna's "high-performing" specialty products). While Plaintiffs have attempted to paint Cigna's advantages today as primarily provider-focused, much of what makes Cigna's offerings unique today are *customer-facing* features, such as wellness programs, specialty products, and international products. *See, e.g.*, Cordani (Cigna) Tr. 390:23-391:2 (Cigna business is oriented around customer centricity in terms of clinical and service programs); Israel Tr. 1947:24-1948:2 ("Cigna has some unique and differentiated offerings, mostly on its own customer facing side"); *see also, e.g.*, DeVeydt (Anthem) Tr. 1689:3-13; Mathai (Anthem) Tr. 1259:9-13. Critically, these features are *independent of Cigna's discounts* or other *provider-facing* features. Such customer-facing programs are in no way affected by changes in the terms of Cigna's provider contracts following the merger. Indeed, as the Court has heard, Anthem intends to preserve these customer-facing programs. Israel Tr. 2109:17-2110:2; DeVeydt (former Anthem) Tr. 1697:16-24. The attributes of the product are not dependent on whether they are branded Blue or Cigna post-merger.

5.      The Court asked whether merger-specificity required that the benefit be one that "either firm couldn't have achieved." Trial Tr. 2681:23-25. First, the DOJ itself withdrew the "either firm" language from its Merger Guidelines. *Compare* 1997 Merger Guidelines at § 4

(containing language) *with* 2010 Merger Guidelines at § 10 (focusing on "efficiencies *likely to be accomplished with the proposed merger* and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects.") (emphasis added). Second, even assuming an "either firm" requirement, *neither Cigna nor Anthem today* could achieve the full best-of-best savings because some of the savings arise from Cigna moving to Anthem's rates, but others arise from Anthem moving to Cigna's rates. As to Cigna, there is no dispute that it has generally secured less favorable provider rates than Anthem for years and has been unable to close that gap despite its best efforts. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ; *see also* Israel Tr. 1836:1, 1862:7-15 (discussing DX0714), 1871:21-1872:2. The merger will allow *Cigna* access to Anthem rates that it has not been able to achieve alone: a clear merger-specific benefit. As a result of the merger, customers who were interested in Cigna offerings but did not choose Cigna due to its poor discount position will, for the first time, have the option to switch to a Cigna product with good discounts. And Cigna customers who do not wish to switch will be able to remain with Cigna and enjoy lower medical costs. Neither of these consumer benefits can exist without the merger. As to Anthem, there is no evidence that it could secure better discounts than Cigna in those instances where Cigna has the discount advantage.

6. Nor is there any question that the *combined company*, acting as purchasing agent for its customers, will bring additional volume to the negotiating table, beyond that which Anthem or Cigna could deliver alone, to the benefit of those customers. *See* Dranove Tr. 2448:20-2449:13. The fact that many providers have separate contracts with Anthem and Cigna today does not change the analysis — the classic conception of a procompetitive group purchasing arrangement is to *combine* the volume of smaller purchasers to secure savings. *See,*

*e.g.*, DOJ and FTC Statements of Antitrust Enforcement Policy in Health Care, at Statement 7 (1996) (joint purchasing arrangements allow parties to achieve volume-based efficiencies). Plaintiffs admit that such a volume-based discount is a procompetitive efficiency.  Trial Tr. 2639:16-25 (quoting Plaintiffs' Conclusions of Law to say "[P]urchasing efficiencies can be procompetitive and not the result of market power where they result from economies of scale that benefit the seller.  For instance, if the merged firm . . . can take advantage of volume-based discounts . . . .");  *see also* Israel Tr. 1848:10-13 ("If you split out the volume into separate buckets, nobody's able to really capture the value of that volume.  If you buy in bulk and bring it together, you're able to get better pricing.").  And Dr. Israel's approach is conservative given that a larger firm is expected to obtain even lower rates. Israel 1854:19-1855:16; Compl. ¶ 71.

7.      Improved provider discounts will not undermine Cigna's collaborative care relationships with providers.  Israel Tr. 1875:21-1876:6.  Although Plaintiffs point to the use of affiliate clauses as undermining Cigna's provider collaborations (Trial Tr. 2644:12-17), Dr. Israel's medical cost savings do not depend on use of the affiliate clause; they are based on the economics of what will happen at the time of renegotiation and the fact that provider contracts are renegotiated frequently.  Drozdowski (Anthem) Tr. 1661:24-25 ("One-third of our hospital agreements are renegotiated every year"), 1659:4-1660:7.  At that time, the parties can renegotiate the relevant Anthem or Cigna provider contract with the combined Anthem and Cigna volume to obtain the best provider discounts, and the best of Cigna's value based care programs.  Israel Tr. 1948:3-13.  There was considerable testimony, including from Mr. Cordani, agreeing that increased patient "density" fuels the value of collaboration.  Cordani (Cigna) Tr. 514:12-515:15; Drozdowski (Anthem) Tr. 1675:17-1676:11; Israel Tr. 1881:11-1882:7.

8.      During closings, Plaintiffs framed this issue by partially quoting Dr. Israel:

4

The core antitrust logic of differentiated products is that customers have revealed that they like things about each of these firms. So it's true that even in areas where Cigna has the worse discounts, some customers have revealed that they like Cigna. Cigna offers them things that are attractive to them. Trial Tr. 2715:5-10 (quoting Israel Tr. 1838:9-15).

But, Plaintiffs selectively ignored Dr. Israel's subsequent testimony where he explained:

> **It's still better for those customers, if they can also get those same thing at a lower price, too, lower costs, right? I mean, that's a procompetitive move.** There, certainly, are customers who are probably on the margin, who maybe they like the Anthem discounts; they also like some of the Cigna offerings. By bringing those things together, that creates an offering that isn't in the marketplace today. **That's a product that doesn't exist today, is Cigna's offerings with Anthem's discounts.** I mean, the same goes in the reverse, to some degree, Anthem's offerings with improved discounts and improved network where it can. But I think that if I was going to summarize my analysis of the merger, it would be on the one hand, you're mostly making a stronger Cigna by giving it better costs; somewhat also making a stronger Anthem. By combining these costs and offerings, they each have -- you're improving the quality of what each firm is able to offer. Israel Tr. 1838:15-1839:7 (emphasis added).

9.      In fact, Plaintiffs admit that the medical cost savings will be obtained *as a result of the merger*. Compl. ¶ 71 ("*As a result of the merger*, Anthem likely would reduce the rates that both types of providers earn by providing medical care to their patients") (emphasis added); Dranove Tr. 2449:14-19 ("Q. [The evidence] also indicates that *the merger will result* in lower provider rates . . . correct? A. Yes.") (emphasis added). Moreover, Plaintiffs' entire monopsony allegation is premised on the merger causing lower provider rates. Compl. ¶¶ 64-75. Thus, Plaintiffs' own admissions conclusively establish the merger-specificity of lower provider rates.

10.      Any contentiousness between the parties does not undermine the merger-specificity of the medical cost savings or the probability that they will be realized. As Dr. Israel explained, medical cost savings are not subject to harmonization of cultures, but rather arise from standard economic principles. Israel Tr. 1872:25-1873:18; Drozdowski (Anthem) Tr. 1672:10-1674:15. Executives of the combined company will also have a fiduciary duty to negotiate the best possible deals with providers and bring the best customer-facing products to market.

## I.    EXECUTIVE SUMMARY

11.    In this action, the Antitrust Division of the U.S. Department of Justice and certain State AGs seek to enjoin a merger that they acknowledge will lower healthcare costs directly for hundreds of large employers and millions of Americans.  Two weeks of trial, supplemented by other evidence in the record, have shown that this effort is misguided.

12.    Despite having had over a year to investigate the proposed merger, and despite the broad investigatory powers under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act, Plaintiffs failed to present reliable, empirical evidence to support the delineation of their alleged "national accounts" product and geographical markets or to show undue concentration in these markets.  Indeed, Plaintiffs' economic work was shown to be rudimentary and outcome-driven.

13.    Plaintiffs did not call a single customer or provider witness at trial to testify to the effects the merger will allegedly have on their business.  And Plaintiffs' ballyhooed customer witness deposition testimony came from a customer (Applied Industrial Technologies) that is not even considered a "national account" by its insurer, demonstrating that even Plaintiffs cannot tell whether a customer is a "national account" or not.

14.    At closing, in the face of Defendants' critical loss evidence, Plaintiffs revealed the narrowness of their case — Plaintiffs explained that: "we're not putting forth a case that says Anthem and Cigna will raise prices across-the-board.  We're saying the outcomes of specific RFPs will be impacted in cases where Anthem and Cigna are, particularly, close competitors." Trial Tr. 2709:9-15.  Plaintiffs have seemingly moved away from their expert's total-market-harm contentions and now seem to contend that harm occurs only when Anthem and Cigna are closest competitors.  When Plaintiff's expert sought to identify such situations, he only found *sixty-two* instances in the 14-State market over the past seven years (2011-2017), or roughly nine per year, even after attributing all the Blues in Cigna's data to Anthem.  *See*

6

Dranove Tr. 951:19-955:2 (discussing PDX005 at 46-47 citing, and relying upon, the 62 RFPs identified as wins or losses to Anthem or Cigna in the top lines of Exs. G-2 (DDX0018), G-4 (DDX00019), G-6 (DDX0009), and G-8 (DDX0010) of Prof. Dranove's Opening Report), *see also* 2411:14-2416:20 (interpreting the total number of RFPs and discussing DDX164).  Unless Prof. Dranove ignored numerous instances of competition between Anthem and Cigna (meaning his diversion ratios are unreliable), this means that on average, each year, *only nine* "national accounts" in the 14-State market, the most sophisticated companies in America, would be affected by Plaintiffs' alleged harm.

15.     Plaintiffs failed to carry their burden to establish a *prima facie* case under *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).  The evidence adduced at trial has shown that Plaintiffs' so-called "national account" market is in fact competitive, and the proposed merger will not substantially lessen competition.

## A.     The Evidence Has Shown That The Product Markets Alleged Are Not Properly Defined

16.     The evidence at trial showed that "[t]he sale of commercial health insurance to national accounts" (Compl. ¶ 20) is not a relevant product market.  Plaintiffs' alleged market does not reflect how customers purchase solutions for their healthcare needs.

17.     While various insurers use the term "national accounts" to refer to certain of their large corporate customers, the meaning of the term varies widely in the industry, changes over time within certain companies, describes accounts that are far from national in scope, and is, in any event, only a malleable guideline.

18.     Plaintiffs posited two alternative "national account" product markets of 5,000+ employees, one with a multistate geographical component and one without.  Plaintiffs, however, failed to provide any sound basis for the 5,000+ threshold beyond analytical convenience.

19.     The term "national accounts" is itself a misnomer because it suggests that employers' members are dispersed across a broad geography.   The evidence, however, demonstrates that most "national account" customers have the vast majority of their enrollees in just a few states and therefore do not need broad, geographically dispersed provider networks.

20.     The fact that customers often are dispersed in only a few states explains why slicing is prevalent.   Customers can choose from a variety of national or regional carriers to provide health insurance for their employees outside their headquarter state.   Additionally, slices of a customer's health insurance business can and regularly do go to smaller firms and new entrants that can build or rent a network of providers to replace services provided by Anthem and Cigna without covering all fifty states.   Plaintiffs thus failed to properly account for a wide range of local competitors that constrain pricing for large, multi-state customers and failed to prove the existence of a robust "national account" product market.

**B.     The Evidence Has Shown That The Geographic Markets Alleged Are Not Properly Defined**

21.     Plaintiffs' geographic markets are similarly arbitrary and without any empirical basis.   Competitive conditions vary significantly across both the proposed 14- and 50-state geographic markets.   There are different regional carriers throughout the fourteen Anthem states that account for a significant amount of share; therefore, Plaintiffs cannot aggregate the competitive conditions in the 14-state market.   The 14-state market further fails to reflect the competitive conditions in the thirty-six other states where the typical large corporate customer that is headquartered in the Anthem footprint has thirty to fifty percent of its employees.

22.     With respect to Plaintiffs' 50-state geographic market, the competitive effects of the merger are completely different in the fourteen Anthem states — where Anthem and Cigna currently compete — as compared to the remaining thirty-six states — where they do not.   Since

8

the fourteen Anthem states and the remaining thirty-six states are distinct geographic markets, they need to be analyzed separately, and a 50-state market combining the two is inappropriate.

23.     Furthermore, Plaintiffs' economist failed to conduct any quantitative analysis to test either of Plaintiffs' proposed markets.

### C.     Plaintiffs' Market Share Calculations Are Flawed, And In Any Case Do Not Reflect The Competitive Dynamics Of The Industry

24.     The evidence at trial demonstrated that Plaintiffs failed to substantiate their market-concentration calculations.  First, Plaintiffs collected data from only twenty-six insurance carriers.  Inexplicably excluded were prominent insurers like Emblem (New York State's largest insurer), MVP Health Care (an insurer covering ███████████████ ), numerous other insurance carriers, and all third-party administrators (TPAs).  Then, in five out of six calculations of market share concentration, Plaintiffs included the covered lives of only the twenty-six carriers that provided data to Plaintiffs.  In essence, Plaintiffs created a fictional twenty-six-firm market and determined the market shares of that market, instead of the "national accounts" market purportedly analyzed.  In the sixth calculation, Plaintiffs relied upon a census survey result to determine the size of the market, but reliance upon that survey was plainly unwarranted — in most cases the survey had shown a market even smaller than Plaintiffs' 26-firm market, thereby exposing the survey as profoundly understating the market.  Plaintiffs not only used the flawed survey for one of their market-concentration calculations, but also used it as a "robustness" check on their 26-firm market.

25.     Plaintiffs' failure to include the full range of market participants yielded inflated market share and Herfindahl-Hirschman Index (HHI) calculations that do not reflect the level of competition in this industry.  Plaintiffs' expert admitted this error when he submitted a sur-rebuttal report the day before trial began that acknowledged that his market share concentrations

9

"fail to pick up the smaller slice" insurers. Despite this error, Plaintiffs' expert presented his original, plainly unreliable market shares during Plaintiffs' case-in-chief and only acknowledged his mistake after Defendants' presentation of rebuttal evidence. Plaintiffs' "new" market shares, however, suffer from all the flaws of the old ones, including the additional flaw that Plaintiffs calculated HHIs for only Anthem and Cigna, and not the entire market, as required. Moreover, these "new" calculations are based on an Anthem document of questionable reliability that Plaintiffs' expert conceded fails to capture all slicing.

26.     Beyond understating the market-size denominator, Plaintiffs also overstated the numerator by combining Anthem with various other members of the Blue Cross and Blue Shield Association (BCBSA or "the Blues") across the country, as though they were a single economic entity. Anthem and other members of the BCBSA are not a single competitive entity; they are independent firms and as the evidence at trial demonstrated, they even compete amongst themselves. Plaintiffs' calculations improperly treated Anthem and other members of the BCBSA as one competitor, which improperly inflated their market concentration calculations.

27.     Plaintiffs' economist never disclosed any Anthem-only market share in his reports or direct testimony; only on cross examination did he acknowledge an Anthem-only market share, buried in his backup data, which fails to trigger the Merger Guidelines thresholds.

28.     Beyond yielding deeply flawed and skewed market-share information, Plaintiffs' investigatory data-gathering also obscured the prevalence of slicing. Plaintiffs gathered customer-identity information only from certain insurers, such that slicing customers could be discerned only among a subset of insurers. Slicing by customers using other insurers — the remainder of the twenty-six data providers as well as those from whom no data was collected — was hidden from view.

REDACTED FOR PUBLIC FILING

**D.     The Evidence Established That There Will Not Be Any Substantial Lessening Of Competition**

29.     As to the competitive effects of the merger, the evidence at trial established that there will not be any substantial lessening of competition.  Plaintiffs made no serious effort to show increased likelihood of coordination.  This is unsurprising given the differentiation of products and customers, unique pricing, and the prevalence of confidential requests for quotations.

30.     As to unilateral effects, Cigna was shown not to be Anthem's closest competitor.  United plainly is.  Just as Cigna's closest competitor is Aetna.  The loss of head-to-head competition between the two merging parties will not materially reduce competition.  And the sophistication of the customers — America's largest corporations — will help ensure competitive pricing.  These customers have a multitude of competitive alternatives — insurance carriers, private exchanges, TPAs, provider-sponsored plans (PSPs), direct contracting, etc. — and they are resourceful, motivated, and well advised by informed consultants.  Ease of entry, expansion, and repositioning will serve as a further check on any anti-competitive effects.

31.     In contrast to Plaintiffs' weak empirical evidence, Anthem presented robust, empirical evidence supporting its claimed efficiencies.  Dr. Israel presented a detailed claim-by-claim analysis that was verified by parallel, but separate, work by the merging companies' integration team, assisted by the consulting firm, McKinsey.  This exhaustive analysis shows $2.4 billion of medical cost savings.  The existence of network cost-savings is not disputed, as it forms the basis of Plaintiffs' monopsony claim.  Large employers will directly benefit from these lower costs that will flow directly to customers under Administrative Services Only (ASO) contracts.  The medical-network efficiencies will be supplemented by variable-cost savings of $515 million, which Dr. Israel also showed to be verifiable and merger specific.  The cognizable

11

efficiencies easily exceed any upward pricing pressure, such that the net effect of the merger is likely to be lower healthcare costs.

32.     Plaintiffs focused much of their attention at trial not on the core economic issues, but on side issues, namely (i) recent contentiousness between top management of the merging companies and (ii) Anthem's membership in the Blue Cross Blue Shield Association.   Neither side issue is substantial.

33.     The evidence at trial established that the rift between the CEOs will not impede the ability of the merged entity to realize the efficiencies.   The evidence established that much of the important and customary pre-closing integration work was successfully completed by June 2016 after hundreds of meetings between the Anthem and Cigna integration teams — teams that worked well together.   Moreover, the medical cost savings will be the natural result of routine negotiations with providers that will take place regardless of whether there is complete harmony at the highest level.

34.     Likewise, the evidence established that membership in the BCBSA will not impede the procompetitive aspects of the merger.   Anthem will have the ability and incentive to compete aggressively using the Cigna network outside the fourteen Anthem states.   Anthem presented credible evidence that it can comply with the "best efforts" rule, while growing Cigna. And once Anthem is in compliance with the "best efforts" rule, growth across the Blue and Cigna brands will keep it in compliance.   The evidence showed that Cigna's overall commercial business has been flat in recent years and that its "national accounts" business has declined.   The merger increases the possibility that this business can, and will, grow as the Cigna brand.

35.     All told, the evidence at trial established that a merger between Anthem and Cigna is likely to be procompetitive and lead to reduced healthcare costs for employers and

REDACTED FOR PUBLIC FILING

employees.  The two companies have complementary strengths, and their combination is likely to produce a strong competitor that will drive lower pricing.

## II.    THE PROPOSED MERGER AND PLAINTIFFS' CHALLENGE

### A.    The Parties

36.    Anthem is a health benefits company based in Indianapolis, Indiana.  PX0125 at 1, 3.  Through its subsidiaries, Anthem offers a broad spectrum of medical healthcare benefits to a variety of customers including individuals, large and small employers, and Medicaid and Medicare enrollees, among others.  PX0701 at 78.  Anthem is a member of the BCBSA, an association of thirty-six independent health benefits plans, and operates as a Blue Cross and/or Blue Shield (BCBS) licensee in all or parts of fourteen U.S. states: California (Blue Cross license only), Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding thirty counties in western Missouri), Nevada, New Hampshire, New York (excluding certain areas), Ohio, Virginia (excluding certain areas near Washington, D.C.), and Wisconsin.  *Id.*  Anthem also competes as a non-Blue branded entity in a number of additional states, under such brands as Amerigroup, Simply Healthcare, CareMore, and others.  PX0125 at 5.  In every state in which it operates as a BCBS licensee, Anthem offers individual products on and off the public exchange, and offers commercial products to large and small group customers.  *Id.* at 9.

37.    Cigna is a health services company based in Bloomfield, Connecticut.  PX0701 at 16-17.  Cigna offers products and services to customers, including large employers, in all fifty states and the District of Columbia.  PX0284 at 4.  Cigna also offers international health benefits to employers and operates in more than thirty countries around the world.  *Id.* at 8; DX0333 at 6.  Cigna offers several specialty products and services, including behavioral health, dental, and vision.  *See* PX0284 at 3.  Cigna's medical products and services cover approximately thirteen million commercial members in the United States.  Cigna Answer ¶ 11.  Cigna's ▮▮▮▮▮▮▮

"███████████████████████████████" Manders (Cigna)

Dep. 99:21-23; Israel Tr. 2030:13-14 (discussing DDX0015 at 52).

### B.    Transaction Structure

38.    On July 23, 2015, Anthem and Cigna entered into an Agreement and Plan of Merger.  PX0125 at 3; PX0284 at 2.  On December 3, 2015, the respective shareholders of Anthem and Cigna overwhelmingly approved the transaction.  PX0125 at 3; PX0284 at 2.

39.    The transaction is valued at approximately $54.2 billion.  Anthem Answer ¶ 1.  Anthem plans to indirectly acquire all of the outstanding shares of Cigna on the closing date through a merger of its wholly-owned subsidiary with and into Cigna.  PX0125 at 3; PX0284 at 2.  The combined company would reflect a pro forma equity ownership comprised of approximately 67% Anthem and approximately 33% Cigna shareholders.  PX0126 at 1.  Effective upon closing, the Anthem Board of Directors will be expanded to fourteen members:  Cigna's President and CEO (Mr. Cordani), four independent directors from Cigna's current Board of Directors and the nine current members of the Anthem Board of Directors.  *Id.* at 1.

### C.    Transaction Rationale

40.    The overarching objective of the transaction is to make high quality healthcare more accessible and more affordable.  Cordani (Cigna) Tr. 509:18-510:9.  The merger will combine the complementary strengths of Anthem and Cigna, allowing the merged entity to better compete in a rapidly evolving healthcare marketplace.  DX0049 at ANTM013257314; *see also* Cordani (Cigna) Tr. 509:18-515:15; DX0048 at ANTM-DDC-001459645 (partnering together will "improve quality and affordability" and allow the combined company to "[r]educe total medical cost," "[o]ptimize specialty and integrated wellness solutions," and "speed adoption of incentive-aligned collaborations across a global network"); *id.* at ANTM-DDC-001459648 ("More choices, expanded solutions and increased affordability enables delivery of greater value

to clients and customers."); PX0317 at ANTM013887258-9.   With respect to "national accounts," the merged entity will better compete in a number of ways, including expanded competition domestically and internationally, product synergies resulting from the firms' complementary offerings, and cost savings resulting from efficiencies realized through the merger.

41.   **Expanded Competition In All Fifty States:**   The transaction will result in expanded and increased competition in all fifty states.  *See* Kertesz (Anthem) Tr. 656:13-16 ("To be an national plan that operates in fifty states and have unfettered access, without asking permission to have a conversation with a prospect, would be — I don't know — exhilarating, I would say."); DeVeydt (former Anthem) Tr. 1689:14-16 (the proposed transaction will provide Anthem with "an immediate footprint to be much more competitive in all of the states outside our 14 Blue states."), 1735:20-1736:4;  Mathai (Anthem) Tr. 1259:3-7.   Among other things, Cigna's customers would benefit by access to Anthem's lower provider rates, increasing competition outside of Anthem's fourteen service areas. *See infra,* § VII.A.1.

42.   **International Expansion:**   International reach is important to many "national accounts" because many of these customers are international companies with significant populations located outside of the United States.  The transaction will enable Anthem to compete more aggressively and effectively against competitors that also serve international populations. *See* DX0049 at ANTM013257323 ("For employers and organizations with multi-national footprints, Cigna has partnerships in 30 countries to provide health coverage to their globally mobile employees through a vast network of over 1 million health care professionals, clinics, and facilities. . . . Anthem does not operate in the international market."); DeVeydt (former Anthem) Tr. 1689:12-13; Kertesz (Anthem) Tr. 658:17-22; Mathai (Anthem) Tr. 1259:7-11.

43.    **Product Synergies:**  The different focuses of Anthem and Cigna will provide

significant synergies.  For example, Anthem's leading low-cost position and its robust medical

management techniques, combined with Cigna's focus on dental, vision, behavioral, and

wellness, will enable the merged firm to offer a set of compelling and complementary products

to customers.  *See* DeVeydt (former Anthem) Tr. 1689:3-11; Record (Steel Dynamics) Dep.

50:10-17 ("it would be the best of both worlds . . . ."); Goulet (former Anthem) Dep. 87:16-21

("Cigna has a much better clinical presence, a much better process of helping individuals get

back to work and I thought that the combination of disability and cross-selling would be large.");

DX0325 at CI-05415463; Drozdowski (Anthem) Tr. 1650:22-1651:1 ("[W]e have a unit price

advantage and a medical management advantage [compared to Cigna]."), 1670:8-20 (discussing

Anthem's leadership in value-based contracting).

44.    **Substantial Efficiencies To "National Account" Customers:**  ASO customers,

including "national accounts," will be direct beneficiaries of significant medical cost savings

because ASO customers bear the risk for the cost of their employees' medical claims.  Matheis

(Anthem) Tr. 1482:13-18, 1610:19-24; *see also* Goulet (former Anthem) Dep. 93:10-95:5. The

analysis and quantification of these medical cost savings for ASO customers were a primary

objective of the integration process launched in October 2015 after the merger agreement was

signed and announced.  Matheis (Anthem) Tr. 1474:8-11.  Defendants conducted two separate

and distinct efficiencies and synergies analyses to estimate savings.  The integration team

estimated that ASO customers — in contrast to the company or its shareholders — will benefit

from approximately $2.6 billion to $3.3 billion in medical cost savings annually.  *See* Matheis

(Anthem) Tr. 1460:17-21; Drozdowski (Anthem) Tr. 1649:8-11.  Separately, Dr. Israel's analysis

found $2.4 billion in medical cost savings accruing to customers.  Israel Tr. 1831:1-4.  Plaintiffs

concede that the combination of Anthem and Cigna will result in lower rates for customers. *See infra* § VIII.A.1. Efficiencies are discussed in more detail in § VII, *infra*.

45. **Other Substantial Efficiencies To The Merged Firm:** At the time the parties announced the transaction, they had conducted preliminary efficiencies and synergies analyses that resulted in a range of $1.7 to $2.3 billion in General and Administrative (G&A) savings, and revenue synergies that would inure to the benefit of the merged firm and its shareholders. *See* DX093 at ANTM001821007; Schlegel (Anthem) Tr. 1401:4-11, 1444:4-12; DeVeydt (former Anthem) Tr. 1702:19-23, 1703:22-1704:8; DX0325 at CI-05415476. Anthem used the midpoint of this G&A and revenue synergies range — $2 billion — for purposes of valuing the transaction. *See* DeVeydt (former Anthem) Tr. 1702:19-23; PX0317 at 14. The announced valuation assumed medical cost savings *only* from the fully insured book of business, because medical cost savings in ASO contracts inure to the benefit of customers, not shareholders. DeVeydt (former Anthem) Tr. 1701:15-1704:8; Schlegel (Anthem) Tr. 1398:14-1399:9.

46. **Increased And Improved Provider Collaborations:** Increased relevance with providers, through greater and more stable patient volume, facilitates provider collaboration and accelerates adoption of value-based reimbursement programs. *See* Swedish (Anthem) Tr. 299:14-19 ("In order for them to take risk in the new world, they need to have scale. So the more patients, the more an actuarial soundness they can manage these larger populations so they can feel comfortable taking risk."); Cordani (Cigna) Tr. 517:2-13 ("Those collaboratives, the number one thing they want are more patients to serve in those models . . . And this is an opportunity to bring like patients to those collaboratives and work with them in more volume."); Goulet (former Anthem) Dep. 230:5-231:21, 232:16-235:19; DX0049 at 2.

47.     **The Merged Firm Will Utilize Anthem's And Cigna's Best Practices:**  As it has done in connection with prior acquisitions, Anthem will fully study and utilize the best of Anthem's and Cigna's respective best practices.  *See, e.g.,* Goulet (former Anthem) Dep. 91:1-92:16 ("[W]hen we acquired Amerigroup, we did a best practices approach and we didn't just acquire something and put Anthem procedures in place.  We actually put committees in place . . . [W]e adopted more of Amerigroup's practices, and they adopted Anthem practices . . .[T]hat's an example of looking at what is the best practice across the companies and adopting it within Anthem and saying here is something that we learned from the other company."); Matheis (Anthem) Tr. 1467:9-14, 1502:8-22.

### D.     The Division's Investigation And This Lawsuit

48.     The Division opened an investigation on July 29, 2015.  On August 27, 2015, Anthem and Cigna each filed their respective HSR pre-merger notification submissions and Plaintiffs issued Requests for Additional Information and Documentary Material ("Second Requests") to Anthem and Cigna on September 28, 2015, pursuant to 15 U.S.C. § 18a(e).

49.     In response to those requests, Anthem produced over eighteen million pages of documents from 112 Anthem custodians to the Division and Cigna submitted 1.55 million documents.  Anthem and Cigna responded to numerous specifications calling for narrative responses and provided seven and five terabytes of data to the Division, respectively.  As part of its investigation, the Division deposed twenty-two Anthem witnesses and numerous Cigna witnesses and interviewed several company representatives.

50.     During its investigation, the Division did not obtain any sworn affidavits or other statements from employers opposing the acquisition, or stating that the acquisition would affect competition.  Instead, the Division appeared to take testimony only from Anthem, Cigna, Aetna,

and Humana.   There is no evidence that the Division took testimony from any purchaser of medical health insurance or health insurance-related products, or from any providers.

51.   The Division served Civil Investigative Demands (CIDs) on twenty-eight insurance carriers, including fifteen members of the BCBSA. Dranove Tr. 1103:4-7 (referencing DDX0002). The requests in these CIDs varied significantly as they sought different types of customer data and revenue information. The Division did not serve any CIDs on any TPAs. Dranove Tr. 1052:11-19.

52.   On July 21, 2016, Plaintiffs — the Division, eleven states, and the District of Columbia — filed a Complaint in this Court alleging that the proposed transaction violates Section 7 of the Clayton Act, 15 U.S.C. § 18. Anthem answered the Complaint on July 26, 2016. Cigna answered the Complaint on September 19, 2016.

53.   The State Plaintiffs include the States of Iowa, Maryland, and Tennessee, and the District of Columbia — all jurisdictions in which Anthem does not hold a Blue Cross or Blue Shield brand license. PX0125 at 4. Of these four non-Anthem jurisdictions, three — Maryland, Tennessee, and the District of Columbia — are jurisdictions in which the local insurance regulators either expressly reviewed and cleared the transaction (Maryland and Tennessee), or expressly determined that no review was necessary in the first instance (District of Columbia). In the fourth jurisdiction, Iowa, Anthem was not required to make any filing and the Iowa insurance regulators are not investigating the transaction.

## III.   NUMEROUS FIRM TYPES PROVIDE HEALTHCARE SOLUTIONS TO "NATIONAL ACCOUNTS"

54.   Many entities provide healthcare solutions to employers.  These include large, local and regional insurance carriers, TPAs, provider-sponsored plans, hospitals engaged in direct contracting with employers, rental network providers, private exchanges operated by

19

consultants, and providers of specialty services such as wellness and care management programs. *See infra* § III.C-F.

A.   **Employer-Provided Healthcare In The U.S.**

55.   Plaintiffs' product market consists of entities offering fully-insured, ASO, and level-funded products. *See* Compl. ¶ 16, 20-21, 39-40, 52-53; Dranove Tr. 851:11-13, 1160:18-23.   Yet ninety-eight percent of "national account" employers use ASO services only.   Abbott (WTW) Tr. 169:5-12.

56.   **Self-Insured Health Plans**.   Under an ASO health plan, an employer bears the risk (*i.e.*, the cost) of medical claims and contracts with a third party for access to a network of providers, claims administration, and other services.   Abbott (WTW) Tr. 69:15-20; PX0284 at 4 (describing Cigna's ASO "funding arrangement").   ASO clients may decide to purchase a reinsurance product called "stop-loss" from any number of carriers to protect against high value claims that exceed a predefined threshold.   Archer (Health Smart) Dep. 36:2-23 (listing HCC, Houston Casualty Company, Highmark, SunLife, Voya and Symatra as the "predominant" stop loss insurers).   Stop-loss insurance can be purchased to cover an individual claim (*e.g.*, if one employee's claims exceed a predetermined amount) or for an employer's claims in the aggregate (*i.e.*, if the total claims for the employer exceed a predetermined amount).   Archer (Health Smart) Dep. 36:2-9.

