**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA, et al.,

        *Plaintiffs*,

    v.

ANTHEM, INC. and CIGNA CORP.,

        *Defendants*.

Case No. 1:16-cv-01493 (ABJ)

---

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW:**
**PHASE II**

# TABLE OF CONTENTS

I.  THE MERGER WILL SUBSTANTIALLY LESSEN COMPETITION IN THE SALE OF COMMERCIAL HEALTH INSURANCE TO LARGE GROUPS.....................................1

    A.  The sale of commercial health insurance to large groups is a relevant product market. ....................................................................................................... 1

    B.  The relevant geographic markets are the 35 metropolitan areas. ............................ 2

    C.  Additional case law supports aggregating the Blues' shares together. .................... 3

    D.  The merger of Anthem and Cigna would likely result in anticompetitive effects. .. 4

II.  THE MERGER WILL SUBSTANTIALLY LESSEN COMPETITION IN THE PURCHASE OF HEALTHCARE SERVICES BY COMMERCIAL INSURERS. ............6

    A.  Market definition in buy-side cases follows analytically similar principles as in sell-side cases, although the considerations are reversed........................................ 7

    B.  The ordinary framework for assessing competitive effects applies to buy-side claims........................................................................................................................ 8

III.  ANTHEM HAS NOT ESTABLISHED A VALID EFFICIENCIES DEFENSE...............10

# TABLE OF AUTHORITIES

## CASES

*Allen v. Dairy Farmers of Am.*,
 Civ. No. 5:09-230, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) .................................................. 8

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ........................................................................................................... 12

*California v. Am. Stores Co.*,
 495 U.S. 271 (1990) ........................................................................................................... 11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992) ............................................................................................................. 1

*FTC v. Advocate Health Care Network*,
 841 F.3d 460 (7th Cir. 2016) ............................................................................................... 3

*FTC v. CCC Holdings, Inc.*,
 605 F.Supp.2d 26 (D.D.C. 2009) ......................................................................................... 6

*FTC v. H.J. Heinz Co.*,
 246 F.3d 708, 716 (D.C. Cir. 2001) ............................................................................ passim

*FTC v. Penn State Hershey Med. Ctr.*,
 838 F.3d 327 (3d Cir. 2016) ........................................................................................... 3, 10

*FTC v. Staples, Inc. (Staples I)*,
 970 F. Supp. 1066 (D.D.C. 1997) ...................................................................................... 12

*FTC v. Swedish Match*,
 131 F. Supp. 2d 151, 166 (D.D.C. 2000) .......................................................................... 2, 6

*FTC v. Sysco Corp.*,
 113 F. Supp. 3d 1 (D.D.C. 2015) ..................................................................................... 1, 11

*FTC v. Whole Foods Mkt., Inc.*,
 548 F.3d 1028 (D.C. Cir. 2008) ............................................................................................ 2

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
 440 U.S. 205 (1979) ........................................................................................................... 12

*Hospital Corp. of Am. v. FTC*,
 807 F.2d 1381 (7th Cir. 1986) ..................................................................................... 3, 4, 9

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ............................................................................ 1

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
   340 U.S. 211 (1951) .......................................................................................... 14

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ............................................................................ 13

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948) ............................................................................................ 6

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ......................................................................... 5, 6

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ..................................................................... passim

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
   305 F.3d 1124 (10th Cir. 2002) .................................................................... 6, 10

*Texaco, Inc. v. Dagher*,
   547 U.S. 1 (2006) ................................................................................................ 4

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .......................................................................... 7, 8

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ............................................................................ 14

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ........................................................................... 9

*United States v. Blue Cross Blue Shield of Mich.*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011) ............................................................ 3

*United States v. Dairy Farmers of Am.*,
   426 F.3d 850 (6th Cir. 2005) ............................................................................. 4

*United States v. H & R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................ passim

*United States v. Marine Bancorp., Inc.*,
   418 U.S. 602 (1974) ............................................................................................ 3

*United States v. Pennzoil Co.*,
   252 F. Supp. 962 (W.D. Pa. 1965) ................................................................. 7, 8

*United States v. Phila. Nat'l Bank,*
   374 U.S. 321 (1963) ............................................................................................... passim

*United States v. Rice Growers Ass'n of Cal.,*
   Civ. No. S-84-1066, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986) .................................... 6, 7, 8, 9

