```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3     United States of America,        )  Civil Action
      et al.,                          )  No. 16-CV-1493
4                                       )
                          Plaintiffs,  )  Bench Trial
5                                       )  AFTERNOON SESSION
      vs.                               )  Washington, DC
6                                       )  Monday, Nov. 28, 2016
      Anthem, Inc. and Cigna            )  Time:  2:17 p.m.
7     Corporation,                      )
                                        )
8                          Defendants.  )
      _____
9
                       TRANSCRIPT OF BENCH TRIAL
10                          HELD BEFORE
              THE HONORABLE JUDGE AMY BERMAN JACKSON
11                  UNITED STATES DISTRICT JUDGE
      _____
12
      A P P E A R A N C E S
13
      For the Plaintiffs:
14    United States            Jon B. Jacobs
                               Scott Ivan Fitzgerald
15                             Peter Schwingler
                               U.S. DEPARTMENT OF JUSTICE
16                                Antitrust Division
                                  450 Fifth Street, NW
17                                Suite 4100
                                  Washington, DC 20530
18                                (202) 598-8916

19    District of Columbia     Catherine Anne Jackson
                                  OFFICE OF ATTORNEY GENERAL
20                                441 4th Street, NW
                                  Suite 630 South
21                                Washington, DC 20001

22    (CONTINUED ON NEXT PAGE)

23    Proceedings reported by machine shorthand, transcript
      produced by computer-aided transcription.
24

25
```

```
 1      A P P E A R A N C E S (CONTINUED):

 2      State of Colorado          Abigail Leah Smith
                                   ATTORNEY GENERAL'S OFFICE
 3                                      Consumer Protection Section
                                        1300 Broadway
 4                                      Denver, CO 80203

 5      For the Defendant:
        Anthem, Inc.              Christopher M. Curran
 6                                John Mark Gidley
                                  Heather Burke
 7                                Robert Milne
                                  Martin Toto
 8                                Michael Hamburger
                                        WHITE & CASE LLP
 9                                      701 13th Street, NW
                                        Washington, DC 20005-3807
10                                      (202) 626-3600

11      Cigna Corporation        Charles F Rule
                                 Daniel J. Howley
12                                      Paul, Weiss, Rifkind,
                                        Wharton & Garrison LLP
13                                      2001 K Street, NW
                                        Washington, DC 20006-1047
14                                      (202) 223-7300

15
        _____
16
        Court Reporter:    Lisa A. Moreira, RDR, CRR
17                         Official Court Reporter
                           United States Courthouse, Room 6718
18                         333 Constitution Avenue, NW
                           Washington, DC  20001
19                         202-354-3267

20

21

22

23

24

25
```

1                          I N D E X

2

3    WITNESS                                              PAGE

4    DAVID DRANOVE, Ph.D., Resumed
          (By Mr. Schwingler)................................936
5         (By Mr. Gidley)...................................1018

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         P R O C E E D I N G S

2              THE COURT:  You can resume with the witness.

3                   DAVID DRANOVE, Ph.D., Resumed

4                   DIRECT EXAMINATION, Continued

5     MR. SCHWINGLER:

6     Q.  Good afternoon, Professor Dranove.

7     A.  Good afternoon.

8     Q.  Let's turn now to your analysis of competitive effects,

9     and let's start with the smaller of the two geographic

10    markets, the Anthem territories.  Could you briefly walk us

11    through the main steps in your effects analysis.

12    A.  Sure.  So what I'm going to do is start with what's

13    called the structural analysis where I'm going to look at

14    the concentration of the marketplace in which competition is

15    affected, how the merger will affect that concentration, and

16    compare that to benchmarks that have been established to try

17    to understand whether the merger is likely to be harmful.

18    Those benchmarks are established using the motion that the

19    market shares of the firms that we're considering in the

20    merger can be used to understand the degree to which they

21    are or are not close competitors.

22              But I'm going to go beyond that to actually look

23    at facts on the ground to see the extent to which Anthem and

24    Cigna are close competitors culminating in what's known as a

25    win/loss analysis, but the loss will be qualitative evidence

1    I'll examine as well.

2              Out of that evidence, I will then estimate the

3    static effects, the price effects we talked about, and, in

4    fact, those market shares in the win/loss analysis will be

5    important inputs into the analysis that I'm going to do.

6              After I look at the effects of the merger on

7    premiums and ASO fees, on prices, I'll turn to dynamic

8    effects, essentially the effects on innovation.  And then

9    I'll close by asking important questions about whether

10   entry, repositioning by existing firms in the market, or

11   efficiencies that might result from the merger could offset

12   the harm that I will have documented through my static and

13   dynamic effects analysis.

14   Q.  Let's start with your structural analysis.  What is the

15   principal method for measuring market concentration under

16   the horizontal merger guidelines?

17   A.  The principal method is to construct what's called the

18   Herfindahl-Hirschman Index or HHI, and this is the sum of

19   the squared market shares where, if you have a market share

20   of, let's say, 10 percent, we call it ten, and we square

21   those up for each of the firms in the market.  We add them

22   up, and we get the total HHI for the market.

23             So if there's a single firm that has all of the

24   market, its market share is 100.  You square 100, you get to

25   10,000, and that's the HHI.

1          And you can see that two equal size firms will be

2     an HHI 5,000 going all the way down to zero or close to zero

3     if the market has many, many very small firms.

4     Q.  As an economist, why do you care about HHIs?

5     A.  Both economic theory and empirical research tell us

6     that, all else equal, the higher the HHI in the market, the

7     higher the prices are likely to be.

8     Q.  And is there any literature specific to health insurance

9     that looks at HHIs?

10    A.  There are a handful of studies that have looked at HHIs

11    and health insurance.  Perhaps the best of these studies,

12    because it overcomes some empirical obstacles that others

13    have not been able to overcome, is a paper by Professor

14    Leemore Dafny by Harvard University and her colleagues that

15    looked at what happened to HHIs in the marketplace after

16    Aetna acquired Prudential back about 15 or 20 years ago, and

17    they documented that in those areas of the country where the

18    HHIs increased by the largest amount, premiums in those

19    markets also increased by the largest amount.

20    Q.  Do HHIs tell us anything about risk of coordinated

21    behavior?

22    A.  Yes.  So HHIs can lead -- high HHIs can lead to higher

23    prices either because you simply remove a competitor from

24    the marketplace as the HHI goes up, but also as the HHI goes

25    up there are fewer firms in the market, and economic theory

1    says it's easier for firms to coordinate with each other to

2    avoid head-to-head competition when the HHI is bigger, when

3    there are fewer firms.

4              THE COURT:  When you're talking about prices, you

5    mentioned ASO fees.  Are you talking at this point only

6    about ASO fees?

7              THE WITNESS:  What I will be doing for pricing

8    is -- because nearly all of the contracts we're going to

9    look at are ASO contracts, they are going to be basically

10   essentially the same as the ASO fees.

11   Q.  How are HHIs used when applying the merger guidelines?

12   A.  Well, under the horizontal merger guidelines, it's

13   stated that if the merger resulted in HHI above 2,500, which

14   is the equivalent of four equal-size firms and nobody else

15   in the market, that if the merger results in an HHI above

16   that level and at the same time causes a change in the HHI

17   of at least 200 points, the merger should be viewed as

18   presumptively anticompetitive, which is to say there's a

19   presumption that it's going to cause harm unless there's

20   evidence to suggest there might be some off-setting reason

21   to support the merger.

22   Q.  And if an industry has an HHI greater than 2,500 under

23   the guidelines, is that what's called a highly concentrated

24   market?

25   A.  Yes, the merger guidelines say that's highly

1    concentrated.

2           An important point to remember here, though, is

3    this is not a clear bright line.  It's not as if somehow

4    going from 2,499 to 2,501 means you've gone from a wonderful

5    competitive market to a consolidated market.  2,500 is just

6    a guidepost to suggest that, you know, above 2,500 is more

7    harmful than below 2500.

8           THE COURT:  So is the market already highly

9    concentrated using these figures?  It's just you don't have

10   a number for a change?

11          THE WITNESS:  That's correct.  And we'll see in

12   the upcoming slides, I've calculated the Herfindahls before

13   and after, and you'll see that it was already near or above

14   2500 for most, if not all, of my market definitions that I

15   use.

16   Q.  And focusing on the Anthem territories' geographic

17   market for the time being, does the merger exceed the

18   guidelines thresholds for both of your definitions of

19   "national account customer"?

20   A.  It exceeds them comfortably, yes.

21   Q.  Let's turn to the next slide.  Could you explain what

22   this slide depicts and how to interpret these numbers.

23   A.  Sure.  So the darker -- first of all, along the bottom

24   are four different market definitions.  The first two bars

25   are for the markets that I define, which is ASO and full

1   insurance combined.  The second two bars are for this

2   alternative market.  If you want to argue that ASO-only is a

3   well-defined market, I've also done the market shares and

4   HHIs for those.  So those are the four different bars.

5          On each bar you can see a red line drawn across at

6   the 2500 threshold.  The blue -- the dark blue bar tells you

7   what the HHI was before the merger, and then the light blue

8   bar tells you the delta, the change in the HHI.  So the

9   final HHI is the sum of the dark and the light blues, and

10  the change in the HHI is the light blue.

11  Q.  And just so we have a clear record, can you quickly walk

12  through your HHI calculations for each of these markets.

13  A.  So prior to the merger in the ASO plus full insurance

14  market, if the market definition is for employers with 5,000

15  or more employees, the HHI before the merger is 2,463, and

16  then it jumps up to exactly 3,000 after the merger for a

17  change of 537.

18         You can see that if we add the geographic screen,

19  the starting point is 2,483, and it jumps up to a little bit

20  over 3,100.

21         Then if we restrict it to ASO only, the starting

22  HHI is now above the threshold, around 2,800 to 2,900, and

23  it jumps up by around 800 or so, depending on whether we

24  apply the geographic screen.

25  Q.  Setting aside presumptions in the merger guidelines for

1  a moment as an economist, what do these numbers tell you?

2  A.  It tells me that before the merger the markets were

3  fairly highly concentrated already, and the merger just

4  makes them more so.

5  Q.  Before we move to the next step in your analysis, I

6  think looking at closeness of competition, I'd like to touch

7  briefly on the way national account customers go about

8  purchasing insurance.

9      What have you observed in the record on this

10  issue, and how does it inform your economic analysis?

11  A.  So I'll try to be brief in terms of what I've observed

12  because the Court has heard this before, and then I'll try

13  to explain what it tells me about how to do the analysis.

14      It's my understanding that employers with their

15  benefits consultants will send out RFPs.  There will be a

16  number of responses.  From those responses, a small number

17  of insurers might be asked to submit a new RFP.  There will

18  be some pencil-sharpening at that time, and at that point

19  there might be a final two or three or four RFPs.  A winner

20  is chosen.

21      At that point there might be some minor changes

22  done to the contract, but by and large, at the end of the

23  RFP process a winner is chosen, and the contract is awarded.

24  Q.  And what mechanism of procurement does that structure --

25  what is that, as an economist?  How would you describe that?

1    A.  It's an auction, in a sense.  It's an auction.

2          Several people are bidding, so the insurers are

3    bidding for the business, and the best bidder wins.  That's

4    the way an auction works.

5    Q.  How does this similarity to an auction inform your

6    analysis of the merger's likely effects?

7    A.  Well, there are a lot of different types of auctions.

8    For example, bidding for a portrait at an art auction looks

9    a little different from this type of auction, but it's

10   understood in the auction literature that no matter how the

11   auction is conducted, ultimately it's the competition

12   between the two top bidders that ultimately drives the

13   price.

14         The best way to see that is to think that if there

15   are only two bidders in an auction, and they were to get

16   together and form what's called an auction ring and

17   essentially combine and cheat, the price would collapse.

18   There would be no competition for the one bidder.  So it's

19   really the competition between the first and second bidders

20   that drives the results of the auction.

21         So as I go forward and I talk about merger

22   effects, what I'm really going to be focusing on is how

23   often Anthem and Cigna are 1 and 2 or 2 and 1.  It's in

24   those situations where the merger's going to affect the

25   outcome of the auction.

1    Q.  Let's turn now to your analysis of closeness of

2    competition.  What is the first type of information you

3    considered?

4    A.  Well, just as a sort of, you know, a starting point, I

5    tried to understand what is it about these customers that

6    they are looking for, and what is it that insurers can bring

7    to the table to meet their needs.  So as we talked about

8    earlier during my testimony, we understand the customers are

9    looking for broad networks that have deep discounts, strong

10   brand reputation and brand recognition, the ability to

11   service accounts so that you don't have a lot of what are

12   called claim edits where there's challenges to claims, and

13   if there are challenges, they're all done properly.  This

14   takes a lot of expenditure on the part of the insurance

15   company to do that correctly.  And they're also looking for

16   features like wellness programs and technology platforms

17   that have been described by previous witnesses in this case.

18          The big four insurers we know are strong on all of

19   these dimensions, which means that they're likely to stand

20   out in this auction process.

21   Q.  And what evidence have you observed about regional or

22   local carriers?

23   A.  The regional carriers we've seen generally don't compete

24   on a full replacement basis.  You don't have situations

25   where, for example, Kaiser replaces Aetna or Anthem for all

1          of the business of a national account customer.  In fact,

2          many of these regionals are fully insured plans so they're

3          not replacing the traditional ASO PPO option, which is also

4          the first choice of the national accounts employers.

5                    Some of the regionals are provider-sponsored

6          plans.  You have a local health system, and the local health

7          system is active in the business, but usually the biggest

8          customer of the local health system is their own employees,

9          which doesn't do much good if you're not a local health

10         system and you're trying to buy health insurance.

11                   But even Kaiser competes as a geographic slice.

12         It saw the long side of the national carriers.  It's not

13         competing for all of the business of the national accounts.

14         It's not going to win that auction.

15         Q.  And what evidence have you observed about TPAs as they

16         function in the market for national accounts?

17         A.  I think the first important point is perhaps the largest

18         TPAs, certainly amongst the largest TPAs, are owned by the

19         national insurers, the big four insurers, so they're not

20         competing head to head against the big four.  They are the

21         big four.

22                   Of those that are not the big four, they're going

23         to have to rent networks.  They usually rent networks from a

24         national carrier, which means they have to pay a rental fee,

25         which drives up the cost of offering their product, and

1    indeed, some of them also have to sign noncompetes with the

2    national carriers they're renting the networks from, which

3    immediately reduces the number of competitors down to the

4    same big four.

5           If you don't sign with a national carrier, you're

6    going to have to patch together rental networks from a lot

7    of different local networks, and that comes with its own

8    administrative burden and expense.

9    Q.  Let me ask you a quick question, Professor Dranove.

10   A.  Yes.

11   Q.  We have a redacted portion of this slide.  Without

12   getting into company names, are the TPAs identified in the

13   redacted portion TPAs you've observed in the record renting

14   networks from a national carrier?

15   A.  Yes, they are.

16   Q.  Okay.  And how -- what evidence have you observed about

17   how often TPAs actually serve national accounts?

18   A.  So in addition to just not finding examples in the

19   record of TPAs having a big footprint with national

20   accounts, we have very specific information from one of the

21   largest benefits consulting firms that reported that of its

22   1,100 U.S. clients, I think it said it recommended that

23   their clients use TPAs less than 1 percent of the time.  And

24   that's consistent with everything I understand about the

25   role of TPAs here.

1  Q.  And did you also observe Mr. Abbott's testimony earlier

2  in trial?

3  A.  Yes, I did.

4  Q.  And is that also consistent with your conclusion?

5  A.  Yes, it is.  TPAs are just not a substitute for the

6  national carriers.

7  Q.  Before we move on, all this evidence you've talked

8  about, high level, what does this tell you about the market

9  shares and HHIs you calculated?

10  A.  The market shares and HHIs I calculated came as no

11  surprise.  The market is generally understood by people in

12  the health economics field to be dominated by the Blues,

13  United second, and Aetna and Cigna are third and fourth with

14  Cigna rapidly growing and starting to catch up a little bit.

15  Q.  After looking at industry facts overall, what was the

16  next step in your analysis?

17  A.  The next step I wanted to do is look at whether or not

18  Cigna and Anthem competed head to head against one another.

19  Just as a reality check, could I find evidence that they

20  really are going after the same contracts.

21  Q.  Without getting into actual customer examples, generally

22  speaking, have you observed evidence of account-specific

23  competition between Anthem and Cigna for national accounts?

24  A.  Yes, I have in two ways.  First, we heard about the

25  Anthem bounty program, and Anthem's bounty program was just

1    an indication that they thought that there were Cigna

2    customers who were ready to switch to Anthem, that these

3    customers viewed them as sufficiently close alternatives

4    that it wouldn't take much of a push to get them to switch,

5    which is what you'd expect if firms are close competitors.

6            There's also ample evidence that's cited in both

7    of my reports and also discussed in trial of specific cases

8    where Anthem's presence pushed Cigna to enhance its bids,

9    and Cigna's presence pushed Anthem to enhance its bids.  In

10   other words, customers were able to use the two to leverage

11   against each other and get better contracts.

12   Q.  As an economist, how much weight do you give to

13   anecdotal evidence of competition like these account-

14   specific examples or the bounty program?

15   A.  I think it's kind of a reality check.  I mean, it tells

16   me that what I'm going to do next, which is try to quantify

17   these effects, is based on facts on the ground, but it's not

18   sufficient to quantify the effects.

19           THE COURT:  Is the bounty program feeling that

20   there are Cigna customers that they could easily go after,

21   is that an internal assessment of their strength as a

22   competitor, or is it their internal assessment to their

23   weakness as a competitor?  We're going to go after the low-

24   hanging fruit, Aetna and Cigna, because it's much easier for

25   us to get those than to try to get United customers.  It

1    shows they compete.

2           So is that all you're trying to show me, that they

3    compete, or that they think they are an equal competitor?

4           THE WITNESS:  It's a little more subtle than that.

5    If Anthem and Cigna were very differentiated appealing to

6    very different customer bases, then you would never believe

7    that a little push from the salespeople would be able to win

8    over customers who are currently with Cigna.  So this is

9    telling us that they're actually competing in the same

10   space, and customers really do feel that one could be

11   replaced by another.  So it's telling us they're not really

12   very differentiated from each other.

13   Q.  On this point of differentiation, Professor Dranove, how

14   is it that a firm like Anthem and a firm like Cigna can

15   compete for a common set of customers?

16   A.  So we've talked about or we've heard a lot about

17   Anthem's strategy, which historically has been based on

18   achieving the best discounts in the marketplace, and

19   Mr. Cordani takes the reins at Cigna a decade ago and

20   realizes they're never going to compete based on discounts,

21   so they're going to compete based on various innovative

22   strategies.  But at the end of the day, both approaches get

23   to the same place, which is reducing the per member per

24   month that the employers are facing.  So the employer's

25   going to look at two different approaches, but look at the

1    same bottom-line number, who is getting us the best per

2    member per month, and in that way you can have different

3    corporate strategies and yet appeal to the very same

4    customers.

5              THE COURT:  Is that metric being calculated when

6    you're dealing with an Anthem or a company that is marketing

7    itself based on its discounts?

8              I know that Cigna likes to calculate that and

9    point that out, but is that even being compared head to

10   head?

11             THE WITNESS:  So I can't say specifically on a

12   particular contract.  Certainly the concept of per member

13   per month has been well-known in the health insurance sector

14   for a long, long time, and Cigna has, for several years now,

15   been making a point of making sure that its customers

16   understand that that is the gold standard for comparison.

17   Q.  And to be clear, is that -- what Cigna's doing, the per

18   member per month -- factoring in, you know, any reductions

19   in utilization based on success of wellness programs and the

20   like?

21   A.  Of course.  So yes, the total amount the customers are

22   spending are, to put it simply, the price times the

23   quantity, and so reducing price is one way to get at a

24   better product for the employers.  Reducing quantity,

25   getting rid of unnecessary services, keeping people

1    healthier so they don't need to go in to see the doctor, is

2    another way to reduce the total amount that's spent.

3              These are just two alternative ways of achieving

4    the same goal.

5    Q.  Let's turn now to your empirical analysis.  What data

6    was available to you or were available to you to study

7    whether Anthem and Cigna are ranked highly more often than

8    shares would predict?

9    A.  Well, both Cigna and Anthem compile data that is similar

10   to what companies compile in a wide range of industries.

11   It's known as win/loss data.  And what win/loss data does

12   for companies is tell them, if we had a customer and we lost

13   that customer, who did we lose it to?  And if we win a new

14   customer, who did we win it from?

15             Cigna's data is from a company called

16   SalesForce.com.  Anthem historically used data from a

17   company called iAvenue and then switched over to

18   SalesForce.com in later years.

19   Q.  And could you explain your approach to measuring

20   closeness of competition using this data.

21   A.  So I mentioned that in an auction framework what matters

22   is are Cigna and Anthem 1 and 2 or 2 and 1, and ideally I'd

23   like to know how often that's how they're ranked in the

24   bids.  I don't have that data so what I have to do is make

25   use of the data at hand.

 1          I do know in cases where, for example, Cigna wins

 2     a contract, that Cigna's No. 1.  What I'd like to know is

 3     was Anthem No. 2.  I don't know if Anthem was No. 2, but I

 4     will know if Anthem was the incumbent in that contract.

 5          The other thing we know is that insurers tend to

 6     stick with their -- I'm sorry, employers tend to stick with

 7     their insurers more often than not.  There tends to be a

 8     fairly high level of satisfaction with incumbent insurers.

 9     So it stands to reason that if an incumbent insurer loses a

10     contract, it's not likely it suddenly became the least-

11     favorite bidder.  It's probably still one of the more highly

12     ranked bidders for that contract.

13          So I'm going to do what I call condition on

14     incumbency to get a sense, kind of a proxy, for how often

15     Cigna and Anthem are 1 and 2.  So if Cigna wins a contract

16     and Anthem was the incumbent, I'll use that as an indication

17     that Cigna and Anthem were, if not 1 and 2, maybe 1 and 2A

18     for that contract, and I'll use that as evidence to take to

19     the data to measure the effects of the merger.

20     Q.  Let's walk through your results.  Could you explain your

21     numbers on this chart and how you interpret them.

22     A.  Sure.  So first using Cigna sales force data, which is

23     available for seven years, I could show that -- I can start

24     by asking a question unrelated to this data, which is, if

25     Anthem and Cigna were bidding, and their importance to

1    employers in the marketplace was reflected by their shares,

2    just by their shares, how often would Cigna be the incumbent

3    losing to Anthem?

4         And to give you a sense of where this number would

5    come from, suppose that Cigna is the incumbent, and Anthem

6    has 40 percent of the market when you take Cigna out of it.

7    So if Anthem is 40 percent of what's left over, we would

8    expect that when Cigna loses the business, based on shares

9    alone, Anthem should win 40 percent of the contracts.  And,

10   in fact, just based on Anthem's share alone, you can see

11   Anthem should win about 43 or 44 percent of the contracts,

12   as you can see from the first bar.  In actuality, when Cigna

13   was the incumbent and it loses a bid to -- and it loses the

14   contract, Anthem is the winner 60 percent of the time.

15        So if we believe that Cigna, as an incumbent, was

16   still well-regarded by the employer, this is telling us that

17   Anthem was a close competitor to Cigna more often than would

18   have been predicted just from market shares.

19        Whenever you have a result like this, that they're

20   closer than what would be predicted by market shares, it

21   tells you looking just at the Herfindahls and structural

22   analysis that I did, it's understating the competitive

23   significance of the merger, that these are closer

24   competitors than just the shares alone.

25   Q.  Perhaps you could briefly describe the two bars on the

1     right-hand portion of the slide.

2     A.   Sure.   So here we're using Anthem's iAvenue data, and

3     Anthem stops using iAvenue in 2013 so we're restricted to

4     that time period.

5           Just based on Cigna's overall share in the market,

6     Cigna should have won about 10 percent of the contracts when

7     Anthem was the incumbent and Anthem lost it to somebody.

8     Cigna should have been that somebody 10 percent of the time.

9     In reality, Cigna was that somebody closer to about 17

10    percent of the time, again showing that Cigna was a closer

11    competitor than just the market shares alone would indicate.

12    Q.   And you ran this analysis over two of your data sets.

13    Could you describe what you found.

14    A.   So sales force also allows me to go in the other

15    direction.   When Cigna wins, whom do they win it from?   If

16    they win it from Anthem about as often as Anthem's overall

17    shares indicate, then when Cigna wins contracts, about 44

18    percent of the time they should win it from Anthem.

19          The reality is when they win contracts, about 54

20    percent of the time they win it from Anthem, and then

21    Anthem's Sales Force data, which I said they use in the

22    later years, from 2015 to 2017, when Anthem wins a contract

23    from an incumbent, Cigna's share alone suggests that it

24    ought to be the incumbent about 10 percent of the time, but,

25    in fact, when Anthem wins a contract from an incumbent,

1    Cigna was the incumbent almost 35 percent of the time.  So

2    adjusting again that Anthem is competing more closely with

3    Cigna than market shares would indicate.

4    Q.  So is it fair to say that, when looking at both Anthem

5    and Cigna ordinary course data and conditioning upon

6    incumbency, you get a consistent result?

7    A.  Yes, I do.  Both sides -- obviously there's four ways to

8    do this.  From Cigna's and Anthem's perspective, wins and

9    losses, they all point in the same direction.

10   Q.  How does your approach differ from that of the

11   defendants' experts?

12   A.  So what Dr. Israel has done is different from this in a

13   way that I don't think is helpful to understanding the

14   merger effects.  So Dr. Israel would ask the following sort

15   of question:  Suppose Anthem bids and loses.  Whom do they

16   lose to?

17        Well, we know in an auction context what affects

18   the customer in a merger is if Anthem and Cigna are 1 and 2

19   or 2 and 1.  Now, there are going to be situations where

20   Anthem bids and loses to Cigna, but Anthem wasn't in the

21   running for the contract, or Anthem bids and loses to

22   United, and Anthem is not in the running for that contract

23   either.  Those situations don't give us any information

24   that's going to be useful for understanding how often Anthem

25   and Cigna are ranked first and second or second and first.

1    I'm not really quite sure how to interpret that

2    evidence.  It's not the evidence that I need in order to go

3    forward and estimate the effects of the merger.

4    Q.  Just to be clear, do defendants' experts condition their

5    analysis on incumbency?

6    A.  No, they don't.

7    Q.  And that's what you just described?

8    A.  That's exactly right.  And, again, if I had known who

9    was 1 and 2 in reality, that's what I would have used.  I

10   believe conditioning on incumbency gets me as close to that

11   as you can with the available data.

12   Q.  Let's turn now to the next step in your analysis, the

13   calculation of static price effects.  What is the rationale

14   for conducting this sort of analysis?

15   A.  Well, what we're basically trying to do is understand

16   one piece of the puzzle, a potentially important piece, but

17   just one piece of the puzzle, which is the impact of the

18   merger on the prices charged to customers.  I've talked

19   about other effects such as innovation effects, which we can

20   look at later, but this is an attempt to quantify one piece

21   of the puzzle.

22   Q.  And what methods did you use to quantify the static

23   price effects in the Anthem territories?

24   A.  I used two complementary techniques, both of which are

25   used to understand the outcomes of auctions and how mergers

1    can affect the outcomes of auctions.

2    Q.  And what are those techniques?

3    A.  One of those is called the UPP or upwards pricing

4    pressure analysis, and the other is called a merger

5    simulation, which is kind of an unfortunate term because in

6    a sense the UPP is also simulating the outcome of the

7    merger, but in the parlance of the literature it gets this

8    special name.

9    Q.  And what's the difference between the two approaches?

10   A.  There's actually a lot of similarities.  Both approaches

11   are trying to get at how often Anthem and Cigna would be 1

12   and 2 or 2 and 1.  And if there was a merger so that in

13   those situations when they were 1 and 2 they're now 1, who

14   was 3?  And what happens when that 3 now becomes 2?  And how

15   does that affect the outcome of the auction?

16            I hope that was clear.

17            THE COURT:  Yes.  No, I'm thinking about some

18   questions.  I'm listening, but okay.

19   A.  And so the difference between them is basically it boils

20   down to how they end up calculating how effective a

21   competitor No. 3 is because after the merger No. 3 becomes

22   the source of discipline in the marketplace.

23   Q.  Does the UPP methodology allow you to readily use the

24   win/loss results that you calculated in perhaps fine-tuning

25   your analysis?

1    A.  So remember we're trying to understand how often they're

2    1 and 2.  You could use just the market shares alone to get

3    an estimate of that.  I gave you an example of that earlier.

4    But it would be nicer to incorporate the win/loss data that

5    gives us deeper insight into how often they're 1 and 2.

6              In principle, both methods would allow us to

7    incorporate that win/loss data, but as it turns out, the

8    statistical requirements for incorporating that into the

9    merger sim could not be met with the available data.  So I'm

10   only going to incorporate the win/loss measures in the UPP

11   analysis.

12             I hope that's clear.

13             THE COURT:  Okay.

14             THE WITNESS:  It is technical.  It's unavoidable.

15   Q.  Perhaps one minor additional technical point.

16   A.  Okay.

17   Q.  Is there a term used for the type of auction model you

18   used in this case?

19   A.  Yes.  So the model I'm using is what's called a sealed

20   bid second price auction, and without getting too much into

21   the weeds, it's well known in auction theory that different

22   types of auctions tend to generate very similar results from

23   the seller or the buyer, depending on whether you're selling

24   an object or buying an object.  The second price sealed bid

25   auction is just a lot easier to use with the data, but it

1    can be used -- the results can be used to approximate a wide

2    number of auction results.

3              THE COURT:  When using an auction model, you are

4    assuming that the decision-maker's decision is 100 percent

5    price-driven?

6              THE WITNESS:  Not at all.

7              THE COURT:  Okay.  If you call it an auction,

8    you're just talking about a choice that winnows itself down

9    to bidders, but you're not saying it ends up being their

10   choice based on price?

11             THE WITNESS:  That's correct.

12             THE COURT:  Okay.

13             THE WITNESS:  The choice is based on the value

14   that's being delivered.

15             THE COURT:  Okay.

16             THE WITNESS:  And we know that the employers and

17   their consultants score each of the bids.

18             THE COURT:  Right.

19             THE WITNESS:  And they come down with a bottom

20   line score that counts a lot of different factors.

21             Think of the auction as based on the highest score

22   being delivered.

23             THE COURT:  Okay.

24   Q.  Let's talk about your results.  Could you walk us

25   through this slide and help us understand what you did and

1    what these numbers mean.

2    A.   Sure.  So the first -- the light blue bars are for three

3    different types of analyses.  There's the merger sim and the

4    UPP, and then there's the UPP that incorporates the win/loss

5    data.  So I'm going to get three different numbers for the

6    light blue bar.

7            The light blue bar is the effect of the merger on

8    the amount that employers are paying for health insurance

9    without factoring in any variable cost savings.  So this is

10   just -- suppose there were no variable cost savings.  Think

11   of this as a baseline.

12           And you can see, using the merger sim, we got

13   about $200 million in static harm.  Using the UPP we got

14   close to $400 million dollars in static harm, and then using

15   the UPP but incorporating the fact that the win/loss data

16   suggests that Anthem and Cigna are close competitors, we get

17   closer to $900 million in static harm.  So that's the light

18   blue.

19           THE COURT:  When you say what they're paying for

20   health insurance --

21           THE WITNESS:  ASO fees.

22           THE COURT:  Okay.  So you're not talking about

23   what they're paying for in health costs.

24           THE WITNESS:  That's correct.  That's correct.

25           THE COURT:  Okay.

1    Q.  And are these results all in the Anthem territories?

2    A.  Yes.  I believe that's correct, yes.

3    Q.  Okay.  Could you explain now what the slightly darker

4    shade of blue represents.

5    A.  So the medium blue is taking the variable cost savings

6    that have been claimed by Dr. Israel, attributing the

7    appropriate amount to the employers in the Anthem

8    territories, the employees in the Anthem territories, and

9    then recomputing the price effect crediting these variable

10   cost savings in full.

11          And you could see that the merger effect is now

12   smaller but is still positive, and depending on which of the

13   three scenarios, merger sim, UPP or UPP with win/loss,

14   ranging from about $150 million all the way up to about $800

15   million.

16   Q.  And just so we're claim, when you're talking about

17   claimed variable cost savings, what do you mean?

18   A.  I mean very specifically here the operational savings

19   for things like sales and general administration.  I am not

20   incorporating any reduction in payments to providers.

21   Q.  And could you cover briefly what's happening in the --

22   with the darker shade of blue.

23   A.  Sure.  The darker shade of blue is what happens if we

24   concede or we agree that ASO is a market and we just look at

25   what goes on in the ASO market.

1          And here we now have a higher market

2     concentration, and so as a result it looks like, in the

3     merger sim and the basic UPP, you actually get bigger harm,

4     although once you incorporate win/loss, you still see

5     substantial harm but not as big as you had in the ASO plus

6     full insurance.

7          If I could just point out one important point

8     here.  The UPP and merger sim, as I mentioned, differ in

9     assumptions about kind of the gap between No. 2 and No. 3.

10    And I don't want to say necessarily assumptions, but the

11    methodologies just kind of lead you to conclude differently

12    about the gap between 2 and 3.

13         The data that I've seen suggests that the gap

14    between the second and third bidders is often quite

15    substantial, and that the UPP may more accurately reflect

16    that than the merger sim.

17         So I don't want to say that one of these is

18    exactly correct and the other's not, but there's reason to

19    suspect that the bigger UPP numbers might be more reasonable

20    than the smaller merger sim numbers.

21         THE COURT:  Well, this is where I'm having -- I'm

22    getting a little lost.  We had, when you looked at market

23    share, a competitor that was a much forceful competitor

24    against Anthem than Cigna, and that was United.  And so one

25    of the reasons you said you were doing all these

1      calculations was to see, once the two competitors at issue

2      become one, how effective a competitor is the one who's

3      still standing.  And given the small slice of the market

4      share that's being added to Anthem compared to the size of

5      United, I'm not sure how any of these answer the question of

6      whether taking Cigna out of the marketplace affects the

7      competition between the new company and United.

8                THE WITNESS:  So it affects it, and I think the

9      important way -- but first of all, if Anthem was acquiring

10     United, these numbers would be different and potentially

11     much bigger.  I obviously haven't done that analysis.

12                But if we go back to an auction framework, any

13     employer who has ranked Anthem first and Cigna second, or

14     vice versa, and we think that happens quite often --

15                THE COURT:  Has already ruled out United.

16                THE WITNESS:  United's third, right?  And so the

17     reason that they're able to get a better bid out of Anthem

18     is because Cigna is coming in with a strong bid.  If you

19     take away Cigna's strong bid, United is not considered as

20     strong.  Its score, the bottom line score, is not as strong.

21     Anthem will not have to bid as aggressively, and that

22     employer is losing out as a result of this merger.

23                This is a quantification.  Would there be bigger

24     numbers if Cigna had a bigger share?  Presumably yes.  But

25     we know just from the merger guidelines that the change in

1      the Herfindahl that we're observing is big enough to cause

2      concern.  It's still presumptively anticompetitive.  This is

3      my best effort to quantify the price concern.

4              THE COURT:  Okay.

5      Q.  Let's turn now to the next step in your analysis, the

6      dynamic effects.  Have you evaluated whether this merger is

7      likely to impact innovation in commercial health insurance?

8      A.  Yes, I have, and my evaluation left me quite sober.  I

9      was very concerned about the path this industry has been

10     going on and how that trajectory might change as a rule of

11     the merger, and I think it's important to step back in time

12     and get a sense of what's been happening over the past 70,

13     even 80, years in efforts to bend the cost curve.

14              It's been well known since the 1930s that there

15     were problems with efficiency in which the healthcare system

16     was operating.  Things like helping providers coordinate

17     care.  Things like wellness programs.  They were documented

18     in a famous study that was published in 1932 commissioned by

19     a federal agency.  These were problems that organizations

20     have been trying to deal with for time in memoriam despite

21     knowledge about these problems or efforts to solve these

22     problems have come in fits and starts with modest degrees of

23     success.

24              So Kaiser was one of the first to recognize the

25     problems with fee-for-service reimbursement.  They talked

1    about reversing the economics by changing the economic

2    incentives for providers.  And Kaiser and some other

3    insurers, such as Group Health Cooperative up in Washington

4    state and later on people like Harvard Pilgrim, got involved

5    in HMOs.

6            By the 1970s, some of the big insurers started to

7    get involved in HMOs as well.  The Blues were all offering

8    HMOs, for example, but they were doing that largely in kind

9    of an outsourced way.  They didn't employ their doctors.

10   They didn't own hospitals.  They weren't trying it the way

11   Kaiser did.  And they were doing it through more of a

12   command control way by dictating referral patterns, for

13   example.

14           And by the late 1980s, there was -- 1990s, there

15   was a backlash against HMOs.  In fact, under President

16   Clinton there was talk about having a patient's bill of

17   rights to essentially prevent HMOs from doing some of the

18   things that were perceived as abuses.

19           So while we still had a few success stories like

20   Kaiser, they were isolated, and our efforts to bend the cost

21   curve were still failing.

22           The federal government instituted some changes

23   during this time.  They started changing the way providers

24   were being reimbursed, and insurers started to file suit by

25   adopting some of the reimbursement strategies.

1          And then in the 1990s providers started to try to

2     bend the cost curve.  We saw the growth of integrated

3     delivery systems which were, if anything, stronger versions

4     of today's accountable care organizations.  So you had

5     hospitals starting to employ physicians, buy up satellite

6     hospitals, and even get into the insurance business

7     themselves.

8          Something we heard about happening now with

9     providers getting involved in insurance business, they tried

10    that in the 1990s, and they utterly failed.  They failed

11    because they lack the expertise and the resources.

12          Providers didn't know how to be insurers.  They

13    didn't know how to price out their products.  They often

14    wrote terrible contracts with the insurance companies that

15    were bringing customers to them.  They also lacked the

16    information systems to be able to manage care, to manage

17    referrals inside and outside of the system, and as a result,

18    there was a real retrenchment in the late '90s and early

19    '00s, and once again healthcare costs started to rise, and

20    that kind of brings us to the Cigna story, the story of this

21    case.

22          So we've had a world in which everybody was going

23    their separate ways.  Nothing was really working.  There was

24    a brief flirtation with HMOs.  That really didn't work.

25    There was a brief flirtation by providers to try to do this

1    on their own; that didn't work.  And then Cigna and to a

2    certain extent at the same time Aetna comes along in the

3    mid-2000s, and they understand that this has to be a

4    partnership, that insurers collaborating with providers

5    could potentially make something happen that hasn't happened

6    before.

7              We've heard about Cigna's provider collaborations.

8    We've heard about care coordination, integrating wellness

9    programs.  This is all part of how today's insurers are now

10   trying to bend the cost curve, and it's very exciting

11   because it's a new approach that seems to be addressing some

12   of the problems that were experienced when each of the parts

13   of the healthcare system, providers and insurers, have tried

14   to solve this problem on their own.

15   Q.  Professor Dranove, is this collaboration you're talking

16   about simply spreading risk to providers?

17   A.  No.  Simply spreading risk to providers was 1980s HMOs.

18   Telling providers, "Instead of paying you more when you do

19   more, we'll pay you less when you do more," that resulted in

20   all kinds of complications, concerns about whether patients

21   could get appointments for care, concerns about quality.

22             This is, when done correctly, a genuine

23   partnership to try to create value for both the employer and

24   the insurer by trying to understand that sweet spot of how

25   to use incentives to create value and not simply use

1   incentives to reduce quantities.

2   Q.  Let's just take a step back and look at the economics

3   literature.  What does the literature tell us about the

4   effects of a merger on innovation?

5   A.  The effects of a merger on innovation, according to both

6   the preponderance of the theory and preponderance of the

7   empirical research, is unambiguously ambiguous.  You just

8   can't tell, without looking at the facts on the ground,

9   about the industry in question and the firms involved in

10  that industry.

11  Q.  And --

12          THE COURT:  What about in this case where the

13  theory of how this merger's going to work is to get the

14  Cigna clients in the Blue states to turn Blue?

15          THE WITNESS:  Yes.  And depending --

16          THE COURT:  What does that do to the innovative

17  value-based model?  Does that make it less ambiguous?

18          THE WITNESS:  No.  I think, in fact, it troubles

19  me, and I'll talk more about this later, but in a nutshell,

20  Cigna is innovating because of its distinct position in the

21  marketplace as a firm that can't compete in the old-

22  fashioned way of getting discounts.

23          Once Cigna's Aetna -- I'm sorry, one Cigna is

24  Anthem, because once it's acquired it is Anthem, it occupies

25  a very different position in the marketplace, and its

1    incentives to innovate are diminished compared to the way it

2    is now.

3              There are also ways in which Anthem is going to

4    implement this that might make it more difficult for Cigna

5    to implement or Anthem/Cigna to implement or continue to

6    implement Cigna's innovations through its collaborations

7    through this partnerships.

8              I'll have more to say about this in the next few

9    minutes.

10   Q.  What does the economics literature tell us about things

11   to look for when analyzing the likely effects of a merger on

12   innovation?

13   A.  So there's a nice framework that sums up the things you

14   want to look at using three categories.  One is

15   contestability.  What are the different firms' incentives to

16   innovate?  One is called appropriability.  Are you able to

17   capture the profits from your innovation, because if you

18   can't, you're not going to spend the money to innovate?  And

19   the third is synergies.  Will the innovation allow you to do

20   things because of your new size or the combination of

21   expertise of the two companies that you couldn't do on your

22   own?

23   Q.  So when looking at contestability, we're looking at will

24   a merger impact the merging firm's incentives to innovate.

25   Is that fair?

1    A.  Correct.  We're going to ask whether the merger affects

2    any or all of these, though in reality what we're going to

3    do is look at the facts on the ground and look at these in

4    their totality.

5              These obviously can go in different directions.

6    We have to understand what's actually happening to

7    understand their totality.

8    Q.  Why don't we do that.  What have you observed in the

9    record, focusing on contestability?

10   A.  So Mr. Cordani takes over Cigna in the mid-2000s, and

11   that's a time in which health insurers are still competing

12   the old-fashioned way.  They're all assembling networks.

13   They're all competing on discounts, and he knows that it's a

14   losing proposition in the long run.  Cigna is essentially a

15   niche player at that time.  It's still competing for

16   national accounts, but in terms of size, it's not going

17   anywhere.

18             So they know that if they're going to grow and

19   eventually -- and make a difference in this marketplace,

20   they have to do things differently.  They have a very strong

21   incentive to innovate.  That's what led them down their

22   innovation path, and -- yes.

23   Q.  Professor Dranove, way back at the beginning of your

24   testimony you mentioned a textbook called the *Economics of*

25   *Strategy*.

 1    A.  Yes, I did.

 2    Q.  Does that textbook provide us a helpful framework for

 3    understanding Cigna's behavior in the last decade?

 4    A.  Yes, it does.  Perhaps the key chapter in the textbook

 5    talks about how firms position themselves to compete against

 6    their rivals in the marketplace.  So you can have two firms

 7    that are competing head to head but pursuing different

 8    positions, and there are two broad categories of positions

 9    that strategists generally identify.

10         The first is known as cost leadership.  We're

11    going to offer a pretty reasonable product, kind of

12    comparable to the average firm in the market in terms of the

13    bells and whistles and quality, but we're going to take

14    advantage of perhaps our scale or some contracts we've

15    negotiated to have the lowest cost in the marketplace, and

16    that's going to allow us to be a very successful competitor.

17    So I think that's a nice way of describing not just Anthem's

18    position in 2005, but I think all of the Blues, by and

19    large, and their position in the marketplace since

20    essentially time in memoriam, but certainly since the 1980s,

21    when price negotiations became important.

22         The Blues for historical reasons were big.  They

23    negotiated the best deals.  Not in every case, but they

24    certainly negotiated very good deals, and that, by itself,

25    allowed them to be effective competitors.

1          The alternative way to position yourself for

2     success is through what's known as a differentiation

3     strategy or what's sometimes called the benefit leader

4     strategy, which is to offer a different type of product that

5     at the end of the day delivers equal or better value to

6     customers, but doesn't do it by the simple driving down of

7     costs, say, through lower input prices, but by adding

8     product features or adding quality to the product or, in

9     this particular case, a combination of that and reducing the

10     Q that we talked about earlier to allow you to compete

11     effectively against the cost leader.

12          And obviously I'm using that to characterize

13     Cigna's strategy as a benefit leader.

14     Q.  Before we get into examples of what Cigna's done,

15     overall how does Cigna's approach to selling group health

16     insurance fit into the framework you just described?

17     A.  Right.  So Cigna is what we'd call a benefit leader.

18          Another important wrinkle from the strategy

19     literature, and this one has, I think, a direct bearing on

20     the case and some of the evidence that we've heard in this

21     case.  It's often been observed -- it's not a rule, but it's

22     a pretty good rule of thumb, if not 100 percent, that it's

23     very difficult to try to pursue two very different

24     strategies at the same time.  This is known as being stuck

25     in the middle, and there are examples of firms that have

1    been able to successfully do this, but it's something you

2    want to be very concerned about.

3            And we heard testimony from Mr. Cordani and I

4    believe potentially even Mr. Swedish about the different

5    cultures of the two organizations, Anthem and Cigna, and

6    whether one culture, which has been driven on having the

7    lowest costs and working with providers to drive down rates,

8    and another culture that historically has been based on

9    collaboration and not necessarily the best rates, how will

10   those fit together?  Where will the company go if you try to

11   merge those two cultures at the same time?

12           As I said, it's often documented that firms,

13   quote-unquote, get stuck in the middle and they end up kind

14   of falling down on both fronts.

15   Q.  What have you observed in the record in terms of

16   examples of Cigna's innovativeness?

17   A.  The one that I'm most excited about because of the

18   history of what's happened in this industry is the

19   collaborations that Cigna has, their collaborative

20   accountable care arrangements in which they're working with

21   the provider organizations to try to not just impose the

22   lowest fees, but to give them a level of fees and other

23   incentives to make their own investments.

24           So the providers are willing to participate.  The

25   providers are willing to take the time to work with the

1      data, for example.  That's something that was new when it

2      was first started by Aetna and then Cigna roughly about the

3      same time, a decade ago.

4             In addition to working with the incentives,

5      they're working with the providers to provide them the data

6      that the providers need in a timely fashion, data the

7      providers might not be able to pull out of their own

8      systems.  Cigna has so much more data than the providers,

9      and it does analyses for so many different providers that it

10     can do things that providers can't do on their own.

11            So in these two ways, the collaborative

12     accountable care is different from the top-down HMO approach

13     that some of these insurers tried in the '70s, and the

14     we're-going-to-do-it-on-our-own approach that the providers

15     tried in the 1990s.

16            THE COURT:  Well, does what you've looked at in

17     the market share reflect that from 2014 to '15, '16 to '17,

18     that this is catching on, that Aetna and Cigna are -- I

19     realize there's some win/losses where Cigna has won, but

20     overall, when you look at the size of the market share of

21     the two that are supposedly the leaders compared to the

22     others, if they were allowed to continue unimpeded, are they

23     going to grow, or are the discount models just going to

24     elbow them out?

25            THE WITNESS:  So I can't speak to Aetna, but I can

1    speak to Cigna, which we know has more than doubled in size

2    in the past seven years.  They are forecasting another

3    doubling in size in the next seven years.  I don't know

4    whether that's overoptimistic or not, but they have been

5    installing new collaborative care arrangements around the

6    country at a very rapid rate.  I believe they're expecting

7    to be up to about 180 different markets in which they have

8    these arrangements.  So by those measures, they're clearly

9    catching on.

10   Q.  Before we move on from this slide, there is a piece

11   that's redacted from public viewing related to the care

12   coordination fee.  Without identifying the specific

13   competitor that's been redacted, is it the case that all

14   major insurers make this care coordination fee available to

15   all providers?

16   A.  So while the care coordination fee is not exclusive to

17   Cigna, Cigna is one of the insurers that gives its all to

18   providers.  Not every insurer does that.

19   Q.  Are you familiar with the term "delivery system

20   alliance"?

21   A.  Yes, I am, and I think this is another very important

22   development for Cigna that contrasts with the way other

23   insurers have been working with providers' systems.

24          So we've heard about the concept of population

25   health and how that's supposed to be the gold standard for

 1     bending the cost curve.  Population health is the concept

 2     that a provider's system should have full financial

 3     responsibility for all of the health of the people who seek

 4     care through that system.

 5              We've gotten partway there through accountable

 6     care organizations, but a problem with accountable care

 7     organizations, which are provider organizations, is that

 8     individuals who -- patients who go through an accountable

 9     care organization are not, quote-unquote, owned by that

10     accountable care organization.  They could seek care inside

11     or outside that accountable care organization.  There's a

12     limit to which that accountable care organization could be

13     responsible for population health.

14              So we've heard about approaches such as Anthem's

15     Vivity, which they contracted with eight ACOs in Southern

16     California.  And I think that's a nice innovation, but those

17     eight ACOs individually can't possibly get to population

18     health in a way that, say, Kaiser or Harvard Pilgrim can.

19     So what a delivery system alliance is is Cigna working hand

20     in hand with an individual healthcare system that wants to

21     be sort of like Kaiser.  They want to be responsible for

22     population health, but they don't have the insurance

23     expertise.  They don't have the data systems to make this

24     work on their own.  So it's a partnership with Cigna.

25              It's different from Anthem's approach.  I think it

1    holds great promise, and the fact that it's different is

2    what's important here.  It's another unique way to try to

3    bend the cost curve.

4    Q.  Does a DSA involve risk sharing with the provider?

5    A.  Yes, it does.

6    Q.  Does it involve more than that?

7    A.  It involves a lot more than that.  It involves both

8    upside and downside risks.  So a lot of these ACO

9    arrangements, there's upside risk.  If the ACO saves money,

10   they get a piece of it back in the form of, say, a rebate

11   check at the end of the year.

12           The DSAs also have downside risk.  Some ACOs also

13   have downside risk, but most don't.  Downside risk is if

14   your costs go up, you have to cut a check back to the

15   insurance company.  So that really exposes them to risk.

16           There's also this technology piece that I talked

17   about, and Cigna is investing -- am I allowed to say the

18   number?

19   Q.  Generally.

20   A.  -- generally hundreds of millions -- yes, hundreds of

21   millions of dollars in supporting the IT infrastructure of

22   the DSAs that it's working with.

23   Q.  And we've talked about health and wellness in this case.

24   Briefly, what have you observed about Cigna's health and

25   wellness programs?

1     A.  Okay.  And, again, to be clear, while Cigna has been a

2     leader in these efforts, and it does it in some unique ways

3     that I think are very, very effective, things like care

4     coordination we see other insurers do.  Working with ASOs we

5     see other insurers do.

6              And the same thing is true in health and wellness.

7     Health and wellness -- people have been talking about that

8     since the 1930s, and there's health and wellness programs

9     everywhere.

10             Cigna's health and wellness programs have some

11    distinct features.  They're not unique, but they certainly

12    make Cigna stand out from some others, including credits for

13    employers and employees that participate in weight loss

14    programs or exercise programs, for example.  And a very

15    important piece that I think will bode well in the long run

16    is Cigna's health and wellness program is integrated into

17    Cigna's core offering, which means that Cigna has every

18    incentive to spend the last useful dollar on health and

19    wellness if that will save money elsewhere in the healthcare

20    pipeline because Cigna will internalize that.

21             If you keep people out of the hospital, Cigna

22    saves that money.  When you have an outsourced health and

23    wellness program -- so one company runs the health and

24    wellness program, another company is selling the insurance

25    product -- you're going to need a remarkably complex

1    contract, the sort of thing that I can't imagine writing in

2    its entirety, that would make sure that the health and

3    wellness program spent every last useful dollar to reduce

4    the cost to the separate health insurance company.

5            So this integration into the core medical offering

6    I think is a key feature of any useful health and wellness

7    program.

8    Q.  What have you observed in the record about Anthem's

9    incentives to innovate?

10   A.  As we talked about, they for decades were sitting pretty

11   as the discount leader.  They had an approach that was very

12   successful for them.  Innovation is costly.  It's risky.  It

13   might change the way competition plays out in the

14   marketplace.

15           It didn't have to do any of that in order to be

16   successful.  And even if it did, its future was never at

17   risk.  It had less market share to gain because it was

18   already in a strong position.

19           For all of these reasons, it had less incentive to

20   innovate than Cigna.  Of course it had an incentive to

21   innovate.  All firms do.  But its incentive to innovate was

22   weaker.

23   Q.  How do you view Anthem's ACOs compared to Cigna's

24   collaborative programs?

25   A.  I think there are two differences.  One, they came

1    later.  And two, I think they're different in ways that I

2    think might make them less successful.

3            The fact that they came later I think is in the

4    record, that Anthem and Cigna, I think, came earliest -- I'm

5    sorry, Cigna and Aetna came earliest, and Anthem came

6    several years later before they came to the marketplace.

7            Cigna's -- from everything I've seen from

8    statements from providers -- seems to involve a lot more

9    collaboration.  They're a lot more timely in the way they

10   interact with providers.  As one Cigna executive put it,

11   Cigna's strategy is -- and I'll just read the quote --

12   "improve the health and wellness of Cigna's customers, but

13   Anthem's strategy is to provide a low-cost product or what

14   they called a Wal-Mart approach."  In fact, in business

15   strategy classes, when we want to give kind of the classic

16   example of cost leadership strategy in a marketplace, Wal-

17   Mart is kind of the first example we give, and so I thought

18   that was a very salient comparison.

19           THE COURT:  So their theory is, we merge,

20   everybody gets the best of both.  You get Cigna's wellness

21   programs on top of our discounts.  Everybody wins.  Why is

22   that wrong?

23           THE WITNESS:  Well, in the best-case scenario --

24   and I'll come back to why I don't buy the best-case

25   scenario.

1              In the best-case scenario, we might get the best

2     of what Cigna is today, but Cigna is still innovating into

3     the future, and Cigna still has more incentive to innovate

4     going forward than Anthem.  Whatever Cigna's next innovation

5     is as an independent firm is lost to us forever in the event

6     of this merger because the incentive to innovate is muted.

7     The strategic position of the firm is different.  So even in

8     the best of all worlds, we're still losing innovation going

9     forward.

10             But then there are just issues as to whether or

11    not they're going to be able to get the best of the best in

12    terms of the discounts, whether they're going to be able to

13    have the same collaborative relationships with providers, if

14    they're shoving discounts down the throats of providers;

15    whether they're going to still implement Cigna's wellness

16    programs.  If they're rebranding Cigna's products and making

17    them Anthem's products, whose wellness programs are they

18    getting?

19             So there are a lot of questions as to whether or

20    not the actual outcome of this merger is going to look like

21    the best-case scenario that's been presented by Anthem.  In

22    fact, I don't think we really know what this merger is going

23    to look like, what this firm is going to look like after the

24    merger.  There's just not enough on the record to guide us.

25             THE COURT:  Does the fact that they haven't talked

1    about it, planned it out, have any impact on whether you can

2    predict these benefits are going to flow?

3              THE WITNESS:  Absolutely.  We've already had a

4    sense, because they're such different organizations, they

5    might have trouble, and then the record shows, hey, they're

6    having trouble.  And so that just confirms that it's

7    probably going to be difficult for them -- difficult for

8    them to achieve what they're hoping to achieve, and it's

9    certainly premature at this time to make any projections of

10   what that's going to look like.

11   Q.  Without identifying specific providers, have you

12   reviewed deposition testimony in this case about how well-

13   received Anthem's collaborations have been relative to

14   Cigna's?

15   A.  Yes, I have, and the evidence does suggest that Anthem

16   is a much more of a one-size-fits-all top-down approach than

17   Cigna.  Again, I don't want to paint these as extremes.

18   Anthem does work with providers.  It takes longer.  The

19   customization, according to the providers, I read from is

20   not as robust as Cigna's, and so in that way Cigna is

21   different from Anthem.

22   Q.  How about in terms of actionable data?  What do

23   providers say about Anthem's versus Cigna's programs?

24   A.  So I saw providers state that Anthem basically has a

25   package of data tools that it uses with them, and then when

1    the providers ask for different data tools, it either takes

2    a long time to get them or they don't get them at all, and

3    they believe Cigna is much more responsive.

4    Q.  And before we move on, have you observed evidence in the

5    record of Anthem innovating?

6    A.  Oh, of course Anthem innovates.  Anthem, at a minimum,

7    recognizes that a lot of these ideas, like collaborative

8    care, are valuable to customers, and so Anthem has attempted

9    to implement them in their own ways.  In some ways, like

10   Vivity, offering something that nobody else has offered.

11          Of course Anthem is innovating, but I think it's

12   important to note that to a large extent it's been in

13   response to Cigna's innovations, and I wonder if they would

14   have come to the market with innovation quite as fast or

15   quite as robustly if Cigna had not been out in front.

16   Q.  So there's again a redacted portion of this slide.

17   Without identifying the provider, can you describe generally

18   what this incident tells you.

19   A.  Sure.  So this was an important local or regional health

20   system that had collaborative relationships with Cigna.  It

21   went back to Anthem.  It complained about the nature of

22   their collaborative relationship or the absence of

23   collaborative relationships, I don't remember which, and

24   Anthem, several months later, came back and proposed a more

25   collaborative relationship.

1    Q.  And have you observed evidence of Anthem recognizing

2    strengths of Cigna's programs and following suit?

3    A.  Oh, yes.  In fact, in Anthem's own documents I think

4    I've seen evidence of that they think of Cigna as an

5    innovator in the marketplace.

6    Q.  Before we move on to appropriability, just in terms of

7    contestability, all this evidence we've talked about, what

8    does it mean?

9    A.  You know, I wasn't surprised to hear Mr. Cordani's

10   testimony.  Knowing how this industry was functioning back

11   in the mid-2000s, I knew that the status quo would just

12   persist forever and forever unless insurers found a new way

13   of going about doing business.

14        The wonderful thing about innovation is until

15   somebody does it you don't really know what it's going to

16   look like, and these collaborative arrangements, I think,

17   represent something new, and it shows us that Cigna really

18   understood they had an incentive to change the way the game

19   was played or they would never grow as an organization, and

20   the evidence suggests that that's what they've done and that

21   it's been successful for them.

22   Q.  And what role does competition play in this?

23   A.  The role of competition was very simple.  They were not

24   on an equal footing as a competitor.  They were a small

25   player, and flipping things around -- because Anthem had a

1  secure position and was playing the game differently.  They

2  were playing the network game very successfully that gives

3  them less impetus to be the first to try these new

4  arrangements.

5         So competition was very, very important.

6  Q.  One last point on contestability.  Do your opinions

7  change -- do your opinions hold even if Anthem and Cigna

8  patch things up and get along just fine after the deal

9  closes?

10  A.  So if they manage to patch things up, there still would

11  be these issues of whether their culture will allow them to

12  merge things together.  There still would be issues of

13  whether they drive provider prices down, the collaborative

14  arrangements with providers will survive.  And then there is

15  the future.  Maybe they're able to implement some or all of

16  Cigna's current innovations, but now you've got a large

17  company that historically has been slower to innovate than

18  some of its rivals.  Will they suddenly become fleet-footed?

19  I'm not convinced that they will.

20  Q.  Let's talk about the next two prongs of the analysis,

21  appropriability and synergies.  What have you observed in

22  the record on these two points?

23  A.  So appropriability and synergies usually argue in favor

24  of larger firms.  Appropriability is can you capture the

25  benefits of the innovations, and, of course, the bigger you

1     are, the more enrollees you might be able to spread those

2     innovations to.  And synergies is do you have the resources,

3     the capabilities, to innovate.

4          So these might weigh in favor of the larger firm,

5     but we also know that Cigna has not been held back from

6     these innovations.  They've not been prevented from

7     innovating for fear of capturing the benefits from it.  If

8     they were, we wouldn't see them out in front on innovation,

9     and Mr. Cordani has testified they will continue to roll out

10    innovations even if the merger doesn't go through.

11         By the same token, they clearly have had the

12    capabilities to innovate as evidenced by the innovations

13    that they've rolled out.

14    Q.  So overall, factoring in all three prongs, what is your

15    opinion about the net effect on innovation from this merger?

16    A.  As I said at the start of this part of my testimony, I

17    was rather sobered by the thought of how this merger could

18    affect innovation in the marketplace.  It's well-understood

19    that provider discounts will only get you so far in bending

20    the cost curve and not really very far at all; that we're

21    finally going to bend the cost curve, and it's going to find

22    new ways to deliver healthcare.

23         There's no guarantee that anything Cigna is doing

24    today is going to stand the test of time, although some

25    early research does suggest that it's holding promise.  But

1   if we don't have innovations like this, we'll have no chance

2   to bend the cost curve, and that's why I'm really very

3   concerned.

4   Q.  And will this dynamic harm you predict impact national

5   account customers headquartered in the Anthem territories?

6   A.  It will absolutely affect national accounts customers

7   headquartered not just in the Anthem territories, but across

8   the entire country because, as we talked about, these

9   innovations can be eventually copied by others.  A Cigna

10  innovation eventually becomes a marketplace innovation in

11  the fullness of time.  Without those innovations, we will

12  lose wherever we are.

13  Q.  Let's turn now to -- actually, before we move on --

14              THE COURT:  Well, one of the things Mr. Cordani

15  talked about is for the value-based proposition to survive,

16  just like the discount model, at some point it needs volume.

17  You have to keep feeding into it.

18              THE WITNESS:  Yes.

19              THE COURT:  So which way does that cut?

20              THE WITNESS:  So that's a question I was actually

21  concerned about because that gets to the synergies and

22  appropriability point, but this approach has been so

23  successful for Cigna that they're now able to roll this out

24  in 180 different markets around the United States.  As they

25  roll it out, they gain more share.  Their success will,

 1      therefore, breed success.
 2              If this innovation is collaboration was something
 3      that was just stuck in five or a small number of markets, we
 4      might say, gosh, it would be great if they could roll this
 5      out on a bigger footprint, but they're able to do it on
 6      their own.
 7      Q.  Did you also analyze the effect of this merger on other
 8      insurers' incentives to innovate?
 9      A.  Yes, I did.
10      Q.  What did you conclude?
11      A.  There's a general rule of thumb that the incentive to
12      innovate is reduced when there are fewer firms that you have
13      to compete against.  So every insurer will have somewhat
14      reduced incentives to innovate when they face less
15      competition.
16      Q.  How does the loss of Cigna as an independent competitor
17      play out in this scenario?
18      A.  Well, I think it's especially important that the
19      competitor they're losing has been one of the more
20      innovative firms in the marketplace, one of the firms they
21      have to keep up with if they're going to be viewed as
22      innovative insurers themselves.
23      Q.  And could this merger affect the ability of other
24      insurers to innovate as rapidly?
25      A.  Yes, because of this concept of spillovers, copying each

 1    other.

 2              These insurers learn from each other.  They adopt

 3    best practices.  If you have one less developer at best

 4    practices, there will be less spillovers to the other

 5    insurers.

 6    Q.  Let's turn now to the other geographic market, the

 7    entire United States.  Could you explain the framework you

 8    applied in analyzing competitive effects in that broader

 9    market.

10    A.  Sure.

11              THE COURT:  Maybe this is a good place.  We need

12    to take a midafternoon break for the court reporter, so why

13    don't we do it now.

14              You can remain seated.  We'll come back in ten

15    minutes.

16              (Recess taken)

17              THE COURT:  Before you ask the witness another

18    question, I want to note that Cigna filed a motion related

19    to the testimony of a witness last week who mentioned the

20    names of customers that should have been confidential, and I

21    didn't have any problem granting the motion.  The problem is

22    by the time the motion came in some people had already

23    received the transcript, not just counsel, but people who

24    were receiving regular transcripts because there was no

25    sealed motion at the time.

 1          So it will be reflected in what gets docketed, but

 2     if something comes in during the trial that someone wants

 3     excluded from the transcript and sealed, it's better to say

 4     that right then and there because otherwise, you know, we

 5     can only affect who sees it in the future, but we can't

 6     affect who sees it in the past.

 7          So you can proceed.

 8     BY MR. SCHWINGLER:

 9     Q.  Professor Dranove, let's turn now to the all U.S.

10     geographic market.

11     A.  Okay.

12     Q.  Can you explain at a high level the conceptual framework

13     you applied in analyzing this merger's effects throughout

14     the United States.

15     A.  Sure.  The first thing we want to remember is that, in

16     terms of who's out there competing for national accounts

17     throughout the United States, it's the same big four that we

18     talked about in the Anthem footprint, although it will be

19     different Blues depending on which territory they've been

20     assigned, of course.

21          We also know in the Anthem territories we have

22     direct harm.  We have the static harm.  We also have the

23     dynamic harm, which I talked about will extend everywhere.

24     But in addition, outside the Anthem territories, there's

25     still likely to be additional harm that we should consider

1    kind of on top of the two forms of harm that I've already

2    discussed.

3    Q.  And do the merger guidelines provide a framework that's

4    helpful in thinking about this particular type of harm?

5    A.  Yes.  We know that the Blues are essentially a joint

6    venture; that the success of one Blue contributes to the

7    success of others, both by enhancing the overall brand name,

8    but also through the BlueCards, through the ability to get

9    cedes from one another, and so forth.  So in this sense we

10   might think of the Blues as having, in a sense, a partial

11   ownership in each other.

12           When you have a partial ownership in another firm,

13   their success helps you, and so the success of the non-

14   Anthem Blues helps Anthem, and the success of Anthem helps

15   the non-Anthem Blues.  And the merger guidelines tell us

16   that when you have this type of relationship, there are

17   concerns raised about whether you're going to compete as

18   aggressively as you would have if you remained fully

19   independent.  There's also opportunities to gain access to

20   sensitive information about competition for different

21   customers, which enhances opportunities to collude.

22   Q.  Did you start your analysis for the all U.S. market by

23   calculating HHIs?

24   A.  Yes, I did.

25   Q.  And could you explain your calculations and how to

1    interpret these numbers.

2    A.   Sure.  I think the best way to do this is to think of

3    kind of on average, for a customer in just any particular

4    location across the United States, the concentration that

5    faces them recognizing that a Blue may have some strength in

6    one market and a different Blue might have a somewhat

7    different strength in another market.

8           But on average, before the merger, if we think of

9    the Blues as a single entity -- because after all they're

10   not competing against each other.  They've been assigned a

11   particular market to represent.  The Herfindahl is a little

12   over 3,000, and the merger will increase that to nearly

13   4,000, but if we apply the geographic screen, you get

14   numbers slightly less but in the same ballpark.

15          Now, I don't want to say that this is to be looked

16   at exactly the same as all of the Blues taken together and

17   acquired Cigna.  That's obviously not what's happening here.

18   This is to give us a sense of the existing concentration in

19   the marketplace and how much Cigna's entanglement with

20   Anthem, the bringing the two together, might influence

21   commerce in the non-Anthem territories.

22   Q.   And could you describe the types of harm you have

23   analyzed with respect to the all U.S. market.

24   A.   Sure.  So first of all, we already know about the head-

25   to-head competition in the Anthem territories.  That's

1    clearly part of the entire United States, and we talked at

2    length about that.

3            I think we also understand that when Anthem has

4    been ceded an account for an employer headquartered outside

5    the Anthem territories, it normally would be competing head

6    to head against Cigna.  We lose that as well.

7            But there are two other forms of competitive harm

8    I want to mention, which is Cigna's incentive to compete for

9    non-Anthem Blue business today and how that will be

10   diminished as a result of the merger, and also the fact that

11   there will be unavoidable entanglements between Cigna and

12   the non-Anthem Blues, its erstwhile competitors, because

13   Cigna is now part of the Blues.

14   Q.  Let's start with the head-to-head competition for ceded

15   accounts.  We have a redacted slide here so I'll ask you not

16   to reveal the specific numbers, but what does the evidence

17   tell you about this potential harm to competition?

18   A.  Well, Anthem does get a significant amount of business

19   from ceded accounts that are headquartered outside the

20   Anthem territories.  It's nothing like half of their

21   business or something like that, but it's a nontrivial

22   amount of their business.

23   Q.  And the -- I'll move on.

24           THE COURT:  Is that all you can tell me?  Is that

25   the most quantification I can get, a nontrivial amount?  Do

```
 1    we know how many times they've gone up against each other

 2    in --

 3              MR. SCHWINGLER:  Your Honor, we'll have in our

 4    proposed findings citations to documents that will provide

 5    the very numbers that have been redacted here.

 6              THE COURT:  Okay.  All right.

 7              MR. SCHWINGLER:  And then I have an unredacted

 8    slide in your binder.

 9              THE COURT:  All right.

10    Q.  Let's talk about incentives for a moment.  In what ways

11    could this merger impact Cigna's incentive to compete

12    against non-Anthem Blues?

13    A.  I think the one I'm most concerned about is just the

14    best efforts rules.  Cigna has plans to aggressively grow,

15    but we know that if Cigna just remains Cigna today, Anthem

16    may not be in compliance two years after the merger's

17    consummated with the association best efforts rules, which

18    means that Anthem is not going to be able to use Cigna as an

19    aggressive competitor in the future as Cigna might be on its

20    own.

21    Q.  And other than the best efforts rules, what other ways

22    could this merger affect Cigna's incentives to compete

23    against non-Anthem Blues?

24    A.  So Anthem clearly has a business relationship with the

25    other Blues.  Again, they're not joint owners of each other.
```

1    I don't want to make it sound like somehow they own each

2    other, but they do interact with each other in terms of

3    developing the Blue brand, developing data products, working

4    with each other.  Sometimes one Blue will ask for a better

5    rate on the BlueCard fees in order to land a client, and

6    they have to negotiate that with another Blue.

7          So the Blues are kind of dependent on each other

8    for their overall success.  I think the last thing Anthem's

9    going to want to do is to use Cigna to compete aggressively

10   against a non-Anthem Blue when the non-Anthem Blue is

11   counting on that account because there's a quid pro quo

12   potential here.  Maybe that other Blue is going to be less

13   respectful of Anthem when Anthem needs something in the

14   future.

15   Q.  And what's the third way this merger could impact

16   Cigna's incentives to compete against non-Anthem Blues?

17   A.  The third is very simple.  When Cigna wins a contract

18   today from a non-Anthem Blue, Cigna gets all the revenue;

19   and if it loses, it gets none of the revenue.

20          In the future, if -- I'm sorry, I said it was

21   simple, but then I went off and I gave you the wrong

22   starting point for that example.

23          If the non-Anthem Blue wins that account today,

24   Anthem will get some revenue from that through the BlueCard.

25   For some employers, it might be substantial; for other

1      employers it might be de minimis.  Maybe for many employers

2      it would be de minimis.  But this BlueCard recapture that it

3      gets, Cigna, in the future, might be less inclined to

4      compete against a non-Anthem Blue because, to some extent,

5      admittedly a limited extent, Anthem's going to win whether

6      Cigna wins the account or the non-Anthem Blue wins the

7      account.

8              So the aggressiveness of Cigna will be diminished.

9      Perhaps not by a huge amount, but on top of everything else,

10     it's another factor to consider.

11     Q.  And should one consider these three ways Cigna's

12     incentives could be impacted individually in a vacuum or

13     collectively?

14     A.  No, clearly these all add together to create an overall

15     concern about diminished competition from Cigna.

16     Q.  Let's talk in a little bit more detail about best

17     efforts rules.  High level, what are the limits that Cigna

18     will face after the merger?

19     A.  Well, I'm not sure this is high level.  The exact

20     numbers are that Anthem has to get 80 percent of its local

21     revenue from the Blue brand, which I think potentially it

22     could do without too much jiggering of Anthem versus Cigna

23     accounts; but more problematically, it has to draw two-

24     thirds of its national revenues or enrollments from the Blue

25     brand.

```
 1              And if it simply takes Cigna today and doesn't
 2     change anything about the names of the companies on the
 3     insurance contract, my understanding is they won't be in
 4     compliance with this best efforts rule.  So they can either
 5     restrict Cigna's growth, which we talked about is going to
 6     reduce the competitiveness of the market, or it's going to
 7     have to rebrand Cigna accounts as Blue accounts, which will
 8     have a whole different set of problems for the marketplace.
 9     Q.  What problems could rebranding Cigna accounts Blue have
10     in the non-Anthem territories?
11     A.  So one is just whether or not Anthem is going to realize
12     some of the benefits of the merger.  If they're rebranding
13     these products as Blue products, will they now be using
14     Cigna's accountable care relationships, or will they be
15     operating under the Anthem contracts, which look very
16     different.
17              Another problem is that as these lives stop
18     becoming Cigna's lives, Cigna's ability to go out and
19     contract in the marketplace with providers is diminished.
20              Mr. Cordani talked about this, that as lives are
21     bled from Cigna and become Anthem's lives, Cigna becomes a
22     much less important player in the eyes of providers, and it
23     might not have the ability to expand its collaborative care
24     and other arrangements the way it's doing today.
25     Q.  Moving to BlueCard recapture, again, we have a redacted
```

1    slide with some specific numbers that I'd ask you not to

2    reveal, but can you give us a sense for significance of

3    BlueCard fees to Anthem and how the merger could affect

4    Cigna's competitiveness.

5    A.   Sure.  So to the extent that Anthem is getting BlueCard

6    fees, it will be somewhat less concerned about Cigna losing

7    a contract to a non-Anthem Blue.  The amount of money that

8    it will recapture, which is a reflection of how much less

9    concerned it will be, is -- I don't know how much I can say

10   here -- it's not of the same order of magnitude as Anthem

11   overall revenues.

12           Don't get me wrong.  This is not the reason to

13   block the merger.  But it's not a trivial amount as well,

14   and it should be considered in conjunction with the other

15   effects we've talked about.

16           MR. SCHWINGLER:  And, Your Honor, again, we'll

17   have documents in the proposed findings that give you these

18   numbers.

19   Q.   And you've talked about the relationships with other

20   Blues.  Could you explain beyond the incentive the effect on

21   Cigna's incentives to compete.  How else might that impact

22   competition outside the Anthem territories?

23   A.   So Cigna, we hope, will still be vigorously competitive

24   with the non-Anthem Blues after this merger.  We know that

25   through the association Anthem gets competitively sensitive

1    information about other Blues.  Ideally, that information

2    would not be passed along to Cigna.

3            We heard Mr. Swedish talk about Anthem in a

4    similar situation -- I believe a Medicaid health plan and

5    another with a Medicare health plan -- setting up firewalls.

6    When he said "setting up firewalls," I perked up because

7    when I hear a company say "setting up firewalls," that means

8    their lawyers have told us, "Whoa, you've got competitive

9    sensitive information here.  We can't let this leak out."

10           I don't know whether those firewalls are ever

11   going to be perfect or not, but it just does tell us the

12   potential for harm here.

13           THE COURT:  Well, do you have anything -- I mean,

14   I saw that in one email.  Is there anything that

15   specifically tells you that what the Blues do when they get

16   together would actually be to give Anthem information that

17   does relate to its competition that would help Cigna in

18   competition against a non-Anthem Blue?

19           THE WITNESS:  I haven't seen that information.

20   That's the sort of thing you try to make sure isn't in

21   correspondences.  I've been involved in antitrust cases

22   where an email like that was enough to sink a deal.  So it's

23   hard to know exactly what they're saying.

24           Again, the fact that they've put up a firewall

25   means there must be some sensitive information, or they

1    wouldn't need the firewall in the first place.

2    Q.  Would Cigna's relationship now with the non-Anthem Blues

3    give any concern about the potential for coordination?

4    A.  Yes.  We talked about these entanglements that if Cigna

5    bids aggressively against a non-Anthem Blue, perhaps that

6    non-Anthem Blue will not be as forthcoming in helping

7    negotiate lower BlueCard fees or perhaps even canceling a

8    cede that's not -- been long-standing for the past five or

9    ten years or more or not granting a new cede.

10             Again, we can't tell how this is going to play

11   out, but these are certainly things that are within the

12   realm of possibility once you throw Cigna into the mix.

13   Q.  Are you familiar with UniCare?

14   A.  Yes, I am, and I think it's a very interesting and

15   informal history.

16   Q.  What happened with UniCare?

17   A.  So this is not the first time that Anthem has tried to

18   find a way to compete with a non-Anthem branded product

19   outside the Anthem territories.  When they acquired

20   WellPoint in 2004, they acquired UniCare along with it, and

21   UniCare was going to be the brand -- you can think of

22   UniCare as a forerunner to Cigna, albeit a smaller

23   forerunner.  The parallels aren't perfect, but I think

24   they're quite informative.

25             Within two years Anthem had decided to stop

1       expanding UniCare.  It was concerned about its relationship

2       within the association, and indeed in 2008 they talked about

3       UniCare as a source of friction with other Blues.  We can

4       only speculate as to what the nature of that friction is,

5       but we have a sense of where that might have arisen.

6               And, indeed, by 2010, the components of UniCare

7       have been scattered amongst all the member Blues.  It was as

8       if UniCare had never existed, as if the competition from

9       UniCare no longer was factored into the marketplace.

10      Q.  And what does the UniCare example tell you about this

11      merger?

12      A.  Well, again, I don't want to say the parallels are

13      exact.  Every company is different.  But there is a

14      suggestion that Anthem may be more concerned about its

15      relationships with the other Blues than it is about

16      aggressive growth of its non-Anthem brand.

17              So in this way, Cigna presents a UniCare problem,

18      and there's a risk that Anthem simply is not going to be as

19      aggressive in growing Cigna because of its concern about its

20      relationship with the Blues.

21              THE COURT:  Well, if it doesn't want to grow Cigna

22      in the non-Anthem states, and it's already the significant

23      presence it is in its own state, then why does it want it?

24              THE WITNESS:  So one can speculate that when you

25      see a company that's doubled its market size in the last

1    four years and is doing business in a way that's different

2    from your own business plan, they may want Cigna simply to

3    eliminate a competitor.

4    Q.   Professor Dranove, have you evaluated whether a supply

5    response, such as entry or repositioning by an existing

6    firm, is likely to prevent this merger from harming

7    competition for national accounts?

8    A.   Yes, I have, and I've concluded that it's not likely to

9    prevent harm to competition.

10   Q.   What standard did you apply when examining entry in this

11   case?

12   A.   The merger guidelines tell us we should look at whether

13   entry will deter or counteract the competitive effects of

14   the merger, and to do that we want to look at three features

15   of entry.  Will it be timely, which I think is self-

16   explanatory.  Is it likely?  I think in a way that's also

17   self-explanatory, but perhaps we should cover that in more

18   detail.  And is it sufficient?  And I think that I'll also

19   need to talk about that in some more detail.

20   Q.   Let's start with timely.  What do the guidelines say

21   about when entry is timely?

22   A.   It's timely if you have prevented significant customer

23   harm.  It's happened soon enough so that the price increases

24   that might have occurred are short-lived, and customers

25   aren't experiencing substantial harm as a result.

1    Q.  What does it mean for entry to be likely?

2    A.  So an entrant is likely to enter a market if it thinks

3    it's profitable to enter, of course.

4         When thinking about the profitability of entry, it

5    has to look at what it's going to take to be a successful

6    competitor in the marketplace.  Does it have the resources

7    that's required?  How big of an investment does it need?

8    Does it have the capital to make that investment?  Does it

9    have the capabilities?

10        And then it wants to ask itself:  Once I enter the

11   market, what kind of revenue stream am I going to receive?

12   Am I going to be able to pay off all of these investments?

13   And it needs to look at the risk involved.  If it's a big

14   investment and an uncertain revenue stream, it might be less

15   inclined to enter the marketplace.

16   Q.  What does it mean for entry to be sufficient?

17   A.  To be sufficient, the entrant -- so it basically needs

18   to accomplish what the accomplished firm was doing, be of

19   similar scale and strength to replace the type of

20   competition that was being provided by the acquired firm.

21   Q.  Based on your review of the record and your application

22   of economic principles, what type of entrants would be

23   required to offset the harm from this merger?

24   A.  A type of entrant that I haven't seen.  I think the

25   entrant is going to have to be able to look very much like

 1    the big four.  It's going to have to have strong national

 2    networks without paying rental fees, which put you at an

 3    immediate competitive disadvantage.  It's going to have to

 4    have experience with data systems to provide the kinds of

 5    information that providers need and that employers want for

 6    their employees.  It's going to have to have a brand so that

 7    the national employers can go to their employees and say,

 8    "Hey, we're giving you a high quality insurance product."

 9    It has to develop a relationship with consultants.  The

10    consultant's neck is on the line if they tell a big company,

11    "Hey, use the start-up brand," and that company tends to

12    fall down in terms of reimbursing claims and clinical

13    programs.  That's on the consultant, the broker.

14            So in all of these ways it's going to be very

15    difficult for an entrant to come into the market and make

16    its mark in the national accounts marketplace.

17    Q.  Focus in on networks for a moment.  How does the need

18    for a network present barriers to entry in the national

19    accounts space?

20    A.  So I would characterize this as a chicken-or-egg

21    problem.  We heard this discussed in other terms this

22    morning from Ms. Bierbower, that in order to have discounts,

23    you need bodies, but in order to -- have covered lives, but

24    in order to have covered lives, you need to have discounts.

25    So if you don't have either, it's going to be hard to get

1    both.

2    Q.  And have you observed evidence in the record of actual

3    attempts to enter the national account space?

4    A.  Yes, I have.  I've seen evidence I think that again is

5    kind of very sobering if you're thinking about the potential

6    for entry to impact competition here.  One is the testimony

7    we heard from Ms. Bierbower about Humana and how they had to

8    break off their efforts to be competitive in the national

9    accounts space because of this chicken-or-egg problem.  You

10   know, it's one thing to participate in, say, the Medicare

11   program where the rates paid to providers are largely

12   determined by the government.  There's not that much

13   discount negotiated in that space.

14        But in the commercial space, where there's large

15   discounts potentially being negotiated, if you're small,

16   it's hard to become big.

17        The other one that I think is also really

18   interesting is Kaiser, which I want to say about 15 years

19   ago, give or take five years, Kaiser made a concerted effort

20   to expand its geographic footprint across the United States,

21   and a wonderful research paper published by Professor Kate

22   Ho -- and that's spelled H-o -- from Columbia University,

23   she explored why Kaiser failed in its efforts to grow its

24   national footprint, and she identified the same problem, the

25   inability to create viable networks across the United

1    States.

2            So I'm going to say, you know, if Kaiser is having

3    a hard time becoming a national player, and if Humana has

4    walked back from becoming a national player, they're like

5    the two biggest candidates to succeed in this way, how are

6    these upstarts going to do better than providing, say, a

7    high-performance network for hip replacement surgery in a

8    few geographic locations, which is the type of entry that I

9    think you are seeing.

10           But expanding beyond that to become a real threat

11   to the big four I think is all but impossible.

12   Q.  How does the evidence of innovation you discussed

13   earlier impact your assessment of entry?

14   A.  Well, employers are increasingly expecting innovations

15   in health and wellness and provider collaboration and

16   providing data back to employers and providers, and that's

17   just another barrier to an entry because they're not going

18   to have the information base to make that happen.

19   Q.  Apart from entry, have you considered defendants'

20   arguments that private exchanges and slicing would constrain

21   a price increase following the merger?

22   A.  Yes, I have.

23   Q.  And what is your assessment?

24   A.  I don't think either is likely to constrain price

25   increases following the merger.  As we discussed before,

1    private exchanges are just another form of distribution.  As

2    a result, they might make it more possible for other firms

3    to come into the market or less possible for other firms to

4    come into the marketplace.  The evidence thus far suggests

5    that, if anything, the big four are more successful in the

6    private exchanges than they are in the traditional

7    marketplace.

8              Now, that could change going forward, but I

9    haven't seen any evidence to suggest that it will.

10             THE COURT:  And where do you get that from?

11             THE WITNESS:  We have evidence that's redacted.

12   Is that correct?

13             MR. SCHWINGLER:  Yes.  So we have evidence that's

14   been -- from a third party.  They've cleared it as partial

15   confidentiality so we don't need to seal the courtroom, but

16   I'll ask the witness to avoid identifying the third party

17   and providing too much detail.  But the unredacted slide is

18   in the binder.

19   Q.  Professor Dranove, what evidence have you observed on

20   this point?

21   A.  So this is from one of the major benefits firms that has

22   an important private exchange, and on their exchange the

23   market shares of the big four are actually slightly bigger

24   than the market shares that I reported earlier.

25             There's also testimonial evidence, and we heard

1    some evidence as well this morning, about concerns about the

2    future growth of private exchanges.

3    Q.  Let's turn now to efficiencies.  What is the framework

4    for analyzing an efficiencies defense under the horizontal

5    merger guidelines?

6    A.  Well, first of all, if efficiencies are large enough and

7    they are variable cost efficiencies, because in economics

8    you understand that it's variable costs that affect pricing,

9    that could lead you to prove that the merger is considered

10   pro-competitive.  So one definitely wants to consider

11   efficiencies, but the guidelines are very clear about what

12   efficiencies we should consider, and particularly they need

13   to do cognizable.  It's a term of the trade.

14        And what that means is they have to be verifiable.

15   You have to be able to demonstrate you really are going to

16   achieve these efficiencies.  They have to be merger-

17   specific.  It has to be that you can't achieve these

18   efficiencies in some other less anticompetitive way.  And

19   there can't be associated anticompetitive reductions in

20   output for service because those would offset any benefits

21   from the efficiencies.

22        And I just want to take a time out here to repeat

23   something I said earlier about this concept of reductions in

24   output because I think there's some confusion on the record

25   in this concept.

1       In a textbook economics market, say the market for

2  widgets, in that market, the starting point is everybody

3  loves widgets, and the more widgets we get, the happier we

4  are.  And if anything happens in the market to reduce the

5  number of widgets that we get, that's harmful to consumers.

6       Health economists understand that this is the

7  wrong way to think about healthcare markets.  Nobody goes

8  into the healthcare marketplace wanting more healthcare

9  services.  I don't go to my doctor and say, "That surgery

10  was great.  Give me another one"; and when they refuse to do

11  it, I say, "You're restricting output.  That's bad for me."

12       We understand that the right measure of output, if

13  we can conceptualize it, is the health that the system is

14  producing.  And greater health is what we want.

15       So people want more widgets.  They also want more

16  health.  Greater health is often associated with less

17  output, not more, and so I don't want to use quantity as a

18  standard for identifying whether this market is working or

19  not.  I really want to do it in terms of, say, quality of

20  care, or ideally, if the data permitted, the health of a

21  population.

22  Q.  What do the guidelines tell us about efficiencies claims

23  that occur outside the ordinary course of business planning?

24  A.  So if they're outside the ordinary course of business

25  planning, it's really very speculative as to whether or not

1    they're going to be able to achieve this.  So, you know, if

2    Anthem were acquiring a subsidiary in a line of business

3    where they already had a subsidiary, they might have some

4    experience with that and be able to forecast what the

5    efficiencies are.

6           Here it's just a remarkably large, unprecedented

7    acquisition.  This is certainly outside the normal course of

8    business.

9           THE COURT:  But this is their business.  I mean,

10   it's a health insurance -- I don't understand why that

11   analogy works here.

12          I mean, yes, it's so big and complicated it makes

13   prediction more difficult, but -- and I can understand why

14   there's a lot of reasons why you might want to view their

15   projections with skepticism, but I don't understand why this

16   one leads you to view it with skepticism.

17          This one seems to be their bread and butter.

18   We've got networks.  We've got discounts.  You've got

19   volume.  You're here.  We're there.  Why isn't that what

20   they think about all the time?

21          THE WITNESS:  Well, they don't think about it all

22   the time because they've never merged like this to the scale

23   all the time.  We talked, for example, about the culture

24   differences.  That's something they've never encountered

25   before.

1        I can give you an example from another area where

2   there have been a lot more mergers so it's been studied much

3   more extensively, and that's hospital mergers, where

4   hospitals have paid consultants who are in the business of

5   calculating merger efficiencies, and then they make

6   projections on merger efficiencies, and you think this is

7   their business, they do it over and over again.  There's a

8   research literature that shows that time and again the

9   hospitals fail to realize the efficiencies that have been

10  generated.

11       I know this is a different line of business, but

12  it does show that it's very difficult, even with experience,

13  to project merger efficiencies, and I think that's what this

14  point is; that when it's outside the usual business planning

15  process, experience even then is -- it's difficult to use

16  experience.  Now it's even more difficult.

17  Q.  And what do the guidelines tell us about efficiency

18  claims that are actually substantiated by past analogous

19  experiences?

20  A.  Well, it's just the other side of the coin.  If you have

21  a similar experience like this, then we should give you more

22  credit in terms of looking at your estimates.

23  Q.  What is your understanding of Anthem's efficiencies

24  defense in this case?

25  A.  Well, they have two components.  There's a traditional

1    variable cost, such as selling expenses, and then there are

2    the medical network synergies, the best of best that you've

3    heard about, and I -- my understanding is I'll be addressing

4    those more in the rebuttal phase.

5    Q.  Could you provide a few high-level observations.

6    A.  Sure.  The first is that even if you fully credit the

7    claimed variable cost savings, they're not enough to offset

8    the static price effects of this merger.

9          And secondly, in terms of the best of best

10   approach, there are a number of reasons to be skeptical

11   about those numbers.  I know that Dr. Israel, at some point

12   in his testimony, talked about those because his measures,

13   while not being perfect, they're noisy measures, but at

14   least they're not biased.

15         But I believe that's not the case.  I believe

16   those numbers are biased and perhaps potentially so, and

17   I'll speak to that later.

18   Q.  Could you summarize at least some of the concerns you

19   have with the claimed provider reimbursement rates as an

20   efficiency.

21   A.  Sure.

22         First of all, they're not an economic efficiency

23   as economists would describe it.  In other words, they're

24   not reducing the amount of societal resources brought to

25   bear in producing healthcare services.

1        That said, lower provider rates, while they're

2   harmful to providers, you know, consumers might like that,

3   so they're not a traditional economic efficiency, but they

4   are something to be considered.  Perhaps more importantly,

5   they're not cognizable because there's been no coherent plan

6   for how these rates are going to be achieved.

7        We've heard discussions about going back and

8   forth, I think, from Mr. Swedish as to whether or not

9   they're going to apply best of best.  I think he even

10  rejected that at some point.  Are they going to jeopardize

11  Cigna's relationships with providers?  If they do, there's a

12  concern about harming the quality of care that's being

13  delivered.  And if you harm the quality of care, that's an

14  offsetting anticompetitive effect, which means, again,

15  they're not cognizable.

16       Indeed, if Cigna becomes Anthem, Cigna's lives are

17  converted to Anthem's lives.  It's going to make it more

18  difficult for Cigna to implement its innovation so we can

19  think of that as a diseconomy.

20       And then finally, the methodology used to

21  calculate the best of best, I think, is just a nonstarter.

22  It's based on several misunderstandings that I'll be talking

23  about in rebuttal.

24  Q.  Professor Dranove, if Anthem drives down the

25  reimbursement rates that Cigna had been paying providers,

1  could that impact Cigna's ability to collaborate with the

2  providers and develop new innovations and lower the cost of

3  care?

4  A.  Of course, and providers have testified to this.

5  Providers don't just talk the rates and become

6  collaborators.  They have to invest their own time and

7  effort into doing this, and the higher rates can be thought

8  of as compensation in part for getting the providers to be a

9  partner in this enterprise.  If the rates are lower, there

10  will be less investment by the providers.

11          THE COURT:  If all of their assumptions are

12  correct, that any Cigna accounts in the Anthem states would

13  willingly go Blue and any Cigna providers in the Anthem

14  states would just be perfectly happy giving the volume that

15  was going to flow their way to accept the Anthem pricing

16  model and the Anthem discounts, is that a merger-specific

17  efficiency?  Because can't all those employers and providers

18  go with Anthem now?  Why do they need the merger to do that?

19          THE WITNESS:  Exactly.  That's one reason why it's

20  not merger-specific.

21          Another point is those providers are already

22  getting the Cigna and Anthem lives.  They're not getting

23  more lives when Cigna contracts are converted to Anthem.

24          There's some notion that the providers are going

25  to be thrilled about this because they're now getting more

1   lives.  They're getting the same number of lives at lower

2   rates.  They're not going to be thrilled.

3   Q.  One quick question about the calculation methodology.

4   Without getting into some of the details that will come

5   later, was the calculation methodology employed by the

6   defendant economists something that occurred in the ordinary

7   course of business planning?

8   A.  No, it's not.  I've never seen a methodology like this

9   used before, and so, as we'll talk about, I think there's a

10   reason why it's not used.  It leads to problems and

11   potential biases.

12   Q.  And remind us, how long have you been involved in the

13   health economics field?

14   A.  Probably about 35 years.  I started when I was a wee

15   lad.

16   Q.  And this is the first time you've seen this methodology?

17   A.  This is the first time I've seen this methodology, yes.

18   Q.  Professor Dranove, I have two more questions.

19   A.  Okay.

20   Q.  Stepping back in light of everything at a high level,

21   what is your opinion about this merger's likely effects on

22   national accounts?

23   A.  When I first heard about this merger long before the

24   Justice Department approached me, I thought about a market

25   in which, for all intents and purposes, you have four

1    national carriers, and you're going to be reduced to three.

2    One of those carriers, I learned through the course of

3    studying the market in more detail, was a highly innovative

4    carrier doing very exciting things.  The thought of losing a

5    competitor, going from a 4 to 3, was bad enough, but having

6    that competitor being subsumed into Anthem and all the

7    uncertainty that creates as to whether it will continue to

8    be innovative gave me great pause, and I've concluded that

9    this merger is really going to have a negative impact on the

10   course of the healthcare industry.

11   Q.  My last question:  Do any of your opinions depend in any

12   way on the continued existence of the Affordable Care Act or

13   any of its provisions?

14   A.  No, it doesn't.  The Affordable Care Act barely

15   touches employers with more than 50 employees.  Almost all

16   of the rules governing employers have to do with employers

17   making it possible for smaller employers to get insurance.

18   There's a mandate to cover for employers that are 50 or

19   larger, but in the national accounts market for certain,

20   they already were all offering insurance, and it has no

21   impact there.

22           THE COURT:  Would it affect -- if the individual

23   mandate goes away, and the requirement for small employers

24   to cover goes away, and the large employers still do it

25   because that's what they need to retain their employees, are

1    providers -- I mean, one of the reasons -- are they going to

2    be able to offer the same discounts if they're now going to

3    have to start paying to cover a bunch of uninsured people

4    that are insured under the Affordable Care Act?

5             THE WITNESS:  You're asking a question that's

6    known in the economics parlance as cost-shifting.  Whether

7    you charge more to the privately insured to make up for your

8    losses elsewhere -- actually, I've written extensively on

9    cost-shifting, and it's a misconception that there's a

10   response that providers -- there's certainly cross-

11   subsidization in the sense that you can make some money on

12   the privately insured to offset losses elsewhere, but if you

13   incur greater losses elsewhere, there's no evidence to

14   suggest that you now squeeze even more profits.  In fact,

15   that would require kind of irresponsible providers,

16   providers saying, you know, "I'm going to be nice to Anthem

17   because I'm doing okay.  But as soon as I'm not okay, I'm

18   not going to be nice to Anthem."  That's not the mindset of

19   providers.

20            THE COURT:  Okay.

21            MR. SCHWINGLER:  I'll pass the witness.

22            THE COURT:  Thank you.

23            All right.  I would like to start.  I realize you

24   won't finish, but I'd like to start.

25            MR. GIDLEY:  Thank you, Your Honor.

1    CROSS-EXAMINATION

2    BY MR. GIDLEY:

3    Q.  Good afternoon, Dr. Dranove.

4    A.  Good afternoon.

5    Q.  You testified earlier on direct that the Blues have some

6    competitively sensitive information when they get together

7    in their meetings.  Do you recall that testimony?

8    A.  Yes, I do.

9    Q.  And you acknowledge in your report that Anthem competes

10   all across the state of California with BlueShield of

11   California, correct?

12   A.  Yes, I do.

13   Q.  And you acknowledge that in the state of New York,

14   particularly upstate New York, there are two Blues that

15   overlap with a service area of Anthem, correct?

16   A.  Yes, that's correct.

17   Q.  All right.  Sir, and the Department of Justice has been

18   studying this merger since something like August or July of

19   2015.  Isn't that correct?

20   A.  Yes, sir.

21   Q.  And you yourself have been involved in this study of

22   this transaction since November of 2015, correct?

23   A.  Yes.  That sounds right.

24   Q.  And, sir, in your various reports you do not report a

25   single instance of collusion, correct?

1    A.   That's correct.

2    Q.   And, sir, you don't report any price-fixing in your

3    reports, correct?

4    A.   That's correct.

5    Q.   And no instances of bid-rigging, correct?

6    A.   I think, if there was price-fixing or bid-rigging, we

7    would probably be in another courtroom litigating those;

8    that's correct.

9    Q.   There are a lot of people here that put people in a

10   different residence when they see price-fixing on this side

11   of the courtroom, correct?

12   A.   Yes, that's correct.

13   Q.   And, sir, during the time that the firewalls have been

14   in place between Anthem and Cigna, there's not been one

15   email that you've put in your report as evidence of a breach

16   of the firewall between Anthem and Cigna, correct?

17   A.   Yes.   In my experience, firms are very careful not to

18   have written communications about things that might be taken

19   to be evidence of collusion.

20   Q.   Well, that's certainly --

21   A.   So this is not surprising to me.   I don't think it's

22   evidence one way or the other.

23   Q.   I didn't mean to cut you off.

24   A.   Uh-huh.

25   Q.   But just so I'm clear, your reports do not include any

1    email evidence or documentary evidence of any breach of any

2    firewall, correct?

3    A.  That's correct.

4         And, again, I don't take that as evidence one way

5    or another.  In fact, I would have been very surprised if

6    there was collusion that there was actual documentary

7    evidence of it.

8    Q.  And the safeguards between Anthem and Cigna have been in

9    place for more than 15 or 16 months, correct?

10   A.  I don't know how long the safeguards have been in place.

11   Q.  And when we say "safeguards," we're talking about the

12   firewall, right?

13   A.  Firewall, right.

14        THE COURT:  So when you asked the question "You

15   don't report any collusion or price-fixing or bid-rigging,"

16   did you mean involving Cigna competing against another Blue,

17   or were you talking more generally about when Anthem

18   competes in California and New York against Blues?

19        MR. GIDLEY:  It was everything, but let's put a

20   question or two in the record so we're clear.

21   Q.  Sir, in your study of this industry over more than a

22   year's time, you don't have a single case of collusion

23   involving the Blues when they meet, correct?

24   A.  That's correct.

25   Q.  And we've also had questions, and I just want to make it

1   clear, there has not been a single instance of collusion

2   regarding any breach of a firewall since the merger was

3   announced back in July or August of 2015, correct?

4   A.  I don't know if that's true or not, but I haven't seen

5   any written evidence of it.

6   Q.  None of your people on your side of the courtroom have

7   brought that to your attention; isn't that fair?

8   A.  That's correct.

9   Q.  Sir, let me go to your slide deck.  In your slide deck,

10   if we could --

11          MR. GIDLEY:  This is a public slide.  Why don't we

12   put it up.

13   Q.  And, sir, I'm going to ask you to compare two slides.

14   A.  Okay.

15   Q.  Slides 33 and 35.  These are the market share pie

16   charts.

17   A.  Sure.

18   Q.  And I believe one of them is in your binder, your

19   witness binder at Tab 1, if that assists you.

20   A.  My screen has turned to ovals rather than circles, but I

21   think I'm okay.

22   Q.  Just bear with us and use your imagination.

23   A.  I think I can figure it out.  Okay.

24   Q.  There's been a little bit of scrunching, I think.

25   A.  Yes.

1    Q.  Dr. Dranove, these shares that are reported for the two

2    different pies, let's start with Slide 33.

3    A.  Uh-huh.

4    Q.  You have a definition of the market, a calculation for a

5    definition of national accounts that is for 5,000 or more

6    employees.  That's on the left.

7    A.  Correct.

8    Q.  And you call that in our report NA5, correct?

9    A.  Yes.

10   Q.  And that stands for National Accounts 5, right?

11   A.  National Accounts 5,000.

12   Q.  5,000.

13        And then on the right in Slide 33 you have 5,000

14   or more employees geographically dispersed.  Do you see

15   that?

16   A.  Yes.  That means with a geographic screen, yes.

17   Q.  And in your report in Appendix F, you describe that as

18   NA5G, correct?

19   A.  Yes.

20   Q.  And, sir, in your report where you talk about geographic

21   dispersion, all that's required is two states, correct?

22   A.  Two states, that's correct, for geographic dispersion

23   for the employees.

24   Q.  So if -- I don't mean to cut you off ever.

25   A.  It's all right.

1  Q.  So you have a headquarter where you calculate to be the

2  majority of the employer's employees are, and second another

3  state, another location, where the employer has more than 5

4  percent of its work force, those are the two state

5  requirements for NA5G, correct?

6  A.  That's correct.

7  Q.  Looking at your shares here -- and we're looking right

8  now at Anthem territories' market shares, and I want you to

9  compare now for these questions, Slide 33 and Slide 35.

10  And, sir, you show the Blues combined in both 33 and 35,

11  correct?

12  A.  That's correct.

13  Q.  And in your Slide 35 from your direct examination,

14  that's the U.S. market share, correct?

15  A.  Yes.

16  Q.  Sometimes we call that the national geographic

17  geographic market, right?  It's the United States as a

18  whole, right?

19  A.  I've never heard that term used, but it sounds good.

20  Q.  I thought I heard you say it once during the direct.

21  A.  No.

22  Q.  But I just want to communicate with you and have our

23  terms defined.

24           And, sir, the Blues for the United States, both

25  under NA5 and NA5G, the Blues, when you combine them as you

1    do in your calculation, have 45 percent nationwide of the

2    shares that you're showing for ASO and fully insured

3    national accounts on Slide 35, correct?

4    A.  Yes, that's correct.

5    Q.  And, sir, if we compare that to the Anthem territories,

6    which is Slide 33, that's the 14-state territory of Anthem

7    operating as a Blue, correct?

8    A.  That is all of the lives that are covered by Blues that

9    reside in the Anthem territories.

10   Q.  And just, again, so we're clear, Anthem doesn't operate

11   in the totality of the 14 states.  They operate in portions

12   of 14 states, correct?

13   A.  Correct.  And this is for those portions.

14   Q.  That's right.  And so in the Anthem territories the

15   Blues share is smaller than nationwide, so the Blues are

16   less successful in terms of market share in the Anthem

17   territories to the tune of 41 percent for 5,000 or more

18   employees and 40 percent for 5,000 or more employees

19   geographically dispersed as compared to 49 percent

20   nationwide, correct?

21   A.  I don't think I want to use the word "less successful."

22           Anthem, because of where it's located, faces

23   different competitive circumstances.  For example, Kaiser

24   has a major footprint in the Anthem territories, more so

25   than it does outside the Anthem territories, so Anthem may

1   be competing very successfully but facing an additional

2   competitor still have a smaller share.

3          As I mentioned during my testimony, in some states

4   around the United States Alabama is well-known in part

5   because it's involved in some current litigation.  There are

6   Blues that have very, very large shares, which explains why

7   the Blues, taking the nation as a whole, may have larger

8   shares than the Blues do in the Anthem territories.

9   Q.  Well, it's fair to say that there's a difference between

10  41 and 40 percent and 49 percent, correct?

11  A.  A difference of either 8 or 9 percent, yes.

12  Q.  Right.  And the Blues combined are 8 or 9 percent

13  smaller in the Anthem territories, correct?

14  A.  Their overall share, yes.

15  Q.  Now, these pie slices in Slide 33, like on the right,

16  that is Aetna 12 percent, Kaiser 15 percent, United 21

17  percent.  Do you see that?

18  A.  Yes, I do.

19  Q.  Now, sir, those were not presented in your first or

20  second report in the text of your report or in the

21  appendices, correct?

22  A.  I don't recall if I did or didn't report that.  I'd be

23  happy to take a look, if you want, just to confirm that.  I

24  just don't recall reporting that.

25  Q.  Sure.  Why don't I refresh your recollection by showing

1     you F-1, Exhibit F-1.

2              MR. GIDLEY:  And I'm not sure whether, Mr. Haley,

3     we can put this up in the courtroom.  I think it's fine for

4     my client for it to go up in the courtroom, and it's

5     aggregate data, Your Honor, so I don't think Anthem has any

6     issue with F-1 going up.

7              THE COURTROOM DEPUTY:  This is previously

8     admitted?

9              MR. GIDLEY:  It's part of his expert report.

10    A.  This is my first report -- I'm sorry.  I didn't mean to

11    speak over you.

12    Q.  And, sir, Exhibit F-1?

13    A.  Okay.  Thank you.

14    Q.  Exhibit F-1 is a NA5 chart, correct?

15    A.  Yes.

16    Q.  And that means that it shows along the top, "National

17    Account Market Shares, Employers With 5,000 Plus Employees,"

18    correct?

19    A.  Yes.

20    Q.  And there's no requirement with NA5 that their employer

21    be in the second state.  You could have all your employees

22    in a single state with NA5, correct?

23    A.  That's correct.

24    Q.  And the 41 percent and the 49 percent are the numbers we

25    see on Slides 33 and 35, correct?

1   A.  Yes, that's correct.

2   Q.  All right.  And there are similarly Cigna shares shown

3   here, 6 percent and 8 percent, right?

4   A.  Yes.

5   Q.  Now, there's no shares shown for Kaiser or United in

6   Exhibit F-1 or Aetna, correct?

7   A.  That's correct.

8           Since the purpose of this slide was to show how we

9   computed the change in the Herfindahl, what's relative to

10  computing the change in the Herfindahl are the shares in the

11  merging firms.  There's enough information on the slide as

12  it is.  I think, in fact, there's pretty much more

13  information on this slide than necessary, and so that's why

14  we reported just the Anthem and Cigna shares.

15  Q.  Similarly, Exhibit F-2 has the Anthem share and the

16  Cigna share, and no share information for Aetna, Kaiser,

17  United, correct?

18  A.  Yes, that's correct.

19  Q.  And in both --

20          THE COURT:  But it's the same percentages, right?

21  It just only doesn't add up.  It's the same percentages; it

22  just doesn't show the other percentages.

23          MR. GIDLEY:  It doesn't show the other slices of

24  the pie, Your Honor.

25          THE COURT:  Okay.

1    Q.  And when we say Anthem territories and we have Anthem's

2    share in both of these slides, this is on a combined Blues

3    basis, correct?

4    A.  That's correct.

5    Q.  So Footnote 1 reads, "The Anthem share for the United

6    States reflects enrollment for Anthem, BCBS Alabama, BCBS

7    Kansas City, BCBS Massachusetts, BCBS Michigan, the Blue in

8    Minnesota, the Blue in North Carolina, the Blue in

9    Tennessee, CareFirst, Florida Blue, HCSC, Highmark, Horizon,

10   Independence, New York and California BlueCard, and

11   non-California Blue Shield of California enrollment."  Do

12   you see that?

13   A.  Yes, sir, I do.

14   Q.  And sir, it's a fact that in every market share that

15   you've presented, both in your testimony today and in your

16   reports, you combine the Blues so that you don't present

17   Anthem by itself, right?

18   A.  In order -- yes, I'm sorry, in order to fully reflect

19   the competitive significance of Anthem and in particular the

20   strength of the Blue networks that Anthem manages in its

21   markets.

22   Q.  Now, sir, you have calculated Anthem's own share by

23   itself, but it's not put into the text or the appendices,

24   correct?

25   A.  I'm trying to remember.  We've done so many

1    calculations, I don't recall if I do or don't.

2              If it's something that's in my report, please

3    point me to it.  I'm willing to believe that we did it, but

4    I just don't recall at this point.

5    Q.  I'm happy for anyone to hand you a note that tells me

6    where it is in the first or second report, but I've read it

7    once or twice, and I haven't found it in the report or in

8    the appendices.  And isn't that the case, that the Anthem

9    market share doesn't appear in any of your reports?

10   A.  Again, I don't recall.  With so many market shares to

11   report, I don't recall which ones ended up in the reports

12   and which ones didn't.

13   Q.  Dr. Dranove, the number for Anthem by itself appears in

14   a back-up file.

15             MR. GIDLEY:  And this has a lot of competitive

16   information, Your Honor, so I think it can't be public, but

17   I can proceed with the examination and put some of the

18   numbers into the record.  This is his back-up file

19   NationalAccountShares.xlsx.

20   Q.  So just to lay a foundation, after you submitted it to

21   the Court and to Anthem's counsel, your report, you also had

22   a series of relatively extensive data and programs and other

23   back-up, correct?

24   A.  I'm sure, and I'm sure the raw data, you know, contains

25   a lot of information that could have been useful here.

1    Q.  All right.

2            MR. GIDLEY:  I'd like to put on the screen for the

3    Court's benefit this file, and it should be in your binder,

4    Dr. Dranove, at Tab 4.

5            THE COURT:  Which binder?  The cross-examination

6    binder?

7            MR. GIDLEY:  The Dranove Cross-Examination Binder

8    1.

9            It shouldn't, I think, be on for the public given

10   the other firm's data.  I'm going to read out our data.

11           THE WITNESS:  I have it.

12           MR. GIDLEY:  We have no objection for our data,

13   Your Honor.

14   Q.  And Dr. Dranove, we have now in front of you at Tab 4

15   this file from your back-up, and if I could direct your

16   attention to the fourth line that says "Anthem."

17   A.  Okay.

18   Q.  And there's a variety of carriers here that are reported

19   in this file.  Do you see that?

20   A.  Yes, I do.

21   Q.  And directing your attention to the top line, the first

22   column heading is "Carrier," right?

23   A.  Yes, it is.

24   Q.  All right.  So that's insurance carrier, right?

25   A.  Yes, sir.

1    Q.  And the second column heading is "Year," right?

2    A.  Yes.

3    Q.  And every market share you present in this courtroom is

4    for 2015, correct?

5    A.  I believe that's correct, yes.

6    Q.  So your calculations and computations for market share

7    in Slide 33, Slide 35, and so forth are for 2015, correct?

8    A.  Yes, sir.

9    Q.  And now, reading across the top, there's "Enrollment

10   NA5ADJ" and "Enrollment NA5GADJ."  Do you see that?

11   A.  Yes, I do.

12   Q.  And then there are two denominator columns, and they

13   have the same values.

14              MR. GIDLEY:  And they're aggregated so I don't see

15   an issue, Your Honor.

16   Q.  The first column is called "NA5DENOM."  Do you see that?

17   A.  Yes, I do.

18   Q.  And, sir, that's the denominator you used in Slides 33

19   and 35 for 2015 market share accounts, correct?

20   A.  I don't know what the number for the denominator is.  It

21   may well be correct, but I certainly don't recall if it was

22   74 million, et cetera.

23   Q.  So, sir, this number is 74.6 million enrollees.  Do you

24   see that?

25   A.  Yes, I do.

1   Q.  And, sir, does that refresh your recollection as to the

2   denominator for your market share calculation in this case

3   for NA5?

4   A.  Like I said, I'd have to go back to what I reported to

5   make sure that's the same number.  I'm willing to accept

6   that it is the same number, but without looking at it on my

7   own, I'm not going to be able to confirm that.

8   Q.  Well, it's not your testimony that this file is corrupt

9   or an intermediate file.  This is a final file of your

10  national shares, correct?

11  A.  Yes, but you're asking me if I can recall what the

12  calculated denominator was.  I don't -- I just don't recall

13  what that exact number was.

14  Q.  Do you recall it in rough orders of magnitude of 75

15  million for NA5?

16  A.  Look, it sounds like a reasonable number, but I couldn't

17  tell if it was 70 or 80.  It sounds about right, but without

18  looking back in my report to get the exact number -- I'm not

19  even sure I report it in my report -- I'm not going to be

20  able to say yes, that's the exact number.

21  Q.  I'll represent to you that, having searched your report

22  several times, the denominator is not reported in any of

23  your reports.

24  A.  That's what I -- that's my recollection as well.  That's

25  why I'm willing to accept that this could be the calculated

1   number, but I have nothing to compare it to in front of me.

2   Q.  Now, the next column is "NA5GDENOM."  Do you see that?

3   A.  Yes, I do.

4   Q.  And that's 57.3 million enrollees, right?

5   A.  Yes, it is.

6   Q.  And that's the denominator for your NA5G calculations

7   that appear at Slides 33 and 35, correct?

8   A.  Again, without going through the same conversation,

9   we'll reach the same conclusion.  If you represent that

10  that's the right number, I have no basis in front of me to

11  dispute that.

12  Q.  Well, sir, this is your back-up, and you testified on

13  direct that there was a 78 percent ratio between the NA5 and

14  the NA5G.  Do you recall that testimony on direct?

15  A.  Yes, I do.

16  Q.  All right.  And, sir, there is a relationship that's

17  approximately of that size.  You probably have more

18  quantitative ability than I do of the 57 million to the 74

19  million.  Isn't that fair?

20  A.  Yes, that looks like it might be in the ballpark of 78

21  percent.

22  Q.  And if we just use round numbers, if we had just

23  quarters, that's about the way my brain works, if you have

24  50 cents versus 75 cents --

25          THE COURT:  I think we got that under these two

1  columns that say "denominator."  Let's keep going.

2  Q.  Next column, sir, says, "Share NA5," and for Anthem 2015

3  it reads 20 percent, correct?

4  A.  Yes, it does.

5  Q.  And the Anthem 2015 market share for NA5G is 19.8

6  percent, correct?

7  A.  Yes.

8  Q.  Sir, in your report --

9          MR. SCHWINGLER:  I have a brief objection.  I'm

10  sorry, could I have a quick sidebar?

11          THE COURT:  Yes, approach.

12          (The following is a conference held at the

13           bench outside the hearing of the gallery)

14          MR. SCHWINGLER:  We have a stipulation that's

15  embodied in the final case management order that the parties

16  wouldn't seek discovery into preliminary data formulations,

17  data run, data analyses or any database-related operations

18  not relied upon by the expert in forming any opinions in his

19  or her final report.  It sounds like we're getting into

20  market share calculations that were preliminary and not

21  reported.  It doesn't speak to trial, but there hasn't -- we

22  agreed to exclude it from discovery, and I'm not sure why

23  we're going down this road.

24          THE COURT:  I think all he's trying to get at is

25  in the pie chart it says 49 percent, and if you're only

 1    looking at it by itself, it's about 20 percent.  Is that

 2    where we're going?  Is that what we just took 20 minutes to

 3    come up with?

 4              MR. GIDLEY:  Yes, Your Honor.

 5              THE COURT:  Okay.  So why can't he ask that?

 6              MR. SCHWINGLER:  Like I said, this was

 7    something -- we had agreed to leave preliminary data work

 8    and calculations out.

 9              THE COURT:  This is a preliminary.  I mean, it's a

10    different calculation, and he is laying the foundation for

11    him being able to ask him, "Isn't it true that if you only

12    look at Anthem, it's a much smaller percentage?"

13              So he'll have to explain why that's relevant at

14    some other point with his expert, but I think he's allowed

15    to ask that question.  I think we could probably get there

16    faster, though, because I know where you're going.

17              MR. GIDLEY:  All right.

18              THE COURT:  Okay.  Thank you.

19              MR. GIDLEY:  Thank you, Your Honor.

20              (This is the end of the bench conference).

21    BY MR. GIDLEY:

22    Q.  Dr. Dranove, just adding the market shares, 20 percent

23    and 8 percent, the total is 28 percent, correct?

24    A.  Adding 20 and 8 is 28 percent.  I'm not sure which

25    market share lines you're referring to when you reference

1   those.

2   Q.  Sir, I'm looking at NA5, the Anthem number, which is 20

3   percent, and the Cigna number for 2015, which is 8 percent.

4   So I'm just asking you, adding 20 percent and 8 percent for

5   the NA5, that is 5,000 members or more national accounts

6   market share, would be 28 percent of the merging parties,

7   correct?

8   A.  That's correct.

9   Q.  And for NA5G, it would be 20 percent plus 9 percent,

10  correct?

11  A.  Yes, sir.

12  Q.  And NA5G is geographically dispersed, correct?

13  A.  Correct.

14  Q.  All right.  Now, I want to talk to you about United.

15  Your report states that United had $157 billion in

16  consolidated revenue in 2015, correct?

17  A.  $157 million or billion?

18  Q.  Billion.

19  A.  Billion, yes.

20  Q.  And Anthem had $79 billion, and Cigna had $38 billion in

21  total revenues, correct?

22  A.  Sounds about right.

23  Q.  Well, adding $79 billion and $38 billion would be about

24  $117 billion, correct?

25  A.  Yes, mental math says that's about right.

1    Q.  So in total revenues, the combined companies would still

2    be smaller than United, correct?

3    A.  Yes.

4    Q.  Well, sir, you testified earlier that Mr. Cordani had

5    doubled the size of Cigna.  Do you recall that testimony?

6    A.  Yes, I do.

7    Q.  And, sir, you were talking about revenue, were you not?

8    A.  I was talking about market share revenue -- share

9    growth.

10   Q.  Well, I'm asking you this:  Since Mr. Cordani took over,

11   is it your testimony that the number of U.S. commercial

12   enrolled lives has doubled at Cigna?

13   A.  I believe I've seen evidence that it is in that

14   ballpark, yes.

15   Q.  Let me direct your attention now to a statement that the

16   agencies have up on their website, and this is a quote from

17   the 2006 DOJ commentary.  It's also found at Tab 5 of your

18   binder.

19            MR. GIDLEY:  And it could up, Mr. Haley, on the

20   screen as public.

21   Q.  And the quote is this, "As an empirical matter, the

22   unilateral effects challenges made by the agencies nearly

23   always have involved combined share greater than 35

24   percent."  Do you see that?

25   A.  Yes, I do.

1    Q.  And, sir, you can't get, for the national shares, above

2    35 percent without adding in Blues, correct?

3    A.  Are we talking about the national shares in the Anthem

4    footprints, or the national shares nationwide?

5    Q.  I'm talking about the shares we were just looking at,

6    NA5 and NA5G.

7    A.  So in the national footprint for the entire United

8    States, if you add together Anthem's share by itself to

9    Cigna's share, it's below 35 percent.

10   Q.  Now let's talk about some of the competitors that you

11   have now broken out in the slides.

12              Sir, taking your attention and focusing it,

13   please, on Anthem territories, in the Anthem territories,

14   those 14 states, Aetna, Other, Kaiser, United all have

15   larger shares than Cigna at 6 percent, correct?

16   A.  If we use the -- without the geographic screen, that's

17   correct.

18   Q.  And you described on direct that Kaiser's a very

19   substantial player in the Anthem territories, correct?

20   A.  I also described that it's quite differentiated from the

21   other players, and we're being generous to ascribe it in

22   equal footing with the other carriers.

23   Q.  Well, I'm glad you raised that.  Your slide says that

24   Kaiser, of course, is famous for its HMO, but your report

25   admits that it also has an ASO product, does it not?

1   A.  I don't recall whether or not it has that, but Kaiser's

2   way of doing business is quite a bit different from

3   everybody else's way of doing business, and for that reason

4   I think we want to think of them as a very different type of

5   insurer.

6   Q.  Sir, this statement is made in Paragraph 46 of your

7   report that, "Kaiser offers ASO and non-HMO products."  Page

8   13.  Did I read that correctly?

9   A.  I'd have to find --

10            THE COURT:  What are you saying that's

11  inconsistent with?

12            MR. GIDLEY:  Yes, Your Honor.  Paragraph 46, Page

13  13.

14            THE COURT:  So what is that inconsistent with?

15  Did he say that it --

16            MR. GIDLEY:  I don't think this can be put up on

17  the courtroom screen, or maybe this is public information.

18  Q.  But you acknowledge in your report that Kaiser has an

19  ASO product?

20  A.  Can I read directly from my report?

21  Q.  I just would like an answer to my question.

22            THE COURT:  Does Kaiser have an ASO product?

23            THE WITNESS:  The vast majority -- it has an ASO

24  product that's a very small portion of its total book of

25  business.

1    THE COURT:  No, I'm asking you why did we go to

2    the report?  What was the question before that that you

3    found that answer inconsistent to and you wanted to go to --

4    you're going very fast, and I'm trying to absorb, so I want

5    to know why you just brought that out.  What was the thing

6    you asked him before that?

7    MR. GIDLEY:  Yes, Your Honor.  I can't recall the

8    question now four back, but on direct he has a slide that

9    says Kaiser's an HMO insurer, and they are famous for staff

10   model HMO.

11   Q.  And you'd agree with that, right?

12   A.  Absolutely.

13   Q.  Meaning that Kaiser has hospitals and doctors on their

14   payroll, right?

15   A.  Actually, they own their hospitals, but the doctors are

16   actually owned by a separate company called the Kaiser --

17   the Permanente Medical Group, which contracts exclusively

18   with the Kaiser Foundation health plans.

19   MR. GIDLEY:  And I appreciate the Court's patience

20   with me.  I think my question was in relation to his

21   commentary on the Kaiser market share.  He said we were

22   being generous to include Kaiser, and my response is, ASO

23   products and non-HMO products are offered by Kaiser, and

24   your report acknowledges that.

25   A.  And I stand by my same claim.  While the big four are

1   largely selling ASO products, Kaiser, the vast majority of

2   its business, is full insurance product.  And so a small

3   portion of Kaiser's business might be put potentially on

4   equal footing with the big four, although given its

5   geographic scope, I would disagree with that as well.  The

6   vast majority should not be put on an equal footing with the

7   big four.

8          THE COURT:  Let me back up one second to the

9   spreadsheet that we were looking at --

10         MR. GIDLEY:  Yes, Your Honor.

11         THE COURT:  -- where we went across.  Was this

12  spreadsheet, NA5 and NA5G and the shares, when he was

13  looking at the whole country, or just when he was looking at

14  the 14 states?  I can't tell from the spreadsheet.

15         MR. GIDLEY:  Your Honor, my understanding is that

16  the rest of these numbers tie to his U.S. nationwide

17  numbers.

18         THE COURT:  Okay.  So you're not suggesting that

19  the Anthem shares within the 14 states, if you took the

20  other Blues out, would be 20 percent.  You're just talking

21  about in the whole United States.

22         MR. GIDLEY:  My understanding is that this is

23  national account, National Geographic United States, not

24  Anthem.

25         THE COURT:  Okay.  Okay.  Thank you.

1   A.  And that's how I interpreted it as well.

2            THE COURT:  All right.

3   Q.  Now, I want to talk a little bit about the definition of

4   national accounts, Dr. Dranove, if I could direct your

5   attention to Tab 7.

6            MR. GIDLEY:  And Mr. Haley, this can -- no.

7   Q.  Tab 8, forgive me.

8            MR. GIDLEY:  This can go up.  This is just a

9   cullout from the UnitedHealthcare website.

10  Q.  Dr. Dranove, UnitedHealthcare defines "national

11  accounts" as accounts with more than 3,000 -- companies,

12  employers, with, quote, 3,000-plus employees.  Do you see

13  that?

14  A.  Yes, I do.

15  Q.  That's underneath about national accounts.

16           And now, if I could direct your attention to your

17  report, this is your first report, and I'm just going to ask

18  you a question without blurting out the name.  Let's direct

19  you to Paragraph 107, Page 32, of your first report.

20  A.  I have Paragraph 107 beginning on Page 31.  Is that

21  correct?

22  Q.  That would be great.  Top of the page, 32, there's a

23  sentence that says one large company, and it's not United,

24  defines a national account as an employer with at least

25  3,000 employees.  Do you see that?

1    A.  I don't see the words "one large company."

2    Q.  No.  I'm trying not to say the name of the large

3    company, sir.

4    A.  Oh, yes.  One large company and United, yes, okay,

5    correct.

6    Q.  Yes.  Thank you.

7         And, sir, I'd like to direct your attention in

8    your first report to your Footnote 127.  And, again, this is

9    on the same page, but I'm not sure we can read it out loud

10   so let see if I can ask a meaningful question.

11        In relation to one of the large companies that

12   uses 3,000 employees, the footnote says, "The number for

13   national accounts for that number can be lower."  Do you see

14   that in Footnote 127?

15   A.  Yes, I do.

16   Q.  Now, let's direct your attention to the Anthem 10K.

17   A.  I just want to clarify.  To be clear, there may be more

18   firms affected by the merger than I am crediting using my

19   definition of national accounts.  The definition may be

20   lower.

21        But in price discrimination markets, I don't have

22   to identify every affected firm.  The firms that I've

23   identified are national accounts firms.

24   Q.  Sir, in your reports you do not report a definition of

25   "national accounts" and compute market shares for companies

1    with 3,000 employees and up as national accounts, correct?

2    A.  I use the 5,000-plus employee standard so that we can --

3    we need to pick a number, and that's the number I chose to

4    have an apples-to-apples comparison, yes.

5    Q.  Let's go to Anthem's definition of "national account."

6    That's found at Tab 9, sir.

7         MR. GIDLEY:  And this is an excerpt from the

8    10K, which is, of course, public and can be on the screen,

9    Mr. Haley.

10   Q.  And if we go to Page 51 of this exhibit -- it's also

11   PX125, Your Honor -- and the second full paragraph.

12        MR. GIDLEY:  If you could zoom in on the first

13   couple of sentences.  It's a little hard to read.

14   A.  Sorry, I'm lost.  Can you tell me which tab I should be

15   behind, and which page number?

16   Q.  Yes, of course.  Tab 9.

17   A.  Tab 9, okay.

18   Q.  Second full paragraph, and it says Page 51.  And it's

19   also on your computer screen, if that's easier to read.

20   A.  I see it now, okay.

21   Q.  And, sir, Anthem's 10K for 2015 reads, "National

22   accounts generally consist of multistate employer groups

23   primarily headquartered in an Anthem service area with at

24   least 5 percent of the eligible employees located out of the

25   headquarter state with more than 5,000 eligible employees.

1    Some exceptions are allowed based on broker and consultant

2    relationships."

3              Did I read that correctly, sir?

4    A.  Yes, you did.

5    Q.  And as far as you know, that is the definition that

6    Anthem uses?

7    A.  This is a definition coming from their 10K.  I believe

8    they use a different definition in at least one other

9    document.  This may be more complete than what's in other

10   documents, but this is certainly one of the definitions they

11   use.

12   Q.  Let me direct your attention to the next tab, Tab 10.

13   And, sir, this is a CID response by a nonparty so I'm not

14   going to use the name of this company out loud in court, but

15   I want to direct your attention -- and we won't put it up on

16   the screen.  So I want to direct your attention to the

17   heading "National Accounts" at Tab 10.

18   A.  Okay.

19   Q.  And, sir, for this major insurer -- and that's when I'm

20   going to pick up the quote -- "it defines national accounts

21   with groups of 3,000 or more eligible employees in two or

22   more regions."  Do you see that?

23   A.  Yes, I do.

24   Q.  And if I can direct your attention, sir, to Tab 11,

25   which is a CID response dated March 4, 2016, by another

1    company.  And, again, we won't read the company name out

2    loud.  Could you go to the page Bates-numbered 0004, 130004.

3    A.  Okay.

4    Q.  And there's a question in the CID, "Describe how your

5    company defines or uses the term 'national accounts' or any

6    other designation used to refer to national account

7    customers and so forth."  Do you see that?

8    A.  Yes, I do.

9    Q.  And this company, and I'll pick up the quote, defines

10   national accounts as, quote, large/complex employers with

11   3K-plus employees with multistate employers throughout the

12   United States.  Do you see that?

13   A.  Yes.  I do understand that different insurers use

14   different definitions, but if I was to use each employer's

15   unique definition as a basis for calculating market shares,

16   I'd ascribe the biggest market share to the employer that

17   used the lowest threshold number of employees, which is

18   totally uninformative about their actual competitive

19   significance.  That's why I need to do an apples-to-apples

20   comparison.

21   Q.  The reference to 3K-plus is 3,000 plus, correct?

22   A.  Yes.

23   Q.  And the next tab, Tab 12, this is another CID response.

24   This one is dated January 29, 2016.  If I could direct your

25   attention to the second page, and, again, this is a response

1   to a Specification 4 from the Justice Department.  And I'm

2   not going to read the company name out loud.  This company,

3   quote, defines a national account as accounts based outside

4   of its services area, which have 1,000 or more eligible

5   employees inside its service area.

6           Do you see that?

7   A.  Yes.  And, again, I think it's well understood that each

8   employer, for reasons unique to that employer, has defined

9   "national accounts" in different ways.

10  Q.  And I'm not going to do this ad infinitum.

11          THE COURT:  That's good.

12          MR. GIDLEY:  Two more examples, Your Honor.

13  Q.  Directing your attention to --

14          THE COURT:  And you're not going do them again

15  with your experts because I've heard them, I've seen them,

16  and now they're in the record, and you can just ask your

17  experts what their opinion is based on these facts that are

18  now in the record.

19          And I understand you're arguing that they're

20  significant.  I'm not suggesting that they're insignificant.

21  I'm suggesting that they're in the record.

22          MR. GIDLEY:  Thank you.

23  Q.  And, sir, directing your attention within Exhibit 13 --

24  now, you saw this at your deposition -- to Slide 27, and

25  this definition of a national account says, "An entity with

 1   an employee or retiree locations in more than one area."  Do

 2   you see that?

 3   A.  Yes, I do.

 4   Q.  And, again, I'm not --

 5   A.  Am I allowed to --

 6   Q.  It's not public so I just want to caution you.

 7   A.  Okay.  This is not a definition from an insurance

 8   company.

 9   Q.  That's fine, but it's --

10   A.  Okay.

11   Q.  Let's go to Tab 14, Page 21, and this is the second

12   request that was made to Anthem, Inc., in this case.  Are

13   you at Page 21?

14   A.  Yes, I am.

15   Q.  And, sir, in the second request there was a definition,

16   quote -- this is at T.  Are you with me at T?

17   A.  Yes.

18   Q.  "The term 'national customer' means a customer with at

19   least 1,000 employees," correct?

20   A.  I see that.

21            MR. GIDLEY:  Let's put up now the definition that

22   Cigna uses, and if I could have --

23            THE COURT:  Did Anthem use that definition in a

24   response to the Justice Department, a thousand employees?

25            MR. GIDLEY:  No.  This is the Justice Department's

1   request to Anthem.

2          THE COURT:  Okay.  I see.  So that's just a

3   definition that they're using for purposes of the request.

4          MR. GIDLEY:  Right.

5          THE WITNESS:  Of course, Anthem reported their

6   data more richer, in a richer way than this, so we were able

7   to apply our screen to get to the 5,000 plus.

8   Q.  The final one is found at Slide -- Tab 16, and it's a

9   quote from Mr. Cordani, president and CEO of Cigna.  So it's

10  at Page 15 at Tab 16.

11          And he talks, sir, "For us, it's commercial

12  employers with 5,000 or more employees that span multiple

13  states.  We exclude large single-state commercial employers.

14  That's part of our regional segment."

15          Do you see that?

16  A.  Yes, I do.

17  Q.  And he also says, "Let me just redefine 'national

18  accounts' because we define it a bit differently than our

19  competition."  Do you see that?  That's what he told

20  investors?

21  A.  Again, I'm sorry, that was just above.  Okay, yes.

22  Q.  All right.  You can set that aside.

23          I'd like to put up now from your direct

24  examination Slide 27.  And, sir, Slide 27 states that, "26

25  carriers produced enrollment data through second requests

1    for CIDs."  Do you see that?

2    A.  Yes, I do.

3    Q.  And the data were not produced in a uniform format,

4    correct?

5    A.  Correct.

6    Q.  And in order to calculate HHIs, those HHIs are based on

7    market shares, correct?

8    A.  Yes, of course.

9    Q.  Just by definition of what an HHI is, it's a square of a

10   market share of a competitor, correct?

11   A.  It's the sum of the squared market shares of all the

12   firms in the market.

13   Q.  And for any particular firm it's the square of its own

14   market share, correct, sir?

15   A.  There's no such thing as a firm-specific HHI.  You have

16   a firm-specific market share, and you have an HHI.  If you

17   want to square the number in order to come up with another

18   number, you could put your name on it, but it's not

19   currently in use in the profession.

20   Q.  All right.  Let's direct your attention to the idea that

21   a competitor has to be nationwide, and I want to put up on

22   the screen, please, Paragraph 8A of the complaint at Page 5.

23        MR. GIDLEY:  Can you do that, Brit.  There we go.

24   Q.  I'll try to read it slowly.  "National accounts, 8A."

25   "Of the big five, only four insurers offer a nationwide

1    commercial network sufficient to serve the country's largest

2    employers, known as national accounts."  Do you see that?

3    A.  Yes, sir.

4    Q.  And given that definition, you do include in your

5    product market for national accounts what you call slice

6    insurers in your definition of the national accounts market,

7    correct?

8    A.  Yes, I do.

9    Q.  And you also include in your product market regional

10   health insurers in your national account product market,

11   correct?

12   A.  Yes, sir.

13   Q.  And you also have testified that you include local

14   health insurers in your national account product market,

15   correct?

16   A.  Yes.  I include all insurers that sell to national

17   accounts employers.

18   Q.  And your national --

19           THE COURT:  For purposes of determining share,

20   that's what he means --

21           THE WITNESS:  Correct, for the purposes of

22   determining share.

23           THE COURT:  Okay.

24           THE WITNESS:  And then when I move on to

25   competitive effects, I look -- I drill down to try to

 1    understand which of those types of insurers are going to

 2    have the biggest impact.

 3    Q.  Right now I'm just talking about market shares and

 4    market participants under the merger guidelines.

 5    A.  All right.

 6    Q.  Do you understand that?

 7    A.  Excellent.

 8    Q.  And, sir, you also include in your definition of the

 9    national account product market TPAs, correct?

10    A.  Yes, I do.

11    Q.  Now, in the 26 firms that received CIDs from the Justice

12    Department, there was not a single stand-alone TPA that

13    received a civil investigative demand, correct?

14    A.  By "stand-alone TPA," are you saying -- for example,

15    United, which operates a TPA, did receive a CID.  You mean

16    something other than that situation?

17    Q.  I'm talking about independent TPAs, companies like

18    HealthSCOPE, Health Net, and so forth.

19    A.  Stand-alone independent TPAs did not receive a CID.

20    Q.  And you were involved in determining which companies got

21    CIDs, correct?

22    A.  I participated in that conversation, yes.

23    Q.  And you also participated in the conversation on which

24    data would be requested of companies in connection with the

25    DOJ's CID, correct?

1    A.  Yes, that's right.

2    Q.  Now, you exclude from the product market of national

3    accounts self-supply, meaning a national account customer

4    that could build its own network of providers and become in

5    privity with healthcare providers such as hospitals,

6    correct?

7    A.  I exclude self-supply as it's currently performed and

8    the potential for self-supply as well, yes.  That's not in

9    the market.

10   Q.  And sometimes in the industry, self-supply, in this

11   industry, health insurance, commercial health insurance, is

12   referred to as direct contracting, correct?

13   A.  I think that's a very special case of self-supply that's

14   not relevant to this case, and I talked about that earlier.

15   Q.  And just so we're clear, direct contracting is not part

16   of your product market for market participants under the

17   merger guidelines, correct?

18   A.  Just to refresh the Court's memory, most of the direct

19   contracting that I'm familiar with is this carving out of,

20   say, a network for hip replacement surgery, and that's not

21   providing the insurance product.  That's simply procuring

22   one very, very small slice of the marketplace.

23           So you can direct-contract for hip replacement

24   surgery, but you're still buying virtually the whole kit and

25   caboodle of health insurance from the main insurance company

1    you're doing business with, and that's why I don't consider

2    that form of direct contracting to be relevant to market

3    share calculations.

4    Q.  You gave one example in your initial report, correct?

5    A.  I don't recall what examples I gave of self-supply in my

6    initial report.

7    Q.  Could I direct your --

8    A.  Of course.

9    Q.  Sorry.  Could I direct your attention to Footnote 141 in

10   your first report, and that's found at Page 34.

11   A.  Uh-huh.

12   Q.  And you refer there to Boeing, correct?

13   A.  Yes, I do.

14   Q.  And you say, "Examples of self-supply include multistate

15   health systems that own their own hospitals and large

16   employers like Boeing."  Do you see that?

17   A.  Yes, I do.

18   Q.  And, sir, in your report you don't mention any other

19   company that's doing direct contracting, correct?

20   A.  I did mention self-supply -- during my direct testimony

21   self-supply, for example, by John Deere and Caterpillar.

22            There's been a coming and going of self-supply off

23   and on for several decades.  Two decades ago self-supply was

24   tried by a consortium of employers in Minneapolis, for

25   example.  They walked back from that one.  It didn't work

1    for them.

2            This is generally not a robust trend.

3    Q.  The only one you mention in your report is Boeing,

4    correct?

5    A.  That is correct.

6            THE COURT:  Are you familiar with any companies

7    analogous to Boeing doing what they're doing in the 14

8    Anthem states?

9            THE WITNESS:  In the 14 Anthem territories, no,

10   I'm not.

11   Q.  And, sir, at your deposition on November 9th you

12   testified that it was your understanding that Intel does not

13   do direct contracting, correct?

14   A.  My understanding is Intel has a carve-out for joint

15   replacement surgery.

16   Q.  Sir, let me direct your attention to Tab 17 within your

17   witness binder.

18           MR. GIDLEY:  And this is a public document from

19   Healthcare Financial Management Association, March 2016.

20   Q.  And if I could direct your attention within that

21   document to Page 5, and tell me when you're there.

22   A.  I am there.

23   Q.  And, sir, it says, "Case Study, Intel Corp. Connected

24   Care."  Do you see that heading?

25   A.  Yes.

1    Q.  "Intel Corp., the global IT innovator, has been a leader

2    in direct employer healthcare action.  A decade ago its cost

3    trend was running above the national average and was

4    projected to reach $1 billion by 2012."

5            Do you see that?

6    A.  Yes, sir.

7    Q.  And, sir, it goes on to describe its experience in

8    Albuquerque, New Mexico.  That's the next paragraph.  "In

9    Albuquerque, New Mexico, the site of Intel's largest U.S.

10   semiconductor manufacturing plant, the company developed a

11   next generation health program in collaboration with

12   Presbyterian Health Services to create a benefit plan and

13   delivery system covering the company's 3,500 employees and

14   approximately 10,000 dependents."  Do you recall that?

15   A.  Yes.  Presbyterian is the largest health insurance in

16   Albuquerque so this just tells me that Intel has contracted

17   with a health insurance.

18   Q.  And, sir, just from the standpoint of critical mass, the

19   number of employees in this example of Intel was beneath

20   5,000 employees.  It was 3,500, correct?

21   A.  Yes, but it doesn't say anything in here about Intel

22   self-supplying health insurance.  It simply says that it's

23   migrated to consumer-directed health plans, which all the

24   major carriers offer.

25   Q.  As I understand your theory of harm from your direct

1    testimony, you're concerned in self-funded or self-insurance

2    with ASO fees, correct?

3    A.  I've defined the market more broadly to include full

4    insurance.  My concern is with all of the options that are

5    available to national accounts employers.

6    Q.  Fair enough.

7              So you're concerned with full insurance where

8    premiums are paid for the full financial risk of healthcare

9    costs as well as ASO fees, which are about 6 or 7 percent of

10   healthcare costs, right?

11   A.  The ASO fee includes with it the contract to get access

12   to healthcare, which is the other 94 percent, so the

13   employers are concerned about the whole healthcare dollar

14   either way.

15   Q.  Right.  But the 6 percent figure appears in your report,

16   does it not?

17   A.  I believe it might, yes.

18   Q.  All right.  So for Intel, if it was trending to spending

19   a billion dollars just in round numbers, the ASO fee for

20   Intel would be $60-$70 million, correct?

21   A.  If it was paying a 6 percent ASO fee, 6 percent of a

22   billion would be $60 million.

23   Q.  And if it were paying 7 percent, it would have been $70

24   million, right?

25   A.  Of course.

1   Q.  Now, you stated in your report in discussing direct

2   contracting that, quote, most employers are not so

3   geographically concentrated in certain cities, such as

4   Boeing in Seattle.  Do you see that?

5   A.  I'll go back to it, but that does ring a bell.

6   Q.  That's Footnote 141.

7   A.  Yes, sir.

8   Q.  And, sir, my next question is, you don't recall any

9   geographic analysis or study of the companies that you

10  describe as NA5 employers or NA5G employers giving, for

11  instance, the number of states on average that they operate

12  in, correct?

13  A.  That's correct.

14  Q.  And, sir, you also don't report any discounted cash flow

15  or financial modeling for the break-even point between

16  purchasing health insurance services ASO versus direct

17  contracting, correct?

18  A.  Given the lack of traction for direct contracting for

19  many decades and the lack of traction today, I don't have

20  to.  I know it's not an important source of competition.

21  Q.  And, therefore, you did not do that calculation,

22  correct?

23  A.  I did not do that calculation.

24  Q.  And, sir, you testified, quote, a large employer could

25  choose to direct-contract anywhere, did you not?

1    A.  In principle, an employer could choose to directly

2    contract with every individual physician.  It's a costly

3    endeavor, but, of course, it is an option.

4            MR. GIDLEY:  I'd like to put up, Brit and

5    Mr. Haley, the redacted version of Slide 28.  That's the

6    numerator "Use CID Enrollment Data," and it's got the

7    insurer names blacked out due to nonparty confidentiality.

8            THE COURT:  Mr. Haley doesn't exactly put them up.

9    All he can do is turn on the monitor.

10           MR. GIDLEY:  This can be on the public screen

11   because of the redaction.

12   Q.  Dr. Dranove, as you testified on direct, the 26

13   recipients of CIDs maintain their data in different buckets,

14   correct?

15   A.  That's correct.

16   Q.  Some did it by employees.  That is, they tracked their

17   customer employers by the number of employees, correct?

18   A.  Yes, it is.

19   Q.  And some did it by number of subscribers, correct?

20   A.  Yes.

21   Q.  Or they provided such granular data that you could

22   detect which subscriber -- which companies, which employers,

23   were greater than 2,885 subscribers, correct?

24   A.  Sometimes they reported the actual size of the employer.

25   Sometimes they reported the enrollees into employer buckets.

1   Q.  And then sometimes the recipient of the DOJ's CID

2   reported employers' size by eligible employees, correct?

3   A.  That's correct.

4   Q.  And sometimes they reported it by members, 5,000 plus

5   members as you see on this slide under "Data Used," correct?

6   A.  That's right.

7   Q.  All right.  Now, to homogenize, so to speak, or to make

8   uniform the data, you used census data, correct?

9   A.  Yes, that's correct.

10  Q.  And the name of the survey that you used was MEHPS,

11  correct?

12  A.  The Medical Expenditure Health Panel Survey.  I believe

13  that's what that stands for.

14  Q.  Right.  And it's conducted by the Census Bureau or

15  department on -- or bureau on behalf of HHS, correct?

16  A.  Health and human services, yes, I believe so.

17  Q.  And one of your calculations involves 2,885 subscribers.

18  Do you see that bucket?

19  A.  I'm not sure.  The wording of the question is kind of

20  confusing, but I do see that I end up using this number

21  2,885 subscribers, yes.

22  Q.  Let me make it easier for you.  Let's go to your

23  Appendix F where you give the various methodological

24  buckets, and I would direct your attention, sir, to Footnote

25  42 at Appendix F-11.  Are you there?

1   A.  You have to give me a moment.  Allow me to read that,

2   please.

3              Yes, I am.

4   Q.  All right.  And it states, "Per MEHPS, on average 57.7

5   percent of employees subscribe to health insurance.  Hence,

6   to translate from subscribers to employees, we calculate the

7   following:  5,000 employees times 57.7 percent equals 2,885

8   subscribers."  Do you see that?

9   A.  That's correct.

10  Q.  So that's where that number comes from, correct?

11  A.  That's right.

12  Q.  And that 57.7 percent, that's a MEHPS survey number,

13  correct?

14  A.  Yes, sir.

15  Q.  And that MEHPS survey number is done at a 1,000-employee

16  cutoff, correct?

17  A.  I don't recall what the MEHPS is using in order to

18  generate that.

19  Q.  Let me refresh your recollection.

20  A.  Actually, looking up, Footnote 41, I see where it is.

21             You have to forgive me.  With this many footnotes

22  throughout my report, my expert report, 150, 200 pages, I

23  don't remember exactly where each footnote is.

24  Q.  You report in Footnote 41, "MEHPS" -- and I'm skipping a

25  bit -- "indicates that on average that establishments with

1   1,000 or more employees that offer health insurance."

2   That's the way they do their survey, correct?

3   A.  Yes, of course.  I didn't recall the 1,000 threshold.

4   Q.  And then you gross that number up from 1,000 to 5,000.

5   That's how you get 2,885, correct?

6   A.  What I do is the following just to be clear because I'm

7   not sure your wording is the right way to describe the

8   calculation.  I want to know if you -- given how many

9   subscribers -- how many subscribers would it take for the

10  company to have 5,000 employees.

11          If, on average, roughly 58 percent of the

12  employees who take up health insurance end up becoming

13  subscribers, that it turns out if you had 2,885 subscribers,

14  that would be the equivalent of 5,000 employees.

15          Put it another way, 2885 divided by 35,000 is 58

16  percent.

17  Q.  And my only point being you're using a national average

18  and applying it to these companies to detect their national

19  account employers, correct?

20  A.  Yes.  So when more localized data is not available, we

21  use the national average because that's the best available.

22  Q.  Let's look at the bucket called "Eligible Employees."

23  That's what some of the companies who responded to your CIDs

24  reported.  And there you use 3,740.  Do you see that?

25  A.  Yes, that's correct.

1    Q.  It's in the far right row.

2         And that's based on a national survey result for

3    MEHPS of 74.8 percent of employees on average in the United

4    States being eligible for health insurance, correct?

5    A.  That's correct.

6    Q.  That's in your Footnote 43, correct?

7    A.  Yes, sir.

8    Q.  All right.  And my point is this:  The data that you

9    used for your market share calculation for national

10   accounts, you use group companies, carriers, that bucketed

11   their data at 3,000-plus eligible employees, correct?

12   A.  Yes, that's correct.

13   Q.  The calculation that you're basing that on, 74.8 percent

14   times 5,000 total employees, is 3,740 eligible employees in

15   Footnote 43, correct?

16   A.  Yes.  I would like to just take a moment to look at the

17   unredacted slide to refresh my memory about a point of fact.

18   I hope that's in here, Slide 28.  Yes, it is.

19        So in this particular case what's going on is we

20   are attributing -- because 3,740 is the correct cutoff, but

21   that's not how the data is reported.  We're dropping down to

22   3,000, which means we're taking companies that have between

23   3,000 and 3,740 eligible employees, which according to the

24   math don't have 5,000 employees.  By rights, they shouldn't

25   be included in the market share calculation, but because of

1    the way the data has been reported, we are including this.

2            It turns out that both of the insurers for whom we

3    are doing this are not amongst the big four.  So by doing

4    this, we're granting larger market shares to insurers

5    outside the big four.  We are, therefore, being generous and

6    being conservative in terms of how we report the impact of

7    the merger.

8    Q.  And between 3,000 and 3,740 eligible employees, you're

9    including what you otherwise define as large group

10   employers, correct?

11   A.  They're not national accounts, but they are large group

12   employers as I define them for Phase 2 of the trial, yes.

13   Q.  Right.  And large group employers are either 50 or 100

14   on up inclusive of national accounts, right?  Basically the

15   sky's the limit on local large groups, right?

16   A.  That's correct.

17   Q.  Every national account is a local large group account,

18   correct?  It would fit in those geographies where we have

19   local large accounts, right?

20   A.  Every national account in the locations where they have

21   a sufficient number of employees is a local account.

22   Q.  Then in your final box, you've got employers with 5,000

23   plus employees that have 6,607 members.  Do you see that?

24   A.  Yes, I do.

25   Q.  And, again, this is a MEHPS calculation that's found at

1  Footnote 44, correct?

2  A.  Yes, and that's again through a combination of census

3  data.

4  Q.  Oh, I'm sorry, it's ACS so it's a different census.

5  A.  So MEHPS and the American Community Survey.

6  Q.  And the ACS survey says on average there are 2.29

7  members per subscriber, correct?

8  A.  Yes.

9  Q.  And then multiplying 2,885 subscribers, your earlier

10  number from the MEHPS survey, times 2.29 members per the ACS

11  survey, yields the number 6,607 members, correct?

12  A.  That's right.

13  Q.  And between an employer that's got 5,000 members up to

14  6,607, say 5,200 members, that would be in the Anthem

15  territories a local large group company employer that you've

16  included in NA5 and NA5G, correct?

17  A.  And to be clear, if you have 5,200 members, you should

18  not, based on the survey data, scale up to 5,000 employees.

19  After all the members include the dependents.  So I'm being

20  generous.  I'm including more business in my national

21  accounts than by rights I ought to because the survey data

22  has -- the way the data's been reported by the companies

23  kind of forces my hand here.

24          But these, again, are two companies that are not

25  amongst the big four, so by doing it this way I'm expanding

1    the enrollments potentially quite substantially.  Given the

2    gap in the threshold 6,600 and the bucketing of 5,000, I'm

3    expanding the enrollment of two companies that are not

4    amongst the big four and thereby increasing their parent

5    competitive significance in my market share calculations.

6    Q.  Let's talk about any commercial health insurance company

7    in the United States just in the abstract on the data that

8    they possess.

9              THE COURT:  Is this a logical breaking point, or

10   is this just a one- or two-question -- or are you moving

11   into a --

12             MR. GIDLEY:  It probably turns into ten questions,

13   Your Honor, so this might be a great break.

14             THE COURT:  I think so.  All right.

15             You'll be back tomorrow.  We'll all be back

16   tomorrow.  We'll start at 9:30.  We'll pick up the cross-

17   examination at that time.

18             I don't have anything else on the calendar, do I?

19             THE COURTROOM DEPUTY:  Not tomorrow, Your Honor.

20             THE COURT:  All right.  You can all be excused.

21                  (Whereupon the hearing was

22                   adjourned at 5:30 p.m.)

23

24

25

1

**CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 28th day of November, 2016.

9

10                                    /s/Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
11                                    United States Courthouse
                                      Room 6718
12                                    333 Constitution Avenue, NW
                                      Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

1068

## $

**$117** [1] - 1036:24
**$150** [1] - 961:14
**$157** [2] - 1036:15, 1036:17
**$200** [1] - 960:13
**$38** [2] - 1036:20, 1036:23
**$400** [1] - 960:14
**$60** [1] - 1057:22
**$60-$70** [1] - 1057:20
**$70** [1] - 1057:23
**$79** [2] - 1036:20, 1036:23
**$800** [1] - 961:14
**$900** [1] - 960:17

## '

**'00s** [1] - 966:19
**'15** [1] - 974:17
**'16** [1] - 974:17
**'17** [1] - 974:17
**'70s** [1] - 974:13
**'90s** [1] - 966:18
**'national** [3] - 1046:5, 1048:18, 1049:17

## /

**/s/Lisa** [1] - 1067:10

## 0

**0004** [1] - 1046:2

## 1

**1** [22] - 943:23, 946:23, 951:22, 952:2, 952:15, 952:17, 955:18, 955:19, 956:9, 957:11, 957:12, 957:13, 958:2, 958:5, 1021:19, 1028:5, 1030:8, 1056:4
**1,000** [5] - 1047:4, 1048:19, 1062:1, 1062:3, 1062:4
**1,000-employee** [1] - 1061:15
**1,100** [1] - 946:22
**10** [6] - 937:20, 954:6, 954:8, 954:24, 1045:12, 1045:17
**10,000** [2] - 937:25, 1056:14
**100** [5] - 937:24, 959:4, 972:22,

1064:13
**107** [2] - 1042:19, 1042:20
**10K** [4] - 1043:16, 1044:8, 1044:21, 1045:7
**11** [1] - 1045:24
**12** [2] - 1025:16, 1046:23
**127** [2] - 1043:8, 1043:14
**13** [3] - 1039:8, 1039:13, 1047:23
**1300** [1] - 934:3
**130004** [1] - 1046:2
**13th** [1] - 934:9
**14** [8] - 1024:11, 1024:12, 1038:14, 1041:14, 1041:19, 1048:11, 1055:7, 1055:9
**14-state** [1] - 1024:6
**141** [2] - 1054:9, 1058:6
**15** [5] - 938:16, 1005:18, 1020:9, 1025:16, 1049:10
**150** [1] - 1061:22
**16** [3] - 1020:9, 1049:8, 1049:10
**16-CV-1493** [1] - 933:3
**17** [2] - 954:9, 1055:16
**180** [2] - 975:7, 987:24
**19.8** [1] - 1034:5
**1930s** [2] - 964:14, 978:8
**1932** [1] - 964:18
**1970s** [1] - 965:6
**1980s** [3] - 965:14, 967:17, 971:20
**1990s** [4] - 965:14, 966:1, 966:10, 974:15

## 2

**2** [20] - 943:23, 951:22, 952:3, 952:15, 952:17, 955:18, 955:19, 956:9, 957:12, 957:13, 957:14, 958:2, 958:5, 962:9, 962:12, 1064:12
**2,100** [1] - 941:20
**2,463** [1] - 941:15
**2,483** [1] - 941:19
**2,499** [1] - 940:4
**2,500** [4] - 939:13, 939:22, 940:5, 940:6

**2,501** [1] - 940:4
**2,800** [1] - 941:22
**2,885** [7] - 1059:23, 1060:17, 1060:21, 1061:7, 1062:5, 1062:13, 1065:9
**2,900** [1] - 941:22
**2.29** [2] - 1065:6, 1065:10
**20** [10] - 938:16, 1034:3, 1035:1, 1035:2, 1035:22, 1035:24, 1036:2, 1036:4, 1036:9, 1041:20
**200** [2] - 939:17, 1061:22
**20001** [3] - 933:21, 934:18, 1067:12
**20005-3807** [1] - 934:9
**20006-1047** [1] - 934:13
**2001** [1] - 934:13
**2004** [1] - 1000:20
**2005** [1] - 971:18
**2006** [1] - 1037:17
**2008** [1] - 1001:2
**2010** [1] - 1001:6
**2012** [1] - 1056:4
**2013** [1] - 954:3
**2014** [1] - 974:17
**2015** [12] - 954:22, 1018:19, 1018:22, 1021:3, 1031:4, 1031:7, 1031:19, 1034:2, 1034:5, 1036:3, 1036:16, 1044:21
**2016** [5] - 933:6, 1045:25, 1046:24, 1055:19, 1067:8
**2017** [1] - 954:22
**202** [3] - 933:18, 934:10, 934:14
**202-354-3267** [1] - 934:19
**20530** [1] - 933:17
**21** [3] - 1025:16, 1048:11, 1048:13
**223-7300** [1] - 934:14
**2500** [3] - 940:7, 940:14, 941:6
**26** [3] - 1049:24, 1052:11, 1059:12
**27** [3] - 1047:24, 1049:24
**28** [6] - 933:6, 1035:23, 1035:24, 1036:6, 1059:5, 1063:18

**2885** [1] - 1062:15
**28th** [1] - 1067:8
**29** [1] - 1046:24
**2:17** [1] - 933:6
**2A** [1] - 952:17

## 3

**3** [7] - 957:14, 957:21, 962:9, 962:12, 1016:5
**3,000** [11] - 941:16, 992:12, 1042:11, 1042:25, 1043:12, 1044:1, 1045:21, 1046:21, 1063:22, 1063:23, 1064:8
**3,000-plus** [2] - 1042:12, 1063:11
**3,500** [2] - 1056:13, 1056:20
**3,740** [5] - 1062:24, 1063:14, 1063:20, 1063:23, 1064:8
**31** [1] - 1042:20
**32** [2] - 1042:19, 1042:22
**33** [11] - 1021:15, 1022:2, 1022:13, 1023:9, 1023:10, 1024:6, 1025:15, 1026:25, 1031:7, 1031:18, 1033:7
**333** [2] - 934:18, 1067:12
**34** [1] - 1054:10
**35** [14] - 955:1, 1015:14, 1021:15, 1023:9, 1023:10, 1023:13, 1024:3, 1026:25, 1031:7, 1031:19, 1033:7, 1037:23, 1038:2, 1038:9
**35,000** [1] - 1062:15
**3K** [1] - 1046:11, 1046:21
**3K-plus** [2] - 1046:11, 1046:21

## 4

**4** [5] - 1016:5, 1030:4, 1030:14, 1045:25, 1047:1
**4,000** [1] - 992:13
**40** [5] - 953:6, 953:7, 953:9, 1024:18, 1025:10
**41** [5] - 1024:17, 1025:10, 1026:24,

1061:20, 1061:24
**4100** [1] - 933:17
**42** [1] - 1060:25
**43** [3] - 953:11, 1063:6, 1063:15
**44** [3] - 953:11, 954:17, 1065:1
**441** [1] - 933:20
**45** [1] - 1024:1
**450** [1] - 933:16
**46** [2] - 1039:6, 1039:12
**49** [4] - 1024:19, 1025:10, 1026:24, 1034:25
**4th** [1] - 933:20

## 5

**5** [6] - 1022:10, 1023:3, 1037:17, 1044:24, 1050:22, 1055:21
**5,000** [25] - 938:2, 941:14, 1022:5, 1022:11, 1022:12, 1022:13, 1024:17, 1024:18, 1026:17, 1036:5, 1044:25, 1049:7, 1049:12, 1056:20, 1060:4, 1061:7, 1062:4, 1062:10, 1062:14, 1063:14, 1063:24, 1064:22, 1065:13, 1065:18, 1066:2
**5,000-plus** [1] - 1044:2
**5,200** [2] - 1065:14, 1065:17
**50** [4] - 1016:15, 1016:18, 1033:24, 1064:13
**51** [2] - 1044:10, 1044:18
**537** [1] - 941:17
**54** [1] - 954:19
**57** [1] - 1033:18
**57.3** [1] - 1033:4
**57.7** [3] - 1061:4, 1061:7, 1061:12
**58** [2] - 1062:11, 1062:15
**598-8916** [1] - 933:18
**5:30** [1] - 1066:22

## 6

**6** [6] - 1027:3, 1038:15, 1057:9, 1057:15, 1057:21
**6,600** [1] - 1066:2

**6,607** [3] - 1064:23, 1065:11, 1065:14
**60** [1] - 953:14
**626-3600** [1] - 934:10
**630** [1] - 933:20
**6718** [2] - 934:17, 1067:11

**7**

**7** [3] - 1042:5, 1057:9, 1057:23
**70** [2] - 964:12, 1032:17
**701** [1] - 934:9
**74** [2] - 1031:22, 1033:18
**74.6** [1] - 1031:23
**74.8** [2] - 1063:3, 1063:13
**75** [2] - 1032:14, 1033:24
**78** [2] - 1033:13, 1033:20

**8**

**8** [8] - 1025:11, 1025:12, 1027:3, 1035:23, 1035:24, 1036:3, 1036:4, 1042:7
**80** [3] - 964:13, 996:20, 1032:17
**800** [1] - 941:23
**80203** [1] - 934:4
**8A** [2] - 1050:22, 1050:24

**9**

**9** [6] - 1025:11, 1025:12, 1036:9, 1044:6, 1044:16, 1044:17
**94** [1] - 1057:12
**9:30** [1] - 1066:16
**9th** [1] - 1055:11

**A**

**Abbott's** [1] - 947:1
**Abigail** [1] - 934:2
**ability** [8] - 944:10, 988:23, 991:8, 997:18, 997:23, 1014:1, 1033:18, 1067:7
**able** [25] - 938:13, 948:10, 949:7, 963:17, 966:16,

969:16, 973:1, 974:7, 981:11, 981:12, 985:15, 986:1, 987:23, 988:5, 994:18, 1003:12, 1003:25, 1008:15, 1010:1, 1010:4, 1017:2, 1032:7, 1032:20, 1035:11, 1049:6
**absence** [1] - 983:22
**absolutely** [3] - 982:3, 987:6, 1040:12
**absorb** [1] - 1040:4
**abstract** [1] - 1066:7
**abuses** [1] - 965:18
**accept** [3] - 1014:15, 1032:5, 1032:25
**access** [2] - 991:19, 1057:11
**accomplish** [1] - 1003:18
**accomplished** [1] - 1003:18
**according** [3] - 968:5, 982:19, 1063:23
**Account** [1] - 1026:17
**account** [27] - 940:19, 942:7, 945:1, 947:22, 948:13, 987:5, 993:4, 995:11, 995:23, 996:6, 996:7, 1005:3, 1041:23, 1042:24, 1044:5, 1046:6, 1047:3, 1047:25, 1051:10, 1051:14, 1052:9, 1053:3, 1062:19, 1064:17, 1064:20, 1064:21
**account-specific** [1] - 947:22
**accountable** [10] - 966:4, 973:20, 974:12, 976:5, 976:6, 976:8, 976:10, 976:11, 976:12, 997:14
**accounts** [53] - 944:11, 945:4, 945:13, 945:16, 946:17, 946:20, 947:23, 970:16, 987:6, 990:16, 993:15, 993:19, 996:23, 997:7, 997:9, 1002:7, 1004:16, 1004:19, 1005:9, 1014:12,

1015:22, 1016:19, 1022:5, 1024:3, 1031:19, 1036:5, 1042:4, 1042:11, 1042:15, 1043:13, 1043:19, 1043:23, 1043:25, 1044:1, 1044:22, 1045:20, 1046:10, 1047:3, 1047:9, 1050:24, 1051:2, 1051:5, 1051:6, 1051:17, 1053:3, 1057:5, 1063:10, 1064:11, 1064:14, 1064:19, 1065:21
**Accounts** [3] - 1022:10, 1022:11, 1045:17
**accounts'** [2] - 1046:5, 1049:18
**accurate** [1] - 1067:5
**accurately** [1] - 962:15
**achieve** [5] - 982:8, 1008:16, 1008:17, 1010:1
**achieved** [1] - 1013:6
**achieving** [2] - 949:18, 951:3
**acknowledge** [3] - 1018:9, 1018:13, 1039:18
**acknowledges** [1] - 1040:24
**ACO** [2] - 977:8, 977:9
**ACOs** [4] - 976:15, 976:17, 977:12, 979:23
**acquired** [6] - 938:16, 968:24, 992:17, 1000:19, 1000:20, 1003:20
**acquiring** [2] - 963:9, 1010:2
**acquisition** [1] - 1010:7
**ACS** [3] - 1065:4, 1065:6, 1065:10
**Act** [2] - 1016:12, 1016:14, 1017:4
**Action** [1] - 933:3
**action** [1] - 1056:2
**actionable** [1] - 982:22
**active** [1] - 945:7
**actual** [6] - 947:21, 981:20, 1005:2, 1020:6, 1046:18, 1059:24
**actuality** [1] - 953:12
**ad** [1] - 1047:10

**add** [5] - 937:21, 941:18, 996:14, 1027:21, 1038:8
**added** [1] - 963:4
**adding** [7] - 972:7, 972:8, 1035:22, 1035:24, 1036:4, 1036:23, 1038:2
**addition** [3] - 946:18, 974:4, 990:24
**additional** [3] - 958:15, 990:25, 1025:1
**addressing** [2] - 967:11, 1012:3
**adjourned** [1] - 1066:22
**adjusting** [1] - 955:2
**administration** [1] - 961:19
**administrative** [1] - 946:8
**admits** [1] - 1038:25
**admitted** [1] - 1026:8
**admittedly** [1] - 996:5
**adopt** [1] - 989:2
**adopting** [1] - 965:25
**advantage** [1] - 971:14
**Aetna** [14] - 938:16, 944:25, 947:13, 948:24, 967:2, 968:23, 974:2, 974:18, 974:25, 980:5, 1025:16, 1027:6, 1027:16, 1038:14
**affect** [13] - 936:15, 943:24, 957:1, 957:15, 986:18, 987:6, 988:23, 990:5, 990:6, 994:22, 998:3, 1008:8, 1016:22
**affected** [3] - 936:15, 1043:18, 1043:22
**affects** [4] - 955:17, 963:6, 963:8, 970:1
**Affordable** [3] - 1016:12, 1016:14, 1017:4
**AFTERNOON** [1] - 933:5
**afternoon** [4] - 936:6, 936:7, 1018:3, 1018:4
**agencies** [2] - 1037:16, 1037:22
**agency** [1] - 964:19
**aggregate** [1] - 1026:5
**aggregated** [1] -

1031:14
**aggressive** [3] - 994:19, 1001:16, 1001:19
**aggressively** [5] - 963:21, 991:18, 994:14, 995:9, 1000:5
**aggressiveness** [1] - 996:8
**ago** [6] - 938:16, 949:19, 974:3, 1005:19, 1054:23, 1056:2
**agree** [2] - 961:24, 1040:11
**agreed** [3] - 1034:22, 1035:7
**aided** [1] - 933:23
**al** [1] - 933:3
**Alabama** [2] - 1025:4, 1028:6
**albeit** [1] - 1000:22
**Albuquerque** [3] - 1056:8, 1056:9, 1056:16
**alliance** [2] - 975:20, 976:19
**allow** [7] - 957:23, 958:6, 969:19, 971:16, 972:10, 985:11, 1061:1
**allowed** [6] - 971:25, 974:22, 977:17, 1035:14, 1045:1, 1048:5
**allows** [1] - 954:14
**almost** [2] - 955:1, 1016:15
**alone** [9] - 953:9, 953:10, 953:24, 954:11, 954:23, 958:2, 1052:12, 1052:14, 1052:19
**alternative** [3] - 941:2, 951:3, 972:1
**alternatives** [1] - 948:3
**ambiguous** [2] - 968:7, 968:17
**America** [1] - 933:3
**American** [1] - 1065:5
**amount** [13] - 938:18, 938:19, 950:21, 951:2, 960:8, 961:7, 993:18, 993:22, 993:25, 996:9, 998:7, 998:13, 1012:24
**ample** [1] - 948:6

**AMY** [1] - 933:10
**analogous** [2] - 1011:18, 1055:7
**analogy** [1] - 1010:11
**analyses** [3] - 960:3, 974:9, 1034:17
**analysis** [28] - 936:8, 936:11, 936:13, 936:25, 937:4, 937:5, 937:13, 937:14, 942:5, 942:10, 942:13, 943:6, 944:1, 947:16, 951:5, 953:22, 954:12, 956:5, 956:12, 956:14, 957:4, 957:25, 958:11, 963:11, 964:5, 985:20, 991:22, 1058:9
**analyze** [1] - 988:7
**analyzed** [1] - 992:23
**analyzing** [4] - 969:11, 989:8, 990:13, 1008:4
**anecdotal** [1] - 948:13
**Anne** [1] - 933:19
**announced** [1] - 1021:3
**answer** [3] - 963:5, 1039:21, 1040:3
**Anthem** [208] - 933:6, 934:5, 936:10, 936:23, 940:16, 943:23, 944:25, 947:18, 947:23, 947:25, 948:2, 948:9, 949:5, 949:14, 950:6, 951:7, 951:9, 951:16, 951:22, 952:3, 952:4, 952:15, 952:16, 952:17, 952:25, 953:3, 953:5, 953:7, 953:9, 953:11, 953:14, 953:17, 954:3, 954:7, 954:16, 954:18, 954:20, 954:22, 954:25, 955:2, 955:4, 955:15, 955:18, 955:20, 955:21, 955:22, 955:24, 956:23, 957:11, 960:16, 961:1, 961:7, 961:8, 962:24, 963:4, 963:9, 963:13,

963:17, 963:21, 968:24, 969:3, 973:5, 980:4, 980:5, 981:4, 981:21, 982:15, 982:18, 982:21, 982:24, 983:5, 983:6, 983:8, 983:11, 983:21, 983:24, 984:1, 984:25, 985:7, 987:5, 987:7, 990:18, 990:21, 990:24, 991:14, 991:15, 992:20, 992:21, 992:25, 993:3, 993:5, 993:9, 993:12, 993:18, 993:20, 994:12, 994:15, 994:18, 994:23, 994:24, 995:10, 995:13, 995:16, 995:18, 995:23, 995:24, 996:4, 996:6, 996:20, 996:22, 997:10, 997:11, 997:15, 998:3, 998:5, 998:7, 998:10, 998:22, 998:24, 998:25, 999:3, 999:16, 999:18, 1000:2, 1000:5, 1000:6, 1000:17, 1000:18, 1000:19, 1000:25, 1001:14, 1001:16, 1001:18, 1001:22, 1010:2, 1013:16, 1013:24, 1014:12, 1014:13, 1014:15, 1014:16, 1014:18, 1014:22, 1014:23, 1016:6, 1017:16, 1017:18, 1018:9, 1018:15, 1019:14, 1019:16, 1020:8, 1020:17, 1023:8, 1024:5, 1024:6, 1024:9, 1024:10, 1024:14, 1024:16, 1024:22, 1024:24, 1024:25, 1025:8, 1025:13, 1026:5, 1027:14, 1027:15, 1028:1, 1028:5, 1028:6, 1028:17, 1028:19, 1028:20, 1029:8, 1029:13, 1030:16, 1034:2, 1034:5, 1035:12, 1036:2, 1036:20,

1038:3, 1038:13, 1038:19, 1041:19, 1041:24, 1043:16, 1044:23, 1045:6, 1048:12, 1048:23, 1049:1, 1049:5, 1055:8, 1055:9, 1065:14
**Anthem's** [29] - 947:25, 948:8, 949:17, 953:10, 954:2, 954:16, 954:21, 955:8, 971:17, 976:14, 976:25, 979:8, 979:23, 980:13, 981:17, 982:13, 982:23, 984:3, 995:8, 996:5, 997:21, 1011:23, 1013:17, 1028:1, 1028:22, 1029:21, 1038:8, 1044:5, 1044:21
**Anthem/Cigna** [1] - 969:5
**anticompetitive** [5] - 939:18, 964:2, 1008:18, 1008:19, 1013:14
**antitrust** [1] - 999:21
**Antitrust** [1] - 933:16
**apart** [1] - 1006:19
**appeal** [1] - 950:3
**appealing** [1] - 949:5
**appear** [2] - 1029:9, 1033:7
**appendices** [1] - 1025:21, 1028:23, 1029:8
**Appendix** [3] - 1022:17, 1060:23, 1060:25
**apples** [4] - 1044:4, 1046:19
**apples-to-apples** [2] - 1044:4, 1046:19
**application** [1] - 1003:21
**applied** [2] - 989:8, 990:13
**apply** [5] - 941:24, 992:13, 1002:10, 1013:9, 1049:7
**applying** [2] - 939:11, 1062:18
**appointments** [1] - 967:21
**appreciate** [1] - 1040:19

**approach** [13] - 951:19, 955:10, 967:11, 972:15, 974:12, 974:14, 976:25, 979:11, 980:14, 982:16, 987:22, 1012:10, 1034:11
**approached** [1] - 1015:24
**approaches** [5] - 949:22, 949:25, 957:9, 957:10, 976:14
**appropriability** [6] - 969:16, 984:6, 985:21, 985:23, 985:24, 987:22
**appropriate** [1] - 961:7
**approximate** [1] - 959:1
**area** [6] - 1011:1, 1018:15, 1044:23, 1047:4, 1047:5, 1048:1
**areas** [1] - 938:17
**argue** [2] - 941:2, 985:23
**arguing** [1] - 1047:19
**arguments** [1] - 1006:20
**arisen** [1] - 1001:5
**arrangements** [8] - 973:20, 975:5, 975:8, 977:9, 984:16, 985:4, 985:14, 997:24
**art** [1] - 943:8
**ascribe** [2] - 1038:21, 1046:16
**aside** [2] - 941:25, 1049:22
**ASO** [28] - 937:7, 939:5, 939:6, 939:9, 939:10, 940:25, 941:2, 941:13, 941:21, 945:3, 960:21, 961:24, 961:25, 962:5, 1024:2, 1038:25, 1039:7, 1039:19, 1039:22, 1039:23, 1040:22, 1041:1, 1057:2, 1057:9, 1057:11, 1057:19, 1057:21, 1058:16
**ASO-only** [1] - 941:2
**ASOs** [1] - 978:4
**assembling** [1] - 970:12

**assessment** [4] - 948:21, 948:22, 1006:13, 1006:23
**assigned** [2] - 990:20, 992:10
**assists** [1] - 1021:19
**associated** [2] - 1008:19, 1009:16
**Association** [1] - 1055:19
**association** [3] - 994:17, 998:25, 1001:2
**assuming** [1] - 959:4
**assumptions** [3] - 962:9, 962:10, 1014:11
**attempt** [1] - 956:20
**attempted** [1] - 983:8
**attempts** [1] - 1005:3
**attention** [21] - 1021:7, 1030:16, 1030:21, 1037:15, 1038:12, 1042:5, 1042:16, 1043:7, 1043:16, 1045:12, 1045:15, 1045:16, 1045:24, 1046:25, 1047:13, 1047:23, 1050:20, 1054:9, 1055:16, 1055:20, 1060:24
**ATTORNEY** [2] - 933:19, 934:2
**attributing** [2] - 961:6, 1063:20
**auction** [26] - 943:1, 943:4, 943:5, 943:8, 943:9, 943:10, 943:11, 943:15, 943:16, 943:20, 943:25, 944:20, 945:14, 951:21, 955:17, 957:15, 958:17, 958:20, 958:21, 958:25, 959:2, 959:3, 959:7, 959:21, 963:12
**auctions** [4] - 943:7, 956:25, 957:1, 958:22
**August** [2] - 1018:18, 1021:3
**available** [9] - 951:6, 952:23, 956:11, 958:9, 975:14, 1057:5, 1062:20, 1062:21
**Avenue** [2] - 934:18, 1067:12
**average** [12] - 971:12,

992:3, 992:8,
1056:3, 1058:11,
1061:4, 1061:25,
1062:11, 1062:17,
1062:21, 1063:3,
1065:6
**avoid** [2] - 939:2,
1007:16
**awarded** [1] - 942:23

## B

**back-up** [5] - 1029:14,
1029:18, 1029:23,
1030:15, 1033:12
**backlash** [1] - 965:15
**bad** [2] - 1009:11,
1016:5
**ballpark** [3] - 992:14,
1033:20, 1037:14
**bar** [6] - 941:5, 941:6,
941:8, 953:12,
960:6, 960:7
**barely** [1] - 1016:14
**barrier** [1] - 1006:17
**barriers** [1] - 1004:18
**bars** [5] - 940:24,
941:1, 941:4,
953:25, 960:2
**base** [1] - 1006:18
**based** [23] - 948:17,
949:17, 949:20,
949:21, 950:7,
950:19, 953:8,
953:10, 954:5,
959:10, 959:13,
959:21, 968:17,
973:8, 987:15,
1003:21, 1013:22,
1045:1, 1047:3,
1047:17, 1050:6,
1063:2, 1065:18
**baseline** [1] - 960:11
**bases** [1] - 949:6
**basic** [1] - 962:3
**basing** [1] - 1063:13
**basis** [4] - 944:24,
1028:3, 1033:10,
1046:15
**Bates** [1] - 1046:2
**Bates-numbered** [1] -
1046:2
**BCBS** [4] - 1028:6,
1028:7
**bear** [2] - 1012:25,
1021:22
**bearing** [1] - 972:19
**became** [2] - 952:10,
971:21
**become** [7] - 963:2,

985:18, 997:21,
1005:16, 1006:10,
1014:5, 1053:4
**becomes** [5] - 957:14,
957:21, 987:10,
997:21, 1013:16
**becoming** [4] -
997:18, 1006:3,
1006:4, 1062:12
**BEFORE** [1] - 933:10
**beginning** [2] -
970:23, 1042:20
**behalf** [1] - 1060:15
**behavior** [2] - 938:21,
971:3
**behind** [1] - 1044:15
**bell** [1] - 1058:5
**bells** [1] - 971:13
**below** [2] - 940:7,
1038:9
**bench** [2] - 1034:13,
1035:20
**Bench** [1] - 933:4
**BENCH** [1] - 933:9
**benchmarks** [2] -
936:16, 936:18
**bend** [7] - 964:13,
965:20, 966:2,
967:10, 977:3,
986:21, 987:2
**bending** [2] - 976:1,
986:19
**beneath** [1] - 1056:19
**benefit** [5] - 972:3,
972:13, 972:17,
1030:3, 1056:12
**benefits** [8] - 942:15,
946:21, 982:2,
985:25, 986:7,
997:12, 1007:21,
1008:20
**BERMAN** [1] - 933:10
**best** [29] - 938:11,
943:3, 943:14,
949:18, 950:1,
964:3, 971:23,
973:9, 980:20,
980:23, 980:24,
981:1, 981:8,
981:11, 981:21,
989:3, 992:2,
994:14, 994:17,
994:21, 996:16,
997:4, 1012:2,
1012:9, 1013:9,
1013:21, 1062:21,
1067:6
**best-case** [4] - 980:23,
980:24, 981:1,
981:21

**better** [7] - 948:11,
950:24, 963:17,
972:5, 990:3, 995:4,
1006:6
**between** [19] - 943:12,
943:19, 947:23,
957:9, 957:19,
962:9, 962:12,
962:14, 963:7,
993:11, 1019:14,
1019:16, 1020:8,
1025:9, 1033:13,
1058:15, 1063:22,
1064:8, 1065:13
**beyond** [3] - 936:22,
998:20, 1006:10
**biased** [2] - 1012:14,
1012:16
**biases** [1] - 1015:11
**bid** [10] - 953:13,
958:20, 958:24,
963:17, 963:18,
963:19, 963:21,
1019:5, 1019:6,
1020:15
**bid-rigging** [3] -
1019:5, 1019:6,
1020:15
**bidder** [3] - 943:3,
943:18, 952:11
**bidders** [6] - 943:12,
943:15, 943:19,
952:12, 959:9,
962:14
**bidding** [4] - 943:2,
943:3, 943:8, 952:25
**bids** [8] - 948:8, 948:9,
951:24, 955:15,
955:20, 955:21,
959:17, 1000:5
**Bierbower** [2] -
1004:22, 1005:7
**big** [29] - 944:18,
945:19, 945:20,
945:21, 945:22,
946:4, 946:19,
962:5, 964:1, 965:6,
971:22, 990:17,
1003:7, 1003:13,
1004:1, 1004:10,
1005:16, 1006:11,
1007:5, 1007:23,
1010:12, 1040:25,
1041:4, 1041:7,
1050:25, 1064:3,
1064:5, 1065:25,
1066:4
**bigger** [9] - 939:2,
962:3, 962:19,
963:11, 963:23,

963:24, 985:25,
988:5, 1007:23
**biggest** [4] - 945:7,
1006:5, 1046:16,
1052:2
**bill** [1] - 965:16
**billion** [12] - 1036:15,
1036:17, 1036:18,
1036:19, 1036:20,
1036:23, 1036:24,
1056:4, 1057:19,
1057:22
**Binder** [1] - 1030:7
**binder** [9] - 994:8,
1007:18, 1021:18,
1021:19, 1030:3,
1030:5, 1030:6,
1030:15, 1055:17
**bit** [8] - 941:19,
947:14, 996:16,
1021:24, 1039:2,
1042:3, 1049:18,
1061:25
**blacked** [1] - 1059:7
**bled** [1] - 997:21
**block** [1] - 998:13
**Blue** [34] - 968:14,
991:6, 992:5, 992:6,
993:9, 995:3, 995:4,
995:6, 995:10,
995:12, 995:18,
995:23, 996:4,
996:6, 996:21,
996:24, 997:7,
997:9, 997:13,
998:7, 999:18,
1000:5, 1000:6,
1014:13, 1020:16,
1024:7, 1028:7,
1028:8, 1028:9,
1028:11, 1028:20
**blue** [12] - 941:6,
941:7, 941:10,
960:2, 960:6, 960:7,
960:18, 961:4,
961:5, 961:22,
961:23
**BlueCard** [8] - 995:5,
995:24, 996:2,
997:25, 998:3,
998:5, 1000:7,
1028:10
**BlueCards** [1] - 991:8
**blues** [1] - 941:9
**Blues** [45] - 947:12,
965:7, 971:18,
971:22, 990:19,
991:5, 991:10,
991:14, 991:15,
992:9, 992:16,

993:12, 993:13,
994:12, 994:23,
994:25, 995:7,
995:16, 998:20,
998:24, 999:1,
999:15, 1000:2,
1001:3, 1001:7,
1001:15, 1001:20,
1018:5, 1018:14,
1020:18, 1020:23,
1023:10, 1023:24,
1023:25, 1024:8,
1024:15, 1025:6,
1025:7, 1025:8,
1025:12, 1028:2,
1028:16, 1038:2,
1041:20
**BlueShield** [1] -
1018:10
**blurting** [1] - 1042:18
**bode** [1] - 978:15
**bodies** [1] - 1004:23
**Boeing** [5] - 1054:12,
1054:16, 1055:3,
1055:7, 1058:4
**boils** [1] - 957:19
**book** [1] - 1039:24
**bottom** [4] - 940:23,
950:1, 959:19,
963:20
**bottom-line** [1] - 950:1
**bounty** [4] - 947:25,
948:14, 948:19
**box** [1] - 1064:22
**brain** [1] - 1033:23
**brand** [10] - 944:10,
991:7, 995:3,
996:21, 996:25,
1000:21, 1001:16,
1004:6, 1004:11
**branded** [1] - 1000:18
**breach** [3] - 1019:15,
1020:1, 1021:2
**bread** [1] - 1010:17
**break** [4] - 989:12,
1005:8, 1058:15,
1066:13
**break-even** [1] -
1058:15
**breaking** [1] - 1066:9
**breed** [1] - 988:1
**brief** [4] - 942:11,
966:24, 966:25,
1034:9
**briefly** [5] - 936:10,
942:7, 953:25,
961:21, 977:24
**bright** [1] - 940:3
**bring** [1] - 944:6
**bringing** [2] - 966:15,

992:20
**brings** [1] - 966:20
**Brit** [2] - 1050:23,
1059:4
**broad** [2] - 944:9,
971:8
**broader** [1] - 989:8
**broadly** [1] - 1057:3
**Broadway** [1] - 934:3
**broken** [1] - 1038:11
**broker** [2] - 1004:13,
1045:1
**brought** [3] - 1012:24,
1021:7, 1040:5
**bucket** [2] - 1060:18,
1062:22
**bucketed** [1] - 1063:10
**bucketing** [1] - 1066:2
**buckets** [3] - 1059:13,
1059:25, 1060:24
**build** [1] - 1053:4
**bunch** [1] - 1017:3
**burden** [1] - 946:8
**Bureau** [1] - 1060:14
**bureau** [1] - 1060:15
**Burke** [1] - 934:6
**business** [33] - 943:3,
945:1, 945:7,
945:13, 953:8,
966:6, 966:9,
980:14, 984:13,
993:9, 993:18,
993:21, 993:22,
994:24, 1002:1,
1002:2, 1009:23,
1009:24, 1010:2,
1010:8, 1010:9,
1011:4, 1011:7,
1011:11, 1011:14,
1015:7, 1039:2,
1039:3, 1039:25,
1041:2, 1041:3,
1054:1, 1065:20
**butter** [1] - 1010:17
**buy** [3] - 945:10,
966:5, 980:24
**buyer** [1] - 958:23
**buying** [2] - 958:24,
1053:24
**BY** [3] - 990:8, 1018:2,
1035:21

# C

**caboodle** [1] - 1053:25
**calculate** [5] - 950:8,
1013:21, 1023:1,
1050:6, 1061:6
**calculated** [8] -
940:12, 947:9,

947:10, 950:5,
957:24, 1028:22,
1032:12, 1032:25
**calculating** [4] -
957:20, 991:23,
1011:5, 1046:15
**calculation** [14] -
956:13, 1015:3,
1015:5, 1022:4,
1024:1, 1032:2,
1035:10, 1058:21,
1058:23, 1062:8,
1063:9, 1063:13,
1063:25, 1064:25
**calculations** [11] -
941:12, 963:1,
991:25, 1029:1,
1031:6, 1033:6,
1034:20, 1035:8,
1054:3, 1060:17,
1066:5
**calendar** [1] - 1066:18
**California** [7] - 976:16,
1018:10, 1018:11,
1020:18, 1028:10,
1028:11
**canceling** [1] - 1000:7
**candidates** [1] -
1006:5
**capabilities** [3] -
986:3, 986:12,
1003:9
**capital** [1] - 1003:8
**capture** [2] - 969:17,
985:24
**capturing** [1] - 986:7
**Care** [4] - 1016:12,
1016:14, 1017:4,
1055:24
**care** [28] - 938:4,
964:17, 966:4,
966:16, 967:8,
967:21, 973:20,
974:12, 975:5,
975:11, 975:14,
975:16, 976:4,
976:6, 976:9,
976:10, 976:11,
976:12, 978:3,
983:8, 997:14,
997:23, 1009:20,
1013:12, 1013:13,
1014:3
**CareFirst** [1] - 1028:9
**careful** [1] - 1019:17
**Carolina** [1] - 1028:8
**carrier** [5] - 945:24,
946:5, 946:14,
1016:4, 1030:24
**Carrier** [1] - 1030:22

**carriers** [12] - 944:22,
944:23, 945:12,
946:2, 947:6,
1016:1, 1016:2,
1030:18, 1038:22,
1049:25, 1056:24,
1063:10
**carve** [1] - 1055:14
**carve-out** [1] -
1055:14
**carving** [1] - 1053:19
**CASE** [1] - 934:8
**case** [26] - 944:17,
958:18, 966:21,
968:12, 971:23,
972:9, 972:20,
972:21, 975:13,
977:23, 980:23,
980:24, 981:1,
981:21, 982:12,
1002:11, 1011:24,
1012:15, 1020:22,
1029:8, 1032:2,
1034:15, 1048:12,
1053:13, 1053:14,
1063:19
**Case** [1] - 1055:23
**cases** [3] - 948:7,
952:1, 999:21
**cash** [1] - 1058:14
**catch** [1] - 947:14
**catching** [2] - 974:18,
975:9
**categories** [2] -
969:14, 971:8
**Caterpillar** [1] -
1054:21
**Catherine** [1] - 933:19
**causes** [1] - 939:16
**caution** [1] - 1048:6
**cede** [2] - 1000:8,
1000:9
**ceded** [3] - 993:4,
993:14, 993:19
**cedes** [1] - 991:9
**census** [3] - 1060:8,
1065:2, 1065:4
**Census** [1] - 1060:14
**cents** [2] - 1033:24
**CEO** [1] - 1049:9
**certain** [2] - 967:2,
1016:19, 1058:3
**certainly** [12] - 945:18,
950:12, 971:20,
971:24, 978:11,
982:9, 1000:11,
1010:7, 1017:10,
1019:20, 1031:21,
1045:10

**CERTIFICATE** [1] -

1067:1
**certify** [1] - 1067:4
**cetera** [1] - 1031:22
**challenges** [3] -
944:12, 944:13,
1037:22
**chance** [1] - 987:1
**change** [14] - 939:16,
940:10, 941:8,
941:10, 941:17,
963:25, 964:10,
979:13, 984:18,
985:7, 997:2,
1007:8, 1027:9,
1027:10
**changes** [2] - 942:21,
965:22
**changing** [2] - 965:1,
965:23
**chapter** [1] - 971:4
**characterize** [2] -
972:12, 1004:20
**charge** [1] - 1017:7
**charged** [1] - 956:18
**Charles** [1] - 934:11
**chart** [3] - 952:21,
1026:14, 1034:25
**charts** [1] - 1021:16
**cheat** [1] - 943:17
**check** [4] - 947:19,
948:15, 977:11,
977:14
**chicken** [1] - 1004:20,
1005:9
**chicken-or-egg** [2] -
1004:20, 1005:9
**choice** [4] - 945:4,
959:8, 959:10,
959:13
**choose** [2] - 1058:25,
1059:1
**chose** [1] - 1044:3
**chosen** [2] - 942:20,
942:23
**Christopher** [1] -
934:5
**CID** [9] - 1045:13,
1045:25, 1046:4,
1046:23, 1052:15,
1052:19, 1052:25,
1059:6, 1060:1
**CIDs** [5] - 1050:1,
1052:11, 1052:21,
1059:13, 1062:23
**Cigna** [156] - 933:6,
934:11, 936:24,
943:23, 947:13,
947:14, 947:18,
947:23, 948:1,
948:8, 948:20,

948:24, 949:5,
949:8, 949:14,
949:19, 950:8,
950:14, 951:7,
951:9, 951:22,
952:1, 952:15,
952:17, 952:22,
952:25, 953:2,
953:5, 953:6, 953:8,
953:12, 953:15,
953:17, 954:6,
954:8, 954:9,
954:10, 954:15,
954:17, 955:1,
955:3, 955:5,
955:18, 955:20,
955:25, 957:11,
960:16, 962:24,
963:6, 963:13,
963:18, 963:24,
966:20, 967:1,
968:14, 968:20,
968:23, 969:4,
970:10, 970:14,
972:17, 973:5,
973:19, 974:2,
974:8, 974:18,
974:19, 975:1,
975:17, 975:22,
976:19, 976:24,
977:17, 978:1,
978:12, 978:17,
978:20, 978:21,
979:20, 980:4,
980:5, 980:10,
981:2, 981:3,
982:17, 982:20,
983:3, 983:15,
983:20, 984:4,
984:17, 985:7,
986:5, 986:23,
987:9, 987:23,
988:16, 989:18,
992:17, 993:6,
993:11, 993:13,
994:14, 994:15,
994:18, 994:19,
995:9, 995:17,
995:18, 996:3,
996:6, 996:8,
996:15, 996:17,
996:22, 997:1,
997:7, 997:9,
997:21, 998:6,
998:23, 999:2,
999:17, 1000:4,
1000:12, 1000:22,
1001:17, 1001:19,
1001:21, 1002:2,
1013:16, 1013:18,
1013:25, 1014:12,

1014:13, 1014:22, 1014:23, 1019:14, 1019:16, 1020:8, 1020:16, 1027:2, 1027:14, 1027:16, 1036:3, 1036:20, 1037:5, 1037:12, 1038:15, 1048:22, 1049:9

**Cigna's** [51] - 948:9, 950:17, 951:15, 952:2, 954:5, 954:23, 955:8, 963:19, 967:7, 968:23, 969:6, 971:3, 972:13, 972:14, 972:15, 973:16, 977:24, 978:10, 978:16, 978:17, 979:23, 980:7, 980:11, 980:12, 980:20, 981:4, 981:15, 981:16, 982:14, 982:20, 982:23, 983:13, 984:2, 985:16, 992:19, 993:8, 994:11, 994:22, 995:16, 996:11, 997:5, 997:14, 997:18, 998:4, 998:21, 1000:2, 1013:11, 1013:16, 1014:1, 1038:9

**circles** [1] - 1021:20
**circumstances** [1] - 1024:23
**citations** [1] - 994:4
**cited** [1] - 948:6
**cities** [1] - 1058:3
**City** [1] - 1028:7
**civil** [1] - 1052:13
**Civil** [1] - 933:3
**claim** [3] - 944:12, 961:16, 1040:25
**claimed** [4] - 961:6, 961:17, 1012:7, 1012:19
**claims** [4] - 944:12, 1004:12, 1009:22, 1011:18
**clarify** [1] - 1043:17
**classes** [1] - 980:15
**classic** [1] - 980:15
**clear** [16] - 940:3, 941:11, 950:17, 956:4, 957:16, 958:12, 978:1, 1008:11, 1019:25,

1020:20, 1021:1, 1024:10, 1043:17, 1053:15, 1062:6, 1065:17
**cleared** [1] - 1007:14
**clearly** [5] - 975:8, 986:11, 993:1, 994:24, 996:14
**client** [2] - 995:5, 1026:4
**clients** [3] - 946:22, 946:23, 968:14
**clinical** [1] - 1004:12
**Clinton** [1] - 965:16
**close** [10] - 936:21, 936:24, 937:9, 938:2, 948:3, 948:5, 953:17, 956:10, 960:14, 960:16
**closely** [1] - 955:2
**closeness** [2] - 942:6, 944:1, 951:20
**closer** [5] - 953:20, 953:23, 954:9, 954:10, 960:17
**closes** [1] - 985:9
**CO** [1] - 934:4
**cognizable** [3] - 1008:13, 1013:5, 1013:15
**coherent** [1] - 1013:5
**coin** [1] - 1011:20
**collaborate** [1] - 1014:1
**collaborating** [1] - 967:4
**collaboration** [6] - 967:15, 973:9, 980:9, 988:2, 1006:15, 1056:11
**collaborations** [4] - 967:7, 969:6, 973:19, 982:13
**collaborative** [13] - 973:19, 974:11, 975:5, 979:24, 981:13, 983:7, 983:20, 983:22, 983:23, 983:25, 984:16, 985:13, 997:23
**collaborators** [1] - 1014:6
**collapse** [1] - 943:17
**colleagues** [1] - 938:14
**collectively** [1] - 996:13
**collude** [1] - 991:21
**collusion** [6] -

1018:25, 1019:19, 1020:6, 1020:15, 1020:22, 1021:1
**Colorado** [1] - 934:2
**COLUMBIA** [1] - 933:1
**Columbia** [2] - 933:19, 1005:22
**column** [5] - 1030:22, 1031:1, 1031:16, 1033:2, 1034:2
**columns** [2] - 1031:12, 1034:1
**combination** [3] - 969:20, 972:9, 1065:2
**combine** [3] - 943:17, 1023:25, 1028:16
**combined** [6] - 941:1, 1023:10, 1025:12, 1028:2, 1037:1, 1037:23
**comfortably** [1] - 940:20
**coming** [3] - 963:18, 1045:7, 1054:22
**command** [1] - 965:12
**commentary** [2] - 1037:17, 1040:21
**commerce** [1] - 992:21
**commercial** [8] - 964:7, 1005:14, 1037:11, 1049:11, 1049:13, 1051:1, 1053:11, 1066:6
**commissioned** [1] - 964:18
**common** [1] - 949:15
**communicate** [1] - 1023:22
**communications** [1] - 1019:18
**Community** [1] - 1065:5
**companies** [22] - 951:10, 951:12, 966:14, 969:21, 997:2, 1037:1, 1042:11, 1043:11, 1043:25, 1052:17, 1052:20, 1052:24, 1055:6, 1058:9, 1059:22, 1062:18, 1062:23, 1063:10, 1063:22, 1065:22, 1065:24, 1066:3
**company** [36] - 944:15, 946:12, 950:6, 951:15, 951:17, 963:7,

973:10, 977:15, 978:23, 978:24, 979:4, 985:17, 999:7, 1001:13, 1001:25, 1004:10, 1004:11, 1040:16, 1042:23, 1043:1, 1043:3, 1043:4, 1045:14, 1046:1, 1046:5, 1046:9, 1047:2, 1048:8, 1053:25, 1054:19, 1056:10, 1062:10, 1065:15, 1066:6
**company's** [1] - 1056:13
**comparable** [1] - 971:12
**compare** [5] - 936:16, 1021:13, 1023:9, 1024:5, 1033:1
**compared** [6] - 950:9, 963:4, 969:1, 974:21, 979:23, 1024:19
**comparison** [4] - 950:16, 980:18, 1044:4, 1046:20
**compensation** [1] - 1014:8
**compete** [19] - 944:23, 949:1, 949:3, 949:15, 949:20, 949:21, 968:21, 971:5, 972:10, 988:13, 991:17, 993:8, 994:11, 994:22, 995:9, 995:16, 996:4, 998:21, 1000:18
**competed** [1] - 947:18
**competes** [3] - 945:11, 1018:9, 1020:18
**competing** [13] - 945:13, 945:20, 949:9, 955:2, 970:11, 970:13, 970:15, 971:7, 990:16, 992:10, 993:5, 1020:16, 1025:1
**competition** [31] - 936:14, 939:2, 942:6, 943:11, 943:18, 943:19, 944:2, 947:23, 948:13, 951:20, 963:7, 979:13, 984:22, 984:23, 985:5, 988:15,

991:20, 992:25, 993:14, 993:17, 996:15, 998:22, 999:17, 999:18, 1001:8, 1002:7, 1002:9, 1003:20, 1005:6, 1049:19, 1058:20
**competitive** [17] - 936:8, 940:5, 953:22, 989:8, 993:7, 998:23, 999:8, 1002:13, 1004:3, 1005:8, 1008:10, 1024:23, 1028:19, 1029:15, 1046:18, 1051:25, 1066:5
**competitively** [2] - 998:25, 1018:6
**competitiveness** [2] - 997:6, 998:4
**competitor** [23] - 938:23, 948:22, 948:23, 949:3, 953:17, 954:11, 957:21, 962:23, 963:2, 971:16, 975:13, 984:24, 988:16, 988:19, 994:19, 1002:3, 1003:6, 1016:5, 1016:6, 1025:2, 1050:10, 1050:21
**competitors** [10] - 936:21, 936:24, 946:3, 948:5, 953:24, 960:16, 963:1, 971:25, 993:12, 1038:10
**compile** [2] - 951:9, 951:10
**complained** [1] - 983:21
**complaint** [1] - 1050:22
**complementary** [1] - 956:24
**complete** [2] - 1045:9, 1067:6
**complex** [1] - 978:25
**compliance** [2] - 994:16, 997:4
**complicated** [1] - 1010:12
**complications** [1] - 967:20
**components** [2] - 1001:6, 1011:25
**computations** [1] -

1031:6
**compute** [1] - 1043:25
**computed** [1] - 1027:9
**computer** [2] - 933:23, 1044:19
**computer-aided** [1] - 933:23
**computing** [1] - 1027:10
**concede** [1] - 961:24
**concentrated** [5] - 939:23, 940:1, 940:9, 942:3, 1058:3
**concentration** [6] - 936:14, 936:15, 937:15, 962:2, 992:4, 992:18
**concept** [6] - 950:12, 975:24, 976:1, 988:25, 1008:23, 1008:25
**conceptual** [1] - 990:12
**conceptualize** [1] - 1009:13
**concern** [7] - 964:2, 964:3, 996:15, 1000:3, 1001:19, 1013:12, 1057:4
**concerned** [12] - 964:9, 973:2, 987:3, 987:21, 994:13, 998:6, 998:9, 1001:1, 1001:14, 1057:1, 1057:7, 1057:13
**concerns** [5] - 967:20, 967:21, 991:17, 1008:1, 1012:18
**concerted** [1] - 1005:19
**conclude** [2] - 962:11, 988:10
**concluded** [2] - 1002:8, 1016:8
**conclusion** [2] - 947:4, 1033:9
**condition** [2] - 952:13, 956:4
**conditioning** [2] - 955:5, 956:10
**conducted** [2] - 943:11, 1060:14
**conducting** [1] - 956:14
**conference** [1] - 1034:12
**conference)** [1] - 1035:20
**confidential** [1] -

989:20
**confidentiality** [2] - 1007:15, 1059:7
**confirm** [2] - 1025:23, 1032:7
**confirms** [1] - 982:6
**confusing** [1] - 1060:20
**confusion** [1] - 1008:24
**conjunction** [1] - 998:14
**Connected** [1] - 1055:23
**connection** [1] - 1052:24
**conservative** [1] - 1064:6
**consider** [6] - 990:25, 996:10, 996:11, 1008:10, 1008:12, 1054:1
**considered** [6] - 944:3, 963:19, 998:14, 1006:19, 1008:9, 1013:4
**considering** [1] - 936:19
**consist** [1] - 1044:22
**consistent** [3] - 946:24, 947:4, 955:6
**consolidated** [2] - 940:5, 1036:16
**consortium** [1] - 1054:24
**constitutes** [1] - 1067:4
**Constitution** [2] - 934:18, 1067:12
**constrain** [2] - 1006:20, 1006:24
**construct** [1] - 937:17
**consultant** [2] - 1004:13, 1045:1
**consultant's** [1] - 1004:10
**consultants** [4] - 942:15, 959:17, 1004:9, 1011:4
**consulting** [1] - 946:21
**consumer** [1] - 1056:23
**Consumer** [1] - 934:3
**consumer-directed** [1] - 1056:23
**consumers** [2] - 1009:5, 1013:2
**consummated** [1] - 994:17

**contains** [1] - 1029:24
**contestability** [5] - 969:15, 969:23, 970:9, 984:7, 985:6
**context** [1] - 955:17
**continue** [4] - 969:5, 974:22, 986:9, 1016:7
**Continued** [1] - 936:4
**continued** [1] - 1016:12
**CONTINUED** [2] - 933:22, 934:1
**contract** [23] - 942:22, 942:23, 950:12, 952:2, 952:4, 952:10, 952:12, 952:15, 952:18, 953:14, 954:22, 954:25, 955:21, 955:22, 979:1, 995:17, 997:3, 997:19, 998:7, 1053:23, 1057:11, 1058:25, 1059:2
**contracted** [2] - 976:15, 1056:16
**contracting** [9] - 1053:12, 1053:15, 1053:19, 1054:2, 1054:19, 1055:13, 1058:2, 1058:17, 1058:18
**contracts** [14] - 939:8, 939:9, 947:20, 948:11, 953:9, 953:11, 954:6, 954:17, 954:19, 966:14, 971:14, 997:15, 1014:23, 1040:17
**contrasts** [1] - 975:22
**contributes** [1] - 991:6
**control** [1] - 965:12
**conversation** [3] - 1033:8, 1052:22, 1052:23
**converted** [2] - 1013:17, 1014:23
**convinced** [1] - 985:19
**Cooperative** [1] - 965:3
**coordinate** [2] - 939:1, 964:16
**coordinated** [1] - 938:20
**coordination** [6] - 967:8, 975:12, 975:14, 975:16, 978:4, 1000:3

**copied** [1] - 987:9
**copying** [1] - 988:25
**Cordani** [9] - 949:19, 970:10, 973:3, 986:9, 987:14, 997:20, 1037:4, 1037:10, 1049:9
**Cordani's** [1] - 984:9
**core** [2] - 978:17, 979:5
**Corp** [2] - 1055:23, 1056:1
**corporate** [1] - 950:3
**Corporation** [2] - 933:7, 934:11
**correct** [154] - 940:11, 959:11, 960:24, 961:2, 962:18, 970:1, 1007:12, 1014:12, 1018:11, 1018:15, 1018:16, 1018:19, 1018:22, 1018:25, 1019:1, 1019:3, 1019:4, 1019:5, 1019:8, 1019:11, 1019:12, 1019:16, 1020:2, 1020:3, 1020:9, 1020:23, 1020:24, 1021:3, 1021:8, 1022:7, 1022:8, 1022:18, 1022:21, 1022:22, 1023:5, 1023:6, 1023:11, 1023:12, 1023:14, 1024:3, 1024:4, 1024:7, 1024:12, 1024:13, 1024:20, 1025:10, 1025:13, 1025:21, 1026:14, 1026:18, 1026:22, 1026:23, 1026:25, 1027:1, 1027:6, 1027:7, 1027:17, 1027:18, 1028:3, 1028:4, 1028:24, 1029:23, 1031:4, 1031:5, 1031:7, 1031:19, 1031:21, 1032:10, 1033:7, 1034:3, 1034:6, 1035:23, 1036:7, 1036:8, 1036:10, 1036:12, 1036:13, 1036:16, 1036:21, 1036:24, 1037:2, 1038:2, 1038:15, 1038:17, 1038:19, 1042:21, 1043:5, 1044:1, 1046:21,

1048:19, 1050:4, 1050:5, 1050:7, 1050:10, 1050:14, 1051:7, 1051:11, 1051:15, 1051:21, 1052:9, 1052:13, 1052:21, 1052:25, 1053:6, 1053:12, 1053:17, 1054:4, 1054:12, 1054:19, 1055:4, 1055:5, 1055:13, 1056:20, 1057:2, 1057:20, 1058:12, 1058:13, 1058:17, 1058:22, 1059:14, 1059:15, 1059:17, 1059:19, 1059:23, 1060:2, 1060:3, 1060:5, 1060:8, 1060:9, 1060:11, 1060:15, 1061:9, 1061:10, 1061:13, 1061:16, 1062:2, 1062:5, 1062:19, 1062:25, 1063:4, 1063:5, 1063:6, 1063:11, 1063:12, 1063:15, 1063:20, 1064:10, 1064:16, 1064:18, 1065:1, 1065:7, 1065:11, 1065:16
**correctly** [4] - 944:15, 967:22, 1039:8, 1045:3
**correspondences** [1] - 999:21
**corrupt** [1] - 1032:8
**cost** [28] - 945:25, 960:9, 960:10, 961:5, 961:10, 961:17, 964:13, 965:20, 966:2, 967:10, 971:10, 971:15, 972:11, 976:1, 977:3, 979:4, 980:13, 980:16, 986:20, 986:21, 987:2, 1008:7, 1012:1, 1012:7, 1014:2, 1017:6, 1017:9, 1056:2
**cost-shifting** [2] - 1017:6, 1017:9
**costly** [2] - 979:12, 1059:2
**costs** [8] - 960:23, 966:19, 972:7, 973:7, 977:14, 1008:8, 1057:9,

1057:10
**counsel** [2] - 989:23, 1029:21
**counteract** [1] - 1002:13
**counting** [1] - 995:11
**country** [4] - 938:17, 975:6, 987:8, 1041:13
**country's** [1] - 1051:1
**counts** [1] - 959:20
**couple** [1] - 1044:13
**course** [24] - 950:21, 955:5, 979:20, 983:6, 983:11, 985:25, 990:20, 1003:3, 1009:23, 1009:24, 1010:7, 1014:4, 1015:7, 1016:2, 1016:10, 1038:24, 1044:8, 1044:16, 1049:5, 1050:8, 1054:8, 1057:25, 1059:3, 1062:3
**court** [2] - 989:12, 1045:14
**COURT** [71] - 933:1, 936:2, 939:4, 940:8, 948:19, 950:5, 957:17, 958:13, 959:3, 959:7, 959:12, 959:15, 959:18, 959:23, 960:19, 960:22, 960:25, 962:21, 963:15, 964:4, 968:12, 968:16, 974:16, 980:19, 981:25, 987:14, 987:19, 989:11, 989:17, 993:24, 994:6, 994:9, 999:13, 1001:21, 1007:10, 1010:9, 1014:11, 1016:22, 1017:20, 1017:22, 1020:14, 1027:20, 1027:25, 1030:5, 1033:25, 1034:11, 1034:24, 1035:5, 1035:9, 1035:18, 1039:10, 1039:14, 1039:22, 1040:1, 1041:8, 1041:11, 1041:18, 1041:25, 1042:2, 1047:11, 1047:14, 1048:23, 1049:2, 1051:19, 1051:23, 1055:6,

1059:8, 1066:9, 1066:14, 1066:20, 1067:1
**Court** [5] - 934:16, 934:17, 942:12, 1029:21, 1067:10
**Court's** [3] - 1030:3, 1040:19, 1053:18
**Courthouse** [2] - 934:17, 1067:11
**COURTROOM** [2] - 1026:7, 1066:19
**courtroom** [8] - 1007:15, 1019:7, 1019:11, 1021:6, 1026:3, 1026:4, 1031:3, 1039:17
**cover** [5] - 961:21, 1002:17, 1016:18, 1016:24, 1017:3
**covered** [3] - 1004:23, 1004:24, 1024:8
**covering** [1] - 1056:13
**create** [5] - 967:23, 967:25, 996:14, 1005:25, 1056:12
**creates** [1] - 1016:7
**credit** [2] - 1011:22, 1012:6
**crediting** [2] - 961:9, 1043:18
**credits** [1] - 978:12
**critical** [1] - 1056:18
**cross** [3] - 1017:10, 1030:5, 1066:16
**Cross** [1] - 1030:7
**CROSS** [1] - 1018:1
**cross-examination** [1] - 1030:5
**CROSS-EXAMINATION** [1] - 1018:1
**Cross-Examination** [1] - 1030:7
**CRR** [3] - 934:16, 1067:3, 1067:10
**cullout** [1] - 1042:9
**culminating** [1] - 936:24
**culture** [4] - 973:6, 973:8, 985:11, 1010:23
**cultures** [2] - 973:5, 973:11
**Curran** [1] - 934:5
**current** [2] - 985:16, 1025:5
**curve** [9] - 964:13, 965:21, 966:2, 967:10, 976:1,

977:3, 986:20, 986:21, 987:2
**customer** [14] - 940:19, 945:1, 945:8, 947:21, 949:6, 951:12, 951:13, 951:14, 955:18, 992:3, 1002:22, 1048:18, 1053:3, 1059:17
**customer'** [1] - 1048:18
**customers** [25] - 942:7, 944:5, 944:8, 948:2, 948:3, 948:10, 948:20, 948:25, 949:8, 949:10, 949:15, 950:4, 950:15, 950:21, 956:18, 966:15, 972:6, 980:12, 983:8, 987:5, 987:6, 989:20, 991:21, 1002:24, 1046:7
**customization** [1] - 982:19
**cut** [4] - 977:14, 987:19, 1019:23, 1022:24
**cutoff** [1] - 1061:16, 1063:20

# D

**Dafny** [1] - 938:14
**Daniel** [1] - 934:11
**dark** [2] - 941:6, 941:9
**darker** [4] - 940:23, 961:3, 961:22, 961:23
**Data** [2] - 1059:6, 1060:5
**data** [63] - 951:5, 951:9, 951:11, 951:15, 951:16, 951:20, 951:24, 951:25, 952:19, 952:22, 952:24, 954:2, 954:12, 954:21, 955:5, 956:11, 958:4, 958:7, 958:9, 958:25, 960:5, 960:15, 962:13, 974:1, 974:5, 974:6, 974:8, 976:23, 982:22, 982:25, 983:1, 995:3, 1004:4, 1006:16, 1009:20, 1026:5,

1029:22, 1029:24, 1030:10, 1030:12, 1034:16, 1034:17, 1035:7, 1049:6, 1049:25, 1050:3, 1052:24, 1059:13, 1059:21, 1060:8, 1062:20, 1063:8, 1063:11, 1063:21, 1064:1, 1065:3, 1065:18, 1065:21, 1066:7
**data's** [1] - 1065:22
**database** [1] - 1034:17
**database-related** [1] - 1034:17
**dated** [2] - 1045:25, 1046:24
**Dated** [1] - 1067:8
**DAVID** [2] - 935:4, 936:3
**DC** [7] - 933:5, 933:17, 933:21, 934:9, 934:13, 934:18, 1067:12
**de** [2] - 996:1, 996:2
**deal** [3] - 964:20, 985:8, 999:22
**dealing** [1] - 950:6
**deals** [2] - 971:23, 971:24
**decade** [4] - 949:19, 971:3, 974:3, 1056:2
**decades** [4] - 979:10, 1054:23, 1058:19
**decided** [1] - 1000:25
**decision** [2] - 959:4
**decision-maker's** [1] - 959:4
**deck** [2] - 1021:9
**deep** [1] - 944:9
**deeper** [1] - 958:5
**Deere** [1] - 1054:21
**defendant** [1] - 1015:6
**Defendant** [1] - 934:5
**Defendants** [1] - 933:8
**defendants'** [3] - 955:11, 956:4, 1006:19
**defense** [2] - 1008:4, 1011:24
**define** [4] - 940:25, 1049:18, 1064:9, 1064:12
**defined** [4] - 941:3, 1023:23, 1047:8, 1057:3
**defines** [6] - 1042:10, 1042:24, 1045:20, 1046:5, 1046:9,

1047:3
**definitely** [1] - 1008:10
**definition** [22] - 941:14, 1022:4, 1022:5, 1042:3, 1043:19, 1043:24, 1044:5, 1045:5, 1045:7, 1045:8, 1046:15, 1047:25, 1048:7, 1048:15, 1048:21, 1048:23, 1049:3, 1050:9, 1051:4, 1051:6, 1052:8
**definitions** [5] - 940:14, 940:18, 940:24, 1045:10, 1046:14
**degree** [1] - 936:20
**degrees** [1] - 964:22
**deliver** [1] - 986:22
**delivered** [2] - 959:14, 959:22, 1013:13
**delivers** [1] - 972:5
**delivery** [4] - 966:3, 975:19, 976:19, 1056:13
**delta** [1] - 941:8
**demand** [1] - 1052:13
**demonstrate** [1] - 1008:15
**denominator** [8] - 1031:12, 1031:18, 1031:20, 1032:2, 1032:12, 1032:22, 1033:6, 1034:1
**Denver** [1] - 934:4
**department** [1] - 1060:15
**DEPARTMENT** [1] - 933:15
**Department** [5] - 1015:24, 1018:17, 1047:1, 1048:24, 1052:12
**Department's** [1] - 1048:25
**dependent** [1] - 995:7
**dependents** [2] - 1056:14, 1065:19
**depicts** [1] - 940:22
**deposition** [3] - 982:12, 1047:24, 1055:11
**DEPUTY** [2] - 1026:7, 1066:19
**describe** [10] - 942:25, 953:25, 954:13, 983:17, 992:22, 1012:23, 1022:17,

1056:7, 1058:10, 1062:7
**Describe** [1] - 1046:4
**described** [5] - 944:17, 956:7, 972:16, 1038:18, 1038:20
**describing** [1] - 971:17
**designation** [1] - 1046:6
**despite** [1] - 964:20
**detail** [5] - 996:16, 1002:18, 1002:19, 1007:17, 1016:3
**details** [1] - 1015:4
**detect** [2] - 1059:22, 1062:18
**deter** [1] - 1002:13
**determined** [1] - 1005:12
**determining** [3] - 1051:19, 1051:22, 1052:20
**develop** [2] - 1004:9, 1014:2
**developed** [1] - 1056:10
**developer** [1] - 989:3
**developing** [2] - 995:3
**development** [1] - 975:22
**dictating** [1] - 965:12
**differ** [2] - 955:10, 962:8
**difference** [5] - 957:9, 957:19, 970:19, 1025:9, 1025:11
**differences** [2] - 979:25, 1010:24
**different** [53] - 940:24, 941:4, 943:7, 943:9, 946:7, 949:6, 949:25, 950:2, 955:12, 958:21, 959:20, 960:3, 960:5, 963:10, 968:25, 969:15, 970:5, 971:7, 972:4, 972:23, 973:4, 974:9, 974:12, 975:7, 976:25, 977:1, 980:1, 981:7, 982:4, 982:21, 983:1, 987:24, 990:19, 991:20, 992:6, 992:7, 997:8, 997:16, 1001:13, 1002:1, 1011:11, 1019:10, 1022:2,

1024:23, 1035:10, 1039:2, 1039:4, 1045:8, 1046:13, 1046:14, 1047:9, 1059:13, 1065:4
**differentiated** [3] - 949:5, 949:12, 1038:20
**differentiation** [2] - 949:13, 972:2
**differently** [4] - 962:11, 970:20, 985:1, 1049:18
**difficult** [10] - 969:4, 972:23, 982:7, 1004:15, 1010:13, 1011:12, 1011:15, 1011:16, 1013:18
**dimensions** [1] - 944:19
**diminished** [5] - 969:1, 993:10, 996:8, 996:15, 997:19
**direct** [43] - 972:19, 990:22, 1018:5, 1023:13, 1023:20, 1030:15, 1033:13, 1033:14, 1037:15, 1038:18, 1040:8, 1042:4, 1042:16, 1042:18, 1043:7, 1043:16, 1045:12, 1045:15, 1045:16, 1045:24, 1046:24, 1049:23, 1050:20, 1053:12, 1053:15, 1053:18, 1053:23, 1054:2, 1054:7, 1054:9, 1054:19, 1054:20, 1055:13, 1055:16, 1055:20, 1056:2, 1056:25, 1058:1, 1058:16, 1058:18, 1058:25, 1059:12, 1060:24
**DIRECT** [1] - 936:4
**direct-contract** [2] - 1053:23, 1058:25
**directed** [1] - 1056:23
**directing** [3] - 1030:21, 1047:13, 1047:23
**direction** [2] - 954:15, 955:9
**directions** [1] - 970:5
**directly** [2] - 1039:20, 1059:1
**disadvantage** [1] - 1004:3

**disagree** [1] - 1041:5
**discipline** [1] - 957:22
**discount** [4] - 974:23, 979:11, 987:16, 1005:13
**discounted** [1] - 1058:14
**discounts** [16] - 944:9, 949:18, 949:20, 950:7, 968:22, 970:13, 980:21, 981:12, 981:14, 986:19, 1004:22, 1004:24, 1005:15, 1010:18, 1014:16, 1017:2
**discovery** [2] - 1034:16, 1034:22
**discrimination** [1] - 1043:21
**discussed** [5] - 948:7, 991:2, 1004:21, 1006:12, 1006:25
**discussing** [1] - 1058:1
**discussions** [1] - 1013:7
**disefficiency** [1] - 1013:19
**dispersed** [3] - 1022:14, 1024:19, 1036:12
**dispersion** [2] - 1022:21, 1022:22
**dispute** [1] - 1033:11
**distinct** [2] - 968:20, 978:11
**distribution** [1] - 1007:1
**District** [1] - 933:19
**DISTRICT** [3] - 933:1, 933:1, 933:11
**divided** [1] - 1062:15
**Division** [1] - 933:16
**docketed** [1] - 990:1
**doctor** [2] - 951:1, 1009:9
**doctors** [3] - 965:9, 1040:13, 1040:15
**document** [3] - 1045:9, 1055:18, 1055:21
**documentary** [2] - 1020:1, 1020:6
**documented** [4] - 937:12, 938:17, 964:17, 973:12
**documents** [4] - 984:3, 994:4, 998:17, 1045:10

**DOJ** [1] - 1037:17
**DOJ's** [2] - 1052:25, 1060:1
**dollar** [3] - 978:18, 979:3, 1057:13
**dollars** [3] - 960:14, 977:21, 1057:19
**dominated** [1] - 947:12
**done** [10] - 941:3, 942:22, 944:13, 955:12, 963:11, 967:22, 972:14, 984:20, 1028:25, 1061:15
**doubled** [4] - 975:1, 1001:25, 1037:5, 1037:12
**doubling** [1] - 975:3
**down** [18] - 938:2, 946:3, 957:20, 959:8, 959:19, 970:21, 972:6, 973:7, 973:14, 974:12, 981:14, 982:16, 985:13, 1004:12, 1013:24, 1034:23, 1051:25, 1063:21
**downside** [4] - 977:8, 977:12, 977:13
**Dr** [13] - 955:12, 955:14, 961:6, 1012:11, 1018:3, 1022:1, 1029:13, 1030:4, 1030:14, 1035:22, 1042:4, 1042:10, 1059:12
**DRANOVE** [2] - 935:4, 936:3
**Dranove** [20] - 936:6, 946:9, 949:13, 967:15, 970:23, 990:9, 1002:4, 1007:19, 1013:24, 1015:18, 1018:3, 1022:1, 1029:13, 1030:4, 1030:7, 1030:14, 1035:22, 1042:4, 1042:10, 1059:12
**draw** [1] - 996:23
**drawn** [1] - 941:5
**drill** [1] - 1051:25
**drive** [2] - 973:7, 985:13
**driven** [2] - 959:5, 973:6
**drives** [2] - 943:12, 943:20, 945:25,

1013:24
**driving** [1] - 972:6
**dropping** [1] - 1063:21
**DSA** [1] - 977:4
**DSAs** [2] - 977:12, 977:22
**due** [1] - 1059:7
**during** [7] - 944:8, 965:23, 990:2, 1019:13, 1023:20, 1025:3, 1054:20
**dynamic** [5] - 937:7, 937:13, 964:6, 987:4, 990:23

**E**

**earliest** [2] - 980:4, 980:5
**early** [2] - 966:18, 986:25
**easier** [5] - 939:1, 948:24, 958:25, 1044:19, 1060:22
**easily** [1] - 948:20
**economic** [7] - 938:5, 938:25, 942:10, 965:1, 1003:22, 1012:22, 1013:3
**Economics** [1] - 970:24
**economics** [8] - 947:12, 965:1, 968:2, 969:10, 1008:7, 1009:1, 1015:13, 1017:6
**economist** [4] - 938:4, 942:1, 942:25, 948:12
**economists** [5] - 1009:6, 1012:23, 1015:6
**edits** [1] - 944:12
**effect** [7] - 960:7, 961:9, 961:11, 986:15, 988:7, 998:20, 1013:14
**effective** [4] - 957:20, 963:2, 971:25, 978:3
**effectively** [1] - 972:11
**effects** [31] - 936:8, 936:11, 937:3, 937:6, 937:8, 937:13, 943:6, 943:22, 948:17, 948:18, 952:19, 955:14, 956:3, 956:13, 956:19, 956:23, 964:6, 968:4, 968:5,

969:11, 989:8, 990:13, 998:15, 1002:13, 1012:8, 1015:21, 1037:22, 1051:25
**efficiencies** [17] - 937:11, 1008:3, 1008:4, 1008:6, 1008:7, 1008:11, 1008:12, 1008:16, 1008:18, 1008:21, 1009:22, 1010:5, 1011:5, 1011:6, 1011:9, 1011:13, 1011:23
**efficiency** [6] - 964:15, 1011:17, 1012:20, 1012:22, 1013:3, 1014:17
**effort** [3] - 964:3, 1005:19, 1014:7
**efforts** [11] - 964:13, 964:21, 965:20, 978:2, 994:14, 994:17, 994:21, 996:17, 997:4, 1005:8, 1005:23
**egg** [2] - 1004:20, 1005:9
**eight** [2] - 976:15, 976:17
**either** [9] - 938:23, 955:23, 983:1, 997:4, 1004:25, 1006:24, 1025:11, 1057:14, 1064:13
**elbow** [1] - 974:24
**eligible** [10] - 1044:24, 1044:25, 1045:21, 1047:4, 1060:2, 1063:4, 1063:11, 1063:14, 1063:23, 1064:8
**Eligible** [1] - 1062:22
**eliminate** [1] - 1002:3
**elsewhere** [4] - 978:19, 1017:8, 1017:12, 1017:13
**email** [4] - 999:14, 999:22, 1019:15, 1020:1
**embodied** [1] - 1034:15
**empirical** [5] - 938:5, 938:12, 951:5, 968:7, 1037:21
**employ** [2] - 965:9, 966:5
**employed** [1] - 1015:5
**employee** [2] - 1044:2,

1048:1
**Employees** [2] - 1026:17, 1062:22
**employees** [51] - 941:15, 945:8, 961:8, 978:13, 1004:6, 1004:7, 1016:15, 1016:25, 1022:6, 1022:14, 1022:23, 1023:2, 1024:18, 1026:21, 1042:12, 1042:25, 1043:12, 1044:1, 1044:24, 1044:25, 1045:21, 1046:11, 1046:17, 1047:5, 1048:19, 1048:24, 1049:12, 1056:13, 1056:19, 1056:20, 1059:16, 1059:17, 1060:2, 1061:5, 1061:6, 1061:7, 1062:1, 1062:10, 1062:12, 1062:14, 1063:3, 1063:11, 1063:14, 1063:23, 1063:24, 1064:8, 1064:21, 1064:23, 1065:18
**employer** [19] - 953:16, 963:13, 963:22, 967:23, 993:4, 1023:3, 1026:20, 1042:24, 1044:22, 1046:16, 1047:8, 1056:2, 1058:24, 1059:1, 1059:24, 1059:25, 1065:13, 1065:15
**employer's** [3] - 949:24, 1023:2, 1046:14
**employers** [47] - 941:14, 942:14, 945:4, 949:24, 950:24, 952:6, 953:1, 959:16, 960:8, 961:7, 978:13, 995:25, 996:1, 1004:5, 1004:7, 1006:14, 1006:16, 1014:17, 1016:15, 1016:16, 1016:17, 1016:18, 1016:23, 1016:24, 1042:12, 1046:10, 1046:11, 1049:12, 1049:13, 1051:2, 1051:17, 1054:16, 1054:24, 1057:5,

1057:13, 1058:2, 1058:10, 1059:17, 1059:22, 1062:19, 1064:10, 1064:12, 1064:13, 1064:22
**Employers** [1] - 1026:17
**employers'** [1] - 1060:2
**encountered** [1] - 1010:24
**end** [9] - 942:22, 949:22, 957:20, 972:5, 973:13, 977:11, 1035:20, 1060:20, 1062:12
**endeavor** [1] - 1059:3
**ended** [1] - 1029:11
**ends** [1] - 959:9
**enhance** [2] - 948:8, 948:9
**enhances** [1] - 991:21
**enhancing** [1] - 991:7
**enrolled** [1] - 1037:12
**enrollees** [4] - 986:1, 1031:23, 1033:4, 1059:25
**Enrollment** [3] - 1031:9, 1031:10, 1059:6
**enrollment** [4] - 1028:6, 1028:11, 1049:25, 1066:3
**enrollments** [2] - 996:24, 1066:1
**entanglement** [1] - 992:19
**entanglements** [2] - 993:11, 1000:4
**enter** [5] - 1003:2, 1003:3, 1003:10, 1003:15, 1005:3
**enterprise** [1] - 1014:9
**entire** [4] - 987:8, 989:7, 993:1, 1038:7
**entirety** [1] - 979:2
**entity** [2] - 992:9, 1047:25
**entrant** [5] - 1003:2, 1003:17, 1003:24, 1003:25, 1004:15
**entrants** [1] - 1003:22
**entry** [15] - 937:10, 1002:5, 1002:10, 1002:13, 1002:15, 1002:21, 1003:1, 1003:4, 1003:16, 1004:18, 1005:6, 1006:8, 1006:13, 1006:17, 1006:19

**equal** [9] - 938:1, 938:6, 939:14, 949:3, 972:5, 984:24, 1038:22, 1041:4, 1041:6
**equal-size** [1] - 939:14
**equals** [1] - 1061:7
**equivalent** [2] - 939:14, 1062:14
**erstwhile** [1] - 993:12
**especially** [1] - 988:18
**essentially** [7] - 937:8, 939:10, 943:17, 965:17, 970:14, 971:20, 991:5
**established** [2] - 936:16, 936:18
**establishments** [1] - 1061:25
**estimate** [3] - 937:2, 956:3, 958:3
**estimates** [1] - 1011:22
**et** [1] - 933:3, 1031:22
**evaluated** [2] - 964:6, 1002:4
**evaluation** [1] - 964:8
**event** [1] - 981:5
**eventually** [3] - 970:19, 987:9, 987:10
**everywhere** [2] - 978:9, 990:23
**evidence** [42] - 936:25, 937:2, 939:20, 944:21, 945:15, 946:16, 947:7, 947:19, 947:22, 948:6, 948:13, 952:18, 956:2, 972:20, 982:15, 983:4, 984:1, 984:4, 984:7, 984:20, 993:16, 1005:2, 1005:4, 1006:12, 1007:4, 1007:9, 1007:11, 1007:13, 1007:19, 1007:25, 1008:1, 1017:13, 1019:15, 1019:19, 1019:22, 1020:1, 1020:4, 1020:7, 1021:5, 1037:13
**evidenced** [1] - 986:12
**exact** [5] - 996:19, 1001:13, 1032:13, 1032:18, 1032:20
**exactly** [8] - 941:16, 956:8, 962:18, 992:16, 999:23,

1014:19, 1059:8, 1061:23
**Examination** [1] - 1030:7
**EXAMINATION** [2] - 936:4, 1018:1
**examination** [5] - 1023:13, 1029:17, 1030:5, 1049:24, 1066:17
**examine** [1] - 937:1
**examining** [1] - 1002:10
**example** [20] - 943:8, 944:25, 952:1, 958:3, 965:8, 965:13, 974:1, 978:14, 980:16, 980:17, 995:22, 1001:10, 1010:23, 1011:1, 1024:23, 1052:14, 1054:4, 1054:21, 1054:25, 1056:19
**Examples** [1] - 1054:14
**examples** [8] - 946:18, 947:21, 948:14, 972:14, 972:25, 973:16, 1047:12, 1054:5
**exceed** [1] - 940:17
**exceeds** [1] - 940:20
**excellent** [1] - 1052:7
**exceptions** [1] - 1045:1
**excerpt** [1] - 1044:7
**exchange** [2] - 1007:22
**exchanges** [4] - 1006:20, 1007:1, 1007:6, 1008:2
**excited** [1] - 973:17
**exciting** [2] - 967:10, 1016:4
**exclude** [4] - 1034:22, 1049:13, 1053:2, 1053:7
**excluded** [1] - 990:3
**exclusive** [1] - 975:16
**exclusively** [1] - 1040:17
**excused** [1] - 1066:20
**executive** [1] - 980:10
**exercise** [1] - 978:14
**Exhibit** [6] - 1026:1, 1026:12, 1026:14, 1027:6, 1027:15, 1047:23
**exhibit** [1] - 1044:10

existed [1] - 1001:8
existence [1] - 1016:12
existing [3] - 937:10, 992:18, 1002:5
expand [2] - 997:23, 1005:20
expanding [4] - 1001:1, 1006:10, 1065:25, 1066:3
expect [2] - 948:5, 953:8
expecting [2] - 975:6, 1006:14
expenditure [1] - 944:14
Expenditure [1] - 1060:12
expense [1] - 946:8
expenses [1] - 1012:1
experience [8] - 1004:4, 1010:4, 1011:12, 1011:15, 1011:16, 1011:21, 1019:17, 1056:7
experienced [1] - 967:12
experiences [1] - 1011:19
experiencing [1] - 1002:25
expert [4] - 1026:9, 1034:18, 1035:14, 1061:22
expertise [3] - 966:11, 969:21, 976:23
experts [4] - 955:11, 956:4, 1047:15, 1047:17
explain [10] - 940:21, 942:13, 951:19, 952:20, 961:3, 989:7, 990:12, 991:25, 998:20, 1035:13
explains [1] - 1025:6
explanatory [2] - 1002:16, 1002:17
explored [1] - 1005:23
exposes [1] - 977:15
extend [1] - 990:23
extensive [1] - 1029:22
extensively [2] - 1011:3, 1017:8
extent [6] - 936:23, 967:2, 983:12, 996:4, 996:5, 998:5
extremes [1] - 982:17
eyes [1] - 997:22

# F

F-1 [6] - 1026:1, 1026:6, 1026:12, 1026:14, 1027:6
F-11 [1] - 1060:25
F-2 [1] - 1027:15
face [2] - 988:14, 996:18
faces [2] - 992:5, 1024:22
facing [2] - 949:24, 1025:1
fact [20] - 937:4, 945:1, 953:10, 954:25, 960:15, 965:15, 968:18, 977:1, 980:3, 980:14, 981:22, 981:25, 984:3, 993:10, 999:24, 1017:14, 1020:5, 1027:12, 1028:14, 1063:17
factor [1] - 996:10
factored [1] - 1001:9
factoring [3] - 950:18, 960:9, 986:14
factors [1] - 959:20
facts [6] - 936:23, 947:15, 948:17, 968:8, 970:3, 1047:17
fail [1] - 1011:9
failed [3] - 966:10, 1005:23
failing [1] - 965:21
fair [6] - 955:4, 969:25, 1021:7, 1025:9, 1033:19, 1057:6
fairly [2] - 942:3, 952:8
fall [1] - 1004:12
falling [1] - 973:14
familiar [4] - 975:19, 1000:13, 1053:19, 1055:6
famous [3] - 964:18, 1038:24, 1040:9
far [5] - 986:19, 986:20, 1007:4, 1045:5, 1063:1
fashion [1] - 974:6
fashioned [2] - 968:22, 970:12
fast [2] - 983:14, 1040:4
faster [1] - 1035:16
favor [2] - 985:23, 986:4
favorite [1] - 952:11
fear [1] - 986:7

feature [1] - 979:6
features [4] - 944:16, 972:8, 978:11, 1002:14
federal [2] - 964:19, 965:22
fee [8] - 945:24, 964:25, 975:12, 975:14, 975:16, 1057:11, 1057:19, 1057:21
fee-for-service [1] - 964:25
feeding [1] - 987:17
fees [14] - 937:7, 939:5, 939:6, 939:10, 960:21, 973:22, 995:5, 998:3, 998:6, 1000:7, 1004:2, 1057:2, 1057:9
few [4] - 965:19, 969:8, 1006:8, 1012:5
fewer [3] - 938:25, 939:3, 988:12
field [2] - 947:12, 1015:13
Fifth [1] - 933:16
figure [2] - 1021:23, 1057:15
figures [1] - 940:9
file [9] - 965:24, 1029:14, 1029:18, 1030:3, 1030:15, 1030:19, 1032:8, 1032:9
filed [1] - 989:18
final [7] - 941:9, 942:19, 1032:9, 1034:15, 1034:19, 1049:8, 1064:22
finally [2] - 986:21, 1013:20
financial [2] - 976:2, 1057:8, 1058:15
Financial [1] - 1055:19
findings [2] - 994:4, 998:17
fine [4] - 957:24, 985:8, 1026:3, 1048:9
fine-tuning [1] - 957:24
finish [1] - 1017:24
firewall [7] - 999:24, 1000:1, 1019:16, 1020:2, 1020:12, 1020:13, 1021:2
firewalls [5] - 999:5,

999:6, 999:7, 999:10, 1019:13
firm [17] - 937:23, 949:14, 968:21, 971:12, 981:5, 981:7, 981:23, 986:4, 991:12, 1002:6, 1003:18, 1003:20, 1043:22, 1050:13, 1050:15, 1050:16
firm's [2] - 969:24, 1030:10
firm-specific [2] - 1050:15, 1050:16
firms [31] - 936:19, 937:10, 937:21, 938:1, 938:3, 938:25, 939:1, 939:3, 939:14, 946:21, 948:5, 968:9, 971:5, 971:6, 972:25, 973:12, 979:21, 985:24, 988:12, 988:20, 1007:2, 1007:3, 1007:21, 1019:17, 1027:11, 1043:18, 1043:22, 1043:23, 1050:12, 1052:11
firms' [1] - 969:15
first [39] - 940:23, 940:24, 943:19, 944:2, 945:4, 945:17, 947:24, 952:22, 953:12, 955:25, 960:2, 963:9, 963:13, 964:24, 971:10, 974:2, 980:17, 985:3, 990:15, 992:24, 1000:1, 1000:17, 1008:6, 1012:6, 1012:22, 1015:16, 1015:17, 1015:23, 1025:19, 1026:10, 1029:6, 1030:21, 1031:16, 1042:17, 1042:19, 1043:8, 1044:12, 1054:10
fit [3] - 972:16, 973:10, 1064:18
fits [2] - 964:22, 982:16
Fitzgerald [1] - 933:14
five [4] - 988:3, 1000:8, 1005:19, 1050:25
fixing [1] - 1019:2,

1019:6, 1019:10, 1020:15
fleet [1] - 985:18
fleet-footed [1] - 985:18
flipping [1] - 984:25
flirtation [2] - 966:24, 966:25
Florida [1] - 1028:9
flow [3] - 982:2, 1014:15, 1058:14
focus [1] - 1004:17
focusing [4] - 940:16, 943:22, 970:9, 1038:12
following [7] - 955:14, 984:2, 1006:21, 1006:25, 1034:12, 1061:7, 1062:6
footed [1] - 985:18
footing [4] - 984:24, 1038:22, 1041:4, 1041:6
Footnote [11] - 1028:5, 1043:8, 1043:14, 1054:9, 1058:6, 1060:24, 1061:20, 1061:24, 1063:6, 1063:15, 1065:1
footnote [2] - 1043:12, 1061:23
footnotes [1] - 1061:21
footprint [7] - 946:19, 988:5, 990:18, 1005:20, 1005:24, 1024:24, 1038:7
footprints [1] - 1038:4
FOR [1] - 933:1
force [3] - 952:22, 954:14, 1023:4
Force [1] - 954:21
forceful [1] - 962:23
forces [1] - 1065:23
forecast [1] - 1010:4
forecasting [1] - 975:2
foregoing [1] - 1067:4
forerunner [2] - 1000:22, 1000:23
forever [3] - 981:5, 984:12
forgive [2] - 1042:7, 1061:21
form [4] - 943:16, 977:10, 1007:1, 1054:2
format [1] - 1050:3
forming [1] - 1034:18
forms [2] - 991:1,

993:7
**formulations** [1] - 1034:16
**forth** [5] - 991:9, 1013:8, 1031:7, 1046:7, 1052:18
**forthcoming** [1] - 1000:6
**forward** [5] - 943:21, 956:3, 981:4, 981:9, 1007:8
**foundation** [2] - 1029:20, 1035:10
**Foundation** [1] - 1040:18
**four** [7] - 939:14, 940:24, 941:4, 942:19, 944:18, 945:19, 945:20, 945:21, 945:22, 946:4, 955:7, 990:17, 1002:1, 1004:1, 1006:11, 1007:5, 1007:23, 1015:25, 1040:8, 1040:25, 1041:4, 1041:7, 1050:25, 1064:3, 1064:5, 1065:25, 1066:4
**fourth** [2] - 947:13, 1030:16
**framework** [9] - 951:21, 963:12, 969:13, 971:2, 972:16, 989:7, 990:12, 991:3, 1008:3
**friction** [2] - 1001:3, 1001:4
**front** [5] - 983:15, 986:8, 1030:14, 1033:1, 1033:10
**fronts** [1] - 973:14
**fruit** [1] - 948:24
**full** [13] - 940:25, 941:13, 944:24, 961:10, 962:6, 976:2, 1041:2, 1044:11, 1044:18, 1057:3, 1057:7, 1057:8, 1067:5
**fullness** [1] - 987:11
**fully** [5] - 945:2, 991:18, 1012:6, 1024:2, 1028:18
**function** [1] - 945:16
**functioning** [1] - 984:10
**funded** [1] - 1057:1
**future** [9] - 979:16,

981:3, 985:15, 990:5, 994:19, 995:14, 995:20, 996:3, 1008:2

## G

**gain** [3] - 979:17, 987:25, 991:19
**gallery** [1] - 1034:13
**game** [3] - 984:18, 985:1, 985:2
**gap** [4] - 962:9, 962:12, 962:13, 1066:2
**Garrison** [1] - 934:12
**GENERAL** [1] - 933:19
**general** [2] - 961:19, 988:11
**GENERAL'S** [1] - 934:2
**generally** [10] - 944:23, 947:11, 947:21, 971:9, 977:19, 977:20, 983:17, 1020:17, 1044:22, 1055:2
**generate** [2] - 958:22, 1061:18
**generated** [1] - 1011:10
**generation** [1] - 1056:11
**generous** [4] - 1038:21, 1040:22, 1064:5, 1065:20
**genuine** [1] - 967:22
**Geographic** [1] - 1041:23
**geographic** [18] - 936:9, 940:16, 941:18, 941:24, 945:11, 989:6, 990:10, 992:13, 1005:20, 1006:8, 1022:16, 1022:20, 1022:22, 1023:16, 1023:17, 1038:16, 1041:5, 1058:9
**geographically** [4] - 1022:14, 1024:19, 1036:12, 1058:3
**geographies** [1] - 1064:18
**Gidley** [1] - 934:6
**GIDLEY** [38] - 1017:25, 1018:2, 1020:19, 1021:11, 1026:2, 1026:9, 1027:23, 1029:15,

1030:2, 1030:7, 1030:12, 1031:14, 1035:4, 1035:17, 1035:19, 1035:21, 1037:19, 1039:12, 1039:16, 1040:7, 1040:19, 1041:10, 1041:15, 1041:22, 1042:6, 1042:8, 1044:7, 1044:12, 1047:12, 1047:22, 1048:21, 1048:25, 1049:4, 1050:23, 1055:18, 1059:4, 1059:10, 1066:12
Gidley)......................
...............**1018** [1] - 935:5
**given** [7] - 963:3, 1030:9, 1041:4, 1051:4, 1058:18, 1062:8, 1066:1
**glad** [1] - 1038:23
**global** [1] - 1056:1
**goal** [1] - 951:4
**gold** [2] - 950:16, 975:25
**gosh** [1] - 988:4
**governing** [1] - 1016:16
**government** [2] - 965:22, 1005:12
**granting** [3] - 989:21, 1000:9, 1064:4
**granular** [1] - 1059:21
**great** [6] - 977:1, 988:4, 1009:10, 1016:8, 1042:22, 1066:13
**greater** [6] - 939:22, 1009:14, 1009:16, 1017:13, 1037:23, 1059:23
**gross** [1] - 1062:4
**ground** [4] - 936:23, 948:17, 968:8, 970:3
**group** [7] - 972:15, 1063:10, 1064:9, 1064:11, 1064:13, 1064:17, 1065:15
**Group** [2] - 965:3, 1040:17
**groups** [3] - 1044:22, 1045:21, 1064:15
**grow** [6] - 970:18, 974:23, 984:19, 994:14, 1001:21, 1005:23
**growing** [2] - 947:14, 1001:19

**growth** [5] - 966:2, 997:5, 1001:16, 1008:2, 1037:9
**guarantee** [1] - 986:23
**guide** [1] - 981:24
**guidelines** [18] - 937:16, 939:11, 939:12, 939:23, 939:25, 940:18, 941:25, 963:25, 991:3, 991:15, 1002:12, 1002:20, 1008:5, 1008:11, 1009:22, 1011:17, 1052:4, 1053:17
**guidepost** [1] - 940:6

## H

**Haley** [6] - 1026:2, 1037:19, 1042:6, 1044:9, 1059:5, 1059:8
**half** [1] - 993:20
**Hamburger** [1] - 934:8
**hand** [6] - 951:25, 954:1, 976:19, 976:20, 1029:5, 1065:23
**handful** [1] - 938:10
**hanging** [1] - 948:24
**happier** [1] - 1009:3
**happy** [3] - 1014:14, 1025:23, 1029:5
**hard** [5] - 999:23, 1004:25, 1005:16, 1006:3, 1044:13
**harm** [24] - 937:12, 939:19, 960:13, 960:14, 960:17, 962:3, 962:5, 987:4, 990:22, 990:23, 990:25, 991:1, 991:4, 992:22, 993:7, 993:17, 999:12, 1002:9, 1002:23, 1002:25, 1003:23, 1013:13, 1056:25
**harmful** [4] - 936:17, 940:7, 1009:5, 1013:2
**harming** [2] - 1002:6, 1013:12
**Harvard** [3] - 938:14, 965:4, 976:18
**HCSC** [1] - 1028:9
**head** [16] - 939:2, 945:20, 947:18, 950:9, 950:10,

971:7, 992:24, 992:25, 993:5, 993:6, 993:14
**head-to-head** [2] - 939:2, 993:14
**heading** [4] - 1030:22, 1031:1, 1045:17, 1055:24
**headquarter** [2] - 1023:1, 1044:25
**headquartered** [5] - 987:5, 987:7, 993:4, 993:19, 1044:23
**Health** [4] - 965:3, 1052:18, 1056:12, 1060:12
**health** [66] - 938:8, 938:11, 945:6, 945:8, 945:9, 945:10, 947:12, 950:13, 960:8, 960:20, 960:23, 964:7, 970:11, 972:15, 975:25, 976:1, 976:3, 976:13, 976:18, 976:22, 977:23, 977:24, 978:6, 978:7, 978:8, 978:10, 978:16, 978:18, 978:22, 978:23, 979:2, 979:4, 979:6, 980:12, 983:19, 999:4, 999:5, 1006:15, 1009:6, 1009:13, 1009:14, 1009:16, 1009:20, 1010:10, 1015:13, 1040:18, 1051:10, 1051:14, 1053:11, 1053:25, 1054:15, 1056:11, 1056:15, 1056:17, 1056:22, 1056:23, 1058:16, 1060:16, 1061:5, 1062:1, 1062:12, 1063:4, 1066:6
**Healthcare** [1] - 1055:19
**healthcare** [17] - 964:15, 966:19, 967:13, 976:20, 978:19, 986:22, 1009:7, 1009:8, 1012:25, 1016:10, 1053:5, 1056:2, 1057:8, 1057:10, 1057:12, 1057:13
**healthier** [1] - 951:1

**HealthSCOPE** [1] - 1052:18
**hear** [2] - 984:9, 999:7
**heard** [20] - 942:12, 947:24, 949:16, 966:8, 967:7, 967:8, 972:20, 973:3, 975:24, 976:14, 999:3, 1004:21, 1005:7, 1007:25, 1012:3, 1013:7, 1015:23, 1023:19, 1023:20, 1047:15
**hearing** [2] - 1034:13, 1066:21
**Heather** [1] - 934:6
**held** [2] - 986:5, 1034:12
**HELD** [1] - 933:10
**help** [2] - 959:25, 999:17
**helpful** [3] - 955:13, 971:2, 991:4
**helping** [2] - 964:16, 1000:6
**helps** [3] - 991:13, 991:14
**hence** [1] - 1061:5
**hereby** [1] - 1067:3
**Herfindahl** [5] - 937:18, 964:1, 992:11, 1027:9, 1027:10
**Herfindahl-Hirschman** [1] - 937:18
**Herfindahls** [2] - 940:12, 953:21
**HHI** [22] - 937:18, 937:22, 937:25, 938:2, 938:6, 938:24, 939:2, 939:13, 939:15, 939:16, 939:22, 941:7, 941:8, 941:9, 941:10, 941:12, 941:15, 941:22, 1050:9, 1050:15, 1050:16
**HHIs** [15] - 938:4, 938:9, 938:10, 938:15, 938:18, 938:20, 938:22, 939:11, 941:4, 947:9, 947:10, 991:23, 1050:6
**HHS** [1] - 1060:15
**high** [10] - 938:22, 947:8, 952:8, 990:12, 996:17,

996:19, 1004:8, 1006:7, 1012:5, 1015:20
**high-level** [1] - 1012:5
**high-performance** [1] - 1006:7
**higher** [5] - 938:6, 938:7, 938:22, 962:1, 1014:7
**highest** [1] - 959:21
**highly** [7] - 939:23, 939:25, 940:8, 942:3, 951:7, 952:11, 1016:3
**Highmark** [1] - 1028:9
**hip** [3] - 1006:7, 1053:20, 1053:23
**Hirschman** [1] - 937:18
**historical** [1] - 971:22
**historically** [4] - 949:17, 951:16, 973:8, 985:17
**history** [2] - 973:18, 1000:15
**HMO** [6] - 974:12, 1038:24, 1039:7, 1040:9, 1040:10, 1040:23
**HMOs** [7] - 965:5, 965:7, 965:8, 965:15, 965:17, 966:24, 967:17
**Ho** [1] - 1005:22
**HO** [1] - 1005:22
**hold** [1] - 985:7
**holding** [1] - 986:25
**holds** [1] - 977:1
**homogenize** [1] - 1060:7
**Honor** [18] - 994:3, 998:16, 1017:25, 1026:5, 1027:24, 1029:16, 1030:13, 1031:15, 1035:4, 1035:19, 1039:12, 1040:7, 1041:10, 1041:15, 1044:11, 1047:12, 1066:13, 1066:19
**HONORABLE** [1] - 933:10
**hope** [4] - 957:16, 958:12, 998:23, 1063:18
**hoping** [1] - 982:8
**Horizon** [1] - 1028:9
**horizontal** [3] - 937:16, 939:12, 1008:4

**hospital** [2] - 978:21, 1011:3
**hospitals** [9] - 965:10, 966:5, 966:6, 1011:4, 1011:9, 1040:13, 1040:15, 1053:5, 1054:15
**Howley** [1] - 934:11
**huge** [1] - 996:9
**human** [1] - 1060:16
**Humana** [1] - 1005:7, 1006:3
**hundreds** [2] - 977:20

**I**

**iAvenue** [3] - 951:17, 954:2, 954:3
**idea** [1] - 1050:20
**ideally** [3] - 951:22, 999:1, 1009:20
**ideas** [1] - 983:7
**identified** [3] - 946:12, 1005:24, 1043:23
**identify** [2] - 971:9, 1043:22
**identifying** [5] - 975:12, 982:11, 983:17, 1007:16, 1009:18
**imagination** [1] - 1021:22
**imagine** [1] - 979:1
**immediate** [1] - 1004:3
**immediately** [1] - 946:3
**impact** [15] - 956:17, 964:7, 969:24, 982:1, 987:4, 994:11, 995:15, 998:21, 1005:6, 1006:13, 1014:1, 1016:9, 1016:21, 1052:2, 1064:6
**impacted** [1] - 996:12
**impetus** [1] - 985:3
**implement** [8] - 969:4, 969:5, 969:6, 981:15, 983:9, 985:15, 1013:18
**importance** [1] - 952:25
**important** [20] - 937:5, 937:9, 940:2, 945:17, 956:16, 962:7, 963:9, 964:11, 971:21, 972:18, 975:21, 977:2, 978:15, 983:12, 983:19,

985:5, 988:18, 997:22, 1007:22, 1058:20
**importantly** [1] - 1013:4
**impose** [1] - 973:21
**impossible** [1] - 1006:11
**improve** [1] - 980:12
**IN** [1] - 933:1
**inability** [1] - 1005:25
**Inc** [3] - 933:6, 934:5, 1048:12
**incentive** [12] - 970:21, 978:18, 979:19, 979:20, 979:21, 981:3, 981:6, 984:18, 988:11, 993:8, 994:11, 998:20
**incentives** [16] - 965:2, 967:25, 968:1, 969:1, 969:15, 969:24, 973:23, 974:4, 979:9, 988:8, 988:14, 994:10, 994:22, 995:16, 996:12, 998:21
**incident** [1] - 983:18
**inclined** [2] - 996:3, 1003:15
**include** [10] - 1019:25, 1040:22, 1051:4, 1051:9, 1051:13, 1051:16, 1052:8, 1054:14, 1057:3, 1065:19
**included** [2] - 1063:25, 1065:16
**includes** [1] - 1057:11
**including** [4] - 978:12, 1064:1, 1064:9, 1065:20
**inclusive** [1] - 1064:14
**inconsistent** [3] - 1039:11, 1039:14, 1040:3
**incorporate** [4] - 958:4, 958:7, 958:10, 962:4
**incorporates** [1] - 960:4
**incorporating** [3] - 958:8, 960:15, 961:20
**increase** [2] - 992:12, 1006:21
**increased** [2] - 938:18, 938:19

**increases** [2] - 1002:23, 1006:25
**increasing** [1] - 1066:4
**increasingly** [1] - 1006:14
**incumbency** [4] - 952:14, 955:6, 956:5, 956:10
**incumbent** [13] - 952:4, 952:8, 952:9, 952:16, 953:2, 953:5, 953:13, 953:15, 954:7, 954:23, 954:24, 954:25, 955:1
**incur** [1] - 1017:13
**indeed** [4] - 946:1, 1001:2, 1001:6, 1013:16
**Independence** [1] - 1028:10
**independent** [5] - 981:5, 988:16, 991:19, 1052:17, 1052:19
**Index** [1] - 937:18
**indicate** [3] - 954:11, 954:17, 955:3
**indicates** [1] - 1061:25
**indication** [2] - 948:1, 952:16
**individual** [3] - 976:20, 1016:22, 1059:2
**individually** [2] - 976:17, 996:12
**individuals** [1] - 976:8
**industries** [1] - 951:10
**industry** [11] - 939:22, 947:15, 964:9, 968:9, 968:10, 973:18, 984:10, 1016:10, 1020:21, 1053:10, 1053:11
**infinitum** [1] - 1047:10
**influence** [1] - 992:20
**inform** [2] - 942:10, 943:5
**informal** [1] - 1000:15
**information** [20] - 944:2, 946:20, 955:23, 966:16, 991:20, 999:1, 999:9, 999:16, 999:19, 999:25, 1004:5, 1006:18, 1018:6, 1027:11, 1027:13, 1027:16, 1029:16, 1029:25, 1039:17

**informative** [1] - 1000:24

**infrastructure** [1] - 977:21

**initial** [2] - 1054:4, 1054:6

**innovate** [18] - 969:1, 969:16, 969:18, 969:24, 970:21, 979:9, 979:20, 979:21, 981:3, 981:6, 985:17, 986:3, 986:12, 988:8, 988:12, 988:14, 988:24

**innovates** [1] - 983:6

**innovating** [5] - 968:20, 981:2, 983:5, 983:11, 986:7

**innovation** [23] - 937:8, 956:19, 964:7, 968:4, 968:5, 969:12, 969:17, 969:19, 970:22, 976:16, 979:12, 981:4, 981:8, 983:14, 984:14, 986:8, 986:15, 986:18, 987:10, 988:2, 1006:12, 1013:18

**innovations** [13] - 969:6, 983:13, 985:16, 985:25, 986:2, 986:6, 986:10, 986:12, 987:1, 987:9, 987:11, 1006:14, 1014:2

**innovative** [6] - 949:21, 968:16, 988:20, 988:22, 1016:3, 1016:8

**innovativeness** [1] - 973:16

**innovator** [2] - 984:5, 1056:1

**input** [1] - 972:7

**inputs** [1] - 937:5

**inside** [3] - 966:17, 976:10, 1047:5

**insight** [1] - 958:5

**insignificant** [1] - 1047:20

**installing** [1] - 975:5

**instance** [3] - 1018:25, 1021:1, 1058:11

**instances** [1] - 1019:5

**Instead** [1] - 967:18

**instituted** [1] - 965:22

**insurance** [45] - 938:8, 938:11, 941:1, 941:13, 942:8, 944:14, 945:10, 950:13, 960:8, 960:20, 962:6, 964:7, 966:6, 966:9, 966:14, 972:16, 976:22, 977:15, 978:24, 979:4, 997:3, 1004:8, 1010:10, 1016:17, 1016:20, 1030:24, 1041:2, 1048:7, 1053:11, 1053:21, 1053:25, 1056:15, 1056:17, 1056:22, 1057:1, 1057:4, 1057:7, 1058:16, 1061:5, 1062:1, 1062:12, 1063:4, 1066:6

**insured** [5] - 945:2, 1017:4, 1017:7, 1017:12, 1024:2

**insurer** [8] - 952:9, 967:24, 975:18, 988:13, 1039:5, 1040:9, 1045:19, 1059:7

**insurers** [37] - 942:17, 943:2, 944:6, 944:18, 945:19, 952:5, 952:7, 952:8, 965:3, 965:6, 965:24, 966:12, 967:4, 967:9, 967:13, 970:11, 974:13, 975:14, 975:17, 975:23, 978:4, 978:5, 984:12, 988:22, 988:24, 989:2, 989:5, 1046:13, 1050:25, 1051:6, 1051:10, 1051:14, 1051:16, 1052:1, 1064:2, 1064:4

**insurers'** [1] - 988:8

**integrated** [2] - 966:2, 978:16

**integrating** [1] - 967:8

**integration** [1] - 979:5

**Intel** [9] - 1055:12, 1055:14, 1055:23, 1056:1, 1056:16, 1056:19, 1056:21, 1057:18, 1057:20

**Intel's** [1] - 1056:9

**intents** [1] - 1015:25

**interact** [2] - 980:10, 995:2

**interesting** [2] - 1000:14, 1005:18

**intermediate** [1] - 1032:9

**internal** [2] - 948:21, 948:22

**internalize** [1] - 978:20

**interpret** [4] - 940:22, 952:21, 956:1, 992:1

**interpreted** [1] - 1042:1

**invest** [1] - 1014:6

**investigative** [1] - 1052:13

**investing** [1] - 977:17

**investment** [4] - 1003:7, 1003:8, 1003:14, 1014:10

**investments** [2] - 973:23, 1003:12

**investors** [1] - 1049:20

**involve** [3] - 977:4, 977:6, 980:8

**involved** [11] - 965:4, 965:7, 966:6, 966:9, 999:21, 1003:13, 1015:12, 1018:21, 1025:5, 1037:23, 1052:20

**involves** [3] - 977:7, 1060:17

**involving** [2] - 1020:16, 1020:23

**irresponsible** [1] - 1017:15

**isolated** [1] - 965:20

**Israel** [4] - 955:12, 955:14, 961:6, 1012:11

**issue** [4] - 942:10, 963:1, 1026:6, 1031:15

**issues** [3] - 981:10, 985:11, 985:12

**IT** [2] - 977:21, 1056:1

**itself** [9] - 950:7, 959:8, 971:24, 1003:10, 1028:17, 1028:23, 1029:13, 1035:1, 1038:8

**Ivan** [1] - 933:14

**J**

**Jackson** [1] - 933:19

**JACKSON** [1] - 933:10

**Jacobs** [1] - 933:14

**January** [1] - 1046:24

**jeopardize** [1] - 1013:10

**jiggering** [1] - 996:22

**John** [2] - 934:6, 1054:21

**joint** [3] - 991:5, 994:25, 1055:14

**Jon** [1] - 933:14

**JUDGE** [2] - 933:10, 933:11

**July** [2] - 1018:18, 1021:3

**jumps** [3] - 941:16, 941:19, 941:23

**JUSTICE** [1] - 933:15

**Justice** [6] - 1015:24, 1018:17, 1047:1, 1048:24, 1048:25, 1052:11

**K**

**Kaiser** [28] - 944:25, 945:11, 964:24, 965:2, 965:11, 965:20, 976:18, 976:21, 1005:18, 1005:19, 1005:23, 1006:2, 1024:23, 1025:16, 1027:5, 1027:16, 1038:14, 1038:24, 1039:7, 1039:18, 1039:22, 1040:13, 1040:16, 1040:18, 1040:21, 1040:22, 1040:23, 1041:1

**Kaiser's** [4] - 1038:18, 1039:1, 1040:9, 1041:3

**Kansas** [1] - 1028:7

**Kate** [1] - 1005:21

**keep** [4] - 978:21, 987:17, 988:21, 1034:1

**keeping** [1] - 950:25

**key** [2] - 971:4, 979:6

**kind** [19] - 948:15, 952:14, 957:5, 962:9, 962:11, 965:8, 966:20, 971:11, 973:13, 980:15, 980:17, 991:1, 992:3, 995:7, 1003:11, 1005:5, 1017:15, 1060:19, 1065:23

**kinds** [2] - 967:20, 1004:4

**kit** [1] - 1053:24

**knowing** [1] - 984:10

**knowledge** [1] - 964:21

**known** [12] - 936:24, 950:13, 951:11, 956:8, 958:21, 964:14, 971:10, 972:2, 972:24, 1017:6, 1025:4, 1051:2

**knows** [1] - 970:13

**L**

**lack** [3] - 966:11, 1058:18, 1058:19

**lacked** [1] - 966:15

**lad** [1] - 1015:15

**land** [1] - 995:5

**large** [24] - 942:22, 971:19, 983:12, 985:16, 1005:14, 1008:6, 1010:6, 1016:24, 1025:6, 1042:23, 1043:1, 1043:2, 1043:4, 1043:11, 1049:13, 1054:15, 1058:24, 1064:9, 1064:11, 1064:13, 1064:15, 1064:17, 1064:19, 1065:15

**large/complex** [1] - 1046:10

**largely** [3] - 965:8, 1005:11, 1041:1

**larger** [6] - 985:24, 986:4, 1016:19, 1025:7, 1038:15, 1064:4

**largest** [8] - 938:18, 938:19, 945:17, 945:18, 946:21, 1051:1, 1056:9, 1056:15

**last** [8] - 971:3, 978:18, 979:3, 985:6, 989:19, 995:8, 1001:25, 1016:11

**late** [2] - 965:14, 966:18

**lawyers** [1] - 999:8

**lay** [1] - 1029:20

**laying** [1] - 1035:10

**lead** [4] - 938:22, 962:11, 1008:9

**leader** [7] - 972:3, 972:11, 972:13,

972:17, 978:2, 979:11, 1056:1
**leaders** [1] - 974:21
**leadership** [2] - 971:10, 980:16
**leads** [2] - 1010:16, 1015:10
**Leah** [1] - 934:2
**leak** [1] - 999:9
**learn** [1] - 989:2
**learned** [1] - 1016:2
**least** [8] - 939:17, 952:10, 1012:14, 1012:18, 1042:24, 1044:24, 1045:8, 1048:19
**leave** [1] - 1035:7
**led** [1] - 970:21
**Leemore** [1] - 938:14
**left** [3] - 953:7, 964:8, 1022:6
**length** [1] - 993:2
**less** [2] - 946:23, 967:19, 968:17, 979:17, 979:19, 980:2, 985:3, 988:14, 989:3, 989:4, 992:14, 995:12, 996:3, 997:22, 998:6, 998:8, 1003:14, 1007:3, 1008:18, 1009:16, 1014:10, 1024:16, 1024:21
**level** [9] - 939:16, 947:8, 952:8, 973:22, 990:12, 996:17, 996:19, 1012:5, 1015:20
**leverage** [1] - 948:10
**light** [8] - 941:7, 941:9, 941:10, 960:2, 960:6, 960:7, 960:17, 1015:20
**likely** [15] - 936:17, 938:7, 943:6, 944:19, 952:10, 964:7, 969:11, 990:25, 1002:6, 1002:8, 1002:16, 1003:1, 1003:2, 1006:24, 1015:21
**limit** [2] - 976:12, 1064:15
**limited** [1] - 996:5
**limits** [1] - 996:17
**line** [10] - 940:3, 941:5, 950:1, 959:20, 963:20, 1004:10, 1010:2, 1011:11,

1030:16, 1030:21
**lines** [1] - 1035:25
**LISA** [1] - 1067:3
**Lisa** [1] - 934:16
**listening** [1] - 957:18
**literature** [8] - 938:8, 943:10, 957:7, 968:3, 969:10, 972:19, 1011:8
**litigating** [1] - 1019:7
**litigation** [1] - 1025:5
**lived** [1] - 1002:24
**lives** [14] - 997:17, 997:18, 997:20, 997:21, 1004:23, 1004:24, 1013:16, 1013:17, 1014:22, 1014:23, 1015:1, 1024:8, 1037:12
**LLP** [2] - 934:8, 934:12
**local** [14] - 944:22, 945:6, 945:8, 945:9, 946:7, 983:19, 996:20, 1051:13, 1064:15, 1064:17, 1064:19, 1064:21, 1065:15
**localized** [1] - 1062:20
**located** [2] - 1024:22, 1044:24
**location** [2] - 992:4, 1023:3
**locations** [3] - 1006:8, 1048:1, 1064:20
**logical** [1] - 1066:9
**long-standing** [1] - 1000:8
**look** [32] - 936:13, 936:22, 937:6, 939:9, 947:17, 949:25, 956:20, 961:24, 968:2, 969:11, 969:14, 970:3, 974:20, 981:20, 981:23, 982:10, 984:16, 997:15, 1002:12, 1002:14, 1003:5, 1003:13, 1003:25, 1025:23, 1032:16, 1035:12, 1051:25, 1062:22, 1063:16
**looked** [5] - 938:10, 938:15, 962:22, 974:16, 992:15
**looking** [22] - 942:6, 944:6, 944:9, 944:15, 947:15, 953:21, 955:4, 968:8, 969:23,

1011:22, 1023:7, 1032:6, 1032:18, 1035:1, 1036:2, 1038:5, 1041:9, 1041:13, 1061:20
**looks** [4] - 938:9, 943:8, 962:2, 1033:20
**lose** [4] - 951:13, 955:16, 987:12, 993:6
**loses** [8] - 952:9, 953:8, 953:13, 955:15, 955:20, 955:21, 995:19
**losing** [7] - 953:3, 963:22, 970:14, 981:8, 988:19, 998:6, 1016:4
**loss** [3] - 936:25, 978:13, 988:16
**losses** [4] - 955:9, 1017:8, 1017:12, 1017:13
**lost** [5] - 951:12, 954:7, 962:22, 981:5, 1044:14
**loud** [4] - 1043:9, 1045:14, 1046:2, 1047:2
**loves** [1] - 1009:3
**low** [2] - 948:23, 980:13
**low-cost** [1] - 980:13
**lower** [8] - 972:7, 1000:7, 1013:1, 1014:2, 1014:9, 1015:1, 1043:13, 1043:20
**lowest** [4] - 971:15, 973:7, 973:22, 1046:17

## M

**machine** [1] - 933:23
**magnitude** [2] - 998:10, 1032:14
**main** [2] - 936:11, 1053:25
**maintain** [1] - 1059:13
**major** [5] - 975:14, 1007:21, 1024:24, 1045:19, 1056:24
**majority** [4] - 1023:2, 1039:23, 1041:1, 1041:6
**maker's** [1] - 959:4
**manage** [3] - 966:16, 985:10

**management** [1] - 1034:15
**Management** [1] - 1055:19
**manages** [1] - 1028:20
**mandate** [2] - 1016:18, 1016:23
**manufacturing** [1] - 1056:10
**March** [2] - 1045:25, 1055:19
**mark** [1] - 1004:16
**Mark** [1] - 934:6
**market** [118] - 936:19, 937:4, 937:10, 937:15, 937:19, 937:21, 937:22, 937:24, 938:3, 938:6, 938:25, 939:15, 939:24, 940:5, 940:8, 940:14, 940:17, 940:24, 941:2, 941:3, 941:14, 945:16, 947:8, 947:10, 947:11, 953:6, 953:18, 953:20, 954:5, 954:11, 955:3, 958:2, 961:24, 961:25, 962:1, 962:22, 963:3, 971:12, 974:17, 974:20, 979:17, 983:14, 989:6, 989:9, 990:10, 991:22, 992:6, 992:7, 992:11, 992:23, 997:6, 1001:25, 1003:2, 1003:11, 1004:15, 1007:3, 1007:23, 1007:24, 1009:1, 1009:2, 1009:4, 1009:18, 1015:24, 1016:3, 1016:19, 1021:15, 1022:4, 1023:8, 1023:14, 1023:17, 1024:16, 1028:14, 1029:9, 1029:10, 1031:3, 1031:6, 1031:19, 1032:2, 1034:5, 1034:20, 1035:22, 1035:25, 1036:6, 1037:8, 1040:21, 1043:25, 1046:15, 1046:16, 1050:7, 1050:10, 1050:11, 1050:12, 1050:14,

1050:16, 1051:5, 1051:6, 1051:9, 1051:10, 1051:14, 1052:3, 1052:4, 1052:9, 1053:2, 1053:9, 1053:16, 1054:2, 1057:3, 1063:9, 1063:25, 1064:4, 1066:5
**Market** [1] - 1026:17
**marketing** [1] - 950:6
**marketplace** [31] - 936:14, 938:15, 938:24, 949:18, 953:1, 957:22, 963:6, 968:21, 968:25, 970:19, 971:6, 971:15, 971:19, 979:14, 980:6, 980:16, 984:5, 986:18, 987:10, 988:20, 992:19, 997:8, 997:19, 1001:9, 1003:6, 1003:15, 1004:16, 1007:4, 1007:7, 1009:8, 1053:22
**markets** [11] - 936:10, 938:19, 940:25, 941:12, 942:2, 975:7, 987:24, 988:3, 1009:7, 1028:21, 1043:21
**Mart** [2] - 980:14, 980:17
**Martin** [1] - 934:7
**mass** [1] - 1056:18
**Massachusetts** [1] - 1028:7
**math** [1] - 1036:25, 1063:24
**matter** [2] - 943:10, 1037:21
**matters** [1] - 951:21
**mean** [17] - 948:15, 960:1, 961:17, 961:18, 984:8, 999:13, 1003:1, 1003:16, 1010:9, 1010:12, 1017:1, 1019:23, 1020:16, 1022:24, 1020:16, 1035:9, 1052:15
**meaning** [2] - 1040:13, 1053:3
**meaningful** [1] - 1043:10
**means** [14] - 940:4, 944:19, 945:24,

978:17, 994:18, 999:7, 999:25, 1008:14, 1013:14, 1022:16, 1026:16, 1048:18, 1051:20, 1063:22

**measure** [2] - 952:19, 1009:12

**measures** [4] - 958:10, 975:8, 1012:12, 1012:13

**measuring** [2] - 937:15, 951:19

**mechanism** [1] - 942:24

**Medicaid** [1] - 999:4

**medical** [2] - 979:5, 1012:2

**Medical** [2] - 1040:17, 1060:12

**Medicare** [2] - 999:5, 1005:10

**medium** [1] - 961:5

**meet** [2] - 944:7, 1020:23

**meetings** [1] - 1018:7

**MEHPS** [10] - 1060:10, 1061:4, 1061:12, 1061:15, 1061:17, 1061:24, 1063:3, 1064:25, 1065:5, 1065:10

**member** [5] - 949:23, 950:2, 950:12, 950:18, 1001:7

**members** [11] - 1036:5, 1060:4, 1060:5, 1064:23, 1065:7, 1065:10, 1065:11, 1065:13, 1065:14, 1065:17, 1065:19

**memoriam** [2] - 964:20, 971:20

**memory** [2] - 1053:18, 1063:17

**mental** [1] - 1036:25

**mention** [4] - 993:8, 1054:18, 1054:20, 1055:3

**mentioned** [6] - 939:5, 951:21, 962:8, 970:24, 989:19, 1025:3

**merge** [3] - 973:11, 980:19, 985:12

**merged** [1] - 1010:22

**merger** [98] - 936:15, 936:17, 936:20, 937:6, 937:11,

937:16, 939:11, 939:12, 939:13, 939:15, 939:17, 939:21, 939:25, 940:17, 941:7, 941:13, 941:15, 941:16, 941:25, 942:2, 942:3, 943:21, 952:19, 953:23, 955:14, 955:18, 956:3, 956:18, 957:4, 957:7, 957:12, 957:21, 958:9, 960:3, 960:7, 960:12, 961:11, 961:13, 962:3, 962:8, 962:16, 962:20, 963:22, 963:25, 964:6, 964:11, 968:4, 968:5, 969:11, 969:24, 970:1, 981:6, 981:20, 981:22, 981:24, 986:10, 986:15, 986:17, 988:7, 988:23, 991:3, 991:15, 992:8, 992:12, 993:10, 994:11, 994:22, 995:15, 996:18, 997:12, 998:3, 998:13, 998:24, 1001:11, 1002:6, 1002:12, 1002:14, 1003:23, 1006:21, 1006:25, 1008:5, 1008:9, 1008:16, 1011:5, 1011:6, 1011:13, 1012:8, 1014:16, 1014:18, 1014:20, 1015:23, 1016:9, 1018:18, 1021:2, 1043:18, 1052:4, 1053:17, 1064:7

**merger's** [6] - 943:6, 943:24, 968:13, 990:13, 994:16, 1015:21

**merger-specific** [2] - 1014:16, 1014:20

**mergers** [3] - 956:25, 1011:2, 1011:3

**merging** [3] - 969:24, 1027:11, 1036:6

**met** [1] - 958:9

**method** [2] - 937:15, 937:17

**methodological** [1] - 1060:23

**methodologies** [1] - 962:11

**methodology** [7] - 957:23, 1013:20, 1015:3, 1015:5, 1015:8, 1015:16, 1015:17

**methods** [2] - 956:22, 958:6

**metric** [1] - 950:5

**Mexico** [2] - 1056:8, 1056:9

**Michael** [1] - 934:8

**Michigan** [1] - 1028:7

**mid-2000s** [3] - 967:3, 970:10, 984:11

**midafternoon** [1] - 989:12

**middle** [2] - 972:25, 973:13

**might** [37] - 937:11, 939:20, 942:17, 942:19, 942:21, 962:19, 964:10, 969:4, 974:7, 979:13, 980:2, 981:1, 982:5, 986:1, 986:4, 988:4, 991:10, 992:6, 992:20, 994:19, 995:25, 996:1, 996:3, 997:23, 998:21, 1001:5, 1002:24, 1003:14, 1007:2, 1010:3, 1010:14, 1013:2, 1019:18, 1033:20, 1041:3, 1057:17, 1066:13

**migrated** [1] - 1056:23

**million** [15] - 960:13, 960:14, 960:17, 961:14, 961:15, 1031:22, 1031:23, 1032:15, 1033:4, 1033:18, 1033:19, 1036:17, 1057:20, 1057:22, 1057:24

**millions** [2] - 977:20, 977:21

**Milne** [1] - 934:7

**mindset** [1] - 1017:18

**minimis** [2] - 996:1, 996:2

**minimum** [1] - 983:6

**Minneapolis** [1] - 1054:24

**Minnesota** [1] - 1028:8

**minor** [2] - 942:21, 958:15

**minutes** [3] - 969:9, 989:15, 1035:2

**misconception** [1] - 1017:9

**misunderstandings** [1] - 1013:22

**mix** [1] - 1000:12

**model** [7] - 958:17, 958:19, 959:3, 968:17, 987:16, 1014:16, 1040:10

**modeling** [1] - 1058:15

**models** [1] - 974:23

**modest** [1] - 964:22

**moment** [5] - 942:1, 994:10, 1004:17, 1061:1, 1063:16

**Monday** [1] - 933:6

**money** [6] - 969:18, 977:9, 978:19, 978:22, 998:7, 1017:11

**monitor** [1] - 1059:9

**month** [4] - 949:24, 950:2, 950:13, 950:18

**months** [2] - 983:24, 1020:9

**Moreira** [2] - 934:16, 1067:10

**MOREIRA** [1] - 1067:3

**morning** [2] - 1004:22, 1008:1

**most** [7] - 940:14, 973:17, 977:13, 993:25, 994:13, 1053:18, 1058:2

**motion** [5] - 936:18, 989:18, 989:21, 989:22, 989:25

**move** [8] - 942:5, 947:7, 975:10, 983:4, 984:6, 987:13, 993:23, 1051:24

**moving** [2] - 997:25, 1066:10

**MR** [48] - 936:5, 990:8, 994:3, 994:7, 998:16, 1007:13, 1017:21, 1017:25, 1018:2, 1020:19, 1021:11, 1026:2, 1026:9, 1027:23, 1029:15, 1030:2, 1030:7, 1030:12, 1031:14, 1034:9,

1034:14, 1035:4, 1035:6, 1035:17, 1035:19, 1035:21, 1037:19, 1039:12, 1039:16, 1040:7, 1040:19, 1041:10, 1041:15, 1041:22, 1042:6, 1042:8, 1044:7, 1044:12, 1047:12, 1047:22, 1048:21, 1048:25, 1049:4, 1050:23, 1055:18, 1059:4, 1059:18, 1059:24, 1066:12

**multiple** [1] - 1049:12

**multiplying** [1] - 1065:9

**multistate** [3] - 1044:22, 1046:11, 1054:14

**must** [1] - 999:25

**muted** [1] - 981:6

# N

**NA5** [15] - 1022:8, 1023:25, 1026:14, 1026:20, 1026:22, 1032:3, 1032:15, 1033:13, 1034:2, 1036:2, 1036:5, 1038:6, 1041:12, 1058:10, 1065:16

**NA5ADJ** [1] - 1031:10

**NA5DENOM** [1] - 1031:16

**NA5G** [12] - 1022:18, 1023:5, 1023:25, 1033:6, 1033:14, 1034:5, 1036:9, 1036:12, 1038:6, 1041:12, 1058:10, 1065:16

**NA5GADJ** [1] - 1031:10

**NA5GDENOM** [1] - 1033:2

**name** [9] - 957:8, 991:7, 1042:18, 1043:2, 1045:14, 1046:1, 1047:2, 1050:18, 1060:10

**names** [4] - 946:12, 989:20, 997:2, 1059:7

**nation** [1] - 1025:7

**national** [84] - 940:19, 942:7, 945:1, 945:4, 945:12, 945:13, 945:16, 945:19, 945:24, 946:2,

946:5, 946:14, 946:17, 946:19, 947:6, 947:23, 970:16, 987:4, 987:6, 990:16, 996:24, 1002:7, 1004:1, 1004:7, 1004:16, 1004:18, 1005:3, 1005:8, 1005:24, 1006:3, 1006:4, 1015:22, 1016:1, 1016:19, 1022:5, 1022:11, 1023:16, 1024:3, 1032:10, 1036:5, 1038:1, 1038:3, 1038:4, 1038:7, 1041:23, 1042:4, 1042:10, 1042:15, 1042:24, 1043:13, 1043:19, 1043:23, 1043:25, 1044:1, 1044:5, 1045:20, 1046:6, 1046:10, 1047:3, 1047:9, 1047:25, 1050:24, 1051:2, 1051:5, 1051:6, 1051:10, 1051:14, 1051:16, 1051:18, 1052:9, 1053:2, 1053:3, 1056:3, 1057:5, 1062:17, 1062:18, 1062:21, 1063:2, 1063:9, 1064:11, 1064:14, 1064:17, 1064:20, 1065:20
**National** [5] - 1022:10, 1026:16, 1041:23, 1044:21, 1045:17
**NationalAccountSha res.xlsx** [1] - 1029:19
**nationwide** [7] - 1024:1, 1024:15, 1024:20, 1038:4, 1041:16, 1050:21, 1050:25
**nature** [2] - 983:21, 1001:4
**near** [1] - 940:13
**nearly** [3] - 939:8, 992:12, 1037:22
**necessarily** [2] - 962:10, 973:9
**necessary** [1] - 1027:13
**neck** [1] - 1004:10
**need** [18] - 951:1, 956:2, 974:6, 978:25, 989:11,

1000:1, 1002:19, 1003:7, 1004:5, 1004:17, 1004:23, 1004:24, 1007:15, 1008:12, 1014:18, 1016:25, 1044:3, 1046:19
**needs** [5] - 944:7, 987:16, 995:13, 1003:13, 1003:17
**negative** [1] - 1016:9
**negotiate** [2] - 995:6, 1000:7
**negotiated** [5] - 971:15, 971:23, 971:24, 1005:13, 1005:15
**negotiations** [1] - 971:21
**net** [1] - 986:15
**Net** [1] - 1052:18
**network** [7] - 985:2, 1004:18, 1006:7, 1012:2, 1051:1, 1053:4, 1053:20
**networks** [13] - 944:9, 945:23, 946:2, 946:6, 946:7, 946:14, 970:12, 1004:2, 1004:17, 1005:25, 1010:18, 1028:20
**never** [1] - 949:6, 949:20, 979:16, 984:19, 1001:8, 1010:22, 1010:24, 1015:8, 1023:19
**new** [13] - 942:17, 951:13, 963:7, 967:11, 969:20, 974:1, 975:5, 984:12, 984:17, 985:3, 986:22, 1000:9, 1014:2
**New** [6] - 1018:13, 1018:14, 1020:18, 1028:10, 1056:8, 1056:9
**next** [18] - 940:21, 942:5, 947:16, 947:17, 948:16, 956:12, 964:5, 969:8, 975:3, 981:4, 985:20, 1033:2, 1034:2, 1045:12, 1046:23, 1056:8, 1056:11, 1058:8
**NEXT** [1] - 933:22
**nice** [5] - 969:13, 971:17, 976:16,

1017:16, 1017:18
**nicer** [1] - 958:4
**niche** [1] - 970:15
**nobody** [3] - 939:14, 983:10, 1009:7
**noisy** [1] - 1012:13
**non** [27] - 991:13, 991:15, 992:21, 993:9, 993:12, 994:12, 994:23, 995:10, 995:16, 995:18, 995:23, 996:4, 996:6, 997:10, 998:7, 998:24, 999:18, 1000:2, 1000:5, 1000:6, 1000:18, 1001:16, 1001:22, 1028:11, 1039:7, 1040:23
**non-Anthem** [23] - 991:15, 992:21, 993:9, 993:12, 994:12, 994:23, 995:10, 995:16, 995:18, 995:23, 996:4, 996:6, 997:10, 998:7, 998:24, 999:18, 1000:2, 1000:5, 1000:6, 1000:18, 1001:16, 1001:22
**non-California** [1] - 1028:11
**non-HMO** [2] - 1039:7, 1040:23
**noncompetes** [1] - 946:1
**none** [2] - 995:19, 1021:6
**nonparty** [2] - 1045:13, 1059:7
**nonstarter** [1] - 1013:21
**nontrivial** [2] - 993:21, 993:25
**normal** [1] - 1010:7
**normally** [1] - 993:5
**North** [1] - 1028:8
**note** [3] - 983:12, 989:18, 1029:5
**notes** [1] - 1067:5
**nothing** [3] - 966:23, 993:20, 1033:1
**notion** [1] - 1014:24
**Nov** [1] - 933:6
**November** [3] - 1018:22, 1055:11, 1067:8
**number** [46] - 940:10,

942:16, 946:3, 950:1, 953:4, 959:2, 977:18, 988:3, 1009:5, 1012:10, 1015:1, 1029:13, 1031:20, 1031:23, 1032:5, 1032:6, 1032:13, 1032:16, 1032:18, 1032:20, 1033:1, 1033:10, 1036:2, 1036:3, 1037:11, 1043:12, 1043:13, 1044:3, 1044:15, 1046:17, 1050:17, 1050:18, 1056:19, 1058:11, 1059:17, 1059:19, 1060:20, 1061:10, 1061:12, 1061:15, 1062:4, 1064:21, 1065:10, 1065:11
**numbered** [1] - 1046:2
**numbers** [24] - 940:22, 942:1, 952:21, 960:1, 960:5, 962:19, 962:20, 963:10, 963:24, 992:1, 992:14, 993:16, 994:5, 996:20, 998:1, 998:18, 1012:11, 1012:16, 1026:24, 1029:18, 1033:22, 1041:16, 1041:17, 1057:19
**numerator** [1] - 1059:6
**nutshell** [1] - 968:19
**NW** [6] - 933:16, 933:20, 934:9, 934:13, 934:18, 1067:12

**O**

**object** [2] - 958:24
**objection** [2] - 1030:12, 1034:9
**observations** [1] - 1012:5
**observe** [1] - 947:1
**observed** [17] - 942:9, 942:11, 944:21, 945:15, 946:13, 946:16, 947:22, 970:8, 972:21, 973:15, 977:24, 979:8, 983:4, 984:1, 985:21, 1005:2, 1007:19
**observing** [1] - 964:1
**obstacles** [1] - 938:12

**obviously** [5] - 955:7, 963:11, 970:5, 972:12, 992:17
**occupies** [1] - 968:24
**occur** [1] - 1009:23
**occurred** [2] - 1002:24, 1015:6
**OF** [5] - 933:1, 933:9, 933:15, 933:19, 1067:1
**off-setting** [1] - 939:20
**offer** [6] - 971:11, 972:4, 1017:2, 1050:25, 1056:24, 1062:1
**offered** [2] - 983:10, 1040:23
**offering** [6] - 945:25, 965:7, 978:17, 979:5, 983:10, 1016:20
**offers** [1] - 1039:7
**OFFICE** [2] - 933:19, 934:2
**OFFICIAL** [1] - 1067:1
**Official** [1] - 934:17
**official** [1] - 1067:10
**offset** [5] - 937:11, 1003:23, 1008:20, 1012:7, 1017:12
**offsetting** [1] - 1013:14
**often** [19] - 943:23, 946:17, 951:7, 951:23, 952:7, 952:14, 953:2, 953:17, 954:16, 955:24, 957:11, 958:1, 958:5, 962:14, 963:14, 966:13, 972:21, 973:12, 1009:16
**old** [2] - 968:21, 970:12
**old-fashioned** [1] - 970:12
**ON** [1] - 933:22
**once** [9] - 962:4, 963:1, 966:19, 968:23, 968:24, 1000:12, 1003:10, 1023:20, 1029:7
**one** [74] - 943:18, 946:20, 947:18, 949:10, 950:23, 952:11, 956:16, 956:17, 956:20, 957:3, 958:15, 962:7, 962:17, 962:24, 963:2,

964:24, 968:23, 969:14, 969:16, 972:19, 973:6, 973:17, 975:17, 978:23, 979:25, 980:10, 982:16, 985:6, 987:14, 988:19, 988:20, 989:3, 991:6, 991:9, 992:6, 994:13, 995:4, 996:11, 997:11, 999:14, 1001:24, 1005:6, 1005:10, 1005:17, 1007:21, 1008:10, 1009:10, 1010:16, 1010:17, 1014:19, 1015:3, 1016:2, 1017:1, 1019:14, 1019:22, 1020:4, 1021:18, 1041:8, 1042:23, 1043:1, 1043:4, 1043:11, 1045:8, 1045:10, 1046:24, 1048:1, 1049:8, 1053:22, 1054:4, 1054:25, 1055:3, 1060:17, 1066:10

**one-size-fits-all** [1] - 982:16

**ones** [2] - 1029:11, 1029:12

**operate** [3] - 1024:10, 1024:11, 1058:11

**operates** [1] - 1052:15

**operating** [3] - 964:16, 997:15, 1024:7

**operational** [1] - 961:18

**operations** [1] - 1034:17

**opinion** [3] - 986:15, 1015:21, 1047:17

**opinions** [4] - 985:6, 985:7, 1016:11, 1034:18

**opportunities** [2] - 991:19, 991:21

**option** [2] - 945:3, 1059:3

**options** [1] - 1057:4

**order** [13] - 956:2, 979:15, 995:5, 998:10, 1004:22, 1004:23, 1004:24, 1028:18, 1034:15, 1050:6, 1050:17, 1061:17

**orders** [1] - 1032:14

**ordinary** [4] - 955:5, 1009:23, 1009:24, 1015:6

**organization** [5] - 976:9, 976:10, 976:11, 976:12, 984:19

**organizations** [8] - 964:19, 966:4, 973:5, 973:21, 976:6, 976:7, 982:4

**otherwise** [2] - 990:4, 1064:9

**ought** [2] - 954:24, 1065:21

**outcome** [4] - 943:25, 957:6, 957:15, 981:20

**outcomes** [2] - 956:25, 957:1

**output** [5] - 1008:20, 1008:24, 1009:11, 1009:12, 1009:17

**outside** [15] - 966:17, 976:11, 990:24, 993:4, 993:19, 998:22, 1000:19, 1009:23, 1009:24, 1010:7, 1011:14, 1024:25, 1034:13, 1047:3, 1064:5

**outsourced** [2] - 965:9, 978:22

**ovals** [1] - 1021:20

**overall** [11] - 947:15, 954:5, 954:16, 972:15, 974:20, 986:14, 991:7, 995:8, 996:14, 998:11, 1025:14

**overcome** [1] - 938:13

**overcomes** [1] - 938:12

**overlap** [1] - 1018:15

**overoptimistic** [1] - 975:4

**own** [26] - 945:8, 946:7, 965:10, 967:1, 967:14, 969:22, 973:23, 974:7, 974:10, 974:14, 976:24, 983:9, 984:3, 988:6, 994:20, 995:1, 1001:23, 1002:2, 1014:6, 1028:22, 1032:7, 1040:15, 1050:13, 1053:4, 1054:15

**owned** [3] - 945:18,

976:9, 1040:16

**owners** [1] - 994:25

**ownership** [2] - 991:11, 991:12

## P

**p.m** [2] - 933:6, 1066:22

**package** [1] - 982:25

**Page** [12] - 1039:7, 1039:12, 1042:19, 1042:20, 1044:10, 1044:18, 1048:11, 1048:13, 1049:10, 1050:22, 1054:10, 1055:21

**PAGE** [2] - 933:22, 935:3

**page** [5] - 1042:22, 1043:9, 1044:15, 1046:2, 1046:25

**pages** [1] - 1061:22

**paid** [3] - 1005:11, 1011:4, 1057:8

**paint** [1] - 982:17

**Panel** [1] - 1060:12

**paper** [2] - 938:13, 1005:21

**Paragraph** [4] - 1039:6, 1042:19, 1042:20, 1050:22

**paragraph** [4] - 1039:12, 1044:11, 1044:18, 1056:8

**parallels** [2] - 1000:23, 1001:12

**parent** [1] - 1066:4

**parlance** [2] - 957:7, 1017:6

**part** [10] - 944:14, 967:9, 986:16, 993:1, 993:13, 1014:8, 1025:4, 1026:9, 1049:14, 1053:15

**partial** [3] - 991:10, 991:12, 1007:14

**participants** [2] - 1052:4, 1053:16

**participate** [3] - 973:24, 978:13, 1005:10

**participated** [2] - 1052:22, 1052:23

**particular** [8] - 950:12, 972:9, 991:4, 992:3, 992:11, 1028:19, 1050:13, 1063:19

**particularly** [2] -

1008:12, 1018:14

**parties** [2] - 1034:15, 1036:6

**partner** [1] - 1014:9

**partnership** [3] - 967:4, 967:23, 976:24

**partnerships** [1] - 969:7

**parts** [1] - 967:12

**partway** [1] - 976:5

**party** [2] - 1007:14, 1007:16

**pass** [1] - 1017:21

**passed** [1] - 999:2

**past** [5] - 964:12, 975:2, 990:6, 1000:8, 1011:18

**patch** [3] - 946:6, 985:8, 985:10

**path** [2] - 964:9, 970:22

**patience** [1] - 1040:19

**patient's** [1] - 965:16

**patients** [2] - 967:20, 976:8

**patterns** [1] - 965:12

**Paul** [1] - 934:12

**pause** [1] - 1016:8

**pay** [3] - 945:24, 967:19, 1003:12

**paying** [9] - 960:8, 960:19, 960:23, 967:18, 1004:2, 1013:25, 1017:3, 1057:21, 1057:23

**payments** [1] - 961:20

**payroll** [1] - 1040:14

**pencil** [1] - 942:18

**pencil-sharpening** [1] - 942:18

**people** [14] - 943:2, 947:11, 950:25, 965:4, 976:3, 978:7, 978:21, 989:22, 989:23, 1009:15, 1017:3, 1019:9, 1021:6

**per** [10] - 949:23, 950:1, 950:2, 950:12, 950:13, 950:17, 950:18, 1065:7, 1065:10

**Per** [1] - 1061:4

**perceived** [1] - 965:18

**percent** [69] - 937:20, 946:23, 953:6, 953:7, 953:9, 953:11, 953:14, 954:6, 954:8,

954:10, 954:18, 954:20, 954:24, 955:1, 959:4, 972:22, 996:20, 1023:4, 1024:1, 1024:17, 1024:18, 1024:19, 1025:10, 1025:11, 1025:12, 1025:16, 1025:17, 1026:24, 1027:3, 1033:13, 1033:21, 1034:3, 1034:6, 1034:25, 1035:1, 1035:22, 1035:23, 1035:24, 1036:3, 1036:4, 1036:6, 1036:9, 1037:24, 1038:2, 1038:9, 1038:15, 1041:20, 1044:24, 1057:9, 1057:12, 1057:15, 1057:21, 1057:23, 1061:5, 1061:7, 1061:12, 1062:11, 1062:16, 1063:3, 1063:13

**percentage** [1] - 1035:12

**percentages** [3] - 1027:20, 1027:21, 1027:22

**perfect** [3] - 999:11, 1000:23, 1012:13

**perfectly** [1] - 1014:14

**performance** [1] - 1006:7

**performed** [1] - 1053:7

**perhaps** [13] - 938:11, 945:17, 953:25, 957:24, 958:15, 971:4, 971:14, 996:9, 1000:5, 1000:7, 1002:17, 1012:16, 1013:4

**period** [1] - 954:4

**perked** [1] - 999:6

**Permanente** [1] - 1040:17

**permitted** [1] - 1009:20

**persist** [1] - 984:12

**perspective** [1] - 955:8

**Peter** [1] - 933:15

**Ph.D** [2] - 935:4, 936:3

**phase** [1] - 1012:4

**Phase** [1] - 1064:12

**physician** [1] - 1059:2

**physicians** [1] - 966:5

**pick** [4] - 1044:3,

1045:20, 1046:9,
1066:16
**pie** [4] - 1021:15,
1025:15, 1027:24,
1034:25
**piece** [8] - 956:16,
956:17, 956:20,
975:10, 977:10,
977:16, 978:15
**pies** [1] - 1022:2
**Pilgrim** [2] - 965:4,
976:18
**pipeline** [1] - 978:20
**place** [6] - 949:23,
989:11, 1000:1,
1019:14, 1020:9,
1020:10
**Plaintiffs** [2] - 933:4,
933:13
**plan** [5] - 999:4, 999:5,
1002:2, 1013:5,
1056:12
**planned** [1] - 982:1
**planning** [4] -
1009:23, 1009:25,
1011:14, 1015:7
**plans** [5] - 945:2,
945:6, 994:14,
1040:18, 1056:23
**plant** [1] - 1056:10
**platforms** [1] - 944:16
**play** [3] - 984:22,
988:17, 1000:10
**played** [1] - 984:19
**player** [6] - 970:15,
984:25, 997:22,
1006:3, 1006:4,
1038:19
**players** [1] - 1038:21
**playing** [2] - 985:1,
985:2
**plays** [1] - 979:13
**plus** [9] - 941:13,
962:5, 1036:9,
1046:11, 1046:21,
1049:7, 1060:4,
1064:23
**Plus** [1] - 1026:17
**point** [32] - 939:5,
940:2, 941:19,
942:18, 942:21,
944:4, 945:17,
949:13, 950:9,
950:15, 955:9,
958:15, 962:7,
985:6, 987:16,
987:22, 995:22,
1007:20, 1009:2,
1011:14, 1012:11,
1013:10, 1014:21,

1029:3, 1029:4,
1035:14, 1058:15,
1062:17, 1063:8,
1063:17, 1066:9
**points** [2] - 939:17,
985:22
**population** [6] -
975:24, 976:1,
976:13, 976:17,
976:22, 1009:21
**portion** [6] - 946:11,
946:13, 954:1,
983:16, 1039:24,
1041:3
**portions** [2] - 1024:11,
1024:13
**portrait** [1] - 943:8
**position** [9] - 968:20,
968:25, 971:5,
971:18, 971:19,
972:1, 979:18,
981:7, 985:1
**positions** [2] - 971:8
**positive** [1] - 961:12
**possess** [1] - 1066:8
**possibility** [1] -
1000:12
**possible** [3] - 1007:2,
1007:3, 1016:17
**possibly** [1] - 976:17
**potential** [7] - 993:17,
995:12, 999:12,
1000:3, 1005:5,
1015:11, 1053:8
**potentially** [9] -
956:16, 963:10,
967:5, 973:4,
996:21, 1005:15,
1012:16, 1041:3,
1066:1
**PPO** [1] - 945:3
**practices** [2] - 989:3,
989:4
**predict** [3] - 951:8,
982:2, 987:4
**predicted** [2] - 953:18,
953:20
**prediction** [1] -
1010:13
**preliminary** [4] -
1034:16, 1034:20,
1035:7, 1035:9
**premature** [1] - 982:9
**premiums** [3] - 937:7,
938:18, 1057:8
**preponderance** [2] -
968:6
**Presbyterian** [2] -
1056:12, 1056:15
**presence** [3] - 948:8,

948:9, 1001:23
**present** [3] - 1004:18,
1028:16, 1031:3
**presented** [3] -
981:21, 1025:19,
1028:15
**presents** [1] - 1001:17
**President** [1] - 965:15
**president** [1] - 1049:9
**pressure** [1] - 957:4
**presumably** [1] -
963:24
**presumption** [1] -
939:19
**presumptions** [1] -
941:25
**presumptively** [2] -
939:18, 964:2
**pretty** [4] - 971:11,
972:22, 979:10,
1027:12
**prevent** [3] - 965:17,
1002:6, 1002:9
**prevented** [2] - 986:6,
1002:22
**previous** [1] - 944:17
**previously** [1] - 1026:7
**price** [24] - 937:3,
943:13, 943:17,
950:22, 950:23,
956:13, 956:23,
958:20, 958:24,
959:5, 959:10,
961:9, 964:3,
966:13, 971:21,
1002:23, 1006:21,
1006:24, 1012:8,
1019:2, 1019:6,
1019:10, 1020:15,
1043:21
**price-driven** [1] -
959:5
**price-fixing** [4] -
1019:2, 1019:6,
1019:10, 1020:15
**prices** [7] - 937:7,
938:7, 938:23,
939:4, 956:18,
972:7, 985:13
**pricing** [4] - 939:7,
957:3, 1008:8,
1014:15
**primarily** [1] - 1044:23
**principal** [2] - 937:15,
937:17
**principle** [2] - 958:6,
1059:1
**principles** [1] -
1003:22
**private** [5] - 1006:20,

1007:1, 1007:6,
1007:22, 1008:2
**privately** [2] - 1017:7,
1017:12
**privity** [1] - 1053:5
**pro** [2] - 995:11,
1008:10
**pro-competitive** [1] -
1008:10
**problem** [9] - 967:14,
976:6, 989:21,
997:17, 1001:17,
1004:21, 1005:9,
1005:24
**problematically** [1] -
996:23
**problems** [9] - 964:15,
964:19, 964:21,
964:22, 964:25,
967:12, 997:8,
997:9, 1015:10
**proceed** [2] - 990:7,
1029:17
**proceedings** [1] -
1067:6
**Proceedings** [1] -
933:23
**process** [3] - 942:23,
944:20, 1011:15
**procurement** [1] -
942:24
**procuring** [1] -
1053:21
**produced** [3] - 933:23,
1049:25, 1050:3
**producing** [2] -
1009:14, 1012:25
**product** [23] - 945:25,
950:24, 971:11,
972:4, 972:8,
978:25, 980:13,
1000:18, 1004:8,
1038:25, 1039:19,
1039:22, 1039:24,
1041:2, 1051:5,
1051:9, 1051:10,
1051:14, 1052:9,
1053:2, 1053:16,
1053:21
**products** [10] -
966:13, 981:16,
981:17, 995:3,
997:13, 1039:7,
1040:23, 1041:1
**profession** [1] -
1050:19
**Professor** [12] - 936:6,
938:13, 946:9,
949:13, 967:15,
970:23, 990:9,

1002:4, 1005:21,
1007:19, 1013:24,
1015:18
**profitability** [1] -
1003:4
**profitable** [1] - 1003:3
**profits** [2] - 969:17,
1017:14
**program** [11] - 947:25,
948:14, 948:19,
978:16, 978:23,
978:24, 979:3,
979:7, 1005:11,
1056:11
**programs** [17] -
944:16, 950:19,
964:17, 967:9,
977:25, 978:8,
978:10, 978:14,
979:24, 980:21,
981:16, 981:17,
982:23, 984:2,
1004:13, 1029:22
**project** [1] - 1011:13
**projected** [1] - 1056:4
**projections** [3] -
982:9, 1010:15,
1011:6
**promise** [2] - 977:1,
986:25
**prongs** [2] - 985:20,
986:14
**properly** [1] - 944:13
**proposed** [3] - 983:24,
994:4, 998:17
**proposition** [2] -
970:14, 987:15
**Protection** [1] - 934:3
**prove** [1] - 1008:9
**provide** [7] - 971:2,
974:5, 980:13,
991:3, 994:4,
1004:4, 1012:5
**provided** [2] -
1003:20, 1059:21
**provider** [11] - 945:5,
967:7, 973:21,
976:7, 977:4,
983:17, 985:13,
986:19, 1006:15,
1012:19, 1013:1
**provider's** [1] - 976:2
**provider-sponsored**
[1] - 945:5
**providers** [60] -
961:20, 964:16,
965:2, 965:23,
966:1, 966:9,
966:12, 966:25,
967:4, 967:13,

967:16, 967:17, 967:18, 973:7, 973:24, 973:25, 974:5, 974:6, 974:7, 974:8, 974:9, 974:10, 974:14, 975:15, 975:18, 980:8, 980:10, 981:13, 981:14, 982:11, 982:18, 982:19, 982:23, 982:24, 983:1, 985:14, 997:19, 997:22, 1004:5, 1005:11, 1006:16, 1013:2, 1013:11, 1013:25, 1014:2, 1014:4, 1014:5, 1014:8, 1014:10, 1014:13, 1014:17, 1014:21, 1014:24, 1017:1, 1017:10, 1017:15, 1017:16, 1017:19, 1053:4, 1053:5

**providers'** [1] - 975:23
**providing** [4] - 1006:6, 1006:16, 1007:17, 1053:21
**provisions** [1] - 1016:13
**proxy** [1] - 952:14
**Prudential** [1] - 938:16
**public** [10] - 975:11, 1021:11, 1029:16, 1030:9, 1037:20, 1039:17, 1044:8, 1048:6, 1055:18, 1059:10
**published** [2] - 964:18, 1005:21
**pull** [1] - 974:7
**purchasing** [2] - 942:8, 1058:16
**purpose** [1] - 1027:8
**purposes** [4] - 1015:25, 1049:3, 1051:19, 1051:21
**pursue** [1] - 972:23
**pursuing** [1] - 971:7
**push** [2] - 948:4, 949:7
**pushed** [2] - 948:8, 948:9
**put** [23] - 950:22, 980:10, 999:24, 1004:2, 1019:9, 1019:15, 1020:19, 1021:12, 1026:3, 1028:23, 1029:17, 1030:2, 1039:16,

1041:3, 1041:6, 1045:15, 1048:21, 1049:23, 1050:18, 1050:21, 1059:4, 1059:8, 1062:15
**puzzle** [3] - 956:16, 956:17, 956:21
**PX125** [1] - 1044:11

## Q

**qualitative** [1] - 936:25
**quality** [7] - 967:21, 971:13, 972:8, 1004:8, 1009:19, 1013:12, 1013:13
**quantification** [2] - 963:23, 993:25
**quantify** [5] - 948:16, 948:18, 956:20, 956:22, 964:3
**quantitative** [1] - 1033:18
**quantities** [1] - 968:1
**quantity** [3] - 950:23, 950:24, 1009:17
**quarters** [1] - 1033:23
**questions** [7] - 937:9, 957:18, 981:19, 1015:18, 1020:25, 1023:9, 1066:12
**quick** [3] - 946:9, 1015:3, 1034:10
**quickly** [1] - 941:11
**quid** [1] - 995:11
**quite** [10] - 956:1, 962:14, 963:14, 964:8, 983:14, 983:15, 1000:24, 1038:20, 1039:2, 1066:1
**quo** [2] - 984:11, 995:11
**quote** [14] - 973:13, 976:9, 980:11, 1037:16, 1037:21, 1042:12, 1045:20, 1046:9, 1046:10, 1047:3, 1048:16, 1049:9, 1058:2, 1058:24
**quote-unquote** [2] - 973:13, 976:9

## R

**raised** [2] - 991:17, 1038:23
**ran** [1] - 954:12
**range** [1] - 951:10
**ranging** [1] - 961:14

**ranked** [5] - 951:7, 951:23, 952:12, 955:25, 963:13
**rapid** [1] - 975:6
**rapidly** [2] - 947:14, 988:24
**rate** [2] - 975:6, 995:5
**rates** [11] - 973:7, 973:9, 1005:11, 1012:19, 1013:1, 1013:6, 1013:25, 1014:5, 1014:7, 1014:9, 1015:2
**rather** [2] - 986:17, 1021:20
**ratio** [1] - 1033:13
**rationale** [1] - 956:13
**raw** [1] - 1029:24
**RDR** [3] - 934:16, 1067:3, 1067:10
**reach** [2] - 1033:9, 1056:4
**read** [14] - 980:11, 982:19, 1029:6, 1030:10, 1039:8, 1039:20, 1043:9, 1044:13, 1044:19, 1045:3, 1046:1, 1047:2, 1050:24, 1061:1
**readily** [1] - 957:23
**reading** [1] - 1031:9
**reads** [3] - 1028:5, 1034:3, 1044:21
**ready** [1] - 948:2
**real** [2] - 966:18, 1006:10
**reality** [6] - 947:19, 948:15, 954:9, 954:19, 956:9, 970:2
**realize** [4] - 974:19, 997:11, 1011:9, 1017:23
**realizes** [1] - 949:20
**really** [19] - 943:19, 943:22, 947:20, 949:10, 949:11, 956:1, 966:23, 966:24, 977:15, 981:22, 984:15, 984:17, 986:20, 987:2, 1005:17, 1008:15, 1009:19, 1009:25, 1016:9
**realm** [1] - 1000:12
**reason** [8] - 939:20, 952:9, 962:18, 963:17, 998:12, 1014:19, 1015:10, 1039:3

**reasonable** [3] - 962:19, 971:11, 1032:16
**reasons** [7] - 962:25, 971:22, 979:19, 1010:14, 1012:10, 1017:1, 1047:8
**rebate** [1] - 977:10
**rebrand** [1] - 997:7
**rebranding** [3] - 981:16, 997:9, 997:12
**rebuttal** [2] - 1012:4, 1013:23
**recapture** [3] - 996:2, 997:25, 998:8
**receive** [3] - 1003:11, 1052:15, 1052:19
**received** [4] - 982:13, 989:23, 1052:11, 1052:13
**receiving** [1] - 989:24
**Recess** [1] - 989:16
**recipient** [1] - 1060:1
**recipients** [1] - 1059:13
**recognition** [1] - 944:10
**recognize** [1] - 964:24
**recognizes** [1] - 983:7
**recognizing** [2] - 984:1, 992:5
**recollection** [4] - 1025:25, 1032:1, 1032:24, 1061:19
**recommended** [1] - 946:22
**recomputing** [1] - 961:9
**record** [20] - 941:11, 942:9, 946:13, 946:19, 970:9, 973:15, 979:8, 980:4, 981:24, 982:5, 983:5, 985:22, 1003:21, 1005:2, 1008:24, 1020:20, 1029:18, 1047:16, 1047:18, 1047:21
**red** [1] - 941:5
**redacted** [10] - 946:11, 946:13, 975:11, 975:13, 983:16, 993:15, 994:5, 997:25, 1007:11, 1059:5
**redaction** [1] - 1059:11
**redefine** [1] - 1049:17

**reduce** [5] - 951:2, 968:1, 979:3, 997:6, 1009:4
**reduced** [3] - 988:12, 988:14, 1016:1
**reduces** [1] - 946:3
**reducing** [5] - 949:23, 950:23, 950:24, 972:9, 1012:24
**reduction** [1] - 961:20
**reductions** [3] - 950:18, 1008:19, 1008:23
**refer** [2] - 1046:6, 1054:12
**reference** [2] - 1035:25, 1046:21
**referral** [1] - 965:12
**referrals** [1] - 966:17
**referred** [1] - 1053:12
**referring** [1] - 1035:25
**reflect** [3] - 962:15, 974:17, 1028:18
**reflected** [2] - 953:1, 990:1
**reflection** [1] - 998:8
**reflects** [1] - 1028:6
**refresh** [5] - 1025:25, 1032:1, 1053:18, 1061:19, 1063:17
**refuse** [1] - 1009:10
**regarded** [1] - 953:16
**regarding** [1] - 1021:2
**regional** [5] - 944:21, 944:23, 983:19, 1049:14, 1051:9
**regionals** [2] - 945:2, 945:5
**regions** [1] - 1045:22
**regular** [1] - 989:24
**reimbursed** [1] - 965:24
**reimbursement** [4] - 964:25, 965:25, 1012:19, 1013:25
**reimbursing** [1] - 1004:12
**reins** [1] - 949:19
**rejected** [1] - 1013:10
**relate** [1] - 999:17
**related** [3] - 975:11, 989:18, 1034:17
**relation** [2] - 1040:20, 1043:11
**relationship** [9] - 983:22, 983:25, 991:16, 994:24, 1000:2, 1001:1, 1001:20, 1004:9, 1033:16

relationships [8] - 981:13, 983:20, 983:23, 997:14, 998:19, 1001:15, 1013:11, 1045:2
relative [2] - 982:13, 1027:9
relatively [1] - 1029:22
relevant [3] - 1035:13, 1053:14, 1054:2
relied [1] - 1034:18
remain [1] - 989:14
remained [1] - 991:18
remains [1] - 994:15
remarkably [2] - 978:25, 1010:6
remember [6] - 940:2, 958:1, 983:23, 990:15, 1028:25, 1061:23
remind [1] - 1015:12
remove [1] - 938:23
rent [2] - 945:23
rental [3] - 945:24, 946:6, 1004:2
renting [2] - 946:2, 946:13
repeat [1] - 1008:22
replace [1] - 1003:19
replaced [1] - 949:11
replacement [5] - 944:24, 1006:7, 1053:20, 1053:23, 1055:15
replaces [1] - 944:25
replacing [1] - 945:3
report [48] - 1018:9, 1018:24, 1019:2, 1019:15, 1020:15, 1022:8, 1022:17, 1022:20, 1025:20, 1025:22, 1026:9, 1026:10, 1029:2, 1029:6, 1029:7, 1029:11, 1029:21, 1032:18, 1032:19, 1032:21, 1034:8, 1034:19, 1036:15, 1038:24, 1039:7, 1039:18, 1039:20, 1040:2, 1040:24, 1042:17, 1042:19, 1043:8, 1043:24, 1054:4, 1054:6, 1054:10, 1054:18, 1055:3, 1057:15, 1058:1, 1058:14, 1061:22, 1061:24, 1064:6
reported [18] - 933:23,

946:21, 1007:24, 1022:1, 1027:14, 1030:18, 1032:4, 1032:22, 1034:21, 1049:5, 1059:24, 1059:25, 1060:2, 1060:4, 1062:24, 1063:21, 1064:1, 1065:22
Reporter [3] - 934:16, 934:17, 1067:10
REPORTER [1] - 1067:1
reporter [1] - 989:12
reporting [1] - 1025:24
reports [9] - 948:7, 1018:24, 1019:3, 1019:25, 1028:16, 1029:9, 1029:11, 1032:23, 1043:24
repositioning [2] - 937:10, 1002:5
represent [4] - 984:17, 992:11, 1032:21, 1033:9
represents [1] - 961:4
reputation [1] - 944:10
request [4] - 1048:12, 1048:15, 1049:1, 1049:3
requested [1] - 1052:24
requests [1] - 1049:25
require [1] - 1017:15
required [3] - 1003:7, 1003:23, 1022:21
requirement [2] - 1016:23, 1026:20
requirements [2] - 958:8, 1023:5
research [5] - 938:5, 968:7, 986:25, 1005:21, 1011:8
reside [1] - 1024:9
residence [1] - 1019:10
resources [4] - 966:11, 986:2, 1003:6, 1012:24
respect [1] - 992:23
respectful [1] - 995:13
responded [1] - 1062:23
response [9] - 983:13, 1002:5, 1017:10, 1040:22, 1045:13, 1045:25, 1046:23, 1046:25, 1048:24
responses [2] - 942:16

responsibility [1] - 976:3
responsible [2] - 976:13, 976:21
responsive [1] - 983:3
rest [1] - 1041:16
restrict [2] - 941:21, 997:5
restricted [1] - 954:3
restricting [1] - 1009:11
result [10] - 937:11, 953:19, 955:6, 962:2, 963:22, 966:17, 993:10, 1002:25, 1007:2, 1063:2
resulted [2] - 939:13, 967:19
results [9] - 939:15, 943:20, 952:20, 957:24, 958:22, 959:1, 959:2, 959:24, 961:1
resume [1] - 936:2
Resumed [2] - 935:4, 936:3
retain [1] - 1016:25
retiree [1] - 1048:1
retrenchment [1] - 966:18
reveal [2] - 993:16, 998:2
revenue [2] - 995:18, 995:19, 995:24, 996:21, 1003:11, 1003:14, 1036:16, 1037:7, 1037:8
revenues [4] - 996:24, 998:11, 1036:21, 1037:1
reversing [1] - 965:1
review [1] - 1003:21
reviewed [1] - 982:12
RFP [2] - 942:17, 942:23
RFPs [2] - 942:15, 942:19
richer [2] - 1049:6
rid [1] - 950:25
Rifkind [1] - 934:12
rigging [3] - 1019:5, 1019:6, 1020:15
right-hand [1] - 954:1
rights [3] - 965:17, 1063:24, 1065:21
ring [2] - 943:16, 1058:5
rise [1] - 966:19
risk [13] - 938:20,

967:16, 967:17, 977:4, 977:9, 977:12, 977:13, 977:15, 979:17, 1001:18, 1003:13, 1057:8
risks [1] - 977:8
risky [1] - 979:12
rivals [2] - 971:6, 985:18
road [1] - 1034:23
Robert [1] - 934:7
robust [2] - 982:20, 1055:2
robustly [1] - 983:15
role [3] - 946:25, 984:22, 984:23
roll [4] - 986:9, 987:23, 987:25, 988:4
rolled [1] - 986:13
Room [2] - 934:17, 1067:11
rough [1] - 1032:14
roughly [2] - 974:2, 1062:11
round [2] - 1033:22, 1057:19
row [1] - 1063:1
Rule [1] - 934:11
rule [5] - 964:10, 972:21, 972:22, 988:11, 997:4
ruled [1] - 963:15
rules [5] - 994:14, 994:17, 994:21, 996:17, 1016:16
run [3] - 970:14, 977:15, 1034:17
running [3] - 955:21, 955:22, 1056:3
runs [1] - 978:23

S

safeguards [3] - 1020:8, 1020:10, 1020:11
sales [3] - 952:22, 954:14, 961:19
Sales [1] - 954:21
SalesForce.com [2] - 951:16, 951:18
salespeople [1] - 949:7
salient [1] - 980:18
satellite [1] - 966:5
satisfaction [1] - 952:8
save [1] - 978:19
saves [2] - 977:9,

978:22
savings [7] - 960:9, 960:10, 961:5, 961:10, 961:17, 961:18, 1012:7
saw [5] - 945:12, 966:2, 982:24, 999:14, 1047:24
scale [4] - 971:14, 1003:19, 1010:22, 1065:18
scattered [1] - 1001:7
scenario [5] - 980:23, 980:25, 981:1, 981:21, 988:17
scenarios [1] - 961:13
SCHWINGLER [10] - 936:5, 990:8, 994:3, 994:7, 998:16, 1007:13, 1017:21, 1034:9, 1034:14, 1035:6
Schwingler [1] - 933:15
Schwingler)............... ..................936 [1] - 935:4
scope [1] - 1041:5
score [3] - 959:17, 959:20, 959:21, 963:20
Scott [1] - 933:14
screen [15] - 941:18, 941:24, 992:13, 1021:20, 1022:16, 1030:2, 1037:20, 1038:16, 1039:17, 1044:8, 1044:19, 1045:16, 1049:7, 1050:22, 1059:10
scrunching [1] - 1021:24
seal [1] - 1007:15
sealed [4] - 958:19, 958:24, 989:25, 990:3
searched [1] - 1032:21
seated [1] - 989:14
Seattle [1] - 1058:4
second [21] - 941:1, 943:19, 947:13, 955:25, 958:20, 958:24, 962:14, 963:13, 1023:2, 1025:20, 1026:21, 1029:6, 1031:1, 1041:8, 1044:11, 1044:18, 1046:25, 1048:11, 1048:15, 1049:25

**secondly** [1] - 1012:9
**Section** [1] - 934:3
**sector** [1] - 950:13
**secure** [1] - 985:1
**see** [58] - 936:23,
938:1, 940:11,
940:13, 941:5,
941:18, 943:14,
951:1, 953:10,
953:12, 960:12,
961:11, 962:4,
963:1, 978:4, 978:5,
986:8, 1001:25,
1019:10, 1022:14,
1025:17, 1026:25,
1028:12, 1030:19,
1031:10, 1031:14,
1031:16, 1031:24,
1033:2, 1037:24,
1042:12, 1042:25,
1043:1, 1043:10,
1043:13, 1044:20,
1045:22, 1046:7,
1046:12, 1047:6,
1048:2, 1048:20,
1049:2, 1049:15,
1049:19, 1050:1,
1051:2, 1054:16,
1055:24, 1056:5,
1058:4, 1060:5,
1060:18, 1060:20,
1061:8, 1061:20,
1062:24, 1064:23
**seeing** [1] - 1006:9
**seek** [3] - 976:3,
976:10, 1034:16
**sees** [2] - 990:5, 990:6
**segment** [1] - 1049:14
**self** [16] - 1002:15,
1002:17, 1053:3,
1053:7, 1053:8,
1053:10, 1053:13,
1054:5, 1054:14,
1054:20, 1054:21,
1054:22, 1054:23,
1056:22, 1057:1
**self-explanatory** [1] -
1002:17
**self-funded** [1] -
1057:1
**self-insurance** [1] -
1057:1
**self-supply** [11] -
1053:3, 1053:7,
1053:8, 1053:10,
1053:13, 1054:5,
1054:14, 1054:20,
1054:21, 1054:22,
1054:23
**self-supplying** [1] -

1056:22
**sell** [1] - 1051:16
**seller** [1] - 958:23
**selling** [5] - 958:23,
972:15, 978:24,
1012:1, 1041:1
**semiconductor** [1] -
1056:10
**send** [1] - 942:15
**sense** [12] - 943:1,
952:14, 953:4,
957:6, 964:12,
982:4, 991:9,
991:10, 992:18,
998:2, 1001:5,
1017:11
**sensitive** [5] - 991:20,
998:25, 999:9,
999:25, 1018:6
**sentence** [1] - 1042:23
**sentences** [1] -
1044:13
**separate** [3] - 966:23,
979:4, 1040:16
**series** [1] - 1029:22
**serve** [2] - 946:17,
1051:1
**service** [6] - 944:11,
964:25, 1008:20,
1018:15, 1044:23,
1047:5
**Services** [1] - 1056:12
**services** [6] - 950:25,
1009:9, 1012:25,
1047:4, 1058:16,
1060:16
**SESSION** [1] - 933:5
**set** [3] - 949:15, 997:8,
1049:22
**sets** [1] - 954:12
**setting** [5] - 939:20,
941:25, 999:5,
999:6, 999:7
**seven** [3] - 952:23,
975:2, 975:3
**several** [7] - 943:2,
950:14, 980:6,
983:24, 1013:22,
1032:22, 1034:23
**shade** [3] - 961:4,
961:22, 961:23
**Share** [1] - 1034:2
**share** [50] - 937:19,
937:24, 953:10,
954:5, 954:23,
962:23, 963:4,
963:24, 974:17,
974:20, 979:17,
987:25, 1021:15,
1023:14, 1024:15,

1024:16, 1025:2,
1025:14, 1027:15,
1027:16, 1028:2,
1028:5, 1028:14,
1028:22, 1029:9,
1031:3, 1031:6,
1031:19, 1032:2,
1034:5, 1034:20,
1035:25, 1036:6,
1037:8, 1037:23,
1038:8, 1038:9,
1040:21, 1046:16,
1050:10, 1050:14,
1050:16, 1051:19,
1051:22, 1054:3,
1063:9, 1063:25,
1066:5
**Shares** [1] - 1026:17
**shares** [45] - 936:19,
937:4, 937:19,
941:3, 947:9,
947:10, 951:8,
953:1, 953:2, 953:8,
953:18, 953:20,
953:24, 954:11,
954:17, 955:3,
958:2, 1007:23,
1007:24, 1022:1,
1023:7, 1023:8,
1024:2, 1025:6,
1025:8, 1027:2,
1027:5, 1027:10,
1027:14, 1029:10,
1032:10, 1035:22,
1038:1, 1038:3,
1038:4, 1038:5,
1038:15, 1041:12,
1041:19, 1043:25,
1046:15, 1050:7,
1050:11, 1052:3,
1064:4
**sharing** [1] - 977:4
**sharpening** [1] -
942:18
**Shield** [1] - 1028:11
**shifting** [2] - 1017:6,
1017:9
**short** [1] - 1002:24
**short-lived** [1] -
1002:24
**shorthand** [1] - 933:23
**shoving** [1] - 981:14
**show** [7] - 949:2,
952:23, 1011:12,
1023:10, 1027:8,
1027:22, 1027:23
**showing** [3] - 954:10,
1024:2, 1025:25
**shown** [2] - 1027:2,
1027:5

**shows** [5] - 949:1,
982:5, 984:17,
1011:8, 1026:16
**side** [4] - 945:12,
1011:20, 1019:10,
1021:6
**sidebar** [1] - 1034:10
**sides** [1] - 955:7
**sign** [2] - 946:1, 946:5
**significance** [5] -
953:23, 998:2,
1028:19, 1046:19,
1066:5
**significant** [4] -
993:18, 1001:22,
1002:22, 1047:20
**sim** [8] - 958:9, 960:3,
960:12, 961:13,
962:3, 962:8,
962:16, 962:20
**similar** [5] - 951:9,
958:22, 999:4,
1003:19, 1011:21
**similarities** [1] -
957:10
**similarity** [1] - 943:5
**similarly** [2] - 1027:2,
1027:15
**simple** [4] - 972:6,
984:23, 995:17,
995:21
**simply** [10] - 938:23,
950:22, 967:16,
967:17, 967:25,
997:1, 1001:18,
1002:2, 1053:21,
1056:22
**simulating** [1] - 957:6
**simulation** [1] - 957:5
**single** [8] - 937:23,
992:9, 1018:25,
1020:22, 1021:1,
1026:22, 1049:13,
1052:12
**single-state** [1] -
1049:13
**sink** [1] - 999:22
**site** [1] - 1056:9
**sitting** [1] - 979:10
**situation** [2] - 999:4,
1052:16
**situations** [5] -
943:24, 944:24,
955:19, 955:23,
957:13
**size** [14] - 938:1,
939:14, 963:4,
969:20, 970:16,
974:20, 975:1,
975:3, 982:16,

1001:25, 1033:17,
1037:5, 1059:24,
1060:2
**skeptical** [1] - 1012:10
**skepticism** [2] -
1010:15, 1010:16
**skipping** [1] - 1061:24
**sky's** [1] - 1064:15
**slice** [4] - 945:11,
963:3, 1051:5,
1053:22
**slices** [1] - 1025:15,
1027:23
**slicing** [1] - 1006:20
**slide** [21] - 940:21,
940:22, 946:11,
954:1, 959:25,
975:10, 983:16,
993:15, 994:8,
998:1, 1007:17,
1021:9, 1021:11,
1027:8, 1027:11,
1027:13, 1038:23,
1040:8, 1060:5,
1063:17
**Slide** [16] - 1022:2,
1022:13, 1023:9,
1023:13, 1024:3,
1024:6, 1025:15,
1031:7, 1047:24,
1049:8, 1049:24,
1059:5, 1063:18
**Slides** [3] - 1026:25,
1031:18, 1033:7
**slides** [5] - 940:12,
1021:13, 1021:15,
1028:2, 1038:11
**slightly** [3] - 961:3,
992:14, 1007:23
**slower** [1] - 985:17
**slowly** [1] - 1050:24
**small** [10] - 938:3,
942:16, 963:3,
984:24, 988:3,
1005:15, 1016:23,
1039:24, 1041:2,
1053:22
**smaller** [10] - 936:9,
961:12, 962:20,
1000:22, 1016:17,
1024:15, 1025:2,
1025:13, 1035:12,
1037:2
**Smith** [1] - 934:2
**sober** [1] - 964:8
**sobered** [1] - 986:17
**sobering** [1] - 1005:5
**societal** [1] - 1012:24
**solve** [2] - 964:21,
967:14

**someone** [1] - 990:2
**sometimes** [8] - 972:3, 995:4, 1023:16, 1053:10, 1059:24, 1059:25, 1060:1, 1060:4
**somewhat** [3] - 988:13, 992:6, 998:6
**soon** [2] - 1002:23, 1017:17
**sorry** [1] - 952:6, 968:23, 980:5, 995:20, 1026:10, 1028:18, 1034:10, 1044:14, 1049:21, 1054:9, 1065:4
**sort** [6] - 944:4, 955:14, 956:14, 976:21, 979:1, 999:20
**sound** [1] - 995:1
**sounds** [6] - 1018:23, 1023:19, 1032:16, 1032:17, 1034:19, 1036:22
**source** [3] - 957:22, 1001:3, 1058:20
**South** [1] - 933:20
**Southern** [1] - 976:15
**space** [6] - 949:10, 1004:19, 1005:3, 1005:9, 1005:13, 1005:14
**span** [1] - 1049:12
**speaking** [1] - 947:22
**special** [2] - 957:8, 1053:13
**specific** [14] - 938:8, 946:20, 947:22, 948:7, 948:14, 975:12, 982:11, 993:16, 998:1, 1008:17, 1014:16, 1014:20, 1050:15, 1050:16
**specifically** [3] - 950:11, 961:18, 999:15
**Specification** [1] - 1047:1
**speculate** [2] - 1001:4, 1001:24
**speculative** [1] - 1009:25
**spelled** [1] - 1005:22
**spend** [2] - 969:18, 978:18
**spending** [2] - 950:22, 1057:18
**spent** [2] - 951:2,

979:3
**spillovers** [2] - 988:25, 989:4
**sponsored** [1] - 945:5
**spot** [1] - 967:24
**spread** [1] - 986:1
**spreading** [2] - 967:16, 967:17
**spreadsheet** [3] - 1041:9, 1041:12, 1041:14
**square** [5] - 937:20, 937:24, 1050:9, 1050:13, 1050:17
**squared** [2] - 937:19, 1050:11
**squeeze** [1] - 1017:14
**staff** [1] - 1040:9
**stand** [7] - 944:19, 978:12, 986:24, 1040:25, 1052:12, 1052:14, 1052:19
**stand-alone** [3] - 1052:12, 1052:14, 1052:19
**standard** [5] - 950:16, 975:25, 1002:10, 1009:18, 1044:2
**standing** [2] - 963:3, 1000:8
**standpoint** [1] - 1056:18
**stands** [3] - 952:9, 1022:10, 1060:13
**start** [14] - 936:9, 936:12, 937:14, 952:23, 986:16, 991:22, 993:14, 1002:20, 1004:11, 1017:3, 1017:23, 1017:24, 1022:2, 1066:16
**start-up** [1] - 1004:11
**started** [7] - 965:6, 965:23, 965:24, 966:1, 966:19, 974:2, 1015:14
**starting** [7] - 941:19, 941:21, 944:4, 947:14, 966:5, 995:22, 1009:2
**starts** [1] - 964:22
**State** [1] - 934:2
**state** [11] - 965:4, 982:24, 1001:23, 1018:10, 1018:13, 1023:3, 1023:4, 1026:21, 1026:22, 1044:25, 1049:13
**statement** [2] -

1037:15, 1039:6
**statements** [1] - 980:8
**states** [18] - 968:14, 1001:22, 1014:12, 1014:14, 1022:21, 1022:22, 1024:11, 1024:12, 1025:3, 1036:15, 1038:14, 1041:14, 1041:19, 1049:13, 1049:24, 1055:8, 1058:11, 1061:4
**STATES** [2] - 933:1, 933:11
**States** [22] - 933:3, 933:14, 934:17, 987:24, 989:7, 990:14, 990:17, 992:4, 993:1, 1005:20, 1006:1, 1023:17, 1023:24, 1025:4, 1028:6, 1038:8, 1041:21, 1041:23, 1046:12, 1063:4, 1066:7, 1067:11
**static** [9] - 937:3, 937:12, 956:13, 956:22, 960:13, 960:14, 960:17, 990:22, 1012:8
**statistical** [1] - 958:8
**status** [1] - 984:11
**stenographic** [1] - 1067:5
**step** [7] - 942:5, 947:16, 947:17, 956:12, 964:5, 964:11, 968:2
**stepping** [1] - 1015:20
**steps** [1] - 936:11
**stick** [2] - 952:6
**still** [7] - 952:11, 953:16, 961:12, 962:4, 963:3, 964:2, 965:19, 965:21, 970:11, 970:15, 981:2, 981:3, 981:8, 981:15, 985:10, 985:12, 990:25, 998:23, 1016:24, 1025:2, 1037:1, 1053:24
**stipulation** [1] - 1034:14
**stop** [2] - 997:17, 1000:25
**stops** [1] - 954:3
**stories** [1] - 965:19
**story** [2] - 966:20

**strategic** [1] - 981:7
**strategies** [4] - 949:22, 950:3, 965:25, 972:24
**strategists** [1] - 971:9
**strategy** [9] - 949:17, 972:3, 972:4, 972:13, 972:18, 980:11, 980:13, 980:15, 980:16
**Strategy** [1] - 970:25
**stream** [2] - 1003:11, 1003:14
**Street** [4] - 933:16, 933:20, 934:9, 934:13
**strength** [5] - 948:21, 992:5, 992:7, 1003:19, 1028:20
**strengths** [1] - 984:2
**strong** [9] - 944:9, 944:18, 963:18, 963:19, 963:20, 970:20, 979:18, 1004:1
**stronger** [1] - 966:3
**structural** [3] - 936:13, 937:14, 953:21
**structure** [1] - 942:24
**stuck** [3] - 972:24, 973:13, 988:3
**studied** [1] - 1011:2
**studies** [2] - 938:10, 938:11
**Study** [1] - 1055:23
**study** [5] - 951:6, 964:18, 1018:21, 1020:21, 1058:9
**studying** [2] - 1016:3, 1018:18
**submit** [1] - 942:17
**submitted** [1] - 1029:20
**subscribe** [1] - 1061:5
**subscriber** [2] - 1059:22, 1065:7
**subscribers** [11] - 1059:19, 1059:23, 1060:17, 1060:21, 1061:6, 1061:8, 1062:9, 1062:13, 1065:9
**subsidiary** [2] - 1010:2, 1010:3
**subsidization** [1] - 1017:11
**substantial** [5] - 962:5, 962:15, 995:25, 1002:25, 1038:19

**substantially** [1] - 1066:1
**substantiated** [1] - 1011:18
**substitute** [1] - 947:5
**subsumed** [1] - 1016:6
**subtle** [1] - 949:4
**succeed** [1] - 1006:5
**success** [12] - 950:19, 964:23, 965:19, 972:2, 987:25, 988:1, 991:6, 991:7, 991:13, 991:14, 995:8
**successful** [10] - 971:16, 979:12, 979:16, 980:2, 984:21, 987:23, 1003:5, 1007:5, 1024:16, 1024:21
**successfully** [3] - 973:1, 985:2, 1025:1
**suddenly** [2] - 952:10, 985:18
**sufficient** [6] - 948:18, 1002:18, 1003:16, 1003:17, 1051:1, 1064:21
**sufficiently** [1] - 948:3
**suggest** [5] - 939:20, 940:6, 982:15, 986:25, 1007:9, 1017:14
**suggesting** [3] - 1041:18, 1047:20, 1047:21
**suggestion** [1] - 1001:14
**suggests** [5] - 954:23, 960:16, 962:13, 984:20, 1007:4
**suit** [2] - 965:24, 984:2
**Suite** [2] - 933:17, 933:20
**sum** [3] - 937:18, 941:9, 1050:11
**summarize** [1] - 1012:18
**sums** [1] - 969:13
**supply** [12] - 1002:4, 1053:1, 1053:7, 1053:8, 1053:10, 1053:13, 1054:5, 1054:14, 1054:20, 1054:21, 1054:22, 1054:23
**supplying** [1] - 1056:22
**support** [1] - 939:21

**supporting** [1] - 977:21

**suppose** [3] - 953:5, 955:15, 960:10

**supposed** [1] - 975:25

**supposedly** [1] - 974:21

**surgery** [5] - 1006:7, 1009:9, 1053:20, 1053:24, 1055:15

**surprise** [1] - 947:11

**surprised** [2] - 984:9, 1020:5

**surprising** [1] - 1019:21

**survey** [10] - 1060:10, 1061:12, 1061:15, 1062:2, 1063:2, 1065:6, 1065:10, 1065:11, 1065:18, 1065:21

**Survey** [2] - 1060:12, 1065:5

**survive** [2] - 985:14, 987:15

**suspect** [1] - 962:19

**Swedish** [3] - 973:4, 999:3, 1013:8

**sweet** [1] - 967:24

**switch** [2] - 948:2, 948:4

**switched** [1] - 951:17

**synergies** [6] - 969:19, 985:21, 985:23, 986:2, 987:21, 1012:2

**system** [15] - 945:6, 945:7, 945:8, 945:10, 964:15, 966:17, 967:13, 975:19, 976:2, 976:4, 976:19, 976:20, 983:20, 1009:13, 1056:13

**systems** [7] - 966:3, 966:16, 974:8, 975:23, 976:23, 1004:4, 1054:15

## T

**Tab** [17] - 1021:19, 1030:4, 1030:14, 1037:17, 1042:5, 1042:7, 1044:6, 1044:16, 1044:17, 1045:12, 1045:17, 1045:24, 1046:23, 1048:11, 1049:8, 1049:10, 1055:16

**tab** [3] - 1044:14, 1045:12, 1046:23

**table** [1] - 944:7

**talks** [2] - 971:5, 1049:11

**technical** [2] - 958:14, 958:15

**techniques** [2] - 956:24, 957:2

**technology** [2] - 944:16, 977:16

**ten** [4] - 937:20, 989:14, 1000:9, 1066:12

**tend** [3] - 952:5, 952:6, 958:22

**tends** [2] - 952:7, 1004:11

**Tennessee** [1] - 1028:9

**term** [7] - 957:5, 958:17, 975:19, 1008:13, 1023:19, 1046:5, 1048:18

**terms** [17] - 942:11, 970:16, 971:12, 973:15, 981:12, 982:22, 984:6, 990:16, 995:2, 1004:12, 1004:21, 1009:19, 1011:22, 1012:9, 1023:23, 1024:16, 1064:6

**terrible** [1] - 966:14

**territories** [30] - 936:10, 956:23, 961:1, 961:8, 987:5, 987:7, 990:21, 990:24, 992:21, 992:25, 993:5, 993:20, 997:10, 998:22, 1000:19, 1024:5, 1024:9, 1024:14, 1024:17, 1024:24, 1024:25, 1025:8, 1025:13, 1028:1, 1038:13, 1038:19, 1055:9, 1065:15

**territories'** [2] - 940:16, 1023:8

**territory** [2] - 990:19, 1024:6

**test** [1] - 986:24

**testified** [9] - 986:9, 1014:4, 1018:5, 1033:12, 1037:4, 1051:13, 1055:12, 1058:24, 1059:12

**testimonial** [1] -

1007:25

**testimony** [19] - 944:8, 947:1, 970:24, 973:3, 982:12, 984:10, 986:16, 989:19, 1005:6, 1012:12, 1018:7, 1025:3, 1028:15, 1032:8, 1033:14, 1037:5, 1037:11, 1037:20, 1057:1

**text** [2] - 1025:20, 1028:23

**textbook** [4] - 970:24, 971:2, 971:4, 1009:1

**THE** [107] - 933:1, 933:1, 933:10, 936:2, 939:4, 939:7, 940:8, 940:11, 948:19, 949:4, 950:5, 950:11, 957:17, 958:13, 958:14, 959:3, 959:6, 959:7, 959:11, 959:12, 959:13, 959:15, 959:16, 959:18, 959:19, 959:23, 960:19, 960:21, 960:22, 960:24, 960:25, 962:21, 963:8, 963:15, 963:16, 964:4, 968:12, 968:15, 968:16, 968:18, 974:16, 974:25, 980:19, 980:23, 981:25, 982:3, 987:14, 987:18, 987:19, 987:20, 989:11, 989:17, 993:24, 994:6, 994:9, 999:19, 999:19, 1001:21, 1001:24, 1007:10, 1007:11, 1010:9, 1010:21, 1014:11, 1014:19, 1016:22, 1017:5, 1017:20, 1017:22, 1020:14, 1026:7, 1027:20, 1027:25, 1030:5, 1030:11, 1033:25, 1034:11, 1034:24, 1035:5, 1035:9, 1035:18, 1039:10, 1039:14, 1039:22, 1039:23, 1040:1, 1041:8, 1041:11, 1041:18, 1041:25, 1042:2, 1047:11,

1047:14, 1048:23, 1049:2, 1049:5, 1051:19, 1051:21, 1051:23, 1051:24, 1055:6, 1055:9, 1059:8, 1066:9, 1066:14, 1066:19, 1066:20

**themselves** [3] - 966:7, 971:5, 988:22

**theory** [7] - 938:5, 938:25, 958:21, 968:6, 968:13, 980:19, 1056:25

**thereby** [1] - 1066:4

**therefore** [3] - 988:1, 1058:21, 1064:5

**they've** [10] - 984:20, 986:6, 986:13, 990:19, 992:10, 994:1, 999:24, 1007:14, 1010:22, 1010:24

**thinking** [4] - 957:17, 991:4, 1003:4, 1005:5

**thinks** [1] - 1003:2

**third** [8] - 947:13, 962:14, 963:16, 969:19, 995:15, 995:17, 1007:14, 1007:16

**thirds** [1] - 996:24

**thousand** [1] - 1048:24

**threat** [1] - 1006:10

**three** [9] - 942:19, 960:2, 960:5, 961:13, 969:14, 986:14, 996:11, 1002:14, 1016:1

**threshold** [5] - 941:6, 941:22, 1046:17, 1062:3, 1066:2

**thresholds** [1] - 940:18

**thrilled** [2] - 1014:25, 1015:2

**throats** [1] - 981:14

**throughout** [4] - 990:13, 990:17, 1046:11, 1061:22

**throw** [1] - 1000:12

**thumb** [2] - 972:22, 988:11

**tie** [1] - 1041:16

**timely** [6] - 974:6, 980:9, 1002:15, 1002:20, 1002:21, 1002:22

**to-head** [1] - 992:25

**today** [10] - 981:2, 986:24, 993:9, 994:15, 995:18, 995:23, 997:1, 997:24, 1028:15, 1058:19

**today's** [2] - 966:4, 967:9

**together** [10] - 943:16, 946:6, 973:10, 985:12, 992:16, 992:20, 996:14, 999:16, 1018:6, 1038:8

**token** [1] - 986:11

**tomorrow** [3] - 1066:15, 1066:16, 1066:19

**took** [3] - 1035:2, 1037:10, 1041:19

**tools** [2] - 982:25, 983:1

**top** [10] - 943:12, 974:12, 980:21, 982:16, 991:1, 996:9, 1026:16, 1030:21, 1031:9, 1042:22

**top-down** [2] - 974:12, 982:16

**total** [8] - 937:22, 950:21, 951:2, 1035:23, 1036:21, 1037:1, 1039:24, 1063:14

**totality** [3] - 970:4, 970:7, 1024:11

**totally** [1] - 1046:18

**Toto** [1] - 934:7

**touch** [1] - 942:6

**touches** [1] - 1016:15

**TPA** [3] - 1052:12, 1052:14, 1052:15

**TPAs** [13] - 945:15, 945:18, 946:12, 946:13, 946:17, 946:19, 946:23, 946:25, 947:5, 1052:9, 1052:17, 1052:19

**tracked** [1] - 1059:16

**traction** [2] - 1058:18, 1058:19

**trade** [1] - 1008:13

**traditional** [4] - 945:3, 1007:6, 1011:25, 1013:3

**trajectory** [1] - 964:10

**transaction** [1] -

1018:22
**transcript** [5] - 933:23, 989:23, 990:3, 1067:5, 1067:6
**TRANSCRIPT** [1] - 933:9
**transcription** [1] - 933:23
**transcripts** [1] - 989:24
**translate** [1] - 1061:6
**trend** [2] - 1055:2, 1056:3
**trending** [1] - 1057:18
**trial** [5] - 947:2, 948:7, 990:2, 1034:21, 1064:12
**Trial** [1] - 933:4
**TRIAL** [1] - 933:9
**tried** [7] - 944:5, 966:9, 967:13, 974:13, 974:15, 1000:17, 1054:24
**trivial** [1] - 998:13
**trouble** [2] - 982:5, 982:6
**troubles** [1] - 968:18
**true** [5] - 978:6, 1021:4, 1035:11, 1067:4, 1067:6
**try** [16] - 936:16, 942:11, 942:12, 948:16, 948:25, 966:1, 966:25, 967:23, 972:23, 973:10, 973:21, 977:2, 985:3, 999:20, 1050:24, 1051:25
**trying** [13] - 945:10, 949:2, 956:15, 957:11, 958:1, 964:20, 965:10, 967:10, 967:24, 1028:25, 1034:24, 1040:4, 1043:2
**tune** [1] - 1024:17
**tuning** [1] - 957:24
**turn** [13] - 936:8, 937:7, 940:21, 944:1, 951:5, 956:12, 964:5, 968:14, 987:13, 989:6, 990:9, 1008:3, 1059:9
**turned** [1] - 1021:20
**turns** [4] - 958:7, 1062:13, 1064:2, 1066:12
**twice** [1] - 1029:7

**two** [52] - 936:9, 938:1, 940:24, 941:1, 942:19, 943:12, 943:15, 947:24, 948:10, 949:25, 951:3, 953:25, 954:12, 956:24, 957:9, 963:1, 969:21, 971:6, 971:8, 972:23, 973:5, 973:11, 974:11, 974:21, 979:25, 980:1, 985:20, 985:22, 991:1, 992:20, 993:7, 994:16, 996:23, 1000:25, 1006:5, 1011:25, 1015:18, 1018:14, 1020:20, 1021:13, 1022:1, 1022:21, 1022:22, 1023:4, 1031:12, 1033:25, 1045:21, 1047:12, 1054:23, 1065:24, 1066:3, 1066:10
**two-question** [1] - 1066:10
**type** [11] - 943:9, 944:2, 958:17, 972:4, 991:4, 991:16, 1003:19, 1003:22, 1003:24, 1006:8, 1039:4
**types** [5] - 943:7, 958:22, 960:3, 992:22, 1052:1

## U

**U.S** [9] - 933:15, 946:22, 990:9, 991:22, 992:23, 1023:14, 1037:11, 1041:16, 1056:9
**ultimately** [2] - 943:11, 943:12
**unambiguously** [1] - 968:7
**unavoidable** [2] - 958:14, 993:11
**uncertain** [1] - 1003:14
**uncertainty** [1] - 1016:7
**under** [12] - 937:15, 939:12, 939:22, 965:15, 997:15, 1008:4, 1017:4, 1023:25, 1033:25, 1052:4, 1053:16,

1060:5
**underneath** [1] - 1042:15
**understating** [1] - 953:22
**understood** [5] - 943:10, 947:11, 984:18, 986:18, 1047:7
**unfortunate** [1] - 957:5
**UniCare** [12] - 1000:13, 1000:16, 1000:20, 1000:21, 1000:22, 1001:1, 1001:3, 1001:6, 1001:8, 1001:9, 1001:10, 1001:17
**uniform** [2] - 1050:3, 1060:8
**unilateral** [1] - 1037:22
**unimpeded** [1] - 974:22
**uninformative** [1] - 1046:18
**uninsured** [1] - 1017:3
**unique** [5] - 977:2, 978:2, 978:11, 1046:15, 1047:8
**UNITED** [2] - 933:1, 933:11
**United** [41] - 933:3, 933:14, 934:17, 947:13, 948:25, 955:22, 962:24, 963:5, 963:7, 963:10, 963:15, 963:19, 987:24, 989:7, 990:14, 990:17, 992:4, 993:1, 1005:20, 1005:25, 1023:17, 1023:24, 1025:4, 1025:16, 1027:5, 1027:17, 1028:5, 1036:14, 1036:15, 1037:2, 1038:7, 1038:14, 1041:21, 1041:23, 1042:23, 1043:4, 1046:12, 1052:15, 1063:3, 1066:7, 1067:11
**United's** [1] - 963:16
**UnitedHealthcare** [2] - 1042:9, 1042:10
**University** [2] - 938:14, 1005:22
**unless** [2] - 939:19, 984:12

**unnecessary** [1] - 950:25
**unprecedented** [1] - 1010:6
**unquote** [2] - 973:13, 976:9
**unredacted** [3] - 994:7, 1007:17, 1063:17
**unrelated** [1] - 952:24
**up** [65] - 937:21, 937:22, 938:24, 938:25, 941:16, 941:19, 941:23, 945:25, 947:14, 957:20, 959:9, 961:14, 965:3, 966:5, 969:13, 973:13, 975:7, 977:14, 985:8, 985:10, 988:21, 994:1, 999:5, 999:6, 999:7, 999:24, 1004:11, 1017:7, 1021:12, 1026:3, 1026:4, 1026:6, 1027:21, 1029:11, 1029:14, 1029:18, 1029:23, 1030:15, 1033:12, 1035:3, 1037:16, 1037:19, 1039:16, 1041:8, 1042:8, 1044:1, 1045:15, 1045:20, 1046:9, 1048:21, 1049:23, 1050:17, 1050:21, 1059:4, 1059:8, 1060:20, 1061:20, 1062:4, 1062:12, 1064:14, 1065:13, 1065:18, 1066:16
**upcoming** [1] - 940:12
**UPP** [14] - 957:3, 957:6, 957:23, 958:10, 960:4, 960:13, 960:15, 961:13, 962:3, 962:8, 962:15, 962:19
**upside** [2] - 977:8, 977:9
**upstarts** [1] - 1006:6
**upstate** [1] - 1018:14
**upwards** [1] - 957:3
**useful** [5] - 955:24, 978:18, 979:3, 979:6, 1029:25
**uses** [5] - 982:25, 1043:12, 1045:6,

1046:5, 1048:22
**usual** [1] - 1011:14
**utilization** [1] - 950:19
**utterly** [1] - 966:10

## V

**vacuum** [1] - 996:12
**valuable** [1] - 983:8
**value** [6] - 959:13, 967:23, 967:25, 968:17, 972:5, 987:15
**value-based** [2] - 968:17, 987:15
**values** [1] - 1031:13
**variable** [9] - 960:9, 960:10, 961:5, 961:9, 961:17, 1008:7, 1008:8, 1012:1, 1012:7
**variety** [1] - 1030:18
**various** [4] - 949:21, 1018:24, 1060:23
**vast** [3] - 1039:23, 1041:1, 1041:6
**venture** [1] - 991:6
**verifiable** [1] - 1008:14
**versa** [1] - 963:14
**version** [1] - 1059:5
**versions** [1] - 966:3
**versus** [4] - 982:23, 996:22, 1033:24, 1058:16
**viable** [1] - 1005:25
**vice** [1] - 963:14
**view** [3] - 979:23, 1010:14, 1010:19, 1016:1
**viewed** [2] - 939:17, 948:3, 988:21
**viewing** [1] - 975:11
**vigorously** [1] - 998:23
**virtually** [1] - 1053:24
**Vivity** [2] - 976:15, 983:10
**volume** [3] - 987:16, 1010:19, 1014:14
**vs** [1] - 933:5

## W

**Wal** [2] - 980:14, 980:16
**Wal-Mart** [1] - 980:14
**walk** [3] - 936:10, 941:11, 952:20, 959:24
**walked** [2] - 1006:4, 1054:25

**wants** [4] - 976:20, 990:2, 1003:10, 1008:10

**Washington** [8] - 933:5, 933:17, 933:21, 934:9, 934:13, 934:18, 965:3, 1067:12

**ways** [16] - 947:24, 951:3, 955:7, 966:23, 969:3, 974:11, 978:2, 980:1, 983:9, 986:22, 994:10, 994:21, 996:11, 1004:14, 1047:9

**we're-going-to-do-it-on-our-own** [1] - 974:14

**weaker** [1] - 979:22

**weakness** [1] - 948:23

**website** [2] - 1037:16, 1042:9

**wee** [1] - 1015:14

**weeds** [1] - 958:21

**week** [1] - 989:19

**weigh** [1] - 986:4

**weight** [2] - 948:12, 978:13

**Weiss** [1] - 934:12

**well-defined** [1] - 941:3

**well-known** [2] - 950:13, 1025:4

**well-regarded** [1] - 953:16

**well-understood** [1] - 986:18

**wellness** [21] - 944:16, 950:19, 964:17, 967:8, 977:23, 977:25, 978:6, 978:7, 978:8, 978:10, 978:16, 978:19, 978:23, 978:24, 979:3, 979:6, 980:12, 980:20, 981:15, 981:17, 1006:15

**WellPoint** [1] - 1000:20

**Wharton** [1] - 934:12

**whistles** [1] - 971:13

**WHITE** [1] - 934:8

**Whoa** [1] - 999:8

**whole** [7] - 997:8, 1023:18, 1025:7, 1041:13, 1041:21, 1053:24, 1057:13

**wide** [2] - 951:10,

959:1

**widgets** [5] - 1009:2, 1009:3, 1009:5, 1009:15

**willing** [5] - 973:24, 973:25, 1029:3, 1032:5, 1032:25

**willingly** [1] - 1014:13

**win** [12] - 945:14, 949:7, 951:13, 951:14, 953:9, 953:11, 954:15, 954:16, 954:18, 954:19, 954:20, 996:5

**win/loss** [12] - 936:25, 937:4, 951:11, 957:24, 958:4, 958:7, 958:10, 960:4, 960:15, 961:13, 962:4

**win/losses** [1] - 974:19

**winner** [3] - 942:19, 942:23, 953:14

**winnows** [1] - 959:8

**wins** [13] - 943:3, 952:1, 952:15, 954:15, 954:17, 954:22, 954:25, 955:8, 980:21, 995:17, 995:23, 996:6

**WITNESS** [34] - 935:3, 939:7, 940:11, 949:4, 950:11, 958:14, 959:6, 959:11, 959:13, 959:16, 959:19, 960:21, 960:24, 963:8, 963:16, 968:15, 968:18, 974:25, 980:23, 982:3, 987:18, 987:20, 999:19, 1001:24, 1007:11, 1010:21, 1014:19, 1017:5, 1030:11, 1039:23, 1049:5, 1051:21, 1051:24, 1055:9

**witness** [7] - 936:2, 989:17, 989:19, 1007:16, 1017:21, 1021:19, 1055:17

**witnesses** [1] - 944:17

**won** [2] - 954:6, 974:19

**wonder** [1] - 983:13

**wonderful** [3] - 940:4,

984:14, 1005:21

**word** [1] - 1024:21

**wording** [2] - 1060:19, 1062:7

**words** [3] - 948:10, 1012:23, 1043:1

**works** [3] - 943:4, 1010:11, 1033:23

**world** [1] - 966:22

**worlds** [1] - 981:8

**wrinkle** [1] - 972:18

**writing** [1] - 979:1

**written** [3] - 1017:8, 1019:18, 1021:5

**wrote** [1] - 966:14

## Y

**year** [1] - 977:11

**Year** [1] - 1031:1

**year's** [1] - 1020:22

**years** [16] - 938:16, 950:14, 951:18, 952:23, 954:22, 964:13, 975:2, 975:3, 980:6, 994:16, 1000:9, 1000:25, 1002:1, 1005:18, 1005:19, 1015:14

**yields** [1] - 1065:11

**York** [4] - 1018:13, 1018:14, 1020:18, 1028:10

**yourself** [2] - 972:1, 1018:21

## Z

**zero** [2] - 938:2

**zoom** [1] - 1044:12