```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Civil Action
       et al.,                        ) No. 16-CV-1493
 4                                     )
                         Plaintiffs,  ) Bench Trial
 5                                     )
       vs.                            ) Washington, DC
 6                                     ) November 29, 2016
       Anthem, Inc. and Cigna         ) Morning Session
 7     Corporation,                   ) Time:  9:30 A.M.
                                       )
 8                       Defendants.  )
       _____
 9
                       TRANSCRIPT OF BENCH TRIAL
10                           HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
11                  UNITED STATES DISTRICT JUDGE
       _____
12
                      A P P E A R A N C E S
13
       For the Plaintiffs:
14        United States          Jon B. Jacobs
                                  Scott Ivan Fitzgerald
15                                Peter Schwingler
                                  Adam Severt
16                                Henry Hauser
                                  U.S. DEPARTMENT OF JUSTICE
17                                Antitrust Division
                                  450 Fifth Street, NW
18                                Suite 4100
                                  Washington, DC 20530
19                                (202) 598-8916

20
          State of Colorado      Abigail Leah Smith
21                                ATTORNEY GENERAL'S OFFICE
                                  Consumer Protection Section
22                                1300 Broadway
                                  Denver, CO 80203
23
          State of California    Paula Lauren Gibson
24                                ATTORNEY GENERAL'S OFFICE
                                  300 South Spring Street, Suite 1702
25                                Los Angeles, CA  90013
```

```
 1    For the Defendant:
         Anthem, Inc.          Christopher M. Curran
 2                             John Mark Gidley
                               Heather Burke
 3                             WHITE & CASE LLP
                               701 13th Street, NW
 4                             Washington, DC 20005-3807
                               (202) 626-3600
 5
         Cigna Corporation     Charles F Rule
 6                             Joseph Bial
                               Paul, Weiss, Rifkind, Wharton &
 7                                Garrison LLP
                               2001 K Street, NW
 8                             Washington, DC 20006-1047
                               (202) 223-7300
 9    _____

10    Court Reporter:          Janice E. Dickman, RMR, CRR
                               Official Court Reporter
11                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
12                             Washington, DC  20001
                               202-354-3267
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    * * * * * * *P R O C E E D I N G S* * * * * * *

2          THE COURTROOM DEPUTY:  Your Honor, calling Civil

3    Action No. 16-1493, the United States of America, et al, v.

4    Anthem and Cigna.

5          MR. FITZGERALD:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. FITZGERALD:  Scott Fitzgerald for the United

8    States.  We just have one preliminary matter to address

9    before we begin today.  That relates to the page count for

10   the Phase 1 proposed findings of fact and conclusions of law.

11         The United States and the plaintiffs have proposed

12   a page limit of 125 pages.  We understand the defendants

13   have proposed a limit of 250 pages.  And since we have a

14   team working on that right now, any clarity we could get,

15   would be much appreciated.

16         THE COURT:  All right.  I will try to give you

17   some clarity on that.  I had no serious expectation that you

18   would all come up with the same number, and I will see what

19   I can do.

20         I understand why everybody wants the volume that

21   they want.  I would note, though, that if we went with 250

22   and you went with 250, that's 500 pages, and that after

23   Phase 2, that would be 1,000 pages.  And I have been told by

24   the parties that they want a quick decision and a quick

25   opinion.

1          So there's some tension between those desires, and

2     I'm going to have to figure it out.  So I will let you know

3     shortly; probably not this minute.  Maybe over lunch.

4          MR. FITZGERALD:  Thank you, Your Honor.

5          THE COURT:  Along those lines, I wanted to talk,

6     again, briefly to everyone about the presentation of the

7     expert testimony.

8          I have every intention of letting the defense put

9     on its case.  I want to hear its case, but I do not want to

10    hear its case more than once.  There is significant overlap

11    among the various experts.  Dr. Israel is supposed to talk

12    about the cost savings of the transaction and the consumer

13    benefits of the transaction, but he also has in his report

14    the fact that the market definitions are inappropriate.

15         Dr. Willig talks about the fact that the market

16    definitions are inappropriate and Dr. Fowdur also talks

17    about the fact that the market definitions are

18    inappropriate, even though that report is focused, as I

19    mentioned yesterday, exclusively on large groups, not

20    national accounts.

21         We have multiple experts who have devoted several

22    pages to why the merger's actually procompetitive, to why

23    Anthem and Cigna are not actually competitors, so this is

24    not taking competition out of the market.

25         There are two experts who talk about the impact of

1    the Blues rules and the risk of coordination that would

2    allegedly be posed by this merger.

3         And I can tell you, I'm only going to hear from

4    one expert why national accounts -- which the facts are

5    already in the record that different people define them

6    differently -- is not an appropriate product market.  I'm

7    only going to hear from one expert the fact that the Anthem

8    states are not contiguous, makes them not an appropriate

9    geographic market for antitrust purposes.

10        I only want to hear from one witness that private

11   exchanges constitute a significant and competitive

12   development that weren't fairly taken into account when

13   someone looked at the impact of this merger and the

14   competition in the future.

15        I'm only going to hear from one witness that

16   slicing, direct contracting, regional providers, and TPAs

17   and other niche players, ACOs and concierge services,

18   constitute competition that wasn't taken into account in the

19   government's description of the market.  And no expert needs

20   to tell me that those things exist because those questions

21   have been asked to every single witness with a great deal of

22   repetition.

23        So what the experts can tell me is what the fact

24   that they exist mean and why it changes the outcome from

25   what the government thinks the outcome would be of this

1   merger, to what the defense wants me to find that the

2   outcome will be of this merger.

3          But you're either going to call fewer experts or

4   slice them and have them deal with different issues, but I

5   am not going to hear anybody talk about the same issue

6   twice.

7          Also, I can just say, with respect to Dr. Israel,

8   he spent a good portion of his report reminding me that he

9   had been the government's expert in *Sysco* case, and there's

10  a lot in the report about why this case isn't the *Sysco*

11  case.  And that does not need to be a part of his testimony

12  because I don't begin to have the in-depth factual knowledge

13  of the *Sysco* case that I have of this case.  And it's going

14  to be hard enough to decide whether this case is what the

15  government says it is.  It doesn't matter to me whether this

16  case is the *Sysco* case.  So just in terms of truncating his

17  testimony, you can leave that out.

18         When it comes back to the government, I want to

19  remind you that your expert is going to be available for

20  redirect today, but he's also, I think you've indicated,

21  he's going to be your rebuttal witness, as well.  I don't

22  want any questions asked that are the same in both portions

23  of his testimony.

24         So there may be things that fit more neatly into

25  the rebuttal box.  They may fit more -- you may feel that

1    they're necessary to elicit them right now on redirect, but

2    once they're in the record and she's typed them and I've

3    heard them, they're in the record and you don't need to

4    elicit his opinion on the same issue twice.

5          And, finally, with respect to the expert, I

6    understand that it can be quite frustrating to someone who

7    has an in-depth knowledge of a subject matter to be asked

8    yes or no questions; you did this; you did this; you did

9    this; you did that.  And the unbearable urge is to say, yes,

10   and let me tell you why.

11         When you hear yourself saying, "As I said before,"

12   there's a signal right there that you said it before.  And

13   if -- they are entitled to ask you tight questions that are

14   just, yes, I did that; yes I did that; yes, I did that.

15         And I would encourage you to just answer the

16   questions.  If the lawyers presenting your testimony feel

17   that elaboration is necessary, they're going to have as we

18   described, two opportunities for you to elaborate.  And

19   also, since there's no jury here, if I think I don't

20   understand why you did something and I think it's important

21   to know, then I can ask you.

22         Obviously, if he asks you a question that you

23   can't answer with a yes or no, you can certainly tell him

24   that.  But I would just, in the interest of time, encourage

25   you to try to suppress the urge to explain on cross-

1    examination, as understandable as it may be.  Lawyers on

2    cross are probably even worse than economists, so I

3    understand what you're doing.

4            So I think we were in the middle of cross

5    examining this witness, and you may proceed.  I would ask

6    you to keep in mind that while I've talked a lot about the

7    speed of the trial, we're not going to make that up with the

8    speed of your questions.

9            It will be the number of your questions and the

10   focused nature of the questions, but I have to be able to

11   hear them and she has to be able to write them down.

12           All right.

13                    CROSS-EXAMINATION

14   BY MR. GIDLEY:

15   Q.  Dr. Dranove, yesterday we were talking about CID data,

16   and I want to ask you some questions just generally about

17   the health insurance industry.

18           First, it's true, sir, that every health insurer

19   would have the identity of the employer customers in its

20   files, correct?

21   A.  I would assume that's true.

22   Q.  And every health insurance company would also

23   necessarily have the name of its subscribers, the employees

24   who elect that insurance, correct?

25   A.  That's correct.

1   Q.  And, finally, every health insurance company would have

2   the names of the members, of the family members of a

3   subscriber, because they all get the card, right?

4   A.  They all get the card.  I don't know whether the cards

5   are individual names, but it wouldn't surprise me.

6   Q.  When I say "the card," we're talking about the card you

7   present at the hospital, and you talked about it earlier,

8   about Blue Cross/Blue Shield, and it's familiar to you,

9   right?

10  A.  Yes.

11  Q.  And, sir, this information, company name, subscribers

12  and members was available to the antitrust division in 2015,

13  correct?

14  A.  I don't know whether all the insurers would have had all

15  that information available.  I don't know that detail.

16  Q.  In your investigation, did you ever learn that an

17  insurer lacked the names of its employer customers, the

18  names of its subscribers, and the names of that health

19  insurance carrier's members?

20  A.  No.

21  Q.  Now, sir, you testified on direct that 26 firms receive

22  CIDs, correct?

23  A.  Correct.

24  Q.  In fact, sir, 28 received CIDs or other form of subpoena

25  process, correct?

1    A.  So now I don't recall the -- I don't know whether it was

2    28 that were sent and 26 responded or 26 were sent and 26

3    responded; I don't recall.

4    Q.  I'll represent to you -- sorry.  I'll represent to you

5    that 28 were sent and 26 responded with data that you used

6    for your NA5 and your NA5g calculation.

7    A.  I'll accept that.

8    Q.  Now, sir, the CIDs that were sent by the Justice

9    Department in this case were sent over a long period of

10   time.  The return dates ranged from December 14th, 2015, to

11   September 2nd, 2016, correct?

12   A.  I'm not aware of the dates in which the CIDs were

13   returned.

14   Q.  Are you aware that the CIDs were issued over an eight-

15   or nine-month period?

16   A.  I'm not aware of the period of time over which they were

17   issued.

18   Q.  Are you aware of the number of specifications that were

19   asked in the CIDs that you had access to; that they ranged

20   from two specifications to 27?

21   A.  I'm aware of the -- that there was a range of

22   specifications; I don't know the exact numbers.

23   Q.  And the data that was requested by the CIDs was 2015

24   data, correct?

25   A.  I believe that's correct, yes.

1    Q.  And, sir, you didn't insist on a 2016 update, say, June

2    30, 2016, did you?

3    A.  No, I did not.

4    Q.  I'd like you to turn in your first binder, Dr. Dranove,

5    to Tab 26, and it has some confidential data, so I'll just

6    warn you about that.

7            This document, Mr. Haley, we'll just put up for

8    the Court.  But it's Tab 26 of the first binder.

9            Let me know when you're there.

10   A.  I'm there.

11   Q.  Dr. Dranove, you saw this document in your deposition.

12   This is a list of the NA5 companies for five large insurers;

13   Aetna, Anthem, Cigna, United, and Humana, correct?

14   A.  I believe that's correct, yes.

15   Q.  The document, without revealing any of the customer

16   names, the document gives the names of the companies, as

17   well as data underneath a column that's entitled "Sum

18   Member, 2015 9-30."

19           So that's S-U-M, M-B-R.  Do you see that?

20   A.  Yes, I do.

21   Q.  That's the list of the members for that particular

22   company that's listed there, right?

23   A.  Correct.

24   Q.  And, sir, if you look at the top ten customers for one

25   of the companies, we'll just start at Page 1, those are

1   familiar household names, right?

2   A.  Many of them are.

3   Q.  Right.  There's some government entities, but the

4   private companies are all Fortune 100-type companies, right?

5   A.  Based on their size, I would believe they could well be

6   in the Fortune 100, yes.

7   Q.  How about the Fortune 500?

8   A.  Again, based on their size, I'm willing to believe that

9   they're amongst the nation's largest companies, based on the

10  number of members.

11  Q.  And then, sir, let me direct your attention to Tab 27.

12          This is another exhibit from your deposition.

13  This is your NA5 list of companies for -- one of the Blues

14  is on Page 1.  And there are nine Blues found underneath

15  this tab, just as in your deposition.

16          Do you recall that?

17  A.  Yes, I do.

18  Q.  And, again, for the nine Blues that are here under Tab

19  27, the actual company name appears.  Do you see that?

20  A.  Yes.  Or if it's not a company, a group name.

21  Q.  All right.  So you can see companies in the top ten that

22  begin with "L" and "G" and so forth, right?

23  A.  Yes.  I understand, yes.

24  Q.  And they're very recognizable companies, right, very

25  large companies?

1     A.   The ones that are -- the companies that are reasonably

2     large, I'm not sure they're all recognizable.

3     Q.   Just so we have a precise record, so at Tabs 26 to 27,

4     we have the list of companies that your computer programs

5     have kicked out as being qualified to be NA5 companies; that

6     is, companies with more than 5,000 employees, correct?

7     A.   That's correct.

8     Q.   All right.  Now, turning to Tab 28, which is your

9     Deposition Exhibit 20.  Are you there?

10    A.   Yes, I am.

11    Q.   Now, sir, there are 14 additional companies; do you

12    recall that from your testimony in the deposition?

13    A.   Maybe you could refresh my memory.  When you say "14

14    additional," you're referring to what?

15    Q.   So we talked a minute ago about 28 CADs and we've

16    already seen 5 plus 9 companies, so we're at 14.

17             This tab has an additional 14 companies.

18    A.   Okay.  Thank you, yes.

19    Q.   And the names of those companies are at the top of this

20    tab, right?  Do you see how on each page --

21    A.   Each page, yes, correct.

22    Q.   AvMed and so forth, right?

23    A.   Yes.

24    Q.   Directing your attention to Page 7, there's nothing for

25    Emblem, correct?

1    A.   That's correct.

2    Q.   And for these 14 insurers, you did not and the division

3    did not insist on the companies providing the employer names

4    for the enrollees for NA5, correct?

5    A.   I don't know what the division insisted.

6    Q.   But you did participate in the selection of the data

7    that was requested for the CIDs; you testified to that

8    yesterday, correct?

9    A.   Yes, I did.

10   Q.   All right.  Now, sir, I want to go to one of your

11   demonstratives from your direct examination.  This is slide

12   26 from the Dranove Examination.

13            This can go on the public screen, Mr. Haley.

14            And this is your numerator/denominator slide, just

15   to refresh you, if you've got a paper copy.

16   A.   Sure.

17   Q.   And, sir -- there we go.

18            Sir, you've got -- you provide a helpful

19   demonstrative that shows the insurer's national accounts

20   share, which for your purposes is either NA5 or NA5g.

21            You have two different calculation methods, right?

22   A.   Yes.

23   Q.   And then the numerator are the insurer's national

24   accounts enrollment, correct?

25   A.   Correct.

 1    Q.  And, again, to be precise, that means the companies that

 2    your computer program kicked out as NA5 or NA5g companies;

 3    the number of enrollees that those insurance carriers have

 4    is the numerator, right?

 5    A.  Yes.

 6    Q.  And then the denominator, you said you did two different

 7    ways to do the denominator, right?

 8    A.  Correct.

 9    Q.  All right.  And directing your attention to Slide 29.

10         This is from your public slide deck yesterday.

11    You talk about two different methods.  We covered this

12    briefly yesterday.  The MEPS ACS census method and the CIDs,

13    which is the stack of the 26 CID companies, correct?

14    A.  Correct.

15    Q.  Now, sir, I'd like to show you what's at your Tab 60 in

16    your second binder.

17         MR. GIDLEY:  And, Your Honor, this has been marked

18    DDX2, but it's confidential.  We'd be happy to supply a

19    redacted version.

20         THE COURT:  Which tab in the binder?

21         MR. GIDLEY:  60, in the second binder.

22    A.  Okay.

23    BY MR. GIDLEY:

24    Q.  And, sir, showing you Tab 60, this is an exhibit that

25    lists the 28 CID companies on the left column.

1    Do you see that?

2    A.  Yes, I do.

3    Q.  And just to kick this off, it's got Aetna, Anthem, AvMed

4    and so forth, correct?

5    A.  Okay.

6    Q.  And then reading across from a particular carrier, it

7    has the NA5 enrollment for the United States.  Just taking

8    Aetna -- I won't read the numbers out loud -- its NA5g

9    enrollment for the United States, its Anthem footprint, 14-

10   state enrollment for Aetna, and its 14-state NA5g

11   enrollment.  Do you see that?

12   A.  Yes, I do.

13   Q.  And at the bottom are the denominators of these four

14   columns.  Do you see that?

15   A.  When you say "the bottom," do you mean the row that's

16   highlighted?

17   Q.  Yeah.  Let's start with, "Market size estimate used by

18   Dranove for market shares."

19           And the first column is 74 million; do you see that?

20   A.  Yes, I do.

21   Q.  And the second column is 57 million?

22   A.  Yes.

23   Q.  And then the third column is 27 million?

24   A.  Yes.

25   Q.  And the fourth column is 19 million; do you see that?

```
 1    A.  Yes.
 2    Q.  All right, sir.  Now, going to the methodology, the sum
 3    of the CIDs, the sum of the numerators is 74 million in the
 4    NA5 United States column.  Do you see that?
 5    A.  Yes, I do.
 6    Q.  And because that number is larger than the census
 7    number, you went with the 74 million number, not the 71
 8    million number, correct?
 9    A.  Yes, that's correct.
10    Q.  And then in the next column, United States NA5g
11    enrollment, the sum of the 26 CID companies that provided
12    data, your calculated sum was 53 million.
13              Do you see that?
14    A.  Yes, I do.
15    Q.  And the census sum was 57 million; do you see that?
16    A.  Yes.
17    Q.  And so you went with the census MEPS sum, correct?
18    A.  Correct.
19    Q.  And then similar, for the final two columns, in both of
20    those cases you went with the CID, not the census MEPS
21    methodology, right?
22    A.  That's correct.
23    Q.  And that's because the sum of those 26 carriers exceeded
24    the census estimate you calculated, correct?
25    A.  Yes, by a little bit, it did, yes.
```

```
 1    Q.  Now, sir, directing your attention to the figure in red,

 2    the 53 million figure you calculated.

 3    A.  Yes.

 4    Q.  We had that number audited, and my sources tell me that

 5    the number is actually 55.5 million.  Do you see that?

 6    A.  Yes, I do.

 7    Q.  Are you aware of that mistake?

 8    A.  I don't concede that it's a mistake.  I just see that

 9    it's a different number.

10    Q.  All right.  Are you aware that if your computer code is

11    run according to the directions you provide in your report,

12    the number yielded for the 26 CIDs is 55.5 million, not your

13    number of 53 million?

14    A.  No.  You're telling me this.  I've not -- I have no way

15    to independently confirm that right now.

16    Q.  Let's go to Tab 4 that we saw yesterday.

17               THE COURT:  Are you going to put on a witness to

18    say this?  You've posited many facts in your questions.

19               Are you going to put on a witness to say this?

20               MR. GIDLEY:  I can, Your Honor.

21               THE COURT:  I just want to know.  You've sort of

22    announced various things in your questions, and so if the

23    answers are going to be relevant -- I mean, right now I

24    think he doesn't know if that's true or not, so if you're

25    happy with that answer, that's fine.  But if I'm supposed to
```

 1    believe that it's true, I'm going to need something other

 2    than your say-so.

 3            MR. GIDLEY:  Your Honor, we'll consider collateral

 4    evidence of impeachment or whether our experts can just

 5    simply address it in their directs.

 6            Obviously, everything's time constrained, but --

 7            THE COURT:  I don't think it's impeachment; he

 8    says he doesn't know.  All right.  Go on.

 9            MR. GIDLEY:  Thank you.

10    BY MR. GIDLEY:

11    Q.  Dr. Dranove, just to show how this connects with

12    yesterday's exam, if you look at Tab 4.

13    A.  Yes, I'm there.

14    Q.  And let me hand Mr. Haley --

15            MR. GIDLEY:  Your Honor, this quantitative data is

16    tedious, so we've marked Tab 4 from yesterday as DDX1.

17            THE COURT:  Okay.

18    BY MR. GIDLEY:

19    Q.  Dr. Dranove, the denominators that we showed you

20    yesterday, the 74 million and the 57 million, do you see

21    that in Tab 4 of what's now marked as DDX1?

22            THE COURT:  Why are we starting again?  What's

23    DDX?  That's new exhibits starting at 1 again?

24            MR. GIDLEY:  The Defendant's Demonstrative 1.

25            THE COURT:  Oh, they're demonstratives?

```
1                         MR. GIDLEY:  Yes.

2                         THE COURT:  This is a demonstrative?

3                         MR. GIDLEY:  Yes, right.

4                         THE COURT:  Okay.

5     A.  I'm sorry.  Could you repeat the question.

6     BY MR. GIDLEY:

7     Q.  Sure.  Just so we're clear, the numbers 74 million,

8     57 million that was found at Tab 4, which we've now marked

9     for the record as DDX1, that document ties to the number;

10    that is, it's the same number as the numbers that appear in

11    the Tab 60 document you have in front of you.

12                        Do you see that?  The 74 million and the 53 million?

13    A.  I have to cross-reference this to the Tab 60 document.

14    Q.  Right.

15    A.  Tab 60.  Okay.  Yes, I see it.

16    Q.  And, sir, with the sum of the CIDs, if you were to add a

17    27th, 28th, 29th, and 30th firm with enrollees that were NA5

18    or NA5g to the denominator, the market size rises, correct?

19    A.  I'm sorry.  If you're asking me if I added additional

20    firms to the denominator, would the size of the denominator

21    increase?  Then yes.

22    Q.  By definition, right?

23    A.  Yes.

24    Q.  And similarly, the numerator for any carrier would

25    decline, correct?
```

1    A.   The numerator stays the same.

2    Q.   Right.   But the numerator is over -- fair enough.

3         Let me rephrase that then.   The numerator divided

4    by the denominator would yield a lower market share

5    percentage, correct?

6    A.   That's correct.

7    Q.   So the merging firms' market share percentage would drop

8    as the denominator rises, correct?

9    A.   That's correct.

10   Q.   Now, sir, if I could have the ASO calculation that you

11   discussed yesterday, I think that's at Slide 34 from your

12   presentation.   So this is public.

13        We just saw, sir, how three out of the four U.S.

14   and Anthem denominator calculations, the CID sum, which you

15   sometimes call a build-up, exceeded the census number,

16   correct?

17   A.   That's correct.

18   Q.   And then you have two more market shares, which is the

19   ASO Anthem territories slide at 34.

20        Do you see that?

21   A.   Yes, I do.

22   Q.   And where it says "build-up denominator" in both NA5 and

23   NA5g, that refers to the 26 CIDs stacked up, correct?

24   A.   Yes.

25   Q.   And again, in both ASO charts, you did not go with the

1     sensus MEPS data; you went with the build-up of the CID

2     responses of the 26 firms, correct?

3     A.  For these charts, the denominator was the build-up

4     denominator, correct.

5     Q.  Right.  So of the six pie charts of market share you've

6     presented to this Court, in five instances it was this 26

7     CIDs that exceeded the census estimate for the denominator

8     or the market share size -- market size, correct?

9     A.  Yes, five of six.

10    Q.  One final question.  If I could direct your attention

11    back to Tab 60.

12    A.  Okay.  Go ahead.

13    Q.  Dr. Dranove, you see Emblem, N/A, and you see Healthy

14    CT, N/A.  Do you see those entries?

15    A.  Yes, I do.

16    Q.  So those are two CID firms that are not contained in the

17    NA5 enrollment list that builds up to your denominator out

18    of the 28 total firms, right?

19    A.  That's correct.

20    Q.  Dr. Dranove, your report does not include a listing of

21    the largest 50 or 100 commercial health insurers in the

22    United States, correct?

23    A.  That's correct.

24    Q.  And, sir, there are hundreds of health insurance

25    companies in this country, correct?

1    A.  Yes, there are.

2    Q.  All right.  And directing your attention now to Tab 67;

3    and let me know when you're there.

4    A.  I'm there.

5    Q.  Dr. Dranove, Tab 67 is a list from the health leaders

6    backup as of January 2015 of more than 100 -- about 150

7    different health insurance companies.

8         Do you see that?

9    A.  Yes, I do.

10   Q.  And, sir, we took this from your backup.

11        And these are national totals.  And what we did

12   was we've yellow-highlighted the insurance carriers that

13   received CIDs.  And you see the names that are yellow-

14   highlighted at Tab -- excuse me, Tab 67.

15        And you recognize that from what we just looked

16   at, right?

17   A.  Yes.

18   Q.  And then there are a number of companies that are not

19   CID recipients.  So just starting on Page 1, Tufts is one

20   that IS not in your denominator, correct?  That's at 32.

21   A.  Yes.  I can see that regional plan listed here.

22   Q.  And UPMC, at 41, University of Pittsburgh Medical

23   Center, they did not receive a CID, correct?

24   A.  Right.  That's a provider-sponsored plan, correct.

25   Q.  Right.  So they're not in the denominator or market size

1    calculation for this case, correct?

2    A.   Correct.

3    Q.   And Centene at Number 70?

4    A.   Let me -- let me just -- they are in my denominator

5    calculation in the census approach.  The census approach

6    would have captured everybody, but as I said, because of the

7    noisiness of that approach, we ended up for some, for all

8    but one of the denominators using the build-up approach,

9    just to be clear.

10   Q.   In the CID buildup approach, that company does not

11   appear in your denominator, correct?

12   A.   That's correct.

13   Q.   And similarly, sir --

14            THE COURT:  All the ones that aren't highlighted

15   aren't in your buildup approach?

16            THE WITNESS:  That's correct.

17            THE COURT:  Okay.

18   BY MR. GIDLEY:

19   Q.   You can set that aside, Dr. Dranove.

20            Dr. Dranove, you testified on direct that TPAs,

21   according to one consultant, were about 1 percent of the

22   market.  Do you recall that testimony?

23   A.   I recall that testimony, yes.

24   Q.   And, sir, Cigna has estimated that 20 percent of the

25   health insurance marketplace uses an independent TPA, correct?

1    A.  Are you talking about the national accounts market or

2    the entire health insurance marketplace?

3    Q.  I'm talking about the entire health insurance market.

4    A.  Cigna has testified to the presence of the TPAs in the

5    entire U.S market; not the national accounts market.

6    Q.  The internal Cigna documents --

7             And if I could have up Tab 25, DX228.  That

8    document, an internal Cigna document, says -- when we have

9    it up.  And there's a public version, Your Honor, for the

10   public screen, Mr. Haley.

11            THE COURT:  Do we have any claim in this case that

12   deals with the entire health insurance market?

13            MR. GIDLEY:  I'm sorry, Your Honor?

14            THE COURT:  Do you have any claim in this case

15   that deals with the entire health insurance market in the

16   United States, no matter what size the employers are?

17            MR. GIDLEY:  No, Your Honor.  I think our point is

18   that it's the 80-20 rule, that the vast majority of

19   enrollees are in large group, and certainly in national

20   accounts.

21            And the second area where it's relevant is when we

22   get to the issue of monopsony.

23            THE COURT:  All right.  Which I thought we were

24   trying next time.

25            All right.  Anyway, I'm just not sure why this is

 1    relevant.  I'll let you ask him about it, but we're

 2    having -- we have lots of testimony about national accounts

 3    to get to.

 4    BY MR. GIDLEY:

 5    Q.  Dr. Dranove, in the third paragraph of DX228, quote:

 6    Approximately 20 percent of the commercial health insurance

 7    marketplace uses an independent payer.

 8          That's the Cigna estimate, correct?

 9    A.  Okay.

10    Q.  That's their estimate, right?

11    A.  Yes.  I don't know what they define as an independent

12    payer.  If it says it elsewhere in the document, I'd be

13    happy to take a look.

14    Q.  It's not a document that you feature in any of your

15    experts reports, correct?

16    A.  I don't recall it.

17    Q.  Could I have DDX6 up?

18          This is a map, Your Honor, of the 14-state Blue

19    territory.  Changing topics.

20          Dr. Dranove, on the screen, and I believe it's Tab

21    87, if you prefer a paper copy, is just a map of Anthem's

22    14-state Blue license territory.

23          Do you see that?

24    A.  Yes, I do.

25    Q.  And the overlapping areas in California and New York are

1    shown in the marks, correct?

2    A.  Yes, I see that.

3    Q.  And Dr. Dranove, other than Anthem, no other Blue

4    Cross/Blue Shield licensee is a party to the Anthem/Cigna

5    merger transaction, correct?

6    A.  You're asking a legal question.  I don't know what the

7    legal definition is of being a party to the transaction.

8    Q.  You did an economic analysis, and your economic analysis

9    is of the combination of Anthem and Cigna, correct?

10   A.  Correct.

11   Q.  And the transaction you analyzed, so far as you know,

12   has as parties Cigna and Anthem, correct?

13   A.  You're asking me for -- I don't know what you mean by

14   the -- it's the legal definition; in other words, who's

15   being sued or something like that?  Or is it an economic

16   question about who has an economic interest in the

17   transaction?

18   Q.  I'm just asking for your understanding.  This is

19   something we covered at your deposition at Page 55.

20         And I'm happy to read the testimony or let you

21   refresh yourself; Page 55, lines 5 through 11.

22         Let me know when you're there.  Are you there, sir?

23   A.  My answer was:  "My understanding is there are no

24   ownership stakes involved, other than the ownership of these

25   two companies."

1   Q.  And, sir, your reports don't describe any equity stake

2   that Anthem owns in any other Blue Cross/Blue Shield

3   licensee, correct?

4   A.  Correct.  And I believe in my direct testimony I spoke

5   to this.

6   Q.  Now, sir, your 49 percent market share would be the same

7   as if Anthem bought all of the Blues in the United States,

8   if they bought 32 of the 35 Blues, correct?

9   A.  And, again, in my direct testimony I explained why I did

10  that.

11  Q.  And similarly, for the 41 percent figure that you used

12  in your pie charts, that number would be the same as if

13  Anthem bought, all at once, 30 of the Blues to create that

14  numerator, correct?

15  A.  Yes.

16          THE COURT:  Wait.  The 49 percent for the entire

17  United States included all of the Blues.

18          The 40 percent in the Anthem states, didn't that

19  exclude the Blues that were in the same states and it was

20  just Anthem?

21          THE WITNESS:  It excludes Blue Shield of

22  California.  It excludes the two Blues in Upstate New York,

23  but it includes the BlueCard lives for all of the other Blue

24  carriers.

25          THE COURT:  Anything they're hosting in that state?

1    THE WITNESS:  Correct.

2    THE COURT:  Okay.

3    BY MR. GIDLEY:

4    Q.  So we're all clear, there are 36 Blues; three have

5    overlapping areas with Anthem today.

6         So you set those aside, and then that leaves 32.

7    And all of the market-share pies you presented in court at

8    Slides 33, 34, and 35, Anthem territories, ASO only, and

9    U.S. market shares, all of those, the numbers that you

10   calculate for the Blues, that market share would be the same

11   as if we bought all 32 companies, right?

12   A.  It would be the same calculation, yes.

13   Q.  All right.  And, sir, you have no citation in your

14   report that the antitrust division has ever added

15   non-merging companies' sales or presence through enrollees

16   to the numerator of analysis of two merging parties,

17   correct?

18   A.  There's no citation like that.

19   Q.  Now, you testified on direct about UniCare; do you

20   recall that?

21   A.  Yes, I do.

22   Q.  That was Slide 67.  If we could have that up.  And it

23   can be on the public screen, of course.

24        And, sir, you testified about a company that was

25   disposed of in 2010, correct?

1    A.   Yes.

2    Q.   Now, sir, you did not testify on direct or evaluate in

3    your reports Amerigroup, correct?

4    A.   That's correct.

5    Q.   I direct your attention to Tab 51.  This is PX125.

6    A.   It's in Binder 2?

7    Q.   Yes, sir.

8    A.   I need a bigger desk.  Okay.

9    Q.   And, sir, I'm directing your attention to a cull-out

10   quote, and I think it may be easier if we just put it up on

11   the screen.

12            This is about the acquisition of Amerigroup.  And

13   maybe I'll ask you first, what year was Amerigroup acquired?

14   A.   I don't know off the top of my head.

15   Q.   And, sir, I'll represent to you it was acquired in 2012.

16   A.   Okay.

17   Q.   And, sir, just to move things along, Amerigroup is a

18   business where Anthem competes in states like Tennessee and

19   Texas and Washington and New Mexico, correct?

20   A.   I don't know what states it competes in, nor in which

21   market it competes.

22            I don't know if this is relevant to the national

23   accounts discussion.

24   Q.   And, sir, Amerigroup, which is a company competing

25   against other Blues for Medicare or Medicaid or for the

1   government payer business, that Amerigroup business is not

2   discussed in any of your reports, correct?

3   A.  I don't discuss Amerigroup; that's correct.

4   Q.  All right.  Similarly, Simply Healthcare was acquired by

5   Anthem in 2015, was it not?

6   A.  I don't know the year in which it was acquired.

7   Q.  And what state does Simply Healthcare put Anthem in

8   competition with a Blue?

9   A.  If my -- I'm recalling correctly, I believe it's in

10  Medicaid market in Florida, but I could have that completely

11  wrong.

12  Q.  And that's head-to-head competition with a Blue, with a

13  non-Blue-licensed business, correct?

14  A.  I don't know if Blue Cross of Florida is competing in

15  the Medicaid market and to what extent.

16  Q.  All right.  So just like Amerigroup, you did not study

17  the Simply Healthcare acquisition or the effect on

18  competition?

19  A.  And I should add, I don't know the extent to which the

20  Blues in which Amerigroup is operating -- or, competing in

21  the Medicare or Medicare markets in the same way.

22          So I don't know whether, in fact, Amerigroup or

23  Simply -- I can't remember the name -- actually directly

24  compete against any Blue plans.

25          And from what I understood from earlier testimony

1    and from you, they're not competing in the national accounts

2    space or in the commercial space whatsoever.

3    Q.  And you haven't said it.  It's not -- neither of those

4    companies are mentioned in any of your reports, correct?

5    A.  That's correct.

6    Q.  Let's talked about cedes.

7          Now, sir, you've testified earlier that Anthem

8    cannot compete for employers whose headquarters are located

9    outside Anthem's 14-state service areas without a cede,

10   correct?

11   A.  Yes.

12   Q.  The service areas within the Blue license are exclusive,

13   other than some of the exceptions we've discussed, right?

14   A.  Exactly.

15   Q.  And, sir, in your reports you do not calculate the

16   annual frequency of cedes between Anthem and other Blues,

17   correct?

18   A.  That's correct.

19   Q.  And you do not present in your reports how many cedes

20   were granted to Anthem in calendar year 2015, correct?

21   A.  That's correct.

22   Q.  And, sir, in your reports you did not analyze the

23   relative size of cedes granted to Anthem or by Anthem to

24   other Blues in any new year, correct?

25   A.  I'm sorry.  When you say, "in any new year," do you mean

1    new cedes or just total cedes?

2    Q.  Yes.  Any new cedes in a given calendar year?

3    A.  I did not report on new cedes on an annual basis, no.

4    Q.  Now, Dr. Dranove, your slide on cedes had some

5    information redacted, so I'll be careful here.

6         And it had a number about the number of members

7    involved, and it's Slide 62, if you want to refresh your

8    memory.  And I won't say that number out loud because it's

9    redacted.  Are you there?

10   A.  Yes, I am.

11   Q.  And that number of members is well under 5 percent of

12   the 75 million number we looked at earlier, right?

13   A.  So, yes, the 75 million number -- refresh my memory as

14   to which slide that was.

15   Q.  That's your denominator number, and I'm just asking --

16   A.  So that's the total size of the national accounts market --

17   Q.  Yes, sir, and I'm comparing that --

18   A.  This represents -- so Anthem's cedes represent -- the

19   lives that Anthem gets from cedes represents less than

20   5 percent of the total size of the national accounts market

21   in the U.S.?

22   Q.  Yes.

23   A.  Correct.

24   Q.  All right.  And you talked also on your direct about

25   Blues revenue; do you recall that?

1    A.  BlueCard?

2    Q.  Yes.

3    A.  Yes.

4    Q.  And, again, the exact number is confidential, but I'd

5    like to show you DDX11, which is a pie chart that compares

6    the total revenues of Anthem to the BlueCard revenue.

7            Again, this is confidential, Mr. Haley.

8    A.  Do I have this?

9    Q.  You should have this, sir, at Tab 50, and it's now on

10   the screen.

11   A.  I'm sorry.  All right.

12   Q.  And, again, without calling out the number, it's fair to

13   say that the total Anthem BlueCard revenue is under

14   3 percent of Anthem's revenue, correct, if you compare those

15   two numbers?

16   A.  On the bottom?  This is Anthem's total revenue,

17   including ASO and full insurance?

18   Q.  Right.

19   A.  So as we talked yesterday, the full insurance being an

20   inflated number, it -- that said, yes, it's a small

21   percentage of the total revenue.

22   Q.  Could I have --

23            THE COURT:  That includes revenue from all

24   sources.  Do they do any Medicaid/Medicare --

25            MR. GIDLEY:  Yes.

1          THE COURT:  That includes everything government,

2     everything they do?

3          MR. GIDLEY:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. GIDLEY:  And that's from the 10-K, Your Honor.

6     BY MR. GIDLEY:

7     Q.  Correct, Dr. Dranove?

8     A.  Yes.  This is a fraction of all of its revenue from all

9     sources.

10    Q.  I'd like to put up on the screen a public document

11    that's found at Tab 46 of your binder, sir.

12          This is a map of the Fortune 500 by headquarters

13    location.  And it can go on the public screen.

14          This is from the Fortune 500 list, Your Honor.

15          Sir, let's just get things moving.  You've been

16    shown a map, the Fortune 500, and you've got it in front of

17    you, right?

18    A.  Yes.

19    Q.  In Texas, 54 of the Fortune 500 are headquartered,

20    correct?

21    A.  According to fortune and their calculations, correct.

22    Q.  Right.  And that Blue is HCSC; that's in the State of

23    Texas, correct?

24    A.  Yes.

25    Q.  And the State of Minnesota, 17.  Do you see that?

```
1    A.  Yes.
2    Q.  And that's Blue Cross of Minnesota, correct?
3    A.  That's correct.
4    Q.  And in Illinois 34, that's also another HCSC state,
5    correct?
6    A.  Yes, it is.
7    Q.  Sir, in those states where the Fortune 500 company is
8    headquartered, absent a cede, Anthem can't compete for that
9    account, correct?
10   A.  That's correct.
11   Q.  You testified also on direct that one reason why you
12   wanted to combine the Blues was -- this is a paraphrase, but
13   it was words to the effect of you, yourself, have walked
14   around with a BlueCard, and you think consumers think that
15   there's just one monolithic Blue.
16           Do you recall that point?
17   A.  Yes, I made that point, and I could reiterate it, but I
18   think it stands.
19           THE COURT:  No.
20   BY MR. GIDLEY:
21   Q.  So my question -- my question is, at Slide 12, the
22   people that do the purchasing for the national accounts,
23   they're sophisticated, aren't they, sir?
24   A.  Yes, they are.  I'm sorry.  Did you say Slide 12; did
25   you --
```

1    Q.  That was from your direct.  Very large employers --

2    A.  Okay.  Yes, yeah.

3    Q.  Sophisticated HR --

4    A.  Absolutely.

5    Q.  Let's talk about the idea of 14 states, Anthem

6    territories as a market, as opposed to say, 10 states.

7            First, you did not calculate a critical loss that

8    would have made an SSNIP for national accounts located in

9    Anthem states unprofitable, as compared to, say, 13 or 10

10   states, correct?

11           THE COURT:  That's one question?

12           THE WITNESS:  I didn't understand the question.

13   BY MR. GIDLEY:

14   Q.  All right.  Well, let's slow it down.

15           Your entire analysis of the 14-state Anthem

16   territory is in a single paragraph, Paragraph 118.

17           MR. GIDLEY:  And I believe, Your Honor, there's

18   nothing confidential about this paragraph, so we've got it.

19   We'll pull it up on the screen.

20           THE COURT:  Paragraph 118 of his report?

21           MR. GIDLEY:  First report, Paragraph 118.

22           THE COURT:  Okay.  Can we not do, by the way --

23   while I appreciate your efforts, the highlighting behind his

24   talking, I find it very distracting.

25           If you're going to call out something by

1    highlighting, I'd highlight it first or pop it out.

2              But she's kind of going around behind you

3    highlighting, and you're usually on a different word and

4    it's distracting to me.  So I'd prefer that we just not do

5    it unless he can't find where you're reading.

6              MR. GIDLEY:  Yes, Your Honor.

7    BY MR. GIDLEY:

8    Q.  I think I can ask you a simple question, if you have

9    Paragraph 118 in front of you.

10   A.  Yes.

11   Q.  Sir, in this paragraph, you provide your analysis of the

12   relevant geographic market, correct?

13   A.  Yes.

14   Q.  At no other place in the report do you analyze the 14

15   states.  It's in this paragraph, right?

16   A.  I believe that's true.

17   Q.  And as to geographic market?

18   A.  Yes.

19   Q.  This paragraph doesn't consider geographic market of 13

20   states or 10 states, correct?

21   A.  Correct.

22   Q.  There's no discussion of that, correct?

23   A.  Correct.

24   Q.  Could I have, now, a slide that's at your Tab 44, your

25   second binder, Dr. Dranove, up on the screen?  It's a public

1    map.

2            And, Dr. Dranove, this is a map that shows four

3    Anthem Blue license states where both the complaint and your

4    report identify no large group local market issues, correct?

5    A.  I'm sorry.  Are we now turning to the large group

6    market?

7            This is not the national accounts market now

8    you're talking about?

9    Q.  I'm simply asking you this question:  You understand

10   that you have a national account market and a local large

11   group?

12   A.  Okay.

13   Q.  And they overlap.  We covered that yesterday, right?

14   A.  Yes.

15   Q.  And, sir, in these four states, you've identified no

16   local markets of issue, correct?

17   A.  In the Phase 2 part of the trial, I will not be

18   identifying local markets at issue in these states, correct.

19   Q.  So that our record's clear, that's Kentucky, Nevada,

20   Ohio, and Wisconsin, correct?

21   A.  Correct.

22   Q.  And those four states, Kentucky, Nevada, Ohio, and

23   Wisconsin are part of the 14 Anthem territory states for

24   your market share calculation, correct?

25   A.  They should be, if these are Anthem territories, yes.

1    Q.  Right.

2          And what I'd like to do is, Your Honor, put up

3    DDX4, and this is a Venn diagram, but it's just a conceptual

4    point, DDX4.

5          This is found, sir, at Tab 45.

6          My point's simple.  That is, you have identified

7    an issue of price discrimination and an SSNIP that would be

8    imposed against national accounts in these four states, but

9    not on employers between 50 and 5,000, correct?

10   A.  I'm sorry.  Are you talking about a SSNIP market

11   definition?

12   Q.  No.  I'm not on market definition.  I'm on competitive

13   effects and market --

14   A.  I'm sorry.  You referred to SSNIP, so I don't think I

15   understand the question.

16   Q.  Let me rephrase it.  Sir, you do not assert in your

17   reports or in your direct exam that there will be adverse

18   competitive effects from an Anthem/Cigna merger in these

19   four states, Kentucky, Nevada, Ohio, and Wisconsin, for

20   employers with employees of less than 5,000, correct?

21   A.  I think that's overstating.

22          I think what I would have said was that the merger

23   would not exceed the presumptive thresholds for a

24   substantial reduction in competition.  It doesn't mean there

25   won't be adverse effects.

1  Q.  You haven't calculated and don't present any rigorous

2  market definition or results for these four states for

3  employers beneath 5,000 in your reports, correct?

4  A.  I think I've -- in my reports I present market

5  definitions for all of the -- I come up with a methodology

6  for market definition for all MSAs, including all the MSAs

7  in these states.

8          But what I conclude is that the market shares in

9  the large group market are sufficiently dispersed in

10  these -- in the MSAs in these four states; that they do not

11  exceed the presumptive threshold.

12  Q.  All right.  I want to go back to those three exhibits.

13          And we did them this morning, so hopefully you

14  remember them.  The three NA5 exhibits where we had the

15  five, the nine, and the 14 CID response companies; do you

16  recall those?

17  A.  Yes.

18  Q.  Sir, for the 14 companies for which you don't have an

19  employer name, it's not possible to match the employer

20  customers of those 14 carriers against the customers of the

21  original 14 companies, the five large companies and the nine

22  Blues, correct?

23  A.  I'm sorry.  You have to repeat that question.  There's a

24  lot going on.

25  Q.  All right.  You have 28 CID companies.  14 you have

1  customers' names in your data printed out as qualifying as

2  NA5 companies.  Do you recall that?

3  A.  Yes.

4  Q.  All right.  14 you do not have their names, correct?

5  A.  Don't have the customer names?

6  Q.  The customer names of those 14 insurance carriers,

7  correct.

8  A.  I don't recall the number of insurers that did or

9  didn't.  Not as we're sitting here right now.

10  Q.  All right.  Well, let's take a look at the tabs, so we

11  have a clear record.

12  A.  Okay.  Good.

13  Q.  So if we could direct your attention, sir, in the first

14  binder.  These are Tabs 26, 27, and 28.

15         Let me know when you got that binder.

16  A.  I'm at 26.

17  Q.  Right.  That's five carriers starting with Aetna, right?

18  A.  Yes.

19  Q.  You have customer names there?

20  A.  Yes.

21  Q.  Then there are nine Blues, starting with Blue Cross/Blue

22  Shield of Alabama on the first page of Tab 27?

23  A.  Yes.

24  Q.  Right?  And all of this we covered in your deposition?

25  A.  Yes.

```
 1              THE COURT:  And we covered it this morning.

 2              MR. GIDLEY:  Yes.

 3    BY MR. GIDLEY:

 4    Q.  Finally, in Tab 28, there are 14 companies, AvMed, Blue

 5    Cross/Blue Shield of Kansas City, Health Net, Harvard

 6    Pilgrim, and so forth, Medical Mutual of Ohio, correct?

 7    A.  Yes.  I'm sorry.  When you said "customer," I was

 8    thinking of individual numbers, not the names of the

 9    companies.

10    Q.  So my question is very simple.

11    A.  Yes.

12    Q.  It's not possible for the companies you calculate to be

13    either NA5 or NA5g companies to match any of those

14    companies, the 14 carriers, with the original 14 carriers

15    for which you have customer names, right?

16    A.  Yes, if I don't have -- obviously, if I don't have the

17    customer names, I can't match enrollments for specific

18    customers, per se -- I don't know if I'm allowed to say the

19    names of the insurers here, but the 14 that you mentioned

20    against the first 14.

21    Q.  And you don't report a matching of common employer

22    accounts, correct?

23    A.  That's correct.

24    Q.  And, sir, let me direct your attention to Tab 36.

25              It's in the second binder, and we're going to
```

1     compare this very quickly to Tab 26.  So --

2     A.  Do I need to have both tabs open?

3     Q.  Yes, sir.

4            THE COURT:  What are the two things that you can't

5     match if you don't know the names of the customers?

6            MR. GIDLEY:  So --

7            THE COURT:  What was your last question?

8            MR. GIDLEY:  The last question, as best as I can

9     recall, Your Honor, is to make the point that for NA5 and

10    for NA5g, one cannot match the employers who have enrollees

11    more than 5,000 of those 14 companies, which include Harvard

12    Pilgrim and other companies, AvMed, with the original 14

13    which were the five largest companies and nine of the Blues.

14           THE COURT:  Okay.

15           MR. GIDLEY:  That was the point.

16    BY MR. GIDLEY:

17    Q.  And so, Dr. Dranove, if you have Tab 36 in front of you,

18    and Tab 26.

19    A.  Okay.

20    Q.  We have done matching across the five large accounts

21    that are found at Tab 26.  We just have a couple of

22    examples.  I'm going to do one.

23           So you have Tab 36 in front of you.  It's

24    confidential, so let's not read data out into the open

25    courtroom.

1    A.  Okay.

2    Q.  All right.  Directing your -- this is an exhibit you saw

3    at your deposition.

4             We've made the change of adding numbers, just so

5    we can have an examination in open court.  If you look at

6    the 25th entry, you see a company.  Don't say its name.

7    A.  Okay.

8    Q.  And you see that that company, its business is split

9    between Aetna and United; do you see that?

10   A.  Yes, I do.

11   Q.  And it's a very large company, right?

12   A.  Indeed.

13   Q.  And, sir, we've done this matching across these five

14   insurers because we have the names here.

15            That's not something you have in your report,

16   correct?

17   A.  That's correct.

18   Q.  And, sir, given the nature of your data, you can't -- we

19   could not add, and you could not add if you were to ever

20   undertake it, a sixth or seventh column to show whether

21   these companies also do business with a Harvard Pilgrim or a

22   Kaiser, and so forth, correct?

23   A.  If Harvard Pilgrim and Kaiser are insurers that didn't

24   report company names, that would be correct.

25   Q.  And if you doubt me, I'll represent that Kaiser is in

1    that group of 14 that did not report --

2    A.  I don't doubt you.

3    Q.  All right.  So you can set that aside.

4         And, sir, because you're lacking the customer

5    names for 14 of the carriers, it's impossible to examine

6    slicing by name across the database of 28 CID respondents,

7    correct?

8    A.  If you tell me specifically what kind of examination

9    you're talking about, I could better answer that question.

10   Q.  Just like you saw in Slide 36, if you want to trace a

11   large company -- and I'll just blurt out a name because it's

12   not one we talked about -- let's say General Electric or

13   some other very large company, and you just want to see how

14   many health carrier insurance companies it does business

15   with, we can't do that with either your NA5 data or your

16   NA5g data beyond the five large companies and the 14 -- and

17   then the nine Blues, correct?

18   A.  I can't go company-by-company and tell you how their

19   enrollments are assigned.

20   Q.  And you can't match at all, given the data that was

21   collected for the 14 companies for which you don't have the

22   employer names, correct?

23   A.  Correct.  I can't go company-by-company at all for those

24   14.

25   Q.  Let me direct your attention now to Tab 91 in your

1   second binder, and this one is not public.

2           Dr. Dranove, this data at Slide 91 gives the

3   enrollment for U.S. commercial medical enrollment for Cigna

4   between the years 2010 and 2016.

5           Do you see that?

6   A.  Yes, I do.

7   Q.  And, sir, it's relatively flat, particularly 2012

8   through 2016, without calling out the numbers, right?

9   A.  Yes, it is.

10  Q.  All right.  Sir, HHS has stated -- and this is found at

11  Tab 73 -- HHS has stated that three health insurers or more

12  results in vigorous premium competition.

13          This is DX232, and it's found at Tab 73, and it's

14  at Page 5, top of the page.

15  A.  I'm sorry.  Can you tell me what page -- repeat the

16  claim you made about what this says.

17  Q.  Right.  The claim I made was a direct quote from DX232

18  at Page 5, last sentence of the first paragraph:

19  Marketplaces -- those are the ones run by the federal

20  government -- show that, as in other markets, having three

21  or more insurers results in vigorous premium competition.

22          Do you see that?

23          THE COURT:  What are they talking about?  The

24  public exchanges?

25          MR. GIDLEY:  Yes.

```
 1                    THE COURT:  Okay.  And who's talking?

 2                    MR. GIDLEY:  This is HHS, its ASPE Office of

 3         Health Policy.

 4                    THE COURT:  Okay.  So the government has said this

 5         about competition within the public exchanges?

 6                    MR. GIDLEY:  That's right, Your Honor.

 7                    THE COURT:  Okay.  So, and what's your question to

 8         him?

 9         BY MR. GIDLEY:

10         Q.  My question is:  It's a fact that HHS has made that

11         statement for the public exchanges, correct?

12         A.  What they say is that earlier research and competition

13         in the marketplace is research that, to the best of my

14         understanding, has yet to be published in a peer review

15         journal, has found that result.

16                    That's quite different from asserting that this is

17         a fact.

18         Q.  All right.  But they asserted, as a matter of public

19         policy, that health insurance premiums would be brought as

20         they say, quote:  Resulting in significantly lower premiums

21         for consumers at three or more health insurers, correct?

22                    THE COURT:  We're talking about -- you're the one

23         who's upset that the government is combining marketplaces

24         and now you're injecting the private exchanges into the

25         discussion.
```

1       I don't believe that this is a general statement

2    by the federal government that having three or more carriers

3    means there's enough -- I mean, that that's enough

4    competition, in general.

5       I don't know that the federal government has said

6    that, but even if the federal government has said that, I

7    guess you can ask him if he agrees with it; but it didn't

8    say that.  There's very specific context here.

9       THE WITNESS:  There's this even more institutional

10   background here.  The government has had a hard time getting

11   participation in the exchanges.  There are many exchanges

12   that have only one or two participants.

13      I think the government here is saying that three

14   is better than two; I don't think in any way the government

15   is saying that three is sufficient.

16   BY MR. GIDLEY:

17   Q.  And, sir, this is not research that you cite in your

18   report, correct?

19   A.  That's correct.

20   Q.  Let's talk about competitive effects.

21      You were asked a series of questions at your

22   deposition about bluffing.  And sir, you haven't studied

23   bluffing in connection with your testimony, correct?

24   A.  Refresh my memory as to what you mean by "bluffing."

25   Q.  Sir, this is a large customer bluffing a health

1    insurance carrier with a threat like moving to a private

2    exchange or going with another carrier to get a lower rate.

3    A.  And repeat the question, please.

4    Q.  My question is:  You've made no study of bluffing in

5    either of your reports, correct?

6    A.  That's correct.

7    Q.  And, sir, you acknowledge that customers can use the

8    threat of switching in negotiations to get better health

9    care rates, correct?

10   A.  Yes.

11   Q.  And you're aware, I think we showed you at your

12   deposition an example where one company threatened to go to

13   a private exchange.  Do you recall that testimony?

14   A.  I vaguely recall it, yes.

15   Q.  And that company felt it got a lower rate by making that

16   threat, correct?

17   A.  That conclusion, I don't recall.  I'd have to revisit

18   the documents that make -- that we were looking at.

19   Q.  Dr. Dranove, in your second report you have a study of

20   switching involving some 37 -- pardon me, 37 RFPs.

21           Do you recall that?

22   A.  It sounds familiar.  Again, I'm not going to remember

23   the exact number.

24   Q.  Let's put it in front of you.  It's Page 21, Paragraph

25   60, and I'm directing your attention, please, now to the

1   fourth sentence, quote -- are you there?

2   A.  Yes.

3   Q.  Great.  Thus, of the combined 37 RFPs where the top two

4   competitors are identified, I observed that Anthem and Cigna

5   were the top two competitors in four of the RFPs, again,

6   11 percent of the time.

7          Do you see that?

8   A.  Yes, I do.

9   Q.  So in the remaining of the 33 of the 37 RFPs, or 89

10  percent of the time, Anthem and Cigna were not the top two

11  competitors, correct?

12  A.  Yes, of course.

13  Q.  Now, sir, you said in your direct testimony that you

14  condition on incumbency.  Do you recall that testimony?

15  A.  Yes, I do.

16  Q.  Could we have Slide 45 -- excuse me, Slide 46 from your

17  direct testimony?

18          THE COURT:  The 37 RFPs that we're talking about

19  were all derived from a particular broker in a particular

20  time period?

21          MR. GIDLEY:  Your Honor, the reference in his

22  report is to two sets of data, both from --

23  BY MR. GIDLEY:

24  Q.  Dr. Dranove, I'll ask you, from Mercer and Willis Towers

25  Watson, correct, Dr. Dranove?

1    A.  So I now have to go back -- the first one, Mercer, yes.

2            I don't remember because I was focusing on that

3    paragraph, so I don't remember if it was Willis Towers

4    Watson, or not.

5    Q.  All right.  But let's just put it in the record and be

6    done.  So if you go to Paragraph 60, it reads, quote:

7            The Mercer data can be combined with WTW, RFP data

8    to provide a more complete picture of the extent of

9    competition between Anthem and Cigna, closed quote.

10   A.  That's fine, yes.

11   Q.  All right.  That's what you wrote, and that's the 37

12   RFPs.

13           Now, let's look at your switching analysis.  You

14   presented in your first report Exhibits G-2 and G-6.  And

15   you discussed in your direct testimony that you condition on

16   incumbency, right?

17   A.  Yes.

18   Q.  What that means is that you focus only on instances of

19   where Cigna or Anthem -- where Cigna loses -- and Cigna was

20   the incumbent, correct?

21   A.  That'd be one of the things that I would have done, yes.

22   Q.  Well, in G-2, that's what you're presenting, correct?

23   A.  So in Exhibit G-2, in particular, I'm looking at

24   situations where Cigna was the incumbent and somebody else

25   won the contract, yes.

1    Q.  All right.  Let's take a look at G-2, and this is in

2    your first report.

3               And we can put it up, if Cigna doesn't object.

4               MR. RULE:  We object.

5               MR. GIDLEY:  They object, so we'll show it to the

6    Court.

7               Your Honor, this is page -- Exhibit, excuse me,

8    G-2 in the first Dranove report, and we should have it up on

9    the screen for the Court and not for the audience.

10   BY MR. GIDLEY:

11   Q.  Dr. Dranove, do you have in front of you G-2?

12   A.  Yes, I do.

13   Q.  All right.  The first note states that only Cigna losses

14   where Cigna's the incumbent are included in the analysis; do

15   you see that?

16   A.  That's correct.

17   Q.  And that's conditioning on incumbency, correct?

18   A.  That's what it is, yes.

19   Q.  And there are two columns on the right; share-based

20   diversion and member-weighted diversion; do you see that?

21   A.  Yes.

22   Q.  And it's also now on your screen.

23               And the share-based diversion is based on a market

24   share you compute with 100 percent being Cigna's losses,

25   correct?

1   A.  I'm -- I don't understand the question.

2   Q.  Well, let me -- I'll ask you an open question.

3            What does the share-based diversion number

4   represent where you've got various percentages there?

5   That's based on market share?

6   A.  So let's take the first number, whatever it is for

7   whichever carrier that is, that is that carrier's share of

8   the insurance market, if we were to exclude Cigna as a

9   participant.

10  Q.  All right.  And that number is calculated for 2015,

11  correct?

12  A.  Yes.

13  Q.  Directing your attention to Note 7 where it talks about

14  Appendix F; that's a 2015 market share, right?

15  A.  Yes.

16  Q.  And you're comparing data in competitions for 2011

17  through 2017, seven years against that 2015 market share,

18  correct?

19  A.  Yes, the other data collected over seven years.

20  Q.  And over the seven years, the losses, you combine losses

21  to Anthem and the other Blues, right?

22  A.  That's correct.

23  Q.  And that means that this includes Cigna's losses to HCSC

24  in Texas and in Illinois and in other Blues, correct?

25  A.  No, that's not correct.

1    Because this was for the Anthem territories, so

2    these would be to accounts in the Anthem territories that

3    would have been ceded.  I believe that's true, that would

4    have been ceded -- I'd have to actually --

5    Q.  Well, let me ask a very precise question.

6        If HCSC had, as a customer, an employer

7    headquartered in Texas with lives, enrollees anywhere in the

8    14 Anthem territories, that's reflected in this diversion

9    number, right?

10   A.  That's correct.  I believe so, yes.

11   Q.  The loss that Cigna suffered to HCSC was priced by HCSC,

12   correct, in this example?

13   A.  That's correct.

14   Q.  So the diversion data here includes losses to other

15   Blues in competitions priced and led by other Blue Cross

16   carriers, not simply Anthem, correct?

17   A.  Yes.

18   Q.  Okay.  Dr. Dranove, you also make reference to G-6.

19       And I think we have this, Your Honor, as a DDX.

20   And Anthem, if I've got my exhibits correct, does not object

21   to this going up on the public screen.

22       So, again, the methodology is similar.  Now we're

23   looking at Anthem 's data and Anthem's lost sales.  And

24   here, over a three-year period, and this is what you

25   present, the number one carrier that Anthem lost customers

1    to was United, correct?

2    A.   That's correct.

3    Q.   And they did so by a three-to-one margin more than

4    Cigna, correct?

5    A.   In terms of member-weighted diversions, yes.

6    Q.   And this is a three-year period, so this is about

7    200,000 members a year, correct?

8    A.   200,000 Anthem members a year; 190,000 Anthem members

9    per year roughly, on average, yes.

10   Q.   Right.   Right.   And we're talking -- you and I are

11   talking about the members column here, where it's 500-plus,

12   divided by three years of 190-, 200,000, right?

13   A.   Correct.

14   Q.   And compared to the overall size of the market, this is

15   a small sample when you do your incumbency, right?

16   A.   Well, it's all of the -- it's all of the iAvenue data to

17   the extent the iAvenue data is complete.   It's the

18   population; it's not a sample.

19            THE COURT:   Can you drop down?   I would just want

20   to see what Footnote 2 said, please.   Thank you.

21   BY MR. GIDLEY:

22   Q.   Dr. Dranove, there are some excluded observations,

23   right?

24            So "other," which in this calculation, is 16

25   percent, a little bit smaller than Cigna, you've dropped out

1    some data, right?

2    A.  I'm sorry.  I don't think I've dropped out data.  I've

3    got another category, and it's included.

4    Q.  All right.  Let's just read it together.

5            The first sentence says, quote, other -- which is

6    other competitors besides those listed here, Cigna, United,

7    Aetna, Kaiser, and Humana -- includes product opportunities

8    where an incumbent is identified as either, one, an insurer

9    other than Anthem and the Blues; Cigna, United, Aetna,

10   Kaiser, or Humana.  Two, other, meaning others, what's in

11   the database.  Or, three, no carrier, none.

12           Do you see that?

13   A.  Yes.

14   Q.  So, first of all, the data set that you're looking for,

15   and this is true -- this is a footnote you have across all

16   of these diversion tables.

17           There are instances where Anthem and Cigna lose

18   customers, and they don't put into the database who they

19   lost the customer to?

20   A.  That's correct.

21   Q.  Meaning the employer.  They might not even know who the

22   employer finally selected for insurance, correct?

23   A.  I don't know what reason it would be for not being

24   there; that could be one.

25   Q.  And then you continue in note two, quote:  Product

1    opportunities for which a winner is not identified, where

2    the "loss to" carrier field is empty, unknown or TBD, are

3    not considered in this analysis, correct?

4    A.   Correct.

5    Q.   All right.   So in this analysis, as well as the analysis

6    we saw in G-2 because we have the identical language in

7    these, there are observations -- or competitions, I should

8    say.

9              There are competitions where Cigna and Anthem do

10   not record in any way who they lost to, right?

11   A.   Yes.

12   Q.   Directing your attention back to Slide 46.   This is from

13   your slide deck; it's public.

14             You have a comparison of predicted-by-shares and

15   win-loss.   But, sir, as I see it in this time period,

16   17 percent of the win-loss was Anthem losing to Cigna and 83

17   percent was losing to other companies in this industry,

18   correct?

19   A.   Yes.

20   Q.   Now, very briefly, if we turn to Slide 47, the Cigna

21   sales force column on the left, and we're going to be at

22   G-4 -- and Cigna's asked us not to put this up on the

23   screen -- the same points are true.

24             We're talking about a fraction of the market,

25   right?   You've got seven years of data --

1    A.  Yes.

2    Q.  -- totaling about 700,000 observations, about 100,000 a

3    year, right?

4    A.  Lives?

5    Q.  Members.

6    A.  Members?  Yes.  And which exhibit do you want me to

7    refer to, or should I just look at the slide?

8    Q.  They all have common footnotes, but right now we're

9    looking at the Slide 47 and your report G-4, which is the

10   support for Slide 47.

11   A.  Okay.

12   Q.  My questions are going to be similar, and I'm going to

13   try to do them relatively quickly.

14           The first is the number of observations is

15   relatively small, right, about 100,000 members a year?

16   A.  I don't know if that's -- it's -- it is what it is.

17           It's neither small, nor large; it is what it is.

18   Q.  All right.  And you're only looking -- again, you have

19   the footnote -- Footnote 1 says, Only Cigna wins where Cigna

20   is not the incumbent are included in this analysis, right?

21   A.  Correct.

22   Q.  Now, in Footnote 7, again, you refer to Appendix F, so

23   the share time period is 2015, being compared to seven years

24   of competition, 2011 to 2017, correct?

25   A.  Yes.  We had the market share data for 2015, so that's

 1   what we used.

 2   Q.   Right.  And for Cigna, you're using national accounts

 3   identified as accounts with greater than 3,000 estimated

 4   eligible employees.  Do you see that, Footnote 1?

 5   A.   Yes.

 6   Q.   And that's different than the definition you use in

 7   Footnote 7 where it says, Market shares are based on

 8   accounts with greater than 5,000 employees.

 9           Do you see that?

10   A.   Yes, necessitated by the way salesforce.com is compiling

11   the data.

12   Q.   So it doesn't match up with the way you calculated NA5

13   or NA5g precisely, correct?

14   A.   Precisely, exactly.  No, it's not exactly the same.

15   Q.   Now, let's turn to G-8, which is the support for the bar

16   chart you have on the right-hand side of Slide 47.

17           Are you there?

18   A.   Yes.

19   Q.   So this is Anthem, the acquirer's experience in losing

20   customers.  And, sir, the No. 1 company that Anthem loses

21   customers to, according to your analysis, is United, correct?

22   A.   Yes.

23   Q.   42 percent of the time, correct?

24   A.   Yes, just above Cigna.

25   Q.   All right.  And you like to compare market shares with

```
1    diversion, but United's 42 percent exceeds its -- your

2    calculation of 35 percent here, correct?

3    A.  Yes.  I mean, just like Cigna, United's a close

4    competitor to Anthem; I'll concede that.

5               MR. GIDLEY:  Just one second, Your Honor.

6               THE WITNESS:  Perhaps you can tell me which of

7    these binders I'm not going to be looking at soon, so that I

8    could free up some space?

9               MR. GIDLEY:  Your Honor, Dr. Dranove can close the

10   other binders for the time being while we do this exam.

11              THE COURT:  All right.  Can you remind me what

12   document was your list of the 150 top carriers from the

13   independent organization that you showed him?

14              MR. GIDLEY:  Yeah, the health leaders list.  Yes,

15   Your Honor, just give me one second.

16              Your Honor, that's found at Tab 67.

17              THE COURT:  The sales force data that you looked

18   at was derived in the ordinary course of business for these

19   companies by either sales force or i --

20              THE DEFENDANT:  -- Avenue.

21              THE COURT:  -- Avenue for these companies'

22   internal purposes, to figure out how they're doing in the

23   market and who they're losing to, et cetera?

24              THE WITNESS:  Exactly.

25              THE COURT:  Now, you depicted it largely as losing
```

1    to UnitedHealthcare, Anthem, Cigna, Kaiser, other.

2              Is that how they had sales force presented to

3    themselves, or did they have 150 categories for all the

4    possible competitors that could possibly have won an

5    account?

6              THE WITNESS:  I don't recall, but I think this is

7    a pretty exhaustive list.

8              For example, Kaiser is included in our table, but

9    in several of these tables, didn't win any of the accounts

10   or wasn't the account that was won from.

11             So I think we've actually reported, pretty

12   completely, what's in there, but I can't be certain.  I

13   don't know what the original source document looked like.

14             THE COURT:  All right.

15   BY MR. GIDLEY:

16   Q.  Dr. Dranove, you've been handed a binder which contains

17   a Form A filing, and that's found at Tab 2 for the Chevron

18   corporation.  And I'm going to do this pretty quickly.

19             Sir, are you familiar with Form A reports that are

20   filed publically with the Department of Labor?

21   A.  No, I'm not.

22   Q.  Let me just show you one or two things that are public

23   about these reports.

24             And this can go up on the screen, Mr. Haley.

25             Let me direct your attention to Page 56 for

1    Chevron.

2              And Dr. Dranove, for Kaiser Foundation Health Plan

3    Inc., Chevron reports, under the form Category 1(e),

4    approximate number of persons covered at end of policy or

5    contract year, 12,597.

6              Do you see that?

7    A.  Yes, I do.

8    Q.  And you have no reason to doubt that report by Chevron,

9    do you?

10   A.  Not at all.

11   Q.  And one other example I'll show you, at Page 24 within

12   this exhibit, you'll see that Chevron has also reported for

13   Health Net.  And can you tell the Court who owns Health Net

14   today?

15   A.  Oh, gosh.  I'm blanking.  I normally know this, but I

16   apologize.  I don't right now.

17   Q.  Does Centene sound about right, sir?

18   A.  That sounds like it might -- yeah.

19   Q.  And, sir, Health Net, now owned by Centene, so this is

20   the end of calendar year 2015, 1,620 persons were covered at

21   the end of the policy or contract year.

22              Do you see that?

23   A.  Yes, I do.

24   Q.  Just to speed things along, we've gone through this

25   exhibit and compiled them into a demonstrative, DDX7.

1    That's at Tab 1 of this binder.  Let me know when you're

2    there.

3    A.  Yes.

4    Q.  And what we did was we went through that form filed with

5    the Department of Labor, and there are a couple of entries

6    that are below 20 lives.

7           And so we've added up the entries.  And, sir, if

8    you accept our math, the public filing of the Chevron

9    Corporation shows that Kaiser is far and away its largest

10   insurance carrier, with 18,215 covered persons at the end of

11   2015.  Do you see that?

12   A.  Yes, I do.

13   Q.  And Centene Health Net is No. 3, with 1,620 members.  Do

14   you see that?

15   A.  Yes.

16   Q.  And Cigna was second with 2,227 members, correct?

17   A.  Yes.

18   Q.  And altogether, if you accept our math, this form shows

19   eight different carriers, including Altius, which is now

20   owned by Coventry and Aetna; Blue Cross/Blue Shield of

21   Texas; Group Health Cooperative, which we believe is owned

22   by Kaiser; Blue Cross of Hawaii, and Humana all share the

23   Chevron account, according to the most recent filing the

24   Chevron Corporation has made with the Department of Labor.

25           Do you see that?

1    A.  Okay.  Yes.

2    Q.  And, sir, Chevron's a very large company, or something

3    like 14th in the Fortune 1000, correct?

4    A.  I'll take your word for it.

5    Q.  This data on slicing or splitting accounts, how ever you

6    want to characterize it, is not data that you examined in

7    your work in this case, correct?

8    A.  I did not examine Chevron data, correct.

9    Q.  Let's talk a little bit about your merger simulation and

10   UPP work.  And sir, yesterday you had Slide 48 up, so let's

11   put that up on the screen.  You can move the other binder

12   out of the way.

13           And, Dr. Dranove, in this Slide 48 you have three

14   scenarios and you have a baseline with claimed variable cost

15   savings and with claimed variable cost savings, ASO only.

16   Do you see that?

17   A.  Yes.

18   Q.  And, sir, variable cost savings, you referred to on

19   direct as sales expense.  Do you recall that testimony?

20   A.  Usually -- I said sales, general administrative,

21   et cetera, yes.

22   Q.  All right.  So the technical accounting term is SG&A,

23   correct?

24   A.  Yes.

25   Q.  Sales, general, and administrative expense, right?

1   A.  Yes.

2   Q.  And your simulations here do not include the medical

3   cost savings, correct?

4   A.  There are no medical cost savings in the simulations,

5   correct.

6   Q.  All right.  And these simulations require market shares

7   as an input for the simulation and for the UPP, correct?

8   A.  Market shares are used in two of the three, in the

9   merger sim and the UPP where I use market shares to estimate

10  the rankings of first and second.

11  Q.  I appreciate the clarification.  So the one on the left

12  and the one in the middle use market share; the one on the

13  right uses diversion ratios, correct?

14  A.  Correct.

15  Q.  And those diversion ratios depend on some of the

16  analyses we just went through that appear in the G Section

17  of your report, correct?

18  A.  That's correct.

19  Q.  And they have the footnotes and limitations, each of

20  them -- we covered four, but you've got a series of, like,

21  16, and they all have the footnotes that say this is based

22  on incumbency.  For Cigna, it's 3,000 eligible employees and

23  so forth, right?

24  A.  It has footnotes; I wouldn't call them limitations,

25  necessarily.

1    Q.  And your simulations and UPP analyses that use market

2    share, one of the market share companies that you use is

3    Cigna, correct?

4    A.  Yes.

5    Q.  So the merger simulations and UPP results assume Cigna

6    shares now, not Cigna being run into the ground, correct?

7    A.  It was using Cigna shares in 2015.

8    Q.  And to be precise, you used Cigna national account

9    shares in Anthem territories, correct?

10   A.  For the merger sims that involve -- so for these merger

11   sims involving Anthem territories, that's correct.

12   Q.  Let's talk about quality and innovation.  You testified

13   on direct about level-funded premiums, and you have a slide

14   on that.  I believe that was in Slide 55.

15           If we could put up Slide 55, just to refresh you.

16   Are you there?

17   A.  Yes.

18   Q.  And level-funded is a product that you said was very

19   innovative, the way Cigna has been using the level-funded

20   product, right?

21   A.  I don't recall.  I said it was very innovative in the

22   way Cigna was using it.  I consider it to be an innovation.

23   Q.  Right.  And the point is that -- and under the major

24   bullet, Anthem must innovate, one of your examples is a

25   level-funded, correct?

1    A.  Yes.

2    Q.  And the level-funded product that Cigna sells nationwide

3    is a product they acquired through a merger, correct?

4    A.  Actually, I don't recall that.

5    Q.  Do you recall the merger that they had involving

6    level -- the level-funded product at all?

7    A.  So I know about a recent merger.  I don't recall that

8    the level-funded was a product they inherited from that

9    merger.

10   Q.  And, sir, they acquired a company called Great West many

11   years ago, and took Great West product from the California

12   western region and took it nationwide as -- due to the

13   merger, correct?

14   A.  I'm not familiar with the experience with Great West.

15   Q.  All right.  Sir, you're familiar with the -- and you

16   don't discuss Great West at all in any of your reports,

17   correct?

18   A.  That's correct.

19   Q.  Sir, you're familiar with the NCQA?

20   A.  National Committee of Consortium on Quality Assurance,

21   yes.

22   Q.  Right.  And they provide health insurance plan ratings

23   each year, correct?

24   A.  Through what's called the HEDIS ratings; is that what

25   you're referring to?

1    Q.  Oh, I'm talking about what's found at their website

2    today, the NCQA Health Insurance Plan ratings, 2016 to 2017,

3    for the United States?

4    A.  Okay.  So I haven't been keeping up with NCQA.  About 20

5    years ago, NCQA started reporting what was called HEDIS or

6    Health Employer Data Information Set, or Health Insurance

7    Data Information Set.

8    Q.  If I could direct your attention, Dr. Dranove, to Tab 92.

9         Tab 92 are the results of the 2016/2017 survey,

10   and I'm just going to pick out three or four examples.

11        THE COURT:  Well, this is just for the fact that

12   they said it.  This doesn't necessarily prove who has the

13   best health insurance.

14        MR. GIDLEY:  Exactly.

15        THE COURT:  All right.

16   BY MR. GIDLEY:

17   Q.  On Page 1, and this is material that exists right now

18   and that employees can see nationwide, Johns Hopkins and

19   Kaiser on Page 1 with a 5.0 rating from NCQA, correct?

20   A.  Yes.

21   Q.  And on Page 2, at the top of Page 2, also with a 5.0

22   rating is Tufts, correct?

23   A.  Yes.

24   Q.  And at 5.0, also, is UPMC, correct?

25   A.  Yes.

1    Q.  And you see Anthem, some of its state plans come in at

2    4.5, the next entries on this exhibit, correct?

3    A.  Maine, New Hampshire, and Connecticut, yes.

4    Q.  All right.  So in those three states, Anthem has a 4.5

5    rating, correct?

6    A.  Yes.

7    Q.  And, sir, quality matters to employees, just as much as

8    the price of their health insurance, right?

9    A.  Yes.  And HEDIS used to be much more commonly used.

10            I think ten or 15 years ago, there were great

11   concerns about the usefulness of the HEDIS measures.  It's

12   my understanding they're not as relied upon today, as they

13   used to be.

14            And the measures that they use have a lot of

15   limitations, including being very sensitive to whom you

16   enroll, so that the ratings can be more a function of whom

17   you enroll, rather than the quality of the care you're

18   actually providing.

19            There are other metrics such as, you know -- you

20   know, well, there are a lot of different issues that have to

21   go back to -- because I used to write about HEDIS and teach

22   about HEDIS, and was always very unhappy with these.

23   Q.  All right.  Well, this isn't HEDIS.  This is what

24   they're putting up independently and --

25   A.  This is -- the underlying source is always known as

1   HEDIS to me.  They might not call it that anymore, but it's,

2   essentially, the same products.

3   Q.  All right.  Sir, let's talk about quantitative measures

4   of quality.

5            I know that sounds like a contradiction in terms,

6   but there's actually a literature where scholars have tried

7   to come up with quantitative measures for quality aspects of

8   health care, correct?

9   A.  I've written a book related to that.

10  Q.  But, sir, your reports do not contain a quantitative

11  analysis of the impact of the merger on quality or

12  innovation, correct?

13  A.  I'm sorry, a quantitative analysis --

14  Q.  Discussion.  I don't mean to talk over you.

15  A.  Right.  We had this discussion during deposition.

16            I quantify what I'm able to quantify, and I don't

17  quantify everything because it's impossible to quantify

18  everything.

19  Q.  And you testified at the deposition, quote:

20            Had the evidence been available to perform a

21  quality study that I felt would pass with a rigor that I

22  would require to present, I would have done so, correct?

23  A.  That's correct.

24  Q.  Dr. Dranove, you wrote an article in 2011 entitled, *Data*

25  *Impediments to Empirical Work in Health Insurance Markets*,

1    correct?

2    A.  I recall that, yes.

3    Q.  And one of the conclusions reads as follows, quote:

4         We conclude that the publically available sources

5    of data on health insurance market shares are unreliable.

6    They show great variability across years relative to both a

7    reasonable, prior, and to the variability exhibited in

8    hospital discharge data.  They do not reflect merger

9    activity.  Did you write those sentences, sir?

10   A.  Yes.  May I put that in context?

11        MR. SCHWINGLER:  Objection, Your Honor.  Is this

12   impeachment?  Otherwise, I would like the witness to see

13   more of the document for context.

14        THE COURT:  Well, I think he admits that he wrote

15   it.  You can elaborate on it if you want to, but I just want

16   to go back to the beginning.

17        What he's saying made it difficult to analyze

18   what's publically available data regarding market shares;

19   isn't that correct?

20        MR. GIDLEY:  Yes.

21        THE COURT:  Okay.  Have we been using that at this

22   point?

23        MR. GIDLEY:  Yes.  That's MEPS; that's the census

24   data.

25        THE COURT:  Right.  But all the CID data's not

```
 1         publically available and the sales force's data's not

 2         publically available.

 3                   MR. GIDLEY:  That's right.  That's right.

 4                   But his MEPS denominator is based on a survey of

 5         health insurance, the MEPS-IC survey.

 6                   THE WITNESS:  I don't recall any numerators of any

 7         of the market share measures we looked at in that paper

 8         using MEPS.

 9         BY MR. GIDLEY:

10         Q.  Your denominators use MEPS as part of the calculation,

11         correct?

12         A.  The problem in the variability was not variability in

13         denominators.  The problem is variability in movement of

14         numerators.

15                   I'd like to elaborate.  During the time period

16         that we studied, there were no mergers of anywhere near the

17         current size.  And so any market share changes resulting

18         from a merger would have been small, and because they're

19         small, they're small relative to other variability in market

20         shares and they'd be difficult to detect in the data.  That

21         doesn't describe this data.

22                   Also, the concern about the metrics was that you

23         look at two different metrics, and they would report two

24         different changes in market share.

25                   Well, I reported changes in market share to show
```

1   that this merger is presumptively anticompetitive.  I have

2   seen at least one calculation done using the Health Leaders

3   data, which is something that they had talked about, that I

4   believe is a reliable effort using HLI data, that also shows

5   that the merger's presumptively anticompetitive.

6           So my paper, I said, there were concerns when

7   the -- because the numbers weren't lining up.  We never said

8   there were concerns when the numbers did line up.  So I

9   think you're taking that quote out of context.

10  Q.  My final question is:  Five out of those six times you

11  concluded that the 26 CID data was larger than the MEPS

12  census data, right?

13  A.  Yes.

14  Q.  All right.

15          MR. GIDLEY:  Your witness.

16          THE COURT:  All right.  This is probably a good

17  time to take a break, so we'll do that for ten minutes.

18          It's also a good time for you to make sure every

19  question you want to ask on redirect you have to ask.

20          (Recess.)

21          THE COURT:  I apologize for the heat in here.  It

22  may have something to do with the enormous number of people.

23  All right.  You may proceed.

24                      REDIRECT EXAMINATION

25  BY MR. SCHWINGLER:

1   Q.  Professor Dranove, yesterday, and perhaps again this

2   morning, Mr. Gidley asked you about market shares you

3   calculated where you treated the Blues as separate

4   competitors.

5           Do you recall that?

6   A.  Yes, I do.

7   Q.  Did you, in fact, perform those calculations as part of

8   your analysis?

9   A.  Yes, I did.

10  Q.  And did you disclose them in the backup to your expert

11  reports?

12  A.  Yes, I did.

13  Q.  Did you discuss them in the reports themselves?

14  A.  No.

15  Q.  Why not?

16  A.  Because I think it's inappropriate, as I described

17  yesterday, to treat the Blues as separate competitors.

18  Q.  And if you were to calculate HHIs using the shares with

19  the Blues treated separately, what would happen in the all

20  U.S. market?

21  A.  In the all U.S. market, the HHSI would essentially

22  collapse.  It would give one the impression that there are

23  many, many different insurers competing for each national

24  account customer's business.

25          And the reason for that is, it would make it

1    appear as if each and every Blue was a small competitor and

2    each one was simultaneously competing for each national

3    account customer, which is, of course, contrary to how the

4    market actually works.

5    Q.  In your opinion, would such a process be a reasonable

6    basis for assessing competition in the all U.S. market?

7    A.  No.  It would not, because again, that's not the

8    reality.  We do not have all of the independent Blues

9    competing against each other.

10   Q.  What would happen to the HHIs if you calculated them

11   based on the Blues as separate competitors in the Anthem

12   territories?

13   A.  In the Anthem territories if you were to calculate HHIs,

14   the result of the merger would still put the market

15   concentration above the presumptive threshold.  It would

16   still be above the presumptive threshold, and the delta HHI

17   would also still be above the presumptive thresholds.

18              THE COURT:  Is there a slide that has that?

19              Did I see a slide that had that, or did you just

20   testify to that?

21              THE WITNESS:  That is in my back-up material.

22   There wasn't a slide.  Again, I don't think that's the

23   appropriate thing to do, for the reasons I gave.

24              THE COURT:  I understand.

25   BY MR. SCHWINGLER:

1    Q.  Could you turn to Tab 60 of the binder you were provided

2    this morning?

3    A.  Is it Binder 2?  Yes.

4    Q.  Binder 2.  This is Defendant's Exhibit DDX2.

5    A.  Yes.

6    Q.  Do you recall Mr. Gidley asking you questions about a --

7    an alleged calculation error in the column related -- under

8    NA5g enrollment for the all U.S. market?

9    A.  Yes, I do.

10   Q.  And do you see on this exhibit here, there's a red

11   number that's about 53 million and a blue number that's

12   about 55 million.

13           Do you see that?

14   A.  Yes.

15   Q.  And right under that, do you see a number that's not in

16   any color that says 57 million?  Do you see that?

17   A.  Yes.

18   Q.  What is that number?

19   A.  That's the size of the market using the census approach.

20   Q.  And which denominator did you use in calculating market

21   shares for the all U.S. market with the geographic screen?

22   A.  So I used the census approach, the 57 million number,

23   which means that for the purposes of reporting market shares

24   and HHIs, any alleged discrepancy between the number I

25   reported and the number that was discussed this morning was

1    irrelevant.

2    Q.  Could you turn to Tab 25, which I believe is in Binder 1.

3    A.  Okay.

4    Q.  This is DDX -- or, DX228.  It's a Cigna document.  You

5    were asked to read a portion of it.

6         I'm going to direct you to the second page, last

7    sentence in the second paragraph.  And just to move things

8    along, this reads:  Cigna sponsored in-depth interviews with

9    both brokers and TPAs, show a vast majority believe

10   employers, especially small employers, will increasingly

11   turn -- excuse me -- smaller employers will increasingly

12   turn to TPAs for their health plan needs.

13        It goes on to say:  But this demand for services

14   comes with a price.  In today's complex health care world,

15   investment and technology is required, something smaller

16   TPAs and brokers cannot absorb.  Do you see that?

17   A.  Yes, I do.

18        THE COURT:  Can you tell me what exhibit you're

19   reading from?

20        MR. SCHWINGLER:  I'm sorry.  This is DX228, Tab 25

21   in the cross binder.

22   BY MR. SCHWINGLER:

23   Q.  If you could turn to the fourth page, there's a chart in

24   the upper right-hand corner that says value propositions.

25        Do you see that?

1    A.  Yes, I do.

2    Q.  On the left, it said ASO carrier model; do you see that?

3           MR. RULE:  Your Honor, this is confidential

4    information I think you're reading.

5    BY MR. SCHWINGLER:

6    Q.  Okay.  I won't read it out loud.  Can you read that

7    chart in the upper right corner?

8    A.  Yes, I do.

9    Q.  Do you see the fifth bullet down under both the columns?

10   A.  Yes, I do.

11   Q.  Do you see there's a different word used to describe the

12   ASO model and TPA model?

13   A.  Yes, I do.

14   Q.  Now that you've had a chance to see more of this

15   document, does this change in any way your opinions about

16   competitiveness of TPAs for national accounts?

17   A.  Yes.  I recall the conversation earlier this morning in

18   which it was discussed that TPAs were in the marketplace;

19   that Cigna considered TPAs in the marketplace; and it wasn't

20   clear to me which market they were talking about.

21          It's clear now that Cigna believes they're not in

22   the market for national accounts.

23   Q.  You had a discussion earlier today about win-loss data

24   that Anthem and Cigna maintain in the ordinary course of

25   business; do you recall that?

1    A.  Yes, I do.

2    Q.  Is it your expectation that companies maintain win-loss

3    data with perfection?

4    A.  No.  And in my experience working with other companies,

5    including in other industries, there are holes, there are

6    gaps in the information.  The competitor intelligence is

7    just not perfect.

8    Q.  Was this the best available data to you for analyzing

9    the extent to which Anthem and Cigna win and lose business

10   from each other?

11   A.  Yes, it is.  And the parties, apparently, think so, as

12   well.  It's the data they use.

13   Q.  When you were asked about your win-loss analysis, you

14   were asked whether you use 2015 market shares as a benchmark

15   to compare.  Are these diversions greater than market

16   shares?

17   A.  Yes.

18   Q.  And do national accounts have RFPs every year?

19   A.  Often they do, yes.  That's pretty typical; that was

20   testified to earlier.

21   Q.  Do some have RFPs every three to five years?

22   A.  I think that happens, as well.  I seem to recall they're

23   more frequent, say, for larger employers, than they would be

24   for smaller ones, is my understanding.

25   Q.  Is it possible for -- well, let me ask this:

1    Assuming that national accounts have RFPs every

2    three to five years, if that were true, would your 2015

3    market shares include enrollment from competition that

4    occurred a year or two earlier?

5    A.  Of course.  And even when they do have competition, they

6    tend to settle on the same carrier year after year.  So a

7    choice that's been made several years ago will often lock

8    them into the choice that they have today.

9    Q.  Does Anthem have to lose more business, more national

10   accounts business to Cigna than to United for this merger to

11   harm competition in the national accounts markets?

12   A.  Oh, definitely not.  It's not the case that the only

13   mergers we ever worry about are when the two largest

14   companies in an industry merge.

15       When you have a dominant carrier, such as many of

16   the Blues are, including Anthem, and you have a substantial

17   competitor, that is going to impact consumers.

18       And in an auction context, in particular, there'll

19   be many cases where those two carriers are first and second

20   and directly impact the option outcome.

21   Q.  Can you turn -- can you turn to Tab 67 in the cross-

22   examination binder?

23   A.  Yes, I can.  Okay.

24   Q.  And you were asked questions earlier about whether these

25   highlighted companies are the companies from which you had

1    CID enrollment data available in this case, is that right?

2    A.  Yes.

3    Q.  And looking at the first three non-highlighted entries,

4    and I won't name their names, but is there something these

5    companies have in common?

6    A.  Yes, they're all Blues.

7    Q.  And --

8    A.  And if you go down the page, it looks like about half,

9    if not more, of the rest of the companies on the first page

10   are also all Blues.

11          And, Your Honor, they don't always have the Blue

12   in their name; they're still Blues, like Anthem.

13   Q.  And did you have CID data available from Tufts?

14   A.  I don't think we did, no.

15   Q.  How about Intermountain Health Care?

16   A.  No, I don't believe so.

17   Q.  How about the University of Pittsburgh Medical Center?

18   A.  No.

19   Q.  Did lacking CID -- let me rephrase.

20          Was the absence of this data troubling to you in

21   any way as you calculated market shares?

22   A.  Now, these are well-known to be carriers associated with

23   large local health systems, that are very strong market

24   shares in their local markets, but don't generally compete

25   for national accounts.

1    For example, UPMC basically splits the western --

2    the Pittsburgh Metropolitan area with Highmark, and the vast

3    majority of those enrollments are just Pittsburgh people.

4    Q.  Could you turn to Tab 91 in your binder?

5    A.  Yes.

6          MR. SCHWINGLER:  Counsel, can you remind me if

7    this is confidential?

8          MR. RULE:  Yes, it is.

9          MR. SCHWINGLER:  Okay.  This is confidential, so

10   we won't get into numbers.

11   BY MR. SCHWINGLER:

12   Q.  Is this the chart showing Cigna's total commercial

13   membership, by year, from 2010 to 2016?

14   A.  Yes.  And seeing this chart reminds me that I did

15   misspeak yesterday on one occasion when I talked about

16   Cigna's growth -- that Cigna's revenue growth has more than

17   doubled its enrollment growth.

18          While it's grown substantially, you can tell, Your

19   Honor, it's not nearly more than doubled.

20   Q.  And this chart shows all commercial membership, not

21   national accounts, is that right?

22   A.  That's correct.

23   Q.  So if Cigna exited a portion of the commercial business

24   during this time period, what effect would that have on

25   these numbers?

1    A.  All right.  So it's my understanding that Cigna pulled

2    back from the small group market during this time period.

3            So that would suggest that its growth in the

4    national account segment has been much more rapid than is

5    suggested by this table.

6    Q.  And were you in the court yesterday when Dr. Smith

7    testified from Cigna?

8    A.  Yes, I was.

9    Q.  Did you observe his testimony about Cigna's performance

10   in the 2017 national accounts selling season?

11   A.  Yes, and he was very delighted by exceeding expectations.

12   Q.  And the results of that selling season, are they

13   depicted on this chart?

14   A.  No, they're not.

15           MR. SCHWINGLER:  No more questions, Your Honor.

16           THE COURT:  All right.  Thank you.  I think he's

17   going to be subject to recall later; is that correct?

18           Is he going to be one of your rebuttal witnesses?

19           MR. SCHWINGLER:  We currently plan to call him as

20   a rebuttal witness.

21           THE COURT:  All right.  So you can step down now,

22   but you'll be back.

23           THE WITNESS:  Yes, I will.  Thank you.

24           THE COURT:  All right.  Does the government

25   have -- well, maybe somebody can collect all these binders

1    and things.

2            Does the government have any more witnesses at

3    this point?

4            MR. FITZGERALD:  Your Honor, the government has no

5    more witnesses.  For Phase 1, we rest.

6            THE COURT:  Okay.  For that, for Phase --

7            MR. FITZGERALD:  Until rebuttal.

8            THE COURT:  All right.  All right.  Is the defense

9    ready to proceed?

10           MR. CURRAN:  We are, Your Honor.

11           And for its first witness, Anthem calls Charles M.

12   Kendrick, Jr.

13           THE COURT:  All right.

14                   CHARLES M. KENDRICK, JR.,

15   was called as a witness and, having been first duly sworn,

16   was examined and testified as follows:

17           MR. CURRAN:  May I proceed, Your Honor?

18           THE COURT:  Yes.

19                     DIRECT EXAMINATION

20   BY MR. CURRAN:

21   Q.  Mr. Kendrick, can you please state your full name?

22   A.  Charles Morgan Kendrick.

23   Q.  And, sir, you are currently president of national

24   accounts at Anthem?

25   A.  That is correct.

1    Q.  Sir, approximately how many national accounts does

2    Anthem have?

3    A.  We have between 525 and 550 distinct customers.

4    Q.  Sir, do I understand correctly, that the overwhelming

5    majority of those national accounts are ASO customers?

6    A.  They are.

7    Q.  Sir, I think we all understand what an ASO customer is.

8    I've got a couple of questions on the mechanics of how that

9    arrangement works.

10          Do I understand correctly that Anthem pays the

11   medical claims of its ASO customers and then invoices the

12   customers for those amounts, plus an ASO fee?

13   A.  Generally speaking, that's correct.

14          We charge administrative service fees on fixed

15   cost to our customers.  And the claims, we pay them through

16   our general account and then invoice the customer.  That's

17   our standard practice, correct.

18   Q.  Sir, have you discerned any trend in the medical claims

19   portion of the expense that your customers bear?

20   A.  Certainly.  For years now, health care costs have been

21   escalating at a pace far more rapidly than CPI and the cost

22   of goods and the margins on our customers, products they

23   sell and manufacture.

24          And it's sort of crescendoed at another tipping

25   point, if you will.  And so we're seeing that, and it's

1     exacerbating very feverish energy, if you will, in an

2     attempt to abate that trend.

3              Health care cost is certainly untenable.

4              It's on the raise.  There's no clear abatement in

5     sight, and that's driving material changes in the market.

6     Q.  What, if anything, do -- are employers doing to respond

7     to those escalating costs?

8     A.  There are a number of things.

9              First of all, the segment generally is a very

10    progressive, diverse, highly resourceful group of large,

11    known brands in America.

12             So they are pushing the markets to find ways to

13    abate costs, lower their trends, sustainably, not in an

14    episodic fashion.

15             So I always view the national employers as sort of

16    our innovation incubators.  Again, these are exceptionally

17    resourceful and progressive, forward-leaning organizations,

18    and their quest is for lowering their costs, improving the

19    quality of health care, and it's springing up lots of

20    innovation in our segment.

21    Q.  What specific solutions or options are these employers

22    pursuing to deal with the escalating costs?

23    A.  They are many.  In fact, if I think about the way our

24    requests for information and our requests for proposals are

25    requested of us today by our consulting community, which is

1   generally the conduit between the --

2        THE COURT:  You're going to have slow down just a

3   little bit because someone is typing while you're speaking.

4        I've discovered this is a -- both companies, at

5   the highest levels, they speak the fastest, with the

6   exception of Mr. Swedish, I guess.

7        MR. CURRAN:  Mr. Kendrick is the fastest talking

8   southerner I've ever encountered.

9        THE COURT:  All right.

10        THE WITNESS:  My apologies.

11        THE COURT:  Well, that's okay.

12   BY MR. CURRAN:

13   Q.  I think that the question was:  What specific solutions

14   or options are employers taking to deal with the escalating

15   costs?

16   A.  You know, I think, at a macro level, health care is one

17   of the most locally consumed commodities, if you will, that

18   our customers and their employees use.

19        I think with that, they're looking at various

20   levers.  If you think about abating your health care costs,

21   there's so many levers that can be used; network strategies,

22   high deductible health plans, various other components, and

23   those levers have been pulled.

24        As a result, the levers are becoming a little more

25   discrete and a little more elegant.  So with that, employers

1    are looking for different ways to slice, if you will, their

2    health care options to where they're actually looking for

3    the most economically advantageous solution in a geography.

4         Where a geography previously might have been

5    defined at a state level or a regional level, is now being

6    defined at an MSA level.  So it's really shifting the

7    solutions that are afforded to these employers in a very

8    granular manner.

9    Q.  And how is that manifested?  What specific steps are

10   employers taking to go local?

11   A.  It's -- they're affording themselves various TPA

12   strategies; various vertically integrated health system

13   strategies; regional players.

14        Previously, it had been, if we recall back in the

15   '90s, many employers utilized HMOs, and they would have 50

16   or 60 HMOs nationally.

17        The burden of administering those programs sort of

18   offset the cost benefit of it, the savings, and we sort of

19   swung away.  With health care costs where they are and

20   continuing to rise, it's sort of brought that back.

21        But what we see now are solutions where an

22   employer can afford themselves of the most economically

23   advantageous solution in a geography and eliminate or sort

24   of abate that solution or that burden of the administration

25   by virtue of private exchanges.

1       So private exchanges are a solution that we see

2   very much for that benefit, to allow an employer to find the

3   most, again, economically advantageous solution in various

4   MSAs; put those together with a common benefit platform.

5       And quite honestly, it delivers the most

6   economically advantageous solution nationally for them.

7   Q.  You mentioned a couple of different tactics these

8   employers are pursuing.

9       I want to ask some follow-up questions on those.

10  First of all, you mentioned regional players.  But, sir,

11  isn't it the case that the big companies that constitute the

12  national accounts are looking for a single provider

13  nationwide?

14  A.  That's not necessarily the case.  There are

15  opportunities to look for a single provider nationwide, but

16  if you look at the traditional carriers, they're not always

17  the most advantageous solution in every single geography

18  nationally, including our organization.

19      So this is the event of the fact that there are

20  mechanisms now where employers can abate their

21  accountability -- not accountability, but responsibility in

22  administering the administrative burden of multiple plan

23  designs; private exchanges have allowed that.

24      In fact, we're seeing employers look even more

25  creatively; direct contracting, building custom networks.

1    And as such, we see many players beginning to enter that

2    arena where we can build custom networks for an employer

3    that aren't part of a national solution, but have very

4    myopic geographically concentrated efforts to lower costs

5    for a population of the employees.

6    Q.  Do the regional carriers impact your business as the

7    president of national accounts?

8    A.  They do, indeed.

9    Q.  In what respect?

10   A.  Well, if you think about it, if we have a piece of

11   business in its entirety or a part of it -- in fact, roughly

12   50 percent of our business, we do not manage it from a

13   medical plan perspective, holistically.

14           So there are multiple payers; multiple solutions

15   that are part of about 50 percent of our customers today.

16   So any time we have -- we lose part of our business, not

17   just necessarily all of it, but a piece of our business to

18   one of the regional players, one of the TPAs, one of the

19   vertically integrated health systems, that is a loss of

20   business to us.

21           Not only is it an economic loss, it's a loss of

22   the relationship with those particular customers or those

23   member's employees of that employer group.

24   Q.  And who are some of the regional players that you

25   discern in the market as competition to yourself?

1    A.  If you think about the regional players, Kaiser

2    Permanente is a regional player.  They don't have a national

3    footprint, but they certainly have a regional one; Harvard

4    Pilgrim, Tufts, various other systems in various pockets;

5    Medical Mutual in the Cleveland market come to mind.  But

6    these are all formidable players that have very economically

7    advantageous solutions relative to total health costs in the

8    geographies in the very myopic way in which they serve the

9    population.

10   Q.  You've referred a couple of times to TPAs as well, right?

11   A.  That is correct.

12   Q.  Some TPAs have their own networks, but many do not,

13   correct?

14   A.  That is correct.

15   Q.  Can they be a competitive force, if they don't have

16   their own network?

17   A.  Absolutely.

18   Q.  Can you explain?

19   A.  They would partner with a traditional organization.

20          They would also partner with an organization that

21   would build a network for them or build a network in a

22   custom manner for an employer.  So we're seeing this

23   routinely.

24          In fact, our RFPs, while employers are asking us

25   to describe our assets and how they would be solutions for

 1    customers, are spending equal time in the process asking us

 2    how we would partner with these innovative, creative new

 3    entrants in the market that, you know, are, sort of, they're

 4    competitors and they're partners on one day.

 5         So, it's -- they do not have their own network,

 6    but they have many ways in which to capitalize on existing

 7    networks or work to build networks.

 8    Q.  Have you ever lost business on a full replacement basis

 9    to a TPA?

10    A.  We have.  We have.

11    Q.  And is it only in those circumstances where TPAs are a

12    competitive force?

13    A.  No, it's not.

14         In fact, most of our awards, if you will, of

15    business do not come in a single payer national solution

16    where it's a coast-to-coast award.

17         It is a best-in-market award, or it's a even more

18    granular award where regionals, vertical systems are also

19    looking at.  We have customers today that have already put

20    us on notice and told us that their bids have been postponed

21    for the 2018 cycle, to further out.

22         But the impetus behind it will be about network

23    optimization, which is a rather broad term of how are they

24    going to optimize existing networks or create brand new

25    networks that are going to afford a very economically

1   advantageous solution for themselves.

2   Q.  Okay.  You also referred to direct contracting --

3              THE COURT:  Are some people also postponing this

4   to await the outcome of the two mergers?

5              THE WITNESS:  There is a little bit of that,

6   perhaps.  When I look at the receipts that our company had,

7   we did not see an abatement in activity coming in.

8              In fact, our awards for 2017 were rather

9   consistent with prior years, as far as number of new-name

10  customers, but there is some wait and see.  National

11  customers, certainly, are not looking for a solution today.

12  They're looking for a solution for a three- or five-year

13  period.  So to the degree that there's things that are

14  uncertain, that would create some dampening.

15  BY MR. CURRAN:

16  Q.  When you refer to three- to five-year period, is that

17  roughly the frequency at which the national accounts re-up

18  their bids?

19  A.  On average.  It's very rare that we propose a national

20  award for less than three years.

21             Many times they are continually negotiated for an

22  additional three; many of them are five years.  In fact,

23  there are national accounts that we've had much longer

24  without bids.  But, they are a rather lengthy period before

25  they go to RFP.

```
1    Q.  Would it be a misstatement to say that most national

2    accounts put their business up for bid each year?

3    A.  There are some that do, but it is not generally the

4    rule.  These are decisions that aren't taken lightly.

5           They're decisions where an employer looks at their

6    options, and they might scan the market more frequently, but

7    they're looking for a long-term play.

8           So they're not solving for a one-year economic

9    issue; they're looking for a long-term partnership.

10   Q.  And you referred earlier to direct contracting.

11   A.  That's correct.

12   Q.  Sir, isn't that pretty much a small part of the

13   competitive landscape, such that it doesn't have much of an

14   impact on your business?

15   A.  It is not an exceptionally large part of the competitive

16   landscape, but it is a competitive threat, nonetheless.

17           THE COURT:  I'm sorry.  Continue your answer and

18   then I have a question for you.

19           THE WITNESS:  It's a fact that while it's not

20   overwhelmingly significant, it is one of the mechanisms and

21   one of the levers that employers are looking for, and are

22   utilizing.

23           THE COURT:  When you talked about the RFPs that

24   you're getting that are asking you now to partner with these

25   innovative and creative new products, are those exclusively
```

1    coming from your incumbents?  Or are they both incumbents

2    and new opportunities, so this would give you a way in, as

3    opposed to a way out?

4              THE WITNESS:  The requests are coming -- they're

5    general in their ask.  They're asking about our flexibility

6    and creativity to work with different networks; for us to

7    perhaps administer a network that was not built by our

8    company.

9              There're asks for us to build custom networks for

10   employers.  So there's a rather large gamut.  It does --

11   there are opportunities there to compete or to bring in

12   competitors that are engagement companies.

13             Certainly, we have those solutions as well, and

14   they're sort of -- they would be disintermediating the

15   existing relationship.  So I don't view the health care

16   award specifically in terms of the network, but there are

17   many pieces and parts of the health care award that are

18   important to us.

19             And it is important for us to stay fresh in the

20   market and competitive, as well.  But again, there's a big

21   swing to the creative forces in the market, the innovative

22   forces in the market.  And the consultants and the employers

23   are very in tune to those and looking for ways, again, to

24   lower the costs.

25   BY MR. CURRAN:

1  Q.  But, Mr. Kendrick, are you getting these new types of

2  RFPs only when you're the incumbent and your customer is

3  considering re-uping, or are you also getting these RFPs

4  from companies or consultants representing companies that

5  you don't have a current relationship with?

6  A.  It is both.  It is both.  It's not our in-force

7  business; it is also brand new business.  It's become more

8  or less the new norm.

9         I mean, these are very large, progressive banking

10  institutions, telecommunications employers, nationally.

11  They're looking for solutions that you would not have

12  thought of many years earlier.

13  Q.  Sir, back to direct contracting.

14         We're all familiar with Boeing and Intel and maybe

15  some other companies out there that it's public knowledge

16  that they've done the direct contracting.  Have you

17  personally been involved in client relationships where the

18  clients are either considering or have, in fact, done direct

19  contracting?

20  A.  Yes.  Yes to both.  I have been involved where we are

21  currently in discussion with existing business and

22  prospective employers on direct contracting on their behalf.

23  I am also involved with existing customers where they have

24  engaged in direct contracting with another entity that will

25  be a competitor against our business.  And so we will lose

1    part of our business to the new entrances, as it goes to the

2    direct contracts that have been created.

3            THE COURT:  If you're doing direct contracting on

4    someone else's behalf, what's the difference between that

5    and what you do when you administer a network in the old

6    model?

7            THE WITNESS:  Well, presently, our model, we're

8    building a network that serves the entire segment.

9            I mean, there are specific national account

10   networks.  National account networks are local market

11   networks which are small group networks, which in many

12   instances are individual networks.

13           If we look at a specific customer and you look at

14   the distribution of the utilization of that population,

15   where they seek care, you could then myopically focus in on,

16   perhaps, one or two health systems in a geography, and then

17   we would approach that network, that subset, if you will,

18   and build a network exclusively for this employer, which is

19   different than a broad-based network.

20           THE COURT:  But you get paid something for your

21   role in administering it, ultimately?

22           THE WITNESS:  That is correct.  We would receive

23   administrative fees for the administering of the network,

24   correct.

25   BY MR. CURRAN:

1   Q.  So you would still charge a fee and still do claims

2   administration and dispute resolution claims, disputed

3   claims, and so forth?

4   A.  We would provide the customer service functions, the

5   clinical management functions, the web enabled -- the web

6   portal functions as well, if we had built -- if we built the

7   specific network for the employer, just like it was part of

8   a present-day broad network.

9            Now, if a network was built by the employer

10  directly or if they engaged a third-party to build a network

11  for them, at that point we would likely not be party to

12  those other functions; customer service, care management,

13  the web-enabled technologies, et cetera.

14  Q.  And I suppose a TPA could fulfill that function?

15  A.  That is correct.

16  Q.  And just to be clear, are you currently working on

17  direct contracting solutions for your customers?

18  A.  That is correct.  We are currently working on direct

19  contracting solutions for prospective customers, as well as

20  customers that are in force today.

21  Q.  And these are national account customers?

22  A.  These are present national account customers, very large

23  national customers.

24  Q.  You referred also, earlier, to private exchanges?

25  A.  Right.

1    Q.  Isn't it true that the private exchanges are just a

2    vehicle to repackage the offerings of the main traditional

3    carriers?

4    A.  I don't believe that's absolutely true.  I think

5    there's -- there are the traditional -- your traditional

6    publically-traded for-profit health service organizations

7    are part of many of the private exchanges.

8            But in addiction to those, our local health

9    systems, regional players; TPAs can play a part within a

10   private exchange strategy.  So the gamut is much wider, so

11   it's not merely a repackaging of the traditional access to

12   networks.  It's that plus many others.

13   Q.  And Anthem is participating on private exchanges,

14   correct?

15   A.  We are.

16   Q.  Are you discerning competition from these nontraditional

17   competitors?

18   A.  I am.  And we're seeing some loss as a result, and it

19   ties back to, in my opinion, the broader health care costs

20   problem.

21           And you've got employers seeking for the lowest

22   cost, and so if the exchange offers them various solutions

23   that ordinarily wouldn't be available to them.  Let's say

24   our position is the most economically advantageous in 75

25   percent of the MSAs nationally, there's 25 percent where

1    we're not number one, let's say.

2           The private exchanges piece together solutions to

3    create a patchwork, if you will, of various network

4    solutions of different types; again, between health care

5    verticals, regional players, traditional employers to create

6    a single network that provides the economics that are an

7    advantage to the specific employer.

8           THE COURT:  When you said ours are the most

9    advantageous in, say, 75 percent of the market, who did you

10   mean by "our"?

11          THE WITNESS:  Anthem Networks.  We have

12   proprietary networks that we own within our 14-state

13   geography.

14          And then we, by virtue of our licensed position

15   with the Blue Cross/Blue Shield association, we rent

16   networks from the other geographies.

17          THE COURT:  So when you're talking about "ours,"

18   our networks, you're lumping Anthem together with the other

19   Blues?

20          THE WITNESS:  I'm describing the -- the network

21   is -- we have the proprietary network, and then we have the

22   other networks that we rent.  And that is our solution that

23   we would put forth in the market today.

24   BY MR. CURRAN:

25   Q.  Now, sir, all of these solutions that you're

1    identifying; slicing, private exchanges, TPAs, the use of

2    regionals, direct contracting, they all carry some

3    administrative cost and burden for the employer, right?

4    A.   They do.

5    Q.   So why would the employers do that, rather than simply

6    use a nationwide single-source carrier?

7    A.   It's, quite simply, it's just a cost benefit analysis.

8            Is the opportunity -- and, again, the

9    administrative services represents roughly 15 percent of the

10   health care spend; the other 85 percent are the claims, the

11   networks.

12           THE COURT:   15 percent is the administrative?

13           THE WITNESS:   Roughly.   15 to 20 percent, and then

14   you've got the balance of it, which is the claim cost, the

15   overwhelming balance.

16           So you figure, if you have your administrative

17   costs, they equal something.   If you're getting network

18   savings that are greater than you would ordinarily get in a

19   national consistent solution, do those economics pencil out

20   to where it makes sense to put multiple, multiple networks

21   in play, multiple different solutions in play?

22   BY MR. CURRAN:

23   Q.   What are you including in your 15 percent?

24           Is that just core medical or is that additional

25   things as well?

1    A.   That would be the core medical.

2            That would be the administrative function; paying

3    the claims; dispute resolution; that would be web services;

4    the general standard practices, including the clinical

5    management work, just the actual personnel costs in

6    providing the nurses and the physicians to do that activity.

7    Q.   Sir, you referred to earlier new innovators as

8    competitors.  Can you elaborate upon that?

9    A.   There're a number of them.  Again, you know, given that

10   we have a problem that's not solved, entrants are emerging

11   in the market to help solve those problems.

12           And so we have companies that are care management

13   entities.  These are consumer engagement entities, these are

14   entities that are specifically designed to, in a very agile

15   manner, go in and build a network for a customer.

16           So all of these various entrants are emerging and

17   are vying and are competing for pieces of the health care

18   award that we traditionally have served on behalf of the

19   customers.

20   Q.   Is Imagine Health one of those?

21   A.   Imagine Health is one of those.

22   Q.   Okay.  But, sir, Imagine Health has never replaced

23   Anthem on a full replacement basis with respect to any

24   customer, right?

25   A.   On a full replacement basis, that is correct.

1    Q.  So it can't be a particularly impactful competitor for

2    you, right?

3    A.  It is a particularly impactful competitor.  And again,

4    most of our business awards do not come on a single vendor.

5         We have slice opportunities and Imagine is being

6    considered by a number of very large employers; in fact, on

7    situations to prospectively build networks, we have very

8    large, well-known customers that, effective January the 1st,

9    will be offering Imagine Health alongside our networks.

10        These are networks that were built very quickly to

11   go alongside us, so those will be losses of business in

12   these geographies where these networks are built.

13   Q.  Losses of business for you?

14   A.  That is correct.

15   Q.  You've also referred to traditional carriers or

16   traditional solutions; what did you mean by that?

17   A.  What I mean, "traditional," I mean the traditional --

18   the publically traded peers of our organization, be it the

19   UnitedHealthcares, the Aetnas, the Cignas, the Humanas of

20   the world.

21        THE COURT:  Do you consider Humana a peer?

22        THE WITNESS:  Humana as a peer is a publically

23   traded, formidable health services organization.  We see

24   them less likely in the national market than the others.

25   BY MR. CURRAN:

1    Q.   Okay.  Let's do a ranking.  Who's your number one

2    competitor among the traditional carriers you've identified?

3    A.   UnitedHealthcare, clearly.

4    Q.   When you say "clearly," explain, please.

5    A.   If I look at United's scope, if I look at their scale,

6    if I look at their reach, geographically, if I look at how

7    progressive and innovative the organization is, it's clearly

8    our most formidable competitor.

9         They've got a very progressive, laser-focused

10   account management function that's appealing to a number of

11   customers.  And if you look at just the numbers, if we look

12   at UnitedHealthcare's enrollment for the national market,

13   it's higher than ours, but it's close.

14        So they are clearly our largest competitor.

15   Q.   And you say UnitedHealthcare is innovative?

16   A.   I do.  I think they're exceptionally innovative.

17        I think they're proactive; they're strategic;

18   their Optum arm is very aggressive.

19        THE COURT:  What is that?

20        THE WITNESS:  Optum is a division of UnitedHealth

21   Group which provides health management services, reporting

22   analytic services, various other creative web-enabled

23   technologies to the employers.  So the --

24        THE COURT:  They've kind of brought in-house

25   things like a TPA and a private exchange and these care

1    management services that you're talking about as upstart,

2    small competitors in the market?  They're trying to counter

3    that by having their own subsidiaries do those very same

4    things?

5              THE WITNESS:  We have -- we all -- all of the,

6    again, traditional service providers have those services as

7    well.

8              United's is a bit different in the way the

9    innovation arm works in Optum, as it relates to the parent

10   company, UHG and UnitedHealthcare.

11             So it's structured slightly different, but they

12   are far and by the most progressive of our competitors.  In

13   fact, if I look at the national landscape of customers that

14   we don't serve today, which would be those within our

15   14-state footprint -- because, again, we can only serve

16   customers that are headquartered in our 14-state market --

17   United overwhelmingly has more of them.

18   BY MR. CURRAN:

19   Q.  Sir, how come Anthem doesn't engage in innovation like

20   United does?

21   A.  We do.  Anthem engages very aggressively in innovation.

22   I think we've done some very creative things, and when I

23   look at the national market, and I think about the national

24   space in it's entirety, you know, again, all of these are

25   very resourceful, publicly-traded, aggressive organizations

```
1    that are very determined to solve their problem.
2              And they also are very mindful of their G and A.
3    Many of the national employers aren't growing in people,
4    they're doing more with less.  They're finding different
5    ways to creatively get after their business.  So the
6    market's not growing markedly, is my point.
7              And then we look at the awards, the wins.
8    Anthem's winning.  So to me, the feat of the community, the
9    feat of the market, if you will, seeing what we're doing --
10   I mean, innovation, in my opinion, is oxygen to our
11   business, to our national business, in particular, and also
12   our large local markets because there's a lot of
13   interchangeability between what we do locally and what we do
14   from a national perspective.
15             It's important.  In the absence of it, we don't
16   win.  We've talked about the emergence of various
17   competitors; the need to stay fresh and competitive in the
18   market, and we take that very seriously in our company.
19   Q.  Can you identify anything concrete, identifiable that
20   reflects Anthem having a commitment to innovation?
21   A.  Of late, for example, we've opened, back in May, our own
22   innovation lab in Atlanta, in technology center, where many
23   of our peer national customers also base their innovation
24   studios.
25             But it's designed to specifically have a very
```

1   agile and consistent process of ideation, scoping,

2   prototype, market testing, development of products and goods

3   and services that are going to better enable a seamless

4   health care delivery solution; higher quality, lower in

5   cost, functioning -- focusing on provider enablement, that's

6   one example.

7           Many years ago, four years ago, let's say, we had

8   a very, very large technology company come to us with a

9   quest of being the healthiest employer in America, and it

10  was a very simplified RFP process.

11          They asked us to codesign, re-imagine, if you

12  will, the health care -- the consumer experience.  We built

13  a program for them which we launched back in 2012, very

14  innovative and creative.

15          That program started with roughly 65,000 members,

16  or employees.  Utilizing it today, we have 3.7 million

17  members using it.  So to my point, innovation, creativity

18  starts with these very progressive organizations.  And then

19  those solutions not only have become pervasive in sort of

20  the standard business practice for our national segment, but

21  they've also become a very important tool for our local

22  market.

23          We've got some very large local markets that

24  afford themselves to the very same interchangeable

25  functionalities that we offer to the national business.

1    Q.  Now, Cigna has a reputation for innovation as well,

2    correct?

3    A.  They do.

4    Q.  In your judgement and experience is that reputation

5    merited?

6    A.  I think that Cigna is exceptionally innovative.

7         I think, ultimately, innovation matters when it

8    provides an economically advantageous solution.  I think

9    there are core assets that need to be enforced, and then

10   innovation amplifies the value of the core assets.  And I'm

11   speaking to network and unit costs.

12        Certainly, that's just a piece of it, but it's

13   certainly a large piece.  So the fact that Cigna's an

14   innovative organization is something to be applauded, and I

15   think that's something that's very attractive to our

16   company, as part of this transaction.

17   Q.  Do you see Cigna becoming a more important competitor of

18   yours in recent years or less important or the same?

19   A.  I would say they are the same to less important.

20        I mean, their national enrollment is materially

21   less large than ours.  Again, the most formidable

22   competitors that we compete head-to-head with, there's

23   United, I would say Aetna's probably the second.

24   Q.  Do you have an understanding of how Cigna's been faring,

25   specifically in the national account segment?

1    A.  Specific understanding is just from general

2    conversations with consultants and people in the market.

3    It's that Cigna's had losses in the business.  I believe in

4    the most recent year there's been some slight improvement in

5    the national enrollment, but generally speaking, it's been

6    relatively flat.

7    Q.  In your experience, has Cigna doubled its national

8    account business in recent years?

9    A.  I don't believe that to be accurate.

10   Q.  Do you have an understanding as to Cigna's trend in the

11   national account business in the recent years?

12   A.  You know, I have seen market share information that's

13   compiled for us, and again, there's -- I have lots of

14   questions about it because I look at our ranks; I know what

15   our market is; I know where our competitor's are.  And so

16   there's a lot of noise, in my opinion, messiness, if you

17   will, in the numbers.

18        But those numbers, certainly, don't indicate large

19   upswings in the national market; more of a decline to flat.

20        THE COURT:  So you're basing this on?  What are

21   your sources of information?  You just have a general

22   understanding from the account managers in the region?

23        And what kind of reports do you look at?  Do you

24   regularly look at the sales force data or is that below your

25   level?

1    THE WITNESS:  I have conversations with my account

2    management lead, our sales leads.  I'm very close to the

3    consultants and the brokers in the market.  I'm very close

4    to our customers.

5    Certainly, I view that as part of my role to

6    understand where our market's going and where the market's

7    moving, and so I'm there.  In addition, through our

8    corporate marketing area we have information that's

9    compiled, that's publically available, that compares the

10   for-profit publically-traded organizations as it relates to

11   various segments, and I see those as well.

12   BY MR. CURRAN:

13   Q.  And what do those reports tell you about Cigna's

14   performance in the national account segment?

15   A.  That it's rather flat.

16   Q.  Mr. Kendrick, can you -- changing subjects, can you

17   describe in general terms your perception of the

18   relationship between Anthem and the non-Anthem Blues?

19   A.  The -- well, we share our networks by virtue of the

20   Cross and Shield license.

21   I serve, representing Anthem, on the Blue

22   Cross/Blue Shield consortium, which is a collection of a

23   subset of the Blues.  We are, certainly, different

24   organizations.  There are -- there's competitiveness between

25   the organizations today.

1    Our company competes with other Blues in the

2    Medicare/Medicaid space.  Other Blues compete with us in

3    various other spaces with TPAs that they own.  So we are, I

4    guess, colleagues, at best, under an alliance of the Cross

5    and Shield system, as independent licensees.  But our

6    go-to-market strategies are, indeed, different.

7    The assets that we put forth as solutions for our

8    customers are, indeed, different.  But by virtue of this

9    alliance through the association, we use one another's

10   networks when folks are traveling or living in our

11   respective geographies.

12   THE COURT:  Well, you also have rules about where

13   you're each allowed to compete.  And the exclusivity rules

14   are a significant aspect of this relationship, isn't that

15   correct?

16   THE WITNESS:  That is correct.  We have geographic

17   boundaries that we cannot compete outside of.

18   So for our business, in fact, all lines of our

19   commercial business, it's branded as a Cross and Shield

20   branded piece of business.

21   We can only pursue those customers that are inside

22   our 14-state footprint.  Now, we have some exceptions where

23   we do compete directly in the State of California with

24   another Blue Cross -- with Blue Shield of California, and

25   there are markets in New York where we compete with

1    Excellus, where there are overlapping counties.

2            THE COURT:  And while you're all independent

3    licensees, the best efforts rules, we're down to the benefit

4    of the -- the association, isn't that right?

5            THE WITNESS:  I -- I can't speak specifically to

6    the impetus of the genesis of the best effort rules and why

7    they were created.

8            I know they're there, and quite honestly, I'm not

9    that involved with best efforts, other than simple knowledge

10   that they, indeed, exist.

11           THE COURT:  Okay.  Can you explain to me why --

12   and I think it's been explained that Anthem will be able

13   to -- Cigna will be able to continue to compete in the

14   non-Anthem states against Blues without violating the

15   exclusivity rules because it won't be Cigna Blue or Anthem

16   Blue that's doing it, or NewCo Blue, but is it still

17   something that's going to cause consternation within the

18   association if Anthem -- you know, which is such a large

19   company -- is suddenly going to be all around the country

20   through its subsidiary?

21           THE WITNESS:  I can't speak to the degree of

22   consternation, but I can say, there's nothing prohibiting it

23   from occurring.

24           And that is absolutely correct, our intent to is

25   to aggressively compete with the Cigna brand.

1      Cigna competes in the 36 geographies that we don't

2      serve today, and so that will continue.  So competition

3      won't abate in those geographies.

4            THE COURT:  So you won't be able to -- it's going

5      to have to have some separate name and identity and branding

6      for that to work?

7            THE WITNESS:  Sure.  We would -- again, the

8      specifics of it, I don't have -- I can't speak to all of

9      them, but generally speaking, certainly, we will have our

10     Anthem, Inc., parent organization and we will have, from a

11     health care perspective, two competing -- two consumer

12     facing brands, the Anthem Blue Cross and the Anthem Blue

13     Cross and Blue Shield brand being the Blue-branded solution.

14           And then Cigna would be a branded health care

15     consumer brand that we would have as well.

16           THE COURT:  All right.

17     BY MR. CURRAN:

18     Q.  And, Mr. Kendrick, you testified a few moments ago about

19     the fact that Anthem, in fact, today has non-Blue brands

20     completing against the Blues outside of your 14 states,

21     right?

22     A.  We do.

23     Q.  Can you identify those brands?

24     A.  Amerigroup, Simply Health, Simply Health in Florida;

25     Amerigroup in a number of states in the Medicaid space.

1          THE COURT:  Do you have any commercial space?

2          I think this is the first time I've used the word

3    "space" in this trial, but I can hardly resist at this

4    point.

5          Do you have any non-Blue subsidiaries that are

6    competing for commercial accounts?

7          THE WITNESS:  I can't think of any.  We are using

8    CareMore as a solution for commercial business in our

9    geographies and, potentially, out as well.

10          But a specific consumer-facing health care brand

11    for commercial presently utilized today, I can't think of

12    one.

13    BY MR. CURRAN:

14    Q.  Sir, the Blues rules don't, on their face, distinguish

15    between commercial business and other type of business,

16    right?

17    A.  That is correct.  There is no -- there is no

18    distinguishing line there.

19    Q.  And these companies, these brands that you're

20    identifying, Amerigroup, Simply, and CareMore, they compete

21    on a day-to-day basis against the other Blues today, right?

22    A.  They do.

23    Q.  And they may cause consternation on the part of those

24    other Blues, right?

25    A.  Perhaps.

1    Q.  But Anthem, nonetheless, aggressively competes through

2    those businesses?

3    A.  We do.

4          THE COURT:  He's actually your witness.

5    BY MR. CURRAN:

6    Q.  Mr. Kendrick, before you became the president of

7    national accounts, you were the president of Blue Cross/Blue

8    Shield of Georgia, correct?

9    A.  I was.

10   Q.  And in that capacity, you were responsible for the large

11   accounts that were being serviced by Blue Cross/Blue Shield

12   of Georgia, correct?

13   A.  The large accounts were one area of my accountability.

14   I was accountable for all of the business within the State

15   of George, specifically.  But, yes, large accounts was one

16   of them.

17   Q.  Okay.  Can you, please, compare and contrast the large

18   accounts that you were responsible for dealing with as

19   president of Blue Cross/Blue Shield of Georgia with the

20   national accounts that you are now responsible for dealing

21   with as president?

22   A.  You know, generally speaking, there is not a materially

23   discernible difference between the buying motives of the

24   general rule of local business and national.  If we think

25   about our national or our national accounts, and we've got

1    between 500 and 550 distinct customers, we have customers

2    that range in size from 400, half-a-million lives to

3    customers that have less than 100 lives, and the reason

4    being is because of slicing.

5            So if you think about a 5,000-life case, we might

6    have one small piece of that business.  And that business --

7    but we still treat it as a national account.  In the local

8    markets you've got 100 lives, 200 lives, and then you have

9    customers for, like -- for example, when I was in Georgia,

10   the state of Georgia, which was 640,000 lives.  I mean, it

11   was the single largest account with Anthem when we wrote the

12   business.  And it behaved and it bought and procured our

13   services very much like the most discerning, progressive,

14   resourceful national accounts that we have.

15           So the innovation, the creativity that we would

16   have to set forth to win these large local pieces of

17   business don't differ from the national market.

18   Q.  Do some of the large local customers use consultants?

19   A.  Yes, they do.  Many of them do.

20           MR. CURRAN:  Thank you, Mr. Kendrick.

21           Your Honor, that concludes my direct examination.

22           THE COURT:  All right.  Has there ever been any

23   discussion, sitting around the leadership of the company,

24   saying that organizing our business segments by large

25   employers and national accounts doesn't make any sense

1    because it's too hard to tell what's what?

2            THE WITNESS:  I don't know that there have been

3    any leadership discussions around that it doesn't make

4    sense.  In fact, when the organizations came together in

5    2004 it was determined that we needed to have a focus around

6    a consistent go-to-market strategy.  It was more of an

7    organizational decision internally.

8            You have consultants that work, let's say in

9    Georgia, and they also work on customers in California.  To

10   have a bifurcated, strategic decision with decision rights

11   for how those markets are served or those customers are

12   served across 14 geographies would be problematic and

13   weren't -- that wasn't what the market was asking for.  So

14   we created a national segment and put various guidelines

15   around definitions to have consistent go-to-market

16   activities in response to the request of our customers and

17   the consultants that serve them.

18           THE COURT:  Thank you.

19           Any cross-examination?

20           MR. SEVERT:  Yes, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. SEVERT:

23   Q.  Sir, you spoke with Mr. Curran about potential options

24   employers might have, right?

25   A.  I did.

1    Q.  And would you agree with me that for any particular

2    national account customer, the consultant representing that

3    customer is more knowledgeable about set-of-options that

4    customer has than Anthem is?

5    A.  I wouldn't agree absolutely that that's the fact.  I

6    think the consultants know, based on their knowledge of what

7    they particularly serve.  But I also believe that we've got

8    very strong knowledge.  I mean, we are in the market every

9    day, talking to the various entities that are approaching us

10   about partnerships.  And so we know where our customers are

11   coming to us.

12          So I view our customers as having a very strong

13   voice and a very strong perspective, one that is shared with

14   us frequently.

15   Q.  Sir, most national account clients are assisted by a

16   consulting firm?

17   A.  Most are.

18   Q.  And those consultants are sophisticated?

19   A.  You could conclude that, correct.

20   Q.  And consultants look out for the best interests of their

21   clients?

22   A.  That is the intent of the relationship, to get unbiased

23   third-party.

24   Q.  They help them make the best decision possible?

25   A.  That is part of their job as being an unbiased,

1    independent third-party, correct.

2         THE COURT:  How do they stay unbiased and

3    independent now that they've cut themselves into the market

4    by establishing these private exchanges?

5         THE WITNESS:  That's sort of a challenge.  And

6    that's a change in the relationship, quite honestly, because

7    the consultants have the relationships.  While they are the

8    conduit for many customers, they too are competitors.  In

9    fact, we have customers -- consultants competing today to

10   build custom networks for employers in our space that we're

11   responding to as I sit here.

12        THE COURT:  All the main private exchanges are

13   offered by the main consulting firms, is that right?

14        THE WITNESS:  They are.  They are.  So they not

15   offer the private exchanges, they have special relationships

16   with various health management companies to also procure and

17   place business within the private exchange.  And we're also

18   seeing consultants bid on building networks for the

19   customers.

20        THE COURT:  Is seems it may have been a creative

21   way, hopefully, ultimately, to either increase choice or

22   decrease cost.  But what it really does is give them a

23   bigger piece of the pie than they had before.

24        THE WITNESS:  I don't disagree with you.

25   BY MR. SEVERT:

1    Q.   So the consultant helps the client draft the RFP?

2    A.   The consultants typically do help draft the RPF.  The

3    employer would typically dictate the actual end game, what

4    their overarching objectives are.

5    Q.   The consultant typically assists in deciding to whom to

6    send the RFP?

7    A.   That is correct.  That is one way of determining who

8    receives the RFPs.

9    Q.   And the consultants often assist in reviewing the RPF

10   responses?

11   A.   They do.

12   Q.   And that could include scoring?

13   A.   That could.

14   Q.   And the consultant may help with the ultimate vendor

15   selection, right?

16   A.   That is correct as well.

17   Q.   Anthem doesn't do any of those things, right?

18   A.   Anthem does work with customers on a direct basis.  We

19   meet with customers through various existing relationships,

20   whether they're in its entirety or they're partial.  So

21   customers are very aware of our assets before going to bid.

22   So it's not exclusively through the lens of a consultant

23   that they view their options in the market.

24   Q.   Anthem doesn't review all of the RPF responses with the

25   client?

1    A.  We typically do not sit down and review our competitors'

2    responses with our customers or our prospects.

3    Q.  Okay, sir.  And, sir, you took the role of president of

4    national accounts last November?

5    A.  I did.

6    Q.  And between the time of 2010 and last November you were

7    plan president of Georgia, is that right?

8    A.  That is correct.

9    Q.  And when you were plan president of Georgia, you were

10   working in the local market in Georgia, right?

11   A.  I was.

12   Q.  You are not part of national accounts organization

13   during that time?

14   A.  I was not part of the national accounts organization for

15   direct accountability.  But as a leader within our company,

16   I felt that -- part of my duties to help and in any way

17   serve the business for the national account segment.

18   Q.  You didn't have primary responsibility for national

19   accounts, though?

20   A.  I did not have primary responsibility for national

21   accounts, that's correct.

22   Q.  And, sir, you've only been in your current position of

23   national accounts during this past sales cycle, right?

24   A.  That is correct.  I will add, however, that prior to my

25   work with Blue Cross and Blue Shield of Georgia as the

1    president, for the five to six years prior I led sales for

2    the national account segment.  It was part of the national

3    account segment when it was created upon the acquisition of

4    WellPoint by Anthem.

5    Q.  And that was 2010, before, right?

6    A.  That is correct.

7              THE COURT:  So you were at WellPoint?

8              THE WITNESS:  I was part of the WellPoint

9    organization that was acquired by Anthem, that is correct.

10   BY MR. SEVERT:

11   Q.  And the sales cycle in which you participated in

12   national accounts, this most recent one, was while this

13   merger was pending, right?

14   A.  That is the most recent one where I've had direct

15   accountability for the sales cycle, that is correct.

16   Q.  It was, indeed, after the Department of Justice opened

17   an investigation into this merger and the ensuing

18   litigation, right?

19   A.  The sales cycle for 2017 began slightly before my

20   appointment in November.  But it's been ongoing for the

21   entire time.

22   Q.  Okay, sir.  You also mentioned in your direct

23   examination Consortium Health Plans?

24   A.  I did.

25   Q.  And, sir, you're a member of the board of directors of

1    Consortium Health Plans?

2    A.  I am.

3    Q.  And Consortium Health Plans is a national coalition of

4    21 Blue Cross/Blue Shield plans, is that right?

5    A.  I don't view us as a national coalition.  We are roughly

6    20-some-odd Blue companies that share predetermined pricing

7    for our network rental arrangements.

8    Q.  And, sir, Consortium Health Plans is a different

9    organization from the Blue Cross/Blue Shield association,

10   correct?

11   A.  That is correct.

12   Q.  And, in fact, Consortium Health Plans was formed to help

13   Blue Cross/Blue Shield plans position themselves as the

14   preferred choice for national accounts, right?

15   A.  The impetus behind the Consortium's -- you know, the

16   genesis of the Consortium I can't speak to.  I know we did

17   not participate in the Consortium before Anthem and

18   WellPoint merged.  So my experience with the Consortium has

19   come post-2005, and it was many years before when the

20   Consortium was in existence.

21          But again, the companies within the Consortium are

22   not one.  We don't have similar go-to-market strategies.  We

23   have opportunities to share our networks and identify

24   collectively what the relative value of those and how

25   they're portrayed to our consultants, rather than having 36

1    different organizations with very different data sets to

2    submit information to the consultants for consideration.

3    Q.  And Consortium Health Plans also helps provide central

4    coordination for the Blues system in competing for national

5    accounts, right?

6    A.  It provide coordination for certain Blue Cross companies

7    that afford themselves of those services Anthem does not.

8    We have an exceptionally capable division that manages this,

9    so our use of Consortium resources, as it relates to that,

10   is minimal to nonexistent.

11   Q.  Okay, sir.

12            THE COURT:  Basically, if you need to go out and

13   find a rental network, you don't have to figure out where to

14   look or how much it's going to cost, that's basically what

15   the coalition provides you with?

16            THE WITNESS:  So, we're -- as a member of Blue, we

17   would not have to go out and find a network.  By virtue of

18   our licensing agreement, we would have -- the other Blues

19   would afford us our networks and we would afford them ours.

20            THE COURT:  With or without the coalition.

21            THE WITNESS:  With our without the coalition,

22   that's correct.

23            THE COURT:  The coalition adds a consistent

24   pricing strategy?

25            THE WITNESS:  That is correct.  It adds a

1      consistent reduced pricing strategy for the benefit of

2      consistency for those employers that choose to -- or, plans

3      that choose to participate with the consortium.  There are

4      certainly other services the consultant -- the Consortium

5      provides, but they're primarily, for our organization,

6      around articulation of network value.

7      BY MR. SEVERT:

8      Q.  Okay.  Sir, I've handed you and put on the screen --

9              THE COURT:  How does that work?  I'm sorry.  If

10     pricing is so local, how can you all have the same prices?

11             THE WITNESS:  The prices aren't for the actual

12     medical services.  The medical services are, indeed, you're

13     correct, delivered and determined locally.  So, Blues of

14     Nebraska contracts for a network in Nebraska based on health

15     care costs in Nebraska.  We contract a network in Georgia

16     based on health care costs in the Georgia market.

17             THE COURT:  But Blue in Nebraska would charge

18     everybody else the same price for it, is that the --

19             THE WITNESS:  That's correct.  There would be a

20     network access charge that would be -- that we charge others

21     and others charge us, and that is where the Consortium comes

22     in, to pull those together.

23     BY MR. SEVERT:

24     Q.  Okay.  Sir, I've handed you the home page from

25     Consortium Health Plans, you can see the URL is on the

1    bottom left.  And I actually printed this out last night.

2    And, sir, you're on the board of directors of this

3    organization?

4    A.  I am.

5    Q.  I want to read you the first two sentences.  It says,

6    Consortium Health Plans was formed in 1994 to help its

7    founding Blue Cross/Blue Shield plans position themselves as

8    the preferred choice for national accounts.  Do you see

9    that, sir?

10   A.  I do.

11   Q.  Now a national coalition of 21 leading BCBS plans,

12   Consortium provides a clear and unified voice, as well as

13   effective central coordination for the Blue system among

14   national accounts and the consultants and brokers who serve

15   them.  Do you see that, sir?

16   A.  I do see that sentence.

17   Q.  You can put that aside.

18           THE COURT:  What exhibit is that?

19           MR. SEVERT:  Your Honor, this is not in evidence,

20   the -- these facts are in evidence through confidential

21   testimony.

22           THE COURT:  All right.  But, Cigna is trying to

23   put together a network once it's your subsidiary, and it's

24   not Cigna Blue, it's just Cigna-Cigna.

25           THE WITNESS:  Right.

1    THE COURT:  It can't have access to this?

2    THE WITNESS:  That is correct.  There would be two

3    distinct consumer facing brands.  One that would be Cross

4    and Shield branded and one that would not, which would be

5    Cigna.

6    BY MR. SEVERT:

7    Q.  Okay.  Sir, just one last topic.  Judge Jackson, during

8    your direct examination, asked you about whether Anthem had

9    a non-Blue commercial product.  Do you recall that question?

10   A.  I do.

11   Q.  And I think your testimony was you couldn't think of

12   one?

13   A.  I believe that's a correct statement.

14   Q.  Okay.  And in fact, the last non-Blue commercial product

15   that Anthem had was UniCare, right?

16   A.  UniCare is a non -- a non-Blue branded product that we

17   have today.  It's very limited in scope.  We have the

18   contract in the state of Massachusetts that's still in

19   existence.  So UniCare competes, theoretically, commercially

20   in the Massachusetts market with this existing account that

21   we have.  But it's not a prevalent non-Blue brand that we

22   actively compete with today.

23   Q.  It's not prevalent today, right?

24   A.  That is correct.

25   MR. SEVERT:  No further questions, Your Honor.

1          THE COURT:  All right.  Any redirect?

2                    REDIRECT EXAMINATION

3     BY MR. CURRAN:

4     Q.  Mr. Kendrick, Consortium pricing, can you just clarify

5     exactly what that pricing relates to?

6     A.  The pricing relates to the network access charges that

7     we charge one another.  Many of the Blues charge variable

8     costs, percent of savings, percent of claims paid.  The

9     market had demanded consistency.  And again, back in 1994,

10    it appears the Consortium was formed, and at that point in

11    time it was around consistency.

12              So, we have transfer pricing, if you will, to

13    where there is consistent, predetermined access fees that

14    we've agreed to share with one another, those of us that are

15    part of the Consortium.

16    Q.  Are those BlueCard fees?

17    A.  Those are BlueCard fees, correct.

18              MR. CURRAN:  Thank you very much.  Nothing further.

19              THE COURT:  Thank you.  You can step down.  Is the

20    next witness -- how long do you estimate the next witness

21    would be?  I'm trying to figure out if we want to break for

22    lunch now, break after the direct.

23              MR. CURRAN:  I recommend we break for lunch for at

24    least this reason:  The next witness is also from Anthem's

25    national account section and I would like my colleague who's

1    doing that examination to make sure that nothing in that

2    examination is redundant with what we've just heard.

3              THE COURT:  Nothing.  Because three-quarters of

4    it, as you know, I've heard a number of times.  I think it's

5    important, but I think he did an excellent job of explaining

6    it to me, so this should definitely be redundant testimony,

7    if it needs to be at all.

8              MR. CURRAN:  The next witness is a step or two

9    below on the administrative rung and may be able to provide

10   more granular details that might be helpful to the Court.

11   So our objective, of course, is not to be redundant, but we

12   want to make sure we provide to Your Honor sufficient

13   detail.

14             THE COURT:  All right.  I just think I've heard a

15   lot about the new innovative products in the market and

16   whether they pose competition or not and why they pose

17   competition and why they're important and what they are and

18   who they are.  And so, I appreciate the fact that you will

19   use the lunch break as you suggested you're going to use it.

20   And we'll all have one, and we'll come back at, let's say,

21   1:45.

22             All right.  Thank you.

23             MR. CURRAN:  Thank you, Your Honor.

24             (Noon recess.)

25                              *   *   *

1

2              CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5           I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of

7     my stenograph notes and is a full, true and complete

8     transcript of the proceedings to the best of my ability.

9                      Dated this 29th day of November, 2016.

10

11

12                      /s/_____

13                      Janice E. Dickman, CRR, RMR
                        Official Court Reporter
14                      Room 6523
                        333 Constitution Avenue NW
15                      Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

**'**

**'90s** [1] - 1182:15

**/**

**/s** [1] - 1224:12

# 1

**1** [15] - 1096:10, 1104:25, 1105:14, 1112:23, 1112:24, 1116:19, 1117:21, 1152:19, 1153:4, 1153:20, 1157:1, 1162:17, 1162:19, 1171:2, 1178:5
**1(** e [1] - 1156:3
**1,000** [1] - 1096:23
**1,620** [2] - 1156:20, 1157:13
**10** [3] - 1130:6, 1130:9, 1131:20
**10-K** [1] - 1128:5
**100** [6] - 1105:6, 1115:21, 1116:6, 1146:24, 1210:3, 1210:8
**100,000** [2] - 1152:2, 1152:15
**100-type** [1] - 1105:4
**1000** [1] - 1158:3
**11** [2] - 1120:21, 1144:6
**118** [4] - 1130:16, 1130:20, 1130:21, 1131:9
**12** [2] - 1129:21, 1129:24
**12,597** [1] - 1156:5
**125** [1] - 1096:12
**13** [2] - 1130:9, 1131:19
**1300** [1] - 1094:22
**13th** [1] - 1095:3
**14** [31] - 1106:11, 1106:13, 1106:16, 1106:17, 1107:2, 1109:9, 1130:5, 1131:14, 1132:23, 1134:15, 1134:18, 1134:20, 1134:21, 1134:25, 1135:4, 1135:6, 1136:4, 1136:14, 1136:19, 1136:20, 1137:11, 1137:12, 1139:1, 1139:5, 1139:16, 1139:21, 1139:24, 1148:8, 1207:20, 1211:12
**14-state** [9] - 1109:10, 1119:18, 1119:22, 1125:9, 1130:15, 1194:12, 1199:15, 1199:16, 1205:22
**14th** [2] - 1103:10, 1158:3
**15** [5] - 1163:10, 1195:9, 1195:12, 1195:13, 1195:23
**150** [3] - 1116:6, 1154:12, 1155:3
**16** [2] - 1149:24, 1159:21
**16-1493** [1] - 1096:3
**16-CV-1493** [1] - 1094:3
**17** [2] - 1128:25, 1151:16
**1702** [1] - 1094:24

# 2

**18,215** [1] - 1157:10
**19** [1] - 1109:25
**190** [1] - 1149:12
**190,000** [1] - 1149:8
**1994** [2] - 1220:6, 1222:9
**1:45** [1] - 1223:21
**1st** [1] - 1197:8

# 2

**2** [9] - 1096:23, 1123:6, 1132:17, 1149:20, 1155:17, 1162:21, 1170:3, 1170:4
**2,227** [1] - 1157:16
**20** [6] - 1106:9, 1117:24, 1119:6, 1157:6, 1162:4, 1195:13
**20-some-odd** [1] - 1217:6
**200** [1] - 1210:8
**200,000** [3] - 1149:7, 1149:8, 1149:12
**20001** [2] - 1095:12, 1224:15
**20005-3807** [1] - 1095:4
**20006-1047** [1] - 1095:8
**2001** [1] - 1095:7
**2004** [1] - 1211:5
**2010** [5] - 1122:25, 1140:4, 1176:13, 1215:6, 1216:5
**2011** [3] - 1147:16, 1152:24, 1164:24
**2012** [3] - 1123:15, 1140:7, 1201:13
**2015** [17] - 1102:12, 1103:10, 1103:23, 1104:18, 1116:6, 1124:5, 1125:20, 1147:10, 1147:14, 1147:17, 1152:23, 1152:25, 1156:20, 1157:11, 1160:7, 1173:14, 1174:2
**2016** [9] - 1094:6, 1103:11, 1104:1, 1104:2, 1140:4, 1140:8, 1162:2, 1176:13, 1224:9
**2016/2017** [1] - 1162:9
**2017** [6] - 1147:17, 1152:24, 1162:2, 1177:10, 1187:8, 1216:19
**2018** [1] - 1186:21
**202** [3] - 1094:19, 1095:4, 1095:8
**202-354-3267** [1] - 1095:12
**20530** [1] - 1094:18
**21** [3] - 1143:24, 1217:4, 1220:11
**223-7300** [1] - 1095:8
**24** [1] - 1156:11
**25** [4] - 1118:7, 1171:2, 1171:20, 1193:25
**250** [3] - 1096:13, 1096:21, 1096:22
**25th** [1] - 1138:6
**26** [22] - 1102:21, 1103:2, 1103:5, 1104:5, 1104:8, 1106:3,

1107:12, 1108:13, 1110:11, 1110:23, 1111:12, 1114:23, 1115:2, 1115:6, 1135:14, 1135:16, 1137:1, 1137:18, 1137:21, 1167:11
**27** [7] - 1103:20, 1105:11, 1105:19, 1106:3, 1109:23, 1135:14, 1135:22
**27th** [1] - 1113:17
**28** [11] - 1102:24, 1103:2, 1103:5, 1106:8, 1106:15, 1108:25, 1115:18, 1134:25, 1135:14, 1136:4, 1139:6
**28th** [1] - 1113:17
**29** [2] - 1094:6, 1108:9
**29th** [2] - 1113:17, 1224:9
**2nd** [1] - 1103:11

# 3

**3** [2] - 1127:14, 1157:13
**3,000** [2] - 1153:3, 1159:22
**3.7** [1] - 1201:16
**30** [2] - 1104:2, 1121:13
**300** [1] - 1094:24
**30th** [1] - 1113:17
**32** [4] - 1116:20, 1121:8, 1122:6, 1122:11
**33** [2] - 1122:8, 1144:9
**333** [2] - 1095:11, 1224:14
**34** [4] - 1114:11, 1119:4, 1122:8, 1129:4
**35** [3] - 1121:8, 1122:8, 1154:2
**36** [7] - 1122:4, 1136:24, 1137:17, 1137:23, 1139:10, 1207:1, 1217:25
**37** [6] - 1143:20, 1144:3, 1144:9, 1144:18, 1145:11

# 4

**4** [5] - 1111:16, 1112:12, 1112:16, 1112:21, 1113:8
**4.5** [2] - 1163:2, 1163:4
**40** [1] - 1121:18
**400** [1] - 1210:2
**41** [2] - 1116:22, 1121:11
**4100** [1] - 1094:18
**42** [1] - 1153:23, 1154:1
**44** [1] - 1131:24
**45** [2] - 1133:5, 1144:16
**450** [1] - 1094:17
**46** [3] - 1128:11, 1144:16, 1151:12
**47** [1] - 1151:20, 1152:9, 1152:10, 1153:16
**48** [2] - 1158:10, 1158:13
**49** [2] - 1121:6, 1121:16

## 5

**5** [6] - 1106:16, 1120:21, 1126:11, 1126:20, 1140:14, 1140:18
**5,000** [6] - 1106:6, 1133:9, 1133:20, 1134:3, 1137:11, 1153:8
**5,000-life** [1] - 1210:5
**5.0** [3] - 1162:19, 1162:21, 1162:24
**50** [6] - 1115:21, 1127:9, 1133:9, 1182:15, 1184:12, 1184:15
**500** [8] - 1096:22, 1105:7, 1128:12, 1128:14, 1128:16, 1128:19, 1129:7, 1210:1
**500-plus** [1] - 1149:11
**51** [1] - 1123:5
**525** [1] - 1179:3
**53** [5] - 1110:12, 1111:2, 1111:13, 1113:12, 1170:11
**54** [1] - 1128:19
**55** [5] - 1120:19, 1120:21, 1160:14, 1160:15, 1170:12
**55.5** [2] - 1111:5, 1111:12
**550** [2] - 1179:3, 1210:1
**56** [1] - 1155:25
**57** [6] - 1109:21, 1110:15, 1112:20, 1113:8, 1170:16, 1170:22
**598-8916** [1] - 1094:19

## 6

**60** [11] - 1108:15, 1108:21, 1108:24, 1113:11, 1113:13, 1113:15, 1115:11, 1143:25, 1145:6, 1170:1, 1182:16
**62** [1] - 1126:7
**626-3600** [1] - 1095:4
**640,000** [1] - 1210:10
**65,000** [1] - 1201:15
**6523** [2] - 1095:11, 1224:14
**67** [6] - 1116:2, 1116:5, 1116:14, 1122:22, 1154:16, 1174:21

## 7

**7** [4] - 1106:24, 1147:13, 1152:22, 1153:7
**70** [1] - 1117:3
**700,000** [1] - 1152:2
**701** [1] - 1095:3
**71** [1] - 1110:7
**73** [2] - 1140:11, 1140:13
**74** [6] - 1109:19, 1110:3, 1110:7, 1112:20, 1113:7, 1113:12

**75** [4] - 1126:12, 1126:13, 1193:24, 1194:9

## 8

**80-20** [1] - 1118:18
**80203** [1] - 1094:22
**83** [1] - 1151:16
**85** [1] - 1195:10
**87** [1] - 1119:21
**89** [1] - 1144:9

## 9

**9** [1] - 1106:16
**9-30** [1] - 1104:18
**90013** [1] - 1094:25
**91** [3] - 1139:25, 1140:2, 1176:4
**92** [2] - 1162:8, 1162:9
**9:30** [1] - 1094:7

## A

**A.M** [1] - 1094:7
**abate** [5] - 1180:2, 1180:13, 1182:24, 1183:20, 1207:3
**abatement** [2] - 1180:4, 1187:7
**abating** [1] - 1181:20
**Abigail** [1] - 1094:20
**ability** [1] - 1224:8
**able** [7] - 1101:10, 1101:11, 1164:16, 1206:12, 1206:13, 1207:4, 1223:9
**absence** [2] - 1175:20, 1200:15
**absent** [1] - 1129:8
**absolutely** [5] - 1130:4, 1185:17, 1193:4, 1206:24, 1212:5
**absorb** [1] - 1171:16
**accept** [3] - 1103:7, 1157:8, 1157:18
**access** [6] - 1103:19, 1193:11, 1219:20, 1221:1, 1222:6, 1222:13
**according** [5] - 1111:11, 1117:21, 1128:21, 1153:21, 1157:23
**account** [32] - 1098:12, 1098:18, 1129:9, 1132:10, 1155:5, 1155:10, 1157:23, 1160:8, 1168:24, 1169:3, 1177:4, 1179:16, 1191:9, 1191:10, 1192:21, 1192:22, 1198:10, 1202:25, 1203:8, 1203:11, 1203:22, 1204:1, 1204:14, 1210:7, 1210:11, 1212:2, 1212:15, 1215:17, 1216:2, 1216:3, 1221:20, 1222:25
**accountability** [5] - 1183:21,

1209:13, 1215:15, 1216:15
**accountable** [1] - 1209:14
**accounting** [1] - 1158:22
**accounts** [62] - 1097:20, 1098:4, 1107:19, 1107:24, 1118:1, 1118:5, 1118:20, 1119:2, 1123:23, 1125:1, 1126:16, 1126:20, 1129:22, 1130:8, 1132:7, 1133:8, 1136:22, 1137:20, 1148:2, 1153:2, 1153:3, 1153:8, 1155:9, 1158:5, 1172:16, 1172:22, 1173:18, 1174:1, 1174:10, 1174:11, 1175:25, 1176:21, 1177:10, 1178:24, 1179:1, 1179:5, 1183:12, 1184:7, 1187:17, 1187:23, 1188:2, 1208:6, 1209:7, 1209:11, 1209:13, 1209:15, 1209:18, 1209:20, 1209:25, 1210:14, 1210:25, 1215:4, 1215:12, 1215:14, 1215:19, 1215:21, 1215:23, 1216:12, 1217:14, 1218:5, 1220:8, 1220:14
**accurate** [2] - 1203:9, 1224:6
**acknowledge** [1] - 1143:7
**ACOs** [1] - 1098:17
**acquired** [7] - 1123:13, 1123:15, 1124:4, 1124:6, 1161:3, 1161:10, 1216:9
**acquirer's** [1] - 1153:19
**acquisition** [3] - 1123:12, 1124:17, 1216:3
**ACS** [1] - 1108:12
**Action** [2] - 1094:3, 1096:3
**actively** [1] - 1221:22
**activities** [1] - 1211:16
**activity** [3] - 1165:9, 1187:7, 1196:6
**actual** [4] - 1105:19, 1196:5, 1214:3, 1219:11
**Adam** [1] - 1094:15
**add** [5] - 1113:16, 1124:19, 1138:19, 1215:24
**added** [3] - 1113:19, 1122:14, 1157:7
**addiction** [1] - 1193:8
**adding** [1] - 1138:4
**addition** [1] - 1204:7
**additional** [6] - 1106:11, 1106:14, 1106:17, 1113:19, 1187:22, 1195:24
**address** [2] - 1096:8, 1112:5
**adds** [2] - 1218:23, 1218:25
**administer** [2] - 1189:7, 1191:5
**administering** [4] - 1182:17, 1183:22, 1191:21, 1191:23
**administration** [2] - 1182:24, 1192:2
**administrative** [1] - 1158:20,

1158:25, 1179:14, 1183:22,
1191:23, 1195:3, 1195:9,
1195:12, 1195:16, 1196:2,
1223:9
**admits** [1] - 1165:14
**advantage** [1] - 1194:7
**advantageous** [10] - 1182:3,
1182:23, 1183:3, 1183:6,
1183:17, 1185:7, 1187:1,
1193:24, 1194:9, 1202:8
**adverse** [2] - 1133:17, 1133:25
**Aetna** [9] - 1104:13, 1109:3,
1109:8, 1109:10, 1135:17,
1138:9, 1150:7, 1150:9, 1157:20
**Aetna's** [1] - 1202:23
**Aetnas** [1] - 1197:19
**afford** [6] - 1182:22, 1186:25,
1201:24, 1218:7, 1218:19
**afforded** [1] - 1182:7
**affording** [1] - 1182:11
**aggressive** [2] - 1198:18,
1199:25
**aggressively** [3] - 1199:21,
1206:25, 1209:1
**agile** [2] - 1196:14, 1201:1
**ago** [8] - 1106:15, 1161:11,
1162:5, 1163:10, 1174:7,
1201:7, 1207:18
**agree** [2] - 1212:1, 1212:5
**agreed** [1] - 1222:14
**agreement** [1] - 1218:18
**agrees** [1] - 1142:7
**ahead** [1] - 1115:12
**al** [2] - 1094:3, 1096:3
**Alabama** [1] - 1135:22
**alleged** [2] - 1170:7, 1170:24
**allegedly** [1] - 1098:2
**alliance** [2] - 1205:4, 1205:9
**allow** [1] - 1183:2
**allowed** [3] - 1136:18, 1183:23,
1205:13
**alongside** [2] - 1197:9, 1197:11
**Altius** [1] - 1157:19
**altogether** [1] - 1157:18
**America** [4] - 1094:3, 1096:3,
1180:11, 1201:9
**Amerigroup** [12] - 1123:3,
1123:12, 1123:13, 1123:17,
1123:24, 1124:1, 1124:3,
1124:16, 1124:20, 1124:22,
1207:25, 1208:20
**amerigroup** [1] - 1207:24
**amounts** [1] - 1179:12
**amplifies** [1] - 1202:10
**AMY** [1] - 1094:10
**analyses** [2] - 1159:16, 1160:1
**analysis** [17] - 1120:8, 1122:16,
1130:15, 1131:11, 1145:13,
1146:14, 1151:3, 1151:5,
1152:20, 1153:21, 1164:11,

1164:13, 1168:8, 1173:13,
1195:7
**analytic** [1] - 1198:22
**analyze** [3] - 1125:22, 1131:14,
1165:17
**analyzed** [1] - 1120:11
**analyzing** [1] - 1173:8
**Angeles** [1] - 1094:25
**announced** [1] - 1111:22
**annual** [2] - 1125:16, 1126:3
**another's** [1] - 1205:9
**answer** [6] - 1100:15, 1100:23,
1111:25, 1120:23, 1139:9,
1188:17
**answers** [1] - 1111:23
**Anthem** [106] - 1094:6, 1095:1,
1096:4, 1097:23, 1098:7,
1104:13, 1109:3, 1109:9,
1114:14, 1114:19, 1120:3,
1120:9, 1120:12, 1121:2,
1121:7, 1121:13, 1121:18,
1121:20, 1122:5, 1122:8,
1123:18, 1124:5, 1124:7,
1125:7, 1125:16, 1125:20,
1125:23, 1126:19, 1127:6,
1127:13, 1129:8, 1130:5,
1130:9, 1130:15, 1132:3,
1132:23, 1132:25, 1144:4,
1144:10, 1145:9, 1145:19,
1147:21, 1148:1, 1148:2,
1148:8, 1148:16, 1148:20,
1148:23, 1148:25, 1149:8,
1150:9, 1150:17, 1151:9,
1151:16, 1153:19, 1153:20,
1154:4, 1155:1, 1160:9,
1160:11, 1160:24, 1163:1,
1163:4, 1169:11, 1169:13,
1172:24, 1173:9, 1174:9,
1174:16, 1175:12, 1178:11,
1178:24, 1179:2, 1179:10,
1193:13, 1194:11, 1194:18,
1196:23, 1199:19, 1199:21,
1200:20, 1204:18, 1204:21,
1206:12, 1206:14, 1206:15,
1206:18, 1207:10, 1207:12,
1207:19, 1209:1, 1210:11,
1212:4, 1214:17, 1214:18,
1214:24, 1216:4, 1216:9,
1217:17, 1218:7, 1221:8,
1221:15
**Anthem's** [8] - 1119:21, 1125:9,
1126:18, 1127:14, 1127:16,
1148:23, 1200:8, 1222:24
**Anthem/Cigna** [2] - 1120:4,
1133:18
**anticompetitive** [2] - 1167:1,
1167:5
**Antitrust** [1] - 1094:17
**antitrust** [3] - 1098:9, 1102:12,
1122:14

**anyway** [1] - 1118:25
**apologies** [1] - 1181:10
**apologize** [2] - 1156:16,
1167:21
**appealing** [1] - 1198:10
**appear** [4] - 1113:10, 1117:11,
1159:16, 1169:1
**Appendix** [2] - 1147:14,
1152:22
**applauded** [1] - 1202:14
**appointment** [1] - 1216:20
**appreciate** [3] - 1130:23,
1159:11, 1223:18
**appreciated** [1] - 1096:15
**approach** [9] - 1117:5, 1117:7,
1117:8, 1117:10, 1117:15,
1170:19, 1170:22, 1191:17
**approaching** [1] - 1212:9
**appropriate** [3] - 1098:6,
1098:8, 1169:23
**approximate** [1] - 1156:4
**area** [4] - 1118:21, 1176:2,
1204:8, 1209:13
**areas** [4] - 1119:25, 1122:5,
1125:9, 1125:12
**arena** [1] - 1184:2
**arm** [2] - 1198:18, 1199:9
**arrangement** [1] - 1179:9
**arrangements** [1] - 1217:7
**article** [1] - 1164:24
**articulation** [1] - 1219:6
**aside** [4] - 1117:19, 1122:6,
1139:3, 1220:17
**ASO** [12] - 1114:10, 1114:19,
1114:25, 1122:8, 1127:17,
1158:15, 1172:2, 1172:12,
1179:5, 1179:7, 1179:11,
1179:12
**ASPE** [1] - 1141:2
**aspect** [1] - 1205:14
**aspects** [1] - 1164:7
**assert** [1] - 1133:16
**asserted** [1] - 1141:18
**asserting** [1] - 1141:16
**assessing** [1] - 1169:6
**assets** [5] - 1185:25, 1202:9,
1202:10, 1205:7, 1214:21
**assigned** [1] - 1139:19
**assist** [1] - 1214:9
**assisted** [1] - 1212:15
**assists** [1] - 1214:5
**associated** [1] - 1175:22
**association** [5] - 1194:15,
1205:9, 1206:4, 1206:18, 1217:9
**assume** [2] - 1101:21, 1160:5
**assuming** [1] - 1174:1
**Assurance** [1] - 1161:20
**Atlanta** [1] - 1200:22
**attempt** [1] - 1180:2

**attention** [16] - 1105:11, 1106:24, 1108:9, 1111:1, 1115:10, 1116:2, 1123:5, 1123:9, 1135:13, 1136:24, 1139:25, 1143:25, 1147:13, 1151:12, 1155:25, 1162:8
**ATTORNEY** [2] - 1094:21, 1094:24
**attractive** [1] - 1202:15
**auction** [1] - 1174:18
**audience** [1] - 1146:9
**audited** [1] - 1111:4
**available** [13] - 1099:19, 1102:12, 1102:15, 1164:20, 1165:4, 1165:18, 1166:1, 1166:2, 1173:8, 1175:1, 1175:13, 1193:23, 1204:9
**Avenue** [4] - 1095:11, 1154:20, 1154:21, 1224:14
**average** [2] - 1149:9, 1187:19
**AvMed** [4] - 1106:22, 1109:3, 1136:4, 1137:12
**await** [1] - 1187:4
**award** [7] - 1186:16, 1186:17, 1186:18, 1187:20, 1189:16, 1189:17, 1196:18
**awards** [4] - 1186:14, 1187:8, 1197:4, 1200:7
**aware** [9] - 1103:12, 1103:14, 1103:16, 1103:18, 1103:21, 1111:7, 1111:10, 1143:11, 1214:21

## B

**back-up** [1] - 1169:21
**background** [1] - 1142:10
**backup** [3] - 1116:6, 1116:10, 1168:10
**balance** [2] - 1195:14, 1195:15
**banking** [1] - 1190:9
**bar** [1] - 1153:15
**base** [1] - 1200:23
**based** [16] - 1105:5, 1105:8, 1105:9, 1146:19, 1146:23, 1147:3, 1147:5, 1153:7, 1159:21, 1166:4, 1169:11, 1191:19, 1212:6, 1219:14, 1219:16
**baseline** [1] - 1158:14
**basing** [1] - 1203:20
**basis** [7] - 1126:3, 1169:6, 1186:8, 1196:23, 1196:25, 1208:21, 1214:18
**BCBS** [1] - 1220:11
**bear** [1] - 1179:19
**became** [1] - 1209:6
**become** [3] - 1190:7, 1201:19, 1201:21
**becoming** [2] - 1181:24,

1202:17
**BEFORE** [1] - 1094:10
**began** [1] - 1216:19
**begin** [3] - 1096:9, 1099:12, 1105:22
**beginning** [2] - 1165:16, 1184:1
**behalf** [3] - 1190:22, 1191:4, 1196:18
**behaved** [1] - 1210:12
**behind** [4] - 1130:23, 1131:2, 1186:22, 1217:15
**believes** [1] - 1172:21
**below** [3] - 1157:6, 1203:24, 1223:9
**Bench** [1] - 1094:4
**BENCH** [1] - 1094:9
**benchmark** [1] - 1173:14
**beneath** [1] - 1134:3
**benefit** [6] - 1182:18, 1183:2, 1183:4, 1195:7, 1206:3, 1219:1
**benefits** [1] - 1097:13
**BERMAN** [1] - 1094:10
**best** [12] - 1137:8, 1141:13, 1162:13, 1173:8, 1186:17, 1205:4, 1206:3, 1206:6, 1206:9, 1212:20, 1212:24, 1224:8
**best-in-market** [1] - 1186:17
**better** [4] - 1139:9, 1142:14, 1143:8, 1201:3
**between** [18] - 1097:1, 1125:16, 1133:9, 1138:9, 1140:4, 1145:9, 1170:24, 1179:3, 1181:1, 1191:4, 1194:4, 1200:13, 1204:18, 1204:24, 1208:15, 1209:23, 1210:1, 1215:6
**beyond** [1] - 1139:16
**Bial** [1] - 1095:6
**bid** [3] - 1188:2, 1213:18, 1214:21
**bids** [3] - 1186:20, 1187:18, 1187:24
**bifurcated** [1] - 1211:10
**big** [2] - 1183:11, 1189:20
**bigger** [2] - 1123:8, 1213:23
**binder** [18] - 1104:4, 1104:8, 1108:16, 1108:20, 1108:21, 1128:11, 1131:25, 1135:14, 1135:15, 1136:25, 1140:1, 1155:16, 1157:1, 1158:11, 1170:1, 1171:21, 1174:22, 1176:4
**Binder** [4] - 1123:6, 1170:3, 1170:4, 1171:2
**binders** [3] - 1154:7, 1154:10, 1177:25
**bit** [6] - 1110:25, 1149:25, 1158:9, 1181:3, 1187:5, 1199:8
**blanking** [1] - 1156:15
**blue** [1] - 1170:11
**Blue** [56] - 1102:8, 1119:18,

1119:22, 1120:3, 1121:2, 1121:21, 1121:23, 1124:8, 1124:12, 1124:13, 1124:14, 1124:24, 1125:12, 1128:22, 1129:2, 1129:15, 1132:3, 1135:21, 1136:4, 1148:15, 1157:20, 1157:22, 1169:1, 1175:11, 1194:15, 1204:21, 1205:24, 1206:15, 1206:16, 1207:12, 1207:13, 1207:19, 1208:5, 1209:7, 1209:11, 1209:19, 1215:25, 1217:4, 1217:6, 1217:9, 1217:13, 1218:6, 1218:16, 1219:17, 1220:7, 1220:13, 1220:24, 1221:9, 1221:14, 1221:16, 1221:21
**Blue-branded** [1] - 1207:13
**BlueCard** [7] - 1121:23, 1127:1, 1127:6, 1127:13, 1129:14, 1222:16, 1222:17
**Blues** [49] - 1098:1, 1105:13, 1105:14, 1105:18, 1121:7, 1121:8, 1121:13, 1121:17, 1121:19, 1121:22, 1122:4, 1122:10, 1123:25, 1124:20, 1125:16, 1125:24, 1126:25, 1129:12, 1134:22, 1135:21, 1137:13, 1139:17, 1147:21, 1147:24, 1148:15, 1150:9, 1168:3, 1168:17, 1168:19, 1169:8, 1169:11, 1174:16, 1175:6, 1175:10, 1175:12, 1194:19, 1204:18, 1204:23, 1205:1, 1205:2, 1206:14, 1207:20, 1208:14, 1208:21, 1208:24, 1218:4, 1218:18, 1219:13, 1222:7
**bluffing** [5] - 1142:22, 1142:23, 1142:24, 1142:25, 1143:4
**blurt** [1] - 1139:11
**board** [2] - 1216:25, 1220:2
**Boeing** [1] - 1190:14
**book** [1] - 1164:9
**bottom** [4] - 1109:13, 1109:15, 1127:16, 1220:1
**bought** [5] - 1121:7, 1121:8, 1121:13, 1122:11, 1210:12
**boundaries** [1] - 1205:17
**box** [1] - 1099:25
**brand** [7] - 1186:24, 1190:7, 1206:25, 1207:13, 1207:15, 1208:10, 1221:21
**branded** [6] - 1205:19, 1205:20, 1207:13, 1207:14, 1221:4, 1221:16
**branding** [1] - 1207:5
**brands** [7] - 1180:11, 1207:12, 1207:19, 1208:19, 1208:19, 1221:3

**break** [5] - 1167:17, 1222:21, 1222:22, 1222:23, 1223:19
**briefly** [3] - 1097:6, 1108:12, 1151:20
**bring** [1] - 1189:11
**broad** [3] - 1186:23, 1191:19, 1192:8
**broad-based** [1] - 1191:19
**broader** [1] - 1193:19
**Broadway** [1] - 1094:22
**broker** [1] - 1144:19
**brokers** [4] - 1171:9, 1171:16, 1204:3, 1220:14
**brought** [3] - 1141:19, 1182:20, 1198:24
**build** [15] - 1114:15, 1114:22, 1115:1, 1115:3, 1117:8, 1184:2, 1185:21, 1186:7, 1189:9, 1191:18, 1192:10, 1196:15, 1197:7, 1213:10
**build-up** [5] - 1114:15, 1114:22, 1115:1, 1115:3, 1117:8
**building** [3] - 1183:25, 1191:8, 1213:18
**builds** [1] - 1115:17
**buildup** [2] - 1117:10, 1117:15
**built** [7] - 1189:7, 1192:6, 1192:9, 1197:10, 1197:12, 1201:12
**bullet** [2] - 1160:24, 1172:9
**burden** [4] - 1182:17, 1182:24, 1183:22, 1195:3
**Burke** [1] - 1095:2
**business** [55] - 1123:18, 1124:1, 1124:13, 1138:8, 1138:21, 1139:14, 1154:18, 1168:24, 1172:25, 1173:9, 1174:9, 1174:10, 1176:23, 1184:6, 1184:11, 1184:12, 1184:16, 1184:17, 1184:20, 1186:8, 1186:15, 1188:2, 1188:14, 1190:7, 1190:21, 1190:25, 1191:1, 1197:4, 1197:11, 1197:13, 1200:5, 1200:11, 1201:20, 1201:25, 1203:3, 1203:8, 1203:11, 1205:18, 1205:19, 1205:20, 1208:8, 1208:15, 1209:14, 1209:24, 1210:6, 1210:12, 1210:17, 1210:24, 1213:17, 1215:17
**businesses** [1] - 1209:2
**buying** [1] - 1209:23
**BY** [46] - 1101:14, 1108:23, 1112:10, 1112:18, 1113:6, 1117:18, 1119:4, 1122:3, 1128:6, 1129:20, 1130:13, 1131:7, 1136:3, 1137:16, 1141:9, 1142:16, 1144:23, 1146:10, 1149:21, 1155:15,

1162:16, 1166:9, 1167:25, 1169:25, 1171:22, 1172:5, 1176:11, 1178:20, 1181:12, 1187:15, 1189:25, 1191:25, 1194:24, 1195:22, 1197:25, 1199:18, 1204:12, 1207:17, 1208:13, 1209:5, 1211:22, 1213:25, 1216:10, 1219:7, 1219:23, 1221:6

## C

**CA** [1] - 1094:25
**CADs** [1] - 1106:15
**calculate** [6] - 1122:10, 1125:15, 1130:7, 1136:12, 1168:18, 1169:13
**calculated** [9] - 1110:12, 1110:24, 1111:2, 1134:1, 1147:10, 1153:12, 1168:3, 1169:10, 1175:21
**calculating** [1] - 1170:20
**calculation** [12] - 1103:6, 1107:21, 1114:10, 1117:1, 1117:5, 1122:12, 1132:24, 1149:24, 1154:2, 1166:10, 1167:2, 1170:7
**calculations** [3] - 1114:14, 1128:21, 1168:7
**calendar** [3] - 1125:20, 1126:2, 1156:20
**California** [7] - 1094:23, 1119:25, 1121:22, 1161:11, 1205:23, 1205:24, 1211:9
**cannot** [4] - 1125:8, 1137:10, 1171:16, 1205:17
**capable** [1] - 1218:8
**capacity** [1] - 1209:10
**capitalize** [1] - 1186:6
**captured** [1] - 1117:6
**card** [4] - 1102:3, 1102:4, 1102:6
**cards** [1] - 1102:4
**Care** [1] - 1175:15
**care** [28] - 1143:9, 1163:17, 1164:8, 1171:14, 1179:20, 1180:3, 1180:19, 1181:16, 1181:20, 1182:2, 1182:19, 1189:15, 1189:17, 1191:15, 1192:12, 1193:19, 1194:4, 1195:10, 1196:12, 1196:17, 1198:25, 1201:4, 1201:12, 1207:11, 1207:14, 1208:10, 1219:15, 1219:16
**careful** [1] - 1126:5
**CareMore** [2] - 1208:8, 1208:20
**carrier** [14] - 1109:6, 1113:24, 1139:14, 1143:1, 1143:2, 1147:7, 1148:25, 1150:11, 1151:2, 1157:10, 1172:2,

1174:6, 1174:15, 1195:6
**carrier's** [2] - 1102:19, 1147:7
**carriers** [21] - 1108:3, 1110:23, 1116:12, 1121:24, 1134:20, 1135:6, 1135:17, 1136:14, 1139:5, 1142:2, 1148:16, 1154:12, 1157:19, 1174:19, 1175:22, 1183:16, 1184:6, 1193:3, 1197:15, 1198:2
**carry** [1] - 1195:2
**case** [21] - 1097:9, 1097:10, 1099:9, 1099:10, 1099:11, 1099:13, 1099:14, 1099:16, 1103:9, 1117:1, 1118:11, 1118:14, 1158:7, 1174:12, 1175:1, 1183:11, 1183:14, 1210:5
**CASE** [1] - 1095:3
**cases** [2] - 1110:20, 1174:19
**categories** [1] - 1155:3
**category** [1] - 1150:3
**Category** [1] - 1156:3
**cede** [2] - 1125:9, 1129:8
**ceded** [3] - 1148:3, 1148:4
**cedes** [11] - 1125:6, 1125:16, 1125:19, 1125:23, 1126:1, 1126:2, 1126:3, 1126:4, 1126:18, 1126:19
**census** [14] - 1108:12, 1110:6, 1110:15, 1110:17, 1110:20, 1110:24, 1114:15, 1115:7, 1117:5, 1165:23, 1167:12, 1170:19, 1170:22
**Centene** [4] - 1117:3, 1156:17, 1156:19, 1157:13
**center** [1] - 1200:22
**Center** [2] - 1116:23, 1175:17
**central** [2] - 1218:3, 1220:13
**certain** [2] - 1155:12, 1218:6
**certainly** [14] - 1100:23, 1118:19, 1179:20, 1180:3, 1185:3, 1187:11, 1189:13, 1202:12, 1202:13, 1203:18, 1204:5, 1204:23, 1207:9, 1219:4
**CERTIFICATE** [1] - 1224:2
**certify** [1] - 1224:5
**cetera** [3] - 1154:23, 1158:21, 1192:13
**challenge** [1] - 1213:5
**chance** [1] - 1172:14
**change** [3] - 1138:4, 1172:15, 1213:6
**changes** [5] - 1098:24, 1166:17, 1166:24, 1166:25, 1180:5
**changing** [2] - 1119:19, 1204:16
**characterize** [1] - 1158:6
**charge** [8] - 1179:14, 1192:1, 1219:17, 1219:20, 1219:21,

1222:7
  **charges** [1] - 1222:6
  **Charles** [3] - 1095:5, 1178:11,
1178:22
  **CHARLES** [1] - 1178:14
  **chart** [8] - 1127:5, 1153:16,
1171:23, 1172:7, 1176:12,
1176:14, 1176:20, 1177:13
  **charts** [4] - 1114:25, 1115:3,
1115:5, 1121:12
  **Chevron** [9] - 1155:17, 1156:1,
1156:3, 1156:8, 1156:12,
1157:8, 1157:23, 1157:24,
1158:8
  **Chevron's** [1] - 1158:2
  **choice** [5] - 1174:7, 1174:8,
1213:21, 1217:14, 1220:8
  **choose** [2] - 1219:2, 1219:3
  **Christopher** [1] - 1095:1
  **CID** [19] - 1101:15, 1108:13,
1108:25, 1110:11, 1110:20,
1114:14, 1115:1, 1115:16,
1116:19, 1116:23, 1117:10,
1134:15, 1134:25, 1139:6,
1165:25, 1167:11, 1175:1,
1175:13, 1175:19
  **CIDs** [15] - 1102:22, 1102:24,
1103:8, 1103:12, 1103:14,
1103:19, 1103:23, 1107:7,
1108:12, 1110:3, 1111:12,
1113:16, 1114:23, 1115:7,
1116:13
  **Cigna** [72] - 1094:6, 1095:5,
1096:4, 1097:23, 1104:13,
1117:24, 1118:4, 1118:6,
1118:8, 1119:8, 1120:9,
1120:12, 1140:3, 1144:4,
1144:10, 1145:9, 1145:19,
1145:24, 1146:3, 1146:13,
1147:8, 1148:11, 1149:4,
1149:25, 1150:6, 1150:9,
1150:17, 1151:9, 1151:16,
1151:20, 1152:19, 1153:2,
1153:24, 1154:3, 1155:1,
1157:16, 1159:22, 1160:3,
1160:5, 1160:6, 1160:7, 1160:8,
1160:19, 1160:22, 1161:2,
1171:4, 1171:8, 1172:19,
1172:21, 1172:24, 1173:9,
1174:10, 1176:23, 1177:1,
1177:7, 1202:1, 1202:6,
1202:17, 1203:7, 1206:13,
1206:15, 1206:25, 1207:1,
1207:14, 1220:22, 1220:24,
1221:5
  **Cigna's** [13] - 1146:14, 1146:24,
1147:23, 1151:22, 1176:12,
1176:16, 1177:9, 1202:13,
1202:24, 1203:3, 1203:10,
1204:13

  **Cigna-Cigna** [1] - 1220:24
  **Cignas** [1] - 1197:19
  **circumstances** [1] - 1186:11
  **citation** [2] - 1122:13, 1122:18
  **cite** [1] - 1142:17
  **City** [1] - 1136:5
  **Civil** [2] - 1094:3, 1096:2
  **claim** [5] - 1118:11, 1118:14,
1140:16, 1140:17, 1195:14
  **claimed** [2] - 1158:14, 1158:15
  **claims** [9] - 1179:11, 1179:15,
1179:18, 1192:1, 1192:2,
1192:3, 1195:10, 1196:3, 1222:8
  **clarification** [1] - 1159:11
  **clarify** [1] - 1222:4
  **clarity** [2] - 1096:14, 1096:17
  **clear** [10] - 1113:7, 1117:9,
1122:4, 1132:19, 1135:11,
1172:20, 1172:21, 1180:4,
1192:16, 1220:12
  **clearly** [4] - 1198:3, 1198:4,
1198:7, 1198:14
  **Cleveland** [1] - 1185:5
  **client** [3] - 1190:17, 1214:1,
1214:25
  **clients** [3] - 1190:18, 1212:15,
1212:21
  **clinical** [2] - 1192:5, 1196:4
  **close** [5] - 1154:3, 1154:9,
1198:13, 1204:2, 1204:3
  **closed** [1] - 1145:9
  **CO** [1] - 1094:22
  **coalition** [7] - 1217:3, 1217:5,
1218:15, 1218:20, 1218:21,
1218:23, 1220:11
  **coast** [2] - 1186:16
  **coast-to-coast** [1] - 1186:16
  **code** [1] - 1111:10
  **codesign** [1] - 1201:11
  **collapse** [1] - 1168:22
  **collateral** [1] - 1112:3
  **colleague** [1] - 1222:25
  **colleagues** [1] - 1205:4
  **collect** [1] - 1177:25
  **collected** [2] - 1139:21,
1147:19
  **collection** [1] - 1204:22
  **collectively** [1] - 1217:24
  **color** [1] - 1170:16
  **Colorado** [1] - 1094:20
  **COLUMBIA** [1] - 1094:1
  **column** [12] - 1104:17, 1108:25,
1109:19, 1109:21, 1109:23,
1109:25, 1110:4, 1110:10,
1138:20, 1149:11, 1151:21,
1170:7
  **columns** [4] - 1109:14,
1110:19, 1146:19, 1172:9
  **combination** [1] - 1120:9

  **combine** [2] - 1129:12, 1147:20
  **combined** [2] - 1144:3, 1145:7
  **combining** [1] - 1141:23
  **coming** [4] - 1187:7, 1189:1,
1189:4, 1212:11
  **commercial** [15] - 1115:21,
1119:6, 1125:2, 1140:3,
1176:12, 1176:20, 1176:23,
1205:19, 1208:1, 1208:6,
1208:8, 1208:11, 1208:15,
1221:9, 1221:14
  **commercially** [1] - 1221:19
  **commitment** [1] - 1200:20
  **Committee** [1] - 1161:20
  **commodities** [1] - 1181:17
  **common** [4] - 1136:21, 1152:8,
1175:5, 1183:4
  **commonly** [1] - 1163:9
  **community** [2] - 1180:25,
1200:8
  **companies** [70] - 1104:12,
1104:16, 1104:25, 1105:4,
1105:9, 1105:13, 1105:21,
1105:24, 1105:25, 1106:1,
1106:4, 1106:5, 1106:6,
1106:11, 1106:16, 1106:17,
1106:19, 1107:3, 1108:1,
1108:2, 1108:13, 1108:25,
1110:11, 1115:25, 1116:7,
1116:18, 1120:25, 1122:11,
1125:4, 1134:15, 1134:18,
1134:21, 1134:25, 1135:2,
1136:4, 1136:9, 1136:12,
1136:13, 1136:14, 1137:11,
1137:12, 1137:13, 1138:21,
1139:14, 1139:16, 1139:21,
1151:17, 1154:19, 1160:2,
1173:2, 1173:4, 1174:14,
1174:25, 1175:5, 1175:9,
1181:4, 1183:11, 1189:12,
1190:4, 1190:15, 1196:12,
1208:19, 1213:16, 1217:6,
1217:21, 1218:6
  **companies'** [2] - 1122:15,
1154:21
  **company** [35] - 1101:22,
1102:1, 1102:11, 1104:22,
1105:19, 1105:20, 1117:10,
1122:24, 1123:24, 1129:7,
1138:6, 1138:8, 1138:11,
1138:24, 1139:11, 1139:13,
1139:18, 1139:23, 1143:12,
1143:15, 1153:20, 1158:2,
1161:10, 1187:6, 1189:8,
1199:10, 1200:18, 1201:8,
1202:16, 1205:1, 1206:19,
1210:23, 1215:15
  **company-by-company** [2] -
1139:18, 1139:23
  **compare** [5] - 1127:14, 1137:1,

1153:25, 1173:15, 1209:17
**compared** [3] - 1130:9, 1149:14, 1152:23
**compares** [2] - 1127:5, 1204:9
**comparing** [2] - 1126:17, 1147:16
**comparison** [1] - 1151:14
**compete** [15] - 1124:24, 1125:8, 1129:8, 1175:24, 1189:11, 1202:22, 1205:2, 1205:13, 1205:17, 1205:23, 1205:25, 1206:13, 1206:25, 1208:20, 1221:22
**competes** [7] - 1123:18, 1123:20, 1123:21, 1205:1, 1207:1, 1209:1, 1221:19
**competing** [12] - 1123:24, 1124:14, 1124:20, 1125:1, 1168:23, 1169:2, 1169:9, 1196:17, 1207:11, 1208:6, 1213:9, 1218:4
**competition** [23] - 1097:24, 1098:14, 1098:18, 1124:8, 1124:12, 1124:18, 1133:24, 1140:12, 1140:21, 1141:5, 1141:12, 1142:4, 1145:9, 1152:24, 1169:6, 1174:3, 1174:5, 1174:11, 1184:25, 1193:16, 1207:2, 1223:16, 1223:17
**competitions** [4] - 1147:16, 1148:15, 1151:7, 1151:9
**competitive** [11] - 1098:11, 1133:12, 1133:18, 1142:20, 1185:15, 1186:12, 1188:13, 1188:15, 1188:16, 1189:20, 1200:17
**competitiveness** [2] - 1172:16, 1204:24
**competitor** [11] - 1154:4, 1169:1, 1173:6, 1174:17, 1190:25, 1197:1, 1197:3, 1198:2, 1198:8, 1198:14, 1202:17
**competitor's** [1] - 1203:15
**competitors** [18] - 1097:23, 1144:4, 1144:5, 1144:11, 1150:6, 1155:4, 1168:4, 1168:17, 1169:11, 1186:4, 1189:12, 1193:17, 1196:8, 1199:2, 1199:12, 1200:17, 1202:22, 1213:8
**competitors'** [1] - 1215:1
**compiled** [3] - 1156:25, 1203:13, 1204:9
**compiling** [1] - 1153:10
**complaint** [1] - 1132:3
**complete** [3] - 1145:8, 1149:17, 1224:7
**completely** [2] - 1124:10,

1155:12
**completing** [1] - 1207:20
**complex** [1] - 1171:14
**components** [1] - 1181:22
**compute** [1] - 1146:24
**computer** [3] - 1106:4, 1108:2, 1111:10
**concede** [2] - 1111:8, 1154:4
**concentrated** [1] - 1184:4
**concentration** [1] - 1169:15
**conceptual** [1] - 1133:3
**concern** [1] - 1166:22
**concerns** [3] - 1163:11, 1167:6, 1167:8
**concierge** [1] - 1098:17
**conclude** [3] - 1134:8, 1165:4, 1212:19
**concluded** [1] - 1167:11
**concludes** [1] - 1210:21
**conclusion** [1] - 1143:17
**conclusions** [2] - 1096:10, 1165:3
**concrete** [1] - 1200:19
**condition** [2] - 1144:14, 1145:15
**conditioning** [1] - 1146:17
**conduit** [2] - 1181:1, 1213:8
**confidential** [10] - 1104:5, 1108:18, 1127:4, 1127:7, 1130:18, 1137:24, 1172:3, 1176:7, 1176:9, 1220:20
**confirm** [1] - 1111:15
**Connecticut** [1] - 1163:3
**connection** [1] - 1142:23
**connects** [1] - 1112:11
**consider** [4] - 1112:3, 1131:19, 1160:22, 1197:21
**consideration** [1] - 1218:2
**considered** [3] - 1151:3, 1172:19, 1197:6
**considering** [2] - 1190:3, 1190:18
**consistency** [3] - 1219:2, 1222:9, 1222:11
**consistent** [8] - 1187:9, 1195:19, 1201:1, 1211:6, 1211:15, 1218:23, 1219:1, 1222:13
**consortium** [2] - 1204:22, 1219:3
**Consortium** [21] - 1161:20, 1216:23, 1217:1, 1217:3, 1217:8, 1217:12, 1217:16, 1217:17, 1217:18, 1217:20, 1217:21, 1218:3, 1218:9, 1219:4, 1219:21, 1219:25, 1220:6, 1220:12, 1222:4, 1222:10, 1222:15
**Consortium's** [1] - 1217:15
**consternation** [3] - 1206:17,

1206:22, 1208:23
**constitute** [3] - 1098:11, 1098:18, 1183:11
**constitutes** [1] - 1224:6
**Constitution** [2] - 1095:11, 1224:14
**constrained** [1] - 1112:6
**consultant** [7] - 1117:21, 1212:2, 1214:1, 1214:5, 1214:14, 1214:22, 1219:4
**consultants** [18] - 1189:22, 1190:4, 1203:2, 1204:3, 1210:18, 1211:8, 1211:17, 1212:6, 1212:18, 1212:20, 1213:7, 1213:9, 1213:18, 1214:2, 1214:9, 1217:25, 1218:2, 1220:14
**consulting** [3] - 1180:25, 1212:16, 1213:13
**consumed** [1] - 1181:17
**consumer** [7] - 1097:12, 1196:13, 1201:12, 1207:11, 1207:15, 1208:10, 1221:3
**Consumer** [1] - 1094:21
**consumer-facing** [1] - 1208:10
**consumers** [3] - 1129:14, 1141:21, 1174:17
**contain** [1] - 1164:10
**contained** [1] - 1115:16
**contains** [1] - 1155:16
**context** [5] - 1142:8, 1165:10, 1165:13, 1167:9, 1174:18
**contiguous** [1] - 1098:8
**continually** [1] - 1187:21
**continue** [4] - 1150:25, 1188:17, 1206:13, 1207:2
**continuing** [1] - 1182:20
**contract** [5] - 1145:25, 1156:5, 1156:21, 1219:15, 1221:18
**contracting** [13] - 1098:16, 1183:25, 1187:2, 1188:10, 1190:13, 1190:16, 1190:19, 1190:22, 1190:24, 1191:3, 1192:17, 1192:19, 1195:2
**contracts** [2] - 1191:2, 1219:14
**contradiction** [1] - 1164:5
**contrary** [1] - 1169:3
**contrast** [1] - 1209:17
**conversation** [1] - 1172:17
**conversations** [2] - 1203:2, 1204:1
**Cooperative** [1] - 1157:21
**coordination** [3] - 1098:1, 1218:4, 1218:6, 1220:13
**copy** [2] - 1107:15, 1119:21
**core** [4] - 1195:24, 1196:1, 1202:9, 1202:10
**corner** [2] - 1171:24, 1172:7
**corporate** [1] - 1204:8
**Corporation** [4] - 1094:7,

1095:5, 1157:9, 1157:24
**corporation** [1] - 1155:18
**correct** [243] - 1101:20,
1101:24, 1101:25, 1102:13,
1102:22, 1102:23, 1102:25,
1103:11, 1103:24, 1103:25,
1104:13, 1104:14, 1104:23,
1106:6, 1106:7, 1106:21,
1106:25, 1107:1, 1107:4,
1107:8, 1107:24, 1107:25,
1108:8, 1108:13, 1108:14,
1109:4, 1110:8, 1110:9,
1110:17, 1110:18, 1110:22,
1110:24, 1113:18, 1113:25,
1114:5, 1114:6, 1114:8, 1114:9,
1114:16, 1114:17, 1114:23,
1115:2, 1115:4, 1115:8,
1115:19, 1115:22, 1115:23,
1115:25, 1116:20, 1116:23,
1116:24, 1117:1, 1117:2,
1117:11, 1117:12, 1117:16,
1117:25, 1119:8, 1119:15,
1120:1, 1120:5, 1120:9,
1120:10, 1120:12, 1121:3,
1121:4, 1121:8, 1121:14,
1122:1, 1122:17, 1122:25,
1123:3, 1123:4, 1123:19,
1124:2, 1124:3, 1124:13,
1125:4, 1125:5, 1125:10,
1125:17, 1125:18, 1125:20,
1125:21, 1125:24, 1126:23,
1127:14, 1128:7, 1128:20,
1128:21, 1128:23, 1129:2,
1129:3, 1129:5, 1129:9,
1129:10, 1130:10, 1131:12,
1131:20, 1131:21, 1131:22,
1131:23, 1132:4, 1132:16,
1132:18, 1132:20, 1132:24,
1133:9, 1133:20, 1134:3,
1134:22, 1135:4, 1135:7,
1136:6, 1136:22, 1136:23,
1138:16, 1138:17, 1138:22,
1138:24, 1139:7, 1139:17,
1139:22, 1139:23, 1141:11,
1141:21, 1142:18, 1142:19,
1142:23, 1143:5, 1143:6,
1143:9, 1143:16, 1144:11,
1144:25, 1145:20, 1145:22,
1146:16, 1146:17, 1146:25,
1147:11, 1147:18, 1147:22,
1147:24, 1147:25, 1148:10,
1148:12, 1148:13, 1148:16,
1148:20, 1149:1, 1149:2,
1149:4, 1149:7, 1149:13,
1150:20, 1150:22, 1151:3,
1151:4, 1151:18, 1152:21,
1152:24, 1153:13, 1153:21,
1153:23, 1154:2, 1157:16,
1158:3, 1158:7, 1158:8,
1158:23, 1159:3, 1159:5,
1159:7, 1159:13, 1159:14,

1159:17, 1159:18, 1160:3,
1160:6, 1160:9, 1160:11,
1160:25, 1161:3, 1161:13,
1161:17, 1161:18, 1161:23,
1162:19, 1162:22, 1162:24,
1163:2, 1163:5, 1164:8,
1164:12, 1164:22, 1164:23,
1165:1, 1165:19, 1166:11,
1176:22, 1177:17, 1178:25,
1179:13, 1179:17, 1185:11,
1185:13, 1185:14, 1188:11,
1191:22, 1191:24, 1192:15,
1192:18, 1193:14, 1196:25,
1197:14, 1202:2, 1205:15,
1205:16, 1206:24, 1208:17,
1209:8, 1209:12, 1212:19,
1213:1, 1214:7, 1214:16,
1215:8, 1215:21, 1215:24,
1216:6, 1216:9, 1216:15,
1217:10, 1217:11, 1218:22,
1218:25, 1219:13, 1219:19,
1221:2, 1221:13, 1221:24,
1222:17
**Correct** [1] - 1132:21
**correctly** [3] - 1124:9, 1179:4,
1179:10
**cost** [17] - 1097:12, 1158:14,
1158:15, 1158:18, 1159:3,
1159:4, 1179:15, 1179:21,
1180:3, 1182:18, 1193:22,
1195:3, 1195:7, 1195:14,
1201:5, 1213:22, 1218:14
**costs** [18] - 1179:20, 1180:7,
1180:13, 1180:18, 1180:22,
1181:15, 1181:20, 1182:19,
1184:4, 1185:7, 1189:24,
1193:19, 1195:17, 1196:5,
1202:11, 1219:15, 1219:16,
1222:8
**counsel** [1] - 1176:6
**count** [1] - 1096:9
**counter** [1] - 1199:2
**counties** [1] - 1206:1
**country** [2] - 1115:25, 1206:19
**couple** [5] - 1137:21, 1157:5,
1179:8, 1183:7, 1185:10
**course** [7] - 1122:23, 1144:12,
1154:18, 1169:3, 1172:24,
1174:5, 1223:11
**Court** [9] - 1095:10, 1095:10,
1104:8, 1115:6, 1146:6, 1146:9,
1156:13, 1223:10, 1224:13
**COURT** [102] - 1094:1, 1096:6,
1096:16, 1097:5, 1108:20,
1111:17, 1111:21, 1112:7,
1112:17, 1112:22, 1112:25,
1113:2, 1113:4, 1117:14,
1117:17, 1118:11, 1118:14,
1118:23, 1121:16, 1121:25,
1122:2, 1127:23, 1128:1,

1128:4, 1129:19, 1130:11,
1130:20, 1130:22, 1136:1,
1137:4, 1137:7, 1137:14,
1140:23, 1141:1, 1141:4,
1141:7, 1141:22, 1144:18,
1149:19, 1154:11, 1154:17,
1154:21, 1154:25, 1155:14,
1162:11, 1162:15, 1165:14,
1165:21, 1165:25, 1167:16,
1167:21, 1169:18, 1169:24,
1171:18, 1177:16, 1177:21,
1177:24, 1178:6, 1178:8,
1178:13, 1178:18, 1181:2,
1181:9, 1181:11, 1187:3,
1188:17, 1188:23, 1191:3,
1191:20, 1194:8, 1194:17,
1195:12, 1197:21, 1198:19,
1198:24, 1203:20, 1205:12,
1206:2, 1206:11, 1207:4,
1207:16, 1208:1, 1209:4,
1210:22, 1211:18, 1213:2,
1213:12, 1213:20, 1216:7,
1218:12, 1218:20, 1218:23,
1219:9, 1219:17, 1220:18,
1220:22, 1221:1, 1222:1,
1222:19, 1223:3, 1223:14,
1224:2
**court** [3] - 1122:7, 1138:5,
1177:6
**Courthouse** [1] - 1095:11
**courtroom** [1] - 1137:25
**COURTROOM** [1] - 1096:2
**Coventry** [1] - 1157:20
**covered** [9] - 1108:11, 1120:19,
1132:13, 1135:24, 1136:1,
1156:4, 1156:20, 1157:10,
1159:20
**CPI** [1] - 1179:21
**create** [5] - 1121:13, 1186:24,
1187:14, 1194:3, 1194:5
**created** [4] - 1191:2, 1206:7,
1211:14, 1216:3
**creative** [7] - 1186:2, 1188:25,
1189:21, 1198:22, 1199:22,
1201:14, 1213:20
**creatively** [2] - 1183:25, 1200:5
**creativity** [3] - 1189:6, 1201:17,
1210:15
**crescendoed** [1] - 1179:24
**critical** [1] - 1130:7
**cross** [7] - 1100:25, 1101:2,
1101:4, 1113:13, 1171:21,
1174:21, 1211:19
**Cross** [13] - 1124:14, 1129:2,
1148:15, 1157:22, 1204:20,
1205:4, 1205:19, 1205:24,
1207:12, 1207:13, 1215:25,
1218:6, 1221:3
**CROSS** [2] - 1101:13, 1211:21
**cross-examination** [1] -

1211:19
**CROSS-EXAMINATION** [2] - 1101:13, 1211:21
**cross-reference** [1] - 1113:13
**Cross/Blue** [15] - 1102:8, 1120:4, 1121:2, 1135:21, 1136:5, 1157:20, 1194:15, 1204:22, 1209:7, 1209:11, 1209:19, 1217:4, 1217:9, 1217:13, 1220:7
**CRR** [2] - 1095:10, 1224:13
**CT** [1] - 1115:14
**cull** [1] - 1123:9
**cull-out** [1] - 1123:9
**CURRAN** [22] - 1178:10, 1178:17, 1178:20, 1181:7, 1181:12, 1187:15, 1189:25, 1191:25, 1194:24, 1195:22, 1197:25, 1199:18, 1204:12, 1207:17, 1208:13, 1209:5, 1210:20, 1222:3, 1222:18, 1222:23, 1223:8, 1223:23
**Curran** [2] - 1095:1, 1211:23
**current** [3] - 1166:17, 1190:5, 1215:22
**custom** [5] - 1183:25, 1184:2, 1185:22, 1189:9, 1213:10
**customer** [23] - 1104:15, 1135:5, 1135:6, 1135:19, 1136:7, 1136:15, 1136:17, 1139:4, 1142:25, 1148:6, 1150:19, 1169:3, 1179:7, 1179:16, 1190:2, 1191:13, 1192:4, 1192:12, 1196:15, 1196:24, 1212:2, 1212:3, 1212:4
**customer's** [1] - 1168:24
**customers** [59] - 1101:19, 1102:17, 1104:24, 1134:20, 1136:18, 1137:5, 1143:7, 1148:25, 1150:18, 1153:20, 1153:21, 1179:3, 1179:5, 1179:11, 1179:12, 1179:15, 1179:19, 1179:22, 1181:18, 1184:15, 1184:22, 1186:1, 1186:19, 1187:10, 1187:11, 1190:23, 1192:17, 1192:19, 1192:20, 1192:21, 1192:22, 1192:23, 1196:19, 1197:8, 1198:11, 1199:13, 1199:16, 1200:23, 1204:4, 1205:8, 1205:21, 1210:1, 1210:3, 1210:9, 1210:18, 1211:9, 1211:11, 1211:16, 1212:10, 1212:12, 1213:8, 1213:9, 1213:19, 1214:18, 1214:19, 1214:21, 1215:2
**customers'** [1] - 1135:1
**cut** [1] - 1213:3
**cycle** [5] - 1186:21, 1215:23, 1216:11, 1216:15, 1216:19

**D**

**D.C** [1] - 1224:15
**dampening** [1] - 1187:14
**Data** [3] - 1162:6, 1162:7, 1164:24
**data** [55] - 1101:15, 1103:5, 1103:23, 1103:24, 1104:5, 1104:17, 1107:6, 1110:12, 1112:15, 1115:1, 1135:1, 1137:24, 1138:18, 1139:15, 1139:16, 1139:20, 1140:2, 1144:22, 1145:7, 1147:16, 1147:19, 1148:14, 1148:23, 1149:16, 1149:17, 1150:1, 1150:2, 1150:14, 1151:25, 1152:25, 1153:11, 1154:17, 1158:5, 1158:6, 1158:8, 1165:5, 1165:8, 1165:18, 1165:24, 1166:20, 1166:21, 1167:3, 1167:4, 1167:11, 1167:12, 1172:23, 1173:3, 1173:8, 1173:12, 1175:1, 1175:13, 1175:20, 1203:24, 1218:1
**data's** [2] - 1165:25, 1166:1
**database** [3] - 1139:6, 1150:11, 1150:18
**Dated** [1] - 1224:9
**dates** [2] - 1103:10, 1103:12
**day-to-day** [1] - 1208:21
**DC** [5] - 1094:5, 1094:18, 1095:4, 1095:8, 1095:12
**DDX** [3] - 1112:23, 1148:19, 1171:4
**DDX1** [3] - 1112:16, 1112:21, 1113:9
**DDX11** [1] - 1127:5
**DDX2** [2] - 1108:18, 1170:4
**DDX4** [2] - 1133:3, 1133:4
**DDX6** [1] - 1119:17
**DDX7** [1] - 1156:25
**deal** [4] - 1098:21, 1099:4, 1180:22, 1181:14
**dealing** [2] - 1209:18, 1209:20
**deals** [2] - 1118:12, 1118:15
**December** [1] - 1103:10
**decide** [1] - 1099:14
**deciding** [1] - 1214:5
**decision** [5] - 1096:24, 1211:7, 1211:10, 1212:24
**decisions** [2] - 1188:4, 1188:5
**deck** [2] - 1108:10, 1151:13
**decline** [2] - 1113:25, 1203:19
**decrease** [1] - 1213:22
**deductible** [1] - 1181:22
**DEFENDANT** [1] - 1154:20
**Defendant** [1] - 1095:1
**Defendant's** [2] - 1112:24, 1170:4
**defendants** [1] - 1096:12

**Defendants** [1] - 1094:8
**defense** [3] - 1097:8, 1099:1, 1178:8
**define** [2] - 1098:5, 1119:11
**defined** [2] - 1182:5, 1182:6
**definitely** [2] - 1174:12, 1223:6
**definition** [8] - 1113:22, 1120:7, 1120:14, 1133:11, 1133:12, 1134:2, 1134:6, 1153:6
**definitions** [5] - 1097:14, 1097:16, 1097:17, 1134:5, 1211:15
**degree** [2] - 1187:13, 1206:21
**delighted** [1] - 1177:11
**delivered** [1] - 1219:13
**delivers** [1] - 1183:5
**delivery** [1] - 1201:4
**delta** [1] - 1169:16
**demand** [1] - 1171:13
**demanded** [1] - 1222:9
**Demonstrative** [1] - 1112:24
**demonstrative** [3] - 1107:19, 1113:2, 1156:25
**demonstratives** [2] - 1107:11, 1112:25
**denominator** [20] - 1108:6, 1108:7, 1113:18, 1113:20, 1114:4, 1114:8, 1114:14, 1114:22, 1115:3, 1115:4, 1115:7, 1115:17, 1116:20, 1116:25, 1117:4, 1117:11, 1126:15, 1166:4, 1170:20
**denominators** [5] - 1109:13, 1112:19, 1117:8, 1166:10, 1166:13
**Denver** [1] - 1094:22
**DEPARTMENT** [1] - 1094:16
**Department** [5] - 1103:9, 1155:20, 1157:5, 1157:24, 1216:16
**depicted** [2] - 1154:25, 1177:13
**Deposition** [1] - 1106:9
**deposition** [11] - 1104:11, 1105:12, 1105:15, 1106:12, 1120:19, 1135:24, 1138:3, 1142:22, 1143:12, 1164:15, 1164:19
**depth** [3] - 1099:12, 1100:7, 1171:8
**DEPUTY** [1] - 1096:2
**derived** [2] - 1144:19, 1154:18
**describe** [5] - 1121:1, 1166:21, 1172:11, 1185:25, 1204:17
**described** [2] - 1100:18, 1168:16
**describing** [1] - 1194:20
**description** [1] - 1098:19
**designed** [2] - 1196:14, 1200:25
**designs** [1] - 1183:23

**desires** [1] - 1097:1
**desk** [1] - 1123:8
**detail** [2] - 1102:15, 1223:13
**details** [1] - 1223:10
**detect** [1] - 1166:20
**determined** [3] - 1200:1, 1211:5, 1219:13
**determining** [1] - 1214:7
**development** [2] - 1098:12, 1201:2
**devoted** [1] - 1097:21
**diagram** [1] - 1133:3
**Dickman** [2] - 1095:10, 1224:13
**DICKMAN** [1] - 1224:5
**dictate** [1] - 1214:3
**differ** [1] - 1210:17
**difference** [2] - 1191:4, 1209:23
**different** [31] - 1098:5, 1099:4, 1107:21, 1108:6, 1108:11, 1111:9, 1116:7, 1131:3, 1141:16, 1153:6, 1157:19, 1163:20, 1166:23, 1166:24, 1168:23, 1172:11, 1182:1, 1183:7, 1189:6, 1191:19, 1194:4, 1195:21, 1199:8, 1199:11, 1200:4, 1204:23, 1205:6, 1205:8, 1217:8, 1218:1
**differently** [1] - 1098:6
**difficult** [2] - 1165:17, 1166:20
**direct** [47] - 1098:16, 1102:21, 1105:11, 1107:11, 1115:10, 1117:20, 1121:4, 1121:9, 1122:19, 1123:2, 1123:5, 1126:24, 1129:11, 1130:1, 1133:17, 1135:13, 1136:24, 1139:25, 1140:17, 1144:13, 1144:17, 1145:15, 1155:25, 1158:19, 1160:13, 1162:8, 1171:6, 1183:25, 1187:2, 1188:10, 1190:13, 1190:16, 1190:18, 1190:22, 1190:24, 1191:2, 1191:3, 1192:17, 1192:18, 1195:2, 1210:21, 1214:18, 1215:15, 1216:14, 1216:22, 1221:8, 1222:22
**DIRECT** [1] - 1178:19
**directing** [9] - 1106:24, 1108:9, 1111:1, 1116:2, 1123:9, 1138:2, 1143:25, 1147:13, 1151:12
**directions** [1] - 1111:11
**directly** [4] - 1124:23, 1174:20, 1192:10, 1205:23
**directors** [2] - 1216:25, 1220:2
**directs** [1] - 1112:5
**disagree** [1] - 1213:24
**discern** [1] - 1184:25
**discerned** [1] - 1179:18
**discernible** [1] - 1209:23
**discerning** [2] - 1193:16, 1210:13

**discharge** [1] - 1165:8
**disclose** [1] - 1168:10
**discovered** [1] - 1181:4
**discrepancy** [1] - 1170:24
**discrete** [1] - 1181:25
**discrimination** [1] - 1133:7
**discuss** [3] - 1124:3, 1161:16, 1168:13
**discussed** [6] - 1114:11, 1124:2, 1125:13, 1145:15, 1170:25, 1172:18
**discussion** [8] - 1123:23, 1131:22, 1141:25, 1164:14, 1164:15, 1172:23, 1190:21, 1210:23
**discussions** [1] - 1211:3
**disintermediating** [1] - 1189:14
**dispersed** [1] - 1134:9
**disposed** [1] - 1122:25
**dispute** [2] - 1192:2, 1196:3
**disputed** [1] - 1192:2
**distinct** [2] - 1179:3, 1210:1, 1221:3
**distinguish** [1] - 1208:14
**distinguishing** [1] - 1208:18
**distracting** [2] - 1130:24, 1131:4
**distribution** [1] - 1191:14
**DISTRICT** [3] - 1094:1, 1094:1, 1094:11
**diverse** [1] - 1180:10
**diversion** [10] - 1146:20, 1146:23, 1147:3, 1148:8, 1148:14, 1150:16, 1154:1, 1159:13, 1159:15
**diversions** [2] - 1149:5, 1173:15
**divided** [2] - 1114:3, 1149:12
**division** [6] - 1102:12, 1107:2, 1107:5, 1122:14, 1198:20, 1218:8
**Division** [1] - 1094:17
**document** [17] - 1104:7, 1104:11, 1104:15, 1104:16, 1113:9, 1113:11, 1113:13, 1118:8, 1119:12, 1119:14, 1128:10, 1154:12, 1155:13, 1165:13, 1171:4, 1172:15
**documents** [2] - 1118:6, 1143:18
**dominant** [1] - 1174:15
**done** [9] - 1137:20, 1138:13, 1145:6, 1145:21, 1164:22, 1167:2, 1190:16, 1190:18, 1199:22
**doubled** [3] - 1176:17, 1176:19, 1203:7
**doubt** [2] - 1138:25, 1139:2, 1156:8
**down** [10] - 1101:11, 1130:14,

1149:19, 1172:9, 1175:8, 1177:21, 1181:2, 1206:3, 1215:1, 1222:19
**Dr** [36] - 1097:11, 1097:15, 1097:16, 1099:7, 1101:15, 1104:4, 1104:11, 1112:11, 1112:19, 1115:13, 1115:20, 1116:5, 1117:19, 1117:20, 1119:5, 1119:20, 1120:3, 1126:4, 1128:7, 1131:25, 1132:2, 1137:17, 1140:2, 1143:19, 1144:24, 1144:25, 1146:11, 1148:18, 1149:22, 1154:9, 1155:16, 1156:2, 1158:13, 1162:8, 1164:24, 1177:6
**draft** [2] - 1214:1, 1214:2
**Dranove** [35] - 1101:15, 1104:4, 1104:11, 1107:12, 1109:18, 1112:11, 1112:19, 1115:13, 1115:20, 1116:5, 1117:19, 1117:20, 1119:5, 1119:20, 1120:3, 1126:4, 1128:7, 1131:25, 1132:2, 1137:17, 1140:2, 1143:19, 1144:24, 1144:25, 1146:8, 1146:11, 1148:18, 1149:22, 1154:9, 1155:16, 1156:2, 1158:13, 1162:8, 1164:24, 1168:1
**driving** [1] - 1180:5
**drop** [2] - 1114:7, 1149:19
**dropped** [2] - 1149:25, 1150:2
**due** [1] - 1161:12
**duly** [1] - 1178:15
**during** [7] - 1164:15, 1166:15, 1176:24, 1177:2, 1215:13, 1215:23, 1221:7
**duties** [1] - 1215:16
**DX228** [4] - 1118:7, 1119:5, 1171:4, 1171:20
**DX232** [2] - 1140:13, 1140:17

# E

**easier** [1] - 1123:10
**economic** [6] - 1120:8, 1120:15, 1120:16, 1184:21, 1188:8
**economically** [8] - 1182:3, 1182:22, 1183:3, 1183:6, 1185:6, 1186:25, 1193:24, 1202:8
**economics** [2] - 1194:6, 1195:19
**economists** [1] - 1101:2
**effect** [3] - 1124:17, 1129:13, 1176:24
**effective** [2] - 1197:8, 1220:13
**effects** [4] - 1133:13, 1133:18, 1133:25, 1142:20

**effort** [2] - 1167:4, 1206:6
**efforts** [4] - 1130:23, 1184:4, 1206:3, 1206:9
**eight** [2] - 1103:14, 1157:19
**either** [9] - 1099:3, 1107:20, 1136:13, 1139:15, 1143:5, 1150:8, 1154:19, 1190:18, 1213:21
**elaborate** [4] - 1100:18, 1165:15, 1166:15, 1196:8
**elaboration** [1] - 1100:17
**elect** [1] - 1101:24
**Electric** [1] - 1139:12
**elegant** [1] - 1181:25
**elicit** [2] - 1100:1, 1100:4
**eligible** [2] - 1153:4, 1159:22
**eliminate** [1] - 1182:23
**elsewhere** [1] - 1119:12
**Emblem** [2] - 1106:25, 1115:13
**emergence** [1] - 1200:16
**emerging** [2] - 1196:10, 1196:16
**Empirical** [1] - 1164:25
**employees** [12] - 1101:23, 1106:6, 1133:20, 1153:4, 1153:8, 1159:22, 1162:18, 1163:7, 1181:18, 1184:5, 1184:23, 1201:16
**Employer** [1] - 1162:6
**employer** [23] - 1101:19, 1102:17, 1107:3, 1134:19, 1136:21, 1139:22, 1148:6, 1150:21, 1150:22, 1182:22, 1183:2, 1184:2, 1184:23, 1185:22, 1188:5, 1191:18, 1192:7, 1192:9, 1194:7, 1195:3, 1201:9, 1214:3
**employers** [38] - 1118:16, 1125:8, 1130:1, 1133:9, 1133:20, 1134:3, 1137:10, 1171:10, 1171:11, 1173:23, 1180:6, 1180:15, 1180:21, 1181:14, 1181:25, 1182:7, 1182:10, 1182:15, 1183:8, 1183:20, 1183:24, 1185:24, 1188:21, 1189:10, 1189:22, 1190:10, 1190:22, 1193:21, 1194:5, 1195:5, 1197:6, 1198:23, 1200:3, 1210:25, 1211:24, 1213:10, 1219:2
**empty** [1] - 1151:2
**enable** [1] - 1201:3
**enabled** [3] - 1192:5, 1192:13, 1198:22
**enablement** [1] - 1201:5
**encountered** [1] - 1181:8
**encourage** [2] - 1100:15, 1100:24
**end** [5] - 1156:4, 1156:20, 1156:21, 1157:10, 1214:3

**ended** [1] - 1117:7
**energy** [1] - 1180:1
**enforced** [1] - 1202:9
**engage** [1] - 1199:19
**engaged** [2] - 1190:24, 1192:10
**engagement** [2] - 1189:12, 1196:13
**engages** [1] - 1199:21
**enormous** [1] - 1167:22
**enroll** [2] - 1163:16, 1163:17
**enrollees** [7] - 1107:4, 1108:3, 1113:17, 1118:19, 1122:15, 1137:10, 1148:7
**enrollment** [16] - 1107:24, 1109:7, 1109:9, 1109:10, 1109:11, 1110:11, 1115:17, 1140:3, 1170:8, 1174:3, 1175:1, 1176:17, 1198:12, 1202:20, 1203:5
**enrollments** [3] - 1136:17, 1139:19, 1176:3
**ensuing** [1] - 1216:17
**enter** [1] - 1184:1
**entire** [9] - 1118:2, 1118:3, 1118:5, 1118:12, 1118:15, 1121:16, 1130:15, 1191:8, 1216:21
**entirety** [3] - 1184:11, 1199:24, 1214:20
**entities** [5] - 1105:3, 1196:13, 1196:14, 1212:9
**entitled** [3] - 1100:13, 1104:17, 1164:24
**entity** [1] - 1190:24
**entrances** [1] - 1191:1
**entrants** [3] - 1186:3, 1196:10, 1196:16
**entries** [5] - 1115:14, 1157:5, 1157:7, 1163:2, 1175:3
**entry** [1] - 1138:6
**episodic** [1] - 1180:14
**equal** [2] - 1186:1, 1195:17
**equity** [1] - 1121:1
**error** [1] - 1170:7
**escalating** [4] - 1179:21, 1180:7, 1180:22, 1181:14
**especially** [1] - 1171:10
**essentially** [2] - 1164:2, 1168:21
**establishing** [1] - 1213:4
**estimate** [7] - 1109:17, 1110:24, 1115:7, 1119:8, 1119:10, 1159:9, 1222:20
**estimated** [2] - 1117:24, 1153:3
**et** [5] - 1094:3, 1096:3, 1154:23, 1158:21, 1192:13
**evaluate** [1] - 1123:2
**event** [1] - 1183:19
**evidence** [4] - 1112:4, 1164:20, 1220:19, 1220:20

**exacerbating** [1] - 1180:1
**exact** [3] - 1103:22, 1127:4, 1143:23
**exactly** [6] - 1125:14, 1153:14, 1154:24, 1162:14, 1222:5
**exam** [3] - 1112:12, 1133:17, 1154:10
**Examination** [1] - 1107:12
**examination** [11] - 1101:1, 1107:11, 1138:5, 1139:8, 1174:22, 1210:21, 1211:19, 1216:23, 1221:8, 1223:1, 1223:2
**EXAMINATION** [5] - 1101:13, 1167:24, 1178:19, 1211:21, 1222:2
**examine** [2] - 1139:5, 1158:8
**examined** [2] - 1158:6, 1178:16
**examining** [1] - 1101:5
**example** [8] - 1143:12, 1148:12, 1155:8, 1156:11, 1176:1, 1200:21, 1201:6, 1210:9
**examples** [3] - 1137:22, 1160:24, 1162:10
**exceed** [2] - 1133:23, 1134:11
**exceeded** [3] - 1110:23, 1114:15, 1115:7
**exceeding** [1] - 1177:11
**exceeds** [1] - 1154:1
**excellent** [1] - 1223:5
**Excellus** [1] - 1206:1
**exception** [1] - 1181:6
**exceptionally** [5] - 1180:16, 1188:15, 1198:16, 1202:6, 1218:8
**exceptions** [2] - 1125:13, 1205:22
**exchange** [6] - 1143:2, 1143:13, 1193:10, 1193:22, 1198:25, 1213:17
**exchanges** [19] - 1098:11, 1140:24, 1141:5, 1141:11, 1141:24, 1142:11, 1182:25, 1183:1, 1183:23, 1192:24, 1193:1, 1193:7, 1193:13, 1194:2, 1195:1, 1213:4, 1213:12, 1213:15
**exclude** [2] - 1121:19, 1147:8
**excluded** [1] - 1149:22
**excludes** [2] - 1121:21, 1121:22
**exclusive** [1] - 1125:12
**exclusively** [4] - 1097:19, 1188:25, 1191:18, 1214:22
**exclusivity** [2] - 1205:13, 1206:15
**excuse** [4] - 1116:14, 1144:16, 1146:7, 1171:11
**exhaustive** [1] - 1155:7
**exhibit** [10] - 1105:12, 1108:24, 1138:2, 1152:6, 1156:12, 1156:25, 1163:2, 1170:10,

1171:18, 1220:18
**Exhibit** [4] - 1106:9, 1145:23, 1146:7, 1170:4
**exhibited** [1] - 1165:7
**exhibits** [4] - 1112:23, 1134:12, 1134:14, 1148:20
**Exhibits** [1] - 1145:14
**exist** [3] - 1098:20, 1098:24, 1206:10
**existence** [2] - 1217:20, 1221:19
**existing** [7] - 1186:6, 1186:24, 1189:15, 1190:21, 1190:23, 1214:19, 1221:20
**exists** [1] - 1162:17
**exited** [1] - 1176:23
**expectation** [2] - 1096:17, 1173:2
**expectations** [1] - 1177:11
**expense** [3] - 1158:19, 1158:25, 1179:19
**experience** [7] - 1153:19, 1161:14, 1173:4, 1201:12, 1202:4, 1203:7, 1217:18
**expert** [8] - 1097:7, 1098:4, 1098:7, 1098:19, 1099:9, 1099:19, 1100:5, 1168:10
**experts** [7] - 1097:11, 1097:21, 1097:25, 1098:23, 1099:3, 1112:4, 1119:15
**explain** [4] - 1100:25, 1185:18, 1198:4, 1206:11
**explained** [2] - 1121:9, 1206:12
**explaining** [1] - 1223:5
**extent** [5] - 1124:15, 1124:19, 1145:8, 1149:17, 1173:9

## F

**face** [1] - 1208:14
**facing** [3] - 1207:12, 1208:10, 1221:3
**fact** [34] - 1096:10, 1097:14, 1097:15, 1097:17, 1098:7, 1098:23, 1102:24, 1124:22, 1141:10, 1141:17, 1162:11, 1168:7, 1180:23, 1183:19, 1183:24, 1184:11, 1185:24, 1186:14, 1187:8, 1187:22, 1188:19, 1190:18, 1197:6, 1199:13, 1202:13, 1205:18, 1207:19, 1211:4, 1212:5, 1213:9, 1217:12, 1221:14, 1223:18
**facts** [3] - 1098:4, 1111:18, 1220:20
**factual** [1] - 1099:12
**fair** [2] - 1114:2, 1127:12
**fairly** [1] - 1098:12
**familiar** [8] - 1102:8, 1105:1,

1143:22, 1155:19, 1161:14, 1161:15, 1161:19, 1190:14
**family** [1] - 1102:2
**far** [5] - 1120:11, 1157:9, 1179:21, 1187:9, 1199:12
**faring** [1] - 1202:24
**fashion** [1] - 1180:14
**fastest** [2] - 1181:5, 1181:7
**feat** [2] - 1200:8, 1200:9
**feature** [1] - 1119:14
**federal** [4] - 1140:19, 1142:2, 1142:5, 1142:6
**fee** [2] - 1179:12, 1192:1
**fees** [5] - 1179:14, 1191:23, 1222:13, 1222:16, 1222:17
**felt** [3] - 1143:15, 1164:21, 1215:16
**feverish** [1] - 1180:1
**few** [1] - 1207:18
**fewer** [1] - 1099:3
**field** [1] - 1151:2
**Fifth** [1] - 1094:17
**fifth** [1] - 1172:9
**figure** [8] - 1097:2, 1111:1, 1111:2, 1121:11, 1154:22, 1195:16, 1218:13, 1222:21
**filed** [2] - 1155:20, 1157:4
**files** [1] - 1101:20
**filing** [3] - 1155:17, 1157:8, 1157:23
**final** [3] - 1110:19, 1115:10, 1167:10
**finally** [4] - 1100:5, 1102:1, 1136:4, 1150:22
**findings** [1] - 1096:10
**fine** [2] - 1111:25, 1145:10
**firm** [2] - 1113:17, 1212:16
**firms** [6] - 1102:21, 1113:20, 1115:2, 1115:16, 1115:18, 1213:13
**firms'** [1] - 1114:7
**first** [31] - 1101:18, 1104:4, 1104:8, 1109:19, 1123:13, 1130:7, 1130:21, 1131:1, 1135:13, 1135:22, 1136:20, 1140:18, 1145:1, 1145:14, 1146:2, 1146:8, 1146:13, 1147:6, 1150:5, 1150:14, 1152:14, 1159:10, 1174:19, 1175:3, 1175:9, 1178:11, 1178:15, 1180:9, 1183:10, 1208:2, 1220:5
**fit** [2] - 1099:24, 1099:25
**Fitzgerald** [2] - 1094:14, 1096:7
**FITZGERALD** [5] - 1096:5, 1096:7, 1097:4, 1178:4, 1178:7
**five** [17] - 1104:12, 1115:6, 1115:9, 1134:15, 1134:21, 1135:17, 1137:13, 1137:20, 1138:13, 1139:16, 1167:10,

1173:21, 1174:2, 1187:12, 1187:16, 1187:22, 1216:1
**five-year** [2] - 1187:12, 1187:16
**fixed** [1] - 1179:14
**flat** [4] - 1140:7, 1203:6, 1203:19, 1204:15
**flexibility** [1] - 1189:5
**Florida** [3] - 1124:10, 1124:14, 1207:24
**focus** [3] - 1145:18, 1191:15, 1211:5
**focused** [3] - 1097:18, 1101:10, 1198:9
**focusing** [2] - 1145:2, 1201:5
**folks** [1] - 1205:10
**follow** [1] - 1183:9
**follow-up** [1] - 1183:9
**follows** [2] - 1165:3, 1178:16
**Footnote** [5] - 1149:20, 1152:19, 1152:22, 1153:4, 1153:7
**footnote** [2] - 1150:15, 1152:19
**footnotes** [2] - 1152:8, 1159:19, 1159:21, 1159:24
**footprint** [4] - 1109:9, 1185:3, 1199:15, 1205:22
**FOR** [1] - 1094:1
**for-profit** [2] - 1193:6, 1204:10
**force** [9] - 1151:21, 1154:17, 1154:19, 1155:2, 1185:15, 1186:12, 1190:6, 1192:20, 1203:24
**force's** [1] - 1166:1
**forces** [2] - 1189:21, 1189:22
**foregoing** [1] - 1224:6
**form** [4] - 1102:24, 1156:3, 1157:4, 1157:18
**Form** [2] - 1155:17, 1155:19
**formed** [3] - 1217:12, 1220:6, 1222:10
**formidable** [4] - 1185:6, 1197:23, 1198:8, 1202:21
**forth** [10] - 1105:22, 1106:22, 1109:4, 1136:6, 1138:22, 1159:23, 1192:3, 1194:23, 1205:7, 1210:16
**fortune** [1] - 1128:21
**Fortune** [9] - 1105:4, 1105:6, 1105:7, 1128:12, 1128:14, 1128:16, 1128:19, 1129:7, 1158:3
**forward** [1] - 1180:17
**forward-leaning** [1] - 1180:17
**Foundation** [1] - 1156:2
**founding** [1] - 1220:7
**four** [13] - 1109:13, 1114:13, 1132:2, 1132:15, 1132:22, 1133:8, 1133:19, 1134:2, 1134:10, 1144:5, 1159:20, 1162:10, 1201:7

**fourth** [3] - 1109:25, 1144:1, 1171:23
**Fowdur** [1] - 1097:16
**fraction** [2] - 1128:8, 1151:24
**free** [1] - 1154:8
**frequency** [2] - 1125:16, 1187:17
**frequent** [1] - 1173:23
**frequently** [2] - 1188:6, 1212:14
**fresh** [2] - 1189:19, 1200:17
**front** [7] - 1113:11, 1128:16, 1131:9, 1137:17, 1137:23, 1143:24, 1146:11
**frustrating** [1] - 1100:6
**fulfill** [1] - 1192:14
**full** [7] - 1127:17, 1127:19, 1178:21, 1186:8, 1196:23, 1196:25, 1224:7
**function** [4] - 1163:16, 1192:14, 1196:2, 1198:10
**functionalities** [1] - 1201:25
**functioning** [1] - 1201:5
**functions** [4] - 1192:4, 1192:5, 1192:6, 1192:12
**funded** [7] - 1160:13, 1160:18, 1160:19, 1160:25, 1161:2, 1161:6, 1161:8
**future** [1] - 1098:14

## G

**G-2** [7] - 1145:14, 1145:22, 1145:23, 1146:1, 1146:8, 1146:11, 1151:6
**G-4** [2] - 1151:22, 1152:9
**G-6** [2] - 1145:14, 1148:18
**G-8** [1] - 1153:15
**game** [1] - 1214:3
**gamut** [2] - 1189:10, 1193:10
**gaps** [1] - 1173:6
**Garrison** [1] - 1095:7
**General** [1] - 1139:12
**general** [11] - 1142:1, 1142:4, 1158:20, 1158:25, 1179:16, 1189:5, 1196:4, 1203:1, 1203:21, 1204:17, 1209:24
**GENERAL'S** [2] - 1094:21, 1094:24
**generally** [9] - 1101:16, 1175:24, 1179:13, 1180:9, 1181:1, 1188:3, 1203:5, 1207:9, 1209:22
**genesis** [2] - 1206:6, 1217:16
**geographic** [6] - 1098:9, 1131:12, 1131:17, 1131:19, 1170:21, 1205:16
**geographically** [2] - 1184:4, 1198:6
**geographies** [8] - 1185:8, 1194:16, 1197:12, 1205:11,

1207:1, 1207:3, 1208:9, 1211:12
**geography** [6] - 1182:3, 1182:4, 1182:23, 1183:17, 1191:16, 1194:13
**George** [1] - 1209:15
**Georgia** [12] - 1209:8, 1209:12, 1209:19, 1210:9, 1210:10, 1211:9, 1215:7, 1215:9, 1215:10, 1215:25, 1219:15, 1219:16
**Gibson** [1] - 1094:23
**GIDLEY** [56] - 1101:14, 1108:17, 1108:21, 1108:23, 1111:20, 1112:3, 1112:9, 1112:10, 1112:15, 1112:18, 1112:24, 1113:1, 1113:3, 1113:6, 1117:18, 1118:13, 1118:17, 1119:4, 1122:3, 1127:25, 1128:3, 1128:5, 1128:6, 1129:20, 1130:13, 1130:17, 1130:21, 1131:6, 1131:7, 1136:2, 1136:3, 1137:6, 1137:8, 1137:15, 1137:16, 1140:25, 1141:2, 1141:6, 1141:9, 1142:16, 1144:21, 1144:23, 1146:5, 1146:10, 1149:21, 1154:5, 1154:9, 1154:14, 1155:15, 1162:14, 1162:16, 1165:20, 1165:23, 1166:3, 1166:9, 1167:15
**Gidley** [3] - 1095:2, 1168:2, 1170:6
**given** [4] - 1126:2, 1138:18, 1139:20, 1196:9
**go-to-market** [4] - 1205:6, 1211:6, 1211:15, 1217:22
**goods** [2] - 1179:22, 1201:2
**gosh** [1] - 1156:15
**government** [18] - 1098:25, 1099:15, 1099:18, 1105:3, 1124:1, 1128:1, 1140:20, 1141:4, 1141:23, 1142:2, 1142:5, 1142:6, 1142:10, 1142:13, 1142:14, 1177:24, 1178:2, 1178:4
**government's** [2] - 1098:19, 1099:9
**granted** [2] - 1125:20, 1125:23
**granular** [3] - 1182:8, 1186:18, 1223:10
**great** [4] - 1098:21, 1144:3, 1163:10, 1165:6
**Great** [4] - 1161:10, 1161:11, 1161:14, 1161:16
**greater** [4] - 1153:3, 1153:8, 1173:15, 1195:18
**ground** [1] - 1160:6
**group** [11] - 1105:20, 1118:19, 1132:4, 1132:5, 1132:11, 1134:9, 1139:1, 1177:2,

1180:10, 1184:23, 1191:11
**Group** [2] - 1157:21, 1198:21
**groups** [1] - 1097:19
**growing** [2] - 1200:3, 1200:6
**grown** [1] - 1176:18
**growth** [4] - 1176:16, 1176:17, 1177:3
**guess** [3] - 1142:7, 1181:6, 1205:4
**guidelines** [1] - 1211:14

## H

**Haley** [6] - 1104:7, 1107:13, 1112:14, 1118:10, 1127:7, 1155:24
**half** [2] - 1175:8, 1210:2
**half-a-million** [1] - 1210:2
**Hampshire** [1] - 1163:3
**hand** [3] - 1112:14, 1153:16, 1171:24
**handed** [3] - 1155:16, 1219:8, 1219:24
**happy** [4] - 1108:18, 1111:25, 1119:13, 1120:20
**hard** [3] - 1099:14, 1142:10, 1211:1
**hardly** [1] - 1208:3
**harm** [1] - 1174:11
**Harvard** [5] - 1136:5, 1137:11, 1138:21, 1138:23, 1185:3
**Hauser** [1] - 1094:16
**Hawaii** [1] - 1157:22
**HCSC** [6] - 1128:22, 1129:4, 1147:23, 1148:6, 1148:11
**head** [5] - 1123:14, 1124:12, 1202:22
**head-to-head** [2] - 1124:12, 1202:22
**headquartered** [4] - 1128:19, 1129:8, 1148:7, 1199:16
**headquarters** [2] - 1125:8, 1128:12
**health** [61] - 1101:17, 1101:18, 1101:22, 1102:1, 1102:18, 1115:21, 1115:24, 1116:5, 1116:7, 1117:25, 1118:2, 1118:3, 1118:12, 1118:15, 1119:6, 1139:14, 1140:11, 1141:19, 1141:21, 1142:25, 1143:8, 1154:14, 1161:22, 1162:13, 1163:8, 1164:8, 1165:5, 1166:5, 1171:12, 1171:14, 1175:23, 1179:20, 1180:3, 1180:19, 1181:16, 1181:20, 1181:22, 1182:2, 1182:12, 1182:19, 1184:19, 1185:7, 1189:15, 1189:17, 1191:16, 1193:6, 1193:8, 1193:19, 1194:4, 1195:10,

1196:17, 1197:23, 1198:21,
1201:4, 1201:12, 1207:11,
1207:14, 1208:10, 1213:16,
1219:14, 1219:16

**Health** [28] - 1136:5, 1141:3,
1156:2, 1156:13, 1156:19,
1157:13, 1157:21, 1162:2,
1162:6, 1164:25, 1167:2,
1175:15, 1196:20, 1196:21,
1196:22, 1197:9, 1207:24,
1216:23, 1217:1, 1217:3,
1217:8, 1217:12, 1218:3,
1219:25, 1220:6

**Healthcare** [3] - 1124:4, 1124:7,
1124:17

**healthiest** [1] - 1201:9

**Healthy** [1] - 1115:13

**hear** [9] - 1097:9, 1097:10,
1098:3, 1098:7, 1098:10,
1098:15, 1099:5, 1100:11,
1101:11

**heard** [4] - 1100:3, 1223:2,
1223:4, 1223:14

**heat** [1] - 1167:21

**Heather** [1] - 1095:2

**HEDIS** [8] - 1161:24, 1162:5,
1163:9, 1163:11, 1163:21,
1163:22, 1163:23, 1164:1

**HELD** [1] - 1094:10

**help** [7] - 1196:11, 1212:24,
1214:2, 1214:14, 1215:16,
1217:12, 1220:6

**helpful** [2] - 1107:18, 1223:10

**helps** [2] - 1214:1, 1218:3

**Henry** [1] - 1094:16

**hereby** [1] - 1224:5

**HHI** [1] - 1169:16

**HHIs** [4] - 1168:18, 1169:10,
1169:13, 1170:24

**HHS** [4] - 1140:10, 1140:11,
1141:2, 1141:10

**HHSI** [1] - 1168:21

**high** [1] - 1181:22

**higher** [2] - 1198:13, 1201:4

**highest** [1] - 1181:5

**highlight** [1] - 1131:1

**highlighted** [6] - 1109:16,
1116:12, 1116:14, 1117:14,
1174:25, 1175:3

**highlighting** [3] - 1130:23,
1131:1, 1131:3

**highly** [1] - 1180:10

**Highmark** [1] - 1176:2

**HLI** [1] - 1167:4

**HMOs** [2] - 1182:15, 1182:16

**holes** [1] - 1173:5

**holistically** [1] - 1184:13

**home** [1] - 1219:24

**honestly** [3] - 1183:5, 1206:8,
1213:6

**Honor** [40] - 1096:2, 1096:5,
1097:4, 1108:17, 1111:20,
1112:3, 1112:15, 1118:9,
1118:13, 1118:17, 1119:18,
1128:3, 1128:5, 1128:14,
1130:17, 1131:6, 1133:2,
1137:9, 1141:6, 1144:21,
1146:7, 1148:19, 1154:5,
1154:9, 1154:15, 1154:16,
1165:11, 1172:3, 1175:11,
1176:19, 1177:15, 1178:4,
1178:10, 1178:17, 1210:21,
1211:20, 1220:19, 1221:25,
1223:12, 1223:23

**HONORABLE** [1] - 1094:10

**hopefully** [2] - 1134:13,
1213:21

**Hopkins** [1] - 1162:18

**hospital** [2] - 1102:7, 1165:8

**hosting** [1] - 1121:25

**house** [1] - 1198:24

**household** [1] - 1105:1

**HR** [1] - 1130:3

**Humana** [6] - 1104:13, 1150:7,
1150:10, 1157:22, 1197:21,
1197:22

**Humanas** [1] - 1197:19

**hundreds** [1] - 1115:24

---

# I

**iAvenue** [2] - 1149:16, 1149:17

**IC** [1] - 1166:5

**idea** [1] - 1130:5

**ideation** [1] - 1201:1

**identical** [1] - 1151:6

**identifiable** [1] - 1200:19

**identified** [7] - 1132:15, 1133:6,
1144:4, 1150:8, 1151:1, 1153:3,
1198:2

**identify** [4] - 1132:4, 1200:19,
1207:23, 1217:23

**identifying** [3] - 1132:18,
1195:1, 1208:20

**identity** [2] - 1101:19, 1207:5

**Illinois** [1] - 1129:4, 1147:24

**Imagine** [4] - 1196:20, 1196:22,
1197:5, 1197:9

**imagine** [2] - 1196:21, 1201:11

**impact** [7] - 1097:25, 1098:13,
1164:11, 1174:17, 1174:20,
1184:6, 1188:14

**impactful** [2] - 1197:1, 1197:3

**impeachment** [3] - 1112:4,
1112:7, 1165:12

**Impediments** [1] - 1164:25

**impetus** [3] - 1186:22, 1206:6,
1217:15

**important** [10] - 1100:20,
1189:18, 1189:19, 1200:15,

1201:21, 1202:17, 1202:18,
1202:19, 1223:5, 1223:17

**imposed** [1] - 1133:8

**impossible** [2] - 1139:5,
1164:17

**impression** [1] - 1168:22

**improvement** [1] - 1203:4

**improving** [1] - 1180:18

**IN** [1] - 1094:1

**in-depth** [3] - 1099:12, 1100:7,
1171:8

**in-force** [1] - 1190:6

**in-house** [1] - 1198:24

**inappropriate** [4] - 1097:14,
1097:16, 1097:18, 1168:16

**Inc** [4] - 1094:6, 1095:1, 1156:3,
1207:10

**include** [5] - 1115:20, 1137:11,
1159:2, 1174:3, 1214:12

**included** [5] - 1121:17,
1146:14, 1150:3, 1152:20,
1155:8

**includes** [6] - 1121:23,
1127:23, 1128:1, 1147:23,
1148:14, 1150:7

**including** [9] - 1127:17, 1134:6,
1157:19, 1163:15, 1173:5,
1174:16, 1183:18, 1195:23,
1196:4

**increase** [2] - 1113:21, 1213:21

**increasingly** [2] - 1171:10,
1171:11

**incubators** [1] - 1180:16

**incumbency** [5] - 1144:14,
1145:16, 1146:17, 1149:15,
1159:22

**incumbent** [6] - 1145:20,
1145:24, 1146:14, 1150:8,
1152:20, 1190:2

**incumbents** [1] - 1189:1

**indeed** [7] - 1138:12, 1184:8,
1205:6, 1205:8, 1206:10,
1216:16, 1219:12

**independent** [9] - 1117:25,
1119:7, 1119:11, 1154:13,
1169:8, 1205:5, 1206:2, 1213:1,
1213:3

**independently** [2] - 1111:15,
1163:24

**indicate** [1] - 1203:18

**indicated** [1] - 1099:20

**individual** [3] - 1102:5, 1136:8,
1191:12

**industries** [1] - 1173:5

**industry** [3] - 1101:17, 1151:17,
1174:14

**inflated** [1] - 1127:20

**Information** [2] - 1162:6,
1162:7

**information** [10] - 1102:11,

1102:15, 1126:5, 1172:4,
1173:6, 1180:24, 1203:12,
1203:21, 1204:8, 1218:2
**inherited** [1] - 1161:8
**injecting** [1] - 1141:24
**innovate** [1] - 1160:24
**innovation** [17] - 1160:12,
1160:22, 1164:12, 1180:16,
1180:20, 1199:9, 1199:19,
1199:21, 1200:10, 1200:20,
1200:22, 1200:23, 1201:17,
1202:1, 1202:7, 1202:10,
1210:15
**innovative** [12] - 1160:19,
1160:21, 1186:2, 1188:25,
1189:21, 1198:7, 1198:15,
1198:16, 1201:14, 1202:6,
1202:14, 1223:15
**innovators** [1] - 1196:7
**input** [1] - 1159:7
**inside** [1] - 1205:21
**insist** [2] - 1104:1, 1107:3
**insisted** [1] - 1107:5
**instances** [4] - 1115:6,
1145:18, 1150:17, 1191:12
**institutional** [1] - 1142:9
**institutions** [1] - 1190:10
**insurance** [29] - 1101:17,
1101:22, 1101:24, 1102:1,
1102:19, 1108:3, 1115:24,
1116:7, 1116:12, 1117:25,
1118:2, 1118:3, 1118:12,
1118:15, 1119:6, 1127:17,
1127:19, 1135:6, 1139:14,
1141:19, 1143:1, 1147:8,
1150:22, 1157:10, 1161:22,
1162:13, 1163:8, 1165:5, 1166:5
**Insurance** [3] - 1162:2, 1162:6,
1164:25
**insurer** [3] - 1101:18, 1102:17,
1150:8
**insurer's** [2] - 1107:19, 1107:23
**insurers** [12] - 1102:14,
1104:12, 1107:2, 1115:21,
1135:8, 1136:19, 1138:14,
1138:23, 1140:11, 1140:21,
1141:21, 1168:23
**integrated** [2] - 1182:12,
1184:19
**Intel** [1] - 1190:14
**intelligence** [1] - 1173:6
**intent** [2] - 1206:24, 1212:22
**intention** [1] - 1097:8
**interchangeability** [1] -
1200:13
**interchangeable** [1] - 1201:24
**interest** [2] - 1100:24, 1120:16
**interests** [1] - 1212:20
**Intermountain** [1] - 1175:15
**internal** [3] - 1118:6, 1118:8,

1154:22
**internally** [1] - 1211:7
**interviews** [1] - 1171:8
**investigation** [2] - 1102:16,
1216:17
**investment** [1] - 1171:15
**invoice** [1] - 1179:16
**invoices** [1] - 1179:11
**involve** [1] - 1160:10
**involved** [6] - 1120:24, 1126:7,
1190:17, 1190:20, 1190:23,
1206:9
**involving** [3] - 1143:20,
1160:11, 1161:5
**irrelevant** [1] - 1171:1
**IS** [1] - 1116:20
**Israel** [2] - 1097:11, 1099:7
**issue** [7] - 1099:5, 1100:4,
1118:22, 1132:16, 1132:18,
1133:7, 1188:9
**issued** [2] - 1103:14, 1103:17
**issues** [3] - 1099:4, 1132:4,
1163:20
**Ivan** [1] - 1094:14

## J

**Jackson** [1] - 1221:7
**JACKSON** [1] - 1094:10
**Jacobs** [1] - 1094:14
**Janice** [2] - 1095:10, 1224:13
**JANICE** [1] - 1224:5
**January** [2] - 1116:6, 1197:8
**job** [2] - 1212:25, 1223:5
**John** [1] - 1095:2
**Johns** [1] - 1162:18
**Jon** [1] - 1094:14
**Joseph** [1] - 1095:6
**journal** [1] - 1141:15
**Jr** [1] - 1178:12
**JR** [1] - 1178:14
**Judge** [1] - 1221:7
**JUDGE** [2] - 1094:10, 1094:11
**judgement** [1] - 1202:4
**June** [1] - 1104:1
**jury** [1] - 1100:19
**JUSTICE** [1] - 1094:16
**Justice** [2] - 1103:8, 1216:16

## K

**Kaiser** [12] - 1138:22, 1138:23,
1138:25, 1150:7, 1150:10,
1155:1, 1155:8, 1156:2, 1157:9,
1157:22, 1162:19, 1185:1
**Kansas** [1] - 1136:5
**keep** [1] - 1101:6
**keeping** [1] - 1162:4
**Kendrick** [10] - 1178:12,
1178:21, 1178:22, 1181:7,

1190:1, 1204:16, 1207:18,
1209:6, 1210:20, 1222:4
**KENDRICK** [1] - 1178:14
**Kentucky** [3] - 1132:19,
1132:22, 1133:19
**kick** [1] - 1109:3
**kicked** [2] - 1106:5, 1108:2
**kind** [4] - 1131:2, 1139:8,
1198:24, 1203:23
**knowledge** [6] - 1099:12,
1100:7, 1190:15, 1206:9,
1212:6, 1212:8
**knowledgeable** [1] - 1212:3
**known** [4] - 1163:25, 1175:22,
1180:11, 1197:8

## L

**lab** [1] - 1200:22
**Labor** [3] - 1155:20, 1157:5,
1157:24
**lacked** [1] - 1102:17
**lacking** [2] - 1139:4, 1175:19
**landscape** [3] - 1188:13,
1188:16, 1199:13
**language** [1] - 1151:6
**large** [41] - 1097:19, 1104:12,
1105:25, 1106:2, 1118:19,
1130:1, 1132:4, 1132:5,
1132:10, 1134:9, 1134:21,
1137:20, 1138:11, 1139:11,
1139:13, 1139:16, 1142:25,
1152:17, 1158:2, 1175:23,
1180:10, 1188:15, 1189:10,
1190:9, 1192:22, 1197:6,
1197:8, 1200:12, 1201:8,
1201:23, 1202:13, 1202:21,
1203:18, 1206:18, 1209:10,
1209:13, 1209:15, 1209:17,
1210:16, 1210:18, 1210:24
**largely** [1] - 1154:25
**larger** [3] - 1110:6, 1167:11,
1173:23
**largest** [7] - 1105:9, 1115:21,
1137:13, 1157:9, 1174:13,
1198:14, 1210:11
**laser** [1] - 1198:9
**laser-focused** [1] - 1198:9
**last** [9] - 1137:7, 1137:8,
1140:18, 1171:6, 1215:4,
1215:6, 1220:1, 1221:7, 1221:14
**late** [1] - 1200:21
**launched** [1] - 1201:13
**Lauren** [1] - 1094:23
**law** [1] - 1096:10
**lawyers** [2] - 1100:16, 1101:1
**lead** [1] - 1204:2
**leader** [1] - 1215:15
**Leaders** [1] - 1167:2
**leaders** [2] - 1116:5, 1154:14

**leadership** [2] - 1210:23, 1211:3
**leading** [1] - 1220:11
**leads** [1] - 1204:2
**Leah** [1] - 1094:20
**leaning** [1] - 1180:17
**learn** [1] - 1102:16
**least** [2] - 1167:2, 1222:24
**leave** [1] - 1099:17
**leaves** [1] - 1122:6
**led** [2] - 1148:15, 1216:1
**left** [5] - 1108:25, 1151:21, 1159:11, 1172:2, 1220:1
**legal** [3] - 1120:6, 1120:7, 1120:14
**lengthy** [1] - 1187:24
**lens** [1] - 1214:22
**less** [10] - 1126:19, 1133:20, 1187:20, 1190:8, 1197:24, 1200:4, 1202:18, 1202:19, 1202:21, 1210:3
**letting** [1] - 1097:8
**level** [13] - 1160:13, 1160:18, 1160:19, 1160:25, 1161:2, 1161:6, 1161:8, 1181:16, 1182:5, 1182:6, 1203:25
**level-funded** [7] - 1160:13, 1160:18, 1160:19, 1160:25, 1161:2, 1161:6, 1161:8
**levels** [1] - 1181:5
**levers** [5] - 1181:20, 1181:21, 1181:23, 1181:24, 1188:21
**license** [4] - 1119:22, 1125:12, 1132:3, 1204:20
**licensed** [2] - 1124:13, 1194:14
**licensee** [2] - 1120:4, 1121:3
**licensees** [2] - 1205:5, 1206:3
**licensing** [1] - 1218:18
**lightly** [1] - 1188:4
**likely** [2] - 1192:11, 1197:24
**limit** [2] - 1096:12, 1096:13
**limitations** [3] - 1159:19, 1159:24, 1163:15
**limited** [1] - 1221:17
**line** [2] - 1167:8, 1208:18
**lines** [3] - 1097:5, 1120:21, 1205:18
**lining** [1] - 1167:7
**list** [10] - 1104:12, 1104:21, 1105:13, 1106:4, 1115:17, 1116:5, 1128:14, 1154:12, 1154:14, 1155:7
**listed** [3] - 1104:22, 1116:21, 1150:6
**listing** [1] - 1115:20
**lists** [1] - 1108:25
**literature** [1] - 1164:6
**litigation** [1] - 1216:18
**lives** [10] - 1121:23, 1126:19, 1148:7, 1152:4, 1157:6, 1210:2,

1210:3, 1210:8, 1210:10
**living** [1] - 1205:10
**LLP** [2] - 1095:3, 1095:7
**local** [18] - 1132:4, 1132:10, 1132:16, 1132:18, 1175:23, 1175:24, 1182:10, 1191:10, 1193:8, 1200:12, 1201:21, 1201:23, 1209:24, 1210:7, 1210:16, 1210:18, 1215:10, 1219:10
**locally** [3] - 1181:17, 1200:13, 1219:13
**located** [2] - 1125:8, 1130:8
**location** [1] - 1128:13
**lock** [1] - 1174:7
**long-term** [2] - 1188:7, 1188:9
**look** [29] - 1104:24, 1112:12, 1119:13, 1135:10, 1138:5, 1145:13, 1146:1, 1152:7, 1166:23, 1183:15, 1183:16, 1183:24, 1187:6, 1191:13, 1198:5, 1198:6, 1198:11, 1199:13, 1199:23, 1200:7, 1203:14, 1203:23, 1203:24, 1212:20, 1218:14
**looked** [6] - 1098:13, 1116:15, 1126:12, 1154:17, 1155:13, 1166:7
**looking** [20] - 1143:18, 1145:23, 1148:23, 1150:14, 1152:9, 1152:18, 1154:7, 1175:3, 1181:19, 1182:1, 1182:2, 1183:12, 1186:19, 1187:11, 1187:12, 1188:7, 1188:9, 1188:21, 1189:23, 1190:11
**looks** [2] - 1175:8, 1188:5
**Los** [1] - 1094:25
**lose** [5] - 1150:17, 1173:9, 1174:9, 1184:16, 1190:25
**loses** [2] - 1145:19, 1153:20
**losing** [5] - 1151:16, 1151:17, 1153:19, 1154:23, 1154:25
**loss** [12] - 1130:7, 1148:11, 1151:2, 1151:15, 1151:16, 1172:23, 1173:2, 1173:13, 1184:19, 1184:21, 1193:18
**losses** [9] - 1146:13, 1146:24, 1147:20, 1147:23, 1148:14, 1197:11, 1197:13, 1203:3
**lost** [5] - 1148:23, 1148:25, 1150:19, 1151:10, 1186:8
**loud** [3] - 1109:8, 1126:8, 1172:6
**lower** [8] - 1114:4, 1141:20, 1143:2, 1143:15, 1180:13, 1184:4, 1189:24, 1201:4
**lowering** [1] - 1180:18
**lowest** [1] - 1193:21
**lumping** [1] - 1194:18
**lunch** [4] - 1097:3, 1222:22,

1222:23, 1223:19

# M

**M-B-R** [1] - 1104:19
**macro** [1] - 1181:16
**main** [3] - 1193:2, 1213:12, 1213:13
**Maine** [1] - 1163:3
**maintain** [2] - 1172:24, 1173:2
**major** [1] - 1160:23
**majority** [4] - 1118:18, 1171:9, 1176:3, 1179:5
**manage** [1] - 1184:12
**management** [9] - 1192:5, 1192:12, 1196:5, 1196:12, 1198:10, 1198:21, 1199:1, 1204:2, 1213:16
**managers** [1] - 1203:22
**manages** [1] - 1218:8
**manifested** [1] - 1182:9
**manner** [3] - 1182:8, 1185:22, 1196:15
**manufacture** [1] - 1179:23
**map** [6] - 1119:18, 1119:21, 1128:12, 1128:16, 1132:1, 1132:2
**margin** [1] - 1149:3
**margins** [1] - 1179:22
**Mark** [1] - 1095:2
**marked** [4] - 1108:17, 1112:16, 1112:21, 1113:8
**markedly** [1] - 1200:6
**market** [132] - 1097:14, 1097:15, 1097:17, 1097:24, 1098:6, 1098:9, 1098:19, 1109:18, 1113:18, 1114:4, 1114:7, 1114:18, 1115:5, 1115:8, 1116:25, 1117:22, 1118:1, 1118:3, 1118:5, 1118:12, 1118:15, 1121:6, 1122:7, 1122:9, 1122:10, 1123:21, 1124:10, 1124:15, 1126:16, 1126:20, 1130:6, 1131:12, 1131:17, 1131:19, 1132:4, 1132:6, 1132:7, 1132:10, 1132:24, 1133:10, 1133:12, 1133:13, 1134:2, 1134:4, 1134:6, 1134:8, 1134:9, 1146:23, 1147:5, 1147:8, 1147:14, 1147:17, 1149:14, 1151:24, 1152:25, 1153:25, 1154:23, 1159:6, 1159:8, 1159:9, 1159:12, 1160:1, 1160:2, 1165:5, 1165:18, 1166:7, 1166:17, 1166:19, 1166:24, 1166:25, 1168:2, 1168:20, 1168:21, 1169:4, 1169:6, 1169:14, 1170:8, 1170:19, 1170:20, 1170:21,

1170:23, 1172:20, 1172:22,
1173:14, 1173:15, 1174:3,
1175:21, 1175:23, 1177:2,
1180:5, 1184:25, 1185:5,
1186:3, 1186:17, 1188:6,
1189:20, 1189:21, 1189:22,
1191:10, 1194:9, 1194:23,
1196:11, 1197:24, 1198:12,
1199:2, 1199:16, 1199:23,
1200:9, 1200:18, 1201:2,
1201:22, 1203:2, 1203:12,
1203:15, 1203:19, 1204:3,
1205:6, 1210:17, 1211:6,
1211:13, 1211:15, 1212:8,
1213:3, 1214:23, 1215:10,
1217:22, 1219:16, 1221:20,
1222:9, 1223:15

**Market** [2] - 1109:17, 1153:7
**market's** [3] - 1200:6, 1204:6
**market-share** [1] - 1122:7
**marketing** [1] - 1204:8
**marketplace** [6] - 1117:25,
1118:2, 1119:7, 1141:13,
1172:18, 1172:19
**marketplaces** [2] - 1140:19,
1141:23
**markets** [12] - 1124:21,
1132:16, 1132:18, 1140:20,
1174:11, 1175:24, 1180:12,
1200:12, 1201:23, 1205:25,
1210:8, 1211:11
**Markets** [1] - 1164:25
**marks** [1] - 1120:1
**Massachusetts** [2] - 1221:18,
1221:20
**match** [7] - 1134:19, 1136:13,
1136:17, 1137:5, 1137:10,
1139:20, 1153:12
**matching** [3] - 1136:21,
1137:20, 1138:13
**material** [3] - 1162:17, 1169:21,
1180:5
**materially** [2] - 1202:20,
1209:22
**math** [2] - 1157:8, 1157:18
**matter** [5] - 1096:8, 1099:15,
1100:7, 1118:16, 1141:18
**matters** [2] - 1163:7, 1202:7
**mean** [20] - 1098:24, 1109:15,
1111:23, 1120:13, 1125:25,
1133:24, 1142:3, 1142:24,
1154:3, 1164:14, 1190:9,
1191:9, 1194:10, 1197:16,
1197:17, 1200:10, 1202:20,
1210:10, 1212:8
**meaning** [2] - 1150:10, 1150:21
**means** [5] - 1108:1, 1142:3,
1145:18, 1147:23, 1170:23
**measures** [5] - 1163:11,
1163:14, 1164:3, 1164:7, 1166:7

**mechanics** [1] - 1179:8
**mechanisms** [2] - 1183:20,
1188:20
**Medicaid** [4] - 1123:25,
1124:10, 1124:15, 1207:25
**Medicaid/Medicare** [1] -
1127:24
**medical** [10] - 1140:3, 1159:2,
1159:4, 1179:11, 1179:18,
1184:13, 1195:24, 1196:1,
1219:12
**Medical** [4] - 1116:22, 1136:6,
1175:17, 1185:5
**Medicare** [3] - 1123:25,
1124:21
**Medicare/Medicaid** [1] - 1205:2
**meet** [1] - 1214:19
**Member** [1] - 1104:18
**member** [4] - 1146:20, 1149:5,
1216:25, 1218:16
**member's** [1] - 1184:23
**member-weighted** [2] -
1146:20, 1149:5
**members** [19] - 1102:2,
1102:12, 1102:19, 1104:21,
1105:10, 1126:6, 1126:11,
1149:7, 1149:8, 1149:11,
1152:5, 1152:6, 1152:15,
1157:13, 1157:16, 1201:15,
1201:17
**membership** [2] - 1176:13,
1176:20
**memory** [4] - 1106:13, 1126:8,
1126:13, 1142:24
**mentioned** [6] - 1097:19,
1125:4, 1136:19, 1183:7,
1183:10, 1216:22
**MEPS** [10] - 1108:12, 1110:17,
1110:20, 1115:1, 1165:23,
1166:4, 1166:5, 1166:8,
1166:10, 1167:11
**MEPS-IC** [1] - 1166:5
**Mercer** [3] - 1144:24, 1145:1,
1145:7
**merely** [1] - 1193:11
**merge** [1] - 1174:14
**merged** [1] - 1217:18
**merger** [25] - 1098:2, 1098:13,
1099:1, 1099:2, 1120:5,
1133:18, 1133:22, 1158:9,
1159:9, 1160:5, 1160:10,
1161:3, 1161:5, 1161:7, 1161:9,
1161:13, 1164:11, 1165:8,
1166:18, 1167:1, 1169:14,
1174:10, 1216:13, 1216:17
**merger's** [2] - 1097:22, 1167:5
**mergers** [3] - 1166:16, 1174:13,
1187:4
**merging** [3] - 1114:7, 1122:15,
1122:16

**merited** [1] - 1202:5
**messiness** [1] - 1203:16
**method** [1] - 1108:12
**methodology** [4] - 1110:2,
1110:21, 1134:5, 1148:22
**methods** [2] - 1107:21, 1108:11
**metrics** [3] - 1163:19, 1166:22,
1166:23
**Metropolitan** [1] - 1176:2
**Mexico** [1] - 1123:19
**middle** [2] - 1101:4, 1159:12
**might** [8] - 1150:21, 1156:18,
1164:1, 1182:4, 1188:6, 1210:5,
1211:24, 1223:10
**million** [27] - 1109:19, 1109:21,
1109:23, 1109:25, 1110:3,
1110:7, 1110:8, 1110:12,
1110:15, 1111:2, 1111:5,
1111:12, 1111:13, 1112:20,
1113:7, 1113:8, 1113:12,
1126:12, 1126:13, 1170:11,
1170:12, 1170:16, 1170:22,
1201:16, 1210:2
**mind** [2] - 1101:6, 1185:5
**mindful** [1] - 1200:2
**minimal** [1] - 1218:10
**Minnesota** [2] - 1128:25,
1129:2
**minute** [2] - 1097:3, 1106:15
**minutes** [1] - 1167:17
**misspeak** [1] - 1176:15
**misstatement** [1] - 1188:1
**mistake** [2] - 1111:7, 1111:8
**model** [5] - 1172:2, 1172:12,
1191:6, 1191:7
**moments** [1] - 1207:18
**monolithic** [1] - 1129:15
**monopsony** [1] - 1118:22
**month** [1] - 1103:15
**Morgan** [1] - 1178:22
**Morning** [1] - 1094:6
**morning** [8] - 1096:5, 1096:6,
1134:13, 1136:1, 1168:2,
1170:2, 1170:25, 1172:17
**most** [21] - 1157:23, 1181:17,
1182:3, 1182:22, 1183:3,
1183:5, 1183:17, 1186:14,
1188:1, 1193:24, 1194:8,
1197:4, 1198:8, 1199:12,
1202:21, 1203:4, 1210:13,
1212:15, 1212:17, 1216:12,
1216:14
**motives** [1] - 1209:23
**move** [3] - 1123:17, 1158:11,
1171:7
**movement** [1] - 1166:13
**moving** [3] - 1128:15, 1143:1,
1204:7
**MR** [106] - 1096:5, 1096:7,
1097:4, 1101:14, 1108:17,

1108:21, 1108:23, 1111:20,
1112:3, 1112:9, 1112:10,
1112:15, 1112:18, 1112:24,
1113:1, 1113:3, 1113:6,
1117:18, 1118:13, 1118:17,
1119:4, 1122:3, 1127:25,
1128:3, 1128:5, 1128:6,
1129:20, 1130:13, 1130:17,
1130:21, 1131:6, 1131:7,
1136:2, 1136:3, 1137:6, 1137:8,
1137:15, 1137:16, 1140:25,
1141:2, 1141:6, 1141:9,
1142:16, 1144:21, 1144:23,
1146:4, 1146:5, 1146:10,
1149:21, 1154:5, 1154:9,
1154:14, 1155:15, 1162:14,
1162:16, 1165:11, 1165:20,
1165:23, 1166:3, 1166:9,
1167:15, 1167:25, 1169:25,
1171:20, 1171:22, 1172:3,
1172:5, 1176:6, 1176:8, 1176:9,
1176:11, 1177:15, 1177:19,
1178:4, 1178:7, 1178:10,
1178:17, 1178:20, 1181:7,
1181:12, 1187:15, 1189:25,
1191:25, 1194:24, 1195:22,
1197:25, 1199:18, 1204:12,
1207:17, 1208:13, 1209:5,
1210:20, 1211:20, 1211:22,
1213:25, 1216:10, 1219:7,
1219:23, 1220:19, 1221:6,
1221:25, 1222:3, 1222:18,
1222:23, 1223:8, 1223:23
   **MSA** [1] - 1182:6
   **MSAs** [5] - 1134:6, 1134:10,
1183:4, 1193:25
   **multiple** [7] - 1097:21, 1183:22,
1184:14, 1195:20, 1195:21
   **must** [1] - 1160:24
   **Mutual** [2] - 1136:6, 1185:5
   **myopic** [2] - 1184:4, 1185:8
   **myopically** [1] - 1191:15

# N

   **N/A** [2] - 1115:13, 1115:14
   **NA5** [18] - 1103:6, 1104:12,
1105:13, 1106:5, 1107:4,
1107:20, 1108:2, 1109:7,
1110:4, 1113:17, 1114:22,
1115:17, 1134:14, 1135:2,
1136:13, 1137:9, 1139:15,
1153:12
   **NA5g** [13] - 1103:6, 1107:20,
1108:2, 1109:8, 1109:10,
1110:10, 1113:18, 1114:23,
1136:13, 1137:10, 1139:16,
1153:13, 1170:8
   **name** [14] - 1101:23, 1102:11,
1105:19, 1105:20, 1124:23,

1134:19, 1138:6, 1139:6,
1139:11, 1175:4, 1175:12,
1178:21, 1187:9, 1207:5
   **names** [26] - 1102:2, 1102:5,
1102:17, 1102:18, 1104:16,
1105:1, 1106:19, 1107:3,
1116:13, 1135:1, 1135:4,
1135:5, 1135:6, 1135:19,
1136:8, 1136:15, 1136:17,
1136:19, 1137:5, 1138:14,
1138:24, 1139:5, 1139:22,
1175:4
   **nation's** [1] - 1105:9
   **national** [101] - 1097:20,
1098:4, 1107:19, 1107:23,
1116:11, 1118:1, 1118:5,
1118:19, 1119:2, 1123:22,
1125:1, 1126:16, 1126:20,
1129:22, 1130:8, 1132:7,
1132:10, 1133:8, 1153:2,
1160:8, 1161:20, 1168:23,
1169:2, 1172:16, 1172:22,
1173:18, 1174:1, 1174:9,
1174:11, 1175:25, 1176:21,
1177:4, 1177:10, 1178:23,
1179:1, 1179:5, 1180:15,
1183:12, 1184:3, 1184:7,
1185:2, 1186:15, 1187:10,
1187:17, 1187:19, 1187:23,
1188:1, 1191:9, 1191:10,
1192:21, 1192:22, 1192:23,
1195:19, 1197:24, 1198:12,
1199:13, 1199:23, 1200:3,
1200:11, 1200:14, 1200:23,
1201:20, 1201:25, 1202:20,
1202:25, 1203:5, 1203:7,
1203:11, 1203:19, 1204:14,
1209:7, 1209:20, 1209:24,
1209:25, 1210:7, 1210:14,
1210:17, 1210:25, 1211:14,
1212:2, 1212:15, 1215:4,
1215:12, 1215:14, 1215:17,
1215:18, 1215:20, 1215:23,
1216:2, 1216:12, 1217:3,
1217:5, 1217:14, 1218:4,
1220:8, 1220:11, 1220:14,
1222:25
   **nationally** [5] - 1182:16,
1183:6, 1183:18, 1190:10,
1193:25
   **nationwide** [6] - 1161:2,
1161:12, 1162:18, 1183:13,
1183:15, 1195:6
   **nature** [2] - 1101:10, 1138:18
   **NCQA** [5] - 1161:19, 1162:2,
1162:4, 1162:5, 1162:19
   **near** [1] - 1166:16
   **nearly** [1] - 1176:19
   **neatly** [1] - 1099:24
   **Nebraska** [4] - 1219:14,

1219:15, 1219:17
   **necessarily** [5] - 1101:23,
1159:25, 1162:12, 1183:14,
1184:17
   **necessary** [2] - 1100:1,
1100:17
   **necessitated** [1] - 1153:10
   **need** [8] - 1099:11, 1100:3,
1112:1, 1123:8, 1137:2,
1200:17, 1202:9, 1218:12
   **needed** [1] - 1211:5
   **needs** [3] - 1098:19, 1171:12,
1223:7
   **negotiated** [1] - 1187:21
   **negotiations** [1] - 1143:8
   **Net** [5] - 1136:5, 1156:13,
1156:19, 1157:13
   **network** [34] - 1181:21,
1185:16, 1185:21, 1186:5,
1186:22, 1189:7, 1189:16,
1191:5, 1191:8, 1191:17,
1191:18, 1191:19, 1191:23,
1192:7, 1192:8, 1192:9,
1192:10, 1194:3, 1194:6,
1194:20, 1194:21, 1195:17,
1196:15, 1202:11, 1217:7,
1218:13, 1218:17, 1219:6,
1219:14, 1219:15, 1219:20,
1220:23, 1222:6
   **Networks** [1] - 1194:11
   **networks** [31] - 1183:25,
1184:2, 1185:12, 1186:7,
1186:24, 1186:25, 1189:6,
1189:9, 1191:10, 1191:11,
1191:12, 1193:12, 1194:12,
1194:16, 1194:18, 1194:22,
1195:11, 1195:20, 1197:7,
1197:9, 1197:10, 1197:12,
1204:19, 1205:10, 1213:10,
1213:18, 1217:23, 1218:19
   **Nevada** [3] - 1132:19, 1132:22,
1133:19
   **never** [2] - 1167:7, 1196:22
   **new** [17] - 1112:23, 1125:24,
1125:25, 1126:1, 1126:2,
1126:3, 1186:2, 1186:24,
1187:9, 1188:25, 1189:2,
1190:1, 1190:7, 1190:8, 1191:1,
1196:7, 1223:15
   **New** [5] - 1119:25, 1121:22,
1123:19, 1163:3, 1205:25
   **new-name** [1] - 1187:9
   **NewCo** [1] - 1206:16
   **next** [7] - 1110:10, 1118:24,
1163:2, 1222:20, 1222:24,
1223:8
   **niche** [1] - 1098:17
   **night** [1] - 1220:1
   **nine** [8] - 1103:15, 1105:14,
1105:18, 1134:15, 1134:21,

1135:21, 1137:13, 1139:17
**nine-month** [1] - 1103:15
**noise** [1] - 1203:16
**noisiness** [1] - 1117:7
**non** [12] - 1122:15, 1124:13, 1175:3, 1204:18, 1206:14, 1207:19, 1208:5, 1221:9, 1221:14, 1221:16, 1221:21
**non-Anthem** [2] - 1204:18, 1206:14
**non-Blue** [6] - 1207:19, 1208:5, 1221:9, 1221:14, 1221:16, 1221:21
**non-Blue-licensed** [1] - 1124:13
**non-highlighted** [1] - 1175:3
**non-merging** [1] - 1122:15
**none** [1] - 1150:11
**nonetheless** [2] - 1188:16, 1209:1
**nonexistent** [1] - 1218:10
**nontraditional** [1] - 1193:16
**noon** [1] - 1223:24
**norm** [1] - 1190:8
**normally** [1] - 1156:15
**Note** [1] - 1147:13
**note** [3] - 1096:21, 1146:13, 1150:25
**notes** [1] - 1224:7
**nothing** [6] - 1106:24, 1130:18, 1206:22, 1222:18, 1223:1, 1223:3
**notice** [1] - 1186:20
**November** [5] - 1094:6, 1215:4, 1215:6, 1216:20, 1224:9
**number** [55] - 1096:18, 1101:9, 1103:18, 1105:10, 1108:3, 1110:6, 1110:7, 1110:8, 1111:4, 1111:5, 1111:9, 1111:12, 1111:13, 1113:9, 1113:10, 1114:15, 1116:18, 1121:12, 1126:6, 1126:8, 1126:11, 1126:12, 1126:13, 1126:15, 1127:4, 1127:12, 1127:20, 1135:8, 1143:23, 1147:3, 1147:6, 1147:10, 1148:9, 1148:25, 1152:14, 1156:4, 1167:22, 1170:11, 1170:15, 1170:18, 1170:22, 1170:24, 1170:25, 1180:8, 1187:9, 1194:1, 1196:9, 1197:6, 1198:1, 1198:10, 1207:25, 1223:4
**Number** [1] - 1117:3
**numbers** [16] - 1103:22, 1109:8, 1113:7, 1113:10, 1122:9, 1127:15, 1136:8, 1138:4, 1140:8, 1167:7, 1167:8, 1176:10, 1176:25, 1198:11, 1203:17, 1203:18
**numerator** [8] - 1107:23,

1108:4, 1113:24, 1114:1, 1114:2, 1114:3, 1121:14, 1122:16
**numerator/denominator** [1] - 1107:14
**numerators** [3] - 1110:3, 1166:6, 1166:14
**nurses** [1] - 1196:6
**NW** [5] - 1094:17, 1095:3, 1095:7, 1095:11, 1224:14

## O

**object** [4] - 1146:3, 1146:4, 1146:5, 1148:20
**objection** [1] - 1165:11
**objective** [1] - 1223:11
**objectives** [1] - 1214:4
**observations** [4] - 1149:22, 1151:7, 1152:2, 1152:14
**observe** [1] - 1177:9
**observed** [1] - 1144:4
**obviously** [3] - 1100:22, 1112:6, 1136:16
**occasion** [1] - 1176:15
**occurred** [1] - 1174:4
**occurring** [1] - 1206:23
**OF** [4] - 1094:1, 1094:9, 1094:16, 1224:2
**offer** [2] - 1201:25, 1213:15
**offered** [1] - 1213:13
**offering** [1] - 1197:9
**offerings** [1] - 1193:2
**offers** [1] - 1193:22
**OFFICE** [2] - 1094:21, 1094:24
**Office** [1] - 1141:2
**OFFICIAL** [1] - 1224:2
**Official** [2] - 1095:10, 1224:13
**offset** [1] - 1182:18
**often** [3] - 1173:19, 1174:7, 1214:9
**Ohio** [4] - 1132:20, 1132:22, 1133:19, 1136:6
**old** [1] - 1191:5
**once** [4] - 1097:10, 1100:2, 1121:13, 1220:23
**one** [75] - 1096:8, 1098:4, 1098:7, 1098:10, 1098:15, 1104:24, 1105:13, 1107:10, 1115:10, 1116:19, 1117:8, 1117:21, 1129:11, 1129:15, 1130:11, 1137:10, 1137:22, 1139:12, 1140:1, 1141:22, 1142:12, 1143:12, 1145:1, 1145:21, 1148:25, 1149:3, 1150:8, 1150:24, 1154:5, 1154:15, 1155:22, 1156:11, 1159:11, 1159:12, 1160:2, 1160:24, 1165:3, 1167:2, 1168:22, 1169:2, 1176:15,

1177:18, 1181:16, 1184:18, 1185:3, 1186:4, 1188:8, 1188:20, 1188:21, 1191:16, 1194:1, 1196:20, 1196:21, 1198:1, 1201:6, 1205:9, 1208:12, 1209:13, 1209:15, 1210:6, 1212:13, 1214:7, 1216:12, 1216:14, 1217:22, 1221:3, 1221:4, 1221:7, 1221:12, 1222:7, 1222:14, 1223:20
**one-year** [1] - 1188:8
**ones** [4] - 1106:1, 1117:14, 1140:19, 1173:24
**ongoing** [1] - 1216:20
**open** [4] - 1137:2, 1137:24, 1138:5, 1147:2
**opened** [2] - 1200:21, 1216:16
**operating** [1] - 1124:20
**opinion** [6] - 1096:25, 1100:4, 1169:5, 1193:19, 1200:10, 1203:16
**opinions** [1] - 1172:15
**opportunities** [8] - 1100:18, 1150:7, 1151:1, 1183:15, 1189:2, 1189:11, 1197:5, 1217:23
**opportunity** [1] - 1195:8
**opposed** [2] - 1130:6, 1189:3
**optimization** [1] - 1186:23
**optimize** [1] - 1186:24
**option** [1] - 1174:20
**options** [7] - 1180:21, 1181:14, 1182:2, 1188:6, 1211:23, 1212:3, 1214:23
**Optum** [3] - 1198:18, 1198:20, 1199:9
**ordinarily** [2] - 1193:23, 1195:18
**ordinary** [2] - 1154:18, 1172:24
**organization** [15] - 1154:13, 1183:18, 1185:19, 1185:20, 1197:18, 1197:23, 1198:7, 1202:14, 1207:10, 1215:12, 1215:14, 1216:9, 1217:9, 1219:5, 1220:3
**organizational** [1] - 1211:7
**organizations** [9] - 1180:17, 1193:6, 1199:25, 1201:18, 1204:10, 1204:24, 1204:25, 1211:4, 1218:1
**organizing** [1] - 1210:24
**original** [4] - 1134:21, 1136:14, 1137:12, 1155:13
**otherwise** [1] - 1165:12
**outcome** [5] - 1098:24, 1098:25, 1099:2, 1174:20, 1187:4
**outside** [3] - 1125:9, 1205:17, 1207:20

**overall** [1] - 1149:14
**overarching** [1] - 1214:4
**overlap** [2] - 1097:10, 1132:13
**overlapping** [3] - 1119:25,
1122:5, 1206:1
**overstating** [1] - 1133:21
**overwhelming** [2] - 1179:4,
1195:15
**overwhelmingly** [2] - 1188:20,
1199:17
**own** [7] - 1185:12, 1185:16,
1186:5, 1194:12, 1199:3,
1200:21, 1205:3
**owned** [3] - 1156:19, 1157:20,
1157:21
**ownership** [2] - 1120:24
**owns** [2] - 1121:2, 1156:13
**oxygen** [1] - 1200:10

**P**

**pace** [1] - 1179:21
**Page** [15] - 1104:25, 1105:14,
1106:24, 1116:19, 1120:19,
1120:21, 1140:14, 1140:18,
1143:24, 1155:25, 1156:11,
1162:17, 1162:19, 1162:21
**page** [13] - 1096:9, 1096:12,
1106:20, 1106:21, 1135:22,
1140:14, 1140:15, 1146:7,
1171:6, 1171:23, 1175:8,
1175:9, 1219:24
**pages** [5] - 1096:12, 1096:13,
1096:22, 1096:23, 1097:22
**paid** [2] - 1191:20, 1222:8
**paper** [4] - 1107:15, 1119:21,
1166:7, 1167:6
**paragraph** [10] - 1119:5,
1130:16, 1130:18, 1130:20,
1131:11, 1131:15, 1131:19,
1140:18, 1145:3, 1171:7
**Paragraph** [5] - 1130:16,
1130:21, 1131:9, 1143:24,
1145:6
**paraphrase** [1] - 1129:12
**pardon** [1] - 1143:20
**parent** [2] - 1199:9, 1207:10
**part** [25] - 1099:11, 1132:17,
1132:23, 1166:10, 1168:7,
1184:3, 1184:11, 1184:15,
1184:16, 1188:12, 1188:15,
1191:1, 1192:7, 1193:7, 1193:9,
1202:16, 1204:5, 1208:23,
1212:25, 1215:12, 1215:14,
1215:16, 1216:2, 1216:8,
1222:15
**partial** [1] - 1214:20
**participant** [1] - 1147:9
**participants** [1] - 1142:12
**participate** [3] - 1107:6,

1217:17, 1219:3
**participated** [1] - 1216:11
**participating** [1] - 1193:13
**participation** [1] - 1142:11
**particular** [9] - 1104:21, 1109:6,
1144:19, 1145:23, 1174:18,
1184:22, 1200:11, 1212:1
**particularly** [4] - 1140:7,
1197:1, 1197:3, 1212:7
**parties** [4] - 1096:24, 1120:12,
1122:16, 1173:11
**partner** [4] - 1185:19, 1185:20,
1186:2, 1188:24
**partners** [1] - 1186:4
**partnership** [1] - 1188:9
**partnerships** [1] - 1212:10
**parts** [1] - 1189:17
**party** [6] - 1120:4, 1120:7,
1192:10, 1192:11, 1212:23,
1213:1
**pass** [1] - 1164:21
**past** [1] - 1215:23
**patchwork** [1] - 1194:3
**Paul** [1] - 1095:6
**Paula** [1] - 1094:23
**pay** [1] - 1179:15
**payer** [4] - 1119:7, 1119:12,
1124:1, 1186:15
**payers** [1] - 1184:14
**paying** [1] - 1196:2
**pays** [1] - 1179:10
**peer** [4] - 1141:14, 1197:21,
1197:22, 1200:23
**peers** [1] - 1197:18
**pencil** [1] - 1195:19
**pending** [1] - 1216:13
**people** [7] - 1098:5, 1129:22,
1167:22, 1176:3, 1187:3,
1200:3, 1203:2
**per** [2] - 1136:18, 1149:9
**percent** [31] - 1117:21, 1117:24,
1119:6, 1121:6, 1121:11,
1121:16, 1121:18, 1126:11,
1126:20, 1127:14, 1144:6,
1144:10, 1146:24, 1149:25,
1151:16, 1151:17, 1153:23,
1154:1, 1154:2, 1184:12,
1184:15, 1193:25, 1194:9,
1195:9, 1195:10, 1195:12,
1195:13, 1195:23, 1222:8
**percentage** [3] - 1114:5,
1114:7, 1127:21
**percentages** [1] - 1147:4
**perception** [1] - 1204:17
**perfect** [1] - 1173:7
**perfection** [1] - 1173:3
**perform** [2] - 1164:20, 1168:7
**performance** [1] - 1177:9,
1204:14
**perhaps** [6] - 1154:6, 1168:1,

1187:6, 1189:7, 1191:16,
1208:25
**period** [14] - 1103:9, 1103:15,
1103:16, 1144:20, 1148:24,
1149:6, 1151:15, 1152:23,
1166:15, 1176:24, 1177:2,
1187:13, 1187:16, 1187:24
**Permanente** [1] - 1185:2
**personally** [1] - 1190:17
**personnel** [1] - 1196:5
**persons** [3] - 1156:4, 1156:20,
1157:10
**perspective** [4] - 1184:13,
1200:14, 1207:11, 1212:13
**pervasive** [1] - 1201:19
**Peter** [1] - 1094:15
**Phase** [5] - 1096:10, 1096:23,
1132:17, 1178:5, 1178:6
**physicians** [1] - 1196:6
**pick** [1] - 1162:10
**picture** [1] - 1145:8
**pie** [4] - 1115:5, 1121:12,
1127:5, 1213:23
**piece** [8] - 1184:10, 1184:17,
1194:2, 1202:12, 1202:13,
1205:20, 1210:6, 1213:23
**pieces** [3] - 1189:17, 1196:17,
1210:16
**pies** [1] - 1122:7
**Pilgrim** [5] - 1136:6, 1137:12,
1138:21, 1138:23, 1185:4
**Pittsburgh** [4] - 1116:22,
1175:17, 1176:2, 1176:3
**place** [2] - 1131:14, 1213:17
**Plaintiffs** [2] - 1094:4, 1094:13
**plaintiffs** [1] - 1096:11
**plan** [9] - 1116:21, 1116:24,
1161:22, 1171:12, 1177:19,
1183:22, 1184:13, 1215:7,
1215:9
**Plan** [2] - 1156:2, 1162:2
**plans** [8] - 1124:24, 1163:1,
1181:22, 1217:4, 1217:13,
1219:2, 1220:7, 1220:11
**Plans** [8] - 1216:23, 1217:1,
1217:3, 1217:8, 1217:12,
1218:3, 1219:25, 1220:6
**platform** [1] - 1183:4
**play** [4] - 1188:7, 1193:9,
1195:21
**player** [1] - 1185:2
**players** [10] - 1098:17, 1182:13,
1183:10, 1184:1, 1184:18,
1184:24, 1185:1, 1185:6,
1193:9, 1194:5
**plus** [3] - 1106:16, 1179:12,
1193:12
**pockets** [1] - 1185:4
**point** [15] - 1118:17, 1129:16,
1129:17, 1133:4, 1137:9,

1137:15, 1160:23, 1165:22, 1178:3, 1179:25, 1192:11, 1200:6, 1201:17, 1208:4, 1222:10
**point's** [1] - 1133:6
**points** [1] - 1151:23
**Policy** [1] - 1141:3
**policy** [3] - 1141:19, 1156:4, 1156:21
**pop** [1] - 1131:1
**population** [4] - 1149:18, 1184:5, 1185:9, 1191:14
**portal** [1] - 1192:6
**portion** [4] - 1099:8, 1171:5, 1176:23, 1179:19
**portions** [1] - 1099:22
**portrayed** [1] - 1217:25
**pose** [2] - 1223:16
**posed** [1] - 1098:2
**posited** [1] - 1111:18
**position** [5] - 1193:24, 1194:14, 1215:22, 1217:13, 1220:7
**possible** [5] - 1134:19, 1136:12, 1155:4, 1173:25, 1212:24
**possibly** [1] - 1155:4
**post-2005** [1] - 1217:19
**postponed** [1] - 1186:20
**postponing** [1] - 1187:3
**potential** [1] - 1211:23
**potentially** [1] - 1208:9
**practice** [2] - 1179:17, 1201:20
**practices** [1] - 1196:4
**precise** [4] - 1106:3, 1108:1, 1148:5, 1160:8
**precisely** [2] - 1153:13, 1153:14
**predetermined** [1] - 1217:6, 1222:13
**predicted** [1] - 1151:14
**predicted-by-shares** [1] - 1151:14
**prefer** [2] - 1119:21, 1131:4
**preferred** [2] - 1217:14, 1220:8
**preliminary** [1] - 1096:8
**premium** [2] - 1140:12, 1140:21
**premiums** [3] - 1141:19, 1141:20, 1160:13
**presence** [2] - 1118:4, 1122:15
**present** [8] - 1102:7, 1125:19, 1134:1, 1134:4, 1148:25, 1164:22, 1192:8, 1192:22
**present-day** [1] - 1192:8
**presentation** [2] - 1097:6, 1114:12
**presented** [4] - 1115:6, 1122:7, 1145:14, 1155:2
**presenting** [1] - 1100:16, 1145:22
**presently** [2] - 1191:7, 1208:11

**president** [10] - 1178:23, 1184:7, 1209:6, 1209:7, 1209:19, 1209:21, 1215:3, 1215:7, 1215:9, 1216:1
**presumptive** [5] - 1133:23, 1134:11, 1169:15, 1169:16, 1169:17
**presumptively** [2] - 1167:1, 1167:5
**pretty** [5] - 1155:7, 1155:11, 1155:18, 1173:19, 1188:12
**prevalent** [2] - 1221:21, 1221:23
**previously** [2] - 1182:4, 1182:14
**price** [4] - 1133:7, 1163:8, 1171:14, 1219:18
**priced** [2] - 1148:11, 1148:15
**prices** [2] - 1219:10, 1219:11
**pricing** [8] - 1217:6, 1218:24, 1219:1, 1219:10, 1222:4, 1222:5, 1222:6, 1222:12
**primarily** [1] - 1219:5
**primary** [2] - 1215:18, 1215:20
**printed** [2] - 1135:1, 1220:1
**private** [20] - 1098:10, 1105:4, 1141:24, 1143:1, 1143:13, 1182:25, 1183:1, 1183:23, 1192:24, 1193:1, 1193:7, 1193:10, 1193:13, 1194:2, 1195:1, 1198:25, 1213:4, 1213:12, 1213:15, 1213:17
**proactive** [1] - 1198:17
**problem** [5] - 1166:12, 1166:13, 1193:20, 1196:10, 1200:1
**problematic** [1] - 1211:12
**problems** [1] - 1196:11
**proceed** [4] - 1101:5, 1167:23, 1178:9, 1178:17
**proceedings** [1] - 1224:8
**process** [5] - 1102:25, 1169:5, 1186:1, 1201:1, 1201:10
**procompetitive** [1] - 1097:22
**procure** [1] - 1213:16
**procured** [1] - 1210:12
**product** [13] - 1098:6, 1150:7, 1150:25, 1160:18, 1160:20, 1161:2, 1161:3, 1161:6, 1161:8, 1161:11, 1221:9, 1221:14, 1221:16
**products** [5] - 1164:2, 1179:22, 1188:25, 1201:2, 1223:15
**Professor** [1] - 1168:1
**profit** [2] - 1193:6, 1204:10
**program** [3] - 1108:2, 1201:13, 1201:15
**programs** [1] - 1106:4, 1182:17
**progressive** [8] - 1180:10, 1180:17, 1190:9, 1198:7, 1198:9, 1199:12, 1201:18,

1210:13
**prohibiting** [1] - 1206:22
**proposals** [1] - 1180:24
**propose** [1] - 1187:19
**proposed** [3] - 1096:10, 1096:11, 1096:13
**propositions** [1] - 1171:24
**proprietary** [2] - 1194:12, 1194:21
**prospective** [2] - 1190:22, 1192:19
**prospectively** [1] - 1197:7
**prospects** [1] - 1215:2
**Protection** [1] - 1094:21
**prototype** [1] - 1201:2
**prove** [1] - 1162:12
**provide** [10] - 1107:18, 1111:11, 1131:11, 1145:8, 1161:22, 1192:4, 1218:3, 1218:6, 1223:9, 1223:12
**provided** [2] - 1110:11, 1170:1
**provider** [4] - 1116:24, 1183:12, 1183:15, 1201:5
**provider-sponsored** [1] - 1116:24
**providers** [2] - 1098:16, 1199:6
**provides** [6] - 1194:6, 1198:21, 1202:8, 1218:15, 1219:5, 1220:12
**providing** [3] - 1107:3, 1163:18, 1196:6
**public** [19] - 1107:13, 1108:10, 1114:12, 1118:9, 1118:10, 1122:23, 1128:10, 1128:13, 1131:25, 1140:1, 1140:24, 1141:5, 1141:11, 1141:18, 1148:21, 1151:13, 1155:22, 1157:8, 1190:15
**publically** [10] - 1155:20, 1165:4, 1165:18, 1166:1, 1166:2, 1193:6, 1197:18, 1197:22, 1204:9, 1204:10
**publically-traded** [2] - 1193:6, 1204:10
**publicly** [1] - 1199:25
**publicly-traded** [1] - 1199:25
**published** [1] - 1141:14
**pull** [2] - 1130:19, 1219:22
**pulled** [2] - 1177:1, 1181:23
**purchasing** [1] - 1129:22
**purposes** [4] - 1098:9, 1107:20, 1154:22, 1170:23
**pursue** [1] - 1205:21
**pursuing** [2] - 1180:22, 1183:8
**pushing** [1] - 1180:12
**put** [27] - 1097:8, 1104:7, 1111:17, 1111:19, 1123:10, 1124:7, 1128:10, 1133:2, 1143:24, 1145:5, 1146:3, 1150:18, 1151:22, 1158:11,

1160:15, 1165:10, 1169:14, 1183:4, 1186:19, 1188:2, 1194:23, 1195:20, 1205:7, 1211:14, 1219:8, 1220:17, 1220:23
**putting** [1] - 1163:24
**PX125** [1] - 1123:5

## Q

**qualified** [1] - 1106:5
**qualifying** [1] - 1135:1
**quality** [9] - 1160:12, 1163:7, 1163:17, 1164:4, 1164:7, 1164:11, 1164:21, 1180:19, 1201:4
**Quality** [1] - 1161:20
**quantify** [4] - 1164:16, 1164:17
**quantitative** [5] - 1112:15, 1164:3, 1164:7, 1164:10, 1164:13
**quarters** [1] - 1223:3
**quest** [2] - 1180:18, 1201:9
**questions** [20] - 1098:20, 1099:22, 1100:8, 1100:13, 1100:16, 1101:8, 1101:9, 1101:10, 1101:16, 1111:18, 1111:22, 1142:21, 1152:12, 1170:6, 1174:24, 1177:15, 1179:8, 1183:9, 1203:14, 1221:25
**quick** [2] - 1096:24
**quickly** [4] - 1137:1, 1152:13, 1155:18, 1197:10
**quite** [6] - 1100:6, 1141:16, 1183:5, 1195:7, 1206:8, 1213:6
**quote** [12] - 1119:5, 1123:10, 1140:17, 1141:20, 1144:1, 1145:6, 1145:9, 1150:5, 1150:25, 1164:19, 1165:3, 1167:9

## R

**raise** [1] - 1180:4
**range** [2] - 1103:21, 1210:2
**ranged** [2] - 1103:10, 1103:19
**ranking** [1] - 1198:1
**rankings** [1] - 1159:10
**ranks** [1] - 1203:14
**rapid** [1] - 1177:4
**rapidly** [1] - 1179:21
**rare** [1] - 1187:19
**rate** [2] - 1143:2, 1143:15
**rates** [1] - 1143:9
**rather** [8] - 1163:17, 1186:23, 1187:8, 1187:24, 1189:10, 1195:5, 1204:15, 1217:25
**rating** [3] - 1162:19, 1162:22, 1163:5

**ratings** [4] - 1161:22, 1161:24, 1162:2, 1163:16
**ratios** [2] - 1159:13, 1159:15
**re** [3] - 1187:17, 1190:3, 1201:11
**re-imagine** [1] - 1201:11
**re-up** [1] - 1187:17
**re-uping** [1] - 1190:3
**reach** [1] - 1198:6
**read** [8] - 1109:8, 1120:20, 1137:24, 1150:4, 1171:5, 1172:6, 1220:5
**reading** [4] - 1109:6, 1131:5, 1171:19, 1172:4
**reads** [3] - 1145:6, 1165:3, 1171:8
**ready** [1] - 1178:9
**reality** [1] - 1169:8
**really** [2] - 1182:6, 1213:22
**reason** [6] - 1129:11, 1150:23, 1156:8, 1168:25, 1210:3, 1222:24
**reasonable** [2] - 1165:7, 1169:5
**reasonably** [1] - 1106:1
**reasons** [1] - 1169:23
**rebuttal** [5] - 1099:21, 1099:25, 1177:18, 1177:20, 1178:7
**recalling** [1] - 1124:9
**receipts** [1] - 1187:6
**receive** [3] - 1102:21, 1116:23, 1191:22
**received** [2] - 1102:24, 1116:13
**receives** [1] - 1214:8
**recent** [5] - 1157:23, 1161:7, 1202:18, 1203:4, 1203:8, 1203:11, 1216:12, 1216:14
**recess** [2] - 1167:20, 1223:24
**recipients** [1] - 1116:19
**recognizable** [2] - 1105:24, 1106:2
**recognize** [1] - 1116:15
**recommend** [1] - 1222:23
**record** [8] - 1098:5, 1100:2, 1100:3, 1106:3, 1113:9, 1135:11, 1145:5, 1151:10
**record's** [1] - 1132:19
**red** [2] - 1111:1, 1170:10
**redacted** [3] - 1108:19, 1126:5, 1126:9
**REDIRECT** [1] - 1167:24
**redirect** [5] - 1099:20, 1100:1, 1167:19, 1222:1, 1222:2
**reduced** [1] - 1219:1
**reduction** [1] - 1133:24
**redundant** [3] - 1223:2, 1223:6, 1223:11
**refer** [3] - 1152:7, 1152:22, 1187:16
**reference** [3] - 1113:13, 1144:21, 1148:18

**referred** [8] - 1133:14, 1158:18, 1185:10, 1187:2, 1188:10, 1192:24, 1196:7, 1197:15
**referring** [2] - 1106:14, 1161:25
**refers** [1] - 1114:23
**reflect** [1] - 1165:8
**reflected** [1] - 1148:8
**reflects** [1] - 1200:20
**refresh** [7] - 1106:13, 1107:15, 1120:21, 1126:7, 1126:13, 1142:24, 1160:15
**regarding** [1] - 1165:18
**region** [2] - 1161:12, 1203:22
**regional** [13] - 1098:16, 1116:21, 1182:5, 1182:13, 1183:10, 1184:6, 1184:18, 1184:24, 1185:1, 1185:2, 1185:3, 1193:9, 1194:5
**regionals** [2] - 1186:18, 1195:2
**regularly** [1] - 1203:24
**reiterate** [1] - 1129:17
**related** [2] - 1164:9, 1170:7
**relates** [6] - 1096:9, 1199:9, 1204:10, 1218:9, 1222:5, 1222:6
**relationship** [7] - 1184:22, 1189:15, 1190:5, 1204:18, 1205:14, 1212:22, 1213:6
**relationships** [4] - 1190:17, 1213:7, 1213:15, 1214:19
**relative** [5] - 1125:23, 1165:6, 1166:19, 1185:7, 1217:24
**relatively** [4] - 1140:7, 1152:13, 1152:15, 1203:6
**relevant** [5] - 1111:23, 1118:21, 1119:1, 1123:22, 1131:12
**reliable** [1] - 1167:4
**relied** [1] - 1163:12
**remaining** [1] - 1144:9
**remember** [5] - 1124:23, 1134:14, 1143:22, 1145:2, 1145:3
**remind** [3] - 1099:19, 1154:11, 1176:6
**reminding** [1] - 1099:8
**reminds** [1] - 1176:14
**rent** [2] - 1194:15, 1194:22
**rental** [2] - 1217:7, 1218:13
**repackage** [1] - 1193:2
**repackaging** [1] - 1193:11
**repeat** [4] - 1113:5, 1134:23, 1140:15, 1143:3
**repetition** [1] - 1098:22
**rephrase** [3] - 1114:3, 1133:16, 1175:19
**replaced** [1] - 1196:22
**replacement** [3] - 1186:8, 1196:23, 1196:25
**report** [26] - 1097:12, 1097:18, 1099:8, 1099:10, 1111:11, 1115:20, 1122:14, 1126:3,

1130:20, 1130:21, 1131:14, 1132:4, 1136:21, 1138:15, 1138:24, 1139:1, 1142:18, 1143:19, 1144:22, 1145:14, 1146:2, 1146:8, 1152:9, 1156:8, 1159:17, 1166:23

**reported** [4] - 1155:11, 1156:12, 1166:25, 1170:25

**Reporter** [3] - 1095:10, 1095:10, 1224:13

**REPORTER** [1] - 1224:2

**reporting** [3] - 1162:5, 1170:23, 1198:21

**reports** [21] - 1119:15, 1121:1, 1123:3, 1124:2, 1125:4, 1125:15, 1125:19, 1125:22, 1133:17, 1134:3, 1134:4, 1143:5, 1155:19, 1155:23, 1156:3, 1161:16, 1164:10, 1168:11, 1168:13, 1203:23, 1204:13

**represent** [6] - 1103:4, 1123:15, 1126:18, 1138:25, 1147:4

**representing** [3] - 1190:4, 1204:21, 1212:2

**represents** [3] - 1126:18, 1126:19, 1195:9

**reputation** [2] - 1202:1, 1202:4

**request** [1] - 1211:16

**requested** [3] - 1103:23, 1107:7, 1180:25

**requests** [3] - 1180:24, 1189:4

**require** [2] - 1159:6, 1164:22

**required** [1] - 1171:15

**research** [3] - 1141:12, 1141:13, 1142:17

**resist** [1] - 1208:3

**resolution** [2] - 1192:2, 1196:3

**resourceful** [4] - 1180:10, 1180:17, 1199:25, 1210:14

**resources** [1] - 1218:9

**respect** [4] - 1099:7, 1100:5, 1184:9, 1196:23

**respective** [1] - 1205:11

**respond** [1] - 1180:6

**responded** [3] - 1103:2, 1103:3, 1103:5

**respondents** [1] - 1139:6

**responding** [1] - 1213:11

**response** [2] - 1134:15, 1211:16

**responses** [4] - 1115:2, 1214:10, 1214:24, 1215:2

**responsibility** [3] - 1183:21, 1215:18, 1215:20

**responsible** [3] - 1209:10, 1209:18, 1209:20

**rest** [2] - 1175:9, 1178:5

**result** [4] - 1141:15, 1169:14, 1181:24, 1193:18

**resulting** [2] - 1141:20, 1166:17

**results** [6] - 1134:2, 1140:12, 1140:21, 1160:5, 1162:9, 1177:12

**return** [1] - 1103:10

**returned** [1] - 1103:13

**revealing** [1] - 1104:15

**revenue** [9] - 1126:25, 1127:6, 1127:13, 1127:14, 1127:16, 1127:21, 1127:23, 1128:8, 1176:16

**revenues** [1] - 1127:6

**review** [3] - 1141:14, 1214:24, 1215:1

**reviewing** [1] - 1214:9

**revisit** [1] - 1143:17

**RFP** [5] - 1145:7, 1187:25, 1201:10, 1214:1, 1214:6

**RFPs** [14] - 1143:20, 1144:3, 1144:5, 1144:9, 1144:18, 1145:12, 1173:18, 1173:21, 1174:1, 1185:24, 1188:23, 1190:2, 1190:3, 1214:8

**Rifkind** [1] - 1095:6

**right-hand** [2] - 1153:16, 1171:24

**rights** [1] - 1211:10

**rigor** [1] - 1164:21

**rigorous** [1] - 1134:1

**rise** [1] - 1182:20

**rises** [2] - 1113:18, 1114:8

**risk** [1] - 1098:1

**RMR** [2] - 1095:10, 1224:13

**role** [3] - 1191:21, 1204:5, 1215:3

**Room** [2] - 1095:11, 1224:14

**roughly** [7] - 1149:9, 1184:11, 1187:17, 1195:9, 1195:13, 1201:15, 1217:5

**routinely** [1] - 1185:23

**row** [1] - 1109:15

**RPF** [3] - 1214:2, 1214:9, 1214:24

**Rule** [1] - 1095:5

**rule** [3] - 1118:18, 1188:4, 1209:24

**RULE** [3] - 1146:4, 1172:3, 1176:8

**rules** [7] - 1098:1, 1205:12, 1205:13, 1206:3, 1206:6, 1206:15, 1208:14

**run** [3] - 1111:11, 1140:19, 1160:6

**rung** [1] - 1223:9

# S

**sales** [17] - 1122:15, 1148:23, 1151:21, 1154:17, 1154:19, 1155:2, 1158:19, 1158:20,

1158:25, 1166:1, 1203:24, 1204:2, 1215:23, 1216:1, 1216:11, 1216:15, 1216:19

**salesforce.com** [1] - 1153:10

**sample** [2] - 1149:15, 1149:18

**savings** [9] - 1097:12, 1158:15, 1158:18, 1159:3, 1159:4, 1182:18, 1195:18, 1222:8

**saw** [6] - 1104:11, 1111:16, 1114:13, 1138:2, 1139:10, 1151:6

**say-so** [1] - 1112:2

**scale** [1] - 1198:5

**scan** [1] - 1188:6

**scenarios** [1] - 1158:14

**scholars** [1] - 1164:6

**SCHWINGLER** [11] - 1165:11, 1167:25, 1169:25, 1171:20, 1171:22, 1172:5, 1176:6, 1176:9, 1176:11, 1177:15, 1177:19

**Schwingler** [1] - 1094:15

**scope** [2] - 1198:5, 1221:17

**scoping** [1] - 1201:1

**scoring** [1] - 1214:12

**Scott** [2] - 1094:14, 1096:7

**screen** [18] - 1107:13, 1118:10, 1119:20, 1122:23, 1123:11, 1127:10, 1128:10, 1128:13, 1130:19, 1131:25, 1146:9, 1146:22, 1148:21, 1151:23, 1155:24, 1158:11, 1170:21, 1219:8

**se** [1] - 1136:18

**seamless** [1] - 1201:3

**season** [2] - 1177:10, 1177:12

**second** [16] - 1108:16, 1108:21, 1109:21, 1118:21, 1131:25, 1136:25, 1140:1, 1143:19, 1154:5, 1154:15, 1157:16, 1159:10, 1171:6, 1171:7, 1174:19, 1202:23

**Section** [2] - 1094:21, 1159:16

**section** [1] - 1222:25

**see** [75] - 1096:18, 1104:19, 1105:19, 1105:21, 1106:20, 1109:1, 1109:11, 1109:14, 1109:19, 1109:25, 1110:4, 1110:13, 1110:15, 1111:5, 1111:8, 1112:20, 1113:12, 1113:15, 1114:20, 1115:13, 1115:14, 1116:8, 1116:13, 1116:21, 1119:23, 1120:2, 1128:25, 1138:6, 1138:8, 1138:9, 1139:13, 1140:5, 1140:22, 1144:7, 1146:15, 1146:20, 1149:20, 1150:12, 1151:15, 1153:4, 1153:9, 1156:6, 1156:12, 1156:22, 1157:11, 1157:14, 1157:25,

1158:16, 1162:18, 1163:1,
1165:12, 1169:19, 1170:10,
1170:13, 1170:15, 1170:16,
1171:16, 1171:25, 1172:2,
1172:9, 1172:11, 1172:14,
1182:21, 1183:1, 1184:1,
1187:7, 1187:10, 1197:23,
1202:17, 1204:11, 1219:25,
1220:8, 1220:15, 1220:16
  **seeing** [7] - 1176:14, 1179:25,
1183:24, 1185:22, 1193:18,
1200:9, 1213:18
  **seek** [1] - 1191:15
  **seeking** [1] - 1193:21
  **seem** [1] - 1173:22
  **segment** [11] - 1177:4, 1180:9,
1180:20, 1191:8, 1201:20,
1202:25, 1204:14, 1211:14,
1215:17, 1216:2, 1216:3
  **segments** [2] - 1204:11,
1210:24
  **selected** [1] - 1150:22
  **selection** [2] - 1107:6, 1214:15
  **sell** [1] - 1179:23
  **selling** [2] - 1177:10, 1177:12
  **sells** [1] - 1161:2
  **send** [1] - 1214:6
  **sense** [3] - 1195:20, 1210:25,
1211:4
  **sensitive** [1] - 1163:15
  **sensus** [1] - 1115:1
  **sent** [5] - 1103:2, 1103:5,
1103:8, 1103:9
  **sentence** [5] - 1140:18, 1144:1,
1150:5, 1171:7, 1220:16
  **sentences** [2] - 1165:9, 1220:5
  **separate** [4] - 1168:3, 1168:17,
1169:11, 1207:5
  **separately** [1] - 1168:19
  **September** [1] - 1103:11
  **series** [2] - 1142:21, 1159:20
  **serious** [1] - 1096:17
  **seriously** [1] - 1200:18
  **serve** [9] - 1185:8, 1199:14,
1199:15, 1204:21, 1207:2,
1211:17, 1212:7, 1215:17,
1220:14
  **served** [3] - 1196:18, 1211:11,
1211:12
  **serves** [1] - 1191:8
  **service** [7] - 1125:9, 1125:12,
1179:14, 1192:4, 1192:12,
1193:6, 1199:6
  **serviced** [1] - 1209:11
  **services** [15] - 1098:17,
1171:13, 1195:9, 1196:3,
1197:23, 1198:21, 1198:22,
1199:1, 1199:6, 1201:3,
1210:13, 1218:7, 1219:4,
1219:12

  **Session** [1] - 1094:6
  **Set** [2] - 1162:6, 1162:7
  **set** [6] - 1117:19, 1122:6,
1139:3, 1150:14, 1210:16,
1212:3
  **set-of-options** [1] - 1212:3
  **sets** [2] - 1144:22, 1218:1
  **settle** [1] - 1174:6
  **seven** [5] - 1147:17, 1147:19,
1147:20, 1151:25, 1152:23
  **seventh** [1] - 1138:20
  **several** [3] - 1097:21, 1155:9,
1174:7
  **Severt** [1] - 1094:15
  **SEVERT** [9] - 1211:20, 1211:22,
1213:25, 1216:10, 1219:7,
1219:23, 1220:19, 1221:6,
1221:25
  **SG&A** [1] - 1158:22
  **share** [32] - 1107:20, 1114:4,
1114:7, 1115:5, 1115:8, 1121:6,
1122:7, 1122:10, 1132:24,
1146:19, 1146:23, 1146:24,
1147:3, 1147:5, 1147:7,
1147:14, 1147:17, 1152:23,
1152:25, 1157:22, 1159:12,
1160:2, 1166:7, 1166:17,
1166:24, 1166:25, 1203:12,
1204:19, 1217:6, 1217:23,
1222:14
  **share-based** [3] - 1146:19,
1146:23, 1147:3
  **shared** [1] - 1212:13
  **shares** [25] - 1109:18, 1114:18,
1122:9, 1134:8, 1151:14,
1153:7, 1153:25, 1159:6,
1159:8, 1159:9, 1160:6, 1160:7,
1160:9, 1165:5, 1165:18,
1166:20, 1168:2, 1168:18,
1170:21, 1170:23, 1173:14,
1173:16, 1174:3, 1175:21,
1175:24
  **Shield** [23] - 1102:8, 1120:4,
1121:2, 1121:21, 1135:22,
1136:5, 1157:20, 1194:15,
1204:20, 1204:22, 1205:5,
1205:19, 1205:24, 1207:13,
1209:8, 1209:11, 1209:19,
1215:25, 1217:4, 1217:9,
1217:13, 1220:7, 1221:4
  **shifting** [1] - 1182:6
  **shortly** [1] - 1097:3
  **show** [11] - 1108:15, 1112:11,
1127:5, 1138:20, 1140:20,
1146:5, 1155:22, 1156:11,
1165:6, 1166:25, 1171:9
  **showed** [3] - 1112:19, 1143:11,
1154:13
  **showing** [2] - 1108:24, 1176:12
  **shown** [2] - 1120:1, 1128:16

  **shows** [6] - 1107:19, 1132:2,
1157:9, 1157:18, 1167:4,
1176:20
  **side** [1] - 1153:16
  **sight** [1] - 1180:5
  **signal** [1] - 1100:12
  **significant** [4] - 1097:10,
1098:11, 1188:20, 1205:14
  **significantly** [1] - 1141:20
  **sim** [1] - 1159:9
  **similar** [4] - 1110:19, 1148:22,
1152:12, 1217:22
  **similarly** [3] - 1113:24, 1117:13,
1121:11
  **Similarly** [1] - 1124:4
  **simple** [4] - 1131:8, 1133:6,
1136:10, 1206:9
  **simplified** [1] - 1201:10
  **Simply** [7] - 1124:4, 1124:7,
1124:17, 1124:23, 1207:24,
1208:20
  **simply** [5] - 1112:5, 1132:9,
1148:16, 1195:5, 1195:7
  **sims** [2] - 1160:10, 1160:11
  **simulation** [2] - 1158:9, 1159:7
  **simulations** [5] - 1159:2,
1159:4, 1159:6, 1160:1, 1160:5
  **simultaneously** [1] - 1169:2
  **single** [10] - 1098:21, 1130:16,
1183:12, 1183:15, 1183:17,
1186:15, 1194:6, 1195:6,
1197:4, 1210:11
  **single-source** [1] - 1195:6
  **sit** [2] - 1213:11, 1215:1
  **sitting** [2] - 1135:9, 1210:23
  **situations** [2] - 1145:24, 1197:7
  **six** [4] - 1115:5, 1115:9,
1167:10, 1216:1
  **sixth** [1] - 1138:20
  **size** [16] - 1105:5, 1105:8,
1109:17, 1113:18, 1113:20,
1115:8, 1116:25, 1118:16,
1125:23, 1126:16, 1126:20,
1149:14, 1166:17, 1170:19,
1210:2
  **slice** [3] - 1099:4, 1182:1,
1197:5
  **slicing** [5] - 1098:16, 1139:6,
1158:5, 1195:1, 1210:4
  **slide** [13] - 1107:11, 1107:14,
1108:10, 1114:19, 1126:4,
1126:14, 1131:24, 1151:13,
1152:7, 1160:13, 1169:18,
1169:19, 1169:22
  **Slide** [19] - 1108:9, 1114:11,
1122:22, 1126:7, 1129:21,
1129:24, 1139:10, 1140:2,
1144:16, 1151:12, 1151:20,
1152:9, 1152:10, 1153:16,
1158:10, 1158:13, 1160:14,

**Slides** [1] - 1122:8
**slight** [1] - 1203:4
**slightly** [2] - 1199:11, 1216:19
**slow** [2] - 1130:14, 1181:2
**small** [14] - 1127:20, 1149:15, 1152:15, 1152:17, 1166:18, 1166:19, 1169:1, 1171:10, 1177:2, 1188:12, 1191:11, 1199:2, 1210:6
**smaller** [4] - 1149:25, 1171:11, 1171:15, 1173:24
**Smith** [2] - 1094:20, 1177:6
**solution** [18] - 1182:3, 1182:23, 1182:24, 1183:1, 1183:3, 1183:6, 1183:17, 1184:3, 1186:15, 1187:1, 1187:11, 1187:12, 1194:22, 1195:19, 1201:4, 1202:8, 1207:13, 1208:8
**solutions** [19] - 1180:21, 1181:13, 1182:7, 1182:21, 1184:14, 1185:7, 1185:25, 1189:13, 1190:11, 1192:17, 1192:19, 1193:22, 1194:2, 1194:4, 1194:25, 1195:21, 1197:16, 1201:19, 1205:7
**solve** [2] - 1196:11, 1200:1
**solved** [1] - 1196:10
**solving** [1] - 1188:8
**someone** [4] - 1098:13, 1100:6, 1181:3, 1191:4
**sometimes** [1] - 1114:15
**soon** [1] - 1154:7
**sophisticated** [3] - 1129:23, 1130:3, 1212:18
**sorry** [18] - 1103:4, 1113:5, 1113:19, 1118:13, 1125:25, 1127:11, 1129:24, 1132:5, 1133:10, 1133:14, 1134:23, 1136:7, 1140:15, 1150:2, 1164:13, 1171:20, 1188:17, 1219:9
**sort** [11] - 1111:21, 1179:24, 1180:15, 1182:17, 1182:18, 1182:20, 1182:23, 1186:3, 1189:14, 1201:19, 1213:5
**sound** [1] - 1156:17
**sounds** [3] - 1143:22, 1156:18, 1164:5
**source** [3] - 1155:13, 1163:25, 1195:6
**sources** [5] - 1111:4, 1127:24, 1128:9, 1165:4, 1203:21
**South** [1] - 1094:24
**southerner** [1] - 1181:8
**space** [9] - 1125:2, 1154:8, 1199:24, 1205:2, 1207:25, 1208:1, 1208:3, 1213:10
**spaces** [1] - 1205:3
**speaking** [6] - 1179:13, 1181:3,

1202:11, 1203:5, 1207:9, 1209:22
**special** [1] - 1213:15
**specific** [11] - 1136:17, 1142:8, 1180:21, 1181:13, 1182:9, 1191:9, 1191:13, 1192:7, 1194:7, 1203:1, 1208:10
**specifically** [7] - 1139:8, 1189:16, 1196:14, 1200:25, 1202:25, 1206:5, 1209:15
**specifications** [3] - 1103:18, 1103:20, 1103:22
**specifics** [1] - 1207:8
**speed** [3] - 1101:7, 1101:8, 1156:24
**spend** [1] - 1195:10
**spending** [1] - 1186:1
**spent** [1] - 1099:8
**split** [1] - 1138:8
**splits** [1] - 1176:1
**splitting** [1] - 1158:5
**sponsored** [2] - 1116:24, 1171:8
**Spring** [1] - 1094:24
**springing** [1] - 1180:19
**SSNIP** [4] - 1130:8, 1133:7, 1133:10, 1133:14
**stack** [1] - 1108:13
**stacked** [1] - 1114:23
**stake** [1] - 1121:1
**stakes** [1] - 1120:24
**standard** [3] - 1179:17, 1196:4, 1201:20
**stands** [1] - 1129:18
**start** [2] - 1104:25, 1109:17
**started** [2] - 1162:5, 1201:15
**starting** [5] - 1112:22, 1112:23, 1116:19, 1135:17, 1135:21
**starts** [1] - 1201:18
**State** [6] - 1094:20, 1094:23, 1128:22, 1128:25, 1205:23, 1209:14
**state** [9] - 1109:10, 1121:25, 1124:7, 1129:4, 1163:1, 1178:21, 1182:5, 1210:10, 1221:18
**statement** [3] - 1141:11, 1142:1, 1221:13
**STATES** [2] - 1094:1, 1094:11
**states** [28] - 1098:8, 1121:18, 1121:19, 1123:18, 1123:20, 1129:7, 1130:5, 1130:6, 1130:9, 1130:10, 1131:15, 1131:20, 1132:3, 1132:15, 1132:18, 1132:22, 1132:23, 1133:8, 1133:19, 1134:2, 1134:7, 1134:10, 1146:13, 1163:4, 1206:14, 1207:20, 1207:25
**States** [15] - 1094:3, 1094:14, 1095:11, 1096:3, 1096:8,

1096:11, 1109:7, 1109:9, 1110:4, 1110:10, 1115:22, 1118:16, 1121:7, 1121:17, 1162:3
**stay** [3] - 1189:19, 1200:17, 1213:2
**stays** [1] - 1114:1
**stenograph** [1] - 1224:7
**step** [3] - 1177:21, 1222:19, 1223:8
**steps** [1] - 1182:9
**still** [9] - 1169:14, 1169:16, 1169:17, 1175:12, 1192:1, 1206:16, 1210:7, 1221:18
**strategic** [2] - 1198:17, 1211:10
**strategies** [5] - 1181:21, 1182:12, 1182:13, 1205:6, 1217:22
**strategy** [4] - 1193:10, 1211:6, 1218:24, 1219:1
**Street** [4] - 1094:17, 1094:24, 1095:3, 1095:7
**strong** [4] - 1175:23, 1212:8, 1212:12, 1212:13
**structured** [1] - 1199:11
**studied** [2] - 1142:22, 1166:16
**studios** [1] - 1200:24
**study** [4] - 1124:16, 1143:4, 1143:19, 1164:21
**subject** [2] - 1100:7, 1177:17
**subjects** [1] - 1204:16
**submit** [1] - 1218:2
**subpoena** [1] - 1102:24
**subscriber** [1] - 1102:3
**subscribers** [3] - 1101:23, 1102:11, 1102:18
**subset** [2] - 1191:17, 1204:23
**subsidiaries** [2] - 1199:3, 1208:5
**subsidiary** [2] - 1206:20, 1220:23
**substantial** [2] - 1133:24, 1174:16
**substantially** [1] - 1176:18
**suddenly** [1] - 1206:19
**sued** [1] - 1120:15
**suffered** [1] - 1148:11
**sufficient** [2] - 1142:15, 1223:12
**sufficiently** [1] - 1134:9
**suggest** [1] - 1177:3
**suggested** [2] - 1177:5, 1223:19
**Suite** [2] - 1094:18, 1094:24
**sum** [9] - 1110:2, 1110:3, 1110:11, 1110:12, 1110:15, 1110:17, 1110:23, 1113:16, 1114:14
**Sum** [1] - 1104:17
**SUM** [1] - 1104:19

**supply** [1] - 1108:18
**support** [2] - 1152:10, 1153:15
**suppose** [1] - 1192:14
**supposed** [2] - 1097:11, 1111:25
**suppress** [1] - 1100:25
**surprise** [1] - 1102:5
**survey** [3] - 1162:9, 1166:4, 1166:5
**sustainably** [1] - 1180:13
**Swedish** [1] - 1181:6
**swing** [1] - 1189:21
**switching** [3] - 1143:8, 1143:20, 1145:13
**sworn** [1] - 1178:15
**swung** [1] - 1182:19
**Sysco** [4] - 1099:9, 1099:10, 1099:13, 1099:16
**system** [4] - 1182:12, 1205:5, 1218:4, 1220:13
**systems** [6] - 1175:23, 1184:19, 1185:4, 1186:18, 1191:16, 1193:9

# T

**tab** [6] - 1105:15, 1106:17, 1106:20, 1108:20, 1113:15, 1162:9
**Tab** [46] - 1104:5, 1104:8, 1105:11, 1105:18, 1106:8, 1108:15, 1108:24, 1111:16, 1112:12, 1112:16, 1112:21, 1113:8, 1113:11, 1113:13, 1115:11, 1116:2, 1116:5, 1116:14, 1118:7, 1119:20, 1123:5, 1127:9, 1128:11, 1131:24, 1133:5, 1135:22, 1136:4, 1136:24, 1137:1, 1137:17, 1137:18, 1137:21, 1137:23, 1139:25, 1140:11, 1140:13, 1154:16, 1155:17, 1157:1, 1162:8, 1170:1, 1171:2, 1171:20, 1174:21, 1176:4
**table** [2] - 1155:8, 1177:5
**tables** [2] - 1150:16, 1155:9
**tabs** [2] - 1135:10, 1137:2
**Tabs** [2] - 1106:3, 1135:14
**tactics** [1] - 1183:7
**talks** [3] - 1097:15, 1097:16, 1147:13
**TBD** [1] - 1151:2
**teach** [1] - 1163:21
**team** [1] - 1096:14
**technical** [1] - 1158:22
**technologies** [2] - 1192:13, 1198:23
**technology** [3] - 1171:15, 1200:22, 1201:8
**tedious** [1] - 1112:16

**telecommunications** [1] - 1190:10
**ten** [4] - 1104:24, 1105:21, 1163:10, 1167:17
**tend** [1] - 1174:6
**Tennessee** [1] - 1123:18
**tension** [1] - 1097:1
**term** [4] - 1158:22, 1186:23, 1188:7, 1188:9
**terms** [5] - 1099:16, 1149:5, 1164:5, 1189:16, 1204:17
**territories** [11] - 1114:19, 1122:8, 1130:6, 1132:25, 1148:1, 1148:2, 1148:8, 1160:9, 1160:11, 1169:12, 1169:13
**territory** [4] - 1119:19, 1119:22, 1130:16, 1132:23
**testified** [14] - 1102:21, 1107:7, 1117:20, 1118:4, 1122:19, 1122:24, 1125:7, 1129:11, 1160:12, 1164:19, 1173:20, 1177:7, 1178:16, 1207:18
**testify** [2] - 1123:2, 1169:20
**testimony** [24] - 1097:7, 1099:11, 1099:17, 1099:23, 1100:16, 1106:12, 1117:22, 1117:23, 1119:2, 1120:20, 1121:4, 1121:9, 1124:25, 1142:23, 1143:13, 1144:13, 1144:14, 1144:17, 1145:15, 1158:19, 1177:9, 1220:21, 1221:11, 1223:6
**testing** [1] - 1201:2
**Texas** [6] - 1123:19, 1128:19, 1128:23, 1147:24, 1148:7, 1157:21
**that'd** [1] - 1145:21
**THE** [146] - 1094:1, 1094:1, 1094:10, 1096:2, 1096:6, 1096:16, 1097:5, 1108:20, 1111:17, 1111:21, 1112:7, 1112:17, 1112:22, 1112:25, 1113:2, 1113:4, 1117:14, 1117:16, 1117:17, 1118:11, 1118:14, 1118:23, 1121:16, 1121:21, 1121:25, 1122:1, 1122:2, 1127:23, 1128:1, 1128:4, 1129:19, 1130:11, 1130:12, 1130:20, 1130:22, 1136:1, 1137:4, 1137:7, 1137:14, 1140:23, 1141:1, 1141:4, 1141:7, 1141:22, 1142:9, 1144:18, 1149:19, 1154:6, 1154:11, 1154:17, 1154:20, 1154:21, 1154:24, 1154:25, 1155:6, 1155:14, 1162:11, 1162:15, 1165:14, 1165:21, 1165:25, 1166:6, 1167:16, 1167:21, 1169:18, 1169:21, 1169:24, 1171:18,

1177:16, 1177:21, 1177:23, 1177:24, 1178:6, 1178:8, 1178:13, 1178:18, 1181:2, 1181:9, 1181:10, 1181:11, 1187:3, 1187:5, 1188:17, 1188:19, 1188:23, 1189:4, 1191:3, 1191:7, 1191:20, 1191:22, 1194:8, 1194:11, 1194:17, 1194:20, 1195:12, 1195:13, 1197:21, 1197:22, 1198:19, 1198:20, 1198:24, 1199:5, 1203:20, 1204:1, 1205:12, 1205:16, 1206:2, 1206:5, 1206:11, 1206:21, 1207:4, 1207:7, 1207:16, 1208:1, 1208:7, 1209:4, 1210:22, 1211:2, 1211:18, 1213:2, 1213:5, 1213:12, 1213:14, 1213:20, 1213:24, 1216:7, 1216:8, 1218:12, 1218:16, 1218:20, 1218:21, 1218:23, 1218:25, 1219:9, 1219:11, 1219:17, 1219:19, 1220:18, 1220:22, 1220:25, 1221:1, 1221:2, 1222:1, 1222:19, 1223:3, 1223:14
**themselves** [10] - 1155:3, 1168:13, 1182:11, 1182:22, 1187:1, 1201:24, 1213:3, 1217:13, 1218:7, 1220:7
**theoretically** [1] - 1221:19
**there'll** [1] - 1174:18
**there're** [2] - 1189:9, 1196:9
**they've** [4] - 1190:16, 1198:24, 1201:21, 1213:3
**They've** [1] - 1198:9
**thinking** [1] - 1136:8
**thinks** [1] - 1098:25
**third** [5] - 1109:23, 1119:5, 1192:10, 1212:23, 1213:1
**third-party** [3] - 1192:10, 1212:23, 1213:1
**threat** [4] - 1143:1, 1143:8, 1143:16, 1188:16
**threatened** [1] - 1143:12
**three** [27] - 1114:13, 1122:4, 1134:12, 1134:14, 1140:11, 1140:20, 1141:21, 1142:2, 1142:13, 1142:15, 1148:24, 1149:3, 1149:6, 1149:12, 1150:11, 1158:13, 1159:8, 1162:10, 1163:4, 1173:21, 1174:2, 1175:3, 1187:12, 1187:16, 1187:20, 1187:22, 1223:3
**three-quarters** [1] - 1223:3
**three-to-one** [1] - 1149:3
**three-year** [2] - 1148:24, 1149:6
**threshold** [3] - 1134:11, 1169:15, 1169:16

**thresholds** [2] - 1133:23, 1169:17
**ties** [2] - 1113:9, 1193:19
**tight** [1] - 1100:13
**tipping** [1] - 1179:24
**today** [25] - 1096:9, 1099:20, 1122:5, 1156:14, 1162:2, 1163:12, 1172:23, 1174:8, 1180:25, 1184:15, 1186:19, 1187:11, 1192:20, 1194:23, 1199:14, 1201:16, 1204:25, 1207:2, 1207:19, 1208:11, 1208:21, 1213:9, 1221:17, 1221:22, 1221:23
**today's** [1] - 1171:14
**together** [7] - 1150:4, 1183:4, 1194:2, 1194:18, 1211:4, 1219:22, 1220:23
**took** [4] - 1116:10, 1161:11, 1161:12, 1215:3
**tool** [1] - 1201:21
**top** [10] - 1104:24, 1105:21, 1106:19, 1123:14, 1140:14, 1144:3, 1144:5, 1144:10, 1154:12, 1162:21
**topic** [1] - 1221:7
**topics** [1] - 1119:19
**total** [10] - 1115:18, 1126:1, 1126:16, 1126:20, 1127:6, 1127:13, 1127:16, 1127:21, 1176:12, 1185:7
**totaling** [1] - 1152:2
**totals** [1] - 1116:11
**Towers** [2] - 1144:24, 1145:3
**TPA** [6] - 1117:25, 1172:12, 1182:11, 1186:9, 1192:14, 1198:25
**TPAs** [16] - 1098:16, 1117:20, 1118:4, 1171:9, 1171:12, 1171:16, 1172:16, 1172:18, 1172:19, 1184:18, 1185:10, 1185:12, 1186:11, 1193:9, 1195:1, 1205:3
**trace** [1] - 1139:10
**traded** [5] - 1193:6, 1197:18, 1197:23, 1199:25, 1204:10
**traditional** [13] - 1183:16, 1185:19, 1193:2, 1193:5, 1193:11, 1194:5, 1197:15, 1197:16, 1197:17, 1198:2, 1199:6
**traditionally** [1] - 1196:18
**transaction** [7] - 1097:12, 1097:13, 1120:5, 1120:7, 1120:11, 1120:17, 1202:16
**transcript** [2] - 1224:6, 1224:8
**TRANSCRIPT** [1] - 1094:9
**transfer** [1] - 1222:12
**traveling** [1] - 1205:10
**treat** [2] - 1168:17, 1210:7

**treated** [2] - 1168:3, 1168:19
**trend** [3] - 1179:18, 1180:2, 1203:10
**trends** [1] - 1180:13
**trial** [3] - 1101:7, 1132:17, 1208:3
**Trial** [1] - 1094:4
**TRIAL** [1] - 1094:9
**tried** [1] - 1164:6
**troubling** [1] - 1175:20
**true** [13] - 1101:18, 1101:21, 1111:24, 1112:1, 1131:16, 1148:3, 1150:15, 1151:23, 1174:2, 1193:1, 1193:4, 1224:6, 1224:7
**truncating** [1] - 1099:16
**try** [3] - 1096:16, 1100:25, 1152:13
**trying** [4] - 1118:24, 1199:2, 1220:22, 1222:21
**Tufts** [4] - 1116:19, 1162:22, 1175:13, 1185:4
**tune** [1] - 1189:23
**turn** [11] - 1104:4, 1151:20, 1153:15, 1170:1, 1171:2, 1171:11, 1171:12, 1171:23, 1174:21, 1176:4
**turning** [2] - 1106:8, 1132:5
**twice** [2] - 1099:6, 1100:4
**two** [37] - 1097:25, 1100:18, 1103:20, 1107:21, 1108:6, 1108:11, 1110:19, 1114:18, 1115:16, 1120:25, 1121:22, 1122:16, 1127:15, 1137:4, 1142:12, 1142:14, 1144:3, 1144:5, 1144:10, 1144:22, 1146:19, 1150:10, 1150:25, 1155:22, 1159:8, 1166:23, 1174:4, 1174:13, 1174:19, 1187:4, 1191:16, 1207:11, 1220:5, 1221:2, 1223:8
**type** [1] - 1208:15
**typed** [1] - 1100:2
**types** [2] - 1190:1, 1194:4
**typical** [1] - 1173:19
**typically** [4] - 1214:2, 1214:3, 1214:5, 1215:1
**typing** [1] - 1181:3

# U

**U.S** [11] - 1094:16, 1114:13, 1118:5, 1122:9, 1126:21, 1140:3, 1168:20, 1168:21, 1169:6, 1170:8, 1170:21
**UHG** [1] - 1199:10
**ultimate** [1] - 1214:14
**ultimately** [3] - 1191:21, 1202:7, 1213:21
**unbearable** [1] - 1100:9

**unbiased** [3] - 1212:22, 1212:25, 1213:2
**uncertain** [1] - 1187:14
**under** [9] - 1105:18, 1126:11, 1127:13, 1156:3, 1160:23, 1170:7, 1170:15, 1172:9, 1205:4
**underlying** [1] - 1163:25
**underneath** [2] - 1104:17, 1105:14
**understandable** [1] - 1101:1
**understood** [1] - 1124:25
**undertake** [1] - 1138:20
**unhappy** [1] - 1163:22
**UniCare** [4] - 1122:19, 1221:15, 1221:16, 1221:19
**unified** [1] - 1220:12
**unit** [1] - 1202:11
**UNITED** [2] - 1094:1, 1094:11
**United** [25] - 1094:3, 1094:14, 1095:11, 1096:3, 1096:7, 1096:11, 1104:13, 1109:7, 1109:9, 1110:4, 1110:10, 1115:22, 1118:16, 1121:7, 1121:17, 1138:9, 1149:1, 1150:6, 1150:9, 1153:21, 1162:3, 1174:10, 1199:17, 1199:20, 1202:23
**United's** [3] - 1154:1, 1154:3, 1198:5
**united's** [1] - 1199:8
**UnitedHealth** [1] - 1198:20
**UnitedHealthcare** [4] - 1155:1, 1198:3, 1198:15, 1199:10
**UnitedHealthcare's** [1] - 1198:12
**UnitedHealthcares** [1] - 1197:19
**University** [2] - 1116:22, 1175:17
**unknown** [1] - 1151:2
**unless** [1] - 1131:5
**unprofitable** [1] - 1130:9
**unreliable** [1] - 1165:5
**untenable** [1] - 1180:3
**up** [42] - 1096:18, 1101:7, 1104:7, 1114:15, 1114:22, 1114:23, 1115:1, 1115:3, 1115:17, 1117:7, 1117:8, 1118:7, 1118:9, 1119:17, 1122:22, 1123:10, 1128:10, 1130:19, 1131:25, 1133:2, 1134:5, 1146:3, 1146:8, 1148:21, 1151:22, 1153:12, 1154:8, 1155:24, 1157:7, 1158:10, 1158:11, 1160:15, 1162:4, 1163:24, 1164:7, 1167:7, 1167:8, 1169:21, 1180:19, 1183:9, 1187:17, 1188:2
**update** [1] - 1104:1

**uping** [1] - 1190:3
**UPMC** [3] - 1116:22, 1162:24, 1176:1
**UPP** [5] - 1158:10, 1159:7, 1159:9, 1160:1, 1160:5
**upper** [2] - 1171:24, 1172:7
**upset** [1] - 1141:23
**upstart** [1] - 1199:1
**Upstate** [1] - 1121:22
**upswings** [1] - 1203:19
**urge** [2] - 1100:9, 1100:25
**URL** [1] - 1219:25
**usefulness** [1] - 1163:11
**uses** [3] - 1117:25, 1119:7, 1159:13
**utilization** [1] - 1191:14
**utilized** [2] - 1182:15, 1208:11
**utilizing** [2] - 1188:22, 1201:16

## V

**vaguely** [1] - 1143:14
**value** [4] - 1171:24, 1202:10, 1217:24, 1219:6
**variability** [6] - 1165:6, 1165:7, 1166:12, 1166:13, 1166:19
**variable** [4] - 1158:14, 1158:15, 1158:18, 1222:7
**various** [21] - 1097:11, 1111:22, 1147:4, 1181:19, 1181:22, 1182:11, 1182:12, 1183:3, 1185:4, 1193:22, 1194:3, 1196:16, 1198:22, 1200:16, 1204:11, 1205:3, 1211:14, 1212:9, 1213:16, 1214:19
**vast** [3] - 1118:18, 1171:9, 1176:2
**vehicle** [1] - 1193:2
**vendor** [2] - 1197:4, 1214:14
**Venn** [1] - 1133:3
**version** [2] - 1108:19, 1118:9
**vertical** [1] - 1186:18
**vertically** [2] - 1182:12, 1184:19
**verticals** [1] - 1194:5
**view** [6] - 1180:15, 1189:15, 1204:5, 1212:12, 1214:23, 1217:5
**vigorous** [2] - 1140:12, 1140:21
**violating** [1] - 1206:14
**virtue** [5] - 1182:25, 1194:14, 1204:19, 1205:8, 1218:17
**voice** [2] - 1212:13, 1220:12
**volume** [1] - 1096:20
**vs** [1] - 1094:5
**vying** [1] - 1196:17

## W

**wait** [2] - 1121:16, 1187:10
**walked** [1] - 1129:13

**wants** [2] - 1096:20, 1099:1
**warn** [1] - 1104:6
**Washington** [7] - 1094:5, 1094:18, 1095:4, 1095:8, 1095:12, 1123:19, 1224:15
**Watson** [2] - 1144:25, 1145:4
**ways** [6] - 1108:7, 1180:12, 1182:1, 1186:6, 1189:23, 1200:5
**web** [5] - 1192:5, 1192:13, 1196:3, 1198:22
**web-enabled** [1] - 1192:13, 1198:22
**website** [1] - 1162:1
**weighted** [2] - 1146:20, 1149:5
**Weiss** [1] - 1095:6
**well-known** [2] - 1175:22, 1197:8
**WellPoint** [4] - 1216:4, 1216:7, 1216:8, 1217:18
**West** [4] - 1161:10, 1161:11, 1161:14, 1161:16
**western** [2] - 1161:12, 1176:1
**Wharton** [1] - 1095:6
**whatsoever** [1] - 1125:2
**whichever** [1] - 1147:7
**WHITE** [1] - 1095:3
**wider** [1] - 1193:10
**Willig** [1] - 1097:15
**willing** [1] - 1105:8
**Willis** [2] - 1144:24, 1145:3
**win** [9] - 1151:15, 1151:16, 1155:9, 1172:23, 1173:2, 1173:9, 1173:13, 1200:16, 1210:16
**win-loss** [5] - 1151:15, 1151:16, 1172:23, 1173:2, 1173:13
**winner** [1] - 1151:1
**winning** [1] - 1200:8
**wins** [2] - 1152:19, 1200:7
**Wisconsin** [3] - 1132:20, 1132:23, 1133:19
**WITNESS** [41] - 1117:16, 1121:21, 1122:1, 1130:12, 1142:9, 1154:6, 1154:24, 1155:6, 1166:6, 1169:21, 1177:23, 1181:10, 1187:5, 1188:19, 1189:4, 1191:7, 1191:22, 1194:11, 1194:20, 1195:13, 1197:22, 1198:20, 1199:5, 1204:1, 1205:16, 1206:5, 1206:21, 1207:7, 1208:7, 1211:2, 1213:5, 1213:14, 1213:24, 1216:8, 1218:16, 1218:21, 1218:25, 1219:11, 1219:19, 1220:25, 1221:2
**witness** [17] - 1098:10, 1098:15, 1098:21, 1099:21, 1101:5, 1111:17, 1111:19, 1165:12, 1167:15, 1177:20,

1178:11, 1178:15, 1209:4, 1222:20, 1222:24, 1223:8
**witnesses** [3] - 1177:18, 1178:2, 1178:5
**won** [3] - 1145:25, 1155:4, 1155:10
**word** [4] - 1131:3, 1158:4, 1172:11, 1208:2
**words** [2] - 1120:14, 1129:13
**works** [3] - 1169:4, 1179:9, 1199:9
**world** [2] - 1171:14, 1197:20
**worry** [1] - 1174:13
**worse** [1] - 1001:2
**write** [3] - 1101:11, 1163:21, 1165:9
**written** [1] - 1164:9
**wrote** [4] - 1145:11, 1164:24, 1165:14, 1210:11
**WTW** [1] - 1145:7

## Y

**year** [27] - 1123:13, 1124:6, 1125:20, 1125:24, 1125:25, 1126:2, 1148:24, 1149:6, 1149:7, 1149:8, 1149:9, 1152:3, 1152:15, 1156:5, 1156:20, 1156:21, 1161:23, 1173:18, 1174:4, 1174:6, 1176:13, 1187:12, 1187:16, 1188:2, 1188:8, 1203:4
**years** [26] - 1140:4, 1147:17, 1147:19, 1147:20, 1149:12, 1151:25, 1152:23, 1161:11, 1162:5, 1163:10, 1165:6, 1173:21, 1174:2, 1174:7, 1179:20, 1187:9, 1187:20, 1187:22, 1190:12, 1201:7, 1202:18, 1203:8, 1203:11, 1216:1, 1217:19
**yellow** [2] - 1116:12, 1116:13
**yellow-highlighted** [1] - 1116:12
**yesterday** [16] - 1097:19, 1101:15, 1107:8, 1108:10, 1108:12, 1111:16, 1112:16, 1112:20, 1114:11, 1127:19, 1132:13, 1158:10, 1168:1, 1168:17, 1176:15, 1177:6
**yesterday's** [1] - 1112:12
**yield** [1] - 1114:4
**yielded** [1] - 1111:12
**York** [3] - 1119:25, 1121:22, 1205:25
**yourself** [4] - 1100:11, 1120:21, 1129:13, 1184:25