57.   **Fully-Insured Health Plan**.   In a "fully-insured" employer health plan, the employer pays the insurer a premium in exchange for the insurer bearing the risk (*i.e.*, the cost) of covered medical claims.   Abbott (WTW) Tr. 69:6-14; PX0125 at 5 ("For our fully-insured products, we charge a premium and assume all of the health care risk.").

58.   **Level-Funded Health Plan**.   Level-funded products are "simplified," self-funded products that are "a bridge between fully-insured and ASO."   Soumakis (Anthem) Dep. 39:1-20.

20

The level-funded customer pays a stable monthly fee, but has the opportunity to recoup money paid if there is surplus money not paid out to claimants from its claims fund. *Id.* at 37:16-38:4. To guard against an abnormally high number of claims, or catastrophically large claims, a level-funded plan typically includes an aggregate stop-loss feature. *Id.* at 38:5-38:23.

**B.**     **Employers Use Consultants To Identify And Select Competitive Healthcare Solutions That Best Match Employer Needs, Including Private Exchanges**

59.     Employers often use consultants and brokers to assist with identifying and selecting competitive healthcare solutions that best meet their needs. Fowdur Tr. 1360:12-17, 1362:20-1363:1; Abbott (WTW) Tr. 64:3-17, 65:20-66:17.   Four consultants, Aon Hewitt, Mercer, Buck, and WTW, offer consulting services to many large multi-site employers. Kertesz (Anthem) Tr. 663:1-13; Abbott (WTW) Tr. 66:9-12, 114:20-23.

60.     Even for "national accounts," healthcare is "pretty local." Mathai (Anthem) Tr. 1261:13-14.   Each U.S. state has its own unique competitive conditions that drive healthcare purchasing decisions and pricing of plan options. Fowdur Tr. 1312:13-24.   Consultants help employers identify and select from the range of healthcare plan solutions available where employees are located. Abbott (WTW) Tr.73:24-74:24.   Consultants use (1) the credible threat of moving to a competitive solution to negotiate the best offer from an incumbent carrier and/or (2) an RFP to go-to-market and identify the best solution or combination of solutions for an employer. Fowdur Tr. 1362:3-1364:3. Employers issuing an RFP, among other things, consider claims processing and adjudication, provider networks in geographies where employers live and work, and "the best possible financial arrangements." Abbott (WTW) Tr. 73:24-74:24.

61.     Brokers and consultants also offer private exchanges directly to employer-clients. "In the [private exchange] environment, the benefit consultant is the end-to-end supplier of health insurance and supplemental benefits, moving employers a step further away from the

purchasing process" — in other words, there is "increased disintermediation" by the consultants. DX0023 at ANTM014392898.   These private exchanges create conflicts of interest as the consultant may be selling its own exchange to a client while also negotiating an RFP.  Kendrick (Anthem) Tr. 1213:2-11; DX0023 at ANTM014392891 ("████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.").

62.    **Aon Hewitt.** Aon Hewitt is a nationwide consulting firm that has two hundred large employer clients, including multi-state "national accounts."  Sharp (Aon) Dep. 75:10-24, 90:12-24, 91:1-7.  Aon recommends national, regional, and local carriers as part of the healthcare plan solutions for its clients.  *Id.* at 58:13-18.  Aon's large employer clients often choose to employ a "multi-carrier strategy," whereby they offer employees health plans from multiple carriers serving a particular geographic market.  *Id.* at 62:15-63:13.  Aon operates a private exchange that its clients can use to purchase health insurance from various carrier and non-carrier options.  *Id.* at 25:2-20, 27:7-14.

63.    **Mercer.** Mercer provides health benefits consulting and brokerage services to ████████████████████ employers nationwide.  Kilmartin (Mercer) Dep. 13:12-14, 17:12-18:11, 21:10-22:5.  Among their clients, █████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████.  DX0277 (Client List (Medical) tab sorted by Segment column); Kilmartin (Mercer) Dep.  76:18-77:4, 77:6.  Mercer often recommends that clients take a multi-carrier approach, as confirmed by the over 550 Mercer accounts that slice between two or more entities for medical health plans, including Capital District Physicians' Health Plan, ConnectiCare, Dean, Emblem, Excellus, Harvard Pilgrim, Health Net, Humana,

Kaiser, Optima (Sentara), Fallon, MVP, Medical Mutual of Ohio, Select Health, and Oxford, as well as TPAs such as Ameriben, HealthScope, and UMR.  DX0277 (Client List (Medical) tab, Carrier columns); Kilmartin (Mercer) Dep. 84:24-85:13, 89:15-90:10, 91:1-92:6; DX0278 at MERCER006835.  Mercer operates a private exchange called the Mercer Marketplace. Kilmartin (Mercer) Dep. 39:22-24, 40:1-2, 49:3-6, 49:8-12, 49:14-17, 49:19.  Companies that have joined the Mercer Marketplace have seen medical plan savings of up to 15% in the first year. DX0364 at 1.

64.     **Buck.**  Buck offers consulting services for employers ranging from ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.  Burnell (Buck) Dep. 45:17-18, 45:21-22.  ▮▮▮▮▮▮ of Buck's clients on ▮▮▮▮▮▮▮ participate in some form ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ *Id.* at 74:4-5, 74:9-11, 49:2-4, 49:9, 49:18-19, 49:22, 50:21-22, 50:25, 51:2-3, 51:7. Buck operates a private exchange with various carrier and non-carrier options. *Id.* at 26:19-20, 26:23, 26:25-27:1, 51:2-3, 51:7.

65.     **Willis Towers Watson (WTW).**  WTW offers consulting services to employers and advises on the range of options available for healthcare coverage. Abbott (WTW) Tr. 64:3-9, 67:17-24, 78:17-22. WTW clients slice their business among carriers such as Harvard Pilgrim and Kaiser that provide a strong value proposition in local geographies. *Id.* at 86:5-14. WTW operates a private exchange called OneExchange. *Id.* at 181:13-18. WTW estimates that approximately 25-30% of WTW clients will eventually be using OneExchange or a similar private exchange. *Id.* at 186:9-15.

**C.     Employers May Obtain Healthcare Solutions From Insurance Carriers Through Single Carrier And Slice Arrangements**

66.     There are hundreds of insurance carriers in the United States competing to provide ASO and fully-insured products to employers. *See* Dranove Tr. 1115:24-1116:1. For

23

example, Mercer's client list 

▇▇▇▇▇▇▇▇▇▇▇.   DX0277 (Client List (Medical) tab sorted by # of Employees Column and Carrier Columns).

67.      This emphasis on local solutions and slicing enables regional carriers to compete for so-called "national accounts" that have members outside the regional carrier's footprint.  For example, ▇▇▇▇▇▇ MVP Healthcare was able to earn business with ▇ in ▇▇▇▇ through slicing. Austen (MVP) Dep. 68:8-9, 94:7, 94:9-11, 122:19-25, 123:2, 142:16-18.

68.      Slicing is routine in the healthcare industry.  DX0277 (Client List (Medical) Tab); Cordani (Cigna) Tr. 528:7-529:6 (discussing how "national accounts" slice); Smith (Cigna) Tr. 784:15-785:15 (identifying Cigna "national account" "slice clients"); Fowdur 1347:1-16.  In fact, using Prof. Dranove's data set, Dr. Fowdur found that 60% of Anthem's Fortune 1000 customers slice with another carrier.  *Id.* at 1346:10-1347:16.  One of the best examples of slicing is the Federal Employee Health Benefit Program (FEHBP), which slices between *forty-eight carrier options across the fifty states*.  DX0030.

69.      Slicing comprises a significant portion of large employer membership for Aetna, Anthem, Cigna, and United:  (1) 50% of Cigna's "national accounts" business is sliced (Thackeray (Cigna) Tr. 750:10-20); (2) 50% of Aetna's "jumbo accounts" are sliced (Hayes (Aetna) Dep. 252:13-18); (3) ▇▇▇▇▇▇▇▇▇▇ (DX0283 at UHC0000309);   (4) nearly ▇ of Anthem "national accounts" are sliced with carriers like Kaiser, MMO, MVP, Oxford, Optima (Sentara), Summa and/or other BCBS providers.  DX0205; *see also* DX0078 (Anthem listing of large group and "national account" carriers who slice); DX0277 (Client List (Medical) Tab, identifying (1) ▇▇▇▇, an account

with 6,765 employees slicing among Anthem, BCBS of Illinois, CDPHP, Harvard Pilgrim, Kaiser, Oxford and United and (2) ███████, an account with 29,200 employees slicing among Kaiser, Select Health, BCBS of Oklahoma, Anthem, Aetna, and Cigna).

70.     The pervasive use of slicing throughout the healthcare industry debunks Mr. Abbott's assertion that slicing is rare (Abbott (WTW) Tr. 196:15-24), as his personal knowledge is limited to the ten to twenty accounts he advises. *Id.* at 218:7-9.

71.     Kaiser, for example, is often offered along with other carriers, especially in California. DX0277 (Client List (Medical) Tab sorted by # of Employees and Carrier Columns, identifying over eighty medical accounts with 1,000 or more employees that selected Kaiser in combination with other carriers); Abbott Tr. 85:21-24; ███████████████████ (███████ ███████████████████████); Brown (Arthur J. Gallagher) Dep. 43:5-18 (all but "four or five" of Brown's 120 clients offer Kaiser as an option); Kidd (Sodexo) Dep. 43:4-22; DX0353 (confirming that Sodexo offers Kaiser to its employees in several states); *see also* § III.E.2.

72.     An employer's ability to slice creates competitive pressure for carriers to provide an employer with the best value to try to win a larger portion of the customer's business because the carrier will lower its fees to serve the whole account, obtain all of the membership, and have a large population to spread costs across. *See* Thackeray (Cigna) Tr. 749:23-750:9, 752:17-753:1 (confirming that Cigna will lower its overall bid to make sure its "financial offer is . . . more advantageous or more aggressive" to be selected as a sole carrier and avoid slicing or moving to a private exchange); Mathai (Anthem) Tr. 1260:16-18 ("[W]ith clients that have . . . slice business with us, even the threat of the competition or a competitor growing over Anthem is

constantly present"); Schumacher (United) Dep. 320:1-4 ███████████████

███████████████████████████████

### 1.    United

73.    United has a provider network throughout the country that includes approximately one million physicians and other healthcare professionals, and approximately 6,000 hospitals and other medical facilities. DX0036 at 2. United has over 190,000 employer customers nationwide, covering approximately thirty million lives. DX0036 at 2. United offers both fully-insured and self-insured products, along with traditional products which "include a full range of medical benefits and network options from managed plans." DX0036 at 2. United offers a full range of products. *See, e.g., id.* at 2-4.

74.    United is the strongest carrier in nearly every category for the provision of healthcare products, and is Anthem's closest competitor within Anthem's fourteen-state footprint. Kendrick (Anthem) Tr. 1198:1-8 ("If I look at United's scope, if I look at their scale, if I look at their reach, geographically, if I look at how progressive and innovative the organization is, it's clearly our most formidable competitor.").

75.    United considers its competitors to include "managed health care companies, insurance companies, HMOs, TPAs and business services outsourcing companies, health care professionals that have formed networks to contract directly with employers or with CMS, specialty benefit providers, government entities, disease management companies, and various health information and consulting companies." DX0036 at 15. United offers innovations like clinical programs, wellness programs, decision support, utilization management services, disease management services, and substance abuse disorder management services. Schumacher (United) Dep. 129:11-130:13. In addition to traditional health insurance plans, United offers level-funded products, ACO arrangements, and data analytics services to its customers. *Id.* at 132:13-134:5.

REDACTED FOR PUBLIC FILING

### 2.   Aetna

76.     Aetna is a national health insurer covering 7 million lives in its national accounts alone.  Hayes (Aetna) Dep. 179:13-20.  Aetna's provider network includes approximately 1.1 million health care providers and over 5,600 hospitals.  PX0292 at CI-LIT-02423674-2 to -3.  Aetna offers both fully-insured plans and ASO plans, and has relationships with accountable care organizations (ACOs).  PX0292 at CI-LIT-02423674-3 to -7.

77.     Aetna is considered Cigna's closest competitor in the market, but "second tier" to Anthem and United.  Smith (Cigna) Tr. 786:9-12; Huggins (Cigna) Dep. 176:24-177:6, 280:15-25.  Aetna identifies a range of regional carriers, private exchanges, provider-owned health plans, and integrated health systems from which it currently faces competition for "national accounts."  Hayes (Aetna) Dep. 210:4-16, 211:24-213:16.  Aetna plans to ███████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ DX0052 at AET-P001-0000861653.

### 3.   The Individual Blue Cross Blue Shield Competitors

78.     The BCBSA is a trade association comprised of the thirty-six independent companies that hold a Blue Cross and/or a Blue Shield license.  Schlegel (Anthem) Tr. 1402:6-20; Bills (Anthem) Dep. 53:24-54:7 ("there's 36 Blue plans and they are independent and so we are literally competing against each other . . . .").  The thirty-six BCBSA licensees each have their own independent management teams and boards of directors.  Schlegel (Anthem) Tr. 1402:10-13.  "[I]n terms of our relationship with Blue plans, we never talk about price.  We never talk about product offerings that we would put to the market.  It's our decision, independent of all Blue plans."  Swedish (Anthem) Tr. 279:21-24; *see also* Hilty (Blue Shield) Dep. 142:3-5 (████████████████████████████████████████████████).

79.     Competitors view the Blue licensees as separate, independent competitors for national accounts customers. *See, e.g.,* Hayes (Aetna) Dep. 67:17-23.

80.     Within certain exceptions discussed below, the BCBS license grants the right to the exclusive use of the brand in a defined geography, known as an exclusive service area. Schlegel (Anthem) Tr. 1403:5-10. Anthem is but one of those thirty-six independent licensees. DX0442 (identifying the thirty-six independent Blue plans). Anthem's BCBS licenses are limited to only fourteen Blue service areas in the United States. *Supra* §II.A; PX0125 at 3. However, Anthem competes both inside and outside of its fourteen Blue service areas through non-Blue brands, such as Amerigroup. Schlegel (Anthem) Tr. 1403:10-13; 1404:4-7.

81.     Because each of the Blue plans has specific states or territories in which it is the Blue licensee, none of the Blue plans offers a full 50-state solution for a customer. PX0125 at 3; Swedish Tr. 226:22-227:16 (explaining the BlueCard network). Through the BlueCard program, Blue licensees such as Anthem can pay a network access fee to access another Blue licensee's provider network (*i.e.*, a rental network). Swedish (Anthem) Tr. 226:22-227:10 (identifying the BlueCard program as a "rental network"); Weber (Anthem) Dep. 38:15-20.

a.     **Blues Compete Directly With Other Blues**

82.     Blue licensees compete directly using the Blue brand in overlapping service areas in California, Idaho, and Washington, and several areas in Pennsylvania and New York. Schlegel (Anthem) Tr. 1403:18-1404:1; DX0354 at 12.

83.     For example, Anthem does not have an exclusive BCBS license in California — Anthem holds the Blue Cross license (Swedish (Anthem) Tr. 223:1-5), Blue Shield, holds the California Blue Shield license. Schlegel (Anthem) Tr. 1403:14-20. It is undisputed that Anthem and Blue Shield compete throughout the state of California. Schlegel (Anthem) Tr. 1403:14-20; Dranove Tr. 884:13-18; Kertesz (Anthem) Tr. 655:4-5; Hilty (Blue Shield) Dep. 162:1-5. Blue

Shield considers ▓▓▓▓▓▓▓ its closest competitors.  Hilty (Blue Shield) Dep. 61:22-24.  .  Other California competitors recognize that Anthem is separate from, and directly competes with, Blue Shield. ▓▓▓▓▓▓▓▓▓▓; Hayes (Aetna) Dep. 76:1-8; Tallman (Health Net) Dep. 62:21-25.

### b.    Anthem Competes With Blues In Non-Anthem States Using Non-Blue Brands Through Direct Daily Competition

84.    Anthem competes directly with other Blue plans outside the fourteen Anthem Blue states using Anthem's non-Blue subsidiaries.  Kendrick (Anthem) Tr. 1207:18-25; Swedish (Anthem) Tr. 271:2-22; Schlegel (Anthem) Tr. 1404:13-1405:1.   Anthem's Amerigroup subsidiary provides Medicaid and Medicare solutions in several states outside of Anthem's fourteen Blue licensee exclusive service areas: Florida, Iowa, Kansas, Louisiana, Maryland, New Jersey, New Mexico, Tennessee, Texas, and Washington.  PX0125 at 3; DeVeydt (former Anthem) Tr. 1696:2-8.  Anthem also does business through its HealthLink (rental network) and CareMore (integrated health plan for Medicare and Medicaid) subsidiaries, including in non-Anthem states such as Arizona.  Schlegel (Anthem) Tr. 1404:13-20; PX0125 at 3.

85.    Other Blue licensees operate non-Blue subsidiaries that compete with other Blues.  Schlegel (Anthem) 1404:7-12 (Independence Blue Cross competes with a non-Blue brand called AmeriHealth); Swedish (Anthem) Tr. 271:3-7; Hilty (Blue Shield) Dep. 285:20-286:7 (▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓).  Competition between Anthem and other Blues remains vigorous and will not subside after the acquisition of Cigna.  Mathai (Anthem) Tr. 1273:9-21; Kendrick (Anthem) Tr. 1206:24-1207:3.

86.    Anthem previously competed using a commercial brand, UniCare, outside of its fourteen Blue service areas.  Anthem acquired UniCare as a by-product of the Anthem and

29

WellPoint Health Networks merger in 2004.  Schlegel (Anthem) Tr. 1404:24-1405:5.  UniCare was not successful despite various turnaround efforts.  DeVeydt (former Anthem) Tr. 1719:17-20 (UniCare "was not competitive.  The name brand was not recognized.").  Anthem ultimately divested the UniCare membership after a company portfolio review during the 2008-2009 recession because the business was in decline.  Schlegel (Anthem) 1405:14-1406:1; PX0202 at ANTM016997858-4 (stating that in 2008, UniCare was one of three underperforming businesses for Anthem, was losing money, and not adding to shareholder value.).  When Anthem sold UniCare in 2009, UniCare only had a little more than 300,000 members (in some states, only fifty members), compared to over eleven million Cigna lives in the present transaction.  Schlegel (Anthem) Tr. 1449:4-21; DeVeydt (former Anthem) Tr. 1734:8-9.  Prof. Dranove pointed to UniCare as an example of what he fears Anthem will do with Cigna, but Prof. Dranove admitted that he did not study other recent Anthem acquisitions that still operate as separate brands within Anthem such as Amerigroup and Simply Health.  Dranove Tr. 1123:2-1125:5.

### c.     Anthem Competes with Other Blues Through Ceding

87.     The exclusive licensee areas of the BCBSA mean that a Blue licensee is precluded from offering Blue-branded products to accounts headquartered in another Blue licensee's exclusive service area unless a "cede" is granted.  Bills (Anthem) Dep. 85:23-86:2; Schlegel (Anthem) Tr. 1440:23-24.

88.     Cedes are not a form of coordination between the Blues.  Only a customer or a consultant — not a Blue licensee — may request a cede; therefore, the Blues cannot coordinate their bidding through ceding.  Bills (Anthem) Dep. 333:3-13; Schlegel (Anthem) Tr. 1441:7-9, 1441:20-21, 1456:9-16.  A Blue plan has no obligation to grant a cede request to a customer, and can choose instead to compete for that client itself.  Kertesz (Anthem) Tr. 654:20-25; Bills (Anthem) Dep. 49:11-50:15, 273:16-274:2.  Ceding incentivizes each Blue to maintain a strong

30

brand so that if a customer moves its headquarters to a different Blues' territory, the customer will seek to maintain the relationship through a cede and will not simply opt for the local Blue. *See* Pogany (former Anthem) Dep. 275:21-276:17 (discussing ██████████████████

██████████████████████████████████████████████████████

████████████████████████████ ).

89.     Consultants recognize that ceding by Blue plans is "very rare." Abbott (WTW) Tr. 181:4-10 (stating that Abbott had not seen a ceding request "in [a]t least 10 years").

### 4.     ConnectiCare

90.     ConnectiCare sells health insurance to customers with members in Connecticut and Massachusetts.     Wise (ConnectiCare) Dep. 27:18-28:3.     ConnectiCare covers "[a]pproximately 305,000 medical coverage members," and has a provider network of "roughly 20,000" providers. *Id.* at 14:24-15:10. ConnectiCare offers fully-insured plans, including HMO plans, POS plans, PPO plans, and Medicare Advantage, as well as self-insured plans. Wise (ConnectiCare) Dep. 42:6-25. ██████████████████████████████

████████████████████████. Schumacher (United) Dep. 88:5-25, 93:18-94:8; Butler (Cigna) Dep. 125:13-21; ████████████████████. Anthem recently lost the ████████████████████. Wise (ConnectiCare) Dep. 112:10-13, 112:15-25, 113:2-9.

### 5.     EmblemHealth

91.     Emblem sells health insurance to customers with members in New York and Connecticut, and has current revenues of approximately $4 billion. Fitzgibbon (Emblem) Dep. 61:7-10, 17:4-7. Emblem covers 1.5 million commercial lives and offers PPO, HMO, Medicare, and Medicaid plans. *Id.* at 89:3-7. ██████████████████████████████

DX0497 (identifying Emblem's ██████████████████████████████

31

▬▬▬); DX0277 (Client List (Medical) Tab, row 2709 identifying ▬▬▬▬). Emblem has its own network that covers ▬▬▬▬, and ▬▬▬▬▬▬▬▬ (*supra* § III.F.1) to cover lives outside of ▬▬▬▬, and from ▬▬▬▬ to cover lives in ▬▬▬▬. Fitzgibbon (Emblem) Dep. at 95:7-12, 105:16-23, 106:24-108:4. Emblem competes directly with ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬. Soumakis (Anthem) Dep. 181:7-182:7.

### 6. Harvard Pilgrim

92.    Harvard Pilgrim sells insurance to customers with members throughout New Hampshire, Maine, Massachusetts, and Connecticut.   Roberts (Harvard Pilgrim) Dep. 15:22-16:2, 16:9-11.  Harvard Pilgrim offers a variety of health insurance products, including "HMO, PPO, POS, commercial lines of business, fully insured, self-insured, and Medicare." *Id.* at 16:12-16.  Harvard Pilgrim has its own provider networks in ▬▬▬▬▬▬▬▬▬, and has an affiliation with United and ▬▬▬▬▬▬▬ to access providers across the country.   Abbott (WTW) Tr. 85:17-20; Roberts (Harvard Pilgrim) Dep. 24:4-8, 31:3-11. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Harvard Pilgrim services "national account" customers such as ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. DX0210 at 25-28; ▬▬▬▬▬▬▬; DX0313; DX0277 (Client List (Medical) Tab, row 2569).

93.    Harvard Pilgrim has been able to rapidly enter new geographies:

- Harvard Pilgrim secured approval to enter the Connecticut market within 2.5 months of submitting its rate filing with the Connecticut Insurance Department and ▬▬▬▬▬▬▬▬▬. Roberts (Harvard Pilgrim) Dep. 112:21-114:15, 284:17-285:3.



- Harvard Pilgrim

  DX0311 at HPHC-ANTHEMDOJ-002342.

- Harvard Pilgrim

  *Id.* at HPHC-ANTHEMDOJ-002343.

- Harvard Pilgrim

  . *Id.*

### 7.   Humana

94.   Humana is an insurance carrier that operates predominantly in fourteen states. Bierbower (Humana) Tr. 828:23-829:2.   In addition to serving both large and small group customers, Humana also provides quality service to existing "national accounts" customers.   *Id.* at 825:22-25, 826:1, 826:13-18, 827:3-4 (identifying Dow Chemical, Fidelity Investments, and Ford Motor Company).   Humana competes for those accounts to retain that business.   Bierbower (Humana) Tr. 825:22-826:12.   Humana services "national accounts" on a slice basis, such as ), which slices Humana with Health Net, Kaiser, Health Care Service Corporation, and Premera Blue Cross.   DX0277 (Client List (Medical) Tab, row 452).

95.   Humana was awarded the East Region of the Tricare program for 2017, which will cover approximately 6 million beneficiaries across 31 states with an annual value of $40 million in revenue per year.   Bierbower (Humana) Tr. 819:15-820:6.   Humana will provide services typically required by large employers, such as medical management, utilization management, care management, disease management, and data analytics.   *Id.* at 825:2-14. Humana has estimated it will take about one year to build a 25,000 provider network in twenty-two states to perform the Tricare contract.   *Id.* at 819:20-25, 822:10-15; *See also* § VIII.C.3.

### 8.     Minuteman Health

96.     Minuteman Health offers insurance to ▮▮▮▮▮▮▮▮▮▮▮▮▮ with members in ▮▮▮▮▮▮ and ▮▮▮▮▮▮. Boudreau (Minuteman) Dep. 12:17-19, 20:13-19.  Minuteman Health services both ▮▮▮▮▮▮▮▮▮▮▮▮▮, and offers ▮▮▮▮▮▮▮▮ products. *Id.* at 14:21-15:7.  It utilizes ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and  has  its ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* at 55:19-56:3.

97.     Minuteman began offering services to ▮▮▮▮▮▮▮▮▮▮▮ ▮ and has been working to ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* at 13:11-13, 35:2-36:15, 44:15-20 (▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮), 63:16-65:7 (noting a ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ). Within ▮▮▮▮▮▮▮▮▮▮, Minuteman had built a ▮▮▮▮▮▮▮▮▮▮ and considered itself to be ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.  *Id.* at 121:9-16, 37:13-39:3.  Minuteman has now grown its network to over ▮▮▮ providers to increasingly ▮▮▮▮▮▮▮▮▮▮.  *Id.* at 21:11-14, 122:5-6.

### 9.     MVP Health Care

98.     MVP Health Care sells health insurance including ASO services and covers a total of approximately ▮▮▮▮▮▮▮.  Austen (MVP) Dep. 16:6, 16:9-17.  MVP has its own primary network in ▮▮▮▮ and ▮▮▮, and ▮▮▮▮▮▮▮▮ ▮▮▮▮ to service members outside of ▮▮▮ and ▮▮▮.  *Id.* at 18:2-8, 18:10.  Ranked ▮▮▮▮▮▮▮▮▮, MVP has been ▮▮▮▮▮▮ ▮▮▮.  *See id.* at 25:24-25, 26:2-15.  MVP has ▮▮▮▮▮▮▮ and plans to increase

�ananananan in the future. *Id.* at 32:14-18, 33:15-18. MVP competes directly with Anthem and United in the Mid-Hudson region of New York (*id.* at 60:8-11) and has succeeded in winning business from both Anthem and United, including on a slice basis (*id.* at 67:3-4, 6-7, 9-14). For example, MVP services ▃▃▃▃▃▃▃▃▃ even though Anthem and other large carriers ▃▃▃▃▃▃▃▃. *Id.* at 122:12-25, 123:2, 148:24-25, 149:2-22, 150:14-20; DX0205. ▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃

▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃ are other examples of large employers that selected MVP for their healthcare plan offerings. DX0277 (Client List (Medical) Tab, rows 1576, 1671, and 2304).

### 10. Tufts Health Plan

99.  Tufts services ▃▃▃▃▃▃▃▃▃▃ customers. Spooner (Tufts) Dep. 82:16-18. Tufts has approximately ▃▃▃▃ in annual revenue, which has ▃▃▃▃ in recent years, and its health plans have been ranked number one in the nation by the National Committee for Quality Assurance (NCQA). *Id.* at 27:18-21, 28:3-5, 30:16-31:8, 32:13-33:11. Tufts has ▃▃▃▃▃▃▃▃. *Id.* at 99:20-25, 101:2-12, 102:23-103:2. ▃▃▃▃▃▃▃▃▃▃▃▃

▃▃▃▃ are examples of large employers that selected Tufts for their medical health plan. DX0314 at 5; DX0277 (Client List (Medical) Tab, row 2632); DX0210 at 28.

100.  Tufts' strategic team ▃▃▃▃▃▃▃▃▃▃▃. *Id.* at 38:4-20 (stating that ▃▃▃▃▃▃▃▃▃▃▃▃▃▃

▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃▃

▃▃▃▃▃▃▃). Most recently, Tufts entered New Hampshire in ▃▃▃▃ and has already gained membership of ▃▃▃▃▃▃ of the commercial market. *Id.* at 193:20-23, 194:15-21, 237:25-238:2, 238:5-12.

### 11.    Medical Mutual of Ohio

101.    Medical Mutual of Ohio is an Anthem competitor.  Mathai (Anthem) Tr. 1269:16-1270:2.   Medical Mutual is a "formidable player[]" with "very economically advantageous solutions relative to total health costs in the geographies . . . in which they serve the population." Kendrick (Anthem) Tr. 1184:24-1185:9; Pogany (former Anthem) Dep. 98:21-24.   Medical Mutual participates on private exchanges and is used as both a single carrier option and as a slice option.  Kertesz (Anthem) Tr. 634:15-16; *see also* Kilmartin (Mercer) Dep. 96:23-97:20 ( █████ ██████████████████████████████████████████████████████████ ).  Anthem has "quite a bit of business" that slices with Medical Mutual.  Mathai (Anthem) Tr. 1269:16-1270:2.

### 12.    Centene/Health Net

102.    Centene, which merged with Health Net in 2016, is a health insurer with approximately 7 million covered members and annual revenue of $38 billion.   Tallman (Centene/Health Net) Dep. 15:19-16:8.  ███████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████.  *Id.* at 14:24-15:7; 46:6-16, 47:9-18, 48:19-49:3, 49:21-50:20, 61:17-62:5, 62:21-63:11, 66:2-15, 65:8-66:10.  Centene offers products on private exchanges.  *Id.* at 94:14-94:24.  Centene is seeking to expand large group enrollment and projects growing that segment in the next five years.  *Id.* at 32:15-17, 32:25-33:6.  Centene/Health Net was recently awarded the west region of the Tricare contract, which covers approximately 3 million beneficiaries over nineteen states.  Bierbower (Humana) Tr. 820:7-9.

### D.    Third-Party Administrators Compete For "National Account" Customers

103.    TPAs comprise 20% of the commercial healthcare market.  Fowdur Tr. 1332:7-1333:7; DX0685 at 1.  Almost ███████████████████████████ as they have

REDACTED FOR PUBLIC FILING

███████████████████████████████████ Burnell (Buck) Dep. 51:2-

3, 51:7, 51:9-10, 51:14-16, 118:7-11.

104.   There are hundreds of TPAs that compete for self-insured large-group multisite

accounts, including on a full replacement basis.  Kertesz (Anthem) Tr. 586:11-23, 637:2-638:6

(Anthem lost the Activision account to Collective Health); ██████████████████████████

████████████████████████████████ ; DX0125 (████████████████████████████

██████████████████████████████████████████████

████████████████); Manders (Cigna) Dep. 275:7-20 (TPAs are a competitor for "national

accounts"); Pogany (former Anthem) Dep. 55:20-56:6 (listing ██████████ and ██████████ as

examples of "national accounts" that moved to a TPA).  TPAs offer various competitive options

including lower cost administration, flexibility, customized networks, as well as innovative

solutions including medical management programs, disease management programs, and wellness

programs.  Lonsdale (Gallagher) Dep. 180:18-181:17 (TPAs have "lower infrastructural costs");

████████████████████████████████ (██████████████████████████

██████████████ )██████████████████████ (██████████████████████

████████████ );████████████████████████████.

105.   TPAs act as "aggregators of services" that offer greater flexibility and

customization than insurance carriers because they are able to work with a variety of vendors.

Fowdur Tr. 1333:25-1335:1.  The ability to offer innovative programs on a more nimble platform

often gives TPAs a "competitive advantage" over traditional carriers. ████████████████████

████████████████████████████████████ ; Phillips (Cigna) Dep.

288:18-289:3 (discussing customer interest in TPAs: "Some customers . . . rather pick and

choose of the myriad of vendors who are out there to solve their — a big part of their solution.");

DX0685 at CI-08221101 (the main value propositions for TPAs are "hands on 24x7 [customer] service,…customized product solutions, transparency of costs, compliance assistance and customized reporting capabilities"); Hatch (AmeriBen) Dep. 39:15-40:8 (AmeriBen's TPA offering differs from an ASO because AmeriBen specializes in flexibility); Batniji (Collective Health) Dep. 112:11-14, 112:16-113:15 (Collective Health can assist with managing complex systems and work with all the "vendors that they have in place.").