*United States v. Rockford Memorial Corp.,*
   717 F. Supp. 1251 (N.D. Ill. 1989), *aff'd*, 898 F.2d 1278 (1990) ............................................. 4

*United States v. Visa U.S.A., Inc.,*
   344 F.3d 229 (2d Cir. 2003) ............................................................................................. 9

*West Penn Allegheny Health Sys., Inc. v. UPMC,*
   627 F.3d 85 (3rd Cir. 2010) ......................................................................................... 9, 13

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
   549 U.S. 312 (2007) ....................................................................................................... 7

## STATUTES

15 U.S.C. § 18 .............................................................................................................. 11

## OTHER AUTHORITIES

21 Cong. Rec. 2461 (1890) ............................................................................................. 6

Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129 (2007) ..... 8

John B. Kirkwood, *Buyer Power and Exclusionary Conduct*, 72 Antitrust L.J. 625 (2005) .......... 7

David J. Ravenscraft and Frederic M. Scherer, *Mergers, Sell-Offs and Economic Efficiency*
   (1987) ..................................................................................................................... 10

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (rev. 1997)  ... 11, 13

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ........... passim

1.      Plaintiffs submit the following proposed conclusions of law for the second phase

of trial, which addresses the potential loss of competition in local markets throughout the United

States. These conclusions supplement the proposed conclusions from phase I (ECF #401).

## I.      THE MERGER WILL SUBSTANTIALLY LESSEN COMPETITION IN THE SALE OF COMMERCIAL HEALTH INSURANCE TO LARGE GROUPS.

### A.      The sale of commercial health insurance to large groups is a relevant product market.

2.      A relevant product market is defined through a "factual inquiry into the

'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504

U.S. 451, 482 (1992).

3.      There may be multiple valid, alternative ways to define the product market in any

given case. The relevant market is simply a recognition of a "field in which meaningful

competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

1202 (9th Cir. 1997). If a set of products passes the hypothetical monopolist test, then it

constitutes a relevant product market even if another slightly different set of products would also

have passed the test. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger

Guidelines § 4.1.1 (2010) ("2010 Merger Guidelines").

4.      In cases that involve product markets defined around groups of customers that a

hypothetical monopolist could profitably target for price increases, *see* 2010 Merger Guidelines

§ 4.1.4, courts may define smaller markets for targeted customers as well as broader markets

encompassing one or more of these smaller markets. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1,

37–48 (D.D.C. 2015) (accepting FTC's argument that, "within the broader product market for

broadline distribution, there is a narrower but distinct product market for 'broadline foodservice

distribution services sold to National Customers'").

5.      Courts may look to critical-loss analyses as well in defining relevant markets, but "the critical loss test alone cannot answer the relevant market inquiry." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 63–64 (D.D.C. 2011). One way the test can be performed is by comparing a critical-loss estimate (the maximum sales a firm can lose from uniformly increasing its price by an assumed amount without losing profit) against the actual loss (how much sales a firm would lose from the assumed price increase), and concluding that the hypothetical monopolist can profitably impose a small but significant and non-transitory increase in price (a "SSNIP") unless "the 'actual loss' from such an increase would exceed the 'critical loss.'" *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1047–48 (D.C. Cir. 2008) (Tatel, J., concurring); *see also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C. 2000).

6.      The critical-loss test has "a widely recognized flaw," however, that can bias it in defendants' favor: "when a company has high margins the critical loss is small, so one might predict an 'Actual Loss greater than the Critical Loss,'" but a high margin also "'tends to imply a small Actual Loss' given that high margins suggest customers are price insensitive." *Whole Foods*, 548 F.3d at 1048 (Tatel, J., concurring). This flaw tends to understate the potential for a hypothetical monopolist to profitably impose a SSNIP and thus incorrectly reject a candidate relevant market. Another way to implement the test involves calculating an "aggregate diversion ratio," *H & R Block*, 833 F. Supp. 2d at 63, but in either version of the test critical loss must be compared against a specific benchmark, which in this case involves "quantitative evidence for the magnitude of the Actual Loss," *Whole Foods*, 548 F.3d at 1048 (Tatel, J., concurring). Unlike Dr. Dranove, Anthem's experts have not done that here.