106.    TPAs control 17-20% of the commercial health insurance business.  DX0685 at CI-08221100; DX0228 at CI-LIT-00053081.  With nearly



. DX0025 at HPHC-ANTHEMDIVISION-002388.

### 1.    CoreSource

107.    CoreSource is one of the nation's largest non-carrier owned TPAs with access to over fifty national and regional networks across the United States.  Horvath (CoreSource) Dep. 53:5-15, 17.  CoreSource is licensed in ▮▮▮▮▮▮ and has clients in more than ▮▮ states. *Id.* at 28:9-16, 86:22-25.  CoreSource services "national accounts," including among others,

*Id.* at 46:9-47:23.  CoreSource competes with ▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 35:20-24.  CoreSource uses nearly ▮▮▮▮▮▮▮▮▮▮ to provide nationwide coverage.  *Id.* at 24:22-25:4.  CoreSource provides a variety of services to its customers, including member advocacy services, disease management services, health and wellness services, and pharmacy benefit management services.  *Id.* at 20:8-14, 22:10-17, 22:10-25.

### 2.    Imagine Health

108.    Imagine Health is a TPA with a strong presence in Chicago, San Antonio, Houston and Dallas that has caused ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED FOR PUBLIC FILING

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆." DX0014 at CI-04878556; *see also* Abbott (WTW) Tr. 209:9-17, 209:23-210:20 (describing Imagine Health as a disintermediator and a new entrant that is disrupting the traditional marketplace); Williams (Cigna) Dep. 144:10-146:7 (naming Imagine Health among a list of competitors for "national account" customers). Imagine Health sets up customized "high performance networks" to compete with carriers such as United, Cigna, and Aetna.   Abbott (WTW) Tr. 191:5-9, 191:20-192:5; ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

109.    Anthem has found that Imagine Health is "growing . . . as a topic of interest for our clients" and Anthem is losing business to Imagine Health. Mathai (Anthem) Tr. 1267:17-25; Kendrick (Anthem) Tr. 1197:1-12. For example, Anthem lost a large home improvement retailer to Imagine Health in Chicago and Dallas for 2017 because the retailer sees Imagine Health as achieving greater economic value. Mathai (Anthem) Tr. 1267:22-1268:5.

110.    Imagine Health is recommended by consultants and is used by WTW clients. Abbott (WTW) Tr. 192:6-8, 193:1-11. Imagine Health is offered on private exchanges, along with other service providers, who in combination offer "many of the capabilities that historically were offered by [Anthem] . . . So they themselves have assembled, really, the capabilities of an insurance company." Kertesz (Anthem) Tr. 636:11-22. Imagine Health is also offered "in lieu of a carrier" in certain geographies, as well as on a slice basis. Thackeray (Anthem) Tr. 746:2-747:13; Kendrick (Anthem) Tr. 1197:1-12 (noting that Imagine Health is offered on a slice basis with Anthem for "very large, well-known customers").

### 3.    AmeriBen

111.    AmeriBen, a TPA serving 75 clients with an average membership of 5,000 lives and "a total membership coverage of about 240,000 individuals," competes nationally with

insurance companies and TPAs alike.   Hatch (AmeriBen) Dep. 12:2-19, 17:8-11, 33:24-34:2,

39:2-8, 59:20-24; 60:1-10, 80:14-16, 80:18, 80:21-81:2.   Over the last five years, AmeriBen has

grown 15% per year on average — both in revenue and in membership.   *Id.* at 21:10-20.

### 4.   Collective Health

112.   

Batniji (Collective Health) Dep. 23:6-13, 26:13-21.   Collective

Health's current customer list includes companies such as

*Id.* at 58:14-61:25, 62:4-64:8; DX0360.

Schumacher (United) Dep. 125:20-126:4, 126:6-12,

126:19-25.   Collective Health recently

Batniji (Collective Health) Dep. 64:24-65:1, 65:4-66:3.   Collective Health competes

*Id.* at 79:13-18; Parr (Cigna) Dep. 185:5-12.   Collective Health

took the                                    (Batniji (Collective Health) Dep. 58:14-59:11) and it

beat Anthem for                              (*id.* at 61:1-21; 63:3-64:8; 159:7-21).

### 5.   Health Plans, Inc.

113.   Health Plans, Inc. ("HPI") is a TPA owned by Harvard Pilgrim that

, serving more than        employer accounts comprising approximately

167,000 members.   Fowdur Tr. 1353:24-25; DX0025 at HPHC-ANTHEMDOJ-002391 (

).

Roberts (Harvard Pilgrim) Dep. 29:6-11, 29:14-30:5.

REDACTED FOR PUBLIC FILING

███  DX0025 at HPHC-ANTHEMDOJ-002388.  HPI services "national accounts" as Prof.

Dranove defines the term, including: ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at HPHC-ANTHEMDOJ-002393.

114.   HPI considers ████████████████████ its competitors: ████████████

████████████████████████████████████████████████████████████████████████

Roberts (Harvard Pilgrim) Dep. 133:9-17.

115.   In addition to geographic growth, HPI plans to respond to ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ DX0025 at HPHC–ANTHEMDOJ-

002390, 400-401.  HPI offers innovative wellness programs through its acquisitions of Trestle

Tree and MedWatch.  Fowdur Tr. 1353:7-1354:3; DX0019 at HPHCANTHEMDOJ-008212;

Roberts (Harvard Pilgrim) Dep. 88:4-15. ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

*Id.* at 73:9-18.  MedWatch is ████████████████████████████████████████████

████████████████████████████████ *Id.* at 90:10-91:1.

### 6.   HealthSCOPE Benefits

116.   ████████████████████████████████████████████████████████████

████████████. Edwards (HealthSCOPE) Dep. 16:22-24. ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████ *Id.* at 37:10-37:11, 37:16-38:18, 38:21-39:4, 39:8. ██████████

████████████████████████████████████████████████████████████████████████

████████████████████ *Id.* at 14:10-17, 14:22-15:4, 16:18-21, 62:5-10, 62:16,

63:6-64:4, 64:6-64:12, 65:21-24.



*Id.* at 93:12-14, 98:20-25.

117.

. *Id.* at 79:16-19, 85:7-10, 85:12-13, 85:17-20.

. *Id.* at 79:3-80:2.

. *Id.* at 80:5-6.

### 7.   HealthSmart

118.   HealthSmart is one of the largest non-carrier owned TPAs with about 1,300 employees and markets its services in all 50 states.   Archer (HealthSmart) Dep. 32:3-15. HealthSmart covers about 250,000 employee lives throughout the country, including in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Ohio, Nevada, New York, Texas, Virginia, and Wisconsin. *Id.* at 15:5-19, 29:6-30:14, 31:6-8, 31:12-22.   HealthSmart has two of its own proprietary, nationwide PPO provider networks, and these national networks include over 600,000 providers across the nation.   *Id.* at 23:12-19, 39:13-19, 39:21-22. HealthSmart also offers its own level-funded plan as well as customized plan design, case management, wellness programs, data analytics, and other services. *Id.* at 59:8-10; DX0368.

### 8.   Key Benefit Administrators, Inc. (KBA)

119.   KBA is one of the nation's largest non-carrier owned TPAs, with between 1.5 and 1.7 million members, and operates in all fifty states.   Gray (KBA) Dep. 14:6-15, 54:19-21.   KBA bids for and services both small and large customers, including "national accounts." *Id.* at 55:19, 55:21-56:2, 56:4.   KBA considers its main competitors to be the Blue companies, United, Cigna, Humana and Anthem. *Id.* at 24:5-15, 39:22-40:5.   KBA offers self-funded major medical programs, a highly customizable set benefit plan supported by stop-loss, and limited coverage

programs designed to meet the minimum essential care and value requirements of the Affordable Care Act. *Id.* at 20:25-21:22. KBA also offers a proprietary chronic disease management program in conjunction with the American Health Data Institute. *Id.* at 24:16-25:10, 25:12-19.

120. KBA has access to seven health insurance rental networks that each operate in all fifty states. *Id.* at 57:23-58:24, 59:1-9; DX0233.

### 9. Meritain Health

121. Meritain Health, a national TPA, is one of the largest TPAs in the nation. Schmidt (Aetna) Dep. 8:11-21, 8:23, 8:25-9:1. Meritain Health services roughly 2,000 employer groups, covering roughly 800,000 lives. *Id.* at 33:25-34:10. Meritain Health has numerous "national accounts" customers. *See* DX0350 at AET-P003-0003829353.

122. Although it is a subsidiary of Aetna, Meritain Health acts fully independently. Schmidt (Aetna) Dep. 11:20-25. Aetna sees TPAs as a growth area as "TPAs provide less expensive administration and more flexible plan design compared to Aetna." DX0348 at AET-P007-0007747255. In fact, Aetna acquired Meritain amid "Aetna['s] rate of loss to TPAs . . . increasing." DX0348 at AET-P007-0007747255. Meritain has been financially successful using rental networks. *See* Schmidt (Aetna) Dep. 84:4-23, 85:4-24.

123. Meritain offers a full array of wellness programs, including, for example, Healthy Merits, which is "a dynamic, multi-level wellness solution that provides savings to employers through lower health care costs, reduced employee absenteeism and increased productivity." Schmidt (Aetna) Dep. 20:17-21:5. On March 28, 2016, Meritain announced a joint venture with Banner Health to offer a value-based ACO arrangement in Arizona. *Id.* at 107:7-21, 109:1-10, 109:13-20, 110:6-16, 110:20-112:5. Meritain also has an affiliate, American Health Holdings, which offers wellness services to clients nationwide. *Id.* at 14:11-21, 14:23-15:25, 20:17-21:14.

### 10.   United Medical Resources, Inc. (UMR)

124.    UMR is the nation's largest TPA servicing 1,700 customers and covering 2.7 million members.  DX0026.  ████████████████████████████████████

████████████████████████████████████   Schumacher (United) Dep. 263:5-

12.  ████████████████████████████████████████████

████████████████████████████.  *Id.* at 128:16-21; DX0026.

### E.   Healthcare Providers Have Launched Their Own Health Plans To Disintermediate "Traditional" Insurance Companies

125.    Provider-sponsored plans ("PSPs") are an increasingly competitive threat.  *See* DX0004 at CI-00932275 (the healthcare industry is "rapidly changing" and new entrants, including PSPs, "are making themselves known through a multitude of channels"); DX011 at ANTM001773718 (████████████████████████████████████

████████████████████████████); *see also* ████████████████████████

126.    Because they are closely integrated with the providers, PSPs can "more effectively manage . . . individual's care across the care continuum" which leads to "better care outcomes at a lower cost."  Parker (IU Health) Dep. 21:8-20.  ██████████████████

████████████████████████████████████████████████

████████████████████  Parker (IU Health) Dep. 21:8-20; *see also* Adams (Centra Health) Dep. 83:13-19, 78:19-79:1 (████████████████████████████████████

████████████████████████████████████████████████

██████████).  PSPs are also able to utilize their health plans' claims data to achieve lower costs and higher quality of care.  Adams (Centra Health) Dep. 87:15-88:8, 73:17-21.  PSPs have significant financial incentives to remove the middle man and become payors, including the ability to capture health plan revenue, leverage local economies of scale, increase their volume of

patients, and create strategic value for the future, all of which increase provider profit compared to partnering or collaborating with a third party payor.  *See* DX0004 at CI-00932283; ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 1. Innovation Health

127. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.  Henderson (Innovation Health) Dep. 17:25-18:7. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮  (*id.* at 26:17-27:3, 131:21), ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  (*id.* at 18:20-22, 18:25-19:6).

128.   Innovation Health was founded around May 2012, and began offering group insurance products in October 2013.  *Id.* at 21:6-21:25.  In a nine-month period beginning in January 2014 — three months after offering its first insurance products — Innovation Health took 110 clients in whole or in part from Anthem. ▮▮▮▮▮▮; DX038 at AET-P005-007290926.  In that same period, Innovation Health attracted employers totaling over 145,000 members, including "national account" employers totaling over 46,000 members. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮; DX038 atAET-P005-007290922-923. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* at 85:18-86:11.

▮▮▮▮▮  *Id.* at 14:2-8. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮.  *Id.* at 14:21-24.

### 2. Kaiser

129. ▮▮▮▮▮▮▮▮▮▮▮▮▮.  Guptill (Kaiser)

Dep. 16:19-17:7. ▮▮▮▮▮▮▮▮▮▮▮▮



██████████████████████████████████████████████████

*Id.* at 42:14-24. ████████████████████████████. *Id.* at 55:22-56:15. ████████████████████████████

████████████████████████████████ *Id.* at 48:12-49:7. Kaiser is a prominent carrier in states like California, and is also a competitor for "national accounts." *See* Mathai (Anthem) Tr. 1269:19-20 (stating that Anthem is commonly sliced with Kaiser in national account business); Kendrick (Anthem) Tr. 1184:24-1185:2; ████████████████

██████████████████████████████████████). ████

██████████████████████████████████████████████████

█████████. DX0363 at KP005002. ██████████████

██████████████████████████████████████████████

██████ Guptill (Kaiser) Dep. 55:8-21, 129:4-11. ████████████████████

██████████████████████████. *Id.* at 55:8-21.

130.   Kaiser's ability to impose a competitive restraint on other carriers vying for national or larger accounts in a given geography is not dependent on its national footprint or its ability to serve as a total replacement. *Id.* at 96:5-9, 167:10-14 (█████████████████

██████████████████████████████████████████████████

██████████████████████████████). In fact, "████████████

████████████████████████████. *Id.* at 202:17-203:4, 203:6.

### 3.   Optima (Sentara) Health

131.   ██████████████████████████████████████

██████████████████████████████████████████. Hilbert (Sentara) Dep. 9:11-19, 13:10-24, 14:12-19 (██████████████████████████

██████████████████████████████████████████████████

46



▓▓▓▓▓▓▓▓▓▓▓). *Id.* at 11:20-12:20. ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 24:24-25:4.

132. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 17:11-13. ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 17:14-21

(▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

133. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 22:19-23:6.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓. *Id.* at 32:19-33:10. ▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.*

at 23:23-25. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓. *Id.* at 18:1-10, 18:17-19:10, 19:22-20:10, 22:11-14.

### 4.   Sutter Health

134.    Sutter Health is a provider system in California with twenty-six hospitals.  Brendt (Sutter) Dep. 42:24-25, 43:14-44:9 (stating that the provider system is primarily in Northern California, with some surgery centers in Southern California, and a single behavioral health facility in Hawaii).  Current annual revenue for Sutter Health is approximately $11 billion. *Id.* at 26:10-21. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓ Schirmer (Sutter) Dep. 24:3-8.

135. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓

REDACTED FOR PUBLIC FILING

136. ▮▮▮▮▮▮▮▮▮▮▮▮ and HealthNet characterized Sutter as a current competitor, and Health Net described that they had lost business to Sutter. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮; Tallman (HealthNet) Dep. 138:12-139:7, 139:10-13, 139:24-140:6. ▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Schirmer (Sutter) Dep. 24:3-8; 34:10-11. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 50:3-15.

### 5.   Tufts Health Freedom Plan

137. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in January 2016.  Spooner (Tufts) Dep. 18:14-19, 18:22-19:5, 36:7-8, 40:13-19.   Granite Health is a network of five hospitals systems in New Hampshire that comprises approximately 36% of the total employment in the hospital sector within New Hampshire. Wilhelmsen (Southern New Hampshire Health System) Dep. 36:19-37:4, 126:24-127:24.   The joint venture offers innovative "tiered" products that let members receive care from a "subset" of the provider network in exchange for lower medical costs.  Spooner (Tufts) Dep. 43:2-25, 44:6-45:4. Tufts Health Plan owns 51% of the Tufts Health Freedom Plan, while Granite Health owns 49%.  *Id.* at 18:25-19:5.

### F.   Rental Networks Are Available To Expand The Reach Of Entities Lacking A Proprietary Provider Network

138.   Network providers are entities that contract with hospitals and provider groups in different geographies to establish rental networks that can be used by carriers, TPAs, and hospitals to create or extend in-network coverage for employers.   Numerous large and regional carriers use rental networks to expand their geographic footprint. *See, e.g.,* Bierbower (Humana) Tr. 829:8-10.  Other network providers, such as CNIC Health Solutions, work with networks

covering areas across the United States to offer custom network solutions that best fit an employer's geographic footprint. Espinoza (CNIC) Dep. 24:21-25:9. Hospital systems that provide health plans directly to employers can extend their in-network geographic reach by contracting with rental network. *E.g.*, ███████████████████████████ (████████

██████████████████████████████████████████████████

██████). Regional carriers and TPAs also rely on network providers to fill gaps in their networks or to expand their geographic reach, making them an even more competitive option for multi-site accounts. Mathai (Anthem) Tr. 1334:15-20; Bierbower (Humana) Tr. 854:11-21; ████████

████████████████████████. The success of rental networks is helping regional carriers and PSPs compete for multi-site employer business, directly undermining Prof. Dranove's assertion that rental fees make use of a rental network uncompetitive. Dranove Tr. 1004:1-3.

### 1.     MultiPlan, Inc.

139.   MultiPlan is a "healthcare cost management solutions" company with a national reach. DX0373 at 1. Owned by "leading private international equity firm BC Partners," MultiPlan has almost 2,100 employees and approximately 1,400 clients. *Id.* at 1. The MultiPlan networks include contracts with over 900,000 providers, and nearly sixty-eight million consumers potentially have access to MultiPlan's products. *Id.* at 1. Among other providers, MultiPlan contracts with ██████████████, Physicians Health Plan of Northern Indiana ("PHP"), ████████████, Hospital Authority, and Hospital Corporation of America to negotiate rates for its nationwide network. ████████████████████████; Cahill (PHP) Dep. 68:9-17, 70:1-3; ████████████████████████; Marchesini (Hospital Corporation of America) Dep. 84:6-8. MultiPlan rents its network to health plans such as Kaiser, Emblem, and MVP Health Care, among others, and these health plans rely on MultiPlan's national network to serve customers outside of their own respective footprints, as well as to expand their in network

offerings.  Van Etten (Kaiser) Dep. 26:4-27:7, 29:4-7; Austen (MVP) Dep. 18:2-10; Fitzgibbon

(Emblem) Dep. 61:3-16.  PSPs including, among others, Piedmont Community Health Plan,

Tufts Freedom Health Plan, Optima Health Plan, and Indiana University Health Plan also rent

MultiPlan networks to supplement their own respective networks.  Adams (Centra) Dep. 52:19-

53:2; Spooner (Tufts) Dep. 136:11-15; 136:24-137:11, 14-16; Hilbert (Sentara) Dep. 27:2-17;

Parker (Indiana University Health) Dep. 75:11-18.

   140. MultiPlan also rents its networks through its subsidiaries Private Healthcare

Systems ("PHCS") and Beech Street.  DX0372 at 1.  PHCS is a national network that offers its

customers access to more than "4,500 hospitals, 70,000 ancillary care facilities and 700,000

healthcare professionals."  DX0372 at 1.  It is "the largest independent primary PPO in the

nation."  DX0372 at 1.  PHCS has "an endorsement from NCQA, one of the country's most

recognized quality assurance organizations."  DX0372 at 1.  PHCS's rental network customers

include ▆▆▆, Tufts Health Plan, Physicians Health Plan of Northern Indiana, Alliant, and

▆▆▆▆▆▆▆.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; Spooner (Tufts) Dep. 136:11-

15, 136:24-137:16; Cahill (PHP) Dep. 68:9-17; Caldwell (Alliant) Dep. 16:19-21, 17:14-18:6;

▆▆▆▆▆▆▆.  ▆▆▆▆▆▆▆▆▆▆▆.

▆▆▆▆▆▆▆.  ▆▆▆▆▆▆▆▆▆▆▆.

▆▆▆▆▆.  ▆▆▆▆▆▆▆.

   **2.** **Cofinity**

   141. Cofinity provides a regional rental network by contracting with providers such as



3.    **First Choice**

142.    First Choice provides a regional rental network used by PSPs ████████████████ ████████████ . ███████████████████ ; ██████████████████████████ .

G.    **"National Accounts" Can Exercise Self-Help By Direct Contracting**

143.    Employers seeking medical health coverage can go directly to the provider source to obtain additional discounts and services. *See* DX0020 at CI-03120474 ("Several clients in the market are considering some level of direct-to-provider collaboration[.]"); Abbott (WTW) Tr. 121:15-24.  Anthem's internal estimate is that ████ of employers currently are "engaging in some form of direct health care provider and service contracting," and that ████ [of employers] expect to do so in the next three to five years."  DX0011 at ANTM001773718.  To facilitate direct contracting, employers can hire a TPA to adjudicate claims.  Eddy (Tolman & Wiker) Dep. 52:13-23. "There may have been a perception at one time that you can only do this if you were Walmart or Boeing, or some of the earlier adopters, but it's becoming something that a broader set of employers [are] considering."  Mathai (Anthem) Tr. 1268:9-24.

144.    Consultants and brokers view direct contracting as an option for employers. *See*
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████ ; Abbott (WTW) Tr. 121:15-122:9; ██████
██████████████████████ (████████████████████████████████
██████████████████ ). Employers are direct contracting as a full replacement solution to traditional carriers.  Fowdur Tr. 1351:18-1352:4 (describing a consultant assisting an employer with 45,000 covered lives in directly contracting for all of its enrollee lives in all of its locations and by doing so "was able to drop its annual cost increases from 18 percent to less than one percent; and those cost increases have remained flat for the past seven years.")

51

145.    Employers can direct contract on a full replacement basis in certain geographies. For example, Intel began direct contracting on a full replacement basis for healthcare in New Mexico before expanding its use of direct contracting to Oregon and Arizona in 2016.  DX0725 at 5 (Intel direct contracting in Albuquerque, N.M. with Presbyterian Health Services "to create a benefit plan and delivery system covering the company's 3,500 employees" in that location); Dranove Tr. 1055:18-1056:24; DX0009 at ANTM015167306.   Intel now plans to use direct contracting in California in 2017.    Kendrick (Anthem) Tr. 1268:9-15; DX0009 at ANTM015167306.  Anthem even voiced concerns that ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████.  *See* DX0009 at ANTM015167305.  Boeing directly contracts on a full replacement basis in certain geographics as well.  Abbott (WTW) Tr. 122:15-24; *see also* DX0006 at ANTM015161832, 863.  Similarly, Caterpillar offers a network comprising more than thirty hospitals and 3,000 providers, which is comprised of direct contracts with numerous hospitals.  Bisping (Caterpillar) Dep. 19:22-20:2.

146.    Employers can also directly contract with providers for specific healthcare services.  DX0006 at ANTM015161832, 863 ("Lowe's contracted directly with Cleveland clinic for several procedures . . . Walmart contracted directly with Cleveland clinic and five other ACO's for several procedures.")

147.    Health insurers are aware that they can be cut out of the process completely. ████████████████████████ Kendrick (Anthem) Tr. 1188:10-16 (direct contracting is "not an exceptionally large part of the competitive landscape, but it is a competitive threat, nonetheless.").  An employer's simple threat can control prices.  Fowdur Tr. 1363:23-1364:3.

H.   **Specialty Competitors Also Serve Large Employers And "National Accounts" Customers**

148.   In addition to the various carrier, TPA, PSP, and direct contracting options, specialty healthcare vendors compete with these alternatives to serve large employers by offering wellness, care management, and other specialty services to the employers.   Many of these competitors offer new technology or specialty services as inducements to switch to their services.

1.   **Accolade**

149.   Accolade provides concierge or advocacy services, as well as clinical programs. Kertesz (Anthem) Tr. 586:1-2; *see also* DX0014 at CI-04878557 (Accolade is a "[n]iche total population care management carrier" that "performs case management and also advocates employers' turning off DM, nurse line, maternity programs, decision support, etc."). ███

██████████████████████████████████████████████████████████████

███████████████████████. Pogany (former Anthem) Dep. 47:25-48:16.

2.   **Castlight**

150.   Castlight is a healthcare technology company that created a "[c]ost and quality transparency" tool.   DX0014 at CI-04878557 (Castlight's clients include Carlson, DaVita, Honeywell, and Safeway); Thackeray (Cigna) Tr. 747:9-13; Kertesz (Anthem) Tr. 603:1-2. Castlight offers "personalized out-of-pocket cost estimates, clinical quality data, real-time deductible information and more. ██████████████████████████████████

████████████████████████████████   DX0003 at HPHC-ANTHEMDOJ-002434.   Plaintiffs' witness Randall Abbott described Castlight, and Imagine Health, as "disintermediator[s]."   Abbott (WTW) Tr. 209:11-17 (discussing DX0711).   WTW's Abbott defined an disintermediator as an "organization[] that [is] coming in and disrupting the traditional relationships between the major health plans and employers." *Id.*

151.    Large grocery store chain Kroger is a Castlight client.  Monti (Kroger) Dep. 85:3-9.  Castlight's transparency tool is a mechanism that allows Kroger employees to compare cost information so that employees can see the difference between what one provider charges and another.  Monti (Kroger) Dep. 86:6-15.  Insurance carriers are taking notice of companies like Castlight, as they are "a newer competitor set in the last few years that [Cigna's Senior Vice President of National Accounts is] start[ing] to see more frequently, upmarketing national accounts."  Thackeray (Cigna) Tr. 747:9-13.

### 3.    Quantum

152.    Quantum provides concierge customer service, medical plan administration, and other services nationwide.  Kertesz (Anthem) Tr. 637:5-7; Thackeray (Cigna) Tr. 747:1-2; Williams (Cigna) Dep. 145:9-23; 168:9-12.  Insurance carriers consider Quantum a competitor. Smith (Cigna) Tr. 786:16-787:3.  Anthem and Aetna have both lost accounts to Quantum. Mathai (Anthem) Tr. 1265:1-14; Hayes (Aetna) Dep. 290:12-20.  For example, Quantum took The Cheesecake Factory account from Aetna.  Hayes (Aetna) Dep. 290:12-20 ("The Cheesecake Factory was on our national accounts kind of full-service platform and we lost them to Quantum, all of the membership.").  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████"  Williams (Cigna) Dep. 110:4-18.

### I.    "National Accounts" Customers Take Advantage Of The Varied, Numerous Solutions Available

153.    Employers that fit within Plaintiffs' definition of a "national account" regularly offer their employees multiple solutions.  Mathai (Anthem) Tr. 1262:16-22 (listing direct contracting, private exchanges, regional players, and niche carve-out disruptors as part of a "long

list of threats . . . to our business today.").   Many of the nation's largest and best-known

companies, in fact, offer a variety of health benefit options to their employees:

- **Dell** offers Kaiser in California and Hawaii, and Harvard Pilgrim in Maine and New Hampshire, as part of the sliced health benefits options for its employees. Abbott (WTW) Tr. 197:17-199:13; DX0416 at 3-4, 7-10.

- **GE** directly contracts with hospitals in Chicago, New York City, Cincinnati, and Charlotte to offer total hip and knee replacement services to its employees. DX0004 at CI-00932287.

- **Kroger Co.** directly contracts with the Hoag Orthopedic Institute to offer bundled payments for orthopedic and spinal surgeries to its employees.  DX0004 at CI-00932287.  Kroger internally administers wellness programs to its associates and uses Castlight to allow its employees to compare costs between different providers for the same medical procedure.  Monti Dep. 87:5-19; 86:6-15.

- **Boeing** directly contracts with the UW Medicine Accountable Care Network in Washington State to offer a narrow network of high-performing physicians and hospitals to its employees, and it utilizes a traditional carrier in other states. Abbott (WTW) Tr. 122:15-22; *see also* DX0006 at ANTM015161832, 863; DX0004 at CI-00932287.

- **Intel** directly contracts with Presbyterian Health Services in New Mexico and Providence in Oregon to offer Intel employees an accountable care and patient-centered medical home program called "Connected Care."   DX0009 at ANTM015167306; DX0004 at CI-00932287; DX0006 at ANTM015161832.

- **Home Depot** offers Kaiser Permanente and Imagine Health as part of the sliced benefit options it provides for its employees.  Abbott (WTW) Tr. 199:21-200:7; DX0707 at 1-2.

- **Bank of America** offers Kaiser Permanente, Aetna, Anthem and United as part of the sliced benefit options it provides for its employees.  DX0708 at 5.

- **PNC** offers Medical Mutual, a regional health plan, in addition to Aetna, Highmark Blue Cross Blue Shield, and United as part of the sliced benefit options it provides for its employees.  DX0709 at 2.

- **Sodexo** offers its employees five carriers including Kaiser (in Colorado, Georgia, Hawaii, the Mid-Atlantic, Northern California, and Southern California), HMSA (in Hawaii), Triple-S (in Puerto Rico), United, and Cigna.  Kidd (Sodexo) Dep. 43:4-22, 44:24-45:8, 45:11-16..

REDACTED FOR PUBLIC FILING

- **Lowe's** directly contracts with Cleveland Clinic to have it function as a center of excellence for specific medical procedures for Lowe's employees.  DX0006 at ANTM015161863; DX0004 at CI-00932286.

- **Walmart** directly contracts with Cleveland Clinic and several other accountable care organizations to offer centers of excellence for particular medical procedures to its employees.  DX0006 at ANTM015161863; DX0710 at 42, 62-63. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Schumacher (United) Dep. 300:11-13.  It is also served by the TPAs HealthSCOPE, Blue Advantage, and Castlight.  DX0710 at 39, 61; Abbott (WTW) Tr. 204:9-205:9, 206:12-207:12, 214:9-25; ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.

154.   More broadly, Dr. Fowdur analyzed the Fortune 1000 "national accounts" customers of Anthem and Cigna.  Fowdur Tr. 1347:1-10.  Dr. Fowdur determined that ▮ of Anthem's ▮ "national accounts" are Fortune 1000 companies.  *Id.* at 1347:11.  Of those ▮, ▮ were sliced with at least one other carrier.  *Id.* at 1347:11-13.  Dr. Fowdur determined that Cigna serviced ▮ Fortune 1000 accounts out of the ▮ Cigna "national accounts" identified by Prof. Dranove.  Of those ▮ "national accounts," ▮ sliced with at least one other carrier.  *Id.* at 1350:6-7 (discussing DDX0016 at 24).

155.   Employers are aware of their options and use them to secure the best deals. Mathai (Anthem) Tr. 1261:14-16 ("But between the economic drivers and having the options [they] have, [employers] have the ability to slice and to curate the offer that's best for them.").

## IV.   PLAINTIFFS' ALLEGED "NATIONAL ACCOUNTS" PRODUCT MARKET FAILS

### A.   Plaintiffs' "National Accounts" Allegations Are Inconsistent

156.   Plaintiffs allege that the sale of "commercial health insurance" to "the country's largest employers, known as 'national accounts,'" is a relevant product market that will be harmed by the merger.  Compl. ¶ 8(a), ¶ 20.  In the Complaint, Plaintiffs did not identify a number of members or employees that qualify an employer as a "national account."  Instead, Plaintiffs identified four "unique characteristics" of "national accounts":

They typically require a provider network covering multiple states; undergo a lengthier, more resource-intensive purchasing process involving requests for proposals; are more likely to hire a large consulting firm to aid them in evaluating and selecting an insurer or insurers; and are more likely to want flexible and customized benefit designs. Compl. at ¶ 21.

157.    Prof. Dranove arbitrarily defines "national accounts" two ways: employers with 5,000 or more employees ("NA5") and employers with 5,000 or more employees that are in two or more states ("NA5g").   Dranove Tr. 1022:4-23.   Although Prof. Dranove mentioned the characteristics identified in the Complaint during his trial testimony, the bright-line numeric and geographic screens that he applied do not reflect any of the characteristics expressed in the Complaint.  Prof. Dranove's screens, and conclusions based thereon, are therefore not consistent with the Complaint's characterization of the market.  Relying on these screens is problematic because Prof. Dranove did not undertake any analysis to demonstrate that this group of customers adequately represents a group that can or will be targeted for price increases post-merger.  To the extent that alternatives relevant for groups of smaller sizes are also relevant for groups of 5,000 employees or more, Prof. Dranove's screens are arbitrary definitions of "national accounts."

158.    Plaintiffs include both ASO and fully-insured products as part of the alleged product market despite key differences between the two products. *See, supra,* § III.A.  There is no economic reason to group these two products into a single market, given the different cost structure of the two products and given that 98% of large employers are self-funded. Neither Plaintiffs nor Prof. Dranove supply any such economic reason.

159.    For purposes of Defendants' findings, Defendants use, but do not accept, Plaintiffs' "national accounts" market definition.

**B.    Professor Dranove Failed To Conduct An Appropriate SSNIP Test Or Any Analysis To Quantify The Extent Of Substitution In The Relevant Market**

160.    To prove the existence of a relevant market, the hypothetical monopolist test from the Division's Merger Guidelines states that it should be considered whether a "hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms." *See* HMG § 4.1.1.