**B.      The relevant geographic markets are the 35 metropolitan areas.**

7.      The definition of a geographic market can be appropriate even if its boundaries

are approximate and some customers are located outside it. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360–61 (1963).

8.      Geographic markets are often "analyzed by using a 'localized approach' and a metropolitan area may be an appropriate geographic market." *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673 (E.D. Mich. 2011). "The use of statistical metropolitan data, such as the MSA, is plausible to establish the geographical area alleged." *Id.*

9.      Counties or MSAs are especially appropriate geographic markets in industries in which service is largely local, such as health insurance, *see id.* (complaint sufficiently alleged "consumers demand access to local providers and, therefore, the health insurance markets are local"), and the provision of hospital or physician services, *see FTC v. Advocate Health Care Network*, 841 F.3d 460, at 470-72 (7th Cir. 2016); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) (defining geographic market locally as "the four counties encompassing and immediately surrounding Harrisburg, Pennsylvania"). *See also United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 619 (1974) (defining the Spokane metropolitan area as the geographic market due to the "'localized' banking market").

10.      "In cases in which the acquired firm markets its products or services on a local, regional, and national basis, the Court has acknowledged the existence of more than one relevant geographic market." *Marine Bancorp.*, 418 U.S. at 621.

**C.      Additional case law supports aggregating the Blues' shares together.**

11.      As Anthem admits, *see* ECF #404 (Anthem's Post-Trial Conclusions of Law Phase I: "National Accounts") at ¶ 46, courts in merger cases have treated separately owned companies as one unit for measuring market shares and concentration in situations where the companies are "unlikely to engage in vigorous or perhaps in any price competition." *Hosp. Corp.*

*of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir. 1986).

12.     For example, courts will treat a set of independently owned firms as a single competitive force in measuring shares and concentration when they are commonly controlled by one of the firms. Thus, in *Hospital Corp. of America v. FTC*, the Seventh Circuit held the FTC "was entitled to conclude" that hospitals managed, but not owned, by the same entity "should be considered allies rather than competitors" in a merger analysis, approving the FTC's determination to count the co-managed hospitals together when calculating the reduction in competition in the market. 807 F.2d at 1387. Similarly, in *United States v. Rockford Memorial Corp.*, the court calculated the relevant market shares "both taking and not taking into account *that one merging hospital had a management contract with another hospital in the market and the* other merging hospital had a parent corporation that also owned a different hospital in the market. 717 F. Supp. 1251, 1279–80 (N.D. Ill. 1989), *aff'd*, 898 F.2d 1278 (7th Cir. 1990); *cf. United States v. Dairy Farmers of Am.*, 426 F.3d 850, 862 (6th Cir. 2005) (acquisition of partial ownership interest in competitor could reduce competition even if acquirer did not gain control over acquired company).

13.     Indeed, Anthem characterizes the Blues as a "joint venture," ECF #324 (Anthem's Pretrial Brief) at 12 (citing *Texaco, Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006)), and, as the Supreme Court explained in *Dagher*, the law regards a joint venture as "a single firm competing with other sellers in the market" when the companies that form it cooperate to provide a service and share in associated risks and rewards, 547 U.S. at 6.

**D.     The merger of Anthem and Cigna would likely result in anticompetitive effects.**

14.     Contrary to Anthem's assertion, *see* ECF #404 (Anthem's Post-Trial Conclusions of Law Phase I: "National Accounts") at ¶ 7, sufficiently large concentration figures can be

enough to enjoin a merger. *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive."). That is how the structural presumption works: a merger that "produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market" is presumptively unlawful. *Phila. Nat'l Bank*, 374 U.S. at 363. Such a merger "must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id*.

15.     The Supreme Court also made clear in *Philadelphia National Bank*, that "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." 374 U.S. at 365 n.42. Indeed, the Court rejected the argument "that, among the three presently largest firms . . . , there will be no increase in concentration. If this argument were valid, then once a market had become unduly concentrated, further concentration would be legally privileged." *Id.*

16.     The structural presumption applies to markets with differentiated products where competition is likely to be harmed by unilateral effects of the merger—such as the markets at issue in this case. *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 570 (6th Cir. 2014); *H & R Block*, 833 F. Supp. 2d at 72.