161.    Prof. Dranove's SSNIP test does not support the existence of his proposed market because he did not conduct a SSNIP test using his proposed 5,000-plus employee definition. Willig Tr. 2224:7-2225:13.  Prof. Dranove ran his SSNIP test based on two articles that reported elasticities for populations of employers *different* from those in his proposed product market, therefore telling him nothing about the market he defined.  *Id.* at 2223:19-2225:6.  Using the reported estimates of elasticities for different populations was improper and says nothing about the market he purported to measure.  *Id.*

162.    Prof. Dranove's SSNIP test also asks the wrong question.  The articles upon which Prof. Dranove relies consider whether an employer will *forgo* health insurance altogether in response to certain price increases.  But the relevant question is whether, in response to a price increase, employers could choose a competitive alternative to make the price increase unprofitable, not simply whether customers will forgo providing health insurance altogether. Fowdur Tr. 1321:14-1322:10; Willig Tr. 2246:15-2247:5; *see also* HMG § 4 ("[E]valuation of competitive alternatives available to customers is always necessary at some point in the analysis.")  Competitive alternatives to the hypothetical monopolist will exist if the product market is too narrowly defined.

163.    Competition from carriers outside the limited set of twenty-six carriers considered by Prof. Dranove presents significant competitive constraint on the imposition of a SSNIP by the merged firm.   DX0730; Fowdur Tr. 1328:23-1329:18, 1343:3-16, 1339:9-1340:4 (explaining how slicing "imposes competitive discipline in the marketplace") (referencing DDX0016 at 19); *see also supra* § III (describing the numerous firm types that service national accounts such as regional carriers and TPAs).   By excluding carriers other than the selected twenty-six carriers from Plaintiffs' data collection and Prof. Dranove's analysis, Prof. Dranove inappropriately assumed that such competition does not exist without ever analyzing that assumption.   Fowdur Tr. 1328:23-1329:15, 1343:3-16, 1339:9-1340:4.   By considering only twenty-six carriers as relevant market participants, Prof. Dranove assumed that the hypothetical monopolist is comprised of these twenty-six carriers alone—and not in fact of all current and future competitors as Prof. Dranove claims.   Dranove Tr. 2243:3-10, 1114:22-1115:9.

### C.    There Is No Separate "National Accounts" Product Market Because There Is Reasonable Interchangeability

164.    In considering the scope of a product market for purposes of an antitrust analysis, the relevant question is "whether the alternatives available to one group are reasonably interchangeable with alternatives available to another."   Fowdur Tr. 1303:22-1304:18.   To the extent that a product sold to one group is "reasonably interchangeable" with the alternatives sold to another group, the two groups are in the same product market and cannot be separated.   *Id.* at 1303:12-1304:18.

165.    Prof. Dranove relies on a bright-line cut off of 5,000-plus enrollees to define his product market of "national accounts."   Fowdur Tr. 1303:18-1304:18.   Prof. Dranove's 5,000 enrollee cut-off is arbitrary and does not reflect the facts in evidence.   *Id.*at 1303:18-1304:18. Prof. Dranove did not show any tangible differences in customers above and below the 5,000

enrollee line, either qualitatively or through any analysis, that justify a separate product market

for groups with 5,000-plus enrollees. *Id.* at 1307:19-1308:17.  Instead, the evidence in the record

shows that the products sold to employers with more than 5,000 enrollees are in fact "reasonably

interchangeable" with those products sold to groups with less than 5,000 enrollees.  *Id.* at

1304:3-1305:18; Kendrick (Anthem) Tr. 1200:8-14, 1210:22-1211:17; Schumacher (United)

Dep. 303:7-16; Hayes (Aetna) Dep. 198:7-20, 198:22; Martie (Anthem) Dep. 87:9-88:1; *see also*

infra § IV.F.

166.    For example, Plaintiffs did not call a single customer witness during this trial

phase, but implored the Court to read deposition testimony from a supposed "national employer"

witness, Kurt Loring.  Nov. 14, 2016 Hr'g Tr. 54:17-55:6.  Mr. Loring works for a company

called Applied Industrial Technologies, which is a Cigna health insurance customer.  Plaintiffs

and Mr. Loring apparently believe that AIT is a "national account," and Mr. Loring testified that

AIT has "access to [Cigna's] full services to administer and to do our health insurance with

them."  Loring (AIT) Dep. 16:23-17:-12.  Yet a Cigna executive confirmed at trial that Cigna

considers AIT to be a "regional account," not a "national account."  Thackeray (Cigna) Tr.

745:19-25.  AIT is a perfect example of why Plaintiffs' purported "national account" product

market is illusory: the same "full services" are available to "national" and non-national accounts

alike, and even Plaintiffs cannot tell when a company falls within their alleged product market.

### D.    Dr. Fowdur's Critical Loss Analysis Demonstrates That A Competitive Option Need Only Be Able To Serve 9.2% Of The Employees Of A "National Account" To Impose Competitive Discipline

167.    An essential part of the hypothetical monopolist test is determining whether an

attempted price increase would result in the loss of enough business to other suppliers to make

the price increase unprofitable, and a critical loss analysis measures how much of a loss is

sufficient to make the attempted increase unprofitable.  HMG § 4.1.3; Fowdur Tr. 1319:13-17.

A critical loss analysis acknowledges that a competitor can impose competitive discipline without capturing all of a hypothetical monopolist's business on a full-replacement basis. A critical loss analysis highlights the competitive importance of slicing, a phenomena prevalent in health insurance, but ignored by Prof. Dranove.

168.　Based on the margins for all of Anthem and Cigna's customers, Dr. Fowdur calculated that the critical loss is only 9.2%. Fowdur Tr. 1319:18-1320:19 (discussing DDX0016 at 9). In other words, if alternative solutions were available to capture more than 9.2% of "national accounts" business in response to a SSNIP, then the proposed product market would fail the hypothetical monopolist test. *Id.* Similarly, Prof. Dranove reported that Anthem's ASO margin is approximately ▮, and acknowledged this meant that the critical loss is approximately ▮. Dranove Tr. 2403:7-2404:19.

169.　The record is full of examples of competitive alternatives ignored by Prof. Dranove that are capable of capturing more than 9.2% of a future merged firm's business as a result of a SSNIP, whether through slicing or on a full replacement basis. *Id.* at 1332:7-1335:1 (discussing significance and advantages of slicing with TPAs); 1335:17-1336:14 (stating that even though some TPAs may have noncompete agreements with its rental network, "there are hundreds of TPAs, [and] hundreds of networks available" able to compete); 1337:16-1338:4 (stating that Anthem "is almost halfway sliced of its members," Cigna "has a comparable proportion of slice accounts," and Aetna has "considerable slicing . . . as well."); 1339:10-1340:25 (stating that "slicing does not take place exclusively among the big four" and using Bank of America as an example to explain how "slicing imposes competitive discipline in the marketplace"); 1346:9-1347:24 (noting that 60% of Fortune 1000 accounts are sliced and "76 percent of the members within … [those] accounts are in sliced arrangements" with companies

such as "SelectHealth, Tufts Health Plan, MMO, MVP, Emblem, UPMC, Health Net, Health Plan of Nevada, Health Partners, and some other Blues through private exchanges"); 1351:10-1352:9 (discussing how a company with "45,000 covered lives" used direct contracting "to drop its annual cost increases from 18 percent to less than one percent"); 1353:7-1354:23 (stating that innovators such as Accolade, Quantum, MedWatch and Trestle Tree "provide additional competition" because "to the extent that these services get carved out from the health plans that were initially providing them these innovators, these wellness service providers would become competitors as well.").

### E. "National Accounts" Are Sensitive To Price Changes And Able To Switch Payors

170.   Customers meeting Plaintiffs' "national accounts" definition are sensitive to price changes, and it is not difficult for such "national accounts" to switch payors or slice among numerous payors.  *See* ███████████████████████; Fowdur Tr. 1337:16-1339:19 (discussing DDX0016 at 18-19).

171.   Switching or slicing among suppliers of healthcare solutions is so easy that "national accounts" have the ability to "bluff" — using the credible threat of switching carriers, using a TPA, slicing among numerous solutions, entering a private exchange, or direct contracting to extract better pricing from incumbent carriers.  Fowdur Tr. 1339:10-19, 1363:23-1364:3 (noting "local or regional plans are competing for slice components of . . . national accounts" and describing how alternatives in the market allow national accounts to "credibly threaten to bluff in order to get a good deal") (referencing DDX0016 at 18-19); ██████████

██████████████████████████████████████████████████████████

██████████████████████████; Thackeray (Cigna) Tr. 749:23-750:9, 752:17-753:1 (Cigna will lower its overall bid to make sure its "financial offer is . . . more advantageous

REDACTED FOR PUBLIC FILING

or more aggressive" to be selected as a sole carrier as opposed to being part of a slice option, or

to keep an account from moving to a private exchange); ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬ ); *see also infra* § VIII.B.3.b.

172.   "National account" customers are also sophisticated and represented by consultants who are aware of industry trends and appropriate pricing.  Abbott (WTW) Tr. 155:5-19, 64:18-66:8; Kendrick (Anthem) Tr. 1212:15-1213:1 (most national account clients are assisted by sophisticated consulting firms); Fowdur Tr. 1360:12-21; *see also supra* § III.B. "National accounts," and their brokers and consultants, are well aware of the variety of competitive offerings and whether a price increase has been imposed.  Thackeray (Cigna) Tr. 751:11-24. This allows them to readily seek better pricing from alternative sources. *See* Abbott (WTW) Tr. 155:5-19, 64:18-66:8; *see also infra* § VIII.B.3.a.

**F.     Plaintiffs' Numeric Threshold For "National Accounts" Fails To Identify Customers That Have Unique Or Peculiar Characteristics Relevant To Their Choice of Healthcare Solutions**

173.   The ASO healthcare solutions that industry participants provide to "national accounts" are no different than the ASO healthcare solutions that these suppliers provide to customers who are smaller or less geographically dispersed. *See, e.g.*, Butler (Cigna) Dep. 30:21-31:2 ("[C]lient needs can be similar across segments."); Abbott (WTW) Tr. 159:11-22. The varying use of the term "national account" within Anthem and Cigna is a reflection of the fact that "national accounts" do not have a clearly defined set of needs.  Mathai (Anthem) Tr. 1257:7-14 (30-50% of Anthem's "national accounts" have 5,000 members, 20-30% have fewer than 2,500 members, and 10% have fewer than 1,000 members); Smith (Cigna) Tr. 784:12-785:8; Thackeray (Cigna) Tr. 740:12-741:21; *see also infra* § IV.G.

1.      "National Accounts" Do Not Have Unique Provider Network Needs

174.    The need for a provider network covering more than one state is not unique to "national accounts."  All customers, including those that do not qualify as "national accounts" under Plaintiffs' definition, need provider networks where their employees and/or members are located.  Kilmartin (Mercer) Dep. 26:14-23, 27:1-6, 27:8; ███████████████████ ████████████████ Welch (Cigna) Dep. 112:18-113:9.  Large "local" customers, including regional employers, university systems, state governments, and municipalities, require provider networks that span multiple locations and metropolitan areas, both within a single state or in neighboring states, in order to serve out-of-state members, family members, and retirees.  *See, e.g.,* Testa (Lockton Companies) Dep. 17:13-20, 28:19-25, 36:10-22 (state municipalities require broad networks in the state and nationwide); Renzi (Rocky Mountain Health) Dep. 44:14-45:8 (local Colorado clients require provider networks in Utah).

175.    The notion that a "national account" as defined by Prof. Dranove requires a "nationwide network" is "artificial."  Fowdur Tr. 1309:9-15.  Prof. Dranove's "national accounts" do not have a national footprint.  "[M]ore than a third of Anthem's national account customers, as they're defined by Prof. Dranove, in fact only have the majority of their enrollees in one to five states [and] [t]wo-thirds of these accounts have enrollees in only up to 15 states . . . [a]nd the same holds true for Cigna as well."  *Id.* at 1309:16-22 (referencing DDX0016 at 5). Regional carriers, provider-sponsored plans, TPAs, and direct contract relationships with providers are significant competitors in part because they offer provider networks in local geographies that can be used by employers to provide healthcare plans wherever an employer's enrollees reside.  *Id.* at 1333:23-1335:1; Mathai (Anthem) Tr. 1261:10-16; Kendrick (Anthem) Tr. 1183:10-1184:5. Even one of Prof. Dranove's four "national" carriers – Cigna – does not

have a nationwide proprietary network as it rents networks in fourteen states.   Dranove Tr. 2359:6-21 (discussing DDX0085 (map of Cigna's rental provider networks)).

176.   Furthermore, payors like Anthem and Cigna negotiate a single contract with providers that governs all customers, "national accounts" or otherwise, and give all customers the same provider discounts.   Drozdowski (Anthem) Tr. 1642:1-17.

### 2.   "National Accounts" Do Not Undertake A Unique Or Peculiar Vendor Selection Process

177.   Plaintiffs allege that national accounts are more likely to "undergo a lengthier, more resource-intensive purchasing process involving requests for proposals [and] are more likely to hire a large consulting firm."   Compl. ¶ 21.   This is not a unique or particular characteristic of "national accounts."

178.   Many large, local group customers use consultants and issue complex RFPs seeking health insurance products and services identical to those sought by "national accounts." Kendrick (Anthem) Tr. 1210:18-19 (many large local customers use consultants); ███████

████████████████ (██████████████████████████████████████

████████████████████████████████ ); ███████████████████

██ (████████████████████████████████████████████████

███████████████████████ ); McKean (Town of Salem) Dep. 13:18-14:6 (Town of Salem uses Workplace Benefits Solutions as broker).   Plaintiffs' witness Randall Abbott testified to the similarity of services WTW offers to national and non-"national accounts."   Abbott (WTW) Tr. 158:15-159:10.

179.   That Anthem and Cigna have business units focused on selling and marketing to "national accounts" does not mean that such customers constitute a relevant antitrust product market.   *See* Compl. ¶ 21.   Anthem's approach to large local customers in terms of bidding

REDACTED FOR PUBLIC FILING

practices and responses to competitive pressures are not materially different from its approaches to "national account" customers.   Kendrick (Anthem) Tr. 1209:24-1210:14 ("So if you think about a 5,000-life case, we might have one small piece of that business[,] . . . but we still treat it as a national account.   In the local markets you've got 100 lives, 200 lives, and then . . . for example . . . in Georgia [one] which was 640,000 lives. . . . And it behaved and it bought and procured our services very much like the most discerning, progressive, resourceful national accounts.").   Cigna similarly uses regional account teams to manage their "national accounts" and "national accounts" teams to manage their regional accounts.   Thackeray (Cigna) Tr. 741:6-14; 742:2-7.   Clients or consultants occasionally request to be managed by a different business unit (national or local) based on their individual preferences.   *Id.* at 741:15-21; *see also* Abbott (WTW) Tr. 158:19-24 (""[S]ize is immaterial[,] . . . [i]f we are able to add value to that relationship and they want our services and are willing to pay for those services[.]").

### 3.   "National Accounts" Do Not Require Unique Vendor Capabilities Or Specialized Vendors

180.   Plaintiffs allege that "national accounts" "are more likely to want flexible and customized benefit designs."   Compl. ¶ 21.   Plaintiffs may say that "national accounts" are more expensive to administer because they require things like customized data files, customized plan designs, and customized clinical programs, as well as dedicated customer service unit. Bierbower (Humana) Tr. 802:18-803:11.   As a result, Plaintiffs may also argue that "national accounts" prefer four particular carriers — Anthem, Aetna, United, and Cigna.

181.   There are a multitude of options for "national accounts" beyond those four carriers.   *See, supra,* § III.   The availability of these options demonstrates that "national accounts" do not require specialized vendors.   To the extent that carriers outside of the four that

Prof. Dranove and Plaintiffs consider can provide the level of services that "national accounts" desire, they represent adequate competitive alternatives.

182.    Based on the critical loss that Dr. Fowdur computed, these alternatives only need to be able to serve a small proportion of the employees of "national accounts" to be competitively significant.   Fowdur Tr. 1319:18-1320:19.   As discussed above in Section III, small and large insurance carriers, TPAs, and provider-sponsored plans can provide all services required by a "national account." Dr. Fowdur testified about several examples of such competitors ignored by Prof. Dranove, including competitors like Collective Health, which has "a full spectrum of customers in terms of size that it offers its services to . . . [and] offer[s] the same product spectrum to the entire range of customers."   *Id.* at 1305:6-18 (referencing DDX0016 at 14-30).

183.    Plaintiffs also contend that United, Anthem, Aetna, and Cigna are selected by customers on a "full-replacement" basis, yet more than half of the employers that select one of these four carriers slice their healthcare plan with other entities, indicating that numerous other vendors can provide similar services as United, Anthem, Aetna and Cigna.   *Supra* § III.C; Fowdur Tr. 1337:16-25.

184.    Based on Prof. Dranove's data, Anthem serves only ▮▮▮▮▮ of the Fortune 1000 companies, the majority of which are sliced with many other competitors, including ▮ accounts sliced with Kaiser and ▮ accounts sliced with companies such as Select Health, Tufts, MMO, MVP, Emblem, UPMC, Health Net, Health Plan of NV, and Health Partners.   Fowdur Tr. 1346:10-1351:4 (referencing DDX0016 at 23). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████. Each of these competitive alternatives services "national accounts" as well as smaller or less geographically dispersed customers. *Supra*, § III. Based on Dr. Fowdur's analysis, as long as some group of those competitive alternatives, combined, is available to capture more than 9.2% of Anthem's "national accounts" business, then those alternatives are sufficient to pose a constraint against anticompetitive effects. Fowdur Tr. 1319:13-1320:19, 1341:9-15. In fact, based on Prof. Dranove's data, ███ of Fortune 1000 accounts are served by insurers other than Anthem, Cigna, United, Aetna, or Humana. Dranove Tr. 2389:2-16, 2390:19-2391:13 (discussing DDX0120). Of the "other" share, the Blues only account for ███ of the Fortune 1000 accounts, based on Prof. Dranove's data. *Id.* at 2391:14-21 (DDX0132).

### G.   There Is No Industry-Recognized Definition Of "National Accounts"

185.    "National account" is not an industry-recognized term that refers to a particular type of customer. It is subjective industry jargon lacking a common definition. Prof. Dranove actually recognized this fact. Dranove Tr. 1047:6-9 ("And, again, I think it's well understood that each employer, for reasons unique to that employer, has defined 'national accounts' in different ways.").

186.    To the extent the term "national account" is used, it has no industry-recognized meaning because "there's no standardized approach." Brown (Arthur J. Gallagher) Dep. 78:15-21, 77:20-78:2 ("One carrier might have as [its] minimum threshold [for national accounts] 3,000 employees, another might be 5" and any "alignment" in the definition is "coincidental"); ███████████████ (r███████████████████████████ ); Testa (Lockton Companies) Dep. 35:3-4, 7-15 (national account is not a "particular size"); Sharp (Aon) Dep. 91:2-7 ("each carrier has a different definition").

187.    The term has so little industry meaning that a number of companies in the industry, including three of the largest consultancies, do not use the term *at all*. Kilmartin

(Mercer) Dep. 18:12-14 (Mercer has no category of "national accounts"); Lonsdale (Arthur J. Gallagher) Dep. 38:11-39:4, 39:7-9, 39:11-40:11 (no "internal grouping of clients" called "national accounts"; Sharp (Aon) Dep. 91:2-7; Abbott (WTW) Tr. 157:2-6. Similarly, other Blues, ██████████████████, have no official "national account" segmentation. ████ ████████████.

188.   Anthem's own use of the term "national account" highlights that the term has no particular meaning in the industry. For one, Anthem actually has *two* definitions. Anthem's definition is "5,000 or more employees with more than 5 percent of the employees residing out of state." Jay (Anthem) Dep. 21:13-22:14. But if the employer is represented by the consultancies Aon, Mercer, or WTW, then the definition is "2,500 or more employees with 5 percent of those being outside of the home state or the contract state." *Id.* Ms. Mathai also testified that 10% of Anthem's "national accounts" have fewer than 1,000 members, and 20-30% of such accounts have fewer than 2,500 members. Mathai (Anthem) Tr. 1257:7-14.

189.   When entities do use the term, numeric thresholds vary widely. For example, █████, Humana, ████████ and Aetna refer to groups with at least 3,000 or more employees as "national accounts," Cigna refers to groups with 5,000 or more U.S. based full-time employees as "national accounts," while ███████ uses the term to refer to groups of 3,000 or more *members*. ██████████████████████████; Sullivan (Cigna) Dep. 53:20-24; ████████████ ████████; Hayes (Aetna) Dep. 22:18-23:9; ████████████████████████; *see also* Dranove Tr. 2364:25-2365:17 (discussing DDX0088). Out of the twenty-six firms the Plaintiffs obtained data from in response to CIDs, only Anthem and Cigna "use the 5,000 employee cutoff." *Id.* at 2364:15-17 (discussing DDX0088). Other companies use even lower thresholds, such as 1,000 eligible employees (Harvard Pilgrim), 100 eligible employees (Blue Shield of

California),  total health care contracts (███████████████), or even just a single covered

life outside of a particular area (BCBS of North Carolina, HCSC, BCBSA, and Medical Mutual

of Ohio).  *Id.* (discussing DDX0088).

190.    The terminology varies in geographic scope as well.  ███████████████

███████████████████████████████████████████████████████

███████████████████████████████.  ███████████████████████

███████████████████████.  By comparison, Cigna requires members to be in two or more

states and ███████████████████████████████████████████.  Sullivan

(Cigna) Dep. 53:20-24; █████████████████████.

191.    Some definitions carve out particular types of employers.  For example, Humana

defines a "national account" as one with 3,000 or more employees and in two or more states, but

excludes from its definition "public sector accounts[,] schools[, and] hospitals."   Bierbower

(Humana) Tr. 827:5-14.

192.    The definition is also fluid.   For example, ██████s definition of "national

account" used to be ███████████████████████████████████████████████s.

███████████████████████.  Anthem's definition recently changed in "either 2012 or

2013."  Jay (Anthem) Dep. 132:8-133:19.  The definition was previously "a thousand employees

or more with 5 percent out of state . . . for Willis Towers Watson, Aon Hewitt and Mercer [.]"

Jay (Anthem) Dep. 132: 8-25.

193.    Industry participants also have exceptions to how they serve "national accounts."

Thackeray (Cigna) Tr. 740:21-25.  For example, Cigna has some customers with less than 5,000

employees who are considered "national accounts," and some customers with more than 5,000

employees who are considered regional accounts.  Thackeray (Cigna) Tr. 742:8-12.

194.   The Department of Justice itself reinforces the lack of meaning attributable to the term "national account" by defining the term in its second request to Anthem as "a customer with at least 1,000 employees." Dranove Tr. 1048:11-20.

195.   After February 2016, Plaintiffs stopped asking CID recipients for their definitions of national accounts. *Id.* at 2365:20-2366:6 (discussing DDX008).

196.   Prof. Dranove in fact uses two *different* metrics — NA5 and NA5g — to calculate market shares in the *same* alleged product market. Dranove Tr. 1022:4-1023:6.

197.   Confirming that "national accounts" has no industry-recognized meaning, various industry participants referenced the arbitrary nature of their company's use of the term. *See, e.g.*, Bierbower (Humana) Tr. 828:8-10 (agreeing that there is "no particular magic" to Humana's 3,000 employee threshold); Bailey (Cigna) Dep. 65:11-66:4 ("Cigna . . . arbitrarily defines a national account");

198.   The lack of industry recognition means that Plaintiffs' "national accounts" product market cannot be subjected to economic scrutiny for purposes of the antitrust inquiry, and therefore Plaintiffs' bright-line definition "does not exist." Fowdur Tr. 1307:14-23 (referencing DDX0016 at 4).

**H.   "National Accounts" Do Not Have Distinct Pricing**

199.   There is no distinct pricing scheme for "national accounts" compared to other customers. Plaintiffs presented no evidence to support this notion, as Prof. Dranove admitted. Dranove Tr. 2361:4-2363:1.

200.   "National accounts" are charged for health insurance the same way as any other type of account — either on a PMPM basis or on the total cost of healthcare.

71

██████████████████████████████████████████████████████████

"█████████████████████████████████████████████████████████████

████████████████  ████████████████████████████████████.

201.     There are two primary costs associated with ASO services — ASO fees and medical costs.  Medical costs are tied to discount rates, while ASO administrative fees are priced based on the services requested.  Hayes (Aetna) Dep. 37:3-13, 37:25-38:1, 38:4-11, 38:17-39:3, 39:21-40:7, 198:23-199:12, 199:15-18, 199:20-23 (fees for like services, whether national account or middle market, "would be similar"); Jay (Anthem) Dep. 49:15-50:4, 51:3-10 (███████████████████████████████████████████████████████████ ███████████████████████████).  The two criteria that comprise Plaintiffs' "national accounts" definition–customer size and geographic scope — are not relevant pricing factors, except for the general relationship that as customer size goes up, ASO administrative fees on a per member basis go down because this allows the ASO insurer to spread administrative costs across a larger pool of members.   Kertesz (Anthem) Tr. 546:5-20 (describing Anthem's pricing bands); Kilmartin (Mercer) Dep. 139:5-23, 140:1-5, 140:8-141:2; ███████████████████

██  Similarly, discount rates are not distinct to "national accounts."  Healthcare providers make the same discount rates available to all commercial customers, including "national accounts."  Drozdowski (Anthem) Tr. 1642:1-17; █████████████████████████ (███████████

███████████████████████████████████████████████████████

███████████).  "National accounts" face no distinct pricing as a group and, if anything, benefit from lower ASO fees due to their larger size.

V.   **PLAINTIFFS' ALLEGED "NATIONAL ACCOUNTS" GEOGRAPHIC MARKET DEFINITIONS FAIL**

202.   Plaintiffs allege two geographic markets for "national accounts" — "(1) the parts of the 14 states where Anthem sells under a Blue license and (2) the United States generally." Compl. ¶ 23.  The facts do not support either proposed geographic market.

203.   To prove the existence of a relevant geographic market, the Merger Guidelines state that a SSNIP test should be performed.  *See* HMG § 4.2; *supra* §IV.B.  Prof. Dranove did not conduct a SSNIP test for either the alleged 14-state geographic market or the alleged 50-state geographic market, and on this basis alone, both markets fail.  Willig Tr. 2225:3-18.

A.   **Plaintiffs' 14-State Geographic Market Is Inappropriately Gerrymandered Based On Only A Single Common Condition — Anthem's Presence**

204.   Plaintiffs' 14-state "national accounts" geographic market comprises the fourteen non-contiguous states in which Anthem has a presence.  These states otherwise bear no similar attributes in terms of location, competition, economy, or any other relevant factor.

205.   Plaintiffs have identified no industry participant that recognizes the existence of this 14-state geographic market.

206.   In four of the fourteen Anthem states (Kentucky, Nevada, Ohio, and Wisconsin), Plaintiffs do not even allege any potential anti-competitive effects from the proposed merger. Dranove Tr. 1132:9-21.  Plaintiffs have provided no explanation for why "national accounts" in those states may face harm, when smaller customers in those states will not.

207.   The Merger Guidelines advise that "[d]efining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares.  This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market."  HMG § 4 (Market Definition).  Competitive conditions across the fourteen states vary significantly, as Prof. Dranove acknowledged.  Dranove Tr. 2341:14-22,

73

2353:13-22.  For example, witnesses from Anthem, around which Plaintiffs framed the alleged geographic market, testified that competitive conditions differ throughout the fourteen states. Mathai (Anthem) Tr. 1263:1-25, 1270:9-15 (while Anthem has maintained a "slightly positive" market share through slicing overall, it has sustained heavy membership losses from clients through slicing in Georgia, New York, and Virginia).  Prof. Dranove stated that these variations do not undermine his market shares because he accounted for those differences by aggregating across the states to net out the effects.  Dranove Tr. 2341:14-22.  However, there are different regional firms throughout the fourteen states that each have a significant amount of share depending on the specific geographic location, and therefore you cannot aggregate the competitive conditions in the 14-state market.  Israel Tr. 2001:18-2002:19.

208.    Customers with significant enrollment outside of the fourteen Anthem states readily can slice or threaten to slice using health plans operating outside the alleged 14-state geographic market, and thereby impose "competitive discipline on a hypothetical monopolist." Fowdur Tr. 1312:5-11, 1314:10-1315:13. Based on Prof. Dranove's enrollee data, 30% of Anthem enrollees and 69% of Cigna enrollees (collectively, 43% of enrollees) reside *outside* of Plaintiffs' 14-state geographic market.  *Id.* at 1311:19-1312:4 (referencing DDX0016 at 6).

209.    Further, commuting patterns could lead employees to choose providers closer to home or work in non-Anthem states.   For example, New Hampshire is part of Plaintiffs' proposed 14-state relevant market, but Massachusetts is not.   Yet the former Southern New Hampshire Health System CEO testified that the hospital system's Nashua, NH campus draws from the greater Boston CBSA.  Wilhelmsen (SNHHS) Dep. 77:6-13, 176:4-21. Competitive conditions outside the 14-state market may also effect competition in Prof. Dranove's market, but he fails to consider these conditions as well.  Fowdur Tr. 1311:19-1312:11.

B.  **Plaintiffs' 50-State Geographic Market Takes No Account Of Widely Varying Regional Competitive Differences**

210.    Plaintiffs' second alleged geographic market comprises all fifty U.S. states, including the fourteen states in which Anthem competes.

211.    Anthem cannot compete under the Blue brand for customers headquartered in thirty-six states of the alleged 50-state geographic market, and Anthem cannot set prices for services delivered in those states to employees of Anthem customers. *Supra* § III.C.3.

212.    Prof. Dranove inappropriately assumed that competitive conditions were similar across the alleged 50-state market.  In order to have "a valid geographic market, you need to have similar competitive conditions." Israel Tr. 2020:21-22.  But competitive conditions vary significantly throughout the fifty states due to the presence of numerous regional competitors, and therefore a single, 50-state market is not a proper geographic market.  *Id.* at 2002:7-19, 2020:15-19; Fowdur Tr. 1312:12-24 ("there are competitive differences across each of the 50 states").

VI.   **PLAINTIFFS' MARKET SHARE CALCULATIONS ARE UNRELIABLE AND NOT APPROPRIATE TO ASSESS THIS MERGER**

213.    The Division's Merger Guidelines advise against the use of market share calculations when assessing the potential competitive effect of a merger in an industry involving differentiated products such as health insurance sold to large employer customers in the United States. HMG § 6.1. The Guidelines instead recommend alternative tools such as econometrics, diversion ratios, and merger simulation models, which more accurately reflect potential harms in such an industry.  *Id.*; Willig Tr. 2164:2-13, 2165:18-2166:12.  Nevertheless, Prof. Dranove relied on market share calculations.

214.    Prof. Dranove's market share calculations are unreliable and misleading.  Among other failings, they ignore the ubiquitous phenomenon of slicing.  Dranove Tr. 2368:12-21

75

(discussing DDX0105).  He attempted to correct for this error in his rebuttal testimony by adding a 9.5% "plug" to his denominator and, in so doing, discredited his earlier presentation of market shares.  *Id.* at 2370:24-2371:15.  Prof. Dranove testified that he never added his 9.5% "plug" to the share he calculated for his NA5G definition.  *Id.* at 2385:1-23.

215.    His calculations also exclude numerous competitors, including over one hundred insurers, and all TPAs.  *Id.* at 892:2-893:2.  Prof. Dranove admitted that such entities are part of his "national accounts" product market.  *Id.* at 853:17-854:10.  His attempt to account for these competitors by using a "gut check" census number failed five of six times because the census number was less than the total of the twenty-six firms.  *Id.* at 900:14-22, 1167:10-14.  In those five instances, his market share calculations systematically excluded hundreds of market participants, demonstrating the calculations' unreliability.  Willig Tr. 2219:6-12.  Additionally, with Prof. Dranove's 9.5% "plug," his market share calculations exceed the census number for both his NA5 and NA5G definitions.  Dranove Tr. 2385:17-2386:10 (discussing DDX0115).

216.    By claiming that his relevant market includes all TPAs, other carriers, and other forms of health insurance, but not actually including those competitors in his market size calculation (the denominator), by definition Prof. Dranove has incorrectly calculated market shares and the shares of both Anthem and Cigna.