17.     Courts in the D.C. Circuit have found mergers presumptively unlawful when the government alleged a unilateral effects theory and the parties' combined market shares were around 30 percent. *Heinz*, 246 F.3d at 712 (combined firm market share of 32.8%); *H & R Block*, 833 F. Supp. 2d at 72 (combined firm market share of 28.4%).

18.     For a merger to lead to price increases based on a unilateral effects theory, there is

no requirement that the merging parties be each other's closest competitor. *See H & R Block*, 833

F. Supp. 2d at 83. Rather, in a differentiated product market such as the ones at issue here, "the

products controlled by the merging firms must be close substitutes." *FTC v. CCC Holdings, Inc.*,

605 F. Supp. 2d 26, 68 (D.D.C. 2009). That is, a "significant fraction of the customers

purchasing that product [must] view products formerly sold by the other merging firm as their

next-best choice." *ProMedica*, 749 F.3d at 569 (quoting 2010 Merger Guidelines § 6.1). A

"significant fraction," in this analysis, "need not approach a majority." *Id.* Thus, in *H&R Block*,

the court found a "reasonable likelihood of unilateral effects," 833 F. Supp. 2d at 88, despite the

fact that a third firm "may be the closest competitor" to both of the two merging firms, *id.* at 83.

*See also Swedish Match*, 131 F. Supp. 2d at 166 (merger between Swedish Match and National

anticompetitive despite non-merging party's being Swedish Match's "closest competitor").

## II.   THE MERGER WILL SUBSTANTIALLY LESSEN COMPETITION IN THE PURCHASE OF HEALTHCARE SERVICES BY COMMERCIAL INSURERS.

19.    The antitrust laws are concerned with competition among buyers just as they are

with competition among sellers. *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334

U.S. 219, 236 (1948) ("The statute does not confine its protection to consumers, or to purchasers,

or to competitors, or to sellers."); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124,

1134 (10th Cir. 2002) ("Supreme Court's treatment of monopsony cases strongly suggests that

suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not

harm end-users."); 21 Cong. Rec. 2461 (1890) (statement of Sen. John Sherman) (listing, as one

of the "great wrongs" of trusts, that they "depress the price of what they buy").

20.    Section 7 of the Clayton Act, therefore, makes unlawful any merger whose effect

may be to lessen competition substantially among buyers. *See United States v. Rice Growers*

*Ass'n of Cal.*, Civ. No. S-84-1066, 1986 WL 12562, at *12 (E.D. Cal. Jan. 31, 1986) (concluding

that proposed acquisition was unlawful under Section 7 because "the effect of such acquisition may be substantially to lessen competition in the market for the purchase or acquisition for milling of paddy rice grown in California"); *United States v. Pennzoil Co.*, 252 F. Supp. 962, 985 (W.D. Pa. 1965) (concluding that the proposed acquisition would violate Section 7 because it would "substantially lessen competition in the purchase of Penn Grade crude in the Penn Grade crude producing area").

21.     Competition among buyers mirrors the dynamics of competition among sellers. *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001). To attract sellers' business, purchasers compete by offering sellers higher prices or otherwise better contract terms. *See id.* Therefore, when a merger is challenged under Section 7 because of its effect on the buy-side of a market, the ultimate question is whether the merger's effect may be to lessen competition substantially among purchasers in their efforts to attract sellers. *See Rice Growers*, 1986 WL 12562, at *12; *Pennzoil*, 252 F. Supp. at 977–78.

22.     Monopsony—the lack of competition on the buy-side—is the "mirror image" of monopoly, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321–22 (2007) (parenthetically quoting John B. Kirkwood, *Buyer Power and Exclusionary Conduct*, 72 Antitrust L.J. 625, 652 (2005)); *Todd*, 275 F.3d at 202, and so "similar legal standards" apply to antitrust claims involving buy-side competition, *Weyerhaeuser*, 549 U.S. at 322.

A.     **Market definition in buy-side cases follows analytically similar principles as in sell-side cases, although the considerations are reversed.**

23.     As with sell-side claims, courts typically begin their analyses of buy-side claims with defining the relevant market. *See Todd*, 275 F.3d at 202.

24.     In defining markets on the buy-side, the ordinary market-definition "factors are *reversed*." *Id.*; *see also* 2010 Merger Guidelines § 12. Accordingly, the question of reasonable

interchangeability must be asked from the perspective of sellers rather than buyers: "A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question." *Todd*, 275 F.3d at 202.