217.    Prof. Dranove's decision to rely on unreliable share calculations is not surprising, as he concluded "long before the Justice Department approached [him]" that the market comprises four national carriers being reduced to three.  Dranove Tr. 1015:20-1016:10.  In other words, Prof. Dranove formed his conclusions prior to considering the evidence in this case.

A.    **Market Share Concentrations Are Inappropriate Tools To Measure Industries Comprising Differentiated Products**

218.    Differentiated products, which appeal to different customers for different reasons, are imperfect substitutes for each other.  Willig Tr. 2164:14-2165:17.  In such markets, bright-line market boundaries are not appropriate because it is not possible to determine products that can be freely substituted with each other from those that are poor substitutes for the products within the market.  *Id.* at 2165:18-2166:12; *see also* Fowdur Tr. 1307:24-1308:19.  Because products with widely different prices and features may, in fact, be in the same market, identifying a relevant market is complicated considerably.  Willig Tr. 2164:2-2166:12.  The Division's Merger Guidelines recognize this problem and suggest alternative solutions:  "The Agencies rely much more on the value of diverted sales than on the level of the HHI for diagnosing unilateral price effects in markets with differentiated products."  HMG § 6.1; Willig Tr. 2164:2-13, 2165:18-2166:12.

219.    The products here are differentiated by characteristic — generally across the industry and specifically between Anthem and Cigna — and by geography.  Willig Tr. 2164:14-2165:17.    Randall Abbott explained that employers differ from each other in terms of the healthcare solutions they seek.    When evaluating bids for healthcare solutions, employers consider a variety of differentiators other than price, including account services, technological innovations, data security, and network breadth.    Abbott (WTW) Tr. 86:15-87:14, 155:20-156:10.  Consultants generally assemble a unique set of objectives and weighted priorities to allow the customer to assess these differences.    *Id.* at 90:20- 91:18; Dranove Tr. 959:16-20.  David Cordani confirmed that "other components" besides price comprise the "basket of value decisions" for employers, including service, access, clinical program quality, and other

"attributes." Cordani (Cigna) Tr. 412:24-413:4. Healthcare solutions are therefore differentiated products. *See* Willig Tr. 2164:14-25, 2174:11-18 (discussing DDX0014 at 5).

220.    Consistent with testimony throughout the trial, Prof. Dranove contrasted the Anthem "cost leadership" strategy from the Cigna "benefit leader strategy" in terms of how the two companies sell their products to "national accounts." Dranove Tr. 971:2-972:13. He explained that Cigna pursued this strategy "to offer a different type of product" than Anthem. *Id.* at 972:4-5. Anthem and Cigna offer products differentiated from each other.

221.    Because the relevant purchasing decision is made by the employer, not the employee, the competitive conditions facing that employer are the relevant questions for assessing the effect on competition. Willig Tr. 2168:11-2169:6, 2170:4-10. Market share calculations based on the 14-state Anthem footprint do not reflect the competitive conditions in the out-of-footprint regions that the employer must consider for employees residing there, and therefore are unreliable. *Id.* at 2213:15-2214:16 (discussing DDX0014 at 6). Including all of these regions into a fifty-state geographic market does not resolve this inherent flaw because it dilutes the share concentrations of regional competitors thus diminishing their importance. *Id.* at 2213:15-2214:16 (discussing DDX0014 at 7). It also either overstates the level of competition between Anthem and Cigna if all the other Blues are combined with Anthem, or causes the share calculations to "essentially collapse," as Prof. Dranove admitted, if Anthem is treated separately, as is appropriate. *Id.* at 2213:15-2214:16; Dranove Tr. 1168:18-24.

222.    By contrast, the tools recommended by the Guidelines to measure the value of diverted sales in these markets (diversion ratios, assessing upward pricing pressure (UPP), and merger simulation models) do not suffer from these problems, and demonstrate that the merger will not have anticompetitive effects. *See, infra,* § VII.B.2.

REDACTED FOR PUBLIC FILING

223.    Prof. Dranove's market shares further fail because static market shares ignore dynamic industry factors (rapid entry, potential for large enrollment changes from lumpiness of enrollment, churning of customers among existing health plans) that show a rapidly changing marketplace, and therefore are not indicative of the future competitive significance of a number of important market participants. Fowdur Tr. 1357:4-16; *see, infra,* § VII.

**B.      Prof. Dranove's Market Share Calculations Are The Result Of Misleading Methodologies And Insufficient Data**

224.    Competition in the health insurance industry is particularly difficult to measure using market shares, as many market participants testified.  For example, Aetna's consultant responsible for market share analysis explained that "[t]he truth is there's no universally precise way to accurately calculate member or customer share without a lot of refinement."  Hayes (Aetna) Dep. 79:11-14, 80:9-14.  Similarly, a ▬▬▬▬ executive testified that ▬▬▬▬ ▬▬▬ uses ▬▬▬▬▬▬▬▬▬▬▬▬ ▬ ▬▬▬▬▬▬ ▬▬▬▬▬▬▬.  Prof. Dranove admitted this difficulty in his academic publications: "We conclude that the publically available sources of data on health insurance market shares are unreliable. They show great variability across years relative to both a reasonable, prior, and to the variability exhibited in hospital discharge data. They do not reflect merger activity."  Dranove Tr. 1165:3-10.

225.    Despite having subpoena power through CIDs for over a year, Plaintiffs requested data from only twenty-eight companies, fifteen of which were Blues (including Anthem), and received data sufficient to calculate "national account" market shares from only twenty-six of these companies. Dranove Tr. 1103:4-7 (discussing DDX002).  Prof. Dranove, who had input into the selection of CID recipients as well as the types of data to request, admitted that the Division failed to seek data from over one hundred insurance plans and all stand-alone TPAs. *Id.*

at 892:2-893:6.  Prof. Dranove admitted that the Division "did not get data on every current and future seller of health insurance," but that "would have been the goal."  Dranove Tr. 2337:6-20.

### 1. Prof. Dranove's Denominator "Plug" For Slicing Discredits Its Previously Identified Market Shares

226.    Prof. Dranove's data collection does not allow for identification of sliced accounts, a ubiquitous effect in the industry.    Fowdur Tr. 1349:11-19, 1350:11-1351:4. Customers with more than 5,000 employees may be sliced among multiple insurers such that one or more of the insurers would not cover 5,000 employees and would therefore not count towards Prof. Dranove's market share calculations.  Dranove Tr. 893:8-13; DX0726; DX0727 (backup data revealing the deficiency in matching companies to carriers, and ignoring slicing).

227.    Fourteen of the twenty-six insurance companies who provided CID responses to Plaintiffs did not provide customer names.  Dranove Tr. 1104:11, 1136:12-1139:2; DX0728 (backup data omitting company names).  It is impossible to cross-reference account names from those fourteen carriers with any other carrier to identify slicing.  Id. at 1136:12-23, 1139:3-24, 2372:18-2374:1 (discussing DDX0106); Fowdur Tr. 1364:5-22.  Prof. Dranove did not attempt to find alternative sources of slicing data despite the inadequacy of the CID discovery process. Public sources of slicing data, such as Form 5500 submissions to the U.S. Dept. of Labor, were not included in his analysis.  Dranove Tr. 1155:16-1158:8 (discussing DDX0007).  He admitted that NA5 and NA5G calculations would have missed six suppliers of healthcare solutions to Chevron, even if he had obtained data from them.  Id. at 2374:2-11 (discussing DDX0107).

228.    Prof. Dranove acknowledged this failing by authoring a supplemental report on the eve of trial where he admitted that his "methodology would fail to pick up the 'smaller' slice, and could therefore theoretically affect my measures of market share and HHI."  Id. at 2372:18-2373:3) (discussing DDX0106 (quoting Prof. Dranove, Third Report at ¶ 1 (Nov. 20, 2016)).

REDACTED FOR PUBLIC FILING

Despite admitting his mistake in his November 20, 2016 report prior to testifying on November 28, 2016, Prof. Dranove presented the Court with market share calculations he knew to be unreliable because they excluded a key phenomenon in the industry — slicing. *Id.* at 2254:20-2255:13. The failure to account for slicing means that Prof. Dranove's original market share calculations miss significant market competition, overstate Anthem and Cigna's market shares, and, by his own admission, must be ignored. *Id.* at 2371:7-15; Fowdur Tr. 1346:13-1350:18.

229. Prof. Dranove's new market share calculations are themselves unreliable. His calculations fail for all of the same reasons as his initial calculations. *See, infra,* § VI.B.2-4. He also did not calculate the HHIs for the entire market — he calculated only Anthem and Cigna – and therefore can draw no conclusions about the market in total. Dranove Tr. 2370:24-2371:15 (discussing DDX0209 at Exhibit 1 (reporting HHI for Anthem combined with Blues and Cigna only). His new slicing calculations underlying the market share calculations are based solely on an Anthem document that underrepresents actual slicing and was described by Prof. Dranove as "not 100 percent complete." *Id.* at 2255:22-25; *see also* Mathai Tr. 1283:23-25 (referring to Anthem's Salesforce.com data as "anecdotal"). Prof. Dranove used 9.5% as his estimate for slicing, but Dr. Fowdur testified that slicing is likely far higher than 9.5% based on her survey of data available on slicing. Fowdur Tr. 1346:10-1347:16 (60% of Fortune 1000 companies slice).

### 2. Attributing Members Of Other Blues To Anthem Overstates Anthem's Competitive Significance

230. Prof. Dranove's market share calculations treat the Blues as a single competitor. Dranove Tr. 883:20-884:17. But assigning other Blues' market shares to Anthem does not reflect competitive realities, and improperly inflates the purported market share of the post-merger entity. Willig Tr. 2213:15-2214:16.

231.    Prof. Dranove admitted that the change in HHI concentration for the proposed national accounts market "would essentially collapse" if the Blues' market shares were calculated separately from Anthem's.    Dranove Tr. 1168:18-24.   If Anthem properly were analyzed as an independent competitor in the "national accounts" market, then the total post-merger market concentration would be below 35%, the Division's usual guideline to determine when to seek to enjoin a merger.  *Id.* at 1036:2-10, 1037:21-1038:9.

232.    Anthem should be accounted for separately from the other Blues in market share calculations.   Willig Tr. 2214:17-2215:14.   The entities have independent CEOs and other executives (Abbott (WTW) Tr. 180:8-10) and  Anthem  is a separate and legally distinct entity from other BCBS licensed entities (Swedish (Anthem) Tr. 224:6-12; Dranove Tr. 854:22-855:17); *see also* § III.C.3 (describing competition between BCBS members).

233.    Anthem and the other BCBS licensed entities share a brand and rental network arrangement.   Swedish (Anthem) Tr. 226:22-227:16; *see also supra* § III.C.3.  Anthem pays a "BlueCard" fee to access the regional networks of other Blues that is similar to rental network arrangements used by other regional insurance carriers and TPAs, such as ██████████████  ██████████████  ( ████████████████  ████████████████ ) and ██████████  ████████████████████████ ( ████████████ 18:2-8, 18:10).   Yet Prof. Dranove did not add other rental arrangements together when calculating his shares.

234.    The Blues regularly compete with one another as Blues.  *See, e.g.*, Kertesz (Anthem) Tr. 654:2-13, 655:4-5 (noting Anthem competes against Blue Shield of California, that Blues Plans are not a single competitor, and that the Blues are operated independently); ████  ██████████  ████████ .   They also regularly compete with each other through non-Blue branded business.  Anthem competes using its Amerigroup subsidiary against other Blues in nine

non-Anthem states. Swedish (Anthem) Tr. 238:13-17, 270:20-271:22, 273:19-274:14, Kendrick (Anthem) Tr. 1207:18-25; PX0125 at 4. Post-merger, Cigna will continue to compete with other BCBS licensed entities. Swedish (Anthem) Tr. 263:20-24. Prof. Willig calculated that Anthem would earn only ▮▮▮▮ of the revenue it would expect to earn from an average "national account" Cigna customer if it relied solely on BlueCard fees and is therefore incentivized to compete against other Blues as Cigna. Willig Tr. 2157:9-15 (discussing DDX0014 at 14).

235.    Industry participants consider the Blues, including Anthem, to each be separate competitors. Abbott (WTW) Tr. 73:9-14 (naming major health plans, including "the Blue Cross/Blue Shield organizations, the [sic] Anthem, Aetna, Cigna, and United"); Bierbower (Humana) Tr. 829:23-830:6; Smith (Cigna) Tr. 785:17-786:2 (naming Anthem and Blues as separate competitors); Hayes (Aetna) Dep. 66:21-23; 67:1-7; 67:10-23 (Aetna considers Anthem and the other BCBSA members to be separate competitors).

236.    Prof. Dranove justified treating the Blues as a single competitor because Blue plans occasionally cede accounts. Dranove Tr. 883:20-884:15. He later admitted that he did no empirical study of ceding (id. at 993:14-22, 1125:15-21) and, in fact, ceded accounts comprise less than 5% of the total size of "national accounts" in the United States (id. at 1126:18-22).

237.    Prof. Dranove justified grouping the Blues together based on members' perception, but provided no rationale for why market share calculations should be based on the perception of employees, rather than the perception of "sophisticated" HR departments of large employers who actually make the relevant purchase decision. Id. at 854:22-857:15, 884:8-12.

238.    Prof. Dranove testified that the merger should not be analyzed as if the Blues collectively were acquiring Cigna. Id. at 992:15-17. Yet he went on to do just that, as he

admitted that his market share calculations would be the same if Anthem acquired thirty-two of the thirty-five Blues, as well as Cigna. *Id.* at 1121:6-15.

239.   Prof. Dranove's back-up files contained Anthem's market share calculations when Anthem is treated as an individual competitor. *Id.* at 1036:2-8. Anthem's market share for Prof. Dranove's 50-state market is 20% (NA5) and 19.8% (NA5g). *Id.* at 1034:2-6 (discussing DDX0001). Anthem's internal market share estimate for its 14-state territory including both home and host lives is approximately ███. PX0191 at ANTM010128336-5. Approximately 55% of Anthem members are home lives. Kertesz (Anthem) Tr. 639:2-640:15 (the home membership is 7.5-7.6 million members compared with 13.5-13.6 total "national accounts" members). Thus, the home market share in the 14-state territory is around 15%. When combined with Cigna's 8-9% market share, as Prof. Dranove admitted, the market share calculations "would essentially collapse." Dranove Tr. 1168:18-24.

### 3. The "Build-up Approach" Improperly Excludes Market Participants From Total Market Size

240.   Prof. Dranove used two different methods to calculate the total market size — the denominator — for his "national accounts" market share analysis: A) the "build-up approach" and B) the "census approach." Dranove Tr. 888:7-17, 890:24-891:3. He claimed that he selected the larger of these two values for his market share denominator as a "robustness check" because both sources of data were "noisy." *Id.* at 888:18-889:13.

241.   The "build-up approach" to the denominator consisted of summing the total enrollment of all companies from which Prof. Dranove acquired data. *Id.* at 890:24-891:3. In all but one of Prof. Dranove's market share calculations, the "build-up approach" was used to calculate the denominator. *Id.* at 898:25-899:10. In these five situations, Prof. Dranove measured the market share of Anthem plus fourteen other Blues, and then compared the market

REDACTED FOR PUBLIC FILING

share of that combined entity to the eleven other companies from whom data was collected. *See, e.g.,* Dranove Tr. 1103:1-7 (discussing DDX002), 883:20-884:15, 890:24-891:3. Prof. Dranove admitted that adding market participants to the denominator would decrease Anthem's calculated market share. *Id.* at 1113:16-1114:9.

242. Prof. Dranove defended his "build-up method" by stating that it included "all competitively significant firms." *Id.* at 892:2-892:4. But he admitted that suppliers to "national account" customers include so-called large national carriers, regional carriers, provider-sponsored plans, local health care systems, and TPAs. *Id.* at 853:20-854:10. Rather than procuring data to include these entities' enrollment in his "build-up method" denominator, Prof. Dranove ignored enrollment from *all* TPAs, twenty-seven of the largest fifty health insurance companies, and seventy-five of the largest one-hundred health insurance companies; Plaintiffs never even sent them CID requests for their data. *Id.* at 1116:5-1117:16 (discussing DX0730); 892:2-893:2 ("the build-up method does not include hundreds and hundreds of health insurers"); 1052:11-19 (admitting that Plaintiffs did not send a CID to a single independent TPA, thereby rendering it impossible to account for these entities in Prof. Dranove's denominator). In effect, Prof. Dranove simply combined the Blues together and thereby measured the share of a fictional combined entity against only eleven of the *hundreds* of competitors he acknowledges compete in the market. Prof. Dranove's market share calculations using the "build-up method" are thus greatly overstated.

243. The one share calculation Prof. Dranove made using his census approach is also flawed. As Dr. Fowdur explained, the census approach cannot be an accurate measure of market size because in most instances it results in lower total enrollment than the build-up approach, which should be impossible given that the build-up approach includes data from just a subset of

the hundreds of health plans and other solutions that are available.  Fowdur Tr. 1330:5-1331:2.

Thus, even Prof. Dranove's market share calculation based on the census approach is unreliable.

### 4. The "Census" Denominator Method Used Unreliable Inferences To Estimate Market Size

244.    The failure of Prof. Dranove's census number in five of six market share

calculations means that his "gut check" census-based denominators systematically understated

the total market size, the very reason for which it was used, and is therefore itself unreliable.

Willig Tr. 2219:6-22. Prof. Dranove has no way to know whether he has accounted for the entire

market, undermining his analysis.

## VII. MERGER-SPECIFIC EFFICIENCIES WILL GENERATE COST SAVINGS THAT SWAMP ANY ALLEGED ANTICOMPETITIVE EFFECTS

### A. The Efficiencies Will Lead Directly To Consumer Savings Through Medical Cost Savings

#### 1. Plaintiffs Admit That Substantial Medical Cost Savings Will Result From The Merger

245.    Plaintiffs admit that the merger will result in substantial medical cost savings.  For

example, Plaintiffs alleged in their Complaint that "[a]s a result of the merger, Anthem likely

would reduce the rates that . . . providers earn by providing medical care to their patients."

Compl. ¶ 71.  The merger synergies accruing to customers are distinct from the deal synergies

announced to shareholders.   Schlegel (Anthem) Tr. 1398:14-1399:9; Matheis (Anthem) Tr.

1611:19-1612:16; Israel Tr. 1831:1-4.

#### 2. Industry Participants Recognize That Self-Insured Or ASO Customers Directly Save When Discount Rates Are Lowered

246.    For self-insured companies, the costs of their employees' medical claims typically

comprise 90-95% of their health plan costs, and the ASO fees for administering the self-insured

plan comprise the remaining 5-10%.  Abbott (WTW) Tr. 175:2-9; *see also* Dranove Tr. 1057:7-

17. Over the past few years, medical costs for all customers are trending up at a rate of 5-6%, whereas administrative fees are trending up at a rate of 0-2%. Abbott (WTW) Tr. 175:10-19.

247. Approximately 98% of large employers — those with over several thousand lives — are self-insured. *Id.* at 69:24-70:4. In self-funded arrangements, the "true payer, the employer, is actually paying the actual cost of the claim . . . . It's more affordable for us to do that. So in other words, if someone goes to the doctor and spends $10 on a drug, we pay that exact $10 as a self-insured employer." Bisping (Caterpillar) Dep. 39:5-40:9. It is undisputed that "if the rates go down, then [the customer] pay[s] less. That's a direct correlation. *Id.* at 75:6-75:10; *see also*, ███████████████████. "[E]very time a healthcare dollar is spent, it's their money. And so if we can reduce that unit price, it saves them money." Drozdowski (Anthem) Tr. 1641:5-21; *see also* Matheis (Anthem) Tr. 1479:19-1480:15, 1631:22-25.

### 3.     Medical Cost Savings From The Merger Will Be Passed-Through To Consumers

248. Firms pass-through cost savings to consumers because it is profit maximizing to do so. Israel Tr. 1955:10-15. A firm that lowers costs has two choices: take the cost reduction in the form of increased profit margin, or pass the savings on to consumers through lower prices and increased sales volume. *Id.* at 1955:10-24. Dr. Israel's analyses show that Anthem passes through both medical cost savings and variable cost savings to consumers. Dr. Israel conducted a regression analysis where he measured (1) the relationship between lower provider prices and ASO fees; and (2) the relationship between lower variable administrative costs and ASO fees. *Id.* at 1953:19-1954:12. This analysis showed that for each $1 decrease in medical costs, there is a $0.023 increase in ASO fees, a 98% pass-through rate. *Id.* at 1954:18-23. Additionally, for each $1 decrease in variable administrative costs, ASO fees are reduced $0.86, an 86% pass-

87

REDACTED FOR PUBLIC FILING

through rate.  *Id.* at 1954:13-17.  Conversely, for the merged firm to claw back the medical cost savings from self-funded clients, an insurer would need to raise its ASO fees nearly 50%.  *Id.* at 1952:16-1953:8.  Such a price increase would not be profitable for this hypothetical insurer because customers would seek other options.  *See e.g.,* Monti (Kroger) Dep. 37:22-38:12 ("If Anthem/Cigna were to try to raise its post-merger prices, even only one percent, [Kroger] would not hesitate to switch to another carrier, as a one percent increase in health insurance costs would be significant"); *see also* Pogany (former Anthem) Dep. 262:17-263:1 (discussing how Anthem was able to increase its client retention rate by *decreasing* administrative fees).

### 4.    Increased Patient Volume Drives Improved Discount Rates

249.    An insurer's volume of covered lives generally improves the discounts the insurer can obtain.  This fact is accepted by academics who study the healthcare industry and it is consistent with the observed discounts for Anthem and Cigna.  Israel Tr. 1833:6-1834:19, 1835:23-1836:1.  It is also consistent with basic economic theory that larger purchasers get lower prices, a proposition with which the last two heads of the Department of Justice's economics groups agreed.  *Id.* at 1832:14-1834:5.

250.    Industry participants agree that larger insurers generally obtain better discounts. Swedish (Anthem) Tr. 290:3-16; Abbott (WTW) Tr. 176:13-19; Muney (Cigna) Dep. 103:16-104:6; Schmidt (Aetna) Dep. 113:20-114:16; Kilmartin (Mercer) Dep. 188:5-24.

251.    ████████████████████████████████████████████ ████████████████████████████████████; *see also* Thackeray (Cigna) Tr. 709:24-710:14 (explaining that "the unit cost negotiation with the provider community has been dictated, primarily based on volume" and noting that Cigna is "not the biggest in this space").

REDACTED FOR PUBLIC FILING

5.     **Dr. Israel's Best-of-Best Model Conservatively Finds That $2.4 Billion In Medical Cost Savings Will Flow To The New Company's Customers**

252.    Dr. Israel quantified the medical cost savings Anthem and Cigna will achieve post-merger through greater volume by implementing a "best-of-best" approach. The best-of-best calculation is premised on the undisputed economic relationship discussed above: an insurer's ability to negotiate attractive rates is tied to the patient volume the insurer can bring to a provider. Israel Tr. 1847:23-1848:9. Under the best-of-best approach, Dr. Israel calculated that approximately $874 million of medical cost savings will accrue to current Anthem customers who will move to lower Cigna rates, and that approximately $1.5 billion in medical cost savings will accrue to current Cigna customers who will move to lower Anthem rates, for a total of $2.4 billion in medical cost savings. *Id.* at 1852:19-1854:1 (discussing DDX0015 at 8).

253.    Notably, the $2.4 billion in medical cost savings calculated by Dr. Israel was calculated separately from the $2 billion synergy estimate calculated by Mr. Matheis' integration planning team. Schlegel (Anthem) Tr. 1398:14-1399:9; Matheis (Anthem) Tr. 1611:19-1612:16; Israel Tr. 1831:1-4. Mr. Matheis' team assessed potential General and Administrative savings and revenue opportunities that would flow to Anthem's bottom line profitability, which Anthem's Board of Directors relied upon in making an offer to buy Cigna. Schlegel (Anthem) Tr. 1399:20-1401:11.

254.    To determine medical cost savings based on the best-of-best model, Dr. Israel conducted a rigorous analysis, starting with 2 billion line item claims from Anthem and Cigna. Israel Tr. 1853:14-15. Dr. Israel matched claims by (1) provider, (2) provider location, (3) service type (e.g., physician, inpatient, or outpatient) and (4) insurance product (e.g., HMO or PPO), and compared the discount rates of Anthem and Cigna for each matched line item. *Id.* at 1852:19-1854:1 (discussing DDX0015 at 8).

89

255.    Dr. Israel's best-of-best analysis is highly conservative.    Although basic economics suggests the combined firm, with greater volume, will be able to achieve larger discounts than either of the two separate firms, the best-of-best model assumes the merged firm will only achieve the *better* of the two rates that existed pre-merger. *Id.* at 1854:19-1855:16.

256.    Dr. Israel's best-of-best model fully accounts for value-based care contract structures. Today, the vast majority of Anthem's and Cigna's health insurance contracts have a fee-for-service component. *Id.* at 1876:20-23 (explaining that over 99% of Cigna's claims data he reviewed were fee-for-service claims); Drozdowski (Anthem) Tr. 1635:10-21, 1638:24-1639:5. To calculate medical cost savings, Dr. Israel compared actual costs to a list price, also known as the billed charges amount. Israel Tr. 1857:21-1858:8. This comparison allowed Dr. Israel to get an apples-to-apples view of the relative cost of each insurer's provider contracts. *Id.* at 1876:20-1877:8. Indeed, even in a value-based reimbursement scheme, insurers continue to negotiate reimbursements with providers, with each side attempting to maximize value under the contract. *Id.* at 1880:9-1882:7. As such, the undisputed economic logic that increased volume results in lower discounts still holds under value-based care contracts. *Id.* at 1880:9-1882:7.

257.    Dr. Israel's method accounts for differences in utilization between Anthem and Cigna patients. *Id.* at 1859:10-13. Because Dr. Israel used actual claims data from Anthem and Cigna, Dr. Israel's best-of-best model specifically credited benefits in claims costs derived from lower utilization. *Id.* at 1858:9-1859:14. Similarly, Dr. Israel's analysis matched claims based on "venue" (e.g., inpatient, physician, or outpatient). *Id.* at 1875:10-14. Lastly, Dr. Israel's model accounted for negotiation between the providers and the payers by looking at current discount rates, which are the result of negotiations between insurers and providers. *Id.* at 1850:14-1851:10. Dr. Israel assumed there will be negotiations post-merger, but found that the

outcome will be different because of the increased volume the merged company will bring to the table. *Id.*

258.    Dr. Israel's best-of-best model analysis is independently verifiable because its conclusions are consistent with industry benchmarks and data. *Id.* at 1862:7-24. Rather than merely reflecting "randomness" in the dataset, as suggested by Prof. Dranove, Dr. Israel's model parallels common industry methodologies — similar to those applied by private consultancies. *Id.* at 1891:20-22, 1904:25-1905:4; Abbott (WTW) Tr. 105:21-106:3; ████████████████ ████████; Drozdowski (Anthem) Tr. 1645:13-1646:6.   Those methodologies regularly calculate Anthem's discount percentage to be roughly ██████ than Cigna — consistent with the results of both internal estimates and Dr. Israel's calculations.   Drozdowski (Anthem) Tr. 1642:18-1644:12; Israel Tr. 1862:7-1863:17 (discussing DX0714).   This consistency is "not randomness;" rather it reflects the "true average" Israel Tr. 1902:22-1905:9.

259.    Dr. Israel's analysis is not dependent on the combined firm's strategy for achieving the medical cost savings (Israel Tr. 2108:7-11); nor is Dr. Israel's analysis affected by any potential discord between the parties.  Israel Tr. 1872:25-1873:18.   The combined firm's post-merger strategy is to deliver value to its customers in the most efficient means, and to maximize profit. DeVeydt (former Anthem) Tr. 1700:11-1701:11. Whether the combined firm's leadership decides to capture these synergies by using an affiliate clause, renegotiation or through value-based contracting, the underlying economic principle remains the same: the merged firm, with greater volume, will do no worse than the previously separate firm with the better discount. Drozdowski (Anthem) Tr. 1655:2-1656:25. If the affiliate clause is not involved, renegotiations will happen soon in the ordinary course of business. *Id.* at 1660:23-1661:13.

REDACTED FOR PUBLIC FILING

260.     Prof. Dranove's "placebo experiment" is not a valid criticism of Dr. Israel's calculated medical cost savings. Israel Tr. 1897:7-1898:25. It is widely accepted that Anthem's discount rates are generally better than Cigna's rates. *See* DX0714; *see, e.g.*, Drozdowski (Anthem) Tr. 1647:4-12; Thackeray (Cigna) Tr. 709:24-710:14 (Cigna has never been the best at bringing aggregate volume to providers, and discounts are primarily based on volume). The distribution of discounts, as illustrated by the claims data Dr. Israel analyzed, comports with that understanding. Israel Tr. 1897:7-1898:25. Dr. Israel agreed that some observed discount variations — particularly at small providers — may be due to the service mix at a given provider and the discounts associated with those procedures. *Id.* at 1901:14-1902:5. Dr. Israel accounted for differences in service mix by considering over 2 billion claims across almost 40,000 providers. *Id.* at 1843:22-1844:3; 1899:8-12. Averaging across claims and providers eliminates such variations, leaving the true average discounts of the two firms. *Id.* at 1902:13-17.

261.     Dr. Israel utilized Prof. Dranove's placebo experiment to demonstrate the robustness of his results. Dr. Israel separated ASO and fully insured claims in the claims data, thereby doubling the data points in his analysis. *Id.* at 1902:22-1905:8. If Prof. Dranove's criticism were valid, increasing the "noise" in Dr. Israel's analysis would generate significantly increased savings. *Id.* However, doubling Israel's data points does not significantly affect his savings results. *Id.* ("So it's not number of dots or how varied they are, it's the overall aggregation that drives my result.").

262.     Even if one were to credit Prof. Dranove's placebo experiment, the merger is still procompetitive. *Id.* at 1905:9-1908:2. Dr. Israel subtracted the cost savings Prof. Dranove calculated in his placebo experiment from the cost savings Dr. Israel calculated through the best-of-best model. *Id.* at 1907:7-12. Dr. Israel then input these reduced cost savings into Prof.

REDACTED FOR PUBLIC FILING

Dranove's merger simulation and Prof. Dranove's model still showed that the merger is procompetitive. *Id.* at 1907:13-17.

263.   Prof. Dranove's contention that all Cigna customers must switch to Anthem to realize these medical cost savings is baseless, because Dr. Israel's efficiencies calculations do not depend on the amount of Cigna accounts rebranded to Anthem.  Israel Tr. 2108:14-2109:13. Mr. Quintero offered no opinions on Dr. Israel's analysis.  Quintero Tr. 2548:24-2549:9.

### 6.   Discounts Are The Relevant Metric To Compare Prices

264.   Discounts were developed over a decade ago as a way to compare the major health plans on a common basis and are the customary tool in the healthcare industry to compare the relative competitiveness of insurers.   Abbott (WTW) Tr. 95:6-23, 99:24-100:24;  104:22-105:10 (WTW's "netRPM" tool is a proprietary discount database they use to advise their clients on the relative competitiveness of insurers); Burnell (Buck Consulting) Dep. 37:4-20 (Buck performs a discount analysis, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇);

Kilmartin (Mercer) Dep. 92:9-20 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); Drozdowski (Anthem) Tr. 1645:13-1646:6 (consultants often compare how two companies' discounts would affect claims costs for a particular customer); *see also* Israel Tr. 1857:11-20.

265.   Dr. Israel's analysis of discounts — like many industry consultants — is not a simple look at the difference in discounts (a "pure discount analysis"), but rather "takes the discount difference and applies it to the actual claims."   Israel Tr. 1858:9-1859:14; *see also* Abbott (WTW) Tr. 106:2-3 ( "[W]e take that [claim] experience data, that claim data, and use that as the basis for the discount determination."); Burnell (Buck Consulting) Dep. 37:4-20. Prof. Dranove agreed with Aon Hewitt's method of looking at discounts.  Dranove Tr. 2420:24-

2421:11 ("The same method, for example, that's used by Aon Hewitt when it look at discounts, they use market baskets.").

266. Insurers, including Anthem, also use discount models to assess their competitiveness on a given bid by comparing their discounts to those of other insurers. Israel Tr. 1954:4-7; Goulet (Anthem) Dep. 108:14-111:21.