25.     Courts may also use a version of the hypothetical monopolist test in conducting this analysis—the "hypothetical monopsonist" test: the question "'in such cases is whether the collective exercise of market power by the buyers of a group of products within a region, which depresses prices paid to sellers . . . would be made unprofitable by seller decisions to deal instead with other buyers or to cease participation in the market.'" *Allen v. Dairy Farmers of Am.*, Civ. No. 5:09-230, 2013 WL 6909953, at *6 (D. Vt. Dec. 31, 2013) (quoting Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129, 133 n.26 (2007)). If a hypothetical monopsonist could profitably impose a small but significant and non-transitory reduction in payments made to a set of sellers of healthcare services, then purchases of those services constitutes a relevant market. *Cf.* 2010 Merger Guidelines § 12 ("In defining relevant markets, the Agencies focus on the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist.").

> **B.      The ordinary framework for assessing competitive effects applies to buy-side claims.**

26.     The structural presumption from *Philadelphia National Bank*, 374 U.S. 321, applies to buy-side merger claims as it does to sell-side ones: post-merger market shares and concentration statistics establish that a merger is presumptively unlawful because it is reasonably likely to lessen competition substantially among buyers, *see Rice Growers*, 1986 WL 12562, at *11–12; *Pennzoil*, 252 F. Supp. at 985.

27.     There is no requirement in a buy-side case, therefore, for plaintiffs to prove that the merger's likely effect is to depress provider prices, or reduce healthcare output or quality:

"[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future." *Hosp. Corp. of Am.*, 807 F.2d at 1389; *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th Cir. 2015) ("Sufficiently large HHI figures establish [a] prima facie case that a merger is anti-competitive." (quoting *H.J. Heinz Co.*, 246 F.3d at 716)).

28.     Of course, more detailed evidence of a merger's likely effect on providers could become relevant if defendants introduced enough evidence to overcome plaintiffs' demonstration of the merger's presumptive illegality. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 983 (D.C. Cir. 1990) ("If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government. . . .").

29.     In such a situation, plaintiffs can establish that the merger is anticompetitive by showing it is likely to reduce reimbursement rates paid to doctors and hospitals even without showing a likely output or quality effect. *Cf. United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (in a Section 1 case, the government can demonstrate that "the defendants' actions have had substantial adverse effects on competition" by showing "increases in price, or decreases in output or quality").

30.     When insurers gain bargaining leverage through reduced competition to lower reimbursement rates, it "tends to diminish the quality and availability of hospital services." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104 (3d Cir. 2010) (citing, e.g., *Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1061 (D.C. Cir. 1995) (Wald, J., dissenting)).

31.     Moreover, in proving a buy-side merger claim, there is no requirement for plaintiffs to prove effects in the downstream market. *See, e.g.*, *Rice Growers*, 1986 WL 12562, at *11–12 (holding merger unlawful based on buy-side claim without analyzing downstream

effects); *Telecor Commc'ns*, 305 F.3d at 1134 (buy-side competition protected against anti-competitive activity that "does not harm end-users"); *cf. Heinz*, 246 F.3d at 719 ("[N]o court has ever held that a reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level."). This is so because the focus of the buy-side analysis is the alleged lessening of competition to attract sellers' business.

## III.   ANTHEM HAS NOT ESTABLISHED A VALID EFFICIENCIES DEFENSE.

32.    In economic terms, efficiencies are "improve[ments] [in] the combined firm's operations" that result from the merger. David J. Ravenscraft and Frederic M. Scherer, *Mergers, Sell-Offs and Economic Efficiency* 211 (1987). Evidence of purported efficiencies may be relevant in a merger analysis, *see Heinz*, 246 F.3d at 720, but only insofar as the evidence relates to the ultimate question in a merger case—"whether efficiencies in the relevant market negate the anticompetitive effect of the merger in that market." *St. Luke's*, 778 F.3d at 789. "[A] successful efficiencies defense requires proof that a merger is not, despite the existence of a prima facie case, anticompetitive." *Id.* at 790.