**B.    The Anthem And Cigna Joint Integration Planning Team Identified Between $2.6 And $3.3 Billion In Medical Cost Savings And Between $2.2 And $2.4 Billion In G&A Savings**

**1.    The Objectives Of Integration Planning Have Been To Lower Costs And Maximize Product Choice For Customers**

267. Shortly after the merger announcement, Anthem and Cigna's Executive Leadership Teams jointly formulated guiding principles and objectives for integration. Matheis (Anthem) Tr. 1462:8-19, 1463:15-1464:24; DX0235 at MCK-ANTHEM-0000694; DX0240 at MCK-ANTHEM-0001029, 0001033; *see also* DX0049 at ANTM013257314; Cordani (Cigna) Tr. 509:18-515:15; DX0048 at ANTM-DDC-001459645.

268. The integration planning objective has been to provide value to consumers, employers and providers while growing the company and meeting the announced shareholder value. Matheis (Anthem) Tr. 1465:17-1466:11; DX0235 at MCK-ANTHEM-0000694, 0000751. For consumers, employers and Anthem, this means addressing the "affordability crisis" by lowering costs, developing new products which would enable Anthem to grow across multiple market segments and geographies, and maximizing choice and quality. Matheis (Anthem) Tr. 1458:13-1459:3, 1465:1-16. For providers, this means leveraging each company's value-based provider practices to develop an approach that captures the "best of both" companies post-close. *Id.* at 1466:20-1467:14; DX0235 at MCK-ANTHEM-0000751.

269.    Work on integration, data gathering, analysis, and planning began in earnest in October 2015.  Matheis (Anthem) Tr. 1474:8-17; Singhal (McKinsey) Tr. 1799:5-8; DX0240; DX0241; DX0236; DX0237; DX0238; DX0059; DX0239; PX0291; PX0213.  Dennis Matheis, SVP of Integration Planning for Anthem, began working in August of 2015 with his Cigna counterpart on joint planning.  Matheis (Anthem) Tr. 1462:5-14.  They were accountable to SteerCo, which made final planning decisions and consisted of Anthem's CEO, Cigna's CEO, and other key leaders from both companies.  *Id.* at 1457:25-1458:5.  Mr. Matheis had extensive operational experience, including managing a $12 billion business segment at Anthem, launching an unprecedented public exchange product that integrated operations across all of Anthem's fourteen states, and participating in contracting work with providers.  *Id.* at 1488:15-1489:4.

270.    Joint planning teams were led by Anthem and Cigna subject matter experts, working collaboratively with support from more than 1,000 employees of the two companies.

██████████████████████████████████████████████████████████

████████.  *Id.* 1472:8-1473:15; DX0240 at MCK-ANTHEM-0001049-1052, 0001093-1122.

271.    The consulting firm McKinsey facilitated planning as the clean room operator and by providing models for calculating synergies.  Singhal (McKinsey) Tr. 1785:7-1787:5.  Clean teams handled each company's sensitive information to accurately assess both companies' strengths and deficiencies and to report synergy results with confidence that were in fact actionable.  *Id.* at 1786:1-1787:16, 1793:1-6.

## 2.    The Integration Planning And Synergies Calculation Work Was Robust With Extensive Involvement By Both Companies

272.    The Anthem and Cigna joint integration teams worked extensively, with over 1,000 joint meetings.  Matheis (Anthem) Tr. 1473:16-1476:13; Singhal (McKinsey) Tr. 1786:1-

REDACTED FOR PUBLIC FILING

17. Mr. Drozdowski and his team alone had approximately 100 meetings with their counterparts at Cigna on the medical-related synergies. Drozdowski (Anthem) Tr. 1644:16-1645:3.

273.   The analysis of medical cost savings involved collecting seven terabytes of data that included 6.2 billion line items of claim information, 2.4 billion claims, 250 million enrollment records and 2 million provider records — raw data that was used to compare actual spend on medical claims by each company. Matheis (Anthem) Tr. 1480:20-1484:14 ("There [was] no estimation involved."); Drozdowski (Anthem) Tr. 1639:20-1640:5.

274.   Similar data-driven approaches were taken to calculate the G&A cost savings and to plan the go-to-market strategy. Matheis (Anthem) Tr. 1477:6-19. Anthem and Cigna took rigorous "top-down" and "bottom-up" methodological approaches that exceeded industry standards. *See* DX0235 at MCK-ANTHEM-0000709; Singhal (McKinsey) Tr. 1783:5-1784:16, 1792:5-25. The goal was to identify, quantify, and track economic value that would accrue to all stakeholders (e.g., members, providers) based on actual data from both organizations, that was validated with business leaders, pressure-tested based on business logic, and designed from the start to lay the foundation for bottoms-up analysis and structuring. *See* Schlegel (Anthem) Tr. 1397:7-1399:9; Singhal (McKinsey) 1786:1-17; DX0690 at ANTM-DDC-002137127-28; DX0235 at MCK-ANTHEM-0000703, -0000709.

275.   The "top-down" work consisted of a granular comparison of each company's operating expenses and relative operational efficiency across 6,000-plus cost centers. Singhal (McKinsey) Tr. 1783:5-1784:16; Matheis (Anthem) Tr. 1493:1-1494:12; DX0235 at MCK-ANTHEM-0000710 (███████████████████████████████). This top-down effort identified where one company had a more efficient PMPM cost basis for a given G&A

function and allowed for identification of duplication.  Matheis (Anthem) Tr. 1494:13-1495:16, 1497:22-1498:17.

276.   The bottom-up process was initiated in January 2016 to "define 'how' the synergies [projected in the top-down analysis] will be achieved," not whether they *could* be achieved.  DX0237 at MCK-ANTHEM-0000856; *see also* DX0690 at ANTM-DDC-002137128; Matheis (Anthem) Tr. 1495:1-1496:16, 1508:3-20; Singhal (McKinsey) Tr. 1782:24-1784:16.

### 3.   The Anthem and Cigna Joint Integration Planning Team Separately Calculated Medical And Network Savings Of $2.6 To $3.3 Billion

277.   The integration planning team undertook a separate medical cost savings analysis from Dr. Israel and calculated $2.6 to $3.3 billion in annually recurring medical savings, a figure slightly higher than Dr. Israel.  Matheis (Anthem) Tr. 1487:3-6, 1692:23-1693:5; Drozdowski (Anthem) Tr. 1649:7-11.  The medical network savings team — led by Colin Drozdowski, Anthem's Vice President of National Provider Solutions, and Alan Muney, Cigna's Chief Medical Officer — identified and quantified the five categories of network and medical management savings they expected to realize, as well as "dissynergies."  Drozdowski (Anthem) Tr. 1644:16-22, 1646:13-24 (discussing DDX0012 at 4); Matheis (Anthem) Tr. 1481:21-1486:9.

278.   The medical savings analysis was conducted using actual claims data through the McKinsey-led clean room.  Matheis (Anthem) Tr. 1481:21-1483:7; Singhal (McKinsey) Tr. 1784:25-1785:8, 1787:6-16.  The claims data was standardized across Anthem and Cigna with a number of important exclusions to ensure that the savings calculation is conservative:  the "value based" and "care coordination" payment components of value-based programs were excluded; providers with less than $100,000 in claims were excluded; and only commercial PPO network claims (i.e., no HMO rates) were included.   Drozdowski (Anthem) Tr. 1645:13-1646:6 (discussing DDX0012 at 5 and identifying the time period of the claims data), 1647:13-22

97

1655:2-11, 1655:14-24, 1659:16-23.   The team did not cherry-pick the best rates on specific procedures at each provider, but instead only considered which party had the best aggregate (net) discounts at each provider.  Matheis (Anthem) Tr. 1481:21-1484:14.

279.    The largest component of medical cost savings — ▇▇▇ to ▇▇▇ billion annually — will be achieved by moving Cigna customers to Anthem's lower contracted rates in Anthem's 14-state footprint.  Drozdowski (Anthem) Tr. 1646:13-24 (discussing DDX0012 at 4 (identifying savings in the "Anthem Rates" column)), 1647:7-12, 1652:14-1655:25 (comparing claim payments to the same providers); Matheis (Anthem) Tr. 1481:21-1483:7.

280.    Providers have already agreed to the existing Anthem rates analyzed.   Cigna customers can benefit from the better Anthem rates if affiliate language in Anthem's contracts is triggered by Anthem post-merger, or through renegotiating existing Cigna contracts. Drozdowski (Anthem) Tr. 1656:1-24, 1672:3-24; DX0696 at MCK-ANTMCI-0000754; Singhal (McKinsey) Tr. 1802:3-13; Matheis (Anthem) Tr. 1490:6-14.   Anthem decided to pursue a hybrid approach whereby, post-close, the combined company would determine the appropriate approach depending on the particular circumstances of each provider.  Drozdowski (Anthem) Tr. 1656:17-25, 1672:3-25.  This decision will depend on data currently in the clean room, which remains off limits due to its competitively sensitive nature.  Id. at 1671:8-19; Matheis (Anthem) Tr. 1492:3-15.  Post-close, the parties will be able to access this data and identify the best means to achieve savings.  Drozdowski (Anthem) Tr. 1671:8-19; Matheis (Anthem) Tr. 1490:6-15.

281.    Post-merger access to Anthem's BlueCard rates outside Anthem's fourteen license areas will provide Cigna customers an additional ▇▇ to ▇▇ million in annual savings. Drozdowski (Anthem) Tr. 1647:13-1648:12 (discussing DDX0012 at 4); Singhal (McKinsey) Tr. 1810:15-1811:16.  These savings will accrue to Cigna customers in the fourteen Anthem states

REDACTED FOR PUBLIC FILING

that choose to convert to Anthem's Blue brand, thus allowing their employees outside the fourteen Anthem states to access BlueCard rental rates instead of Cigna rates. Matheis (Anthem) Tr. 1487:7-1488:3; Drozdowski (Anthem) Tr. 1647:13-1648:12.

282.   A third source of medical cost savings results from applying Cigna's lower contracted rates to Anthem's customers, yielding ███ to $800 million in annual savings. Singhal (McKinsey) Tr. 1810:15-1811:16; Drozdowski (Anthem) Tr. 1647:17-1648:12. Although Cigna rarely has lower rates than Anthem, the Cigna team recognized that the savings are significant in the aggregate due to Anthem's larger customer base. *Id.* at 1647:17-1648:12 (discussing DDX0012 at 4); Matheis (Anthem) Tr. 1483:13-1484:14,1489:10-1490:7.

283.   Mr. Drozdowski's team identified additional medical cost savings achievable through the combination of Anthem and Cigna. Drozdowski (Anthem) Tr. 1646:13-24, 1648:24-1649:11 (discussing DDX0012 at 4 (confirming ███ to ███ million in ancillary savings, ███ to ███ million in specialty savings, and off-setting dissynergies of ███ to ███ million for BlueCard Fees and ███ to ███ million in out-of-network costs)).

284.   The calculated savings are conservative.   The merger will yield medical management savings arising from best practices regarding medical management techniques being applied to Anthem and Cigna's customers; even though the integration planning team calculated these savings, they are not included in the $2.6 to $3.3 billion in medical cost savings. Drozdowski (Anthem) Tr. 1649:20-1651:1; Singhal (McKinsey) Tr. 1820:20-1821:6. Similarly, additional savings may result from applying Anthem's or Cigna's better cost position by medical procedure, rather than looking at cost position at the provider level. Matheis (Anthem) Tr. 1481:21-1483:7; Drozdowski (Anthem) Tr. 1671:8-19; Singhal (McKinsey) Tr. 1786:18-1787:5.

REDACTED FOR PUBLIC FILING

Further, the medical and network savings do not assume any rate improvement through re-contracting. Matheis (Anthem) Tr. 1484:15-1485:5, 1485:12-1486:9.

285.   The medical management team, including Cigna, continued to refine the methods to achieve the medical cost savings through late-June 2016.  Matheis (Anthem) Tr. 1489:10-1490:5; DX0695 at MCK-ANTMCI-0001533, 1537; Drozdowski (Anthem) Tr. 1657:15-1658:1. Cigna voiced no objection to the methodology.  *Id.* at 1649:12-19, 1659:24-1660:7.  The medical cost savings calculated by the team will be passed through directly to ASO customers.  Matheis (Anthem) Tr. 1631:16-25; Singhal (McKinsey) Tr. 1790:3-19; *see also* § VII.A.2; § VII.A.3.

286.   Mr. Quintero's criticism that it is not plausible that Anthem's discount rates are superior to Cigna's discount rates to the extent found by the integration planning team is baseless.  Quintero Tr. 2528:24-2530:9.  █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████. Further, Mr.

Quintero agreed that the method used by team to calculate the medical cost savings is recognized and used in the industry.  Quintero Tr. 2572:8-14; *see also* DX0703 at 6; DX0743 at 2.

### 4.   G&A Cost Savings Amount To $2.36 Billion

287.   The top-down analysis identified $2.36 billion in G&A cost savings, including $515 million in variable annual cost savings, referred to as "best-in-breed" savings (savings resulting from adoption of the more efficient process or better cost position of either of the two merging parties).  DX0238 at MCK-ANTHEM-0000916-917; Matheis (Anthem) Tr. 1502:24-1503:7; Singhal (McKinsey) Tr. 1783:5-1784:6; *see also* PX0297 at DOJ-EMAIL-00071311-

1317.   The $515 million in variable cost savings was conservative, excluding ███ million in potential variable cost savings ("additional opportunity savings").   DX0238 at MCK-ANTHEM-0000916-917; Matheis (Anthem) Tr. 1503:8-1505:24.

288.   SteerCo approved these top-down savings projections of $2.36 billion in G&A cost savings on February 11, 2016, and communicated the targets to the teams to design ways to capture the savings through the on-going bottom-up process.   Matheis (Anthem) Tr. 1499:23-1500:10, 1505:25-1506:12, 1508:3-10; DX0238 at MCK-ANTHEM-0000913-917.

289.   Through the bottom-up process, to date, the joint Anthem-Cigna integration planning teams have identified 400-plus actionable initiatives to achieve $2.02 billion in annual savings.   Matheis (Anthem) Tr. 1508:3-1509:6; Singhal (McKinsey) Tr. 1801:8-24.   The bottom-up initiatives relied upon Cigna and Anthem team member input.   Matheis (Anthem) Tr. 1508:3-16, 1499:23-1500:10, 1474:6-20; Singhal (McKinsey) Tr. 1801:8-24.   Mr. Matheis is "very confident" that the integration planning teams will continue to identify initiatives to achieve the $2.36 billion in G&A cost savings.   Matheis (Anthem) Tr. 1507:10-23.

### 5.   Anthem Has Developed Near-Term And Long-Term Go-To-Market Plans For Membership Growth Post-Close

290.   The parties have developed a strategy for new and improved products that combine the best features of both Anthem's and Cigna's products — the "go-to-market" strategy. Matheis (Anthem) Tr. 1511:5-8; Singhal (McKinsey) Tr. 1778:2-16.   The strategy includes short-term plans (first 180 days) and long-term plans for the first four years post-close.   Matheis (Anthem) Tr. 1459:8-21, 1514:9-11, 1521:3-19 (discussing DX0057).

291.   The teams worked on this go-to-market strategy throughout the integration planning process, in parallel with work on cost-saving synergies.   Matheis (Anthem) Tr. 1511:9-14, 1517:19-1518:19.   The teams conducted an extensive "Foundational Analysis" to assess the

strengths and weaknesses of the two companies' respective products, which formed the basis of go-to-market planning. *Id.* at 1511:15-1514:4; Singhal (McKinsey) Tr. 1783:7-1784:6; DX0057 at ANT-00006005. The go-to-market plan projects that the combined company will achieve additional membership of approximately 2.5-3.7 million lives over and above the membership that both companies would have been able to achieve absent the merger (*id.* at ANT00006009), resulting in ████████████████████████████████████ (DX0058 at ANT00006059).

292.    The Anthem-Cigna teams have planned new products that combine the best features of each company at more affordable prices. Singhal (McKinsey) Tr. 1790:3-1791:1; DX0057 at ANT00006020-21, 24. The medical and administrative cost savings realized by this merger are built into the go-to-market plans to be "passed through to [the combined company's] customers." Matheis (Anthem) Tr. 1515:11-16; Singhal (McKinsey) Tr. 1790:3-19.

293.    The combined company projects that roughly half of the 2.5 to 3.7 million new lives will purchase Cigna-branded products outside Anthem's service areas. Matheis (Anthem) Tr. 1516:13-20; *see also* §VIII.A.1 (discussing Anthem's intention to continue to compete as Cigna). For new clients inside the Anthem fourteen states, an early iteration of the go-to-market playbook proposed a "Bias-to-Blue" strategy for the first 180 days post-close. Matheis (Anthem) Tr. 1524:6-1525:11. Under this strategy, clients not currently served by either company that request a Cigna quote would also receive an Anthem Blue quote, but the choice would remain with the client. Matheis (Anthem) Tr. 1430:10-25, 1523:19-1526:13, 1527:3-15; Schlegel (Anthem) Tr. 1417:9-1418:1. Cigna leadership was involved in creating and vetting the initial "Bias-to-Blue" approach; however, Mr. Cordani expressed concerns with the approach and, in response, the team adopted a "brand agnostic" approach for new accounts. Matheis (Anthem) Tr. 1527:17-1530:1; PX0213; PX0291; DX0713. Anthem expects that most customers will

choose the Blue brand because, in prior Anthem acquisitions, "the consumer always has a choice" and the conversion rate historically has been 99% to the new Blue product. DeVeydt (former Anthem) 1696:14-1697:4.   Ultimately, the long-term goal is to create brand-agnostic products that offer the best of both companies. Matheis (Anthem) Tr. 1532:2-15.

### 6.   Anthem Plans To Accelerate Value-Based Collaborations

294.   Anthem plans to accelerate the expansion of value-based provider collaborations, which it believes benefits providers, patients and Anthem. Drozdowski (Anthem) Tr. 1639:6-19. Both "Anthem and Cigna have adopted" the CMS goal of tying 50% of fee-for-service payments to quality or value though alternative payment models by 2018. DX0689 at ANTM-DDC0005333147.   Approximately 50% of Anthem's spend is already through such incentive programs. Matheis (Anthem) Tr. 1608:15-8.   The percentage of Anthem commercial hospital contracts that contain value-based components is even greater, at over 85%.   Drozdowski (Anthem) Tr. 1634:11-16, 1640:6-10.   Around 45,000 primary care physicians participate in Anthem's Enhanced Personal Healthcare Program, which involves incentive programs. Drozdowski (Anthem) Tr. 1635:10-1636:19.

295.   Anthem is committed to and "lead[s] the competition" for value-based programming.   Drozdowski (Anthem) Tr. 1670:17-20.   Anthem's incentive-based Q-HIP program, the "first program of its kind in the nation," has been around for 15 years. Drozdowski (Anthem) Tr. 1634:23-1635:5, 1640:12-1641:4. Anthem has a history of working with providers to understand how value-based programs can succeed economically and clinically. Drozdowski (Anthem) Tr. 1663:5-1664:21.   Indeed, Anthem has more value-based contracting than Cigna despite Anthem's smaller geographic footprint.   Drozdowski (Anthem) Tr. 1667:12-1668:1, 1670:17-20 (discussing Anthem's leadership in value-based contracting); DX0689 at ANTM-DDC-000533182.

296.    The goal of the merger is to offer providers "best of breed" practices and to "leverage[e] membership density" for more effective collaboration in all 50 states.  DX0160 at ANTM-DDC-001575562;  DX0689  at  ANTM-DDC-000533147-149,  179-186;  Matheis (Anthem) Tr. 1494:20-1495:16.  This increased density is key because successful provider collaborations depend on increasing membership density.  Drozdowski (Anthem) Tr. 1675:24-1676:11; Singhal (McKinsey) Tr. 1791:11-23; Cordani (Cigna) Tr. 514:12-515:15.

297.    Expansion of Cigna's provider collaborations will be made possible by increasing Cigna's membership density outside Anthem's fourteen service areas.  This added density will be achieved through direct growth and by rebranding Anthem's AmeriGroup Medicaid membership to "Cigna outside the local 14."  Matheis (Anthem) Tr. 1533:22-1534:16; DX0057 at ANT00006009.  These added commercial members would be covered by providers using the same contracts that Cigna presently uses for its collaborations outside Anthem's fourteen service areas.  Matheis (Anthem) Tr. 1540:17-1542:4.  The projected growth in membership is expected to more than offset any lost Cigna membership that may come from Cigna members switching to BlueCard.  Drozdowski (Anthem) Tr. 1675:24-1676:11; Matheis (Anthem) Tr. 1533:17-1534:16.

### 7.    Anthem Is Ready To Begin Capturing Cost Savings Day 1 Post-Close

298.    Due to the extensive work that the parties jointly accomplished to date there is minimal additional work before day one post-merger.  Drozdowski (Anthem) Tr. 1660:23-1661:13; Singhal (McKinsey) Tr. 1792:16-25; DeVeydt (former Anthem) Tr. 1702:3-6.

299.    To capture the medical cost savings, the only necessary step remaining is to enter the clean room and determine whether to rely on affiliate language or re-contract with a provider. Matheis (Anthem) Tr. 1490:6-14; Singhal (McKinsey) Tr. 1786:18-1787:5.  Anthem "routinely" takes these types of actions and expects to achieve the savings "fairly quickly."  Drozdowski (Anthem) Tr. 1661:16-1662:5.  Anthem actually has recent experience re-contracting on a

comparable scale.  Matheis (Anthem) Tr. 1488:15-1489:4.  Further, savings will be immediate because 80% of the savings can be realized without any change by Cigna's customers. Drozdowski (Anthem) Tr. 1657:3-1658:25 (discussing DX153).

300.    Anthem is prepared to begin capturing G&A cost savings immediately through the 400+ actionable cost saving initiatives identified thus far, none of which depend on harmonizing cultures and can be initiated upon closing.  Singhal (McKinsey) Tr. 1814:19-1815:9;  DeVeydt (former Anthem) Tr. 1692:7-1693:24; Matheis (Anthem) Tr. 1502:16-22, 1508:11-1509:6, 1512:16-21; *see also* DX0240 at MCK-ANTHEM-001041-24; DX0690 at ANTM-DDC-002137142.

### 8.    The Medical Cost Savings, G&A Cost Savings And Membership Growth Synergies Are Merger-Specific

301.    The medical cost savings identified relate to the merger because they involve taking the better of Anthem and Cigna provider rates and making them available to more customers; an opportunity not otherwise available without access to the other parties' competitively sensitive discount rates and the combined company's increased size.  Matheis (Anthem) Tr. 1481:14-1483:11, 1485:6-14, 1509:7-14; Drozdowski (Anthem) Tr. 1646:13-24; Compl. ¶ 71. By combining the best of what each company can do—adding the better cost position to the value the companies currently offer—the merger will result in a product that doesn't exist in the market today; therefore, the medical cost savings cannot be achieved pre-merger by customers simply switching to the company with the better cost position.  Israel Tr. 1838:20-1839:16; *see also* Introductory Section (Issues Raised At Closings Arguments).

302.    The G&A cost savings are also all merger-specific because savings result from costs made redundant by the merger or by applying either party's best practices across the combined firm.  Singhal (McKinsey) Tr. 1782:24-1784:16; Matheis (Anthem) Tr. 1509:7-14.

303.   The revenue synergies achievable from growing the combined membership above the membership that both companies would have been able to achieve absent the merger are merger-specific because they result from making the best offerings of each party available in a combined form to customers.   DX0057 at ANT00006009; Matheis (Anthem) Tr. 1516:7-20, 1519:9-1520:11; DX0049; *see also* Cordani (Cigna) Tr. 509:18-515:15; DX0048 at ANTM-DDC-001459645; DeVeydt (former Anthem) Tr. 1689:14-15.

304.   Mr. Quintero criticized Defendants' efficiencies as not cognizable and merger-specific, but the criticisms are not credible.   He has never published on these issues, nor reviewed relevant court decisions.   Quintero Tr. 2538:17-2539:22.   He levied opinions about providers, but only reviewed a single provider deposition and a single provider contract.   *Id.* at 2540:3-10, 2546:14-18.   He criticized the integration planning team and medical cost savings calculations, but did not review the "business deliberations leading up to their final calculations," any documents reflecting negotiations between Anthem and providers, nor the deposition testimony of the Anthem and Cigna medical networks co-leads.   *Id.* at 2544:11-2546:24.

### C.   Alleged Discord Between The Parties Will Not Stop The Efficiencies From Being Realized

305.   Plaintiffs provide no evidence that Defendants' integration effort and Day 1 (and beyond) strategies will be anything other than successful and achieve the estimated efficiencies. Swedish (Anthem) Tr. 358:5-359:16; Matheis (Anthem) Tr. 1517:19-1518:9.   Despite Mr. Cordani raising generalized questions about the estimated G&A efficiencies reported publicly, Mr. Cordani encouraged the integration team to pursue greater G&A savings in their January 2016 SteerCo meeting and then joined in the SteerCo's February 11, 2016 decision to approve the $2.36 billion projection in G&A cost savings.   *See* DX0237 at MCK-ANTHEM-0000864 (SteerCo presentation of $2.3 billion); DX0238 at MCK-ANTHEM-0000912-917 (final

calculation approved by SteerCo); Matheis (Anthem) Tr. 1499:16-1500:15 (February 11 SteerCo approved $2.36 billion in G&A cost savings calculation).

306.   With respect to medical and network savings, the integration team worked together through the end of June 2016 (just prior to the filing of this suit), and there is no evidence that Cigna voiced objections to Anthem or McKinsey regarding the methodology employed to assess such savings.   Drozdowski (Anthem) Tr. 1649:7-19, 1659:24-1660:7. Moreover, Cigna joined in the joint Medical & Network Synergies white paper submitted to the Department of Justice on May 25, 2016 which estimated preliminary medical cost savings between ███ billion and ███ billion annually using three different models, including Dr. Israel's Best-in-Breed model.   PX0296 at DOJ-EMAIL-00071252.   Cigna agreed that the merger ████████████████████████████████████████████████████████ and would facilitate the ███████████████████████████████ (*id.* at -262).

307.   In total, over the eight project workstreams, teams, involving individuals from Anthem, Cigna and McKinsey held over 1000 meetings, drafted numerous proposals, and collaborated on over 400 project-related initiatives from the date of deal closing, in addition to their regular work commitments.   DX0692; DX0690; DX0704; DX0699; DX0698; DX0702; DX0701; DX0700; Matheis (Anthem) Tr. 1473:16- 1474:2.   This was all done with a focus on maximizing value and successfully completing the merger.   Matheis (Anthem) Tr. 1472:11-23; DeVeydt (former Anthem) Tr. 1689:24-1691:14.

308.   While individual instances of contentiousness arose at points in this process (principally at the C-suite level, but intermittently elsewhere), both organizations were extensively involved and were aligned on methodology.   Matheis (Anthem) Tr.1472:8-23, 1466:17-1477:19; Cordani (Cigna) Tr. 437:14-438:14; Drozdowski (Anthem) Tr. 1644:23-

1645:3. Plaintiffs sought to develop the impression that ambiguity about Mr. Cordani's post-closing responsibilities had created a rift between the organizations but the Merger Agreement states that on Day 1, Mr. Cordani "shall be President and Chief Operating Officer of Anthem" (with duration subject to the pleasure of the Anthem Board of Directors) and does not specifically identify the responsibilities of the President and Chief Operating Officer. PX0120 at ANT0000000018; Swedish (Anthem) Tr. 383:16-384:4.

309.    In Cigna and Anthem's joint proxy statement, Cigna encouraged its shareholders to approve the transaction on the grounds that the merged entity would "yield immediate value through the realization of synergies and expand consumer choice, quality and affordability, as well as potentially significantly increase the capability of each company to realize its current strategic vision." PX701 at 110. Cigna believed that these efficiencies could be realized despite "the challenges inherent in the combination of two businesses of the size and complexity of Cigna and Anthem, including unforeseen difficulties in integrating operations and systems and difficulties in integrating employees." PX701 at 140.

### D.    Merger Efficiencies Do Not Demonstrate Monopsony Power

310.    While Plaintiffs' monopsony allegations are scheduled for Phase II of this action, Defendants briefly address them here in case Plaintiffs raise monopsony in their Proposed Findings of Fact. Defendants anticipate providing additional evidence during Phase II.

311.    The efficiencies-related cost savings are not a result of monopsony power. Economists test for monopsony power by looking at whether (1) prices are moved below the competitive level, (2) output is reduced, and (3) cost reductions are not passed through. Israel Tr. 1964:12-25.    As discussed above, the cost reductions here will be passed through to customers. *See supra* VII.A.3. Moreover, the evidence discussed below establishes that prices will not move below competitive levels and that there will be no reductions in output.

REDACTED FOR PUBLIC FILING

1.      **Reimbursement Rates Will Remain Substantially Higher Than The Cost of Care And Output Will Not Be Reduced**

312.    The competitive level is one that covers the costs of an efficient producer. Israel Tr. 1966:24-1967:2.  Plaintiffs admit that Medicare fee-for-service rates are set to cover the cost of providing services for an "efficient" hospital.  Plaintiffs' Stipulation ¶ 8 (Oct. 21, 2016), ECF No. 200 (stipulating that Medicare payments "reflect the expected relative costliness of inpatient treatment for patients"); Israel Tr. 1966:17-1967:4, *see also id.* at 1967:5-10 (discussing CMS statements to the same effect).  In this case, the lower prices that will result from the transaction cannot be monopsonistic because prices are being moved towards, not away from, the competitive level. *Id.* at 1969:1-6.

313.    Dr. Israel calculated the mean reimbursement rates Anthem currently pays providers.  Today, Anthem reimburses providers at 191% of Medicare rates. *Id.* at 1968:15-18. Post-merger, Anthem's rates will move to 188% of Medicare rates. *Id.* at 1968:19-21.  A shift in provider reimbursement rates towards Anthem's rates is a shift towards the competitive level and hence a procompetitive, not anticompetitive, effect. *Id.* at 1969:1-6.

314.    In a joint DOJ-FTC report, the Government agreed, "[a]gencies should be concerned only if the transaction or practice leads to prices below competitive levels."  Israel Tr. 1965:24-1966:4 (discussing DDX0015 at 24).  The improved discounts that will be achieved from the merger here will directly benefit consumers without coming close to falling below the competitive level.  Israel Tr. 1966:17-25.

2.      **The Merger Will Not Reduce Output**

315.    Dr. Israel's economic analysis proved, and the academic literature confirmed, that increased insurer market share leads to an increase, not a decrease, in provider output.  To test whether an insurer's market share has any bearing on such output, Dr. Israel analyzed whether an

increase in an insurer's share has an effect on utilization (e.g., hospital visits or physicians per enrollee). *Id.* at 1969:21-1972:17. He found that an increase in an insurer's share results in an increase in, or no effect on, utilization. *Id.* at 1971:23-1972:17.

316.    Dr. Israel also performed three separate regression analyses to determine whether the supply of medical services responds to a decrease in provider reimbursement rates. These analyses modeled the effect of increased insurer market share on the number of hospital beds, doctors, and nurses. *Id.* at 1972:18-9. None of the regressions found a statistically significant effect of increased insurer concentration on the supply of hospital beds, physicians or nurses. *Id.*

317.    Dr. Israel's results are consistent with economic literature showing a correlation between increased market share and utilization. *Id.* at 1971:2-22. Dr. Michael McKellar, a health care economist whom Prof. Dranove cited, has similarly found that higher insurer market shares are associated with lower provider prices and higher utilization. *Id.* at 1971:10-18.

318.    Even accepting quality as the appropriate metric, this merger will have no detrimental effect on quality. To determine whether providers respond to reimbursement rate reductions by cutting the quality of their services, Dr. Israel performed a regression analysis where he measured the relationship between four measures of healthcare quality commonly and an insurer's market concentration. Israel Tr. 1978:18-1979:16. Dr. Israel found no relationship between an insurer's market concentration and health care quality. Israel Tr. 1979:14-16.

319.    Moreover, David Cutler, a leading healthcare economist, stated that 30% of cost in the United States health care system could be eliminated with no effect on quality. Israel Tr. 1975:9-11. Indeed, there is a substantial amount of waste in today's healthcare system. Matheis (Anthem) Tr. 1479:19-1480:15; Drozdowski (Anthem) Tr. 1651:4-21; Wilhelmsen (Southern New Hampshire Health System) Dep. 44:5-21 (noting that there is a wasteful amount of

laboratory work done and that more Medicare procedures does not mean the patient is receiving better care); McKean (Town of Salem) Dep. 105:17-106:10 (stating that one of the reasons why health insurance costs have risen is because of overuse by patients); *see also* Israel Tr. 1975:17-1976:6 (higher payments to providers create an incentive to *avoid* lowering costs).