33.    To successfully establish an efficiencies defense, defendants carry a heavy burden. They must "clearly show that their claimed efficiencies will offset any anticompetitive effects of the merger." *Penn State Hershey*, 838 F.3d at 348 (3d Cir. 2016); *see also St. Luke's*, 778 F.3d at 790 ("[D]efendant must 'clearly demonstrate' that 'the proposed merger enhances rather than hinders competition because of the increased efficiencies.'"); *Heinz*, 246 F.3d at 721–22 (rejecting conclusion that "post-merger efficiencies will outweigh the merger's anticompetitive effects"). This burden is increased where plaintiffs have established a prima facie case due to market concentration: "'proof of 'extraordinary efficiencies' is required to offset the anticompetitive concerns in highly concentrated markets." *St. Luke's*, 778 F.3d at 790

(quoting *Heinz*, 246 F.3d at 720).

34.     Anthem has inaccurately suggested that a plaintiff's burden of proving relevant

markets and establishing a presumption of anticompetitive harm is the same as a defendant's

burden of proving cognizable efficiencies sufficient to rebut that presumption. *See* Trial Tr.

1/4/17, 4897:11–16 (Curran). But plaintiffs "need not present market shares and HHI estimates

with the precision of a NASA scientist. The 'closest available approximation' often will do."

*Sysco*, 113 F. Supp. 3d at 54. And "[t]o show that a merger is unlawful, a plaintiff need only

prove that its effect '*may* be substantially to lessen competition.'" *California v. Am. Stores Co.*,

495 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18). By contrast, a "court must 'undertake a

rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that

those 'efficiencies' represent more than mere speculation and promises about post-merger

behavior.'" *Sysco*, 113 F. Supp. 3d at 82 (quoting *Heinz*, 246 F.3d at 721).

35.     An efficiencies defense must show that the merger will improve, rather than harm,

competition in the relevant market. *See St. Luke's*, 778 F.3d at 790. For example, "if two small

firms were unable to match the prices of a larger competitor, but could do so after a merger

because of decreased production costs, a court recognizing the efficiencies defense might

reasonably conclude that the transaction likely would not lessen competition." *Id.* Likely price

decreases do not count as efficiencies, however, if they are achieved by degrading the quality of

a product such that consumers do not benefit. *See H & R Block*, 833 F. Supp. 2d at 89

(cognizable efficiencies "do not arise from anticompetitive reductions in output or service"

(quoting 2010 Merger Guidelines § 10)); *see also* U.S. Dep't of Justice & Fed. Trade Comm'n,

Horizontal Merger Guidelines § 4 (rev. 1997) ("1997 Merger Guidelines") (same).

36.     A successful efficiencies defense based on the ability to lower input costs (for

example, by achieving purchasing savings) cannot be based on the exercise of the merged firm's enhanced market power in upstream markets. *See* 2010 Merger Guidelines § 12 ("Reduction in prices paid by the merging firms *not arising from the enhancement of market power* can be significant in the evaluation of efficiencies from a merger . . . ." (emphasis added)). Instead, a defendant must show that the purchasing savings derive from some other source, such as making its suppliers more efficient by providing them additional volume or some other benefit. In 1979, the Supreme Court explained how purchasing efficiencies can lawfully be achieved by consolidating purchases with a single dealer:

> Suppose, for example, that an insurance company entered into a contract with a large retail drug chain whereby its policyholders could obtain drugs under their policies only from stores operated by this chain. The justification for such an agreement would be administrative and bulk-purchase savings resulting from obtaining all of the company's drug needs from a single dealer.

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 215 (1979). Likewise, in their first proposed merger in 1997, Staples and Office Depot proffered an efficiencies defense based, in part, on increasing the efficiency of their vendors, arguing that as their "suppliers become more efficient due to their increased sales volume to the combined Staples-Office Depot, they would be able to lower prices to their other retailers." *FTC v. Staples, Inc. (Staples I)*, 970 F. Supp. 1066, 1089 (D.D.C. 1997).

37.     A merger is unlawful if its likely effect is to lessen competition substantially in *any* market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 337 (1962). The Supreme Court has rejected the suggestion that "anticompetitive effects in one market could be justified by procompetitive consequences in another." *Phila. Nat'l Bank*, 374 U.S. at 370; *St. Luke's*, 778 F.3d at 789 (Ninth Circuit's rejecting the "argument that the merger would allow the defendant to compete more efficiently *outside* the relevant market").