320.   The Federal Government seemingly agrees, having recently reduced payments to Medicare Advantage plans and the rate of annual increases for hospital payments. *Id.* at 1975:5-11. These reforms will save more than $450 billion in the next decade, an amount substantially larger than the $2.4 billion medical cost savings calculated by Dr. Israel. *Id.* at 1975:5-16.

321.   Additionally, numerous industry participants have testified that providers do not reduce the quantity or quality of service in response to a reduction in commercial reimbursement rates. ███████████ (███████████████████████████████████████ ); Austen (MVP) Dep. 52:23-53:16 (Ms. Austen has never heard a provider say they would go out of business, cut back their hours, or fire physicians or other staff in response to a reduction in reimbursement rates); ███████████ (███████████████████████ ).

322.   Prof. Dranove has undertaken no rigorous analysis to demonstrate that any reduction in quality is likely, despite conceding that such analysis is feasible.   Dranove Tr. 1164:10-23.

323.   Despite claiming that medical network synergies are the result of monopsony power, Plaintiffs alleged that the combined company will have such monopsony power only in thirty-five CBSAs. Compl. ¶ 68. In consideration of this fact, Dr. Israel accepted the allegation, and for the sake of argument, deducted any savings accrued from these thirty-five CBSAs from

REDACTED FOR PUBLIC FILING

the total medical costs savings that he calculated.  He entered this value into Prof. Dranove's model and found an overall net benefit for "national accounts."  Israel Tr. 1981:22-1982:3.

### 3.   The Merger Will Yield Only A Small Reduction In Provider Revenue

324.    The evaluation of whether anticompetitive buying power has been exercised should be considered in the context of the revenues earned by the provider from that buyer. Willig Tr. 2228:20-2231:1.  This allows an economist to consider what effect increased buyer power may have on the provider.  *Id.*  Dr. Willig considered this fact and determined that the 3% reduction in payments determined by Dr. Israel would result in only a 0.5% reduction in revenue for hospitals and physicians.  *Id.* at 2229:1-2230:4.

325.    Prof. Dranove contended that hospital margins are only 2-4%, but he provided no support for that figure.  Dranove Tr. 2316:14-21.  He later admitted that the American Hospital Association, upon whom he relied in his report, stated that hospital margins are in fact 4-8% (*id.* at 2242:17-2444:3 (discussing DDX0176).

## VIII.   THE MERGER WILL NOT ADVERSELY AFFECT COMPETITION

### A.   There Is No Evidence Of Possible "Enhanced Coordination" Post-Merger And Cigna Will Continue To Compete (Coordinated Interaction)

326.    Competition is fierce for large employers like Plaintiffs' so-called "national accounts."  Mathai (Anthem) Tr. 1260:8-18; Schmidt (Meritain) Dep. 69:23-70:9; DX0049 at ANTM013257320 ("Health insurance is flush with competition.  The number of health insurers increased by 26 percent in 2015 with 70 new entrants offering coverage...").  Anthem competes as aggressively as it can in every environment, including in competition with the other Blues. Kertesz (Anthem) Tr. 599:24-25; DeVeydt (former Anthem) Tr. 1698:25-1699:4; Schlegel (Anthem) Tr. 1404:2-1405:12; ████████████████████████ ; ████████████████  ████████████████ .  Post-merger, the Cigna brand will continue to compete against all

competitors, including the Blues.  Mathai (Anthem) Tr. 1273:12-21; Kendrick (Anthem) Tr. 1206:24-1207:3.  There is no evidence that the merger will enhance coordination.

327.    Neither Prof. Dranove nor the Plaintiffs found a single instance of collusion, price-fixing, or bid-rigging among any competitors in the healthcare industry, including Anthem and the other Blues.  Dranove Tr. 1018:24-1021:18.  And Prof. Dranove has not done any coordinated effects study as to the potential for coordination post-merger.  Israel Tr. 1986:6-15. The healthcare industry is not conducive to coordination because of confidential bidding, powerful buyers, highly differentiated products, and many different firms with different footprints and different offerings.  Israel Tr. 1986:16-22.

### 1.    Cigna Will Continue To Compete Against The Blue Licensees

328.    Anthem signed the merger agreement with the "intention . . . to be a very aggressive competitor in every state outside the fourteen states using the Cigna brand."  DeVeydt (former Anthem) Tr. 1736:5-11.  Post-merger, Anthem intends to compete against other Blue licensees with the Cigna brand outside of Anthem's Blue footprint.  Mathai (Anthem) Tr. 1273:14-21; Kendrick (Anthem) Tr. 1206:24-1207:3.  Anthem executives have told the other Blue licensees that Anthem will compete with the Cigna brand post-merger.  Swedish (Anthem) Tr. 263:17-19 ("The principal topic, the overriding topic, was:  I want you to know we're going to compete in all markets with the Cigna brand."); Pogany (former Anthem) Dep. 191:3-12.  The BCBSA rules, which simply dictate the use of the BCBSA trademarks, do not change Anthem's incentives to compete with other Blue licensees through the Cigna brand.  Mathai (Anthem) Tr. (Anthem) 1274:3-1275:4.

2.    **The National "Best Efforts" Rule Will Not Constrain Growth Or Competition Post-Merger**

329.    The national "best efforts" requirement in Anthem's license agreement with the BCBSA specifies that "66 2/3 of [Anthem's] annual combined national net revenue, as defined by the BCBSA, attributable to health care plans and related services must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks." PX0125 at 33; Swedish (Anthem) Tr. 236:24-237:4; Schlegel (Anthem) Tr. 1409:15-18 (referencing DDX0013 at 1). For purposes of the national "best efforts" requirement, revenue is defined as premiums and premium equivalents. *Id.* at 1406:15-23. Premium equivalents are used to approximate an equivalent to a fully-insured premium, and include the ASO fees plus the claims expenses that Anthem pays on behalf of the customer. *Id.* at 1406:24-1407:7, 1410:13-25 (referencing DDX0013 at 2).

330.    Anthem has never violated the national "best efforts" requirement. Schlegel (Anthem) Tr. 1411:17-1412:11. Anthem intends to comply fully with the national "best efforts" requirement following the acquisition of Cigna. *Id.* at 1423:2-5. Anthem estimates that after merging with Cigna the combined company will not meet the 66 2/3 threshold of the national "best efforts" requirement. *Id.* at 1411:1-14. Anthem will have 120 days to submit a plan to the BCBSA for coming back into compliance and then two years following approval of that plan to comply. *Id.* at 1411:15-1412:11 (referencing DDX0013 at 4); PX0125 at 33.

331.    Anthem has multiple options available to come into compliance, including growing Blue-branded products as a result of the combined capabilities flowing from the merger, growing the specialty business, and utilizing Cigna's expertise in cross-selling specialty products into the existing book of Blue-branded medical business. PX0125 at 33; Schlegel (Anthem) Tr. 1416:1-19 (referencing DDX0013 at 5). These options would increase Blue-branded revenues

114

for purposes of compliance with the national "best efforts" requirement and thus reduce the amount of Cigna business that Anthem ultimately would need to rebrand. *Id.* at 1416:25-1417:6.

332.    Another alternative is for the combined company to rebrand Cigna business inside Anthem's fourteen BCBSA license areas. *Id.* at 1414:6-11. Rebranding all of Cigna's existing business inside Anthem's fourteen license areas alone, including related business located outside the fourteen areas, would take Anthem to estimated ▮ of relevant revenue. *Id.* at 1414:14-15 (referencing DDX0013 at 5). With this cushion, Anthem and Cigna would not need to rebrand all Cigna business inside Anthem's fourteen service areas to meet the 66 2/3 threshold. *Id.*

333.    If Anthem were to fail to comply with the national "best efforts" rule for an extended period of time, this failure is not a credible economic incentive for the BCBSA to terminate Anthem's Blue license given Anthem's size and value to the BCBSA. Willig Tr. 2158:6-2159:17, 2160:11-25, 2162:21-2163:4.

334.    Prior to the merger and throughout the integration process, a number of options were discussed by Anthem and Cigna to ensure compliance with the national "best efforts" requirement. PX0701 at 112 ("[D]uring the course of the next several weeks through July 23, 2015, members of Cigna's senior management, together with Cigna's legal and financial advisors, conducted a series of diligence sessions regarding the rules of the BCBSA."); Cordani (Cigna) Tr. 486:23-487:17. Cigna's team was provided access to necessary information to understand Anthem's membership in the BCBSA, including the national "best efforts" requirement. DX0325 at Cl-05415470 ("And our organization [Cigna] walked away . . . with an understanding that those issues [BCBSA rules] are issues, as any business environment would have, but they're wholly manageable.").

335.    During due diligence, Wayne DeVeydt, Anthem's then-CFO, spoke with Mr. Cordani about the BCBSA rules and how they operate. DeVeydt (former Anthem) Tr. 1699:5-17.  Mr. DeVeydt never made a representation to Mr. Cordani that the BCBSA rules would change after the signing of the merger agreement. *Id.* at 1699:5-17.   Prior to the transaction Anthem conducted its own internal analysis based on public information and went through "lots of analytics regarding . . . the math of how the Blue rules apply to [Anthem] and how [Anthem] may have to adapt relative to those rules at closing." DX0325 at Cl-05415474; Schlegel (Anthem) Tr. 1408:6-20.   Once due diligence discussions with Cigna began, this effort was refined by details obtained from Cigna. *Id.* at 1408:15-20.

336.    The current plan for the combined company is to integrate the capabilities of both Anthem and Cigna and develop compelling value options for the customer, whereby customers would be incentivized to move to a Blue-branded product in Anthem's fourteen service areas. *Id.* at 1417:9-16.   The intent is to allow customer choice in the rebranding decision. *Id.* at 1417:24-1418:1.   Based on precedent transactions like Amerigroup, where 99% of eligible customers rebranded to a Blue-branded product, it is expected that Cigna customers in Anthem's fourteen service areas will choose the improved Blue-branded product.   DeVeydt (former Anthem) Tr. 1696:14-1698:2.

337.    Cigna customers with members inside and outside Anthem's fourteen service areas could choose to slice between a Cigna product and a Blue-branded product.  Schlegel (Anthem) Tr. 1418:11-17; Mathai (Anthem) Tr. 1275:5-15 ("I believe you could offer both brands to a single account, and that would be fine.").   There is no "forcing mechanism" that would force a customer to buy a Blue-branded product in an Anthem service area and also buy a Blue-branded product outside the service area. *Id.* at 1533:8-15.   If only Cigna membership

residing in Anthem's fourteen states were rebranded, the combined company would still comply with the national "best efforts" rule. Schlegel (Anthem) Tr. 1437:10-13 ("The Court: But you're saying you've run the numbers without the people outside the fourteen states and you're satisfied that you're going to meet the best-efforts rule? A: We will be at compliance.").

338.   There are no BCBSA rules or requirements that prohibit Anthem from rebranding customers in Anthem's fourteen exclusive service areas from Cigna to a Blue brand, that prohibit a customer from slicing an account between an Anthem Blue-brand and a Cigna brand anywhere inside and outside Anthem's fourteen service areas, or that prohibit Anthem from exercising any of the other levers available to grow revenue needed to comply with the national "best efforts" requirement. *Id.* at 1418:2-17.

339.   The "best efforts" rules will have no anticompetitive effect because only effects that occur in the alleged market are relevant, as Plaintiffs concede (Trial Tr. 2634:2-8), and Cigna is presently declining in the "national accounts" market (*e.g.*, Mathai (Anthem) Tr. 1276:5-25) such that any post-merger growth is only procompetitive.

### 3.   BlueCard Will Not Diminish Anthem's Incentive To Compete As Cigna In The Anthem Non-Blue Service Areas

340.   Anthem alone currently does not have a nationwide network and relies on the BlueCard network to give it access to networks outside of its fourteen Blue service areas. Swedish (Anthem) Tr. 226:22-227:3; *see also* § III.C.3. For providing access to their networks, the Blue licensees receive a BlueCard network access fee. Schlegel (Anthem) Tr. 1435:11.

341.   ████████████████████████████████████████████████████████
████████████████████████████████████████. PX0333 at DOJ-EMAIL-
00070228 (████████████████████████████████████████████████████
████████████████████████████████████████████████████).

REDACTED FOR PUBLIC FILING

342.   BlueCard fees are not a major source of revenue, as they account for less than 3% of Anthem's total annual revenue.  Dranove Tr. 1127:12-1128:9 (discussing DDX011).

343.   The combined company will earn more profit and more revenue if customers contract with Cigna instead of the local Blue outside of Anthem's fourteen Blue service areas. DeVeydt (former Anthem) Tr. 1700:11-16; Mathai (Anthem) Tr. 1274:8-11.   Having its own Cigna members will allow the combined company to spread investment over a broader membership to keep products affordable, earn higher margins by avoiding BlueCard rental network fees, and sell ancillary services like vision, dental, and disability, and be more efficient. DeVeydt (former Anthem) Tr. 1700:18-1701:11, 1722:20-22.   It also allows Anthem to earn additional revenue on services such as clinical programs, health management programs, and wellness programs.  Mathai (Anthem) 1274:11-19.

344.   BlueCard fees do not dampen Anthem's incentive to compete with the Cigna brand outside its fourteen-state footprint.  As Prof. Willig explained, winning accounts with the Cigna brand will be far more profitable for the combined company than the alternative BlueCard fees.  Willig Tr. 2150:8-13, 2157:9-15 (referencing DDX0014 at 14).

345.   

. Prof. Willig then adjusted for the fact that Cigna accounts headquartered outside the Anthem footprint only have a fraction of their total membership in the Anthem footprint.  *Id.* at 2151:8-24.

REDACTED FOR PUBLIC FILING

███. *Id.* at 2152:25-2154:7. This reduces Anthem's profits by ██ if it chose to rely on a local Blue. *Id.*

346.    Prof. Willig also observed that, even if Cigna lost the out-of-region account, there is no guarantee the local Blue would win. *Id.* at 2156:19-2157:7. He controlled for this and concluded that Anthem's profits would be reduced ████ if it chose to rely on a local Blue over pursuing the business itself as Cigna. *Id.* at 2157:9-15 (referencing DDX0014 at 14).

347.    Accordingly, Anthem's economic incentive will be to grow Cigna as a separate brand outside the Anthem footprint and compete with local Blues instead of relying on BlueCard fees. *Id.* at 2157:9-21. The combined company would expect to earn from BlueCard fees only ████ of what it would earn from an average Cigna customer. *Id.* (discussing DDX0014 at 14)

### B.    There Is No Evidence That The Merged Company Will Profitably Raise Prices (Unilateral Effects)

348.    It is undisputed that prices for "national accounts" largely comprise two components — ASO administrative fees and provider rates. Plaintiffs acknowledge that the merger will cause provider rates to decrease with the resulting savings passed-through to customers, constituting a benefit to "national account" customers. *See supra*, § VII.A.1. Plaintiffs meanwhile presented no evidence — neither testimonial nor economic analysis — that administrative fees will increase and, in fact, argued at closing that "it's just simply irrelevant" because Plaintiffs do not allege a price increase. Trial Tr. 2709:9-15. ████████████

████████████████████████████████

████████████████████████████████

████████████████████ that meet his NA5 or NA5G definitions. Dranove Tr. at 2393:24-2393:21 (discussing DDX0121).

REDACTED FOR PUBLIC FILING

####### 1.    Anthem And Cigna Are Not Considered Next Best Substitutes

349.    Anthem competes more directly with United than with other carriers.   Kendrick (Anthem) Tr. 1198:3-8 (United is "clearly [Anthem's] most formidable competitor"); Schell (Anthem) Dep. 233:5-10, 12-13, 15-20; Goulet (former Anthem) Dep. 108:14-111:25; DX0035 (███████████████████████████████████████████████████████).   An internal Anthem memorandum details why United is Anthem's closest competitor:



DX0082 at ANTM000606014.

*See also* Goulet (former Anthem) Dep. 110:13-111:21 (United and Anthem have the best discounts).   Customers similarly consider United to be a close competitor to Anthem, and do not consider Cigna a close competitor to Anthem.   Little (Post Foods) Dep. 61:18-24, 62:1-7 ("based on discounts and administrative services fee[s]" offered, United had "next closest financial value" compared to Anthem); Monti (Kroger) Dep. 18:19-21 ("I believe that in the way that Kroger purchases healthcare, that [Anthem and Cigna] are not close competitors, yes.").

350.    For example, in the most recent RFP for Steel Dynamics (a company with more than 7,000 employees in twenty-five states), Anthem and United were finalists.   Record (Steel Dynamics) Dep. 28:25-29:3.   ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████.

351.    Cigna competes more directly with Aetna than with other carriers.   *Supra* § III.C.2; Manders (Cigna) Dep. 207:9-208:2 (Aetna's "value proposition historically has been more aligned to [Cigna's]" and thus Aetna has been one of the hardest competitors for Cigna

because they are "more similar to [Cigna] than others"); Benedict (Cigna) Dep. 121:18-24, 122:2-16, 18-24; Huggins (Cigna) Dep. 280:15-24.

352. " ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." DX0161 at ANTM-DDC-001576517. Mr. Cordani explained the differentiated approaches of the two companies. Cigna views itself as a "global health services company" that focuses on "the broad suite of solutions around health, wellbeing, and sense of security," and on engagement, health improvements, and value-based relationships. Cordani (Cigna) Tr. 424:7-425:8. He considers Cigna to be a "strong offering" for employers seeking "incentive-based and engagement-based programs" and explained that Cigna typically does not bid for clients seeking "a lean claim payment and call administration service" because Cigna would not "deliver unique value." *Id.* at 407:2-408:11; *see also* Guilmette (Cigna) Dep. 103:8-24, 149:15-19. He explained that Anthem's "legacy strength . . . is in the individual guarantee cost to marketplace" (Cordani (Cigna) Tr. 510:15-18) and one of Anthem's greatest strengths is its network access (*id.* at 512:6-9 ("Anthem . . . tends to have more robust networks outside the urban-densified areas. The legacy of the Blues. They have tremendous access.")).

353. Prof. Dranove summed up these differences between Anthem and Cigna when he contrasted Anthem's "cost leadership" strategy to deliver "the lowest cost in the marketplace" with Cigna's "benefit leader" strategy to deliver a product of "equal or better value" by "adding product features or adding quality." Dranove Tr. 971:10-972:13.

354. Plaintiffs' anecdotes of head-to-head competition in isolated instances are consistent with the conclusion — well supported in the record — that Cigna is not Anthem's closest competitor. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Dranove Tr. 1144:3-12

REDACTED FOR PUBLIC FILING

(conceding that, in Prof. Dranove's study of thirty-seven RFPs, Anthem and Cigna were the top two competitors only ███ of the time).  Even the documents cited by Plaintiffs in their closing involved additional competitors or no actual improvement in Anthem's offer.  *See, e.g.,* PX0322

(███████████████████████████████████████████████████████████████████

████████████████████████████████████); PX0051 (███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████).

355.   Plaintiffs questioned Mr. Thackeray at trial about several e-mails that discussed Cigna bidding for "national accounts" against Anthem.  Thackeray (Cigna) Tr. 730:11-738:16.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. Mr. Thackeray testified that since January 2016, Cigna has not won any new "national account" business from Anthem in his region.  Thackeray (Cigna) Tr. 744:16-745:2 (stating that there have been no "national account X wins from Anthem since January 2016" and explaining that "X" is an internal term to refer to "an employer . . . coming to Cigna that did not have a previous relationship with Cigna."); ███████████████████████████████████

████████████████████████████████████████████

356.   The "Aetna/Cigna bounty program" is also consistent with the conclusion that Cigna is not Anthem's closest competitor — Anthem viewed the bounty program as a way to take accounts from the "weakest competitors" and discontinued the program as unnecessary after receiving criticism that it paid "additional compensation to acquire membership that is easier to get from Aetna and Cigna than UHC."  Kertesz (Anthem) Tr. 652:5-653:3; PX0143 at

ANTM000360549; *see also* Mathai (Anthem) Tr. 1276:5-25 (Cigna's "national account" membership has dropped substantially over the past decade, from a little over nine million members to a little over three million members).

### 2.   Economic Analysis Shows No Anticompetitive Effects

#### a.   Diversion Ratios And Econometric Analyses Show That Anthem And Cigna Are Not Close Competitors

357.   Dr. Israel's diversion ratios show that the extent of competition between Anthem and Cigna for national accounts is smaller than the level of competition implied by their overall market shares.   Israel Tr. 1995:19-1996:22 (referencing DDX0015 at 37).   To calculate the diversion ratios, Dr. Israel matched Anthem's and Cigna's bids from 2015 and 2016 to identify instances in which both Anthem and Cigna bid.   *Id.* at 1995:8-17, 2004:17-20.   Using each party's bid data — which shows whether the company won or lost the bid — and customer lists, Dr. Israel determined how often Anthem and Cigna lost a bid that the other party won.   *Id.* at 1995:8-17, 1997:4-25 (referencing DDX0015 at 36).

358.   If Anthem and Cigna are particularly close competitors, then in situations in which both bid, it would be expected that Anthem would lose more frequently to Cigna than the rate implied by Cigna's overall market share and, similarly, Cigna should lose more frequently to Anthem than the rate implied by Anthem's overall market share.   *See id.* at 1996:10-18.   Dr. Israel found that this was not the case.   *Id.* at 1996:19-21.   Instead, the diversions ratios he calculated show that each company loses less often to the other company than predicted by market shares.   *Id.* at 1996:10-22.

359.   By contrast, Prof. Dranove's "diversion ratios" were in fact a switching study, where he focused on only those instances in which either Anthem or Cigna were the incumbent and lost the bid.   Dranove Tr. 951:19-952:19.   An analysis of switching (or churn) is

inappropriate because it is assumes that the incumbent was the second best option on the bid. Israel Tr. 2005:14-18.  Customers who decide to switch away from the incumbent often may be looking for something different from the service they were previously receiving, in which case the incumbent would not be the second best option.  *Id.* at 2005:8-13; *see also* Abbott (WTW) Tr. 80:7-15, 88:19-22.  As such, the observations of switching between Anthem and Cigna actually represent their dissimilarity rather than closeness of competition.  Israel Tr. 2006:19-22.

360.    Prof. Dranove's switching study is further inappropriate because it required him to omit a large portion of observable competitive situations between Anthem and Cigna.  *Id.* at 2003:1-19 (referencing DDX0015 at 39).  To increase his sample size, Prof. Dranove used data starting in 2011, but if one restricts Prof. Dranove's sample to 2015-2017, Prof. Dranove relied on a total of sixty-eight bids, whereas Dr. Israel relied on a total of 325 bids.  *Id.* at 2003:20-2004:23 (referencing DDX0015 at 39).  Combined across his Cigna and Anthem data sets, Prof. Dranove's diversion analysis was based on approximately 1% of the competition in the market as defined by Plaintiffs and Prof. Dranove.  Dranove Tr. 2415:4-2416:20 (discussing DDX164). Furthermore, Prof. Dranove acknowledged that insurers such as MVP, Tufts, Geisinger, and TPAs could be in the "other" category in his diversion data, but could not "recall if [his] team did a breakdown of what exactly was in the 'other' category."  *Id.* 2435:1-13.

361.    Prof. Dranove relied on the perception of the losing bidder to determine the winner of the bid – an unreliable assumption.  For example, if Cigna recorded a loss to Anthem, Prof. Dranove took it as fact rather than confirming whether Anthem won by looking at Anthem's data.  Dranove Tr. 951:19-952:19.

362.    To determine whether Anthem and Cigna are particularly close competitors, Dr. Israel performed an econometric analysis of pricing patterns to test whether Anthem or Cigna

react to the presence of one another as a competitor by offering more competitive ASO bids. Israel Tr. 2006:23-2007:22. Dr. Israel's regression showed that Anthem's presence or absence as a competitor on a given bid has no statistically detectable effect on Cigna's bids, and vice versa for Anthem's bids and Cigna's presence. *Id.* at 2007:23-25. The loss of this direct competition would have little or no effect on the combined company's bids. *Id.* at 2007:23-2008:5.

363.    Dr. Israel also performed an econometric analysis of the effect of Cigna's competitive strength on Anthem's bid. *Id.* at 2010:20-2011:9   Dr. Israel used data from Anthem's discount model to determine instances where Anthem viewed Cigna as a particularly weak competitor ( ███████████████████████████████████████████ ███████ ). *Id.* at 2010:22-2011:17. If Cigna were a close competitor, one would expect Anthem to raise its price when Cigna's discounts are non-competitive. *Id.* at 2011:18-23. The regression shows, however, that Cigna's competitiveness has no statistically significant effect on Anthem's bid. *Id.* at 2011:18-24. This is consistent with testimony from Anthem's Vice President of National Accounts Management, Swati Mathai, who explained that Anthem prices are based on the risk associated with the employer, and not the bids of other competitors. Mathai (Anthem) Tr. 1260:21-25 ("Anthem utilizes an underwriting model or a retention model for existing accounts. It is formula driven, competitor agnostic, it's cost driven. . . .").

###    b.    Merger Simulation Models Demonstrate That The Merger Will Not Result In Anticompetitive Effects

364.    Dr. Israel employed a merger simulation to assess whether the merger would have pro- or anti-competitive effects on the healthcare industry. Such models are endorsed by the Horizontal Merger Guidelines and were used by Plaintiffs in this case. HMG § 6.1; Willig Tr. 2215:22-2217:6; Dranove Tr. 957:4-5; *see also* § VI.A.

REDACTED FOR PUBLIC FILING

365.    In *FTC v. Sysco*, Dr. Israel's merger simulation showed the merger was anticompetitive.  Israel Tr. 1865:20-18:66:9. The same merger simulation model here shows that cost savings swamp any potential harm.  *Id.* at 2017:20-2019:2.

366.    Dr. Israel's merger simulation considers the benefit that consumers receive from a strengthened Anthem and Cigna as a merged competitor against the potential harm resulting from the merger.  *Id.* at 2019:10-2020:11 (discussing DDX0015 at 45).  Competitive harm may arise only in those rare cases in which Anthem and Cigna are the two best options available to an ASO customer in the absence of the merger.  *Id.* at 2019:9-12.

367.    Dr. Israel's merger simulation demonstrated that in the Anthem footprint there will be a net $4.50 per member per month (PMPM) total cost of care savings on average for all ASO customers (not limited to Anthem and Cigna customers).  *Id.* at 2017:18-2018:24; (referencing DDX0015 at 47).  Based on HealthLeaders' estimate that there are 27 million ASO members in Anthem states, in the aggregate, the merger will result in $1.5 billion in net consumer benefits.  *Id.* at 2018:24-2019:2 (referencing DDX0015 at 47).

368.    Dr. Israel extended his merger simulation to model the effects of the merger in all fifty states.  Dr. Israel accounted for the relatively small amount of Blue Card fees the combined firm would receive when the combined firm loses a bid to another BCBSA licensee.  *Id.* at 2022:9-2023:7 (referencing DDX0015 at 48).  In all 50 states, there will be a net $1.94 PMPM total cost of care savings on average for all ASO customers (not limited to Anthem and Cigna customers).  *Id.* at 2023:8-12 (discussing DDX0015 at 48).  Based on HealthLeaders' estimate of 80 million ASO members nationwide, the merger will result in a $1.9 billion net consumer benefit across all fifty states.  *Id.* (discussing DDX0015 at 48).

369.    Even assuming there is a "national account" market, the merger is procompetitive. *Id.* at 2025:11-2026:1 (referencing DDX0015 at 49).   Dr. Israel ran his merger simulation model exclusively on so-called "national accounts," and found that in the Anthem footprint, there will be a \$5.04 PMPM total cost savings on average for "national account" customers.   *Id.* (referencing DDX0015 at 49).   In all fifty states, there will be a \$2.13 PMPM total cost savings for "national account" customers.   *Id.* (referencing DDX0015 at 49).

370.    Dr. Israel's merger simulation is conservative in a number of respects.   The merger simulation used share-based diversions, which are larger than Anthem and Cigna's actual diversion ratios.   *Id.* at 2026:10-18 (referencing DDX0015 at 50).   The merger simulation assumes that only 50% of medical cost savings will be passed-through to customers, which is significantly less than the 98% pass-through shown by Dr. Israel's analysis.   *Id.* at 2026:4-9 (referencing DDX0015 at 50); *see also supra* § VII.A.3.   The merger simulation assumes the gap between a customer's first and second best choice is the same as the gap between their second and third choice.   *Id.* at 2026:19-23 (referencing DDX0015 at 50).   Although an incumbent may enjoy an advantage over a customer's second choice, the customer's second choice does not enjoy the same advantage over a customer's third choice.   *Id.* at 2027:10-20.

### c.    Even Using Professor Dranove's Faulty Assumptions, His Merger Simulation Shows That The Merger Is Procompetitive

371.    Plaintiffs admit that the merger will achieve substantial medical cost savings. Compl. ¶ 71; *see supra* §VII.A.1.   Yet, in all of his models, Prof. Dranove's assumed *zero* medical cost savings.   Dranove Tr. 1159:2-5.

372.    Dr. Israel found that by including even one-third of the calculated medical cost savings in Prof. Dranove's merger simulation model, but otherwise retaining his data and

assumptions, the model finds the merger procompetitive for "national accounts." Israel Tr. 1867:6-11, 2013:4-11.

373. Prof. Dranove's UPP model is also inappropriate because it fails to incorporate *any* medical cost savings and therefore does not accurately measure the effect of the merger as it fails to consider any downward pricing pressure, which it must do. Israel Tr. 2015:19-23.

### 3. Market Features Restrain Anticompetitive Pricing

374. History has already proven that the market for "national accounts" prevents imposition of a significant price increase. In 2011, Anthem's then CEO sought to increase margins through higher ASO fees. Goulet (former Anthem) Dep. 330:25-331:5. As a result of the increased price, Anthem lost numerous "national account" customers. *Id.* at 331:5-9, 346:25-347:13; *see also* Kertesz (Anthem) Tr. 660:12-14 ("I don't know the specific impact to our retention levels, but we lost a considerable amount of business at renewal."). This was reinforced by Cain Hayes, President National Accounts at Aetna, who does not believe the merger will have much impact on Aetna's ability to compete in the space, in part, because "[t]here's 20 – as I mentioned before, there's 25 or 30 competitors" in the market and the merger will not be "a game-changer." Hayes (Aetna) Dep. 179:21-180:12, 180:15-181:1.

#### a. "National Accounts" Are Sophisticated Power Buyers And Have The Ability To Disintermediate Insurers

375. "National accounts" are adept at leveraging their buying power and utilizing the bidding process to obtain lower rates. Mathai (Anthem) Tr. 1260:16-18 ("[W]ith clients that have, you know, slice business with us, even the threat of the competition or a competitor growing over Anthem is constantly present."). As one Cigna executive explained, "national" customers:

> Tend to be more sophisticated, more inclined to use more than one
> payor, like us, so there's way more slice business...So more

> sophisticated customers, use consultants, have large internal
> benefit teams with sophisticated people within their organization,
> and, very importantly, it's not uncommon for them to choose
> multiple payors, and it's also not uncommon for them to use other
> types of vendors for parts of their solution set.

Manders (Cigna) Dep. 97:9-22

376.    "National accounts" routinely use experienced consultants and brokers to help

develop and negotiate the best solutions for the customer's health care financing. *Supra* § III.B;

Kendrick (Anthem) Tr. 1212:15-23; Hayes (Aetna) Dep. 281:25-282:19, 282:21 (consultants

create competitive pressures for Aetna to compete vigorously in seeking business). For example,

██████████████████████████████████████████████████

██████████████████████████████████████████. Kilmartin (Mercer)

Dep. 25:20-26:1, 48:5-21. WTW's OneExchange private exchange provides a national solution

for clients but the configuration in any instance is customized for the specific geographic markets

of interest for each client. Abbott (WTW) Tr. 181:25-182:10.

377.    "National accounts" use multiple payors, nontraditional vendors, and direct

contracting to tailor solutions to their needs and to obtain the best possible price. Employers

such as Intel, Walmart, Boeing, Caterpillar, and Lowe's contract with providers directly, cutting

out insurers entirely. *Supra* §§ III.G & I; ████████████████████.

378.    "National accounts" can form buying consortiums, such as HTA, which was

formed by twenty of America's largest corporations, including American Express, Caterpillar,

Coca-Cola, IBM, and Macy's, to leverage their collective scale to "break with existing

marketplace practices" and create HTA's own medical provider network to increase efficiency,

reduce cost, and increase quality to obtain better outcomes. McHugh (HTA) 13:1-14:3, 19:9-

20:13, 40:7-42:9.