38.     For that reason, reduced purchasing costs achieved through greater market power in upstream markets do not transform into cognizable efficiencies merely by being passed through to consumers in downstream markets. In *West Penn Allegheny Health System v. UPMC*, the Third Circuit held that Highmark, the Blue Cross licensee in Pittsburgh, could not defend against its "improperly motivated exercise of monopsony power . . . on the sole ground that it enabled Highmark to set lower premiums on its insurance plans." 627 F.3d at 105; *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (rejecting argument that defendants' conspiracy to depress suppliers' prices was lawful because it benefitted consumers through lower prices; "the central purpose of the antitrust laws, state and federal, is to preserve competition").

39.     Efficiency claims must be verified to be cognizable. A court "must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *Heinz*, 246 F.3d at 721; *see also* 2010 Merger Guidelines § 10 ("Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means."); 1997 Merger Guidelines § 4 (same).

40.     Cognizable efficiencies must be also merger-specific, meaning they "cannot be achieved by either company alone." *Heinz*, 246 F.3d at 721–22; *see also* 2010 Merger Guidelines § 10 ("The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects."); 1997 Merger Guidelines § 4 (same). For example, if a defendant claims—as Anthem does here—that a merger is necessary to acquire the beneficial product attributes of its rival, it must prove it cannot make similar product

improvements absent the merger. In *Heinz*, the D.C. Circuit held that the acquiring company failed to meet that burden. Heinz argued that acquiring Beech-Nut would allow it to combine its lower cost of production with Beech-Nut's better product recipes. But "neither the district court nor the appellees addressed the question whether Heinz could obtain the benefit of better recipes by investing more money in product development and promotion—say, by an amount less than the amount Heinz would spend to acquire Beech-Nut." 246 F.3d at 722.

41.     A claim of countervailing market power also is not a valid efficiencies defense. The antitrust laws do not condone a defense that an otherwise anticompetitive merger can counteract another party's market power. *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 (1951) (horizontal agreement to eliminate competition among liquor sellers was not justified to counteract allegedly anticompetitive acts of buyers); *United States v. Apple, Inc.*, 791 F.3d 290, 298 (2d Cir. 2015) (self-help defense encompasses "a concept of marketplace vigilantism that is wholly foreign to the antitrust laws"). The Supreme Court "reject[ed]" a similar "application of the concept of 'countervailing power'" in *Philadelphia National Bank*, 373 U.S. at 370. And the contrary view urged here by Anthem could lead to an arms race with a monopolist hospital bargaining with a monopolist insurer in each market—hardly the intent of the antitrust laws.

14

Dated: January 6, 2017

Paula Lauren Gibson
Deputy Attorney General
Office of the Attorney General of California
300 S Spring Street
Suite 1702
Los Angeles, CA 90013
Phone: (213) 897-0014
Facsimile: (213) 897-2801
E-mail: Paula.Gibson@doj.ca.gov

*Attorney for the State of California*

Rachel O. Davis
Assistant Attorney General
Office of the Attorney General of Connecticut
55 Elm Street
PO Box 120
Hartford, CT 06106
Phone: (860) 808-5041
Facsimile: (860) 808-5033
E-mail: rachel.davis@ct.gov

*Attorney for the State of Connecticut*

Respectfully submitted,

*/s/ Jon B. Jacobs*
Jon B. Jacobs (D.C. Bar No. 412249)
Scott I. Fitzgerald
Daniel E. Haar
Kathleen Kiernan (D.C. Bar No. 10003748)
Ryan Struve (D.C. Bar No. 495406)
Leah Gould
U.S. Department of Justice
Antitrust Division, Litigation I Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Phone: (202) 598-8916
Facsimile: (202) 307-5802
E-mail: jon.jacobs@usdoj.gov

*Attorneys for United States of America*

**CERTIFICATE OF SERVICE**

I certify that on January 6, 2017, I caused the foregoing document to be served upon all

counsel of record via the Court's EM/ECF system.

> */s/ Jon B. Jacobs*
> Jon B. Jacobs (D.D.C. Bar #412249)
> U.S. Department of Justice
> Antitrust Division, Litigation I Section
> 450 Fifth Street, NW, Suite 4100
> Washington, DC 20530
> Telephone: (202) 598-8916
> Facsimile: (202) 307-5802
> E-mail: jon.jacobs@usdoj.gov
>
> *Attorney for United States of America*