REDACTED FOR PUBLIC FILING

379.   Some "national accounts," such as Caterpillar, have sophisticated, in-house experience and do not even use brokers.  Bisping (Caterpillar) Dep. 52:13-20, 53:18-54:5.

**b.     The Credible Threat Of Disintermediation And Slicing Prevents Selective Targeting Of "National Accounts" For Price Increases**

380.   Many "national accounts" are already served, in whole or in part, by companies other than the four carriers cited by Plaintiffs.  *Supra* § III.  In some instances, "national accounts" slice their business among several insurers, including smaller insurers, provider-sponsored plans, and TPAs, or will solely utilize one of these options instead of the four largest carriers.  *Supra* § III.C-E.  Slicing is facilitated in part by brokers seeking the best deal possible for their clients, and the growth of private exchanges.  *Supra* § III.B & G.

381.   

This is because a competitor need only threaten to obtain 9.2% of the "national account's" business to act as a price constraint, and numerous competitors satisfy this threshold and therefore act as constraints on pricing.  Fowdur Tr. 1319:13-1320:19.

382.   Brokers recognize that these threats are credible and that threatening to "go to market" for bids typically results in reduced costs because incumbent carriers are willing to offer lower-cost proposals rather than risk losing all or part of an account in an open RFP process. *See, e.g.,* Kilmartin (Mercer) Dep. 79:1-4, 6-8;

(

). Prof. Dranove agreed that employers can use the threat of

REDACTED FOR PUBLIC FILING

switching in negotiations to get better rates, but failed to study this effect on the market. Dranove Tr. 1143:7-10.

383.   Private exchanges provide employers with additional leverage because carriers recognize that they will lose members if a client moves to an exchange that offers multiple carriers. *See* Schell (Anthem) Dep. 223:23-25, 224:5-13. ████████████████████



384.   The credible threat of employing one of the many solutions described above is sufficient to extract the best pricing from an incumbent carrier if faced with a price increase. Fowdur Tr. 1302:10-12, 1317:17-1318:5, 1363:15-1364:3; Dranove Tr. 1143:7-16.

        **c.   Private Exchanges Offer Employers Additional Solutions And Would Constrain The Merged Firm From Raising Prices**

385.   Private exchanges are a growing force and "represent the most fundamental change to take place in the [health & welfare] benefits market for the last 30 years." DX0198 at ANTM-DDC-002891990; *see also supra* § III.B.   Private exchanges "████████████ ████████████████████████████████████████████ ████████." DX0130 at ANTM013985093.   Private exchanges create cost savings, enhance consumerism, and encourage carrier competition and slicing. *See* DX0198 at ANTM-DDC-002892011; DX0130 at ANTM013985082. ███████████████ ████████████████████████████████████

REDACTED FOR PUBLIC FILING

████████████████████████████████████████████████

████████████████████████. DX0201 at ANTM-DDC-002892032R.

386.    With the breadth of carrier options available through private exchanges, large customers use private exchanges as a way to slice their coverage. *See, e.g.* Kertesz (Anthem) Tr. 589:6-19, 633:12-19 (Private exchanges "are offering a lot of competition for customers that might have been a whole carrier solution previously."). Exchanges facilitate slicing by allowing regional and local carriers to compete side-by-side with large insurers. Kertesz (Anthem) Tr. 635:10-12; *see also* Abbott (WTW) Tr. 182:24-25; Kilmartin (Mercer) Dep. 67:20-24, 68:1-7, 68:22-24. ████████████████████████████████████████

████████████████████.  ██████████████████████. Further examples of smaller carriers that compete on private exchanges include Coventry, Geisinger, Dean Health Plan, Kaiser, Harvard Pilgrim, Hawaii Management Alliance Association, Health Alliance Medical Plans Inc., HealthNet, MVP, Pacific Source Health Plans, SummaCare, UPMC, and a number of the BCBS plans. Kertesz (Anthem) Tr. 634:7-14; DX0208 at 7; DX0277; ████████████████

████████. The consequence for larger carriers is that they lose members to other carriers available on the exchange. Mathai (Anthem) Tr. 640:17-22 (Anthem's account with SunTrust decreased from 30,000 to 8,000 lives when SunTrust moved onto WTW's private exchange).

387.    Aon, Mercer, and WTW all assess whether to add regional carriers to their exchanges by considering whether the regional carrier's networks cover new areas of the country, and whether the regional carrier innovates, has proven able to drive lower costs, or has a notable value proposition. DX0199. The Gallagher Marketplace aims to reflect the local market and frequently adds regional carriers "to provide good choices for its clients." Lonsdale (Arthur J. Gallagher) Dep. 157:18–25.

388. 

389. Even carriers that participate in private exchanges compete on price to keep their clients from moving to exchanges. Thackeray (Cigna) Tr. 749:13-750:9 (Cigna's "typical approach" to retain clients who wish to go to private exchanges is to lower its prices and offer "financial incentives," despite Cigna being offered on 35 private exchanges itself).

390. 

. DX0012 at ANTM003091272.

391. Private exchange growth is projected to continue. *See* Abbott (WTW) Tr. 186:9-15, 186:19-23 ("over time 25 to 30 percent of [WTW's] clients will be using [its private exchange] or a similar private exchange."). Covered lives on private exchanges are estimated to have more than tripled from 2014 to 2016. *See* PX0036 at AET-P001-0000863879-5; DX0284 at UHC0000694.

. PX0036 at AET-0000863879-5.

██████████████. DX0087 at ANTM001599367. The ██ major consultants with exchanges all expect their exchanges to grow. ████████████████████

███████████; Kilmartin (Mercer) Dep. 29:4-16, 53:3-5; Sharp (Aon) Dep. 30:6-8. A United planning document states that "████████████████████████████████ ████████." DX0284 at UHC0000694.

### C.   Barriers to Entry are Low

392.   The Division's Merger Guidelines include as "market participants" firms that will easily and rapidly enter. HMG § 5.2. Existing regional competitors can and do compete for "national accounts," either on a full replacement basis because many "national accounts" are really regional or for part of the business on a slice basis. *Supra* § III.C. Entry and expansion by such competitors are occurring at a pace that will provide competitive discipline post-merger. *See* Fowdur Tr. 1319:13-1320:19; Gray (Key Benefit Administrators) Dep. 43:20-44:22; ████████████████████████████████.

393.   The barriers to rapidly enter or expand into Plaintiffs' "national accounts" market are low. Dr. Fowdur's 9.2% critical loss shows that competition that can secure 9.2% of the hypothetical monopolist's business will act as a competitive constraint. Fowdur Tr. 1319:13-1320:19. A new "full replacement" competitor, although available here, is unnecessary because slicing is more than sufficient to impose such a constraint. *Id.*

394.   Plaintiffs offered no evidence at trial as to the cost or time needed to enter the "national accounts" market. The evidence instead demonstrates that rapid entry and expansion can and does occur, and the existence of low regulatory barriers, brokers, rental networks, and the ability to partner mean that it will continue to occur after the merger. Prof. Dranove, in fact, admitted that his market share calculations do not account for entry when he learned that IU Health expanded from about 1,800 enrollees in January 2015 to 200,000 enrollees in June 2016 –

a change in share that his data did not acknowledge or allow for.  Dranove Tr. 2428:23-2429:23 (discussing DDX0096); DX0730.

1.  **Significant, Recent Entry By Provider-Sponsored Plans, TPAs, Smaller Insurers, And Other Firms**

395.  Numerous provider-sponsored plans, TPAs, smaller insurance carriers, and other firms have recently entered or expanded into new markets to serve large commercial customers, including "national accounts."  This real-world evidence demonstrates that rapid entry and expansion can and does occur.

396.  **Provider-Sponsored Plans (PSPs).**



.  *See*

DX0002 at ANTM000515788-89.  These and other PSPs have met with success in the market due to their close integration with providers.  *See, supra* § III.E.

397.  For example, Inova partnered with Aetna in May 2012 to launch Innovation Health in Virginia and began offering health plans in October 2013.  Henderson (Innovation Health) Dep. 21:7-25; *supra* § III.E.1.  Within two years, Innovation Health has expanded to nearly ██████████████ in "national accounts." Fowdur Tr. 1355:16-21; Henderson (Innovation Health) Dep. 54:2-6.  Similarly, an older PSP Optima (the insurance arm of Sentara healthcare in Virginia) expanded to Ohio in January 2015, with plans to launch in a similar manner in Alabama, North Carolina, and Florida, by partnering with local healthcare systems.  Hilbert (Optima) Dep. 18:1-20:10; *supra* § III.E.3.

398.  Additionally, UC Health entered the market in December 2013 and now serves clients with members across eighteen states with plans to serve clients in eight additional states.

REDACTED FOR PUBLIC FILING

Major (UC Health) Dep. 11:6-9, 14:12-15:6, 15:9-15, 15:17-22, 73:11-18, 73:20-74:13.

████████████████████████████████████████████ (Schirmer

(Sutter Health) Dep. 34:10-11) ████████████████████████████████

████████████████████████████ (Schirmer (Sutter Health) Dep. 82:14-22;

*supra* § III.E.4).

399.   **Insurers.**   Insurance carriers other than United, Aetna, Anthem, and Cigna continue to grow and expand throughout the country. *Supra* § III.C. These companies compete on both a full-replacement and slice basis in their base regions and across the country, and compete directly through the RFP process and through private exchanges. *Id.*

400.   For example, Harvard Pilgrim recently entered Connecticut and ██████████

██████████████████████████████████████████ Roberts (Harvard Pilgrim)

Dep. 15:17-16:2; *supra* § III.C.6.   Centene is "[a] growth-oriented company, and they are bidding all of the time" and "[a]lways bidding on new – new areas, new locales, new geographies, yes." Tallman (Centene) Dep. 111:25-112:15; *supra* § III.C.12.   In January 2016, Tufts entered New Hampshire with its Tufts Health Freedom Plan. Spooner (Tufts) Dep. 79:7-15, 79:23-80:13; *supra* § III.C.10.

401.   **TPAs.**   TPAs comprise 20% of the commercial healthcare market already and hundreds of them compete for large employers on a slice and full replacement basis. *Supra* § III.D.   Because TPAs offer flexible, highly customized benefit designs, TPAs offer particular appeal to "national accounts" and numerous TPAs have focused on growing and entering into the market across the country. *Id.*

402.   For example, ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████. Batniji (CollectiveHealth) Dep. 58:14-61:25, 63:3-64:8; *supra* § III.D.4. ███████████████████████

███████████████████████████████. *Id.* at 85:17-86:2.

403. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████ ████████████████████████; DX0019 at HPHC-ANTHEMDOJ-008218, HPHC-ANTHEMDOJ-008224; *supra* § III.D.5.

404.    Other TPAs growing across the country include, but are not limited to, AmeriBen (expanded over the last five years from Arizona to "many other states"; Hatch (AmeriBen) Dep. 21:18-22:5, 22:7-15; *supra* § III.D.3), ██████████████████████; ███████

████████████████████████; *supra* § III.D.6), and ████████████████

██████████████; ████████████████████████; *supra* § III.D.1).

405.    **Other Firms**. Insurance carriers are also taking notice of new entrants that target specific services that carriers market to their "national accounts." *See* Thackeray (Cigna) Tr. 746:14-747:13. These entrants threaten insurance carriers even if they partner with them because they often take the most profitable portions of the carrier's business and force the carrier to increase its own innovation or otherwise lower its prices to compete. *Id.* at 748:14-749:2 (describing how offerings by Quantum and Accolade are beginning to occupy the utilization management or case management space—a space that is core to Cigna's profit margins).

406.    One type of new entrant focuses on consumer engagement and experience, such as concierge services, and includes Quantum Health, Accolade, and Oscar. DX0002 at ANTM000515803; *supra* § III.H. ████████████████████████████

██████████████████████████████████████████



137

REDACTED FOR PUBLIC FILING



████████████████████████████. *Id.* at ANTM000515805.

████████████████████████████████████████. *Id.* at ANTM000515801. ████████.

████████████████████████.” *Id.* at ANTM000515801; *see also* DX0003 at HPHC-ANTHEMDOJ-002426 ████████████; Wilhelmsen (Southern New Hampshire Health System) Dep. 27:24-28:8, 77:25-79:1 (explaining that in the last six years, Southern New Hampshire Healthcare has opened five retail walk-in clinics and has already acquired land to open a sixth in Massachusetts).

407. ████████████████████. DX0002 at ANTM000515797. ████████.

████████████████████. *See id.* at ANTM000515798. ████.

████████.” *Id.* at ANTM000515802.

## 2. Legal And Regulatory Requirements To Serve ASO Customers Are Minimal

408. Because there are little to no legal or regulatory requirements for servicing ASO clients, rapid entry is possible. *See* Gray (Key Benefit Administrators) Dep. 43:20-44:22;

███████████████████████████; Major (UC Health) Dep. 76:4-9, 76:11-77:19, 77:21-78:2.  Fully-insured plans can receive the necessary state regulatory approval in less than a year.  *See* Spooner (Tufts) Dep. 79:7-15, 79:23-80:13 (state regulatory approval in seven months); ███████████████████ (███████████████████████ ████████████████ ).

### 3.   Provider Networks Can Be Rented Or Created Quickly

409.   Firms can obtain a provider network by renting networks, building their own proprietary networks, or utilizing some combination of the two approaches.  Kendrick (Anthem) Tr. 1194:11-23; Abbott (WTW) Tr. 118:1-8; Archer (HealthSmart) Dep. 49:8-12.

410.   The availability of rental networks, such as Multiplan and First Health, allow competitors to obtain a provider network quickly and easily.  *See supra* § III.F; Fowdur Tr. 1336:1-3.  ██████████████████████████████████ ███████ . ████████████████████████████ .

411.   Rental network fees and provider rate differences do not pose a barrier to entry for competitors relying, in whole or in part, on rental networks.  Fowdur Tr. 1334:15-20.  TPAs are "much more nimble than these large health plans, because they don't have that much fixed cost, so they incur rental network fees.  But because their other costs are low, they can still compete on a cost basis and, therefore, win these accounts."  *Id.*; *see also* ██████████████ ██████ (███████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ ); ████████████████ ("█████████████████████████████████████████████ █████████████████████████████████████████████ ██████████ ").

412.   TPAs have established broad footprints using rental networks. ████

████ ( ████████████ ).

████████████████

████████████████

████████████████ . ████

████████ . HealthSCOPE ████

████████ , with substantial portions of its membership in the Anthem states California,

Georgia, Indiana, Missouri, Ohio, and Nevada. ████████████

██ . Key Benefit Administrators relies on rental networks and has membership in several states.

Gray (KBA) Dep. 45:24-46:3, 46:5-10, 12-13 (listing membership in eighteen states, including

Anthem states California, Colorado, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New

Hampshire, New York, Ohio, Virginia, and Wisconsin).

413.   TPAs typically use multiple, overlapping networks to have maximum flexibility

to meet client needs and provide the best provider rate. Fowdur Tr. 1334:2-12. A non-compete

clause in a rental agreement is not significant because TPAs have other networks and there are

many TPAs available to compete. *Id.* at 1335:23-1336:3; 1336:6-9 ("there are hundreds of

TPAs, hundreds of networks available"); *see also* DX0233 (listing over 42 rental networks used

by Key Benefit Administrators), DX0401 (listing over 85 rental networks used by HealthSmart).

414.   ████████████████

████████████████

████████████ . Roberts (Harvard Pilgrim) Dep. 24:4-8,

31:6-11, 32:5-17, 34:16-35:5.

REDACTED FOR PUBLIC FILING

415.   Real-world evidence shows that proprietary provider networks can be built rapidly.  For example, Imagine Health built networks "very quickly to go alongside" Anthem and to win business at "very large, well-known customers" effective January 2017.   Kendrick (Anthem) Tr. 1197:1-12.

416.   Beth Bierbower of Humana testified that it typically takes Humana six months to a year to establish a proprietary network capable of serving "national accounts" in a new territory, although Humana is sometimes able to establish networks in six months.  Bierbower (Humana) Tr. 836:5-17.   Networks can be built in multiple geographies in parallel.  *Id.* at 836:23-25.  Humana's expansion of its TRICARE network is expected to require contracts with 25,000 new providers across twenty-two states (for a total thirty-one state network). *Id.* at 819:20-25, 822:10-15.  Humana has estimated that it will accomplish the network negotiations over the course of a year without hiring any additional employees, as the process requires only 28 full-time equivalents. *Id.* at 822:7-9.

417.   Healthcare providers have ready-made networks available for use as the foundation for a new health plan.  *See* Henderson (Innovation Health) Dep. 26:25-27:22 (describing how Innovation Health partners with Inova's Signature Partners clinically integrated provider network); Spooner (Tufts Health Plan) Dep. 36:2-12, 156:6-25.  Tufts, an insurance carrier, partnered with hospital systems in New England to enter there with Tufts Health Freedom Plan in a process that took about one year. *Id.*; *supra* § III.E.5.

### 4.   Partnerships With Providers Of Specialty Services Facilitate Entry

418.   The idea that TPAs cannot develop ancillary or specialty product offerings to compete for "national accounts" is mistaken as many TPAs already offer proprietary wellness and other adjunct programs.  Fowdur Tr. 1333:23-1335:1; *see, e.g.,* Gray (Key Benefit Administrators) Dep. 25:6-10, 12-19 (discussing KBA's proprietary disease management

program, American Health Data Institute); Espinoza (CNIC) Dep. 17:14-23; Horvath (CoreSource) Dep. 20:5-11; Archer (Health Smart) Dep. 68:5-10 (Health Smart owns its own pharmacy benefit manager).

419.   Alternatively, competitors can partner with vendors to offer such programs or vendors of adjunct services can be sliced in. *See, e.g.*, Hayes (Aetna) Dep. 272:21-273:15; ████████████████████████; Batniji (Collective Health) Dep. 166:13-167:5. TPAs have won national account business by partnering with providers of adjunct services. *See supra* § III.D (discussing national account customers for Meritain, HealthSCOPE, Collective Health).

### 5.   Consultants And Brokers Facilitate Entry Directly As Intermediaries On Behalf Of Their Clients And By Operating Private Exchanges

420.   Consultants and brokers facilitate entry and expansion by staying up-to-date on market developments, providing alternatives for clients to consider in seeking the best deal for that client, and understanding that "every employer will have a different footprint." Abbott (WTW) Tr. 81:14-16. There is no "one-size-fits-all" approach to health care financing solutions. Kilmartin (Mercer) Dep. 48:12-21. Because of the need to tailor solutions to clients, "part of [a consultant's] job is to make [clients] aware of what is in the marketplace," which includes "mak[ing] them aware of alternatives that might be available." Abbott (WTW) Tr. 81:14-19.

421.   Firms can increase their brand awareness and attractiveness to consultants, employers, and others through strong showings on industry ratings, like NCQA, which currently rates Harvard Pilgrim and MVP plans ahead of Cigna plans. DX0731; Cordani Tr. 511:15-512:20 (citing NCQA measures as support for quality of Cigna's health clinical programs).

422.   Further, broker-operated private exchanges allow smaller insurers and TPAs to seek business in side-by-side comparisons with larger insurers which facilitate both competition and slicing. *See supra* § VIII.B.3.c. The growth of private exchanges provides an ever

broadening avenue for these slice competitors to reach "national accounts" and compete for business. Fowdur Tr. 1314:8-9; Mathai (Anthem) Tr. 1262:23-1263:18.

## IX. INNOVATION WILL BE ENHANCED BY THE MERGER

423.    Plaintiffs contend that the merger will result in anticompetitive "dynamic effects" through harm to innovation. Dranove Tr. 845:2-22; PDX005 at 49-57. Plaintiffs provide no evidence that Cigna is a "maverick" firm that plays a disruptive role in the market to the benefit of consumers by restraining prices, either through a new technology or business model, or an economic incentive to take a price leadership role or deviate from industry practices. HMG ¶ 2.1.5. Plaintiffs' "evidence" exists largely in the form of comparing Cigna's provider collaborations and ACO relationships with Anthem's, which Plaintiffs imply will cease upon completion of the merger. *See, e.g.,* Dranove Tr. 973:12-974:10, 976:14-24, 981:19-24 (discussing Cigna's approach to collaboration and comparing it to Anthem's approach, but admitting, "I don't think we really know what this merger is going to look like. . . . There's just not enough on the record to guide us."); PDX005 at 49-57. Prof. Dranove identifies nothing unique about Cigna's incentive to innovate, and he offers no quantitative analysis of the impact of the merger on quality or innovation even though he admits that such analyses could have been conducted. Dranove Tr. 1164:10-23.

424.    Plaintiffs ignore that Anthem and Cigna are only two of many players in the dynamic healthcare solutions marketplace and insurers and non-insurers are under pressure to present new and creative alternatives to meet employer needs. *See, e.g.,* Hilty (Blue Shield) Dep. 148:20-149:23 ("[Y]ou have to innovate in order to be able to meet your clients' needs. . . . [I]f we don't do it, somebody else is going to do it."); *see also* Kendrick (Anthem) Tr. 1198:15-18 ("I think [United is] exceptionally innovative. I think they're proactive; they're strategic; their Optum arm is very aggressive").

425.    Innovation is a central tool in curbing increasing healthcare costs and is prevalent in the industry.  The transition to value-based care and the increased use of digital technologies and data analytics are all part of the push by healthcare solution providers to create differentiated offerings to control costs, improve quality, and increase choice.  *See* Abbott (WTW) Tr. 93:7-21.  Innovation has helped move provider reimbursement from a fee-for-service model to a pay-for-performance model, a model which has been encouraged by the federal government's stated goal "to have more than 50% of reimbursements in alternative reimbursements or value-based reimbursements by 2018."  Muney (Cigna) Dep. 63:21-64:10; Abbott (WTW) Tr. 82:1-5 ("And increasingly now, as we look in the post-ACA, Accountable Care Act environment, the emergence of some provider groups, such as accountable care organizations, there might be potential options for them in a local marketplace.").  Reduced reimbursement rates "are one of the catalysts that are fueling the transition from historical, volume-based models to a value orientation." Schumacher (United) Dep. 251:7-11.  Provider collaborations and payment reforms are just some of the innovations occurring in the marketplace.  Health and wellness programs, where "barriers to entry are modest," are provided by "more than 5,600 vendors [who] reportedly generate annual revenue of $8 billion" in an industry "characterized by intense competition and fragmented market share."  DX0299 at 7.

426.    Anthem already focuses intently on meeting client needs through innovation, but the merger with Cigna will enhance Anthem's ability to bring creative solutions to clients by adding scale and Cigna's well-regarded products to its portfolio.  *See, e.g.*, Kendrick (Anthem) Tr. 1200:7-18, 1202:12-16.

### A.    Anthem Is A Successful Innovator

427.    Anthem has a strong track record of innovation.  As Colin Drozdowski put it, "[Anthem] lead[s] the competition" in value-based initiatives.  Drozdowski (Anthem) Tr.

1670:8-20.   Prof. Dranove agreed.   Dranove Tr. 983:6-10 ("[O]f course Anthem innovates.
Anthem, at a minimum, recognizes that a lot of these ideas, like collaborative care, are valuable
to customers, and so Anthem has attempted to implement them in their own ways. . . . like [with]
Vivity, offering something that nobody else has offered.").

428.   Anthem is an industry leader in the continuing rapid shift towards value-based
care, which is the "new normal."   *See* DX0106 at ANTM007987965 (Anthem will "[c]ontinue to
transition to value-based payment as the new normal, with a combination of ACO/EPHC,
Bundled Payments, and P4P"); Muney (Cigna) Dep. 164:4-10 ("many payers" focused on value-
based initiatives).    For example, Anthem established Q-HIP, an industry leading hospital value-
based program fifteen years ago.   Drozdowski (Anthem) Tr. 1634:17-1635:5.   As a sign of the
program's success, 85% of Anthem's patient hospital admissions occur at Q-HIP participating
hospitals.   *Id.* at 1640:6-10.   For primary care physicians, Anthem's "marquee value-based
program is enhanced personal healthcare [EPHC], an alternative payment model" with about
45,000 participating physicians.   Cheslock (Anthem) Dep. 51:18-52:11; Drozdowski (Anthem)
Tr. 1635:10-14.   EPHC "was in part borne out of the" primary care medical home (PCMH) and
accountable care organization (ACO)-type pilot Anthem had started in 2006 and 2007.   Cheslock
(Anthem)   Dep.   100:9-19,   *see also*   26:13-27:8,   208:7-209:14   (Over the first year of
implementation, EPHC physicians "managed costs . . . three percent or $9.51 more effectively
than providers not in the EPHC program" and "quality metrics were better or higher for the
EPHC providers."); DX0155 at ANTM-DDC-001410801.

429.   Anthem also leads in collaborations with ACOs.   For example, Anthem recently
contracted with seven ACOs in Southern California for its Vivity program.   Swedish (Anthem)
Tr. 295:18-296:22 (noting that Anthem has tripled its ACO numbers and declaring Vivity a

"fascinating example" of an ACO); Dranove Tr. 975:19-977:3 (Vivity Health is a "nice innovation"). Vivity is "a very unique, out of the kind of standard norm contracting relationship . . ." through which Anthem and the providers it contracts with "are truly working together and sharing profit," as well as risk. Kehaly (Anthem) Dep. 114:12-19. With Vivity, Anthem created "a different delivery system" that only Anthem could have created because of its "established, tenured relationship [with providers]" and because of its "brand . . . that consumers trust." *Id.* at 113:11, 114:23-116:21. Anthem's success with Vivity has been resounding as Vivity has surpassed multiple membership enrollment targets and growth of 200,000 members by 2020 is projected. *Id* at 118:17-119:4, 119:25-122:25.

430.    Overall, Anthem's provider collaborations are extensive.   As of May 2016, Anthem had 805 hospitals in Anthem's pay for performance program, 4.5 million members attributed to ACOs/PCMHs, 55,000 providers in EPHC contracts, and "$50 billion in spend tied to all value-based payment programs." DX0155 at ANTM-DDC-001410797.

431.    Even on a total cost of care measure, which accounts for both an insurer's ability to negotiate lower prices and its ability to impact utilization, Anthem comes out ahead of Cigna. As measured by the joint Anthem-Cigna integration team, Anthem provides a lower total cost of care than Cigna. Drozdowski (Anthem) Tr. 1649:20-1653:23 (Anthem has "a unit price advantage and a medical management [i.e., utilization] advantage" over Cigna); ; Cheslock (Anthem) Dep. 210:18-211:2 (explaining Anthem has "pretty consistently" seen negative (i.e.,

improved) total cost of care trends when taking over national accounts from other carriers and implementing Anthem's programs).

432.    Anthem has not stopped innovating and, in fact, opened its own innovation laboratory in Atlanta in May 2016. It is "designed to specifically have a very agile and consistent process of ideation, scoping, prototype, market testing, development of products and goods and services that are going to better enable a seamless health care delivery solution." Kendrick (Anthem) Tr. 1200:19-1201:6.

### B.    Anthem Will Have Every Incentive To Continue Innovating Post Merger

433.    A combined Anthem and Cigna will have more incentive to innovate than a separate Anthem and Cigna. "Post-merger, the merging firms are a stronger competitor, more able to compete successfully in more bids, mores situations; and thus, they have more opportunity to recoup the investments in innovation . . . [because] their innovations become more profitable." Israel Tr. 2032:6-2033:16. Even Prof. Dranove's model demonstrates that the combined entity will have more incentive to innovate than before. *Id.*

434.    Increased volume of lives for the combined Anthem-Cigna will further accelerate the move from fee-for-service reimbursements to value-based arrangements. Israel Tr. 1977:9-1978:14 ("volume is an important part of the equation … [Anthem and Cigna] see this merger as another step of volume that will help."); *see also* Cordani (Cigna) Tr. 516:16-517:14 (successful collaboratives want "more patients to serve in those models," and the merger "is an opportunity to bring . . . patients to those collaboratives and work with them in more volume").

### C.    Industry-Wide Trends Support Continued Innovation

#### 1.    The Shift To Value-Based Care And Provider Collaborations Is An Industry-Wide Trend Leading To Increased Competition

435.    ███████████████████████████████████████████████

REDACTED FOR PUBLIC FILING



. *See, e.g.,* DX0362 at KP001625 (                                                                                                   ).

DX0362 at KP001625.

436.

. *See, e.g.,*

. Similarly, Aetna anticipates that 38% of it medical spend will be through value-based contracts in 2016, increasing to 54% in 2018 and 75% in 2020. Hayes (Aetna) Dep. 257:8-258:7.

### 2.   Innovative Programs Are Offered By A Wide Variety Of Insurers, TPAs, And Other Vendors

437.   Insurers, TPAs, and other vendors provide many choices for care management, disease management, wellness, and other specialty programs.   These programs may be carved out of an insurer's offering and provided by a different vendor, allowing smaller vendors to gain a toehold in large employer accounts.   For example, Dr. Fowdur referred to several new competitive alternatives, such as Accolade, Quantum, MedWatch, and Trestle Tree, that provide targeted offerings to "national accounts" in place of large insurance carriers.   Fowdur Tr. 1353:7-

148

1354:3; *supra* § III.H.

438. ████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ ██████████

███████ . ███████████████████████████████ . *See, e.g.,*

████████████ ██████████████████████████████████

████████████████████████████████████████████████

████████████ ); 110:11-17 ("

██████████ "); 111:23-112:3 ("

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████ "); 114:22-115:8 ("

████████████████████████████████████████████ "); 114:14-21

(" █████████████████████████████████

████████████████ ."); 117:17-118:3 ("

██████████████████████████████████ ."); 118:11-21 ("

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ ."); 118:22-119:8 ████████████████

████████████████████████████████████████████████

████████████████████████████████████████ . The

availability of these innovative care management programs from new entrants demonstrates that

the merger will have no effect on innovation.

REDACTED FOR PUBLIC FILING

### D.    There Is Nothing Uniquely Innovative About Cigna

439.    Cigna recognizes that many other firms innovate.  *See, e.g.,* Manders (Cigna) Dep. 41:19-42:18; Muney (Cigna) Dep. 164:4-10 ("Many payers are focused on [innovation]"); Huggins (Cigna) Dep. 120:13-23 (collaborative care "not unique to Cigna" because "[o]ther competitors also have their versions of this type of capability").

440.    Cigna, meanwhile, has lagged in a number of areas.

441.    Prof. Dranove used Cigna's level-funded product to characterize Cigna as an innovative firm.  Dranove Tr. 1160:12-1161:14 (discussing PDX005 at 55).  However, he was unaware that Cigna obtained this product through its own acquisition of a company called Great West.  *Id.*; *see also* Brown (Arthur J. Gallagher) Dep. 113:4-114:8, 114:17-115:2 (explaining that Cigna did not have a level funding product until it purchased Great West, and that the level-funding product Cigna sells today is "basically very similar to the way it was 15 years ago").

REDACTED FOR PUBLIC FILING

Dated: December 15, 2016
     Washington, D.C.

Respectfully submitted,

*/s/ Christopher M. Curran*
Christopher M. Curran (D.C. Bar No. 408561)
J. Mark Gidley (D.C. Bar No. 417280)
George L. Paul (D.C. Bar No. 440957)
Noah Brumfield (D.C. Bar. No. 488967)
Matthew S. Leddicotte (D.C. Bar. No. 487612)
**WHITE & CASE**LLP
701 Thirteenth Street, NW
Washington, DC  20005
Tel:  +1 202 626 3600
Fax:  +1 202 639 9355
ccurran@whitecase.com
mgidley@whitecase.com
gpaul@whitecase.com
nbrumfield@whitecase.com
mleddicotte@whitecase.com

Robert A. Milne, *pro hac vice*
Jack E. Pace III, *pro hac vice*
Michael J. Gallagher, *pro hac vice*
Martin M. Toto, *pro hac vice*
**WHITE & CASE**LLP
1155 Avenue of the Americas
New York, NY 20036
Tel: +1 212 819 8200
Fax: +1 212 354 8113
rmilne@whitecase.com
jpace@whitecase.com
mgallagher@whitecase.com
mtoto@whitecase.com

Heather M. Burke, *pro hac vice*
**WHITE & CASE**LLP
3000 El Camino Real
5 Palo Alto Sq., 9th Floor
Palo Alto, CA 94306
Tel: +1 (650) 213 0300
Fax: +1 (650) 213 8158
hburke@whitecase.com

Richard L. Rosen
Wilson D. Mudge
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW

REDACTED FOR PUBLIC FILING

Washington, DC 20001
Telephone: +1 202 942 5072
Facsimile: +1 202 942 5999
Richard.rosen@aporter.com
Wilson.mudge@aporter.com

*Counsel for Anthem, Inc.*

REDACTED FOR PUBLIC FILING