IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, et al., | ) Civil Action ) No. 16-CV-1493 |
| | ) |
| Plaintiffs, | ) Bench Trial |
| | ) ***AFTERNOON SESSION*** |
| vs. | ) Washington, DC |
| | ) December 12, 2016 |
| Anthem, Inc. and Cigna Corporation, | ) Time:  2:04 p.m. |
| | ) |
| | ) |
| Defendants. | ) |

_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

_____


**A P P E A R A N C E S**

FOR THE PLAINTIFFS

United States                    **Jon B. Jacobs**
                                 **Scott Ivan Fitzgerald**
                                 **Peter Schwingler**
                                 **Adam Severt**
                                 **Ryan S. Struve**
                                 U.S. DEPARTMENT OF JUSTICE
                                 Antitrust Division
                                 450 Fifth Street, NW, Suite 4100
                                 Washington, DC 20530
                                 (202) 598-8916


State of California              **Emilio Varanini**
                                 ATTORNEY GENERAL'S OFFICE
                                 455 Golden Gate Avenue, Suite 11000
                                 San Francisco, CA  94102


**(APPEARANCES CONTINUED)**

**APPEARANCES (continued):**

For the Defendant:
Anthem, Inc.                    **Christopher M. Curran**
                               **John Mark Gidley**
                               **Heather Burke**
                               **Robert Milne**
                               **Martin Toto**
                               **Michael Hamburger**
                               WHITE & CASE LLP
                               701 13th Street, NW
                               Washington, DC 20005-3807
                               (202) 626-3600

Cigna Corporation              **Charles F. Rule**
                               **Joseph Bial**
                               Paul, Weiss, Rifkind, Wharton &
                               Garrison LLP
                               2001 K Street, NW
                               Washington, DC 20006-1047
                               (202) 223-7300

_____

Court Reporter:                Elizabeth SaintLoth,  RPR, FCRR
                               Official Court Reporter
                               United States Courthouse, Room 6720
                               333 Constitution Avenue, NW
                               Washington, DC  20001
                               202-354-3242

                               *   *   *

**WITNESS INDEX:**

    Dr. David Dranove - Redirect - Page 2500
    Ronald G. Quintero - Direct - Page 2512
    Ronald G. Quintero - Cross - Page 2538
    Ronald G. Quintero - Redirect - Page 2601

1                    **P R O C E E D I N G S**

2              MR. GIDLEY:  Your Honor --

3              THE COURT:  You're back.

4              MR. GIDLEY:  Yes.  Just for a brief correction.

5     Hopefully, it will assist the Court.

6              THE COURT:  All right.

7              MR. GIDLEY:  I misspoke myself.  I said that our

8     citation to Brown showed no distinct prices was page 89.

9     It's page 69.  My IV-H was correct, and the discussion

10    begins on paragraph 185.

11             THE COURT:  All right.

12             MR. GIDLEY:  Sorry about that.

13             THE COURT:  That's okay.  I have already looked at

14    it.

15             All right.  You can proceed.

16                        REDIRECT

17    BY MR. SCHWINGLER:

18    Q     Good afternoon, Professor Dranove.

19    A     Good afternoon.

20    Q     There was some confusion earlier today Centene and

21    Health Net.  I think the record was just unclear.

22    A     Yes.

23    Q     Do you know, did Health Net receive a CID?

24    A     Yes.  Health Net receive a CID.  They are a part of

25    Centene.

1    Q    All right.  And you were asked about a Tab 2 in your

2    witness binder, which is a map purporting to show Cigna rental

3    networks.  Do you recall that?

4    A    Yes, I do.

5    Q    When you testified earlier you couldn't recall seeing

6    that map before; is that right?

7    A    Yes, that's correct.

8    Q    Could you open your rebuttal report?  It should be in

9    one of those binders.  And turn to page 110, paragraph 305.

10            THE COURT:  Do you know where it is in the binder?

11   We only have 146 tabs.

12   A    Which paragraph?

13   Q    Paragraph 305 on page 110 of your rebuttal report.

14   A    Yes.  I have that.  Yes.

15   Q    Could you just review paragraph 305 and see if it

16   refreshes your recollection on this point?

17   A    Yes.  I recall this now.

18   Q    Okay.  And did, in fact, you review that map of

19   purported rental networks when reviewing Professor Willig's

20   opening report?

21   A    Yes, it was in his report.  I just didn't recall him

22   presenting it at trial.

23   Q    Do you agree that that map shows rental networks that

24   Cigna uses?

25   A    Not exactly.  It's a combination of factors.

1          Some of these are companies owned by Cigna or joint

2    ventures with Cigna.  The maps themselves, the shaded areas --

3    it's hard to say that the entire area that's shaded is actually

4    an area with a rental network.  In many of these states, it's

5    just rural parts of the states.  So I think this map is

6    misleading.

7          Q    Did you make that criticism in your rebuttal report?

8          A    Yes, I did.

9          Q    Did Professor Willig present this map as part of his

10   testimony in open court?

11         A    No, he did not.

12         Q    You were asked about testimony from an Anthem witness

13   Swati Mathai?

14         A    Yes.

15         Q    That testimony was characterized to you and you were

16   asked if you recalled the testimony.  I'd actually like you to

17   look at the actual testimony.

18              Could you pull up line 1257 -- sorry -- page 1257, and

19   then lines 2 through 6?

20         A    Yes.

21         Q    And, actually, the lines should be just below that,

22   lines 7 through 9, to include that as well.

23         A    Yes.

24         Q    So when you testified earlier that you recall this

25   testimony, did you recall the specific question asked of

1    Ms. Mathai and her specific answer?

2         A    No.  I wasn't recalling this deposition.

3         Q    All right.  Starting at line 7, the actual question

4    was:  And approximately how many of those 550 national accounts

5    would you estimate have below 5,000 members?

6              And her answer was:  Probably between 30 and 50

7    percent.

8              Do you see that?

9         A    Yes, I do.

10        Q    You were asked earlier today about employees.  What's

11   the distinction?

12        A    We recall that members are those who have signed up for

13   the plan, but my market definition was based on employees.

14        Q    So if Anthem has a national account for which it has

15   4500 members, could that company still be a company with more

16   than 5,000 employees?

17        A    Yes.  And Anthem recalls -- reports their data by

18   employees.  They could easily have 4,500 members and have well

19   over 5,000 employees.

20        Q    If you could turn to tabs 141 and 142 of the binder.

21        A    Okay.

22        Q    Tab 141 is the spreadsheet with the slices.

23        A    Yes.

24        Q    And tab 142 is a document that was -- I think lists

25   something along the lines of 25 or 26, customers.

1    A    Yes.

2    Q    And you were asked if the customers listed on the

3  document, in tab 142, were listed on the spreadsheet in tab 141.

4  Do you recall that?

5    A    Yes, I do.

6    Q    And have you actually gone through all 26 customers to

7  see if they are or are not listed on that spreadsheet?

8    A    No, I had not.  I accepted the assertion that they

9  weren't listed [sic].  But I did not actually do my own

10  calculation or compare the two.

11    Q    You were asked a question about Dr. Fowdur's critical

12  loss analysis.

13    A    Yes.

14    Q    Did you consider the critical loss analysis that

15  Dr. Fowdur presented?

16    A    No, I did not.

17    Q    Did you do your own empirical estimate of whether

18  national accounts product market passes the hypothetical

19  monopolist test?

20    A    Yes, I did, using the equivalent of the critical loss

21  and critical elasticity analysis and actually looked at the

22  actual elasticity in the market, whereas Dr. Fowdur simply

23  identified an elasticity you would need to find in order to

24  violate the test; but she didn't actually look at the actual

25  elasticity.

1    Q    And under your analysis, what was the outcome?

2    A    The outcome was that -- the hypothetical monopolist

3  test was easily passed, and it was a well-defined market.

4    Q    You were asked earlier about your testimony a week ago

5  Friday about provider systems that might give Cigna a better

6  rate than Anthem to prop Cigna up.  Do you recall that?

7    A    Yes.

8    Q    Are you aware of any examples of that phenomenon in the

9  trial record in this case?

10   A    No, I am not.

11   Q    You were asked about use of the terminology related to

12 discounts.

13   A    Yes.

14   Q    Can you remind us of the historical origin of that

15 term?

16   A    Sure.  Back in the 1980s some insurers started to

17 negotiate discounts off of charges with some hospitals.

18        Over time, that was replaced, to a certain extent, due

19 to other reimbursement systems, especially with respect to the

20 payment system based on DRGs.  And while that terminology is

21 still used today, it's even used for physicians for whom there

22 was never such a thing as a negotiated discount.

23        Physicians have been paid according to a relative value

24 scale since the 1990s.

25   Q    Can you turn to tab 18 in your binder?

1   A    Sure.  Okay.

2   Q    DDX0095.

3   A    Yes.

4   Q    This document claims as a source of only 5500.  Do you

5   see that?

6   A    Yes, I do.

7   Q    Can you tell, by looking at this document that was

8   presented to you today, whether these enrollment numbers are for

9   health insurance or dental or disability, or something else?

10   A    No.  And we know that there are lots of ways in which

11   TPAs and other carriers slice insurance.  I can't tell if this

12   is slicing the medical coverage or slicing dental, or something

13   else.

14   Q    Could you turn to -- well, I guess you don't have to

15   turn to the tab.  Tab 87 is the Abbott testimony about

16   repricing.  Do you recall that?

17   A    Yes.

18   Q    And did Dr. Israel conduct a repricing analysis when

19   calculating his $2.4 billion in claim savings?

20   A    No.

21   Q    If he had done a repricing analysis, would that have

22   avoided some of the issues that you identified, in terms of the

23   reliability of that $2.4 billion?

24   A    Yes, I believe so.

25   Q    You were asked whether you calculated the efficiency of

1   American hospitals in any of your reports.  Do you recall that?

2       A    I was asked that, yes.

3       Q    Did Dr. Israel calculate the efficiency of any American

4   hospital?

5       A    No.

6       Q    Did any of defendants' experts go through that

7   analysis?

8       A    No.

9       Q    And would that be a relevant analysis for purposes of

10  understanding this merger?

11      A    No.  I don't really see the relevance.

12      Q    All right.  You were asked about HCA, Hospital

13  Corporation of America.  Do you recall that?

14      A    Yes.

15      Q    And if one were to try to understand the profitability

16  of hospitals throughout the United States, is HCA a

17  representative example?

18      A    No, it's not.  It's, I believe, the largest of all of

19  the for-profit chains.  The for-profit hospitals collectively

20  represent only about 10 percent, give or take, of America's

21  hospitals; so it's clearly not representative.

22      Q    And you were asked about DX0714, which was Dr. Israel's

23  calculation robustness check, using Aon data.  Do you recall

24  that?

25      A    I recall that, yes.

1    Q    Can you remind us, what was your original criticism of
2    the numbers presented on DX714?
3    A    His original analysis was flawed because he didn't do
4    proper weightings.  He gave too much weight to smaller markets.
5    Q    All right.  And among the various materials that were
6    put in front of you this morning, before lunch, did any of them
7    change your opinion about your criticism of the numbers on
8    DX714?
9    A    No.  I think DX714 is still flawed.
10   Q    And right before lunch you testified about a
11   calculation you did involving 100- to $500 million in lower
12   provider rates.  Do you recall that?
13   A    Yes, I do.
14   Q    Can you plug savings of that nature into a static
15   merger simulation and yield a legitimate prediction of the
16   effects of this merger on consumers?
17   A    No, for three reasons.
18        First, the 100- to 500 million was based on a scenario
19   that I argued is just not consistent with the testimony we have
20   heard; namely, that there will be no issues associated with the
21   best-efforts rule; that Cigna will not have any re-branding.  In
22   fact, we expect there to be some re-branding; so that is one
23   reason why you just can't use those numbers.
24        Second, those numbers are assuming that there won't be
25   additional effects felt, for example, by providers who might be

1  less willing to collaborate or quality effects, such as those I

2  have testified to.

3        Third, that simulation completely ignores the effects

4  of invasion.  In other words, that simulation focuses on a

5  short-term, unrealistic scenario that doesn't capture a broader

6  set of effects that are relevant to this case.

7    Q    Does the mathematics behind that simulation hold

8  constant provider quality of care?

9    A    It holds constant provider quality, the willingness to

10  collaborate, and innovation.  And, of course, all of those are

11  likely to change as a result of the merger, which means that

12  that simulation result is not a prediction of what is going to

13  happen for the merger; it's a portion of what will happen in an

14  unrealistic scenario.

15            MR. SCHWINGLER:  No further questions, Your Honor.

16            THE COURT:  All right.  Thank you.

17            MR. GIDLEY:  Your Honor, just as a housekeeping

18        item, we'd like to move the admission of three exhibits; the

19        first is DX763, that was the Emblem website found at tab 16.

20        The second, Your Honor, is DX764, which is the Emblem

21        confidential client information; and the third is found

22        at -- that's DX764.  The third is at tab 118, DX771, the HCA

23        annual report for 2015.

24            THE COURT:  All right.  Any objection?

25            MR. SCHWINGLER:  I guess for what purpose are they

1    being moved into the record?

2           MR. GIDLEY:  Your Honor, to take the top one, the

3    Emblem website -- it's not for the truth, but simply the

4    marketing message of Emblem that they are the leading

5    insurer.

6           THE COURT:  Right.  You can't tell from that who

7    their clients are; whether they're the leading insurer for

8    employers of what size, whether that's national accounts or

9    it's not.  But I think all of that goes to the weight, so

10   all of them will be admitted.

11          (Whereupon, the exhibits were admitted into

12   evidence.)

13          MR. GIDLEY:  Thank you, Your Honor.

14          THE COURT:  All right.  Can Dr. Dranove step down?

15          MR. GIDLEY:  He may.

16          THE COURT:  All right.  You are excused.  Thank

17   you.

18          MR. JACOBS:  Thank you, Your Honor.

19          Your Honor, plaintiffs have one more witness, our

20   efficiencies expert.  I believe his direct examination

21   should be less than an hour, and handling this witness will

22   be my colleague Ryan Struve.

23          THE COURT:  All right.

24          MR. CURRAN:  And, Your Honor, Mr. Milne will handle

25   the witness for the defense.

1          THE COURT:  All right.

2          It's 2:20.  We'll take our midafternoon break at

3     the end of your direct at 3:20.

4          (Whereupon, the witness, Ronald G. Quintero was

5     sworn.)

6          THE COURT:  All right.  You may proceed.

7          MR. STRUVE:  Great.  Thank you.

8          Your Honor, the parties have stipulated to this

9     witness's qualifications as an expert.  And we're offering

10    him as an expert in accounting, finance, and business

11    operations.

12         THE COURT:  All right.  Is that true?

13         MR. MILNE:  Your Honor, we have stipulated to

14    Mr. Quintero's qualifications as a Certified Public

15    Accountant and -- but we have issues which we'll explore

16    during cross-examination concerning the application of those

17    credentials to the matter at hand, which is opining on the

18    cognizability of efficiencies in an antitrust case.  But we

19    are not -- we have stipulated to his qualifications as an

20    expert.

21         THE COURT:  All right.  Certainly, the witnesses

22    that you have put on, Mr. Matheis and others, who have

23    talked about how they did the top-down analysis to arrive at

24    their targets of how much the efficiencies were were not

25    economists, were they?

```
1                    MR. MILNE:  No.

2                    THE COURT:  All right.  If you want to ask him

3        questions on cross, you are free to do so.

4                    You may proceed.

5                    MR. STRUVE:  Thank you.

6                         DIRECT EXAMINATION

7    BY MR. STRUVE:

8        Q    Good afternoon, Mr. Quintero.

9        A    Good afternoon.

10       Q    Generally, can you describe the scope of work that you

11   did in this matter?

12       A    Yes, sir.  I was retained by the Department of Justice

13   to evaluate certain efficiencies and synergies that were

14   proffered by the defendants, and my evaluation is based on the

15   Horizontal Merger Guidelines.

16       Q    What were you evaluating them for specifically?

17       A    For purposes of cognizability based on the Horizontal

18   Merger Guidelines.

19                   MR. STRUVE:  Sam, can you put up PDX13?

20                   Mr. Haley, I think the screens can stay on for the

21       balance of this direct.

22   BY MR. STRUVE:

23       Q    What does it take for a claimed efficiency to be

24   cognizable?

25       A    The Horizontal Merger Guidelines cite three criteria,
```

1    all of which have to be met in order for a claimed efficiency to

2    be deemed cognizable.  First of all, it has to be merger

3    specific.  So one that can only be achieved with a merger and

4    which could not be achieved in the absence of a merger.

5             Secondly, it's got to be based on variable costs, those

6    costs that change with volume, as compared to fixed costs, such

7    as rent, that is unaffected by volume.

8             And finally, they have to be verifiable.  Means of

9    verification include being able to document, based on previous

10   experience of the parties to the proposed transaction in having

11   achieved similar efficiencies in the past.

12            Also, documentation based on identification and

13   quantification with proper support of the claimed efficiencies.

14            And finally, verification based on being able to

15   demonstrate a credible plan with an appropriate level of detail,

16   indicating how the claimed efficiencies can potentially be

17   realized.

18        Q    And a claimed efficiency must meet all three criteria?

19        A    It has to be three for three.

20            If we look at this diagram, it's only where all three

21   overlap that an efficiency can be deemed to be a cognizable

22   efficiency.  I have often described it as being similar to a

23   three-legged stool with each of the criteria being one of the

24   legs, where, if any is removed, the stool does not stand.

25        Q    Do others use this type of methodology for evaluating

```
1   efficiencies?

2        A    Yes, sir.

3             This is the standard means, based on the Horizontal

4   Merger Guidelines, for evaluating claimed efficiency in

5   connection with antitrust matters.  And these are also used

6   pervasively in other areas, such as mergers and acquisitions

7   analysis, evaluating business plans, financial projections, and

8   for many other purposes.

9             THE COURT:  This does seem more to be legal, what

10       you are asking him.

11            MR. MILNE:  Your Honor, this is part of our

12       objection.

13            THE COURT:  Okay.  I got it.

14            It seems to me he's testifying to the legal

15       requirements that I'm going to have to find apply here.  So

16       why is this a matter for an expert witness's testimony?

17            They seem more like legal analyses than opinions,

18       based on his expertise and experience.

19            MR. STRUVE:  Well, the overall framework of

20       evaluating the efficiency comes from the guidelines, of

21       course, but the merger specificity, verifiability, and

22       whether a cost is fixed or variable -- those are all fact

23       conclusions that an accountant or finance expert would draw.

24            So that's -- the total of his testimony will be

25       about whether their claimed efficiencies fall into the
```

 1      merger specificity or variable cost categories, or whether

 2      they have been verified.

 3              THE COURT:  All right.  Well, I will let you go

 4      forward.  I think you should proceed relatively

 5      expeditiously, because this really does seem to me to be the

 6      legal application to the guidelines, all of that which we've

 7      already heard, all of which I understand how everybody is

 8      plugging into this framework.

 9              Assuming you're not really going to take as long as

10      you say, go ahead.  But I don't think -- I feel like these

11      are legal questions, largely, that you are asking him.

12              MR. STRUVE:  Okay.  I hope that we get into

13      portions that are more fact intensive.

14              THE COURT:  All right.

15  BY MR. STRUVE:

16      Q    Mr. Quintero, have you -- what are the three types of

17  synergies or efficiencies that you have evaluated here?

18      A    The three proffered by the defendants pertain to

19  medical and network savings, general administrative expense

20  savings, and revenue synergies.

21      Q    Starting with the general and administrative savings,

22  have you observed trial for the defendants' presentation of

23  those efficiencies?

24      A    I have.

25      Q    During that time, have you heard testimony from them

1    about the integration planning teams creating estimates or

2    targets of G&A savings?

3        A    I have.

4        Q    Are those efficiencies estimates or targets cognizable?

5        A    No, sir.  They are simply as stated, targets.

6             MR. MILNE:  Your Honor, I would renew the

7        objection.  That's a legal conclusion.

8             THE COURT:  I don't understand the need for his

9        testimony on that issue.

10            I mean, if he's going to say:  I crunched the

11       numbers and the numbers aren't coming out that way and the

12       savings are coming from something else other than from the

13       merger, that's one thing.  But if he's going to tell me that

14       their planning is still in its nascent stages and they are

15       not speaking to each other anymore; and they have figured

16       out the targets, but they haven't figured out the bottom up

17       and how they're going to implement the targets, I do not

18       need to hear that from this witness.

19            MR. STRUVE:  Okay.

20            THE COURT:  All right?

21            MR. STRUVE:  Yes, Your Honor.

22   BY MR. STRUVE:

23       Q    Have you looked at the back of the information

24   underlying the G&A estimates?

25       A    I have.

1    Q    What are your overall opinions about the merger

2   specificity of the G&A estimates?

3              MR. MILNE:  Objection, again, Your Honor, legal

4       conclusion.

5              THE COURT:  All right.  Well, I think merger

6       specificity could have some accounting aspects to it, so let

7       me hear what he has to say.

8              I think I certainly -- I will note your continuing

9       objection to this expert.  I understand it.  And I'm going

10      to try to truncate it to the extent I can.

11             MR. MILNE:  Very well.  I understand.

12   A    Many of them are not merger specific but are rather

13  representative of the normal continuous improvement that

14  companies routinely undergo in-house through some combination of

15  continuing improvement, training, retention of consultants,

16  hiring people from competitors, and by other means that are not

17  dependent upon a merger taking place.

18   Q    Do you have opinions about whether the G&A efficiencies

19  relate to variable costs?

20   A    Yes, sir.  Based on what has been proffered by

21  defendants, both in the white paper, back in May, and listening

22  to Dr. Israel's testimony, they have asserted that $515 million

23  of claimed G&A savings pertain to variable cost.  And of those

24  515 million, they have indicated that 361 million have been

25  detailed via a bottom-up analysis.

```
 1        Q     Finally, let's discuss --
 2              THE COURT:  I am not sure I understood your answer.
 3              He said:  Do you have an opinion as to whether
 4        they're based on variable cost?
 5              You said 361 million of the 515 million "they say"
 6        are based on variable costs.  So what are you saying?
 7              THE WITNESS:  Your Honor, that would be the outer
 8        limit based on their own having developed the information as
 9        to what will be variable costs.
10              THE COURT:  So according to them, you're saying
11        it's no more than the 361?
12              THE WITNESS:  With respect to what's a variable
13        cost, yes, Your Honor.
14              MR. STRUVE:  Sam, could you please put up PDX21?
15    BY MR. STRUVE:
16        Q     Finally, let's discuss verifiability.
17              The slide has six points; we can talk about each
18    individually, and some more expeditiously than others.
19              First, what can you tell us about the confidence levels
20    in the underlying data underneath their G&A estimates?
21              MR. STRUVE:  Sam, can you please put up PDX16?
22        A     The integration planning team that developed 400
23    initiatives that are the basis for their claimed efficiencies
24    attributed levels of confidence to many of the efficiencies.
25    And what gives me pause -- knowing that it's extremely common
```

1   that efficiencies do not get realized into actual mergers and

2   acquisitions is such a small portion -- if you look at the blue

3   wedge here, only seven percent of all of the claimed

4   efficiencies developed by the integration teams are ones that

5   they attribute a high degree of confidence in.

6          So if they're not confident in them, and recognize this

7   is an area where, again, failure is quite common, it gives me

8   pause as to how likely it is that what they have developed is to

9   ultimately come to pass were the transaction approved.

10          THE COURT:  This chart itself was used by -- was an

11      exhibit to the Singhal declaration or the data that you used

12      to generate this chart and the size of these pieces of pie

13      that were in his declaration?

14          THE WITNESS:  All of this data was contained in the

15      support for the Singhal declaration.  So all I did was put

16      it into a graphical format.

17          THE COURT:  So in his declaration, he specifies how

18      much he feels his team found a high level of confidence,

19      medium, low, or didn't say one way or the other?

20          THE WITNESS:  In the exhibits and spreadsheets

21      supporting his declaration, yes, Your Honor.

22          THE COURT:  All right.

23   BY MR. STRUVE:

24      Q   Going back to the earlier slide, what can you tell us

25   about the data efficiencies underlying the G&A estimates?

1     A     The G&A estimates are based on data that is not real

2   data -- at least not real financial information.  The data comes

3   from two sources.

4          With Anthem, it reflects general administrative

5   expenses for the eight months ending August of 2015 and

6   projections for the last four months of the year.

7          With Cigna, the data that was used reflects only three

8   months of actual data during 2015; and the other nine months

9   represent projections.

10         Now, one thing I can tell you, from having done

11  projections for more than 40 years and reviewed many of them, is

12  one thing you can say with certainty about any projection is it

13  will be wrong, pretty wrong on the high side or the low side.

14  But none of these numbers have been tied into actual financial

15  information, which is quite perplexing; because according to the

16  testimony that's been proffered, the integration planning team

17  wasn't given the green light by the steering committee to

18  commence their bottom-up analysis until February of 2016.  By

19  February, both Anthem and Cigna had their audited financial

20  statements released.

21         So it mystifies me why they didn't have, as a starting

22  point, financial information that ties in to actual financial

23  statements as opposed to use a combination of some actual

24  numbers and some projected numbers.

25         So in terms of being able to verify any kind of

1    efficiency analysis, there has got to be something -- if we're

2    saying that Anthem is better than Cigna, or vice versa in

3    certain areas -- there has got to be something that you can tie

4    in to real data to know you have got an apples-to-apples

5    comparison.  We don't have it here.

6        Q    Looking at the third bullet, the fixed versus variable

7    costs, what can you tell us about the underlying data about

8    fixed and variable costs?

9        A    The integration planning team had 400 initiatives that

10   they developed that formed the basis for their claimed

11   efficiencies.  In those initiatives, for the most part, they do

12   not differentiate between what is a fixed and what is a variable

13   cost.

14           Fourth --

15           MR. STRUVE:  And, Sam, could you put up PDX22?

16       Q    High portion of total G&A spend.  What can you tell us

17   that you found?

18       A    Through previous testimony, they indicate that a large

19   portion of all the claimed G&A savings would come from being

20   able to eliminate Cigna general administrative expenses.

21           So the relevant expenditure categories, they have

22   indicated that Cigna's expenses are $5.68 billion.

23           The claimed G&A savings are $2.36 billion.  So, in

24   other words, 41 and a half percent of all of the relevant G&A

25   spent by Cigna is deemed to be avoidable.

1          Now, in my experience, I have never seen -- I have

2     never even heard of a situation where this large a portion is

3     deemed to be avoidable.  So again, looking at it, it gives me

4     pause as to realizability.

5          Q    Going back to the slide, the fifth item was lack of

6     Cigna engagement.  How does that affect the verifiability of the

7     G&A estimates?

8          A    As you know, it's well established in the record about

9     the problems engaging Cigna in this whole process.  Given that

10    the bulk of the G&A savings would come from savings at the Cigna

11    level, there is nobody more knowledgeable about Cigna's own G&A

12    costs -- and which are avoidable and which are necessities --

13    than is Cigna and, yet, Cigna basically checked out of this

14    process back in April.

15              In fact, with Mr. Matheis, he wrote an e-mail --

16              THE COURT:  I know about the e-mails.

17              THE WITNESS:  Okay.  And so absence of their

18         involvement absolutely undermines this.

19    BY MR. STRUVE:

20         Q    And then, finally, the "generated outside the course of

21    business"; what does that tell you?

22         A    The Horizontal Merger Guidelines raise an additional

23    level of skepticism to any claimed efficiencies that are not

24    ones that were generated in the normal course of business but,

25    rather, that were created for the specific purpose of being able

1    to support a position in proceedings such as these.

2         MR. STRUVE:  Sam, you can take down PDX21.

3    Q    Mr. Quintero, what are your opinions with regard to

4    what Mr. Matheis called the, quote, best in breed approach to

5    estimating G&A efficiencies?

6    A    It can't be properly done if we've got financial

7    information, or if we don't have financial information that's

8    directly comparable between the two companies; and that's

9    dependent upon having real data, not some combination of

10   projected and actual historical data.

11        When I looked at the underlying details, I saw

12   instances where the disparities between Anthem and Cigna, quote,

13   comparable costs, were so great that it reinforced to me that it

14   is not an apples-to-apples comparison that was used to be able

15   to calculate the claimed efficiencies.

16   Q    Can you give us any examples of claims where there was

17   this certain mismatch in data?

18   A    Example, in adjuster salaries.

19        At the Anthem level, the salary per person was

20   $107,000; at Cigna, it was $175,000.  It is inconceivable that

21   for the same position Cigna is going to be paying 70 percent

22   more than is Anthem.

23        Now, this -- the first cut in similar analyses

24   routinely occurs because of differences in terms of

25   allocations of staff costs, allocations of overhead, and taxes

1   and other matters.  But there is no indication that they went

2   any further than just looking at whatever preliminary numbers

3   that were obtained.

4        I saw that in another example in terms of sales

5   incentives, where Anthem was paying $3 per member, Cigna $9 per

6   member.  These are both sophisticated companies.  It's unlikely

7   that Cigna is paying three times as much as Anthem for the same

8   type of service.  Again, this is the sort of data that is

9   routinely scrubbed down in order to come up with a credible

10  comparative analysis for generating potential savings.

11  Q    So after looking at all 400 of the proposed

12  initiatives, what are your ultimate conclusions about the

13  cognizable G&A efficiencies?

14  A    Based on the three criteria that I described, no more

15  than $192 million worth were potentially cognizable.  However,

16  that $192 million in annualized savings was dramatically offset

17  by the cost to achieve.

18       In information technology alone, the cost to achieve

19  was a one time cost of $825 million.  Mr. Matheis testified that

20  the severance cost of eliminating certain positions would be

21  somewhere between 600- and $800 million.

22       So if we add just the IT costs to achieve and the

23  severance costs to achieve, it's roughly 1.4- to $1.6 billion.

24  So, in other words, $7 initial cost for, at most, every $1 in

25  potential savings.  So on a net basis that, basically, wipes out

1    any claimed efficiencies in the G&A area.

2        Q    Moving on to the revenue synergies.  Did you hear

3    testimony about projected revenue synergies as well?

4        A    I did.

5        Q    What are your opinions about those claimed synergies?

6        A    First of all, the Horizontal Merger Guidelines don't

7    even provide for revenue efficiencies because there is no clear

8    basis for being able to establish how any revenue synergies are

9    going to translate into cost savings for customers.

10            However, setting that aside, when I looked at both what

11   was written and testified about with revenue efficiencies, they

12   are both nonmerger specific.  They were things like:  We're

13   going to create new products; we're going to enter into new

14   markets; we're going to further penetrate markets we're already

15   involved in.  Well, these are things that these companies are

16   doing anyways.  And these are things that don't require a merger

17   to be able to accomplish them.

18            These are things that can be done via a variety of

19   other means; whether it's retaining consultants, training your

20   staff, developing better internal programs.  But Mr. Matheis

21   testified that there is no specific business plan as to how

22   these things are going to be accomplished.  So they are really

23   nothing more than speculative targets.

24       Q    Finally, moving to the network synergies, have you also

25   heard testimony from the integration team's estimates of medical

1   network synergies?

2       A    I have.

3       Q    One of those approaches was to apply the Anthem rates

4   to Cigna claims where the Anthem discounts appear to be higher,

5   or vice versa.  What are your opinions about the cognizability

6   of that mathematical approach?

7       A    It's nothing more than a mathematical approach.  That's

8   not cognizable to the limited degree that they have applied it

9   thus far.

10      Q    And is that calculation tied to the post merger

11  business plans of the companies?

12      A    No, sir.  There is no business plan.

13           With Mr. Drozdowski, he said --

14           THE COURT:  We heard what he said.

15           THE WITNESS:  Okay.

16      Q    Are the calculations tied to the underlying contractual

17  discounts?

18      A    No, sir.

19      Q    Can the contracts even be boiled down to a simple

20  discount?

21      A    No, sir.  They are much more complex than that.

22      Q    Does their approach introduce any biases into the

23  ultimate results?

24      A    There are three major statistical biases that result

25  from the way in which it has been applied.  They are what is

1  referred to as data mining bias, time period bias, and upward

2  bias.

3      Q    Can you explain how data mining bias applies here?

4      A    Data mining bias exists when an analyst mines the data

5  to try and find some hypothesis for a relationship present in

6  the data.

7          And in this particular case, they always mine gold

8  because, in every single case -- and I've looked at the

9  underlying data -- either Anthem has the better discount and

10 that was extrapolated to create a Cigna savings, or vice versa.

11         Now, the normal means by which data mining bias is

12 corrected is the same hypothesis is applied to other periods or

13 out-of-sample data to see if the views with respect to

14 comparative superiority of contracts or discounts seems to be

15 present in that other period.  That was not done.

16         So this is just data that was mined for one period and

17 viewed as being completely applicable for any period.

18     Q    How about time period bias?  How is that applicable

19 here?

20     A    Time period bias occurs when the analyst uses data for

21 just a single time period and applies whatever those results

22 are, again, to all time periods, without seeing whether or

23 not --

24         THE COURT:  Isn't that what you just told me the

25     data mining bias was?

 1          THE WITNESS:  It's another variation.  It's a

 2     cousin of the same type of a bias.

 3          Data mining bias -- you come up with a hypothesis,

 4     you think it's valid; you don't test it.

 5          Time period bias you, first of all, assume

 6     contracts are stagnant, that they never change.  And,

 7     secondly, that you assume that whatever relationship existed

 8     also will never change.

 9          The correction mechanism is the same thing.  You

10     test it for other periods to see if it still holds true.

11     That was not done here.

12          MR. STRUVE:  Sam, can you please put up PDX14?

13 BY MR. STRUVE:

14     Q    Finally, can you explain upward bias?

15     A    Yes, sir.  Upward bias is a statistical issue that

16 occurs when the way in which an analysis is done is prone

17 towards producing higher results than what may truly be valid.

18          MR. STRUVE:  PDX14, I guess, shouldn't go on the

19     public screens.  Thank you.

20     Q    So what does this chart tell you about your analysis?

21     A    Dr. Israel testified that, generally, the Anthem

22 discounts were four to five percent better than the Cigna

23 discounts.

24          When I looked at the underlying data, I was surprised

25 to see routinely the discount differentials were substantially

1   greater than that.

2          With PDX14, it reveals that of the claim savings from

3   the eight months ended August of 2015, that were the basis for

4   this analysis, that 815 million out of 1.138 billion were

5   attributable to situations where the calculated Anthem discount

6   exceeded the Cigna discount by more than 25 percent.  So, in

7   other words, the Anthem discount might have been 60 percent, the

8   Cigna discount might have been 25 percent, so there is a 35

9   percent differential; and that was applied to the Cigna billings

10  in order to create claimed savings.

11         Now, as both testimony from Dr. Dranove, from

12  Mr. Cordani revealed -- these are not true differences in

13  contracts.  These can be a function of the claims mix for a

14  particular period, legacy contracts, or various other issues.

15         And so when I see this huge a disparity of discounts, I

16  know both Anthem and Cigna are sophisticated companies.  Anthem

17  is not that good, and Cigna is not that bad to explain such a

18  large disparity.

19         Now, normally, this would be the starting point for

20  going down to the contract level to see if Anthem's discount is

21  really that much greater, and Anthem's contract is that much

22  greater than Cigna.  There is no evidence of that having been

23  done here.

24         Whatever the mathematical discount was -- the discount

25  differential was, it was used as a basis to calculate claim

1  savings.  So, in other words, the bulk of the claim savings, 815

2  million out of 1.138 billion, came from these large disparities.

3      And the other aspect to upward bias is:  Since the

4  data is based on only eight months' worth of data, they

5  annualized this difference by multiplying the 815 million by the

6  ratio of 12 months divided by eight months to create $1.22

7  billion in claimed M&N savings.

8      So again, it's the bulk of the 1.7 million that they

9  claimed based on the Anthem rates analysis.

10     Q   Well, Dr. Israel testified that while there would be

11  some variability in the data that -- over time and enough

12  instances, that that should all average out.  Is that accurate,

13  in your opinion?

14     A   That's not correct.

15     For example, he said most of the differences might be

16  four or five percent; but you might have an occasional situation

17  where Anthem's discount is nine percent more than Cigna's.  But

18  that would be counterbalanced by another situation where it was

19  only one percent; so, on average, it would be five percent.

20     In looking at the underlying data, the data is not

21  consistent with that testimony because -- as I indicated in the

22  previous exhibit, lots of situations where the Anthem discount

23  exceeded the discount of Cigna by more than 25 percent.  So if

24  we have one 25 percent of Anthem's favor, that's got to be

25  counterbalanced by a negative 15 percent.  But a negative 15

1  percent would not be part of this analysis but, rather, that

2  would be part of the Cigna rates analysis that shows how

3  applying Cigna rates to Anthem's billings creates additional

4  savings.

5       So what we have is a situation where the floor is zero

6  percent.  The ceiling, from looking at the data, can be a 40, 50

7  percent or more differential.  So that methodology inherently

8  skews the claim savings upwards.

9    Q    Moving to the Cigna rates analysis.

10        MR. STRUVE:  Sam, can you put up PDX15?

11        And, again, this needs to stay off of the public

12  monitors.

13    Q    Let's walk real briefly through this chart.

14        For context purposes, the first column is three

15  specific providers.  And their tax identification numbers have

16  been partially redacted; is that right?

17    A    Yes, sir.

18    Q    And the next three columns are, you know, a billed

19  amount, allowed amount, and a computed discount for Cigna,

20  followed by the same for Anthem; is that right?

21    A    That is correct.

22    Q    What does this chart represent in your analysis?

23    A    The issue that comes up here is -- I noticed that the

24  situation -- many of the situations contributing a significant

25  portion of the claim savings from applying Cigna's billings to

1   Anthem's -- Cigna's discount to Anthem's billings came from

2   situations where Cigna had relatively small billings, whereas

3   Anthem had very large billings.

4           Now, it's one thing for a provider, such as a hospital,

5   to give Cigna a better discount on small billings.  But it

6   becomes very painful for them to give those same preferable

7   discounts to Anthem on much larger billings.

8           First of all, as I said before, they may not even be

9   real contractual differentials.  But if we take a look at the

10  first one, with the healthcare provider --

11          THE COURT:  Excuse me.

12          MR. BIAL:  Your Honor, this is highly confidential

13      information.  So if you can direct the witness to not speak

14      of the specifics.

15          THE COURT:  All right.  Let's not use the actual

16      numbers.  Let's just talk about the concepts.

17          THE WITNESS:  Okay, Your Honor.

18          The concept is:  Cigna's billings in that first one

19      were roughly one-sixth of the billings of Anthem.  So Cigna

20      had a higher discount on those small billings.

21          THE COURT:  But as I have been hearing over and

22      over again that you get better rates with providers with

23      more volume -- which is the opposite of what you are

24      saying -- that these are so unique because they were for

25      such small pools of customers they were willing to do it.

1              So how do you -- which way does this go?

2              THE WITNESS:  It goes both ways, Your Honor.

3              When I looked at the underlying data, I saw that in

4     26 percent of the cases actually Cigna had a higher claimed

5     discount based on their data than did Anthem.

6              So it cuts both ways.  And it cuts both ways

7     because, as I previously testified, this methodology is not

8     a reliable methodology to determine who has the better

9     contract.  But it skews the results upwards when you have a

10    discount from small billings being applied to much larger

11    Anthem volume in order to fabricate much larger claim

12    savings.  And that created a significant portion of the

13    claimed savings from what we'll refer to as the Cigna rates

14    analysis, applying Cigna's better rates where they exist to

15    Anthem's billings.

16 BY MR. STRUVE:

17    Q    What percentage of contracts does the planning team

18 assume that they will convert to Anthem rates or Cigna rates one

19 way or another?

20    A    100 percent, every single one.  They assume that if

21 Anthem's got the better rates --

22              THE COURT:  I know what they assume.

23    Q    Is that a reasonable conclusion based on your analysis?

24    A    No, sir.  Because it depends upon a bilateral

25 negotiation to be able to accomplish that.

1    Q    Let's talk a little bit about the methodology used by

2    the planning teams to arrive at this network number.

3         Mr. Matheis testified that they, quote, carved out the

4    low volume providers.  Is that accurate based on your

5    investigation of the spreadsheets?

6    A    That's not true.  The low volume providers were

7    included in this analysis.

8         Hospitals with billing and other institutions with

9    billings under $100,000 were grouped in one category by

10   metropolitan area.  With professions, physicians with billings

11   under 50,000, they were grouped together and treated as if they

12   were another entity.

13   Q    Mr. Matheis also testified that, quote:  We looked at

14   the provider TIN level, at the tax ID number level, so we didn't

15   go in and actually assume below that, end quote.  Is that

16   accurate?

17             THE COURT:  The provider what level?

18             MR. STRUVE:  The provider TIN level, T-I-N.

19             THE COURT:  Tax identification number?

20             MR. STRUVE:  Right.

21             THE COURT:  And what effect would that -- you are

22        saying he did it at -- for each provider based on their tax

23        identification number?

24             MR. STRUVE:  I'm asking if he broke it down further

25        than that.  If that's an accurate statement that he made.

1          THE COURT:  Is that what you saw that they did?

2          THE WITNESS:  No, Your Honor.  They went much below

3     that.  They broke it down not only by tax identification

4     number, but by geographical location.  They distinguished

5     between inpatient, outpatient, and physician services.

6          And, most significantly, they treated ASO and fully

7     insureds as if they were two entirely different contracts,

8     and they produced additional savings, even though they

9     should have both had the same savings because they were the

10    same type of -- the same contract being applied to both.

11    BY MR. STRUVE:

12    Q    Moving away from the specific areas of efficiencies and

13    talking about integrations more generally, what are the key

14    ingredients necessary for a successful integration?

15    A    A successful integration depends on three important

16    issues:  Experience, planning, and people to be able to

17    implement the plan.

18    Q    And were those ingredients present in this case?

19    A    They were not.

20         First of all, nobody has experience in having

21    successfully implemented a business combination of this order of

22    magnitude.  It is in the hospital insurance -- or the health

23    care insurance business, it is without precedent.  It's the

24    largest one that's ever been proposed.

25         With respect to Mr. Matheis, he testified he's never

1    done an integration before.

2           And Anthem's consultant of the last nine years,

3    Mr. Singhal, he said he did one integration back in 2005

4    involving a health insurance company with -- insuring

5    five-and-a-half million lives; so that was a small fraction of

6    this.

7           THE COURT:  I feel like, right now, he's testifying

8        to common sense things for which a lay -- I don't need an

9        expert to help me figure out -- especially given the fact

10       that every single lay witness has already said:  You need

11       all of these things.  And then whether they testify that

12       they have it or not is going to be based on my analysis of

13       the record.

14           So unless he's going to tell me something really

15       arising out of his own experience at a somewhat different

16       level than what he just told me, I don't know that we need

17       to go down this road.

18           MR. MILNE:  Your Honor, I would just add that this

19       last segment of testimony is nowhere disclosed in any of

20       Mr. Quintero's reports.

21           THE COURT:  All right.  Well, I don't think that

22       his telling me what the lay witnesses have said, that

23       doesn't fall into the framework of what might make

24       integration successful or unsuccessful.

25           I am not saying it's not important.  I understand

1    it's a very important part of the Government's case; but I'm

2    very focused on it, and I am not sure that he needs to go

3    through the testimony and tell me who said what about these

4    issues.

5              MR. STRUVE:  Okay.  No further questions, Your

6    Honor.

7              THE COURT:  All right.  Thank you.

8              Any cross-examination.

9              MR. MILNE:  Yes.

10             THE COURT:  It was not meant as a disrespect to

11   you.  People have been educating me for a couple of weeks

12   now.

13             THE WITNESS:  I understand, Your Honor.

14             THE COURT:  Okay.

15             MR. MILNE:  Your Honor, I apologize again.  We have

16   binders to hand to you --

17             THE COURT:  Well, remember, this is testimony that

18   you said is inadmissible and unnecessary, so it shouldn't

19   take you long to cross-examine him.

20             MR. MILNE:  Having done it, we have to address it.

21             THE COURT:  All right.  Well, we have less than an

22   hour of it.

23             MR. MILNE:  Mr. Haley, it's highly likely that most

24   of what we'll put up on the screen will be not for the

25   public.

```
1                    THE COURT:  Oh, for God's sake.

2                    All right.  I hope you will hearken back to

3          something that I said at the very beginning of the trial,

4          that the best and most effective cross-examination in the

5          history of mankind is:  "I have no questions for this

6          witness."

7                    MR. MILNE:  I understand, Your Honor.

8                    We certainly have a few questions for this witness.

9                    THE COURT:  All right.  Well, then he's going to

10         have an opportunity to answer them.

11                   MR. MILNE:  I understand, Your Honor.

12                   THE COURT:  All right.

13                            CROSS-EXAMINATION

14    BY MR. MILNE:

15         Q    Good afternoon, Mr. Quintero.

16         A    Hello.

17         Q    Now, you are not a lawyer, correct?

18         A    I am not.

19         Q    And you have never been qualified as an expert to offer

20    opinions on the cognizability of efficiencies in an antitrust

21    case, have you, sir?

22         A    In deposition testimony I have given such testimony,

23    but not in a courtroom proceeding.

24         Q    In one case, right?

25         A    That is correct.
```

1      Q      And you have never been actually qualified by a court

2  to offer such testimony, have you?

3      A      In connection with antitrust matters?

4      Q      Correct.

5      A      That is correct.

6      Q      And you have never published an article on the standard

7  for assessing efficiencies in antitrust cases, have you?

8      A      I have not.

9      Q      And you said you reviewed the merger guidelines as part

10  of your assignment here?

11      A      Yes, sir.

12      Q      And you understand the merger guidelines are not the

13  law, right?

14      A      I have no opinion of that.  They are a frame of

15  reference that I use as a CPA.

16      Q      And you did not review any court cases or the like to

17  see how courts actually interpret the cognizability of

18  efficiencies, did you, sir?

19      A      I did not.

20      Q      You are not an expert in health care insurance, are

21  you; you don't hold yourself out as one, do you?

22      A      I do not.

23      Q      And among the materials that you listed as having

24  reviewed or relied upon for purposes of your opinions here --

25  and just for purposes of the binders that you have, that first

1   binder set should contain your reports, if you need to reference

2   any of them.

3           But in -- among the materials you listed as having

4   relied upon in your work here, was the deposition of a

5   hospital -- a representative of a hospital, Bon Secours.  Do you

6   recall that?  Mr. Wheeler?

7       A    I do.

8       Q    You deemed that -- that testimony to be appropriate and

9   relevant for your review, right?

10      A    Well, it is one of the things that I reviewed.

11      Q    Right.  And it makes sense that you would do that since

12  you opine about the plausibility of the combined entity actually

13  achieving Anthem level rates in negotiations with providers

14  after the closing, correct?

15      A    Well, to be very specific, I raise the issues in my

16  report and testimony, where I said that it was not cognizable in

17  the way that information was developed.

18      Q    Right.  You offered the opinion that it was not

19  plausible that the NewCo -- that the combined entity would be

20  able to achieve Anthem level rates in individual negotiations

21  with providers, right?

22      A    Would you tell me what you are specifically looking at?

23           THE COURT:  All right.  You know, I didn't let them

24      do this on direct.  So you are now going beyond the scope of

25      the direct, bringing in aspects of his report that I didn't

1    let him testify to.

2            Do you want to go there?

3            Should we take a break now?  You can look at your

4    cross-examination and figure out what you actually want to

5    ask him about and what you don't?

6            Because it seems to me after I heeded your

7    admonitions, granted a lot of your objections, and didn't

8    say:  Don't talk to me about whether these contracts are

9    negotiable or they're not -- if you are going to start

10   getting into his -- under -- what he looked at that underlay

11   an opinion that he did not testify to in this courtroom but

12   is in his report, which isn't in evidence, then all that's

13   going to be in evidence after I kept it out.

14           MR. MILNE:  Well, Your Honor, just to be clear --

15   and I am happy to modify this as appropriate.  But I believe

16   he was allowed to testify about the adequacy of the 100

17   percent confidence -- what they call "assumption," built

18   into the methodology.

19           THE COURT:  Well, they asked him the best of the

20   best.  He said it assumes 100 percent will achieve it.  And

21   when they asked the next question I said:  Been there, done

22   that.  I am pretty sure he did not give all of his reasons

23   for his opinion --

24           MR. MILNE:  And, Your Honor, it's perfectly fine;

25   and I can skip over this.

1          My only point is that:  As part of the work that

2     this expert did on this case, he was provided the deposition

3     transcript of only one provider.  There were 15 providers

4     whose depositions were taken in the case, and he saw only

5     one of them.

6          THE COURT:  That's fine.  It's just you are

7     undermining a portion of an opinion that is in his report

8     and wasn't in his direct testimony, I don't believe.  So go

9     ahead.  But what I'm saying is:  You are now going beyond

10    the scope of direct into things that I didn't actually let

11    him talk about.

12          MR. MILNE:  Okay.  Well, as long as it's clear,

13    Your Honor, that in offering that opinion on the 100 percent

14    that --

15          THE COURT:  Let's just get to the bottom of it.

16          In talking about what hospitals would or wouldn't

17    do, you only read one deposition about a hospital; not all

18    of them?

19          THE WITNESS:  That is my recollection, yes, Your

20    Honor.

21    BY MR. MILNE:

22    Q    And as part of the materials you reviewed in this case,

23    you did not review any of the depositions of any of the

24    individuals involved for either Anthem, Cigna, or McKinsey, for

25    that matter, in the integration planning teams involved in

1    assessing medical or network synergies, did you?

2       A    That's not correct.

3       Q    Can you tell me whose deposition you reviewed?

4       A    Mr. Swedish, Mr. Cordani, Mr. Matheis.  There were two

5    depositions of his.  I reviewed Mr. Schlegel.

6            I was present for the testimony of some of the

7    individuals, for example -- not only the ones that I just

8    mentioned but, also, Mr. Drozdowski.  And there may have been

9    others that I referenced in my reports.

10      Q    You rendered your opinions in this case, sir, well

11   before trial, right?

12      A    Yes, sir.

13      Q    And at the time you rendered your opinions, you had

14   reviewed -- Mr. Drozdowski was the leader -- the co-leader of

15   the medical network savings team, wasn't he --

16      A    Yes, sir, he was --

17      Q    -- as part of the integration planning activities,

18   right?

19      A    My understanding was Mr. Matheis was the individual who

20   was primarily responsible.  And I did review the testimony from

21   his deposition that preceded my releasing my reports.

22      Q    And Mr. Matheis was in charge of the overall

23   integration planning, right?

24      A    Yes, sir.

25      Q    There were various sub-teams that had been developed as

1    part of that overall business project focusing on different

2    areas; isn't that right?

3        A    That is correct.

4        Q    And one of those teams was a medical and network

5    savings team, right?

6        A    Yes, sir.

7        Q    That was the team that focused on the savings available

8    as a result of network synergies in dealing with providers,

9    right?

10       A    Yes, sir.  That would be right.

11       Q    And the leaders of those teams -- of that particular

12   team was Mr. Drozdowski of Anthem, correct?

13       A    I recall his being one of them, yes.

14       Q    Right.  And his deposition was taken in the case; but

15   you didn't review that, right?

16       A    I did not.

17       Q    That was not provided to you by the Department of

18   Justice?

19       A    I don't recall having seen it.

20       Q    And the Cigna lead -- co-lead on that team was

21   Dr. Muney, right?

22       A    Yes.

23       Q    And you didn't review Dr. Moony's transcript either?

24       A    No.  I only saw correspondence from him.

25       Q    And you didn't review any -- you didn't review the

1   depositions of any other Anthem or Cigna employee who was

2   involved in negotiations with providers?

3       A    Can you indicate some names, and I can tell you if I

4   recall them?

5       Q    Sure.  Well, Mr. Drozdowski we have already talked

6   about.  Mr. Golias?

7       A    I do not recall that name.

8       Q    Mr. Garvey?

9       A    I don't recall having done so.

10      Q    Mr. Leopold?

11      A    No.  I don't recall having done so.

12      Q    And you didn't review any of the doc -- you heard --

13  you were in court for Mr. Drozdowski's testimony.  He said there

14  were over 100 meetings held of that integration planning team

15  that consisted of Anthem and Cigna individuals, as supported by

16  McKinsey, held over the course of their work, right?

17      A    I heard them make that claim.

18      Q    And that work continued through June -- late June of

19  2016; isn't that right?

20      A    I don't recall the cutoff point; but it continued

21  throughout a portion of the year.

22      Q    Well after March, right?

23      A    I believe so.

24      Q    And March was the point where, at least, some of the

25  integration planning efforts were scaled back by Cigna, right?

1    A    That is correct.

2    Q    Okay.  And you didn't review the materials reflecting

3  the meetings and the actual activities of the medical and

4  network savings team, did you?

5    A    I reviewed the output of their work, which was included

6  as either portions of Mr. Singhal's declaration, or a number of

7  exhibits pertaining to his declaration and supporting

8  documentation.

9    Q    And -- but you didn't review any of the materials

10  showing their actual business deliberations leading up to their

11  final calculations, did you?

12    A    No, sir.  I reviewed the end result of all of their

13  activities.

14    Q    Okay.  And you didn't review any contracts with

15  providers, did you?

16    A    I reviewed a contract with a provider.

17    Q    One?

18    A    Yes, sir.

19    Q    Okay.  And you didn't review any documents reflecting

20  the history of negotiations between Anthem and any provider to

21  get a sense of its ability to obtain discounts based on the

22  volume of covered lives it had in any particular geography, did

23  you?

24    A    I did not.

25    Q    You didn't do the same with respect to Cigna?

1    A    No, sir.

2    Q    Okay.  With respect to the output -- you said you

3    reviewed the output.  In your deposition, do you recall telling

4    me that you actually couldn't utilize the data; you couldn't

5    read Dr. Israel's data to be able to understand what was in it?

6            MR. STRUVE:  Objection, Your Honor, outside the

7        scope.  He hasn't proffered an opinion about the usefulness

8        of the data that was provided.

9            MR. MILNE:  Your Honor, he just said that he

10        reviewed the data, the final output.

11            THE COURT:  He said he reviewed the output of the

12        work done by Singhal.  Now you are asking about Dr. Israel's

13        data.

14   BY MR. MILNE:

15    Q    Well, did you review material from Dr. Israel?

16    A    I reviewed what was contained within his report.  But

17   the output that I referred to was that of the integration

18   planning team, because that was what was ultimately going to be

19   used; not Dr. Israel's analysis.

20    Q    So you had no problem with Dr. Israel's analysis?

21            MR. STRUVE:  Again, objection, Your Honor.

22            This is, A, irrelevant; and, B, untied to anything

23        we proffered in his direct testimony.

24            THE COURT:  All right.

25            MR. MILNE:  Well, Your Honor, I believe in his

1    direct testimony he was not specific between the work of the

2    integration planning team and/or the work of Dr. Israel as

3    it relates to medical and network savings.

4         If the position today is that this witness is not

5    opining on Dr. Israel's work at all, I can move on.  But in

6    his report he purports to do that, and I believe it was

7    ambiguous.

8         THE COURT:  Let's talk about what he did in court

9    and not in his report --

10        MR. MILNE:  Right.

11        THE COURT:  -- which is not in evidence.

12        MR. MILNE:  Your Honor, but he --

13        THE COURT:  He dealt with some data.  So why don't

14   you ask him if that data which he has criticized and

15   explained that there were gaps between the discounts

16   summarized, but the discounts utilized for the calculations,

17   et cetera -- if he got that from Dr. Israel's report or he

18   got that from -- and then go from there.

19   BY MR. MILNE:

20   Q    When you just referred to the end -- the output, were

21   you referring to Dr. Israel's output or were you referring to

22   the integration planning team's output?

23   A    The integration planning team's work.

24   Q    Okay.  And you are not offering any opinion here today

25   with respect to Dr. Israel's work?

```
 1      A    Not today.  It was contained within my report.

 2      Q    But you are not offering it today?

 3           THE COURT:  It's not what he was offering.  He

 4      wasn't asked to offer it.

 5           MR. MILNE:  Of course.

 6  BY MR. MILNE:

 7      Q    You weren't asked to offer an opinion on Dr. Israel

 8  today?

 9      A    I was not.

10      Q    Very good.  All right.

11           MR. MILNE:  If we could -- I have prepared just a

12      quick summary document here.  If we can put up tab No. 4.

13           I think, actually, this can go on the public

14      screens at the moment.  Tab 4 in your first binder.

15  BY MR. MILNE:

16      Q    Now, Mr. Quintero, this is just a graphical summary of

17  some of the numbers we have been talking about here.  And just

18  to make clear what we're talking about here, there are the three

19  areas of synergies that I believe you mentioned in your direct.

20  You have the medical and network savings, the general

21  administration savings, and then the revenue growth savings,

22  right?

23      A    Yes, sir.

24           May I clarify one thing to make sure there is no

25  misunderstanding?
```

1    Q    Sure.

2    A    On the general administrative savings, Dr. Israel

3  referred to that, although he did not develop that number.  So I

4  want to make sure that the record is clear about that because I

5  did comment about that.

6    Q    Understood.  Understood.

7         And there has been some testimony -- and I just want to

8  be clear here.  The general and administrative cost savings, you

9  are aware that the merging parties, when they announced the

10  deal, announced a synergy target that they thought they could

11  achieve; do you recall that?

12    A    Yes, sir, I do.

13    Q    It was about $2 billion, right?

14    A    That is correct.

15    Q    And that was $2 billion that was largely -- met the

16  general and administrative cost savings, right?

17    A    Yes, sir.

18    Q    They weren't talking about medical and network cost

19  savings or revenue growth targets at that time when they

20  initially announced the deal, were they?

21    A    I don't recall anything specific to revenue growth

22  targets; and it was not geared towards M&N savings.

23    Q    So that general administrative bar in the middle is

24  what ties back to the announcement that the companies made when

25  they announced to Wall Street the synergies they thought were

1    achievable?

2       A    Yes, sir.

3       Q    Okay.  And with respect to medical and network savings,

4    there were -- and I won't spend time with it -- but just to make

5    clear, there were independent analyses done by both Dr. Israel

6    and the Anthem-Cigna, with help from McKinsey integration

7    planning team, right?

8       A    Yes, sir.

9       Q    And in your -- strike that.

10           You are aware that Dr. Israel conducted various merger

11   simulation analyses, right?

12      A    Yes, sir.

13      Q    And you were in court when he testified about those

14   things, right?

15      A    I was.

16      Q    Okay.  And you understand that Dr. Israel used, for

17   purposes of his merger simulation work, the medical -- on the

18   efficiency side, he used the medical and network savings that he

19   estimated, right?

20      A    We're talking about the $2.39 billion?

21      Q    Right.  Right.  He used that.

22      A    When you say he used it, he used it for what purposes?

23      Q    He used it as an input to his merger simulation.

24      A    I do not know enough about how he did his merger

25   simulation.

1          THE COURT:  He was not asked a single question on

2     direct about Dr. Israel's merger simulation.

3     Q    You understand that Dr. Israel used $515 million out of

4     the total G&A savings as part of his merger simulation, right?

5     A    I have no personal opinion on that.

6     Q    Okay.  Now, you testified about -- you testified about

7     how out of that 2.2- to 2.36 billion that was estimated as G&A

8     savings by the integration planning team, that $515 million of

9     that was found by the team to be variable -- variable cost

10    savings.

11    A    That was what was contained in the white paper from

12    May, that is correct.

13    Q    You tabulated the overall G&A spend of the two firms as

14    part of your work in this case, didn't you?

15    A    I did not tabulate that.

16         There -- as I previously testified, there is an

17    indication that out of what was represented as being $21 billion

18    in G&A, that 15 billion was the categories that were looked at

19    by Anthem and Cigna.  And as I previously testified,

20    approximately 5 billion of that was Cigna's G&A, of which

21    they're asserting that, I think, about 2.4 billion, largely from

22    Cigna, is avoidable.  But that's not my tabulation.

23    Q    Okay.  Well, if you could turn to table 2 of your

24    supplemental report, which I think should be the Roman II in

25    that first binder.

1          MR. MILNE:  And if we could just maybe -- let's not put

2     that on the public screen but, hopefully, we can get it up.

3     Q     So in table 2 you reported that the combined G&A spend

4     for the two firms -- I believe this is 2015 numbers -- was

5     16.026 billion?

6     A     Well, these are numbers that I indicate in the last

7     column were my references.  And it's not clear where these

8     numbers came from in terms of how they were developed.  I only

9     indicate the sources of the information.

10          So it's not clear whether they're 2015 or a combination

11    of projected and actual -- or what it is; but this is what was

12    developed by the defendants.

13    Q     When you say that the claimed -- the projected G&A

14    savings represents a particular percentage of Cigna's G&A spend,

15    you are using the numbers contained in table 2 as your reference

16    point, right?

17    A     Yes, sir.  That is correct.

18    Q     And if you were to use the combined G&A spend of the

19    two companies as your reference point, the projected G&A savings

20    as a percentage would be much lower; isn't that right?

21    A     Yes, sir, it would.

22    Q     And if we focus just on the variable piece it would be

23    even lower still, correct?

24    A     From here, where do you see the variable portion?

25    Q     I am just asking you.  We have talked about the

1   variable portion being 515 million.  And if we use that as the

2   comparison as against 16.026, that number, it would be a smaller

3   percentage than the number that you calculated focusing only on

4   Cigna, correct?

5       A    The defendants never differentiated between fixed and

6   variable on a global basis, so there is no information that they

7   have proffered that provides a basis to do that calculation.

8       Q    Well, my question is just very -- is very much more

9   basic.  You testified that $515 million out of the claimed G&A

10  total was said to be variable, right?

11      A    That was what was represented by the defendants, that

12  is correct.

13      Q    Okay.  And if one were to compare that number with the

14  total G&A spend that you report in table 2 for the two

15  companies, that percentage would be on the order of three

16  percent?

17      A    But that's not an apples-to-apples comparison because

18  this 16 million, on this table, includes fixed and variable

19  costs.  So we don't have a number to be able to see what portion

20  of variable costs are potentially being eliminated because it's

21  not been provided.

22          THE COURT:  I think that's his point; that if it

23      was just variable you'd be expecting to glean a much lower

24      percent.

25          You showed these numbers to say this is really a

1    high expectation for what could be achieved.  And what he's

2    saying was if you applied it only to the variable costs, it

3    might seem like a smaller number, which is less unrealistic.

4    Is that what --

5            MR. MILNE:  That's part of my point.  And it's

6    also -- the other point, Your Honor, is that when you

7    compare as against the combined G&A spend, the percentages

8    are much more modest.  This is a combined company, and they

9    are talking about savings across the two companies.

10           But I will move on, Your Honor.  I think the point

11   has been made.

12   BY MR. MILNE:

13   Q    Now, back to the medical and network here for a moment.

14   You testified -- strike that.

15           In table 3 of your supplemental report --

16           MR. MILNE:  And this, again, is nonpublic, so if we

17   can keep it off the public screen.

18   Q    In table 3 of your report, you identified -- you break

19   out some of the specific numbers that build up to the overall

20   medical and network savings, correct?

21   A    Yes, sir.

22   Q    Okay.  The largest two are the Anthem rates and the

23   Cigna rates, the first 200 network efficiencies, right?

24   A    Yes, sir.  That is correct.

25   Q    And the Anthem rates number represents the calculation

1    of the savings expected if Cigna clients take advantage of rates

2    currently being enjoyed by Anthem, where Anthem has the lower

3    average pricing with the provider, right?

4        A    That actually misstates what was actually done.

5             Remember, it's not current rates.  It reflects

6    discounts over the relevant time period --

7        Q    Right, in 2015.

8        A    -- that were developed in this analysis.

9             But it's not comparing rates, it's comparing

10   mathematically computed discounts and assuming that that's a

11   basis of contract differentials.

12       Q    Okay.  And the second largest is the Cigna rates, one

13   where it's the opposite, where -- it's a situation where Cigna

14   is determined to have the better discount, and now Anthem rates

15   are applied to that.

16       A    Anthem billings are applied to the differential in

17   discounts.

18       Q    Right.  And you understand that the rationale for these

19   claimed savings is that firms that have more enrolled patients

20   or covered lives generally get better rates, better discounts,

21   than ones who have fewer, right?

22       A    No.  The rationale is just that they can force

23   whichever is the higher mathematically-computed discount on the

24   provider and that there be no push-back.

25       Q    I am not asking about the mathematics of it, I am

1    asking about the rationale underlying the methodology.

2          And isn't the rationale underlying the methodology,

3    that firms that have more covered lives generally get better

4    discounts, better pricing from providers than ones who have

5    fewer covered lives; isn't that right?

6    A    Well, that's not a stated rationale, because the number

7    of covered lives don't change whether these two companies are

8    separate or together.  The providers have the same number of

9    covered lives during the relevant time period.

10   Q    Do you know how many covered lives Anthem has as of

11   2016?  38 million or so; is that right?

12   A    There are a number of ways that they are computed,

13   but -- for example, when you referred to the -- indirectly to

14   the press release that came out in July of 2015, when the

15   transaction was announced, that was approximately the number

16   that Anthem represented as having as covered lives.

17   Q    Okay.  And Cigna has about a little over 12 million

18   covered lives?

19   A    My recollection is that that same press release said

20   Cigna had about 14 and a half million, but again, there is a

21   number of different ways how that number can be computed.

22   Q    So if Anthem had on the order of 39 million covered

23   lives before the deal, and now that there is this transaction,

24   the merger closes and now the combined entity has 39 -- 38 and a

25   half, or whatever it may be, plus, say, 14 million covered

```
 1   lives, now that NewCo has more covered lives than Anthem had

 2   before, right?

 3              THE COURT:  More than Anthem and Cigna had before.

 4              MR. MILNE:  Correct.

 5              THE COURT:  Right.  Which those providers, by

 6        definition in this analysis, already were their patients.

 7              MR. MILNE:  Understood, Your Honor.

 8              THE COURT:  Okay.

 9              MR. MILNE:  But it is an entity --

10   BY MR. MILNE:

11     Q    Mr. Quintero, the next time that contract is up for

12   negotiation, the entity that will be negotiating with that

13   hospital is an entity that will have on the order of 25 percent

14   more covered lives to put into the negotiation than Anthem had

15   before; isn't that right?

16              MR. STRUVE:  Objection.

17              THE COURT:  All right.  Let me hear the objection.

18              MR. STRUVE:  Objection to the line of questioning.

19        It's outside the scope of his expertise.

20              He is not an expert in the economics of the health

21        care industry.  And I think that's why, on direct, he

22        assumed an average discount advantage random, four or five

23        percent.

24              THE COURT:  Well, I mean, I think you're kind of

25        arguing with him now; but you can ask that question.  I
```

1    think he answered it.  And we talked -- I talked to

2    Dr. Israel about this a lot.

3              MR. MILNE:  I understand, Your Honor.

4    BY MR. MILNE:

5    Q    Mr. Quintero, your opinion in this case is that zero

6    cognizable -- strike that -- zero verifiable medical and network

7    savings here, correct?

8    A    Based on the horizontal merger guidelines, that is

9    correct.

10   Q    But you don't deny -- you would agree with me, wouldn't

11   you, that the entity that will come out of this merger will have

12   substantially more covered lives than either Anthem or Cigna had

13   alone; isn't that correct?

14   A    On a combined basis, that would be correct.

15   Q    Right.  And would you also agree that this increase in

16   covered lives will give the new company greater leverage in

17   provider negotiations than either company had on its own?

18   A    They have not proffered a business plan as to how

19   they're going to do it.  In some cases it could continue to be

20   Cigna negotiating with a provider, in some cases it could be

21   Anthem negotiating with a provider, it could be a combination of

22   the two.  That has not yet been determined.

23   Q    I'd like to put on the screen a statement that was made

24   at a status hearing in this case and ask you if you agree with

25   it.

1      MR. MILNE: If we can get that up, please. This is

2    a statement made by --

3      THE COURT: Let me ask you something about what you

4    just said. The assumption is that the new company gets

5    greater leverage than either company had before.

6      MR. MILNE: Right.

7      THE COURT: But the best of the best assumes that

8    whichever one has already got the lower discount is not

9    going any lower. So where is the added leverage?

10      MR. MILNE: Well, Your Honor, that is correct.

11    That what the methodology did was conservative in saying:

12    We are going to do -- we are just going to assume that we

13    get the same rate that either Anthem or Cigna was able to do

14    when Dr. Dranove -- the DOJ itself is alleging something

15    more.

16          They're alleging that, as a result of these two

17    firms coming together, they are going to get even better

18    discounts. So that just underscores the conservatism of the

19    medical and network teams' worth.

20      THE COURT: All right. But you said the medical

21    and network team -- I think what you said is: You don't

22    deny, do you, that NewCo is going to get greater leverage

23    than either company had alone?

24      MR. MILNE: Correct.

25      THE COURT: That, as I understand it, is not an

1          aspect of your best-of-the-best calculation.

2                  The best-of-the-best calculation is Anthem already

3          got the best discount Anthem can get, and Cigna is going to

4          get it, too.  And Cigna already got the best discount it can

5          get; and Anthem is going to get it, too.  So there is no

6          greater combined leverage that I heard about from any

7          witness of yours.

8                  MR. MILNE:  No.  Dr. Israel testified about this,

9          Your Honor, to say that one of the reasons that his

10         methodology is conservative is because in the real world it

11         may well be.  And certainly the other side, in this case, is

12         affirmatively arguing that --

13                 THE COURT:  Well, he said there would be a bulk

14         discount.  And we went around and about, well, you can have

15         a bulk discount if you are going to have a better product.

16         But your calculations -- the calculations that you have

17         asked to be considered as offsetting any anticompetitive

18         effect of the merger -- which you also deny -- was based on

19         the best of the best, not achieving greater leverage --

20                 MR. MILNE:  Absolutely, Your Honor.

21                 THE COURT:  -- that's all I wanted to say.

22                 MR. MILNE:  I want to be very clear, too.  That's

23         exactly what we're doing.  And that's part of the reason why

24         we're being conservative, because it is well accepted in

25         this case -- we don't think it amounts anywhere close to

1    monopsony.  But it is well accepted in this case that in

2    this industry, when you gain a significant number of covered

3    lives you have more leverage.

4            I mean, that's -- what I put up on the screen here

5    is Mr. Jacobs himself saying that, you know, he

6    understands --

7            THE COURT:  All right.  Well, what Mr. Jacobs said

8    in a status conference is not evidence, especially in

9    Phase 1.

10           MR. MILNE:  It goes directly to the efficiencies --

11   the conservatism of the efficiencies, Your Honor.  That was

12   my only point.

13           THE COURT:  All right.

14           MR. MILNE:  I am not trying to turn it into

15   evidence.

16           THE COURT:  All right.

17           MR. MILNE:  Maybe we could go to --

18           THE COURT:  I understand your point now, that you

19   are not saying that's how you got to the --

20           MR. MILNE:  Right.

21 BY MR. MILNE:

22     Q    You understand Dr. Dranove has -- I believe some of his

23 opinions were put up on the screen earlier today in which

24 Dr. Dranove says that, absent the merger -- strike that.

25           I will say the acquisition will result in a substantial

1   increase in bargaining leverage over hospitals and physician

2   groups.

3            MR. STRUVE:  Again, Your Honor, objection to this

4       line of questioning.  It's dealing with the economics of the

5       health care industry, not the calculation of efficiencies.

6       So its relevance --

7            THE COURT:  I think it goes beyond the scope of

8       direct.  But, yes, Dr. Dranove said that this morning, and I

9       asked him to elaborate on it.

10           MR. MILNE:  Understood, Your Honor.  And I don't

11      want to try Your Honor's patience, and maybe I'm doing that.

12           But my point is that this witness has come before

13      the Court and is saying said that the medical -- that there

14      is zero cognizable medical and network savings or verifiable

15      medical and network savings when we have -- when it is

16      undeniable that there will be -- the NewCo will have more

17      covered lives and the economists and the fact witnesses say

18      that when you have more covered lives you are likely to do

19      better but you should at least be able to do as well as you

20      did going in with that.  So that's -- I can very much move

21      on, Your Honor.

22           THE COURT:  Right.  I think his point is whether

23      those are merger specific, et cetera, et cetera.

24           MR. MILNE:  We can talk about that.

25           THE COURT:  They have been verified given all of

```
 1        the other testimony.  I don't think he's saying that there

 2        is no math here that could get you those numbers.  I think

 3        he has got a different --

 4   BY MR. MILNE:

 5        Q    Well, have you performed any analysis here to assess

 6   the likelihood, Mr. Quintero, that in any given negotiation that

 7   the new company would have with any provider, the likelihood

 8   that the NewCo will achieve at least the pricing level that

 9   either Anthem or Cigna had going in?

10             MR. STRUVE:  Again, objection, Your Honor.  This is

11        economic testimony.  He is not an expert in negotiation

12        studies.  He is simply evaluating the efficiencies that they

13        have proffered in the underlying analysis of the --

14             THE COURT:  I mean, I feel like you're arguing with

15        the witness and you're asking him the same question multiple

16        times.  If you want to ask that one question, he can answer,

17        then you need to move on.

18             MR. MILNE:  No.  I'll move on.

19   BY MR. MILNE:

20        Q    You haven't done that, have you, sir?

21        A    I have evaluated what has been proffered to me.

22        Q    Mr. Quintero, I'd like to talk to you a little bit

23   about the methodology used in respect of the medical and network

24   savings.

25             You were in court when Mr. Drozdowski testified, right?
```

1    A    I was.

2    Q    He talked about the methodology that the medical and

3  network saving team employed, right?

4    A    I recall his addressing it.

5    Q    And one of the things he said was that the way that the

6  team evaluated discounts was not that different than that which

7  is typically done by consulting firms in this industry, with an

8  important exception that he thought made the approach that the

9  team did in some way superior.  Do you recall that?

10    A    I heard him make that claim.

11    Q    But you haven't reviewed any of the underlying

12  documents reflecting the actual thought processes of the team as

13  they put together their projections, right?

14    A    I reviewed the documents that are referred to in both

15  of my reports.

16    Q    If you could turn to slide 5 in the second binder.

17         THE COURT:  All right.  Well, even though we

18     haven't gotten to the end, we need to have a break that the

19     court reporter needs in the afternoon.  We'll go ahead and

20     take it, and then we'll come back and you can complete your

21     cross-examination.  So we'll break for 15 minutes and come

22     back at about five of 4.  Thank you.

23         (Whereupon, a recess was taken.)

24         MR. MILNE:  Thank you, Your Honor.

25  BY MR. MILNE:

1    Q    Okay.  Mr. Quintero, I think when we broke we were

2 about to look at an exhibit.

3         MR. MILNE:  If we can go to the cover page of this and

4 keep it off the public.  Can we go to the cover?

5    Q    This is -- again, this is tab 44 --

6         THE COURT:  703, thank you.

7    Q    -- in your material.

8         And this is DX0703; and it is in evidence.

9         Mr. Quintero --

10   A    I'm sorry.  You said tab 44 in my binder?

11   Q    I believe it should be tab 44; and it's probably in the

12 third binder.

13   A    Okay.

14   Q    The numbers should progress upward.  It's Roman

15 numerals in that first one and then actual numbers thereafter.

16        THE COURT:  It's also on the screen.

17   Q    It's also on the screen, in case you would like to look

18 at the entire thing.

19   A    All right.

20   Q    Let me know when you are there.

21   A    All right.  I have it.

22   Q    This is a document reflecting the activities of the

23 Anthem-Cigna integration planning team discussing value capture

24 issues, right?

25   A    Yes, sir.

1    Q    And this is a document that you did not list among your

2    reliance material, is it?

3    A    I don't recall if I did, although I saw several

4    evolutions of documents similar to this.

5    Q    Okay.  Now, if I could ask you to turn to slide 5 in

6    the slide there.  Are you there?

7    A    Yes, sir.

8    Q    On slide 5 the team, the medical network savings team,

9    is discussing what kind of methodology it's going to use,

10   correct?

11   A    That's the way they described this document, that is

12   correct.

13   Q    Okay.  And if you look down at the bottom of the

14   document there is a source referenced, and that's a document

15   entitled:  Milliman Determining Discounts.  It's a white paper.

16   Do you see that?

17   A    I do.

18   Q    And that is listed as the source for the various

19   options that are discussed on this page, right?

20   A    Yes, sir.

21   Q    And Milliman -- you know that Milliman is one of the

22   large national health care coverage consultants, right?

23   A    Yes, sir.  My stepson is having an interview with them

24   this week.

25   Q    All right.  Conflict of interest right there.

1          Well, then you know all about Milliman.  And you know

2     they put out discount information, right, to the health care

3     community?

4     A    Well, I can see that from the title of this document

5     that they produce a lot of information.

6     Q    Right.  And they put forward information about carrier

7     discounts with providers that are used in bid proposals and the

8     like, right?

9     A    Again, I don't know the breadth of what they produce.

10    Q    Well, in any event, if we focus on this slide 5, up at

11    the top that first bullet says:  For our initial sizing, while

12    provider TINs were unavailable, we used Method E.  And TINs you

13    understand refers to taxpayer identification numbers?

14    A    Yes, sir.

15    Q    Okay.  And so the team is saying that for an initial

16    estimate they use what is down there at the bottom as Method E,

17    right?

18    A    Yes, sir.

19    Q    But then they say they're refining the analytics based

20    on the sharing of information that the medical and network team

21    undertook, right?

22    A    What are you referring to now?

23    Q    The second bullet there, the highlighted bullet.  Well,

24    I guess, on the screen, you can see there is a highlighting on

25    it.

1          It says:  We are refining the analytics based on shared

2     provider TINs using an approach similar to Method E below?

3          A    Yes, I can see it says that.

4          Q    You understand that the two companies exchanged a

5     massive quantity of data, claims data, right?

6          A    They developed a lot.  I don't know the extent to which

7     they were exchanging it as opposed to providing it to the people

8     who were working in the clean room.

9          Q    Okay.  Fair point.  So the claims data that represents

10    the actual implementation of thousands of contracts across the

11    country were provided and put into a common repository, the

12    so-called clean room, right?

13         A    Yes, sir.

14         Q    And McKinsey facilitated that business exercise, right?

15         A    That is correct.

16         Q    And this was comprehensive claim information, wasn't

17    it?

18         A    What do you mean by comprehensive claim information?

19         Q    They didn't do a sample or -- within the time frames

20    that they covered, and I believe for the McKinsey integration

21    planning team effort we're talking about January 1, 2015 through

22    the end of August 2015.  Right?

23         A    Yes, sir.  They provided certain screening criteria to

24    develop their analysis, based on the totality of claims, and

25    they refined it to a subset of that as a basis for doing their

```
1   analysis.

2      Q    Right.  So the information fed into the clean room was

3   not a sample, though, was it?

4      A    Well, it was the data that met their screening

5   criteria.

6      Q    Right.  But it represented claims paid in the United

7   States under the various provider contracts for that period of

8   time for the two companies, right?

9      A    Well, again, subject to the screening criteria that was

10  described in an exhibit to the Singhal declaration.

11     Q    Are you aware of any significant information that was

12  screened out?

13            THE COURT:  Well, there had to be providers they

14        had in common, right?

15            MR. MILNE:  Well, they shared that information, of

16        course, yes.

17            THE COURT:  I thought that was the subset that they

18        went through for purposes of this exercise, the

19        efficiencies.

20            MR. MILNE:  Correct.  If there were claims made, it

21        didn't mean that there were necessarily contracts that both

22        companies had with each hospital.  Because you may recall

23        Mr. Drozdowski talked about the situation where, let's say,

24        Anthem had a contract, Cigna did not, but a Cigna employee

25        goes -- a covered patient goes into that hospital, that's an
```

1       out-of-network situation.  So those kinds of things would

2       have been included.

3   BY MR. MILNE:

4       Q    But you understand that it was a lot of data, correct,

5   that was shared?

6       A    It was an ample amount of data.

7       Q    Okay.  And the team adopted an approach similar to

8   Method B, which is described below in -- on the side, right?

9       A    Yes, sir.

10      Q    And if we could -- I want to switch documents here and

11  ask you to turn to tab 29 in your materials.  And we'll put it

12  up on the screen.

13           So this is a document published by Milliman and it's

14  called Determining Discounts.

15           THE COURT:  What is the exhibit number?  Again,

16      when you say "this" --

17           MR. MILNE:  Oh, I'm sorry.  DX0743.

18           THE COURT:  All right.

19  BY MR. MILNE:

20      Q    This appears to be the Milliman document that's

21  referenced in the integration planning team document that we

22  just looked at, right, DX703?

23      A    I didn't cross reference that.

24      Q    Well, if you'd like, I can represent to you that it is.

25  If you can turn to what is labeled, I guess, table --

 1   Exhibit 3 -- figure 3 on page 2 of the Milliman document.  Do

 2   you see that?

 3        A    Which tab are we looking at now?

 4        Q    Tab 29.

 5        A    Okay.  So we're on 29.  And you want me to look at --

 6        Q    Page 2.

 7        A    All right.

 8        Q    If you look at figure 3 on page 2 you see it looks like

 9   exactly the same options and information as was contained in the

10   integration's planning team document, DX703?

11        A    Yes, sir.

12        Q    And so you understand that option B, something similar

13   to option B was what the integration planning team adopted?

14        A    Yes, sir.

15        Q    Okay.  And while we're looking --

16             THE COURT:  Why is this document confidential;

17        didn't you say it's published by Milliman?

18             MR. MILNE:  I believe it was -- well, it was

19        produced -- this version was produced by Aetna and they

20        designated it confidential, so that's the only reason, Your

21        Honor.  It probably can be deconfidentialized at some point.

22             THE COURT:  I certainly think so.  You talked about

23        it as something in the industry that anyone has access to.

24             MR. MILNE:  I agree with you.

25             THE COURT:  All right.

BY MR. MILNE:

Q    While we're looking at that page 2, if you look in the upper left-hand corner of that page, you see figure 1.  Do you see that, sir?

A    Yes, sir.

Q    And there it's talking about some of the discount ranges that are seen in various states, including California?

A    Yes, sir.

Q    And Milliman is reporting that discounts -- provider discounts can range from 55 to 65 percent depending on the locations and claim types, right?

A    Well, that's what this document says.

Q    And the discount range is substantial; 55 percent, 65 percent discounts, right?

            THE COURT:  In one of the four states lists.

            MR. MILNE:  Correct.

A    Well, I don't know how they compiled that information, so all I can do is tell you that reading this document I see the same things that you have pointed out.

BY MR. MILNE:

Q    Okay.  You haven't undertaken any kind of study or analysis about typical levels of discount achieved by insurance carriers in any of the geographies at issue in this case?

A    No, sir.  As I previously testified, I reviewed the information proffered by the defendants.

1    Q    So that wasn't necessary for your work?

2    A    No, sir.

3    Q    You understand Milliman is a reputable company?  Your

4    relative wouldn't be interviewing with them if they weren't, I

5    assume; is that right?

6    A    That is correct.

7    Q    Now, one of the things you talked about during your

8    direct examination was discount spreads that, I believe, you

9    said looked large, right?

10   A    Yes, sir.

11   Q    And if we could pull up your exhibit.  I actually don't

12   have the exhibit number handy, the one that you put up on the

13   screen.

14        MR. MILNE:  Can we get that up?

15   Q    So this is PDX14, 014.

16        You were asked about this on your direct examination,

17   right?

18   A    I actually can't see the document you are referring to.

19   Q    Okay.  Well, do you have -- okay.  There it goes.  You

20   were asked about that on your direct?

21   A    I was.

22   Q    You compiled these numbers using a spreadsheet that was

23   produced in the case by McKinsey?

24   A    That is correct.

25   Q    Okay.  And on this table you report that there are

1   81,841 instances of Anthem discounts exceeding the Cigna

2   discount by greater than 25 percent, right?

3       A    Yes, sir, on that spreadsheet.

4       Q    And that is out of 286,000 -- I'm sorry, I'm going to

5   be a little -- I'm just going to refer generally to the numbers

6   here because we are dealing with a document that's confidential.

7           So do you see that lower number, the number that begins

8   with a "2" there.  That's the total number of instances that

9   were in your data set, right?

10      A    Well, this was McKinsey's data set.

11      Q    The data set that you manipulated to create this

12  exhibit, right?

13      A    Well, if by sorting it you mean manipulating, yes,

14  that's correct.

15      Q    Sorting.  Right.  So there were 286,000 instances, as

16  you call them in there, and 81,804 -- I'm sorry -- that number

17  is what you say are the number that represents Anthem's discount

18  exceeding Cigna's --

19              THE COURT:  Now that's the question your team

20          didn't want you to ask --

21              MR. MILNE:  I understand.

22              THE COURT:  -- and you've asked it twice.  So ask

23          your next question.

24  BY MR. MILNE:

25      Q    So the number of instances where you have the

1    difference of the sort that you're reporting here represents

2    about a third of the total?

3        A    A little bit less than that.

4        Q    And the rest of the instances, by definition, involves

5    smaller spreads, correct?

6        A    Yes, sir, between slightly more than zero and 25

7    percent.

8        Q    Right.  By definition that's what they are.

9             And when you do the average across the entire universe,

10   it brings the average savings down substantially, correct?

11       A    I'm sorry, I don't know what you mean.

12       Q    If you were to -- if you were to look at what the

13   average discount across this entire universe instead of focusing

14   on that less-than-a-third portion, the overall average discount

15   would be substantially lower, right?

16       A    Well, the issue isn't the size of the discount, it's

17   what is producing the savings.  And this shows the bulk of the

18   savings comes from the outsized discounts.

19       Q    I understand what you are saying this suggests.  But I

20   am asking you -- first of all, did you do the calculation to

21   determine what the overall discount level was where you assessed

22   the discount across all 280 -- that other number, the larger

23   number?

24       A    The defendants represented that that number was about a

25   five percent differential, but this is what was driving their

1    ultimate number, is these outsized differences.

2         Q    Now, did you make any effort to assess how frequently

3    in the marketplace greater than 25 percent discount differences,

4    in fact, exist?

5         A    I did not do any independent studies.

6         Q    You felt there was no need for you to do that?

7         A    Again, my focus was on evaluating what was proffered by

8    the defendants.

9         Q    So you're questioning whether it's inappropriate that

10   there be a certain percentage of spreads, if you will, greater

11   than 25 percent, but you have done no study to understand how

12   common or uncommon that is today, right?

13        A    What is inappropriate is to have a spread of this order

14   of magnitude and to not do the next step in terms of research

15   for the explanation.

16        Q    My question is:  You didn't do any study yourself --

17             THE COURT:  I don't think he said the discounts were

18   inappropriate.

19             What he said was, in his original testimony, that this

20   was much more significant than what was reported as the average.

21   And so that caught his attention because the total achieved

22   wasn't achievable with the kind of average discounts that have

23   been testified to was achievable by virtue of a strong

24   percentage of this size discount.

25             But I don't think he said they are appropriate or

1    inappropriate as a matter of practice in the industry.  He said

2    they had a big impact on the calculation --

3            MR. MILNE:  They had a big impact.  And I believe

4        that an implication of what he was saying is not what he

5        actually said, was that there was something suspicious about

6        there being spreads like that.

7    BY MR. MILNE:

8        Q    Let me ask a question.

9            So you didn't ask to see -- you know there was a lot of

10    information produced in this case from many sources, right?

11        A    Yes, sir.

12        Q    You didn't receive as part of the materials from the

13    discovery record information that would give you a sense of the

14    types of spreads, gaps, between insurance carriers, in terms of

15    discounts that exist in the industry today or existed in 2015?

16        A    Remember, this is just two carriers, Anthem and Cigna.

17        Q    Did you ask to see Anthem and Cigna information about

18    the types of spreads that existed on discounts between Anthem

19    and Cigna in 2015, 2014, prior to this analysis being done by

20    the integration planning team?

21        A    No, sir.  I saw no evidence that it was considered.  I

22    heard Dr. Israel testify that he never looked at a contract.

23        Q    All right.  Could you turn to tab 41 in your binder.

24            MR. MILNE:  And this is not for the public screen.

25    BY MR. MILNE:

1    Q    This document, I guess we have it in native form marked

2  as DX0747, and it was produced out of the files of Cigna, with

3  identification number 4136442.

4        This is a spreadsheet.  You see that, sir?

5    A    Barely, yes, sir.

6    Q    If you go -- we can magnify it.

7        First of all, you see that it's a spreadsheet dealing

8  with Indiana?

9    A    Yes, sir.

10   Q    And if you look down that first column, it's various

11 individual health systems and then facilities within the health

12 systems.  That's just moving the far left column and then the

13 immediate column to the right.

14   A    Well, I see the labels that they have here.

15   Q    If you look over a little further you will see that

16 there is information about BIC discount; do you see that?

17   A    Yes, sir.

18   Q    You understand BIC in this context refers to best in

19 class?

20   A    That's what my assumption is.

21   Q    And then the next column is CHC, that's Cigna Health

22 Care --

23   A    Okay.

24   Q    -- discount, right?  Do you see that?

25   A    I do.

1    Q    And then you see a column, gap, discount, gap, unit

2  cost?

3    A    Yes, sir.

4    Q    And I am not asking you to go through this in detail.

5  But if we scroll down those columns that are in red, if you just

6  peruse, you can see some large gaps, correct?

7    A    Yes, sir.

8    Q    But that wasn't something you looked at in rendering

9  your opinions here?

10   A    I couldn't look at it if it was never furnished.

11   Q    It was produced in the litigation, though, right?  It

12 just wasn't provided to you by the Department of Justice.

13   A    It may have been, but with the Singhal declaration, it

14 indicated all of the source documents that the integration

15 planning team's analysis was dependent upon; and this was not

16 referenced to it.

17          THE COURT:  The numbers you just highlighted were

18     in the gap unit cost column, not the discount column, which

19     seem to be the ones calculated --

20          MR. MILNE:  Right.

21          THE COURT:  -- next to the first column and second

22     column.  They're smaller.

23          MR. MILNE:  They're smaller, but still not

24     nontrivial, Your Honor.

25          THE COURT:  Right.

1          MR. MILNE:  I am not certainly -- yes.  I am not

2     controlling the highlighting here.  Let's highlight some in

3     the second column.

4          THE COURT:  You don't have to highlight them.

5          MR. MILNE:  In both columns we have substantial

6     spreads.

7 BY MR. MILNE:

8     Q    And you didn't look at any underlying business

9 documents to get a sense of the kinds of spreads that existed

10 before this analysis was done by the integration planning team?

11    A    I'm sorry.  Which analysis are you referring to now?

12    Q    The one that you commented upon.

13    A    The one that was the basis for quantifying the M&N

14 efficiencies?

15    Q    Yes.

16    A    When you say I didn't look at -- what are you referring

17 to exactly?

18    Q    I'm asking:  Did you review documents such as this one

19 that reflect the kinds of spreads that actually exist in the

20 marketplace -- existed in the marketplace at the time the

21 integration planning team undertook this analysis?

22    A    I can't even comment on this document because it is an

23 excerpt from a spreadsheet, and I don't know how -- what the

24 basis for compiling the information, what the breadth of this

25 analysis is.

1    Q    But that's not the -- not to interrupt you, but that's

2  not my question.

3         I'm just asking whether you did an analysis of that

4  type to ask the questions that you are asking.

5    A    I did an analysis of the information that was

6  referenced as being the basis for quantifying the claimed

7  efficiencies, and I don't recall seeing any reference to this

8  document.

9    Q    So you looked at the calculation and made comments on

10 the calculation.

11   A    Well, I looked at a lot of other documents besides

12 that.

13   Q    But you didn't look at these kinds of documents.

14   A    I don't recall having seen this document.

15        MR. MILNE:  I won't belabor the Court with any more

16     of these, but suffice it to say that there are many more in

17     the record.

18   Q    You testified that with respect to the medical and

19 network planning team, that there was no business plan in terms

20 of actually achieving the projected synergies.

21   A    Yes.  I saw no plan indicating how they were going to

22 use this starting point of differences in ostensible discounts

23 to a specific plan, to try to decide what they were going to do

24 based on ostensible discounts and trying to get them from the

25 providers.

1    Q    And first of all, you know -- you mentioned that one of

2    the things that's important here is understanding whether real

3    business expertise and thinking was brought to bear on any

4    projection of synergies, right?

5    A    That is important, yes, sir.

6    Q    And the medical and network savings team was comprised

7    of business executives from both Anthem and Cigna that had many,

8    many years of experience in this industry; isn't that right?

9    A    I don't dispute that.

10   Q    Including Mr. Drozdowski, Dr. Muney and others that

11   were described in -- at least in Mr. Drozdowski's testimony?

12   A    Yes, sir.

13            THE COURT:  I believe that the quality of the

14       integration planning around this issue was an issue where I

15       cut off the direct, so you are going beyond the scope of the

16       direct now.

17            MR. MILNE:  Okay, Your Honor.

18            Well, again, I believe he did testify about

19       business experience and a criticism of whether this was like

20       a business planning exercise.  And I'm just trying to

21       establish that it was a business planning exercise --

22            THE COURT:  I heard all of the testimony.

23            I think what he said was after the targets it

24       didn't have the planning as to how to get the bottom up to

25       implement them, which I have heard considerable testimony

1    about.  And I stopped the Government from going down that

2    road because I don't think that is an area that I need an

3    expert to tell me what your witness has said and your

4    witness has said.  I have to figure out the inferences that

5    arise from the testimony.  I don't need him to tell me --

6              MR. MILNE:  Understood.  Understood.

7              And, Your Honor, that top-up, down, bottom-up

8    relates to G&A.  We're talking now about medical and

9    network.  And he did say on his direct that there was no

10   plan and that there was -- you know, he offered as a

11   criticism --

12             THE COURT:  I have heard the testimony upon which

13   he's basing -- I have heard all of your witnesses say what

14   they did and what didn't get done when Cigna walked away.

15             And I think you can both argue that.  And you have

16   done a beautiful job, everybody laying it out in your

17   findings of fact.  And so I don't need him to summarize what

18   happened in this courtroom on direct or on cross, especially

19   since I wouldn't let them do it on direct.  I don't need you

20   to do it either.

21             MR. MILNE:  Okay.  Very well, Your Honor.

22   BY MR. MILNE:

23   Q    Let me just ask one question to end this.

24        You heard Mr. Drozdowski testify about the -- his

25   confidence level in being able to achieve the projected medical

1    and network savings, didn't you?

2        A    Yes, sir.

3        Q    But you hadn't reviewed any of Mr. Drozdowski's

4    testimony before you actually rendered your opinions in this

5    case; isn't that right?

6        A    That is correct.

7        Q    Okay.  All right.  Let me turn to G&A here then.

8             Mr. Quintero, you, on your direct, spoke about

9    confidence levels, right, and you put up an exhibit?

10       A    Yes, sir.

11            MR. MILNE:  I don't know if we have that exhibit

12       available, the pie chart.  No?

13            THE DEPUTY:  Was it something available to the

14       public?

15            MR. MILNE:  No, not public.

16            THE DEPUTY:  That's fine.

17            MR. MILNE:  Sorry.  I have mine.  Yes.  Okay.  This

18       one.

19   BY MR. MILNE:

20       Q    Now, this document, this pie chart is based on, as you

21   indicate down at the bottom, material contained in Mr. Singhal's

22   declaration.  It was an exhibit to Mr. Singhal's declaration,

23   Exhibit 4, right?

24       A    That is correct.

25       Q    And that was a spreadsheet, right?

1    A    Yes, sir.

2    Q    And that was a spreadsheet that contained many fields,

3    and we're talking now about the bottom-up analysis, just to be

4    clear, not top down but bottom up, right?

5    A    That is correct.

6    Q    And there were 400 separate -- 400-some-odd separate

7    initiatives that have been identified for bottom-up

8    consideration, right?

9    A    Approximately that number, yes, sir.

10    Q    Okay.  And one of the fields on that status document

11    for each of the teams to fill in was something relating to

12    confidence level, right?

13    A    Yes, sir.

14    Q    Okay.  And I believe your chart indicates here that

15    almost half of the individual entries had no entry, right?

16    Didn't specify anything; like confidence, lack of confidence, or

17    something in between.

18    A    Well, actually, that's not precisely the case, because

19    about 700 million of them were not even subjected to this

20    analysis.  There were things, like, "to be determined" where

21    there was nothing.  And there were other ones that the Singhal

22    declaration said they didn't have the data for so they expressed

23    no opinion.

24          So the bulk of what was contained in the analysis done

25    by the integration team did have an opinion, but they certainly

 1   didn't have an opinion on the 700-million-plus that they never

 2   looked at.

 3       Q    Well, there is 1.112 and change -- there is a very

 4   large number there indicated as being nonspecified, right?

 5       A    That's correct.  And of that 1.112 more than 700

 6   million constitutes either items that had not yet been specified

 7   or that the integration team that Mr. Singhal worked with did

 8   not review the information.

 9       Q    And so the bottom line is for those initiatives there

10   is just no opinion one way or the other; high confidence, low

11   confidence, or something in between?

12       A    That's correct, because they weren't even reviewed by

13   the integration team or had not even yet been developed.  They

14   were just targets.

15       Q    Now, if you look at the entries where something --

16   where there was an actual -- where the team -- first of all,

17   given the fact that -- strike that.

18            You reviewed Mr. Matheis's deposition testimony in this

19   case, didn't you?

20       A    Yes, sir, I did.

21       Q    You were in court to hear Mr. Matheis testify?

22       A    I did.

23       Q    Mr. Matheis said that he spoke to the leaders of the

24   individual teams to glean the level of confidence that they had

25   in being able to achieve synergies, correct?

1     A     I don't remember that element of his testimony.

2     Q     Well, I won't -- maybe we'll circle back and put it up

3  on the screen.

4          The fact that a significant percentage of entries on

5  this spreadsheet didn't even fill in this item -- strike that.

6          Did you review anything that would lead you to draw a

7  conclusion about the use to which the leaders of the integration

8  planning effort put the information contained in that confidence

9  field?

10    A     No.  I don't know what their views were.

11    Q     And there was no testimony from Mr. Matheis or any of

12 the leaders of the integration planning team that they relied in

13 any way on that particular column in the spreadsheet?

14    A     No, sir.  I just viewed this as the unvarnished

15 opinions of the people who prepared the claimed efficiencies.

16    Q     If we look at the universe of entries where the field

17 was actually filled in, have you calculated what percentage of

18 that total represents -- represented at least medium levels of

19 confidence?

20    A     If I were to take out the 700 million or so that were

21 either not specified or not reviewed by the integration planning

22 team, it would be a subset.  So I take the 2.36 billion back

23 out, the 750-plus million, and so I would redo the calculation,

24 but I have not redone that calculation.

25    Q     Well, would it surprise you, just eye-balling it, that

```
 1   it would be about 70 percent?
 2       A    70 percent is -- what subset?  What does that reflect?
 3                THE COURT:  Medium plus high.
 4   BY MR. MILNE:
 5       Q    Medium and high, right?
 6       A    I don't know.  I'd have to -- as a CPA, I --
 7                THE COURT:  It's basically divided in half.
 8                MR. MILNE:  It's more than half.
 9                THE COURT:  If the half became a whole it would
10       basically double each one of those slices, right?
11                THE WITNESS:  No, Your Honor, because, remember,
12       700-plus million they didn't even review.  And so I believe
13       what you asked me about is the portion that was reviewed; is
14       that correct?
15   BY MR. MILNE:
16       Q    I'm asking for the teams that actually filled in that
17   field?
18                THE COURT:  You can tell that from looking at it.
19                MR. MILNE:  Yes.
20                THE COURT:  Yes, okay.  So ask your next question.
21                MR. MILNE:  Very good, Your Honor.
22                THE COURT:  To be fair to the witness, I don't
23       think the question was that clear.  I figured out where you
24       were going.  I could just look at it and see that.
25                MR. MILNE:  My apologies, Your Honor.
```

```
 1    BY MR. MILNE:

 2       Q    If you could turn to tab 5 -- I'm sorry, tab S, which

 3    would be at the back of the third binder.

 4       A    I'm sorry, which tab?

 5       Q    S.  This is an excerpt from the deposition taken in

 6    October of this year of Mr. Matheis.  That is one of the

 7    depositions you reviewed, right?

 8       A    Yes, sir.

 9       Q    Okay.  And if you could turn to page 204 of the

10    transcript.  I won't read it aloud.  But at the bottom of 203

11    there is a question that pertains to this spreadsheet.

12            Do you see that?  Okay.  But it's your testimony at the

13    bottom of 203 and it carries over to 204.

14       A    Okay.

15       Q    And the very last sentence of Mr. Matheis's answer

16    expresses a high degree of confidence, doesn't it?

17       A    Which page are you looking at now?

18       Q    204, the very end of the answer to the question that

19    begins at the bottom of 203.

20       A    And what is he expressing a high confidence in?

21       Q    The work of the integration planning team.

22            You reviewed this deposition, didn't you, sir?

23       A    Yes, sir.  But I --

24       Q    With respect to the bottom of --

25       A    Again, looking at a page out of context, so I'm asking.
```

1     Q    If you go back to 203.  And if we circle back even a

2  few more pages, you can see that the exhibit that's at issue is

3  the very document that we have been discussing, Singhal 4.

4          But on 203, the first question on that page is:  As far

5  as the actual information that's contained in that column, that

6  would have come from the team's doing a bottom-up analysis

7  instead of, say, McKinsey doing it.

8          And Mr. Matheis says:  Yes, I believe that would be

9  correct.

10         So we're talking about this same spreadsheet, correct?

11    A    Again, I don't see where it pertains to the

12  spreadsheet.

13    Q    The next question is:  But it's your testimony that you

14  are not sure the teams were conscientious about updating that

15  field in the tool.

16    A    Which page are you looking at now?

17    Q    The very next question on the same page 203.  And then

18  he goes on and gives an answer.

19    A    Okay.

20    Q    And in that answer he culminates by saying --

21         THE COURT:  All right.  Anybody having a problem

22    with the phone needs to turn it off.

23         Go on.

24    Q    His answer culminates by him saying that:  My

25  confidence level is very high based on the integration, the

1   interaction that I have had with the team leads.

2          Do you see that?

3   A    Yes, sir.

4   Q    You haven't studied any documents reflecting

5   Mr. Matheis's interaction with the team leads, have you?

6   A    I don't recall offhand.

7   Q    You mentioned on your direct with respect to G&A, what

8   I think you termed the lack of engagement of Cigna, right?

9   A    Yes, sir.

10  Q    And you understand that there was, with respect to G&A

11  savings, two phases of the analysis, right, at least; there was

12  the top down and there was the bottom up?

13  A    Yes, sir.

14  Q    And the top-down analysis was an analysis that was

15  completed before March of 2016; isn't that right?

16  A    That is correct.

17  Q    And the results of the top-down analysis were approved

18  by the steering committee of the integration planning effort,

19  right?

20  A    Yes, sir.

21  Q    And the steering committee consisted of the top

22  executives from both Anthem and Cigna, correct; including the

23  CEOs.

24  A    That is my recollection.

25  Q    Including the CFOs, right?

1     A    I don't remember all of the people.  I know there were

2   five representatives of each.

3     Q    Okay.  And you are aware that McKinsey was involved in

4   helping to facilitate this effort, right?

5     A    Yes, sir.

6     Q    McKinsey is a well-known business consulting firm,

7   right?

8     A    That's correct.

9     Q    They have a good reputation?

10     A    Generally.

11     Q    The G&A planning exercise involved multiple teams that

12   consisted -- and I'm talking now about the top-down analysis --

13   that consisted of both Anthem employees and Cigna employees,

14   correct?

15     A    Yes, sir.

16     Q    And with McKinsey personnel involved as well?

17     A    That is correct.

18     Q    And I believe Mr. Matheis testified that there were at

19   the top-down level at least 17 different teams?

20     A    I don't remember the exact number.  I remember there

21   being several.

22     Q    And he also testified that there were on the order of

23   1,000 employees across the two companies that had signed NDAs to

24   participate in this process?

25     A    I recall that.

1    Q    And those teams met frequently, right?

2    A    That's my understanding.

3    Q    And there were weekly meetings of those team leaders

4 with Mr. Matheis?

5    A    I recall there being frequent, I don't recall the exact

6 frequency.

7    Q    And the analysis led to the identification of 97

8 sub-functions, right?

9    A    96 or 97, that is my recollection.

10    Q    That were subject to potential savings?

11    A    Yes, sir.

12    Q    Mr. Singhal --

13        THE COURT:  If you are just going to ask him facts

14    that Matheis testified to and Singhal testified to and

15    Drozdowski testified to, why do we have to do that?  I was

16    here for that testimony.

17        MR. MILNE:  Okay.

18        THE COURT:  I took notes.  You get to pick all of

19    that testimony that you want me to focus on and put it in

20    your findings of fact and conclusions of law.

21        MR. MILNE:  Okay, Your Honor.

22        THE COURT:  This just seems like a closing

23    argument, and it's not necessary.

24        MR. MILNE:  I will move on.

25 BY MR. MILNE:

1    Q    Let me ask you, Mr. Quintero, to turn to tab 21 in your

2   binder.

3              THE COURT:  And to be fair, I did the exact same

4       thing to the Government.

5              MR. MILNE:  I understand.  I mean, there is an

6       aspect to what he's saying that I think -- understanding

7       the -- how integral to the business process this was, I

8       think, goes directly to his criticism that we didn't have a

9       business process here, that it was something made up after

10      the fact, ginned up by some consultant to justify a number.

11      So that's --

12             THE COURT:  Well, I don't think you are correctly

13      characterizing what he said.  But I certainly understand

14      what the Government's tack on this is; and I understand what

15      you are telling me the reasons why it -- people have

16      confidence in it.

17   BY MR. MILNE:

18      Q    Okay.  Well, moving on then.  If you could turn to tab

19   21 in your binder?

20      A    Which binder?

21      Q    Well, it should be your second binder.  This is a

22   document that bears DXO237.  It's in evidence.  This is a -- I'm

23   sorry -- I actually -- could you turn to tab 43.  I apologize.

24   Tab 43.

25             Do you have it, sir?

1    A    Yes, sir, I do.

2    Q    Okay.  Now, this document is DX0690 in evidence.  This

3  is materials relating to an integration team lead's meeting that

4  was held in November of 2015, right?

5    A    Yes, sir.

6    Q    And if you could turn to slide .2.  And this document

7  lays out the guiding principles for the top-down analysis,

8  right?

9    A    Yes, sir, that is what it is labeled as.

10    Q    Among the items specified under levels of rigor is that

11  the analysis must be done from the lens of a business operator,

12  right?

13    A    Yes, sir.

14    Q    Should answer how synergies can be realized, and I

15  won't belabor it, but you see the level of rigor that's being

16  set forth for this top-down exercise, right?

17    A    I see what's being represented.

18    Q    And you understand that Mr. Singhal has said that the

19  level of rigor in this top-down analysis exceeded the level of

20  rigor of many bottom-up analyses that have occurred in merger

21  cases, right?

22    A    I recall that testimony.

23    Q    And -- but you haven't analyzed any of the underlying

24  work that goes -- that would demonstrate what level of work the

25  individual teams undertook to get to the top-down number?

1   A   Well, that would normally be represented in the

2   business plan.  And I have testified I have not seen such a

3   business plan.

4   Q   You haven't reviewed the minutes of -- not the

5   minutes -- the materials relating to the weekly team leader

6   meetings, the individual planning teams that made up the G&A

7   planning effort, have you?

8   A   I have seen various documents that look like this.  I

9   don't recall all of them.  But, again, the ultimate proof is the

10  business plan that is the culmination of the process, and that's

11  what I have not seen.

12  Q   And you understand that there is a high level of

13  confidence expressed as a result of this process, the top-down

14  process, by Mr. Matheis, and the steering committee approved the

15  numbers that came out of the top-down analysis?

16          THE COURT:  You asked him that already.

17          MR. MILNE:  Pardon?

18          THE COURT:  You asked him that already.  The

19     steering committee, the CEOs and CFOs; and they approved it.

20          MR. MILNE:  Okay.  Very good.

21  BY MR. MILNE:

22  Q   At one point during your direct examination you said

23  that the data used on the Cigna side of the G&A assessment was

24  limited to three months.  Did you misspeak?  It was

25  three-quarters, wasn't it?

1    A    No, sir, it was three months ended -- we're talking

2 about general administrative cost savings.  It was the three

3 months ended March of 2015.  And projections for the nine months

4 ended December, 2015.

5    Q    So it's your testimony that the analyses here relating

6 to G&A savings are based on, literally, three months of Cigna

7 data?

8    A    Three months actual, nine months projected.

9    Q    Okay.  And on the issue of fixed versus variable G&A

10 savings, have you analyzed the deliberations by which the

11 integration planning team classified projected savings as

12 variable versus fixed?

13    A    I have seen various documents, but remember my analysis

14 of the claimed efficiencies is based on the, roughly, 400

15 initiatives, and those generally did not distinguish between

16 what was fixed and what was variable.

17    Q    And you know, with respect to the top-down analysis,

18 there was a very meticulous -- by the various sub-functions, the

19 90-some-odd sub-functions, classification made by the individual

20 teams of which portion they, in their judgment, viewed to be

21 variable versus fixed, right?

22    A    Yes.  But those were the targets.  It's not the attempt

23 to have cognizable efficiencies as developed by the integration

24 team, as manifested in the bottom-up analysis.

25    Q    And the bottom-up analysis was not an analysis, you

1    understand, to confirm the achievability of the top-down,

2    correct?

3         A    Correct.  The top-down was targets, the bottom-up was

4    an attempt to determine how they were going to achieve those

5    targets.

6         Q    But it didn't detract from the confidence and the

7    ability to achieve the top-down numbers, right?

8         A    Well, again, the top-down were just targets.  And so it

9    would be the bottom-up that would be the means by which such

10   targets would potentially be accomplished.

11        Q    Now, do you understand that part of the --

12             THE COURT:  You are not suggesting that even when

13        the best company does it, with the very best of business

14        intentions and no discord between the parties, and the very

15        best consultants and the most experienced guy at McKinsey,

16        that there aren't gaps between the targets and what they

17        determine they can actually do when they get their pencils

18        out and do bottoms-up?

19             MR. MILNE:  No, no, Your Honor.  But what I'm

20        saying, and what our point is here, is that this top-down

21        analysis was a very, very robust analysis that was akin to,

22        you know -- it was akin to, basically, what they would need

23        to do if they really needed to go to market soon.

24             And there will always be issues in any transaction

25        of making those, as Mr. Drozdowski said in the context of

1        the medical network, once the legal restraints on the full

2        sharing of information are lifted, then you have to make

3        final decisions.

4              But you have all of this material and so I won't

5        belabor it, Your Honor, but I believe what Mr. Matheis and

6        the others have --

7              THE COURT:  I heard what they said.  I heard what

8        they said on cross.  I heard it all.

9              MR. MILNE:  Right.

10             THE COURT:  I don't think that it is appropriate

11       for you to stand here and repeat it all on cross, which I

12       said, I think, 15 minutes ago.

13             MR. MILNE:  All right, Your Honor.  Well, then, if

14       I may have a moment.

15             THE COURT:  Please.

16             MR. MILNE:  All right.  No further questions, Your

17       Honor.

18             THE COURT:  All right.  Thank you.  And I don't

19       think even the most critical government witness or

20       government lawyer has suggested that this was guesswork and

21       no work went into the targets.  I believe they're focused on

22       the word "target."

23             MR. MILNE:  Well -- and I guess my point is that it

24       is more than just a target.

25             THE COURT:  I understand.

1        MR. MILNE:  And I don't think that -- in terms of

2     what this witness has done, he hasn't really done the work

3     to really be able to comment on that one way or the other.

4             THE COURT:  All right.  Is there any redirect?

5             MR. STRUVE:  One question.

6             THE COURT:  All right.

7                        REDIRECT

8  BY MR. STRUVE:

9     Q    Mr. Milne asked you a lot of questions about what you

10  didn't review.  I want to ask you one quick question about what

11  you did.

12        In your evaluation of the efficiencies put forth by the

13  defendants, did you review all of the materials proffered by

14  them in their white papers, declarations, and reports in support

15  of those claim efficiencies?

16    A    Those, and many more.

17            MR. STRUVE:  No further questions.

18            THE COURT:  Thank you.

19            You may step down.

20            THE WITNESS:  Thank you, Your Honor.

21            MR. MILNE:  Your Honor, just on housekeeping.

22            We have two exhibits that were discussed here that

23     are not in evidence, so it's DX0743, which is the Milliman

24     document; and the other one is DX0747, which is the

25     spreadsheet, the Indiana spreadsheet.  We'd like to move

1     those into evidence.

2             THE COURT:  All right.  Thank you.  I am going to

3     permit that since they were used a lot in the testimony.

4             Yes, Mr. Jacobs.

5             MR. JACOBS:  The plaintiffs have no further

6     witnesses, so we rest for Phase 1.  That is our rebuttal

7     case.

8             THE COURT:  All right.  I am going to excuse

9     everyone for the evening.  I will see you all at 10:00 a.m.

10    tomorrow.

11            I do think I have a good understanding of what

12    everybody is trying to tell me here.  I do have some

13    questions.  I think my questions are targeted and isolated;

14    and I don't want you to assume from that that I don't think

15    the other parts of the case aren't important or I haven't

16    heard them.

17            As I said, I have spent a lot of time with your

18    findings of fact and conclusions of law, and a lot of time

19    with all of you listening to the arguments as they have

20    unfolded throughout the testimony.  So I don't think

21    tomorrow will really bear any resemblance to an oral

22    argument on all of the evidence, but I do have some

23    questions I want to ask.  And so that's what we will do.

24    And then we will begin Phase 2 the next day.  All right.

25            Thank you very much.

1          THE WITNESS:  Thank you.

2          THE DEPUTY:  The exhibits?

3          THE COURT:  I admitted them.  Thank you.

4          (Whereupon, Court adjourned for the day, 4:58 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE</u>

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 13th day of December, 2016.

<u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
Official Court Reporter

## $

**$1.22** [1] - 2530:6
**$100,000** [1] - 2534:9
**$107,000** [1] - 2523:20
**$175,000** [1] - 2523:20
**$192** [2] - 2524:15,
2524:16
**$2.36** [1] - 2521:23
**$2.39** [1] - 2551:20
**$21** [1] - 2552:17
**$5.68** [1] - 2521:22
**$500** [1] - 2508:11
**$515** [4] - 2517:22,
2552:3, 2552:8,
2554:9
**$800** [1] - 2524:21
**$825** [1] - 2524:19

## /

**/s** [1] - 2604:12

## 0

**014** [1] - 2574:15

## 1

**1** [5] - 2524:24,
2562:9, 2569:21,
2573:3, 2602:6
**1,000** [1] - 2593:23
**1.112** [2] - 2587:3,
2587:5
**1.138** [2] - 2529:4,
2530:2
**1.4** [1] - 2524:23
**1.6** [1] - 2524:23
**1.7** [1] - 2530:8
**10** [1] - 2507:20
**100** [7] - 2508:11,
2508:18, 2533:20,
2541:16, 2541:20,
2542:13, 2545:14
**10:00** [1] - 2602:9
**110** [2] - 2501:9,
2501:13
**11000** [1] - 2498:21
**118** [1] - 2509:22
**12** [3] - 2498:6,
2530:6, 2557:17
**1257** [2] - 2502:18
**13th** [2] - 2499:6,
2604:10
**14** [2] - 2557:20,
2557:25

**141** [3] - 2503:20,
2503:22, 2504:3
**142** [3] - 2503:20,
2503:24, 2504:3
**146** [1] - 2501:11
**15** [6] - 2530:25,
2542:3, 2552:18,
2565:21, 2600:12
**16** [2] - 2509:19,
2554:18
**16-CV-1493** [1] -
2498:3
**16.026** [2] - 2553:5,
2554:2
**17** [1] - 2593:19
**18** [1] - 2505:25
**185** [1] - 2500:10
**1980s** [1] - 2505:16
**1990s** [1] - 2505:24

## 2

**2** [15] - 2501:1,
2502:19, 2550:13,
2550:15, 2552:23,
2553:3, 2553:15,
2554:14, 2572:1,
2572:6, 2572:8,
2573:2, 2575:8,
2596:6, 2602:24
**2.2** [1] - 2552:7
**2.36** [2] - 2552:7,
2588:22
**2.4** [3] - 2506:19,
2506:23, 2552:21
**200** [1] - 2555:23
**20001** [1] - 2499:15
**20005-3807** [1] -
2499:6
**20006-1047** [1] -
2499:10
**2001** [1] - 2499:10
**2005** [1] - 2536:3
**2014** [1] - 2578:19
**2015** [15] - 2509:23,
2520:5, 2520:8,
2529:3, 2553:4,
2553:10, 2556:7,
2557:14, 2569:21,
2569:22, 2578:15,
2578:19, 2596:4,
2598:3, 2598:4
**2016** [6] - 2498:6,
2520:18, 2545:19,
2557:11, 2592:15,
2604:10
**202** [3] - 2498:19,
2499:7, 2499:11
**202-354-3242** [1] -

2499:16
**203** [6] - 2590:10,
2590:13, 2590:19,
2591:1, 2591:4,
2591:17
**204** [3] - 2590:9,
2590:13, 2590:18
**20530** [1] - 2498:19
**21** [2] - 2595:1,
2595:19
**223-7300** [1] - 2499:11
**25** [10] - 2503:25,
2529:6, 2529:8,
2530:23, 2530:24,
2558:13, 2575:2,
2576:6, 2577:3,
2577:11
**2500** [1] - 2499:19
**2512** [1] - 2499:20
**2538** [1] - 2499:20
**26** [3] - 2503:22,
2504:6, 2533:4
**2601** [1] - 2499:21
**280** [1] - 2576:22
**286,000** [2] - 2575:4,
2575:15
**29** [3] - 2571:11,
2572:4, 2572:5
**2:04** [1] - 2498:6
**2:20** [1] - 2511:2

## 3

**3** [6] - 2524:5,
2555:15, 2555:18,
2572:1, 2572:8
**30** [1] - 2503:6
**305** [3] - 2501:9,
2501:13, 2501:15
**333** [1] - 2499:15
**35** [1] - 2529:8
**361** [3] - 2517:24,
2518:5, 2518:11
**38** [2] - 2557:11,
2557:24
**39** [2] - 2557:22,
2557:24
**3:20** [1] - 2511:3

## 4

**4** [5] - 2549:12,
2549:14, 2565:22,
2585:23, 2591:3
**4,500** [1] - 2503:18
**40** [2] - 2520:11,
2531:6
**400** [5] - 2518:22,

2521:9, 2524:11,
2586:6, 2598:14
**400-some-odd** [1] -
2586:6
**41** [2] - 2521:24,
2578:23
**4100** [1] - 2498:18
**4136442** [1] - 2579:3
**43** [2] - 2595:23,
2595:24
**44** [3] - 2566:5,
2566:10, 2566:11
**450** [1] - 2498:18
**4500** [1] - 2503:15
**455** [1] - 2498:21
**4:58** [1] - 2603:4

## 5

**5** [6] - 2552:20,
2565:16, 2567:5,
2567:8, 2568:10,
2590:2
**5,000** [3] - 2503:5,
2503:16, 2503:19
**50** [2] - 2503:6, 2531:6
**50,000** [1] - 2534:11
**500** [1] - 2508:18
**515** [3] - 2517:24,
2518:5, 2554:1
**55** [2] - 2573:10,
2573:13
**550** [1] - 2503:4
**5500** [1] - 2506:4
**598-8916** [1] - 2498:19

## 6

**6** [1] - 2502:19
**60** [1] - 2529:7
**600** [1] - 2524:21
**626-3600** [1] - 2499:7
**65** [2] - 2573:10,
2573:13
**6720** [1] - 2499:14
**69** [1] - 2500:9

## 7

**7** [3] - 2502:22,
2503:3, 2524:24
**70** [3] - 2523:21,
2589:1, 2589:2
**700** [3] - 2586:19,
2587:5, 2588:20
**700-million-plus** [1] -
2587:1
**700-plus** [1] - 2589:12

**701** [1] - 2499:6
**703** [1] - 2566:6
**750-plus** [1] - 2588:23

## 8

**81,804** [1] - 2575:16
**81,841** [1] - 2575:1
**815** [3] - 2529:4,
2530:1, 2530:5
**87** [1] - 2506:15
**89** [1] - 2500:8

## 9

**9** [2] - 2502:22, 2524:5
**90-some-odd** [1] -
2598:19
**94102** [1] - 2498:22
**96** [1] - 2594:9
**97** [2] - 2594:7, 2594:9

## A

**a.m** [1] - 2602:9
**Abbott** [1] - 2506:15
**ability** [3] - 2546:21,
2599:7, 2604:7
**able** [18] - 2513:9,
2513:14, 2520:25,
2521:20, 2522:25,
2523:14, 2525:8,
2525:17, 2533:25,
2535:16, 2540:20,
2547:5, 2554:19,
2560:13, 2563:19,
2584:25, 2587:25,
2601:3
**absence** [2] - 2513:4,
2522:17
**absent** [1] - 2562:24
**absolutely** [2] -
2522:18, 2561:20
**accepted** [3] - 2504:8,
2561:24, 2562:1
**access** [1] - 2572:23
**accomplish** [2] -
2525:17, 2533:25
**accomplished** [2] -
2525:22, 2599:10
**according** [3] -
2505:23, 2518:10,
2520:15
**account** [1] - 2503:14
**Accountant** [1] -
2511:15
**accountant** [1] -
2514:23

**accounting** [2] - 2511:10, 2517:6

**accounts** [3] - 2503:4, 2504:18, 2510:8

**accurate** [5] - 2530:12, 2534:4, 2534:16, 2534:25, 2604:5

**achievability** [1] - 2599:1

**achievable** [3] - 2551:1, 2577:22, 2577:23

**achieve** [12] - 2524:17, 2524:18, 2524:22, 2524:23, 2540:20, 2541:20, 2550:11, 2564:8, 2584:25, 2587:25, 2599:4, 2599:7

**achieved** [6] - 2513:3, 2513:4, 2513:11, 2555:1, 2573:22, 2577:21

**achieving** [3] - 2540:13, 2561:19, 2582:20

**acquisition** [1] - 2562:25

**acquisitions** [2] - 2514:6, 2519:2

**Action** [1] - 2498:3

**activities** [4] - 2543:17, 2546:3, 2546:13, 2566:22

**actual** [20] - 2502:17, 2503:3, 2504:22, 2504:24, 2519:1, 2520:8, 2520:14, 2520:22, 2520:23, 2523:10, 2532:15, 2546:3, 2546:10, 2553:11, 2565:12, 2566:15, 2569:10, 2587:16, 2591:5, 2598:8

**Adam** [1] - 2498:16

**add** [2] - 2524:22, 2536:18

**added** [1] - 2560:9

**additional** [4] - 2508:25, 2522:22, 2531:3, 2535:8

**address** [1] - 2537:20

**addressing** [1] - 2565:4

**adequacy** [1] - 2541:16

**adjourned** [1] - 2603:4

**adjuster** [1] - 2523:18

**administration** [1] - 2549:21

**administrative** [9] - 2515:19, 2515:21, 2520:4, 2521:20, 2550:2, 2550:8, 2550:16, 2550:23, 2598:2

**admission** [1] - 2509:18

**admitted** [3] - 2510:10, 2510:11, 2603:3

**admonitions** [1] - 2541:7

**adopted** [2] - 2571:7, 2572:13

**advantage** [2] - 2556:1, 2558:22

**Aetna** [1] - 2572:19

**affect** [1] - 2522:6

**affirmatively** [1] - 2561:12

**afternoon** [6] - 2500:18, 2500:19, 2512:8, 2512:9, 2538:15, 2565:19

**AFTERNOON** [1] - 2498:5

**ago** [2] - 2505:4, 2600:12

**agree** [5] - 2501:23, 2559:10, 2559:15, 2559:24, 2572:24

**ahead** [3] - 2515:10, 2542:9, 2565:19

**akin** [2] - 2599:21, 2599:22

**al** [1] - 2498:3

**alleging** [2] - 2560:14, 2560:16

**allocations** [2] - 2523:25

**allowed** [2] - 2531:19, 2541:16

**almost** [1] - 2586:15

**alone** [3] - 2524:18, 2559:13, 2560:22

**aloud** [1] - 2590:10

**ambiguous** [1] - 2548:7

**America** [2] - 2498:3, 2507:13

**America's** [1] - 2507:20

**American** [2] - 2507:1, 2507:3

**amount** [3] - 2531:19, 2571:6

**amounts** [1] - 2561:25

**ample** [1] - 2571:6

**AMY** [1] - 2498:10

**analyses** [6] - 2514:17, 2523:23, 2551:5, 2551:11, 2596:20, 2598:5

**analysis** [65] - 2504:12, 2504:14, 2504:21, 2505:1, 2506:18, 2506:21, 2507:7, 2507:9, 2508:3, 2511:23, 2514:7, 2517:25, 2520:18, 2521:1, 2524:10, 2528:16, 2528:20, 2529:4, 2530:9, 2531:1, 2531:2, 2531:9, 2531:22, 2533:14, 2533:23, 2534:7, 2536:12, 2547:19, 2547:20, 2556:8, 2558:6, 2564:5, 2564:13, 2569:24, 2570:1, 2573:22, 2578:19, 2580:15, 2581:10, 2581:11, 2581:21, 2581:25, 2582:3, 2582:5, 2586:3, 2586:20, 2586:24, 2591:6, 2592:11, 2592:14, 2592:17, 2593:12, 2594:7, 2596:7, 2596:11, 2596:19, 2597:15, 2598:13, 2598:17, 2598:24, 2598:25, 2599:21

**analyst** [2] - 2527:4, 2527:20

**analytics** [2] - 2568:19, 2569:1

**analyzed** [2] - 2596:23, 2598:10

**announced** [5] - 2550:9, 2550:10, 2550:20, 2550:25, 2557:15

**announcement** [1] - 2550:24

**annual** [1] - 2509:23

**annualized** [2] - 2524:16, 2530:5

**answer** [11] - 2503:1, 2503:6, 2518:2, 2538:10, 2564:16, 2590:15, 2590:18, 2591:18, 2591:20, 2591:24, 2596:14

**answered** [1] - 2559:1

**Anthem** [68] - 2498:6, 2499:2, 2502:12, 2503:14, 2503:17, 2505:6, 2520:4, 2520:19, 2521:2, 2523:12, 2523:19, 2523:22, 2524:5, 2524:7, 2526:3, 2526:4, 2527:9, 2528:21, 2529:5, 2529:7, 2529:16, 2530:9, 2530:22, 2531:20, 2532:3, 2532:7, 2532:19, 2533:5, 2533:11, 2533:18, 2540:13, 2540:20, 2542:24, 2544:12, 2545:1, 2545:15, 2546:20, 2551:6, 2552:19, 2555:22, 2555:25, 2556:2, 2556:14, 2556:16, 2557:10, 2557:16, 2557:22, 2558:1, 2558:3, 2558:14, 2559:12, 2559:21, 2560:13, 2561:2, 2561:3, 2561:5, 2564:9, 2566:23, 2570:24, 2575:1, 2578:16, 2578:17, 2578:18, 2583:7, 2592:22, 2593:13

**Anthem's** [1] - 2529:20, 2529:21, 2530:17, 2530:24, 2531:3, 2532:1, 2533:15, 2533:21, 2536:2, 2575:17

**Anthem-Cigna** [2] - 2551:6, 2566:23

**anticompetitive** [1] - 2561:17

**antitrust** [5] - 2511:18, 2514:5, 2538:20, 2539:3, 2539:7

**Antitrust** [1] - 2498:18

**anyways** [1] - 2525:16

**Aon** [1] - 2507:23

**apologies** [1] - 2589:25

**apologize** [2] - 2537:15, 2595:23

**appear** [1] - 2526:4

**APPEARANCES** [2] - 2498:23, 2499:1

**apples** [6] - 2521:4, 2523:14, 2554:17

**apples-to-apples** [3] -

**2521:4, 2523:14, 2554:17**

**applicable** [2] - 2527:17, 2527:18

**application** [2] - 2511:16, 2515:6

**applied** [9] - 2526:8, 2526:25, 2527:12, 2529:9, 2533:10, 2535:10, 2555:2, 2556:15, 2556:16

**applies** [2] - 2527:3, 2527:21

**apply** [2] - 2514:15, 2526:3

**applying** [3] - 2531:3, 2531:25, 2533:14

**approach** [7] - 2523:4, 2526:6, 2526:7, 2526:22, 2565:8, 2569:2, 2571:7

**approaches** [1] - 2526:3

**appropriate** [5] - 2513:15, 2540:8, 2541:15, 2577:25, 2600:10

**approved** [4] - 2519:9, 2592:17, 2597:14, 2597:19

**April** [1] - 2522:14

**area** [6] - 2502:3, 2502:4, 2519:7, 2525:1, 2534:10, 2584:2

**areas** [6] - 2502:2, 2514:6, 2521:3, 2535:12, 2544:2, 2549:19

**argue** [1] - 2584:15

**argued** [1] - 2508:19

**arguing** [3] - 2558:25, 2561:12, 2564:14

**argument** [2] - 2594:23, 2602:22

**arguments** [1] - 2602:19

**arise** [1] - 2584:5

**arising** [2] - 2536:15

**arrive** [2] - 2511:23, 2534:2

**article** [1] - 2539:6

**aside** [1] - 2525:10

**ASO** [1] - 2535:6

**aspect** [3] - 2530:3, 2561:1, 2595:6

**aspects** [2] - 2517:6, 2540:25

**asserted** [1] - 2517:22

**asserting** [1] -

2552:21
**assertion** [1] - 2504:8
**assess** [2] - 2564:5, 2577:2
**assessed** [1] - 2576:21
**assessing** [2] - 2539:7, 2543:1
**assessment** [1] - 2597:23
**assignment** [1] - 2539:10
**assist** [1] - 2500:5
**associated** [1] - 2508:20
**assume** [9] - 2528:5, 2528:7, 2533:18, 2533:20, 2533:22, 2534:15, 2560:12, 2574:5, 2602:14
**assumed** [1] - 2558:22
**assumes** [2] - 2541:20, 2560:7
**assuming** [3] - 2508:24, 2515:9, 2556:10
**assumption** [3] - 2541:17, 2560:4, 2579:20
**attempt** [2] - 2598:22, 2599:4
**attention** [1] - 2577:21
**ATTORNEY** [1] - 2498:21
**attributable** [1] - 2529:5
**attribute** [1] - 2519:5
**attributed** [1] - 2518:24
**audited** [1] - 2520:19
**August** [3] - 2520:5, 2529:3, 2569:22
**available** [3] - 2544:7, 2585:12, 2585:13
**Avenue** [2] - 2498:21, 2499:15
**average** [10] - 2530:12, 2530:19, 2556:3, 2558:22, 2576:9, 2576:10, 2576:13, 2576:14, 2577:20, 2577:22
**avoidable** [4] - 2521:25, 2522:3, 2522:12, 2552:22
**avoided** [1] - 2506:22
**aware** [5] - 2505:8, 2550:9, 2551:10, 2570:11, 2593:3

# B

**bad** [1] - 2529:17
**balance** [1] - 2512:21
**balling** [1] - 2588:25
**bar** [1] - 2550:23
**barely** [1] - 2579:5
**bargaining** [1] - 2563:1
**based** [26] - 2503:13, 2505:20, 2508:18, 2512:14, 2512:17, 2513:5, 2513:9, 2513:12, 2513:14, 2514:3, 2514:18, 2517:20, 2518:4, 2518:6, 2518:8, 2520:1, 2524:14, 2530:4, 2530:9, 2533:5, 2533:23, 2534:4, 2534:22, 2536:12, 2546:21, 2559:8, 2561:18, 2568:19, 2569:1, 2569:24, 2582:24, 2585:20, 2591:25, 2598:6, 2598:14
**basic** [1] - 2554:9
**basing** [1] - 2584:13
**basis** [14] - 2518:23, 2521:10, 2524:25, 2525:8, 2529:3, 2529:25, 2554:6, 2554:7, 2556:11, 2559:14, 2569:25, 2581:13, 2581:24, 2582:6
**bear** [2] - 2583:3, 2602:21
**bears** [1] - 2595:22
**beautiful** [1] - 2584:16
**became** [1] - 2532:6
**becomes** [1] - 2532:6
**BEFORE** [1] - 2498:10
**begin** [1] - 2602:24
**beginning** [1] - 2538:3
**begins** [3] - 2500:10, 2575:7, 2590:19
**behind** [1] - 2509:7
**belabor** [3] - 2582:15, 2596:15, 2600:5
**below** [6] - 2502:21, 2503:5, 2534:15, 2535:2, 2569:2, 2571:8
**Bench** [1] - 2498:4
**BENCH** [1] - 2498:9
**BERMAN** [1] - 2498:10

**best** [20] - 2508:21, 2523:4, 2538:4, 2541:19, 2541:20, 2560:7, 2561:1, 2561:2, 2561:3, 2561:4, 2561:19, 2579:18, 2599:13, 2599:15, 2604:7
**best-efforts** [1] - 2508:21
**best-of-the-best** [2] - 2561:1, 2561:2
**better** [18] - 2505:5, 2521:2, 2525:20, 2527:9, 2528:22, 2532:5, 2532:22, 2533:8, 2533:14, 2533:21, 2556:14, 2556:20, 2557:3, 2557:4, 2560:17, 2561:15, 2563:19
**between** [18] - 2503:6, 2521:12, 2523:8, 2523:12, 2524:21, 2535:5, 2546:20, 2548:1, 2548:15, 2554:5, 2576:6, 2578:14, 2578:18, 2586:17, 2587:11, 2598:15, 2599:14, 2599:16
**beyond** [4] - 2540:24, 2542:9, 2563:7, 2583:15
**Bial** [1] - 2499:8
**BIAL** [1] - 2532:12
**bias** [15] - 2527:1, 2527:2, 2527:3, 2527:4, 2527:11, 2527:18, 2527:20, 2527:25, 2528:2, 2528:3, 2528:5, 2528:14, 2528:15, 2530:3
**biases** [2] - 2526:22, 2526:24
**BIC** [2] - 2579:16, 2579:18
**bid** [1] - 2568:7
**big** [2] - 2578:2, 2578:3
**bilateral** [1] - 2533:24
**billed** [1] - 2531:18
**billing** [1] - 2534:8
**billings** [16] - 2529:9, 2531:3, 2531:25, 2532:1, 2532:2, 2532:3, 2532:5, 2532:7, 2532:18, 2532:19, 2532:20,

2533:10, 2533:15, 2534:9, 2534:10, 2556:16
**billion** [18] - 2506:19, 2506:23, 2521:22, 2521:23, 2524:23, 2529:4, 2530:2, 2530:7, 2550:13, 2550:15, 2551:20, 2552:7, 2552:17, 2552:18, 2552:20, 2552:21, 2553:5, 2588:22
**binder** [16] - 2501:2, 2501:10, 2503:20, 2505:25, 2540:1, 2549:14, 2552:25, 2565:16, 2566:10, 2566:12, 2578:23, 2590:3, 2595:2, 2595:19, 2595:20, 2595:21
**binders** [3] - 2501:9, 2537:16, 2539:25
**bit** [3] - 2534:1, 2564:22, 2576:3
**blue** [1] - 2519:2
**boiled** [1] - 2526:19
**Bon** [1] - 2540:5
**bottom** [24] - 2516:16, 2517:25, 2520:18, 2542:15, 2567:13, 2568:16, 2583:24, 2584:7, 2585:21, 2586:3, 2586:4, 2586:7, 2587:9, 2590:10, 2590:13, 2590:19, 2590:24, 2591:6, 2592:12, 2596:20, 2598:24, 2598:25, 2599:3, 2599:9
**bottom-up** [11] - 2517:25, 2520:18, 2584:7, 2586:3, 2586:7, 2591:6, 2596:20, 2598:24, 2598:25, 2599:3, 2599:9
**bottoms** [1] - 2599:18
**bottoms-up** [1] - 2599:18
**branding** [2] - 2508:21, 2508:22
**breadth** [2] - 2568:9, 2581:24
**break** [5] - 2511:2, 2541:3, 2555:18, 2565:18, 2565:21
**breed** [1] - 2523:4

**brief** [1] - 2500:4
**briefly** [1] - 2531:13
**bringing** [1] - 2540:25
**brings** [1] - 2576:10
**broader** [1] - 2509:5
**broke** [3] - 2534:24, 2535:3, 2566:1
**brought** [1] - 2583:3
**Brown** [1] - 2500:8
**build** [1] - 2555:19
**built** [1] - 2541:17
**bulk** [7] - 2522:10, 2530:1, 2530:8, 2561:13, 2561:15, 2576:17, 2586:24
**bullet** [4] - 2521:6, 2568:11, 2568:23
**Burke** [1] - 2499:3
**business** [28] - 2511:10, 2514:7, 2522:21, 2522:24, 2525:21, 2526:11, 2526:12, 2535:21, 2535:23, 2544:1, 2546:10, 2559:18, 2569:14, 2581:8, 2582:19, 2583:3, 2583:7, 2583:19, 2583:20, 2583:21, 2593:6, 2595:7, 2595:9, 2596:11, 2597:2, 2597:3, 2597:10, 2599:13
**BY** [41] - 2500:17, 2512:7, 2512:22, 2515:15, 2516:22, 2518:15, 2519:23, 2522:19, 2528:13, 2533:16, 2535:11, 2538:14, 2542:21, 2547:14, 2548:19, 2549:6, 2549:15, 2555:12, 2558:10, 2559:4, 2562:21, 2564:4, 2564:19, 2565:25, 2571:3, 2571:19, 2573:1, 2573:20, 2575:24, 2578:7, 2578:25, 2581:7, 2584:22, 2585:19, 2589:4, 2589:15, 2590:1, 2594:25, 2595:17, 2597:21, 2601:8

# C

**CA** [1] - 2498:22
**calculate** [3] - 2507:3,

2523:15, 2529:25
**calculated** [5] -
2506:25, 2529:5,
2554:3, 2580:19,
2588:17
**calculating** [1] -
2506:19
**calculation** [15] -
2504:10, 2507:23,
2508:11, 2526:10,
2554:7, 2555:25,
2561:1, 2561:2,
2563:5, 2576:20,
2578:2, 2582:9,
2582:10, 2588:23,
2588:24
**calculations** [5] -
2526:16, 2546:11,
2548:16, 2561:16
**California** [2] -
2498:20, 2573:7
**capture** [2] - 2509:5,
2566:23
**Care** [1] - 2579:22
**care** [7] - 2509:8,
2535:23, 2539:20,
2558:21, 2563:5,
2567:22, 2568:2
**carrier** [1] - 2568:6
**carriers** [4] - 2506:11,
2573:23, 2578:14,
2578:16
**carries** [1] - 2590:13
**carved** [1] - 2534:3
**case** [29] - 2505:9,
2509:6, 2511:18,
2527:7, 2527:8,
2535:18, 2537:1,
2538:21, 2538:24,
2542:2, 2542:4,
2542:22, 2543:10,
2544:14, 2552:14,
2559:5, 2559:24,
2561:11, 2561:25,
2562:1, 2566:17,
2573:23, 2574:23,
2578:10, 2585:5,
2586:18, 2587:19,
2602:7, 2602:15
**CASE** [1] - 2499:5
**cases** [6] - 2533:4,
2539:7, 2539:16,
2559:19, 2559:20,
2596:21
**categories** [3] -
2515:1, 2521:21,
2552:18
**category** [1] - 2534:9
**caught** [1] - 2577:21
**ceiling** [1] - 2531:6

**Centene** [2] - 2500:20,
2500:25
**CEOs** [2] - 2592:23,
2597:19
**certain** [7] - 2505:18,
2512:13, 2521:3,
2523:17, 2524:20,
2569:23, 2577:10
**certainly** [8] -
2511:21, 2517:8,
2538:8, 2561:11,
2572:22, 2581:1,
2586:25, 2595:13
**certainty** [1] - 2520:12
**CERTIFICATE** [1] -
2604:2
**Certified** [1] - 2511:14
**certify** [1] - 2604:4
**cetera** [3] - 2548:17,
2563:23
**CFOs** [2] - 2592:25,
2597:19
**chains** [1] - 2507:19
**change** [7] - 2508:7,
2509:11, 2513:6,
2528:6, 2528:8,
2557:7, 2587:3
**characterized** [1] -
2502:15
**characterizing** [1] -
2595:13
**charge** [1] - 2543:22
**charges** [1] - 2505:17
**Charles** [1] - 2499:8
**chart** [8] - 2519:10,
2519:12, 2528:20,
2531:13, 2531:22,
2585:12, 2585:20,
2586:14
**CHC** [1] - 2579:21
**check** [1] - 2507:23
**checked** [1] - 2522:13
**Christopher** [1] -
2499:2
**CID** [2] - 2500:23,
2500:24
**Cigna** [83] - 2498:6,
2499:8, 2501:2,
2501:24, 2502:1,
2502:2, 2505:5,
2505:6, 2508:21,
2520:7, 2520:19,
2521:2, 2521:20,
2521:25, 2522:6,
2522:9, 2522:10,
2522:13, 2523:12,
2523:20, 2523:21,
2524:5, 2524:7,
2526:4, 2527:10,
2528:22, 2529:6,

2529:8, 2529:9,
2529:16, 2529:17,
2529:22, 2530:23,
2531:2, 2531:3,
2531:9, 2531:19,
2532:2, 2532:5,
2532:19, 2533:4,
2533:13, 2533:18,
2542:24, 2544:20,
2545:1, 2545:15,
2545:25, 2546:25,
2551:6, 2552:19,
2552:22, 2554:4,
2555:23, 2556:1,
2556:12, 2556:13,
2557:17, 2557:20,
2558:3, 2559:12,
2559:20, 2560:13,
2561:3, 2561:4,
2564:9, 2566:23,
2570:24, 2575:1,
2578:16, 2578:17,
2578:19, 2579:2,
2579:21, 2583:7,
2584:14, 2592:8,
2592:22, 2593:13,
2597:23, 2598:6
**Cigna's** [10] - 2521:22,
2522:11, 2530:17,
2531:25, 2532:1,
2532:18, 2533:14,
2552:20, 2553:14,
2575:18
**circle** [2] - 2588:2,
2591:1
**citation** [1] - 2500:8
**cite** [1] - 2512:25
**Civil** [1] - 2498:3
**claim** [13] - 2506:19,
2529:2, 2529:25,
2530:1, 2531:8,
2531:25, 2533:11,
2545:17, 2565:10,
2569:16, 2569:18,
2573:11, 2601:15
**claimed** [28] -
2512:23, 2513:1,
2513:13, 2513:16,
2513:18, 2514:4,
2514:25, 2517:23,
2518:23, 2519:3,
2521:10, 2521:19,
2521:23, 2522:23,
2523:15, 2525:1,
2525:5, 2529:10,
2530:7, 2530:9,
2533:4, 2533:13,
2553:13, 2554:9,
2556:19, 2582:6,
2588:15, 2598:14

**claims** [9] - 2506:4,
2523:16, 2526:4,
2529:13, 2569:5,
2569:9, 2569:24,
2570:6, 2570:20
**clarify** [1] - 2549:24
**class** [1] - 2579:19
**classification** [1] -
2598:19
**classified** [1] -
2598:11
**clean** [2] - 2569:8,
2569:12, 2570:2
**clear** [12] - 2525:7,
2541:14, 2542:12,
2549:18, 2550:4,
2550:8, 2551:5,
2553:7, 2553:10,
2561:22, 2586:4,
2589:23
**clearly** [1] - 2507:21
**client** [1] - 2509:21
**clients** [2] - 2510:7,
2556:1
**close** [1] - 2561:25
**closes** [1] - 2557:24
**closing** [2] - 2540:14,
2594:22
**co** [2] - 2543:14,
2544:20
**co-lead** [1] - 2544:20
**co-leader** [1] -
2543:14
**cognizability** [5] -
2511:18, 2512:17,
2526:5, 2538:20,
2539:17
**cognizable** [11] -
2512:24, 2513:2,
2513:21, 2516:4,
2524:13, 2524:15,
2526:8, 2540:16,
2559:6, 2563:14,
2598:23
**collaborate** [2] -
2509:1, 2509:10
**colleague** [1] -
2510:22
**collectively** [1] -
2507:19
**COLUMBIA** [1] -
2498:1
**column** [14] - 2531:14,
2553:7, 2579:10,
2579:12, 2579:13,
2579:21, 2580:1,
2580:18, 2580:21,
2580:22, 2581:3,
2588:13, 2591:5
**columns** [3] -

2531:18, 2580:5,
2581:5
**combination** [7] -
2501:25, 2517:14,
2520:23, 2523:9,
2535:21, 2553:10,
2559:21
**combined** [9] -
2540:12, 2540:19,
2553:3, 2553:18,
2555:7, 2555:8,
2557:24, 2559:14,
2561:6
**coming** [3] - 2516:11,
2516:12, 2560:17
**commence** [1] -
2520:18
**comment** [3] - 2550:5,
2581:22, 2601:3
**commented** [1] -
2581:12
**comments** [1] -
2582:9
**committee** [5] -
2520:17, 2592:18,
2592:21, 2597:14,
2597:19
**common** [6] -
2518:25, 2519:7,
2536:8, 2569:11,
2570:14, 2577:12
**community** [1] -
2568:3
**companies** [16] -
2502:1, 2517:14,
2523:8, 2524:6,
2525:15, 2526:11,
2529:16, 2550:24,
2553:19, 2554:15,
2555:9, 2557:7,
2569:4, 2570:8,
2570:22, 2593:23
**company** [12] -
2503:15, 2536:4,
2555:8, 2559:16,
2559:17, 2560:4,
2560:5, 2560:23,
2564:7, 2574:3,
2599:13
**comparable** [2] -
2523:8, 2523:13
**comparative** [2] -
2524:10, 2527:14
**compare** [3] -
2504:10, 2554:13,
2555:7
**compared** [1] - 2513:6
**comparing** [2] -
2556:9
**comparison** [4] -

2521:5, 2523:14,
2554:2, 2554:17
**competitors** [1] -
2517:16
**compiled** [2] -
2573:17, 2574:22
**compiling** [1] -
2581:24
**complete** [2] -
2565:20, 2604:6
**completed** [1] -
2592:15
**completely** [2] -
2509:3, 2527:17
**complex** [1] - 2526:21
**comprehensive** [2] -
2569:16, 2569:18
**comprised** [1] -
2583:6
**computed** [5] -
2531:19, 2556:10,
2556:23, 2557:12,
2557:21
**concept** [1] - 2532:18
**concepts** [1] -
2532:16
**concerning** [1] -
2511:16
**conclusion** [4] -
2516:7, 2517:4,
2533:23, 2588:7
**conclusions** [4] -
2514:23, 2524:12,
2594:20, 2602:18
**conduct** [1] - 2506:18
**conducted** [1] -
2551:10
**conference** [1] -
2562:8
**confidence** [21] -
2518:19, 2518:24,
2519:5, 2519:18,
2541:17, 2584:25,
2585:9, 2586:12,
2586:16, 2587:10,
2587:11, 2587:24,
2588:8, 2588:19,
2590:16, 2590:20,
2591:25, 2595:16,
2597:13, 2599:6
**confident** [1] - 2519:6
**confidential** [5] -
2509:21, 2532:12,
2572:16, 2572:20,
2575:6
**confirm** [1] - 2599:1
**conflict** [1] - 2567:25
**confusion** [1] -
2500:20
**connection** [2] -

2514:5, 2539:3
**conscientious** [1] -
2591:14
**conservatism** [2] -
2560:18, 2562:11
**conservative** [3] -
2560:11, 2561:10,
2561:24
**consider** [1] - 2504:14
**considerable** [1] -
2583:25
**consideration** [1] -
2586:8
**considered** [2] -
2561:17, 2578:21
**consisted** [4] -
2545:15, 2592:21,
2593:12, 2593:13
**consistent** [2] -
2508:19, 2530:21
**constant** [2] - 2509:8,
2509:9
**constitutes** [2] -
2587:6, 2604:5
**Constitution** [1] -
2499:15
**consultant** [2] -
2536:2, 2595:10
**consultants** [4] -
2517:15, 2525:19,
2567:22, 2599:15
**consulting** [2] -
2565:7, 2593:6
**consumers** [1] -
2508:16
**contain** [1] - 2540:1
**contained** [11] -
2519:14, 2547:16,
2549:1, 2552:11,
2553:15, 2572:9,
2585:21, 2586:2,
2586:24, 2588:8,
2591:5
**context** [4] - 2531:14,
2579:18, 2590:25,
2599:25
**continue** [1] - 2559:19
**CONTINUED** [1] -
2498:23
**continued** [3] -
2499:1, 2545:18,
2545:20
**continuing** [2] -
2517:8, 2517:15
**continuous** [1] -
2517:13
**contract** [9] - 2529:20,
2529:21, 2533:9,
2535:10, 2546:16,
2556:11, 2558:11,

2570:24, 2578:22
**contracts** [12] -
2526:19, 2527:14,
2528:6, 2529:13,
2529:14, 2533:17,
2535:7, 2541:8,
2546:14, 2569:10,
2570:7, 2570:21
**contractual** [2] -
2526:16, 2532:9
**contributing** [1] -
2531:24
**controlling** [1] -
2581:2
**convert** [1] - 2533:18
**Cordani** [2] - 2529:12,
2543:4
**corner** [1] - 2573:3
**Corporation** [3] -
2498:7, 2499:8,
2507:13
**correct** [56] - 2500:9,
2501:7, 2530:14,
2531:21, 2538:17,
2538:25, 2539:4,
2539:5, 2540:14,
2543:2, 2544:3,
2544:12, 2546:1,
2550:14, 2552:12,
2553:17, 2553:23,
2554:4, 2554:12,
2555:20, 2555:24,
2558:4, 2559:7,
2559:9, 2559:13,
2559:14, 2560:10,
2560:24, 2567:10,
2567:12, 2569:15,
2570:20, 2571:4,
2573:16, 2574:6,
2574:24, 2575:14,
2576:5, 2576:10,
2580:6, 2585:6,
2585:24, 2586:5,
2587:5, 2587:12,
2587:25, 2589:14,
2591:9, 2591:10,
2592:16, 2592:22,
2593:8, 2593:14,
2593:17, 2599:2,
2599:3
**corrected** [1] -
2527:12
**correction** [2] -
2500:4, 2528:9
**correctly** [1] - 2595:12
**correspondence** [1] -
2544:24
**cost** [19] - 2514:22,
2515:1, 2517:23,
2518:4, 2518:13,

2521:13, 2524:17,
2524:18, 2524:19,
2524:20, 2524:24,
2525:9, 2550:8,
2550:16, 2550:18,
2552:9, 2580:2,
2580:18, 2598:2
**costs** [16] - 2513:5,
2513:6, 2517:19,
2518:6, 2518:9,
2521:7, 2521:8,
2522:12, 2523:13,
2523:25, 2524:22,
2524:23, 2554:19,
2554:20, 2555:2
**counterbalanced** [2] -
2530:18, 2530:25
**country** [1] - 2569:11
**couple** [1] - 2537:11
**course** [7] - 2509:10,
2514:21, 2522:20,
2522:24, 2545:16,
2549:5, 2570:16
**court** [9] - 2502:10,
2539:1, 2539:16,
2545:13, 2548:8,
2551:13, 2564:25,
2565:19, 2587:21
**Court** [7] - 2499:13,
2499:14, 2500:5,
2563:13, 2582:15,
2603:4, 2604:12
**COURT** [128] - 2498:1,
2500:3, 2500:6,
2500:11, 2500:13,
2501:10, 2509:16,
2509:24, 2510:6,
2510:14, 2510:16,
2510:23, 2511:1,
2511:6, 2511:12,
2511:21, 2512:2,
2514:9, 2514:13,
2515:3, 2515:14,
2516:8, 2516:20,
2517:5, 2518:2,
2518:10, 2519:10,
2519:17, 2519:22,
2522:16, 2526:14,
2527:24, 2532:11,
2532:15, 2532:21,
2533:22, 2534:17,
2534:19, 2534:21,
2535:1, 2536:7,
2536:21, 2537:7,
2537:10, 2537:14,
2537:17, 2537:21,
2538:1, 2538:9,
2538:12, 2540:23,
2541:19, 2542:6,
2542:15, 2547:11,

2547:24, 2548:8,
2548:11, 2548:13,
2549:3, 2552:1,
2554:22, 2558:3,
2558:5, 2558:8,
2558:17, 2558:24,
2560:3, 2560:7,
2560:20, 2560:25,
2561:13, 2561:21,
2562:7, 2562:13,
2562:16, 2562:18,
2563:7, 2563:22,
2563:25, 2564:14,
2565:17, 2566:6,
2566:16, 2570:13,
2570:17, 2571:15,
2571:18, 2572:16,
2572:22, 2572:25,
2573:15, 2575:19,
2575:22, 2577:17,
2580:17, 2580:21,
2580:25, 2581:4,
2583:13, 2583:22,
2584:12, 2589:3,
2589:7, 2589:9,
2589:18, 2589:20,
2589:22, 2591:21,
2594:13, 2594:18,
2594:22, 2595:3,
2595:12, 2597:16,
2597:18, 2599:12,
2600:7, 2600:10,
2600:15, 2600:18,
2600:25, 2601:4,
2601:6, 2601:18,
2602:2, 2602:8,
2603:3
**Courthouse** [1] -
2499:14
**courtroom** [3] -
2538:23, 2541:11,
2584:18
**courts** [1] - 2539:17
**cousin** [1] - 2528:2
**cover** [2] - 2566:3,
2566:4
**coverage** [2] -
2506:12, 2567:22
**covered** [20] -
2546:22, 2556:20,
2557:3, 2557:5,
2557:7, 2557:9,
2557:10, 2557:16,
2557:18, 2557:22,
2557:25, 2558:1,
2558:14, 2559:12,
2559:16, 2562:2,
2563:17, 2563:18,
2569:20, 2570:25
**CPA** [2] - 2539:15,

2589:6
**create** [5] - 2525:13, 2527:10, 2529:10, 2530:6, 2575:11
**created** [2] - 2522:25, 2533:12
**creates** [1] - 2531:3
**creating** [1] - 2516:1
**credentials** [1] - 2511:17
**credible** [2] - 2513:15, 2524:9
**criteria** [7] - 2512:25, 2513:18, 2513:23, 2524:14, 2569:23, 2570:5, 2570:9
**critical** [5] - 2504:11, 2504:14, 2504:20, 2504:21, 2600:19
**criticism** [6] - 2502:7, 2508:1, 2508:7, 2583:19, 2584:11, 2595:8
**criticized** [1] - 2548:14
**CROSS** [1] - 2538:13
**Cross** [1] - 2499:20
**cross** [11] - 2511:16, 2512:3, 2537:8, 2537:19, 2538:4, 2541:4, 2565:21, 2571:23, 2584:18, 2600:8, 2600:11
**CROSS-EXAMINATION** [1] - 2538:13
**cross-examination** [5] - 2511:16, 2537:8, 2538:4, 2541:4, 2565:21
**cross-examine** [1] - 2537:19
**crunched** [1] - 2516:10
**culminates** [2] - 2591:20, 2591:24
**culmination** [1] - 2597:10
**CURRAN** [1] - 2510:24
**Curran** [1] - 2499:2
**current** [1] - 2556:5
**customers** [5] - 2503:25, 2504:2, 2504:6, 2525:9, 2532:25
**cut** [2] - 2523:23, 2583:15
**cutoff** [1] - 2545:20
**cuts** [2] - 2533:6

# D

**data** [57] - 2503:17, 2507:23, 2518:20, 2519:11, 2519:14, 2519:25, 2520:1, 2520:2, 2520:7, 2520:8, 2521:4, 2521:7, 2523:9, 2523:10, 2523:17, 2524:8, 2527:1, 2527:3, 2527:4, 2527:6, 2527:9, 2527:11, 2527:13, 2527:16, 2527:20, 2527:25, 2528:3, 2528:24, 2530:4, 2530:11, 2530:20, 2531:6, 2533:3, 2533:5, 2547:4, 2547:5, 2547:8, 2547:10, 2547:13, 2548:13, 2548:14, 2569:5, 2569:9, 2570:4, 2571:4, 2571:6, 2575:9, 2575:10, 2575:11, 2586:22, 2597:23, 2598:7
**Dated** [1] - 2604:10
**David** [1] - 2499:19
**DC** [5] - 2498:5, 2498:19, 2499:6, 2499:10, 2499:15
**DDX0095** [1] - 2506:2
**deal** [3] - 2550:10, 2550:20, 2557:23
**dealing** [4] - 2544:8, 2563:4, 2575:6, 2579:7
**dealt** [1] - 2548:13
**December** [3] - 2498:6, 2598:4, 2604:10
**decide** [1] - 2582:23
**decisions** [1] - 2600:3
**declaration** [12] - 2519:11, 2519:13, 2519:15, 2519:17, 2519:21, 2546:6, 2546:7, 2570:10, 2580:13, 2585:22, 2586:22
**declarations** [1] - 2601:14
**deconfidentialized** [1] - 2572:21
**deemed** [5] - 2513:2, 2513:21, 2521:25,

2522:3, 2540:8
**Defendant** [1] - 2499:2
**defendants** [10] - 2512:14, 2515:18, 2517:21, 2553:12, 2554:5, 2554:11, 2573:25, 2576:24, 2577:8, 2601:13
**Defendants** [1] - 2498:8
**defendants'** [2] - 2507:6, 2515:22
**defense** [1] - 2510:25
**defined** [1] - 2505:3
**definition** [4] - 2503:13, 2558:6, 2576:4, 2576:8
**degree** [3] - 2519:5, 2526:8, 2590:16
**deliberations** [2] - 2546:10, 2598:10
**demonstrate** [2] - 2513:15, 2596:24
**dental** [2] - 2506:9, 2506:12
**deny** [3] - 2559:10, 2560:22, 2561:18
**DEPARTMENT** [1] - 2498:17
**Department** [3] - 2512:12, 2544:17, 2580:12
**dependent** [3] - 2517:17, 2523:9, 2580:15
**deposition** [12] - 2503:2, 2518:20, 2540:4, 2542:2, 2542:17, 2543:3, 2543:21, 2544:14, 2547:3, 2587:18, 2590:5, 2590:22
**depositions** [5] - 2542:4, 2542:23, 2543:5, 2545:1, 2590:7
**DEPUTY** [3] - 2585:13, 2585:16, 2603:2
**describe** [1] - 2512:10
**described** [6] - 2513:22, 2524:14, 2567:11, 2570:10, 2571:8, 2583:11
**designated** [1] - 2572:20
**detail** [2] - 2513:15, 2580:4
**detailed** [2] - 2517:25
**details** [1] - 2523:11

**determine** [4] - 2533:8, 2576:21, 2599:4, 2599:17
**determined** [3] - 2556:14, 2559:22, 2586:20
**Determining** [2] - 2567:15, 2571:14
**detract** [1] - 2599:6
**develop** [2] - 2550:3, 2569:24
**developed** [13] - 2518:8, 2518:22, 2519:4, 2519:8, 2521:10, 2540:17, 2543:25, 2553:8, 2553:12, 2556:8, 2569:6, 2587:13, 2598:23
**developing** [1] - 2525:20
**diagram** [1] - 2513:20
**difference** [2] - 2530:5, 2576:1
**differences** [6] - 2523:24, 2529:12, 2530:15, 2577:1, 2577:3, 2582:22
**differential** [5] - 2529:9, 2529:25, 2531:7, 2556:16, 2576:25
**differentials** [3] - 2528:25, 2532:9, 2556:11
**differentiate** [1] - 2521:12
**differentiated** [1] - 2554:5
**Direct** [1] - 2499:20
**direct** [25] - 2510:20, 2511:3, 2512:21, 2532:13, 2540:24, 2540:25, 2542:8, 2542:10, 2547:23, 2548:1, 2549:19, 2552:2, 2558:21, 2563:8, 2574:8, 2574:16, 2574:20, 2583:15, 2583:16, 2584:9, 2584:18, 2584:19, 2585:8, 2592:7, 2597:22
**DIRECT** [1] - 2512:6
**directly** [3] - 2523:8, 2562:10, 2595:8

**disability** [1] - 2506:9
**disclosed** [1] - 2536:19
**discord** [1] - 2599:14
**discount** [46] - 2505:22, 2526:20, 2527:9, 2528:25, 2529:5, 2529:6, 2529:7, 2529:8, 2529:20, 2529:24, 2530:17, 2530:22, 2530:23, 2531:19, 2532:1, 2532:5, 2532:20, 2533:5, 2533:10, 2556:14, 2556:23, 2558:22, 2560:8, 2561:3, 2561:4, 2561:14, 2561:15, 2568:2, 2573:6, 2573:13, 2573:22, 2574:8, 2575:2, 2575:17, 2576:13, 2576:14, 2576:16, 2576:21, 2576:22, 2577:3, 2577:24, 2579:16, 2579:24, 2580:1, 2580:18
**Discounts** [2] - 2567:15, 2571:14
**discounts** [31] - 2505:12, 2505:17, 2526:4, 2526:17, 2527:14, 2528:22, 2528:23, 2529:15, 2532:7, 2546:21, 2548:15, 2548:16, 2556:6, 2556:10, 2556:17, 2556:20, 2557:4, 2560:18, 2565:6, 2568:7, 2573:9, 2573:10, 2573:14, 2575:1, 2576:18, 2577:17, 2577:22, 2578:15, 2578:18, 2582:22, 2582:24
**discovery** [1] - 2578:13
**discuss** [2] - 2518:1, 2518:16
**discussed** [2] - 2567:19, 2601:22
**discussing** [3] - 2566:23, 2567:9, 2591:3
**discussion** [1] - 2500:9
**disparities** [2] - 2523:12, 2530:2

**disparity** [2] - 2529:15, 2529:18
**dispute** [1] - 2583:9
**disrespect** [1] - 2537:10
**distinct** [1] - 2500:8
**distinction** [1] - 2503:11
**distinguish** [1] - 2598:15
**distinguished** [1] - 2535:4
**DISTRICT** [3] - 2498:1, 2498:1, 2498:11
**divided** [2] - 2530:6, 2589:7
**Division** [1] - 2498:18
**doc** [1] - 2545:12
**document** [33] - 2503:24, 2504:3, 2506:4, 2506:7, 2513:9, 2549:12, 2566:22, 2567:1, 2567:11, 2567:14, 2568:4, 2571:13, 2571:20, 2571:21, 2572:1, 2572:10, 2572:16, 2573:12, 2573:18, 2574:18, 2575:6, 2579:1, 2581:22, 2582:8, 2582:14, 2585:20, 2586:10, 2591:3, 2595:22, 2596:2, 2596:6, 2601:24
**documentation** [2] - 2513:12, 2546:8
**documents** [13] - 2546:19, 2565:12, 2565:14, 2567:4, 2571:10, 2580:14, 2581:9, 2581:18, 2582:11, 2582:13, 2592:4, 2597:8, 2598:13
**DOJ** [1] - 2560:14
**done** [27] - 2506:21, 2520:10, 2523:6, 2525:18, 2527:15, 2528:11, 2528:16, 2529:23, 2536:1, 2537:20, 2541:21, 2545:9, 2545:11, 2547:12, 2551:5, 2556:4, 2564:20, 2565:7, 2577:11, 2578:19, 2581:10, 2584:14, 2584:16, 2586:24, 2596:11, 2601:2

**double** [1] - 2589:10
**down** [36] - 2510:14, 2511:23, 2523:2, 2524:9, 2526:19, 2529:20, 2534:24, 2535:3, 2536:17, 2567:13, 2568:16, 2576:10, 2579:10, 2580:5, 2584:1, 2584:7, 2585:21, 2586:4, 2592:12, 2592:14, 2592:17, 2593:12, 2593:19, 2596:7, 2596:16, 2596:19, 2596:25, 2597:13, 2597:15, 2598:17, 2599:1, 2599:3, 2599:7, 2599:8, 2599:20, 2601:19
**Dr** [39] - 2499:19, 2504:11, 2504:15, 2504:22, 2506:18, 2507:3, 2507:22, 2510:14, 2517:22, 2528:21, 2529:11, 2530:10, 2544:21, 2544:23, 2547:5, 2547:12, 2547:15, 2547:19, 2547:20, 2548:2, 2548:5, 2548:17, 2548:21, 2548:25, 2549:7, 2550:2, 2551:5, 2551:10, 2551:16, 2552:2, 2552:3, 2559:2, 2560:14, 2561:8, 2562:22, 2562:24, 2563:8, 2578:22, 2583:10
**dramatically** [1] - 2524:16
**Dranove** [3] - 2499:19, 2500:18, 2510:14, 2529:11, 2560:14, 2562:22, 2562:24, 2563:8
**draw** [2] - 2514:23, 2588:6
**DRGs** [1] - 2505:20
**driving** [1] - 2576:25
**Drozdowski** [11] - 2526:13, 2543:8, 2543:14, 2544:12, 2545:5, 2564:25, 2570:23, 2583:10, 2584:24, 2594:15, 2599:25
**Drozdowski's** [3] - 2545:13, 2583:11,

2585:3
**due** [1] - 2505:18
**during** [6] - 2511:16, 2515:25, 2520:8, 2557:9, 2574:7, 2597:22
**DX0690** [1] - 2596:2
**DX0703** [1] - 2566:8
**DX0714** [1] - 2507:22
**DX0743** [2] - 2571:17, 2601:23
**DX0747** [2] - 2579:2, 2601:24
**DX703** [2] - 2571:22, 2572:10
**DX714** [3] - 2508:2, 2508:8, 2508:9
**DX763** [1] - 2509:20, 2509:22
**DX764** [2] - 2509:20, 2509:22
**DX771** [1] - 2509:22
**DXO237** [1] - 2595:22

## E

**e-mail** [1] - 2522:15
**e-mails** [1] - 2522:16
**easily** [2] - 2503:18, 2505:3
**economic** [1] - 2564:11
**economics** [2] - 2558:20, 2563:4
**economists** [2] - 2511:25, 2563:17
**educating** [1] - 2537:11
**effect** [2] - 2534:21, 2561:18
**effective** [1] - 2538:4
**effects** [5] - 2508:16, 2508:25, 2509:1, 2509:3, 2509:6
**efficiencies** [43] - 2510:20, 2511:18, 2511:24, 2512:13, 2513:11, 2513:13, 2513:16, 2514:1, 2514:25, 2515:17, 2515:23, 2516:4, 2517:18, 2518:23, 2518:24, 2519:1, 2519:4, 2519:25, 2521:11, 2522:23, 2523:5, 2523:15, 2524:13, 2525:1, 2525:7, 2525:11, 2535:12, 2538:20, 2539:7, 2539:18,

2555:23, 2562:10, 2562:11, 2563:5, 2564:12, 2570:19, 2581:14, 2582:7, 2588:15, 2598:14, 2598:23, 2601:12, 2601:15
**efficiency** [11] - 2506:25, 2507:3, 2512:23, 2513:1, 2513:18, 2513:21, 2513:22, 2514:4, 2514:20, 2521:1, 2551:18
**effort** [6] - 2569:21, 2577:2, 2588:8, 2592:18, 2593:4, 2597:7
**efforts** [2] - 2508:21, 2545:25
**eight** [4] - 2520:5, 2529:3, 2530:4, 2530:6
**either** [13] - 2527:9, 2542:24, 2544:23, 2546:6, 2559:12, 2559:17, 2560:5, 2560:13, 2560:23, 2564:9, 2584:20, 2587:6, 2588:21
**elaborate** [1] - 2563:9
**elasticity** [4] - 2504:21, 2504:22, 2504:23, 2504:25
**element** [1] - 2588:1
**eliminate** [1] - 2521:20
**eliminated** [1] - 2554:20
**eliminating** [1] - 2524:20
**elizabeth** [1] - 2499:13
**Elizabeth** [1] - 2604:12
**ELIZABETH** [1] - 2604:4
**Emblem** [4] - 2509:19, 2509:20, 2510:3, 2510:4
**Emilio** [1] - 2498:20
**empirical** [1] - 2504:17
**employed** [1] - 2565:3
**employee** [2] - 2545:1, 2570:24
**employees** [8] - 2503:10, 2503:13, 2503:16, 2503:18, 2503:19, 2593:13, 2593:23

**employers** [1] - 2510:8
**end** [8] - 2511:3, 2534:15, 2546:12, 2548:20, 2565:18, 2569:22, 2584:23, 2590:18
**ended** [4] - 2529:3, 2598:1, 2598:3, 2598:4
**ending** [1] - 2520:5
**engagement** [2] - 2522:6, 2592:8
**engaging** [1] - 2522:9
**enjoyed** [1] - 2556:2
**enrolled** [1] - 2556:19
**enrollment** [1] - 2506:8
**enter** [1] - 2525:13
**entire** [4] - 2502:3, 2566:18, 2576:9, 2576:13
**entirely** [1] - 2535:7
**entitled** [1] - 2567:15
**entity** [8] - 2534:12, 2540:12, 2540:19, 2557:24, 2558:9, 2558:12, 2558:13, 2559:11
**entries** [4] - 2586:15, 2587:15, 2588:4, 2588:16
**entry** [1] - 2586:15
**equivalent** [1] - 2504:20
**especially** [4] - 2505:19, 2536:9, 2562:8, 2584:18
**establish** [2] - 2525:8, 2583:21
**established** [1] - 2522:8
**estimate** [3] - 2503:5, 2504:17, 2568:16
**estimated** [2] - 2551:19, 2552:7
**estimates** [9] - 2516:1, 2516:4, 2516:24, 2517:2, 2518:20, 2519:25, 2520:1, 2522:7, 2525:25
**estimating** [1] - 2523:5
**et** [3] - 2498:3, 2548:17, 2563:23
**evaluate** [1] - 2512:13
**evaluated** [3] - 2515:17, 2564:21, 2565:6
**evaluating** [7] -

2512:16, 2513:25,
2514:4, 2514:7,
2514:20, 2564:12,
2577:7
**evaluation** [2] -
2512:14, 2601:12
**evening** [1] - 2602:9
**event** [1] - 2568:10
**evidence** [14] -
2510:12, 2529:22,
2541:12, 2541:13,
2548:11, 2562:8,
2562:15, 2566:8,
2578:21, 2595:22,
2596:2, 2601:23,
2602:1, 2602:22
**evolutions** [1] -
2567:4
**exact** [3] - 2593:20,
2594:5, 2595:3
**exactly** [4] - 2501:25,
2561:23, 2572:9,
2581:17
**examination** [9] -
2510:20, 2511:16,
2537:8, 2538:4,
2541:4, 2565:21,
2574:8, 2574:16,
2597:22
**EXAMINATION** [2] -
2512:6, 2538:13
**examine** [1] - 2537:19
**example** [7] - 2507:17,
2508:25, 2523:18,
2524:4, 2530:15,
2543:7, 2557:13
**examples** [2] - 2505:8,
2523:16
**exceeded** [3] - 2529:6,
2530:23, 2596:19
**exceeding** [2] -
2575:1, 2575:18
**exception** [1] - 2565:8
**excerpt** [2] - 2581:23,
2590:5
**exchanged** [1] -
2569:4
**exchanging** [1] -
2569:7
**excuse** [2] - 2532:11,
2602:8
**excused** [1] - 2510:16
**executives** [2] -
2583:7, 2592:22
**exercise** [6] - 2569:14,
2570:18, 2583:20,
2583:21, 2593:11,
2596:16
**exhibit** [12] - 2519:11,
2530:22, 2566:2,

2570:10, 2571:15,
2574:11, 2574:12,
2575:12, 2585:9,
2585:11, 2585:22,
2591:2
**Exhibit** [2] - 2572:1,
2585:23
**exhibits** [6] - 2509:18,
2510:11, 2519:20,
2546:7, 2601:22,
2603:2
**exist** [4] - 2533:14,
2577:4, 2578:15,
2581:19
**existed** [5] - 2528:7,
2578:15, 2578:18,
2581:9, 2581:20
**exists** [1] - 2527:4
**expect** [1] - 2508:22
**expectation** [1] -
2555:1
**expected** [1] - 2556:1
**expecting** [1] -
2554:23
**expeditiously** [2] -
2515:5, 2518:18
**expenditure** [1] -
2521:21
**expense** [1] - 2515:19
**expenses** [3] - 2520:5,
2521:20, 2521:22
**experience** [8] -
2513:10, 2514:18,
2522:1, 2535:16,
2535:20, 2536:15,
2583:8, 2583:19
**experienced** [1] -
2599:15
**expert** [14] - 2510:20,
2511:9, 2511:10,
2511:20, 2514:16,
2514:23, 2517:9,
2536:9, 2538:19,
2539:20, 2542:2,
2558:20, 2564:11,
2584:3
**expertise** [3] -
2514:18, 2558:19,
2583:3
**experts** [1] - 2507:6
**explain** [3] - 2527:3,
2528:14, 2529:17
**explained** [1] -
2548:15
**explanation** [1] -
2577:15
**explore** [1] - 2511:15
**expressed** [2] -
2586:22, 2597:13
**expresses** [1] -

2590:16
**expressing** [1] -
2590:20
**extent** [3] - 2505:18,
2517:10, 2569:6
**extrapolated** [1] -
2527:10
**extremely** [1] -
2518:25
**eye** [1] - 2588:25
**eye-balling** [1] -
2588:25

## F

**fabricate** [1] - 2533:11
**facilitate** [1] - 2593:4
**facilitated** [1] -
2569:14
**facilities** [1] - 2579:11
**fact** [14] - 2501:18,
2508:22, 2514:22,
2515:13, 2522:15,
2536:9, 2563:17,
2577:4, 2584:17,
2587:17, 2588:4,
2594:20, 2595:10,
2602:18
**factors** [1] - 2501:25
**facts** [1] - 2594:13
**failure** [1] - 2519:7
**fair** [3] - 2569:9,
2589:22, 2595:3
**fall** [2] - 2514:25,
2536:23
**far** [3] - 2526:9,
2579:12, 2591:4
**favor** [1] - 2530:24
**FCRR** [3] - 2499:13,
2604:4, 2604:12
**February** [2] -
2520:18, 2520:19
**fed** [1] - 2570:2
**felt** [2] - 2508:25,
2577:6
**few** [2] - 2538:8,
2591:2
**fewer** [2] - 2556:21,
2557:5
**field** [4] - 2588:9,
2588:16, 2589:17,
2591:15
**fields** [2] - 2586:2,
2586:10
**Fifth** [1] - 2498:18
**fifth** [1] - 2522:5
**figure** [6] - 2536:9,
2541:4, 2572:1,
2572:8, 2573:3,

2584:4
**figured** [3] - 2516:15,
2516:16, 2589:23
**files** [1] - 2579:2
**fill** [2] - 2586:11,
2588:5
**filled** [2] - 2588:17,
2589:16
**final** [3] - 2546:11,
2547:10, 2600:3
**finally** [7] - 2513:8,
2513:14, 2518:1,
2518:16, 2522:20,
2525:24, 2528:14
**finance** [2] - 2511:10,
2514:23
**financial** [8] - 2514:7,
2520:2, 2520:14,
2520:19, 2520:22,
2523:6, 2523:7
**findings** [3] - 2584:17,
2594:20, 2602:18
**fine** [3] - 2541:24,
2542:6, 2585:16
**firm** [1] - 2593:6
**firms** [6] - 2552:13,
2553:4, 2556:19,
2557:3, 2560:17,
2565:7
**first** [25] - 2508:18,
2509:19, 2513:2,
2518:19, 2523:23,
2525:6, 2528:5,
2531:14, 2532:8,
2532:10, 2532:18,
2535:20, 2539:25,
2549:14, 2552:25,
2555:23, 2566:15,
2568:11, 2576:20,
2579:7, 2579:10,
2580:21, 2583:1,
2587:16, 2591:4
**Fitzgerald** [1] -
2498:15
**five** [8] - 2528:22,
2530:16, 2530:19,
2536:5, 2558:22,
2565:22, 2576:25,
2593:2
**five-and-a-half** [1] -
2536:5
**fixed** [11] - 2513:6,
2514:22, 2521:6,
2521:8, 2521:12,
2554:5, 2554:18,
2598:9, 2598:12,
2598:16, 2598:21
**flawed** [2] - 2508:3,
2508:9
**floor** [1] - 2531:5

**focus** [4] - 2553:22,
2568:10, 2577:7,
2594:19
**focused** [3] - 2537:2,
2544:7, 2600:21
**focuses** [1] - 2509:4
**focusing** [3] - 2544:1,
2554:3, 2576:13
**followed** [1] - 2531:20
**FOR** [2] - 2498:1,
2498:14
**for-profit** [1] - 2507:19
**force** [1] - 2556:22
**foregoing** [1] - 2604:5
**form** [1] - 2579:1
**format** [1] - 2519:16
**formed** [1] - 2521:10
**forth** [2] - 2596:16,
2601:12
**forward** [2] - 2515:4,
2568:6
**four** [5] - 2520:6,
2528:22, 2530:16,
2558:22, 2573:15
**Fourth** [1] - 2521:14
**Fowdur** [2] - 2504:15,
2504:22
**Fowdur's** [1] -
2504:11
**fraction** [1] - 2536:5
**frame** [1] - 2539:14
**frames** [1] - 2569:19
**framework** [3] -
2514:19, 2515:8,
2536:23
**Francisco** [1] -
2498:22
**free** [1] - 2512:3
**frequency** [1] - 2594:6
**frequent** [1] - 2594:5
**frequently** [2] -
2577:2, 2594:1
**Friday** [1] - 2505:5
**front** [1] - 2508:6
**full** [2] - 2600:1,
2604:6
**fully** [1] - 2535:6
**function** [1] - 2529:13
**functions** [3] - 2594:8,
2598:18, 2598:19
**furnished** [1] -
2580:10

## G

**G&A** [40] - 2516:2,
2516:24, 2517:2,
2517:18, 2517:23,
2518:20, 2519:25,

2520:1, 2521:16, 2521:19, 2521:23, 2521:24, 2522:7, 2522:10, 2522:11, 2523:5, 2524:13, 2525:1, 2552:4, 2552:7, 2552:13, 2552:18, 2552:20, 2553:3, 2553:13, 2553:14, 2553:18, 2553:19, 2554:9, 2554:14, 2555:7, 2584:8, 2585:7, 2592:7, 2592:10, 2593:11, 2597:6, 2597:23, 2598:6, 2598:9

**gain** [1] - 2562:2

**gap** [3] - 2580:1, 2580:18

**gaps** [4] - 2548:15, 2578:14, 2580:6, 2599:16

**Garrison** [1] - 2499:9

**Garvey** [1] - 2545:8

**Gate** [1] - 2498:21

**geared** [1] - 2550:22

**general** [10] - 2515:19, 2515:21, 2520:4, 2521:20, 2549:20, 2550:2, 2550:8, 2550:16, 2550:23, 2598:2

**GENERAL'S** [1] - 2498:21

**generally** [8] - 2512:10, 2528:21, 2535:13, 2556:20, 2557:3, 2575:5, 2593:10, 2598:15

**generate** [1] - 2519:12

**generated** [2] - 2522:20, 2522:24

**generating** [1] - 2524:10

**geographical** [1] - 2535:4

**geographies** [1] - 2573:23

**geography** [1] - 2546:22

**Gidley** [1] - 2499:3

**GIDLEY** [8] - 2500:2, 2500:4, 2500:7, 2500:12, 2509:17, 2510:2, 2510:13, 2510:15

**ginned** [1] - 2595:10

**given** [7] - 2520:17, 2522:9, 2536:9,

2538:22, 2563:25, 2564:6, 2587:17

**glean** [2] - 2554:23, 2587:24

**global** [1] - 2554:6

**God's** [1] - 2538:1

**gold** [1] - 2527:7

**Golden** [1] - 2498:21

**Golias** [1] - 2545:6

**government** [2] - 2600:19, 2600:20

**Government** [2] - 2584:1, 2595:4

**Government's** [2] - 2537:1, 2595:14

**granted** [1] - 2541:7

**graphical** [2] - 2519:16, 2549:16

**great** [2] - 2511:7, 2523:13

**greater** [11] - 2529:1, 2529:21, 2529:22, 2559:16, 2560:5, 2560:22, 2561:6, 2561:19, 2575:2, 2577:3, 2577:10

**green** [1] - 2520:17

**grouped** [2] - 2534:9, 2534:11

**groups** [1] - 2563:2

**growth** [3] - 2549:21, 2550:19, 2550:21

**guess** [7] - 2506:14, 2509:25, 2528:18, 2568:24, 2571:25, 2579:1, 2600:23

**guesswork** [1] - 2600:20

**guidelines** [5] - 2514:20, 2515:6, 2539:9, 2539:12, 2559:8

**Guidelines** [6] - 2512:15, 2512:18, 2512:25, 2514:4, 2522:22, 2525:6

**guiding** [1] - 2596:7

**guy** [1] - 2599:15

## H

**Haley** [2] - 2512:20, 2537:23

**half** [8] - 2521:24, 2536:5, 2557:20, 2557:25, 2586:15, 2589:7, 2589:8, 2589:9

**Hamburger** [1] -

2499:5

**hand** [3] - 2511:17, 2537:16, 2573:3

**handle** [1] - 2510:24

**handling** [1] - 2510:21

**handy** [1] - 2574:12

**happy** [1] - 2541:15

**hard** [1] - 2502:3

**HCA** [3] - 2507:12, 2507:16, 2509:22

**Health** [4] - 2500:21, 2500:23, 2500:24, 2579:21

**health** [10] - 2506:9, 2535:22, 2536:4, 2539:20, 2558:20, 2563:5, 2567:22, 2568:2, 2579:11

**healthcare** [1] - 2532:10

**hear** [5] - 2516:18, 2517:7, 2525:2, 2558:17, 2587:21

**heard** [20] - 2508:20, 2515:7, 2515:25, 2522:2, 2525:25, 2526:14, 2545:12, 2545:17, 2561:6, 2565:10, 2578:22, 2583:22, 2583:25, 2584:12, 2584:13, 2584:24, 2600:7, 2600:8, 2602:16

**hearing** [2] - 2532:21, 2559:24

**hearken** [1] - 2538:2

**Heather** [1] - 2499:3

**heeded** [1] - 2541:6

**held** [3] - 2545:14, 2545:16, 2596:4

**HELD** [1] - 2498:10

**hello** [1] - 2538:16

**help** [2] - 2536:9, 2551:6

**helping** [1] - 2593:4

**hereby** [1] - 2604:4

**high** [12] - 2519:5, 2519:18, 2520:13, 2521:16, 2555:1, 2587:10, 2589:3, 2589:5, 2590:16, 2590:20, 2591:25, 2597:12

**higher** [5] - 2526:4, 2528:17, 2532:20, 2533:4, 2556:23

**highlight** [2] - 2581:2, 2581:4

**highlighted** [2] - 2568:23, 2580:17

**highlighting** [2] - 2568:24, 2581:2

**highly** [2] - 2532:12, 2537:23

**himself** [1] - 2562:5

**hiring** [1] - 2517:16

**historical** [2] - 2505:14, 2523:10

**history** [2] - 2538:5, 2546:20

**hold** [2] - 2509:7, 2539:21

**holds** [2] - 2509:9, 2528:10

**Honor** [65] - 2500:2, 2509:15, 2509:17, 2509:20, 2510:2, 2510:13, 2510:18, 2510:19, 2510:24, 2511:8, 2511:13, 2514:11, 2516:6, 2516:21, 2517:3, 2518:7, 2518:13, 2519:21, 2532:12, 2532:17, 2533:2, 2535:2, 2536:18, 2537:6, 2537:13, 2537:15, 2538:7, 2538:11, 2541:14, 2541:24, 2542:13, 2542:20, 2547:6, 2547:9, 2547:21, 2547:25, 2548:12, 2555:6, 2555:10, 2558:7, 2559:3, 2560:10, 2561:9, 2561:20, 2562:11, 2563:3, 2563:10, 2563:21, 2564:10, 2565:24, 2572:21, 2580:24, 2583:17, 2584:7, 2584:21, 2589:11, 2589:21, 2589:25, 2594:21, 2599:19, 2600:5, 2600:13, 2600:17, 2601:20, 2601:21

**Honor's** [1] - 2563:11

**HONORABLE** [1] - 2498:10

**hope** [2] - 2515:12, 2538:2

**hopefully** [2] - 2500:5, 2553:2

**horizontal** [1] - 2559:8

**Horizontal** [6] - 2512:15, 2512:17, 2512:25, 2514:3, 2522:22, 2525:6

**hospital** [9] - 2507:4,

2532:4, 2535:22, 2540:5, 2542:17, 2558:13, 2570:22, 2570:25

**Hospital** [1] - 2507:12

**hospitals** [8] - 2505:17, 2507:1, 2507:16, 2507:19, 2507:21, 2534:8, 2542:16, 2563:1

**hour** [2] - 2510:21, 2537:22

**house** [1] - 2517:14

**housekeeping** [2] - 2509:17, 2601:21

**huge** [1] - 2529:15

**hypothesis** [3] - 2527:5, 2527:12, 2528:3

**hypothetical** [2] - 2504:18, 2505:2

## I

**ID** [1] - 2534:14

**identification** [8] - 2513:12, 2531:15, 2534:19, 2534:23, 2535:3, 2568:13, 2579:3, 2594:7

**identified** [4] - 2504:23, 2506:22, 2555:18, 2586:7

**ignores** [1] - 2509:3

**II** [1] - 2552:24

**immediate** [1] - 2579:13

**impact** [2] - 2578:2, 2578:3

**implement** [3] - 2516:17, 2535:17, 2583:25

**implementation** [1] - 2569:10

**implemented** [1] - 2535:21

**implication** [1] - 2578:4

**important** [7] - 2535:15, 2536:25, 2537:1, 2565:8, 2583:2, 2583:5, 2602:15

**improvement** [2] - 2517:13, 2517:15

**IN** [1] - 2498:1

**in-house** [1] - 2517:14

**inadmissible** [1] - 2537:18

**inappropriate** [4] - 2577:9, 2577:13, 2577:18, 2578:1
**Inc** [2] - 2498:6, 2499:2
**incentives** [1] - 2524:5
**include** [2] - 2502:22, 2513:9
**included** [3] - 2534:7, 2546:5, 2571:2
**includes** [1] - 2554:18
**including** [4] - 2573:7, 2583:10, 2592:22, 2592:25
**inconceivable** [1] - 2523:20
**increase** [2] - 2559:15, 2563:1
**independent** [2] - 2551:5, 2577:5
**INDEX** [1] - 2499:18
**Indiana** [2] - 2579:8, 2601:25
**indicate** [5] - 2521:18, 2545:3, 2553:6, 2553:9, 2585:21
**indicated** [5] - 2517:24, 2521:22, 2530:21, 2580:14, 2587:4
**indicates** [1] - 2586:14
**indicating** [2] - 2513:16, 2582:21
**indication** [2] - 2524:1, 2552:17
**indirectly** [1] - 2557:13
**individual** [8] - 2540:20, 2543:19, 2579:11, 2586:15, 2587:24, 2596:25, 2597:6, 2598:19
**individually** [1] - 2518:18
**individuals** [3] - 2542:24, 2543:7, 2545:15
**industry** [8] - 2558:21, 2562:2, 2563:5, 2565:7, 2572:23, 2578:1, 2578:15, 2583:8
**inferences** [1] - 2584:4
**information** [35] - 2509:21, 2516:23, 2518:8, 2520:2, 2520:15, 2520:22, 2523:7, 2524:18,

2532:13, 2540:17, 2553:9, 2554:6, 2568:2, 2568:5, 2568:6, 2568:20, 2569:16, 2569:18, 2570:2, 2570:11, 2570:15, 2572:9, 2573:17, 2573:25, 2578:10, 2578:13, 2578:17, 2579:16, 2581:24, 2582:5, 2587:8, 2588:8, 2591:5, 2600:2
**ingredients** [2] - 2535:14, 2535:18
**inherently** [1] - 2531:7
**initial** [3] - 2524:24, 2568:11, 2568:15
**initiatives** [7] - 2518:23, 2521:9, 2521:11, 2524:12, 2586:7, 2587:9, 2598:15
**innovation** [1] - 2509:10
**inpatient** [1] - 2535:5
**input** [1] - 2551:23
**instances** [7] - 2523:12, 2530:12, 2575:1, 2575:8, 2575:15, 2575:25, 2576:4
**instead** [2] - 2576:13, 2591:7
**institutions** [1] - 2534:8
**insurance** [8] - 2506:9, 2506:11, 2535:22, 2535:23, 2536:4, 2539:20, 2573:22, 2578:14
**insureds** [1] - 2535:7
**insurer** [2] - 2510:5, 2510:7
**insurers** [1] - 2505:16
**insuring** [1] - 2536:4
**integral** [1] - 2595:7
**integration** [43] - 2516:1, 2518:22, 2519:4, 2520:16, 2521:9, 2525:25, 2535:14, 2535:15, 2536:1, 2536:3, 2536:24, 2542:25, 2543:17, 2543:23, 2545:14, 2545:25, 2547:17, 2548:2, 2548:22, 2548:23, 2551:6, 2552:8, 2566:23, 2569:20,

2571:21, 2572:13, 2578:20, 2580:14, 2581:10, 2581:21, 2583:14, 2586:25, 2587:7, 2587:13, 2588:7, 2588:12, 2588:21, 2590:21, 2591:25, 2592:18, 2596:3, 2598:11, 2598:23
**integration's** [1] - 2572:10
**integrations** [1] - 2535:13
**intensive** [1] - 2515:13
**intentions** [1] - 2599:14
**interaction** [2] - 2592:1, 2592:5
**interest** [1] - 2567:25
**internal** [1] - 2525:20
**interpret** [1] - 2539:17
**interrupt** [1] - 2582:1
**interview** [1] - 2567:23
**interviewing** [1] - 2574:4
**introduce** [1] - 2526:22
**invasion** [1] - 2509:4
**investigation** [1] - 2534:5
**involved** [7] - 2525:15, 2542:24, 2542:25, 2545:2, 2593:3, 2593:11, 2593:16
**involvement** [1] - 2522:18
**involves** [1] - 2576:4
**involving** [2] - 2508:11, 2536:4
**irrelevant** [1] - 2547:22
**isolated** [1] - 2602:13
**Israel** [15] - 2506:18, 2507:3, 2528:21, 2530:10, 2547:15, 2548:2, 2549:7, 2550:2, 2551:5, 2551:10, 2551:16, 2552:3, 2559:2, 2561:8, 2578:22
**Israel's** [11] - 2507:22, 2517:22, 2547:5, 2547:12, 2547:19, 2547:20, 2548:5, 2548:17, 2548:21, 2548:25, 2552:2
**issue** [9] - 2516:9, 2528:15, 2531:23, 2573:23, 2576:16,

2583:14, 2591:2, 2598:9
**issues** [9] - 2506:22, 2508:20, 2511:15, 2529:14, 2535:16, 2537:4, 2540:15, 2566:24, 2599:24
**IT** [1] - 2524:22
**item** [3] - 2509:18, 2522:5, 2588:5
**items** [2] - 2587:6, 2596:10
**itself** [2] - 2519:10, 2560:14
**IV** [1] - 2500:9
**IV-H** [1] - 2500:9
**Ivan** [1] - 2498:15

**J**

**JACKSON** [1] - 2498:10
**JACOBS** [2] - 2510:18, 2602:5
**Jacobs** [4] - 2498:15, 2562:5, 2562:7, 2602:4
**January** [1] - 2569:21
**job** [1] - 2584:16
**John** [1] - 2499:3
**joint** [1] - 2502:1
**Jon** [1] - 2498:15
**Joseph** [1] - 2499:8
**JUDGE** [2] - 2498:10, 2498:11
**judgment** [1] - 2598:20
**July** [1] - 2557:14
**June** [2] - 2545:18
**Justice** [3] - 2512:12, 2544:18, 2580:12
**JUSTICE** [1] - 2498:17
**justify** [1] - 2595:10

**K**

**keep** [2] - 2555:17, 2566:4
**kept** [1] - 2541:13
**key** [1] - 2535:13
**kind** [5] - 2520:25, 2558:24, 2567:9, 2573:25, 2577:22
**kinds** [4] - 2571:1, 2581:9, 2581:19, 2582:13
**knowing** [1] - 2518:25
**knowledgeable** [1] -

2522:11
**known** [1] - 2593:6

**L**

**labeled** [2] - 2571:25, 2596:9
**labels** [1] - 2579:14
**lack** [3] - 2522:5, 2586:16, 2592:8
**large** [9] - 2521:18, 2522:2, 2529:18, 2530:2, 2532:3, 2567:22, 2574:9, 2580:6, 2587:4
**largely** [3] - 2515:11, 2550:15, 2552:21
**larger** [4] - 2532:7, 2533:10, 2533:11, 2576:22
**largest** [4] - 2507:18, 2535:24, 2555:22, 2556:12
**last** [5] - 2520:6, 2536:2, 2536:19, 2553:6, 2590:15
**late** [1] - 2545:18
**law** [3] - 2539:13, 2594:20, 2602:18
**lawyer** [2] - 2538:17, 2600:20
**lay** [3] - 2536:8, 2536:10, 2536:22
**laying** [1] - 2584:16
**lays** [1] - 2596:7
**lead** [3] - 2544:20, 2588:6
**lead's** [1] - 2596:3
**leader** [3] - 2543:14, 2597:5
**leaders** [5] - 2544:11, 2587:23, 2588:7, 2588:12, 2594:3
**leading** [3] - 2510:4, 2510:7, 2546:10
**leads** [2] - 2592:1, 2592:5
**least** [5] - 2520:2, 2545:24, 2563:19, 2564:8, 2583:11, 2588:18, 2592:11, 2593:19
**led** [1] - 2594:7
**left** [2] - 2573:3, 2579:12
**left-hand** [1] - 2573:3
**legacy** [1] - 2529:14
**legal** [8] - 2514:9, 2514:14, 2514:17,

2515:6, 2515:11, 2516:7, 2517:3, 2600:1
**legged** [1] - 2513:23
**legitimate** [1] - 2508:15
**legs** [1] - 2513:24
**lens** [1] - 2596:11
**Leopold** [1] - 2545:10
**less** [6] - 2509:1, 2510:21, 2537:21, 2555:3, 2576:3, 2576:14
**less-than-a-third** [1] - 2576:14
**level** [25] - 2513:15, 2519:18, 2522:11, 2522:23, 2523:19, 2529:20, 2534:14, 2534:17, 2534:18, 2536:16, 2540:13, 2540:20, 2564:8, 2576:21, 2584:25, 2586:12, 2587:24, 2591:25, 2593:19, 2596:15, 2596:19, 2596:24, 2597:12
**levels** [6] - 2518:19, 2518:24, 2573:22, 2585:9, 2588:18, 2596:10
**leverage** [8] - 2559:16, 2560:5, 2560:9, 2560:22, 2561:6, 2561:19, 2562:3, 2563:1
**lifted** [1] - 2600:2
**light** [1] - 2520:17
**likelihood** [2] - 2564:6, 2564:7
**likely** [4] - 2509:11, 2519:8, 2537:23, 2563:18
**limit** [1] - 2518:8
**limited** [2] - 2526:8, 2597:24
**line** [5] - 2502:18, 2503:3, 2558:18, 2563:4, 2587:9
**lines** [4] - 2502:19, 2502:21, 2502:22, 2503:25
**list** [1] - 2567:1
**listed** [7] - 2504:2, 2504:3, 2504:7, 2504:9, 2539:23, 2540:3, 2567:18
**listening** [2] - 2517:21, 2602:19
**lists** [2] - 2503:24,

2573:15
**literally** [1] - 2598:6
**litigation** [1] - 2580:11
**lives** [19] - 2536:5, 2546:22, 2556:20, 2557:3, 2557:5, 2557:7, 2557:9, 2557:10, 2557:16, 2557:18, 2557:23, 2558:1, 2558:14, 2559:12, 2559:16, 2562:3, 2563:17, 2563:18
**LLP** [2] - 2499:5, 2499:9
**location** [1] - 2535:4
**locations** [1] - 2573:11
**look** [23] - 2502:17, 2504:24, 2513:20, 2519:2, 2532:9, 2541:3, 2566:2, 2566:17, 2567:13, 2572:5, 2572:8, 2573:2, 2576:12, 2579:15, 2580:10, 2581:8, 2581:16, 2582:13, 2587:15, 2588:16, 2589:24, 2597:8
**looked** [18] - 2500:13, 2504:21, 2516:23, 2523:11, 2525:10, 2527:8, 2528:24, 2533:3, 2534:13, 2541:10, 2552:18, 2571:22, 2574:9, 2578:22, 2580:8, 2582:9, 2582:11, 2587:2
**looking** [15] - 2506:7, 2521:6, 2522:3, 2524:2, 2524:11, 2530:20, 2531:6, 2540:22, 2572:3, 2572:15, 2573:2, 2589:18, 2590:17, 2590:25, 2591:16
**looks** [1] - 2572:8
**loss** [3] - 2504:12, 2504:14, 2504:20
**LOTH** [1] - 2604:4
**Loth** [1] - 2604:12
**low** [5] - 2519:19, 2520:13, 2534:4, 2534:6, 2587:10
**lower** [9] - 2508:11, 2553:20, 2553:23, 2554:23, 2556:2, 2560:8, 2560:9,

2575:7, 2576:15
**lunch** [2] - 2508:6, 2508:10

# M

**M&N** [3] - 2530:7, 2550:22, 2581:13
**magnify** [1] - 2579:6
**magnitude** [2] - 2535:22, 2577:14
**mail** [1] - 2522:15
**mails** [1] - 2522:16
**major** [1] - 2526:24
**manifested** [1] - 2598:24
**manipulated** [1] - 2575:11
**manipulating** [1] - 2575:13
**mankind** [1] - 2538:5
**map** [6] - 2501:2, 2501:6, 2501:18, 2501:23, 2502:5, 2502:9
**maps** [1] - 2502:2
**March** [4] - 2545:22, 2545:24, 2592:15, 2598:3
**Mark** [1] - 2499:3
**marked** [1] - 2579:1
**market** [5] - 2503:13, 2504:18, 2504:22, 2505:3, 2599:23
**marketing** [1] - 2510:4
**marketplace** [3] - 2577:3, 2581:20
**markets** [3] - 2508:4, 2525:14
**Martin** [1] - 2499:4
**massive** [1] - 2569:5
**material** [5] - 2547:15, 2566:7, 2567:2, 2585:21, 2600:4
**materials** [11] - 2508:5, 2539:23, 2540:3, 2542:22, 2546:2, 2546:9, 2571:11, 2578:12, 2596:3, 2597:5, 2601:13
**math** [1] - 2564:2
**Mathai** [2] - 2502:13, 2503:1
**Matheis** [21] - 2511:22, 2522:15, 2523:4, 2524:19, 2525:20, 2534:3, 2534:13, 2535:25,

2543:4, 2543:19, 2543:22, 2587:21, 2587:23, 2588:11, 2590:6, 2591:8, 2593:18, 2594:4, 2594:14, 2597:14, 2600:5
**Matheis's** [3] - 2587:18, 2590:15, 2592:5
**mathematical** [3] - 2526:6, 2526:7, 2529:24
**mathematically** [2] - 2556:10, 2556:23
**mathematically-computed** [1] - 2556:23
**mathematics** [2] - 2509:7, 2556:25
**matter** [5] - 2511:17, 2512:11, 2514:16, 2542:25, 2578:1
**matters** [3] - 2514:5, 2524:1, 2539:3
**McKinsey** [11] - 2542:24, 2545:16, 2551:6, 2569:14, 2569:20, 2574:23, 2591:7, 2593:3, 2593:6, 2593:16, 2599:15
**McKinsey's** [1] - 2575:10
**mean** [9] - 2516:10, 2558:24, 2562:4, 2564:14, 2569:18, 2570:21, 2573:13, 2576:11, 2595:5
**means** [7] - 2509:11, 2513:8, 2514:3, 2517:16, 2525:19, 2527:11, 2599:9
**meant** [2] - 2537:10
**mechanism** [1] - 2528:9
**medical** [30] - 2506:12, 2515:19, 2525:25, 2543:1, 2543:15, 2544:4, 2546:3, 2548:3, 2549:20, 2550:18, 2551:3, 2551:17, 2551:18, 2555:13, 2555:20, 2559:6, 2560:19, 2560:20, 2563:13, 2563:14, 2563:15, 2564:23, 2565:2, 2567:8, 2568:20, 2582:18,

2583:6, 2584:8, 2584:25, 2600:1
**medium** [4] - 2519:19, 2588:18, 2589:3, 2589:5
**meet** [1] - 2513:18
**meeting** [1] - 2596:3
**meetings** [4] - 2545:14, 2546:3, 2594:3, 2597:6
**member** [2] - 2524:5, 2524:6
**members** [4] - 2503:5, 2503:12, 2503:15, 2503:18
**mentioned** [4] - 2543:8, 2549:19, 2583:1, 2592:7
**merger** [32] - 2507:10, 2508:15, 2508:16, 2509:11, 2509:13, 2513:2, 2513:3, 2513:4, 2514:21, 2515:1, 2516:13, 2517:1, 2517:5, 2517:12, 2517:17, 2525:16, 2526:10, 2539:9, 2539:12, 2551:10, 2551:17, 2551:23, 2551:24, 2552:2, 2552:4, 2557:24, 2559:8, 2559:11, 2561:18, 2562:24, 2563:23, 2596:20
**Merger** [6] - 2512:15, 2512:18, 2512:25, 2514:4, 2522:22, 2525:6
**mergers** [2] - 2514:6, 2519:1
**merging** [1] - 2550:9
**message** [1] - 2510:4
**met** [4] - 2513:1, 2550:15, 2570:4, 2594:1
**Method** [4] - 2568:12, 2568:16, 2569:2, 2571:8
**methodology** [13] - 2513:25, 2531:7, 2533:7, 2533:8, 2534:1, 2541:18, 2557:1, 2557:2, 2560:11, 2561:10, 2564:23, 2565:2, 2567:9
**meticulous** [1] - 2598:18
**metropolitan** [1] -

2534:10
**Michael** [1] - 2499:5
**midafternoon** [1] - 2511:2
**middle** [8] - 2505:5, 2508:25, 2529:7, 2529:8, 2530:15, 2530:16, 2536:23, 2555:3
**Milliman** [11] - 2567:15, 2567:21, 2568:1, 2571:13, 2571:20, 2572:1, 2572:17, 2573:9, 2574:3, 2601:23
**million** [31] - 2508:11, 2508:18, 2517:22, 2517:24, 2518:5, 2524:15, 2524:16, 2524:19, 2524:21, 2529:4, 2530:2, 2530:5, 2530:8, 2536:5, 2552:3, 2552:8, 2554:1, 2554:9, 2554:18, 2557:11, 2557:17, 2557:20, 2557:22, 2557:25, 2586:19, 2587:6, 2588:20, 2588:23, 2589:12
**mlLNE** [1] - 2555:16
**Milne** [3] - 2499:4, 2510:24, 2601:9
**MILNE** [111] - 2511:13, 2512:1, 2514:11, 2516:6, 2517:3, 2517:11, 2536:18, 2537:9, 2537:15, 2537:20, 2537:23, 2538:7, 2538:11, 2538:14, 2541:14, 2541:24, 2542:12, 2542:21, 2547:9, 2547:14, 2547:25, 2548:10, 2548:12, 2548:19, 2549:5, 2549:6, 2549:11, 2549:15, 2553:1, 2555:5, 2555:12, 2558:4, 2558:7, 2558:9, 2559:3, 2559:4, 2560:1, 2560:6, 2560:10, 2560:24, 2561:8, 2561:20, 2561:22, 2562:10, 2562:14, 2562:17, 2562:20, 2562:21, 2563:10, 2563:24,

2564:4, 2564:18, 2564:19, 2565:24, 2565:25, 2566:3, 2570:15, 2570:20, 2571:3, 2571:17, 2571:19, 2572:18, 2572:24, 2573:1, 2573:16, 2573:20, 2574:14, 2575:21, 2575:24, 2578:3, 2578:7, 2578:24, 2578:25, 2580:20, 2580:23, 2581:1, 2581:5, 2581:7, 2582:15, 2583:17, 2584:6, 2584:21, 2584:22, 2585:11, 2585:15, 2585:17, 2585:19, 2589:4, 2589:8, 2589:15, 2589:19, 2589:21, 2589:25, 2590:1, 2594:17, 2594:21, 2594:24, 2594:25, 2595:5, 2595:17, 2597:17, 2597:20, 2597:21, 2599:19, 2600:9, 2600:13, 2600:16, 2600:23, 2601:1, 2601:21
**mine** [2] - 2527:7, 2585:17
**mined** [1] - 2527:16
**mines** [1] - 2527:4
**mining** [6] - 2527:1, 2527:3, 2527:4, 2527:11, 2527:25, 2528:3
**minutes** [4] - 2565:21, 2597:4, 2597:5, 2600:12
**misleading** [1] - 2502:6
**mismatch** [1] - 2523:17
**misspeak** [1] - 2597:24
**misspoke** [1] - 2500:7
**misstates** [1] - 2556:4
**misunderstanding** [1] - 2549:25
**mix** [1] - 2529:13
**modest** [1] - 2555:8
**modify** [1] - 2541:15
**moment** [3] - 2549:14, 2555:13, 2600:14
**monitors** [1] - 2531:12
**monopolist** [2] - 2504:19, 2505:2
**monopsony** [1] -

2562:1
**months** [14] - 2520:5, 2520:6, 2520:8, 2529:3, 2530:6, 2597:24, 2598:1, 2598:3, 2598:6, 2598:8
**months'** [1] - 2530:4
**Moony's** [1] - 2544:23
**morning** [2] - 2508:6, 2563:8
**most** [8] - 2521:11, 2524:24, 2530:15, 2535:6, 2537:23, 2538:4, 2599:15, 2600:19
**move** [8] - 2509:18, 2548:5, 2555:10, 2563:20, 2564:17, 2564:18, 2594:24, 2601:25
**moved** [1] - 2510:1
**moving** [6] - 2525:2, 2525:24, 2531:9, 2535:12, 2579:12, 2595:18
**MR** [164] - 2500:2, 2500:4, 2500:7, 2500:12, 2500:17, 2509:15, 2509:17, 2509:25, 2510:2, 2510:13, 2510:15, 2510:18, 2510:24, 2511:7, 2511:13, 2512:1, 2512:5, 2512:7, 2512:19, 2512:22, 2514:11, 2514:19, 2515:12, 2515:19, 2516:6, 2516:19, 2516:21, 2516:22, 2517:3, 2517:11, 2518:14, 2518:15, 2518:21, 2519:23, 2521:15, 2522:19, 2523:2, 2528:12, 2528:13, 2528:18, 2531:10, 2532:12, 2533:16, 2534:18, 2534:20, 2534:24, 2535:11, 2536:18, 2537:5, 2537:9, 2537:15, 2537:20, 2537:23, 2538:7, 2538:11, 2538:14, 2541:14, 2541:24, 2542:12, 2542:21, 2547:6, 2547:9, 2547:14, 2547:21, 2547:25, 2548:10, 2548:12,

2548:19, 2549:5, 2549:6, 2549:11, 2549:15, 2553:1, 2555:5, 2555:12, 2555:16, 2558:4, 2558:7, 2558:9, 2558:10, 2558:16, 2558:18, 2559:3, 2559:4, 2560:1, 2560:6, 2560:10, 2560:24, 2561:8, 2561:20, 2561:22, 2562:10, 2562:14, 2562:17, 2562:20, 2562:21, 2563:3, 2563:10, 2563:24, 2564:4, 2564:10, 2564:18, 2564:19, 2565:24, 2565:25, 2566:3, 2570:15, 2570:20, 2571:3, 2571:17, 2571:19, 2572:18, 2572:24, 2573:1, 2573:16, 2573:20, 2574:14, 2575:21, 2575:24, 2578:3, 2578:7, 2578:24, 2578:25, 2580:20, 2580:23, 2581:1, 2581:5, 2581:7, 2582:15, 2583:17, 2584:6, 2584:21, 2584:22, 2585:11, 2585:15, 2585:17, 2585:19, 2589:4, 2589:8, 2589:15, 2589:19, 2589:21, 2589:25, 2590:1, 2594:17, 2594:21, 2594:24, 2594:25, 2595:5, 2595:17, 2597:17, 2597:20, 2597:21, 2599:19, 2600:9, 2600:16, 2600:23, 2601:1, 2601:8, 2601:17, 2601:21, 2602:5
**multiple** [2] - 2564:15, 2593:11
**multiplying** [1] - 2530:5
**Muney** [2] - 2544:21, 2583:10
**must** [2] - 2513:18, 2596:11
**mystifies** [1] - 2520:21

**N**

**name** [1] - 2545:7
**namely** [1] - 2508:20
**names** [1] - 2545:3
**nascent** [1] - 2516:14
**national** [5] - 2503:4, 2503:14, 2504:18, 2510:8, 2567:22
**native** [1] - 2579:1
**nature** [1] - 2508:14
**NDAs** [1] - 2593:23
**necessarily** [1] - 2570:21
**necessary** [3] - 2535:14, 2574:1, 2594:23
**necessities** [1] - 2522:12
**need** [15] - 2504:23, 2516:8, 2516:18, 2536:8, 2536:10, 2536:16, 2540:1, 2564:17, 2565:18, 2577:6, 2584:2, 2584:5, 2584:17, 2584:19, 2599:22
**needed** [1] - 2599:23
**needs** [4] - 2531:11, 2537:2, 2565:19, 2591:22
**negative** [2] - 2530:25
**negotiable** [1] - 2541:9
**negotiate** [1] - 2505:17
**negotiated** [1] - 2505:22
**negotiating** [3] - 2558:12, 2559:20, 2559:21
**negotiation** [5] - 2533:25, 2558:12, 2558:14, 2564:6, 2564:11
**negotiations** [5] - 2540:13, 2540:20, 2545:2, 2546:20, 2559:17
**net** [1] - 2524:25
**Net** [3] - 2500:21, 2500:23, 2500:24
**network** [33] - 2502:4, 2515:19, 2525:24, 2526:1, 2534:2, 2543:1, 2543:15, 2544:4, 2544:8, 2546:4, 2548:3, 2549:20, 2550:18,

2551:3, 2551:18,
2555:13, 2555:20,
2555:23, 2559:6,
2560:19, 2560:21,
2563:14, 2563:15,
2564:23, 2565:3,
2567:8, 2568:20,
2571:1, 2582:19,
2583:6, 2584:9,
2585:1, 2600:1
**networks** [3] - 2501:3,
2501:19, 2501:23
**never** [13] - 2505:22,
2522:1, 2522:2,
2528:6, 2528:8,
2535:25, 2538:19,
2539:1, 2539:6,
2554:5, 2578:22,
2580:10, 2587:1
**new** [5] - 2525:13,
2559:16, 2560:4,
2564:7
**NewCo** [5] - 2540:19,
2558:1, 2560:22,
2563:16, 2564:8
**next** [11] - 2531:18,
2541:21, 2558:11,
2575:23, 2577:14,
2579:21, 2580:21,
2589:20, 2591:13,
2591:17, 2602:24
**nine** [5] - 2520:8,
2530:17, 2536:2,
2598:3, 2598:8
**nobody** [2] - 2522:11,
2535:20
**none** [1] - 2520:14
**nonmerger** [1] -
2525:12
**nonpublic** [1] -
2555:16
**nonspecified** [1] -
2587:4
**nontrivial** [1] -
2580:24
**normal** [3] - 2517:13,
2522:24, 2527:11
**normally** [2] -
2529:19, 2597:1
**note** [1] - 2517:8
**notes** [2] - 2594:18,
2604:6
**nothing** [3] - 2525:23,
2526:7, 2586:21
**noticed** [1] - 2531:23
**November** [1] - 2596:4
**nowhere** [1] - 2536:19
**number** [38] - 2534:2,
2534:14, 2534:19,
2534:23, 2535:4,

2546:6, 2550:3,
2554:2, 2554:3,
2554:13, 2554:19,
2555:3, 2555:25,
2557:6, 2557:8,
2557:12, 2557:15,
2557:21, 2562:2,
2571:15, 2574:12,
2575:7, 2575:8,
2575:16, 2575:17,
2575:25, 2576:22,
2576:23, 2576:24,
2577:1, 2579:3,
2586:9, 2587:4,
2593:20, 2595:10,
2596:25
**numbers** [29] -
2506:8, 2508:2,
2508:7, 2508:23,
2508:24, 2516:11,
2520:14, 2520:24,
2524:2, 2531:15,
2532:16, 2549:17,
2553:4, 2553:6,
2553:8, 2553:15,
2554:25, 2555:19,
2564:2, 2566:14,
2566:15, 2568:13,
2574:22, 2575:5,
2580:17, 2597:15,
2599:7
**numerals** [1] -
2566:15
**NW** [4] - 2498:18,
2499:6, 2499:10,
2499:15

## O

**objection** [12] -
2509:24, 2514:12,
2516:7, 2517:3,
2517:9, 2547:6,
2547:21, 2558:16,
2558:17, 2558:18,
2563:3, 2564:10
**objections** [1] -
2541:7
**observed** [1] -
2515:22
**obtain** [1] - 2546:21
**obtained** [1] - 2524:3
**occasional** [1] -
2530:16
**occurred** [1] - 2596:20
**occurs** [3] - 2523:24,
2527:20, 2528:16
**October** [1] - 2590:6
**OF** [3] - 2498:1,
2498:9, 2498:17

**offer** [4] - 2538:19,
2539:2, 2549:4,
2549:7
**offered** [2] - 2540:18,
2584:10
**offering** [5] - 2511:9,
2542:13, 2548:24,
2549:2, 2549:3
**offhand** [1] - 2592:6
**OFFICE** [1] - 2498:21
**official** [1] - 2604:12
**Official** [1] - 2499:14
**offset** [1] - 2524:16
**offsetting** [1] -
2561:17
**often** [1] - 2513:22
**once** [1] - 2600:1
**one** [61] - 2501:9,
2507:15, 2508:22,
2510:2, 2510:19,
2513:3, 2513:23,
2516:13, 2519:19,
2520:10, 2520:12,
2524:19, 2526:3,
2527:16, 2530:19,
2530:24, 2532:4,
2532:10, 2532:18,
2532:19, 2533:18,
2533:20, 2534:9,
2535:24, 2536:3,
2538:24, 2539:21,
2540:10, 2542:3,
2542:5, 2542:17,
2544:4, 2544:13,
2546:17, 2549:24,
2554:13, 2556:12,
2560:8, 2561:9,
2564:16, 2565:5,
2566:15, 2567:21,
2573:15, 2574:7,
2574:12, 2581:12,
2581:13, 2581:18,
2583:1, 2584:23,
2585:18, 2586:10,
2587:10, 2589:10,
2590:6, 2597:22,
2601:3, 2601:5,
2601:10, 2601:24
**one-sixth** [1] -
2532:19
**ones** [7] - 2519:4,
2522:24, 2543:7,
2556:21, 2557:4,
2580:19, 2586:21
**open** [2] - 2501:8,
2502:10
**opening** [1] - 2501:20
**operations** [1] -
2511:11
**operator** [1] - 2596:11

**opine** [1] - 2540:12
**opining** [2] - 2511:17,
2548:5
**opinion** [18] - 2508:7,
2518:3, 2530:13,
2539:14, 2540:18,
2541:11, 2541:23,
2542:7, 2542:13,
2547:7, 2548:24,
2549:7, 2552:5,
2559:5, 2586:23,
2586:25, 2587:1,
2587:10
**opinions** [14] -
2514:17, 2517:1,
2517:18, 2523:3,
2525:5, 2526:5,
2538:20, 2539:24,
2543:10, 2543:13,
2562:23, 2580:9,
2585:4, 2588:15
**opportunity** [1] -
2538:10
**opposed** [2] -
2520:23, 2569:7
**opposite** [2] -
2532:23, 2556:13
**option** [2] - 2572:12,
2572:13
**options** [2] - 2567:19,
2572:9
**oral** [1] - 2602:21
**order** [11] - 2504:23,
2513:1, 2524:9,
2529:10, 2533:11,
2535:21, 2554:15,
2557:22, 2558:13,
2577:13, 2593:22
**origin** [1] - 2505:14
**original** [3] - 2508:1,
2508:3, 2577:19
**ostensible** [2] -
2582:22, 2582:24
**out-of-network** [1] -
2571:1
**out-of-sample** [1] -
2527:13
**outcome** [2] - 2505:1,
2505:2
**outer** [1] - 2518:7
**outpatient** [1] - 2535:5
**output** [9] - 2546:5,
2547:2, 2547:3,
2547:10, 2547:11,
2547:17, 2548:20,
2548:21, 2548:22
**outside** [3] - 2522:20,
2547:6, 2558:19
**outsized** [2] -
2576:18, 2577:1

**overall** [8] - 2514:19,
2517:1, 2543:22,
2544:1, 2552:13,
2555:19, 2576:14,
2576:21
**overhead** [1] -
2523:25
**overlap** [1] - 2513:21
**own** [6] - 2504:9,
2504:17, 2518:8,
2522:11, 2536:15,
2559:17
**owned** [1] - 2502:1

## P

**p.m** [2] - 2498:6,
2603:4
**Page** [4] - 2499:19,
2499:20, 2499:20,
2499:21
**page** [18] - 2500:8,
2500:9, 2501:9,
2501:13, 2502:18,
2566:3, 2567:19,
2572:1, 2572:6,
2572:8, 2573:2,
2573:3, 2590:9,
2590:17, 2590:25,
2591:4, 2591:16,
2591:17
**pages** [1] - 2591:2
**paid** [2] - 2505:23,
2570:6
**painful** [1] - 2532:6
**paper** [3] - 2517:21,
2552:11, 2567:15
**papers** [1] - 2601:14
**paragraph** [5] -
2500:10, 2501:9,
2501:12, 2501:13,
2501:15
**Pardon** [1] - 2597:17
**part** [18] - 2500:24,
2502:9, 2514:11,
2521:11, 2531:1,
2531:2, 2537:1,
2539:9, 2542:1,
2542:22, 2543:17,
2544:1, 2552:4,
2552:14, 2555:5,
2561:23, 2578:12,
2599:11
**partially** [1] - 2531:16
**participate** [1] -
2593:24
**particular** [6] - 2527:7,
2529:14, 2544:11,
2546:22, 2553:14,

2588:13
**parties** [4] - 2511:8, 2513:10, 2550:9, 2599:14
**parts** [2] - 2502:5, 2602:15
**pass** [1] - 2519:9
**passed** [1] - 2505:3
**passes** [1] - 2504:18
**past** [1] - 2513:11
**patience** [1] - 2563:11
**patient** - 2570:25
**patients** [2] - 2556:19, 2558:6
**Paul** [1] - 2499:9
**pause** [3] - 2518:25, 2519:8, 2522:4
**paying** [3] - 2523:21, 2524:5, 2524:7
**payment** [1] - 2505:20
**PDX13** [1] - 2512:19
**PDX14** [4] - 2528:12, 2528:18, 2529:2, 2574:15
**PDX15** [1] - 2531:10
**PDX16** [1] - 2518:21
**PDX21** [2] - 2518:14, 2523:2
**PDX22** [1] - 2521:15
**pencils** [1] - 2599:17
**penetrate** [1] - 2525:14
**people** [7] - 2517:16, 2535:16, 2537:11, 2569:7, 2588:15, 2593:1, 2595:15
**per** [3] - 2523:19, 2524:5
**percent** [39] - 2503:7, 2507:20, 2519:3, 2521:24, 2523:21, 2528:22, 2529:6, 2529:7, 2529:8, 2529:9, 2530:16, 2530:17, 2530:19, 2530:23, 2530:24, 2530:25, 2531:1, 2531:6, 2531:7, 2533:4, 2533:20, 2541:17, 2541:20, 2542:13, 2554:16, 2554:24, 2558:13, 2558:23, 2573:10, 2573:13, 2573:14, 2575:2, 2576:7, 2576:25, 2577:3, 2577:11, 2589:1, 2589:2
**percentage** [9] - 2533:17, 2553:14,

2553:20, 2554:3, 2554:15, 2577:10, 2577:24, 2588:4, 2588:17
**percentages** [1] - 2555:7
**perfectly** [1] - 2541:24
**performed** [1] - 2564:5
**period** [12] - 2527:1, 2527:15, 2527:16, 2527:17, 2527:18, 2527:20, 2527:21, 2528:5, 2529:14, 2556:6, 2557:9, 2570:7
**periods** [3] - 2527:12, 2527:22, 2528:10
**permit** [1] - 2602:3
**perplexing** [1] - 2502:15
**person** [1] - 2523:19
**personal** [1] - 2552:5
**personnel** [1] - 2593:16
**pertain** [2] - 2515:18, 2517:23
**pertaining** [1] - 2546:7
**pertains** [2] - 2590:11, 2591:11
**peruse** [1] - 2580:6
**pervasively** [1] - 2514:6
**peter** [1] - 2498:16
**Phase** [3] - 2562:9, 2602:6, 2602:24
**phases** [1] - 2592:11
**phenomenon** [1] - 2505:8
**phone** [1] - 2591:22
**physician** [2] - 2535:5, 2563:1
**physicians** [2] - 2505:21, 2505:23, 2534:10
**pick** [1] - 2594:18
**pie** [3] - 2519:12, 2585:12, 2585:20
**piece** [1] - 2553:22
**pieces** [1] - 2519:12
**place** [1] - 2517:17
**Plaintiffs** [1] - 2498:4
**plaintiffs** [2] - 2510:19, 2602:5
**PLAINTIFFS** [1] - 2498:14
**plan** [13] - 2503:13, 2513:15, 2525:21, 2526:12, 2535:17, 2559:18, 2582:19,

2582:21, 2582:23, 2584:10, 2597:2, 2597:3, 2597:10
**planning** [42] - 2516:1, 2516:14, 2518:22, 2520:16, 2521:9, 2533:17, 2534:2, 2535:16, 2542:25, 2543:17, 2543:23, 2545:14, 2545:25, 2547:18, 2548:2, 2548:22, 2548:23, 2551:7, 2552:8, 2566:23, 2569:21, 2571:21, 2572:10, 2572:13, 2578:20, 2580:15, 2581:10, 2581:21, 2582:19, 2583:14, 2583:20, 2583:21, 2583:24, 2588:8, 2588:12, 2588:21, 2590:21, 2592:18, 2593:11, 2597:6, 2597:7, 2598:11
**plans** [2] - 2514:7, 2526:11
**plausibility** [1] - 2540:12
**plausible** [1] - 2540:19
**plug** [1] - 2508:14
**plugging** [1] - 2515:8
**plus** [2] - 2557:25, 2589:3
**point** [22] - 2501:16, 2520:22, 2529:19, 2542:1, 2545:20, 2545:24, 2553:16, 2553:19, 2554:22, 2555:5, 2555:6, 2555:10, 2562:12, 2562:18, 2563:12, 2563:22, 2569:9, 2572:21, 2582:22, 2597:22, 2599:20, 2600:23
**pointed** [1] - 2573:19
**points** [1] - 2518:17
**pools** [1] - 2532:25
**portion** [15] - 2509:13, 2519:2, 2521:16, 2521:19, 2522:2, 2531:25, 2533:12, 2542:7, 2545:21, 2553:24, 2554:1, 2554:19, 2576:14, 2589:13, 2598:20
**portions** [2] - 2515:13, 2546:6

**position** [3] - 2523:1, 2523:21, 2548:4
**positions** [1] - 2524:20
**post** [1] - 2526:10
**potential** [3] - 2524:10, 2524:25, 2594:10
**potentially** [4] - 2513:16, 2524:15, 2554:20, 2599:10
**practice** [1] - 2578:1
**preceded** [1] - 2543:21
**precedent** [1] - 2535:23
**precisely** [1] - 2586:18
**prediction** [2] - 2508:15, 2509:12
**preferable** [1] - 2532:6
**preliminary** [1] - 2524:2
**prepared** [2] - 2549:11, 2588:15
**present** [5] - 2502:9, 2527:5, 2527:15, 2535:18, 2543:6
**presentation** [1] - 2515:22
**presented** [3] - 2504:15, 2506:8, 2508:2
**presenting** [1] - 2501:22
**press** [2] - 2557:14, 2557:19
**pretty** [2] - 2520:13, 2541:22
**previous** [3] - 2513:9, 2521:18, 2530:22
**previously** [4] - 2533:7, 2552:16, 2552:19, 2573:24
**prices** [1] - 2500:8
**pricing** [3] - 2556:3, 2557:4, 2564:8
**primarily** [1] - 2543:20
**principles** [1] - 2596:7
**problem** [2] - 2547:20, 2591:21
**problems** [1] - 2522:9
**proceed** [4] - 2500:15, 2511:6, 2512:4, 2515:4
**proceeding** [1] - 2538:23
**proceedings** [2] - 2523:1, 2604:7
**process** [8] - 2522:9, 2522:14, 2593:24,

2595:7, 2595:9, 2597:10, 2597:13, 2597:14
**processes** [1] - 2565:12
**produce** [2] - 2568:5, 2568:9
**produced** [7] - 2535:8, 2572:19, 2574:23, 2578:10, 2579:2, 2580:11
**producing** [2] - 2528:17, 2576:17
**product** [2] - 2504:18, 2561:15
**products** [1] - 2525:13
**professions** [1] - 2534:10
**Professor** [3] - 2500:18, 2501:19, 2502:9
**proffered** [13] - 2512:14, 2515:18, 2517:20, 2520:16, 2547:7, 2547:23, 2554:7, 2559:18, 2564:13, 2564:21, 2573:25, 2577:7, 2601:13
**profit** [2] - 2507:19
**profitability** [1] - 2507:15
**programs** [1] - 2525:20
**progress** [1] - 2566:14
**project** [1] - 2544:1
**projected** [10] - 2520:24, 2523:10, 2525:3, 2553:11, 2553:13, 2553:19, 2582:20, 2584:25, 2598:8, 2598:11
**projection** [2] - 2520:12, 2583:4
**projections** [6] - 2514:7, 2520:6, 2520:9, 2520:11, 2565:13, 2598:3
**prone** [1] - 2528:16
**proof** [1] - 2597:9
**prop** [1] - 2505:6
**proper** [2] - 2508:4, 2513:13
**properly** [1] - 2523:6
**proposals** [1] - 2568:7
**proposed** [3] - 2513:10, 2524:11, 2535:24
**provide** [1] - 2525:7
**provided** [7] - 2542:2,

2544:17, 2547:8,
2554:21, 2569:11,
2569:23, 2580:12
**provider** [23] - 2505:5,
2508:12, 2509:8,
2509:9, 2532:4,
2532:10, 2534:14,
2534:17, 2534:18,
2534:22, 2542:3,
2546:16, 2546:20,
2556:3, 2556:24,
2559:17, 2559:20,
2559:21, 2564:7,
2568:12, 2569:2,
2570:7, 2573:9
**providers** [17] -
2508:25, 2531:15,
2532:22, 2534:4,
2534:6, 2540:13,
2540:21, 2542:3,
2544:8, 2545:2,
2546:15, 2557:4,
2557:8, 2558:5,
2568:7, 2570:13,
2582:25
**provides** [1] - 2554:7
**providing** [1] - 2569:7
**Public** [1] - 2511:14
**public** [10] - 2528:19,
2531:11, 2537:25,
2549:13, 2553:2,
2555:17, 2566:4,
2578:24, 2585:14,
2585:15
**published** [3] -
2539:6, 2571:13,
2572:17
**pull** [2] - 2502:18,
2574:11
**purported** [1] -
2501:19
**purporting** [1] -
2501:2
**purports** [1] - 2548:6
**purpose** [2] - 2509:25,
2522:25
**purposes** [9] - 2507:9,
2512:17, 2514:8,
2531:14, 2539:24,
2539:25, 2551:17,
2551:22, 2570:18
**push** [1] - 2556:24
**push-back** [1] -
2556:24
**put** [27] - 2508:6,
2511:22, 2512:19,
2518:14, 2518:21,
2519:15, 2521:15,
2528:12, 2531:10,
2537:24, 2549:12,

2553:1, 2558:14,
2559:23, 2562:4,
2562:23, 2565:13,
2568:2, 2568:6,
2569:11, 2571:11,
2574:12, 2585:9,
2588:2, 2588:8,
2594:19, 2601:12

## Q

**qualifications** [3] -
2511:9, 2511:14,
2511:19
**qualified** [2] -
2538:19, 2539:1
**quality** [4] - 2509:1,
2509:8, 2509:9,
2583:13
**quantification** [1] -
2513:13
**quantifying** [2] -
2581:13, 2582:6
**quantity** [1] - 2569:5
**quarters** [1] - 2597:25
**questioning** [3] -
2558:18, 2563:4,
2577:9
**questions** [13] -
2509:15, 2512:3,
2515:11, 2537:5,
2538:5, 2538:8,
2582:4, 2600:16,
2601:9, 2601:17,
2602:13, 2602:23
**quick** [2] - 2549:12,
2601:10
**Quintero** [17] -
2499:20, 2499:20,
2499:21, 2511:4,
2512:8, 2515:16,
2523:3, 2538:15,
2549:16, 2558:11,
2559:5, 2564:6,
2564:22, 2566:1,
2566:9, 2585:8,
2595:1
**Quintero's** [2] -
2511:14, 2536:20
**quite** [2] - 2519:7,
2520:15
**quote** [5] - 2523:4,
2523:12, 2534:3,
2534:13, 2534:15

## R

**raise** [2] - 2522:22,
2540:15

**random** [1] - 2558:22
**range** [2] - 2573:10,
2573:13
**ranges** [1] - 2573:7
**rate** [2] - 2505:6,
2560:13
**rates** [23] - 2508:12,
2526:3, 2530:9,
2531:2, 2531:3,
2531:9, 2532:22,
2533:13, 2533:14,
2533:18, 2533:21,
2540:13, 2540:20,
2555:22, 2555:23,
2555:25, 2556:1,
2556:5, 2556:9,
2556:12, 2556:14,
2556:20
**rather** [3] - 2517:12,
2522:25, 2531:1
**ratio** [1] - 2530:6
**rationale** [5] -
2556:18, 2556:22,
2557:1, 2557:2,
2557:6
**re** [2] - 2508:21,
2508:22
**re-branding** [2] -
2508:21, 2508:22
**read** [3] - 2542:17,
2547:5, 2590:10
**reading** [1] - 2573:18
**real** [8] - 2520:1,
2520:2, 2521:4,
2523:9, 2531:13,
2532:9, 2561:10,
2583:2
**realizability** [1] -
2522:4
**realized** [2] - 2513:17,
2519:1, 2596:14
**really** [11] - 2507:11,
2515:5, 2515:9,
2525:22, 2529:21,
2536:14, 2554:25,
2599:23, 2601:2,
2601:3, 2602:21
**reason** [3] - 2508:23,
2561:23, 2572:20
**reasonable** [1] -
2533:23
**reasons** [4] - 2508:17,
2541:22, 2561:9,
2595:15
**rebuttal** [4] - 2501:8,
2501:13, 2502:7,
2602:6
**recalled** [1] - 2502:16
**recalling** [1] - 2503:2
**receive** [3] - 2500:23,

2500:24, 2578:12
**recess** [1] - 2565:23
**recognize** [1] - 2519:6
**recollection** [5] -
2501:16, 2542:19,
2557:19, 2592:24,
2594:9
**record** [8] - 2500:21,
2505:9, 2510:1,
2522:8, 2536:13,
2550:4, 2578:13,
2582:17
**red** [1] - 2580:5
**redacted** [1] - 2531:16
**redirect** [1] - 2601:4
**Redirect** [2] - 2499:19,
2499:21
**REDIRECT** [2] -
2500:16, 2601:7
**redo** [1] - 2588:23
**redone** [1] - 2588:24
**refer** [2] - 2533:13,
2575:5
**reference** [6] -
2539:15, 2540:1,
2553:15, 2553:19,
2571:23, 2582:7
**referenced** [5] -
2543:9, 2567:14,
2571:21, 2580:16,
2582:6
**references** [1] -
2553:7
**referred** [6] - 2527:1,
2547:17, 2548:20,
2550:3, 2557:13,
2565:14
**referring** [6] -
2548:21, 2568:22,
2574:18, 2581:11,
2581:16
**refers** [2] - 2568:13,
2579:18
**refined** [1] - 2569:25
**refining** [2] - 2568:19,
2569:1
**reflect** [2] - 2581:19,
2589:2
**reflecting** [5] - 2546:2,
2546:19, 2565:12,
2566:22, 2592:4
**reflects** [3] - 2520:4,
2520:7, 2556:5
**refreshes** [1] -
2501:16
**regard** [1] - 2523:3
**reimbursement** [1] -
2505:19
**reinforced** [1] -
2523:13

**relate** [1] - 2517:19
**related** [1] - 2505:11
**relates** [2] - 2548:3,
2584:8
**relating** [4] - 2586:11,
2596:3, 2597:5,
2598:5
**relationship** [2] -
2527:5, 2528:7
**relative** [2] - 2505:23,
2574:4
**relatively** [2] - 2515:4,
2532:2
**release** [2] - 2557:14,
2557:19
**released** [1] - 2520:20
**releasing** [1] -
2543:21
**relevance** [2] -
2507:11, 2563:6
**relevant** [7] - 2507:9,
2509:6, 2521:21,
2521:24, 2540:9,
2556:6, 2557:9
**reliability** [1] -
2506:23
**reliable** [1] - 2533:8
**reliance** [1] - 2567:2
**relied** [3] - 2539:24,
2540:4, 2588:12
**remember** [9] -
2537:17, 2556:5,
2578:16, 2588:1,
2589:11, 2593:1,
2593:20, 2598:13
**remind** [2] - 2505:14,
2508:1
**removed** [1] - 2513:24
**rendered** [3] -
2543:10, 2543:13,
2585:4
**rendering** [1] - 2580:8
**renew** [1] - 2516:6
**rent** [1] - 2513:7
**rental** [4] - 2501:2,
2501:19, 2501:23,
2502:4
**repeat** [1] - 2600:11
**replaced** [1] - 2505:18
**report** [20] - 2501:8,
2501:13, 2501:20,
2501:21, 2502:7,
2509:23, 2540:16,
2540:25, 2541:12,
2542:7, 2547:16,
2548:6, 2548:9,
2548:17, 2549:1,
2552:24, 2554:14,
2555:15, 2555:18,
2574:25

**reported** [2] - 2553:3, 2577:20
**reporter** [1] - 2565:19
**Reporter** [3] - 2499:13, 2499:14, 2604:12
**reporting** [2] - 2573:9, 2576:1
**reports** [8] - 2503:17, 2507:1, 2536:20, 2540:1, 2543:9, 2543:21, 2565:15, 2601:14
**repository** [1] - 2569:11
**represent** [4] - 2507:20, 2520:9, 2531:22, 2571:24
**representative** [4] - 2507:17, 2507:21, 2517:13, 2540:17
**representatives** [1] - 2593:2
**represented** [8] - 2552:17, 2554:11, 2557:16, 2570:6, 2576:24, 2588:18, 2596:17, 2597:1
**represents** [6] - 2553:14, 2555:25, 2569:9, 2575:17, 2576:1, 2588:18
**repricing** [3] - 2506:16, 2506:18, 2506:21
**reputable** [1] - 2574:3
**reputation** [1] - 2593:9
**require** [1] - 2525:16
**requirements** [1] - 2514:15
**research** [1] - 2577:14
**resemblance** [1] - 2602:21
**respect** [14] - 2505:19, 2518:12, 2527:13, 2535:25, 2546:25, 2547:2, 2548:25, 2551:3, 2564:23, 2582:18, 2590:24, 2592:7, 2592:10, 2598:17
**responsible** [1] - 2543:20
**rest** [2] - 2576:4, 2602:6
**restraints** [1] - 2600:1
**result** [8] - 2509:11, 2509:12, 2526:24, 2544:8, 2546:12,

2560:16, 2562:25, 2597:13
**results** [5] - 2526:23, 2527:21, 2528:17, 2533:9, 2592:17
**retained** [1] - 2512:12
**retaining** [1] - 2525:19
**retention** [1] - 2517:15
**revealed** [1] - 2529:12
**reveals** [1] - 2529:2
**revenue** [9] - 2515:20, 2525:2, 2525:3, 2525:7, 2525:8, 2525:11, 2549:21, 2550:19, 2550:21
**review** [22] - 2501:15, 2501:18, 2539:16, 2540:9, 2542:23, 2543:20, 2544:15, 2544:23, 2544:25, 2545:12, 2546:2, 2546:9, 2546:14, 2546:19, 2547:15, 2581:18, 2587:8, 2588:6, 2589:12, 2601:10, 2601:13
**reviewed** [26] - 2520:11, 2539:9, 2539:24, 2540:10, 2542:22, 2543:3, 2543:5, 2543:14, 2546:5, 2546:12, 2546:16, 2547:3, 2547:10, 2547:11, 2547:16, 2565:11, 2565:14, 2573:24, 2585:3, 2587:12, 2587:18, 2588:21, 2589:13, 2590:7, 2590:22, 2597:4
**reviewing** [1] - 2501:19
**Rifkind** [1] - 2499:9
**rigor** [4] - 2596:10, 2596:15, 2596:19, 2596:20
**road** [2] - 2536:17, 2584:2
**Robert** [1] - 2499:4
**robust** [1] - 2599:21
**robustness** [1] - 2507:23
**Roman** [2] - 2552:24, 2566:14
**ronald** [1] - 2499:20
**Ronald** [3] - 2499:20, 2499:21, 2511:4
**room** [3] - 2569:8, 2569:12, 2570:2
**Room** [1] - 2499:14

**roughly** [3] - 2524:23, 2532:19, 2598:14
**routinely** [4] - 2517:14, 2523:24, 2524:9, 2528:25
**RPR** [3] - 2499:13, 2604:4, 2604:12
**rule** [1] - 2508:21
**Rule** [1] - 2499:8
**rural** [1] - 2502:5
**Ryan** [2] - 2498:17, 2510:22

## S

**Saint** [1] - 2604:12
**SAINT** [1] - 2604:4
**Saint-Loth** [1] - 2604:12
**SAINT-LOTH** [1] - 2604:4
**SaintLoth** [1] - 2499:13
**sake** [1] - 2538:1
**salaries** [1] - 2523:18
**salary** [1] - 2523:19
**sales** [1] - 2524:4
**Sam** [7] - 2512:19, 2518:14, 2518:21, 2521:15, 2523:2, 2528:12, 2531:10
**sample** [3] - 2527:13, 2569:19, 2570:3
**San** [1] - 2498:22
**saving** [1] - 2565:3
**savings** [69] - 2506:19, 2508:14, 2515:19, 2515:20, 2515:21, 2516:2, 2516:12, 2517:23, 2522:10, 2524:10, 2524:16, 2524:25, 2525:9, 2527:10, 2529:2, 2529:10, 2530:1, 2530:7, 2531:4, 2531:8, 2531:25, 2533:12, 2533:13, 2535:8, 2535:9, 2543:15, 2544:5, 2544:7, 2546:4, 2548:3, 2549:20, 2549:21, 2550:2, 2550:8, 2550:16, 2550:19, 2550:22, 2551:3, 2551:18, 2552:4, 2552:8, 2552:10, 2553:14, 2553:19,

2555:9, 2555:20, 2556:1, 2556:19, 2559:7, 2563:14, 2563:15, 2564:24, 2567:8, 2576:10, 2576:17, 2576:18, 2583:6, 2585:1, 2592:11, 2594:10, 2598:2, 2598:6, 2598:10, 2598:11
**saw** [5] - 2523:11, 2524:4, 2533:3, 2535:1, 2542:4, 2544:24, 2567:3, 2578:21, 2582:21
**scale** [1] - 2505:24
**scaled** [1] - 2545:25
**scenario** [3] - 2508:18, 2509:5, 2509:14
**Schlegel** [1] - 2543:5
**SCHWINGLER** [3] - 2500:17, 2509:15, 2509:25
**Schwingler** [1] - 2498:16
**scope** [7] - 2512:10, 2540:24, 2542:10, 2547:7, 2558:19, 2563:7, 2583:15
**Scott** [1] - 2498:15
**screen** [13] - 2537:24, 2553:2, 2555:17, 2559:23, 2562:4, 2562:23, 2566:16, 2566:17, 2568:24, 2571:12, 2574:13, 2578:24, 2588:3
**screened** [1] - 2570:12
**screening** [3] - 2569:23, 2570:4, 2570:9
**screens** [3] - 2512:20, 2528:19, 2549:14
**scroll** [1] - 2580:5
**scrubbed** [1] - 2524:9
**second** [8] - 2508:24, 2509:20, 2556:12, 2565:16, 2568:23, 2580:21, 2581:3, 2595:21
**secondly** [2] - 2513:5, 2528:7
**Secours** [1] - 2540:5
**see** [42] - 2501:15, 2503:8, 2504:7, 2506:5, 2507:11, 2527:13, 2528:10, 2528:25, 2529:15,

2529:20, 2539:17, 2553:24, 2554:19, 2567:16, 2568:4, 2568:24, 2569:3, 2572:2, 2572:8, 2573:3, 2573:4, 2573:18, 2574:18, 2575:7, 2578:9, 2578:17, 2579:4, 2579:7, 2579:14, 2579:15, 2579:16, 2579:24, 2580:1, 2580:6, 2589:24, 2590:12, 2591:2, 2591:11, 2592:2, 2596:15, 2596:17, 2602:9
**seeing** [3] - 2501:5, 2527:22, 2582:7
**seem** [5] - 2514:9, 2514:17, 2515:5, 2555:3, 2580:19
**segment** [1] - 2536:19
**sense** [5] - 2536:8, 2540:11, 2546:21, 2578:13, 2581:9
**sentence** [1] - 2590:15
**separate** [3] - 2557:8, 2586:6
**service** [1] - 2524:8
**services** [1] - 2535:5
**SESSION** [1] - 2498:5
**set** [6] - 2509:6, 2540:1, 2575:9, 2575:10, 2575:11, 2596:16
**setting** [1] - 2525:10
**seven** [1] - 2519:3
**several** [2] - 2567:3, 2593:21
**severance** [2] - 2524:20, 2524:23
**Severt** [1] - 2498:16
**shaded** [2] - 2502:2, 2502:3
**shared** [3] - 2569:1, 2570:15, 2571:5
**sharing** [3] - 2568:20, 2600:2
**short** [1] - 2509:5
**short-term** [1] - 2509:5
**show** [1] - 2501:2
**showed** [2] - 2500:8, 2554:25
**showing** [2] - 2546:10
**shows** [3] - 2501:23, 2531:2, 2576:17
**sic]** [1] - 2504:9
**side** [6] - 2520:13,

2551:18, 2561:11, 2571:8, 2597:23
**signed** [2] - 2503:12, 2593:23
**significant** [6] - 2531:24, 2533:12, 2562:2, 2570:11, 2577:20, 2588:4
**significantly** [1] - 2535:6
**similar** [7] - 2513:11, 2513:22, 2523:23, 2567:4, 2569:2, 2571:7, 2572:12
**simple** [1] - 2526:19
**simply** [4] - 2504:22, 2510:3, 2516:5, 2564:12
**simulation** [11] - 2508:15, 2509:3, 2509:4, 2509:7, 2509:12, 2551:11, 2551:17, 2551:23, 2551:25, 2552:2, 2552:4
**Singhal** [12] - 2519:11, 2519:15, 2536:3, 2547:12, 2570:10, 2580:13, 2586:21, 2587:7, 2591:3, 2594:12, 2594:14, 2596:18
**Singhal's** [3] - 2546:6, 2585:21, 2585:22
**single** [6] - 2527:8, 2527:21, 2533:20, 2536:10, 2552:1
**situation** [8] - 2522:2, 2530:16, 2530:18, 2531:5, 2531:24, 2556:13, 2570:23, 2571:1
**situations** [4] - 2529:5, 2530:22, 2531:24, 2532:2
**six** [1] - 2518:17
**sixth** [1] - 2532:19
**size** [4] - 2510:8, 2519:12, 2576:16, 2577:24
**sizing** [1] - 2568:11
**skepticism** [1] - 2522:23
**skews** [2] - 2531:8, 2533:9
**skip** [1] - 2541:25
**slice** [1] - 2506:11
**slices** [2] - 2503:22, 2589:10
**slicing** [2] - 2506:12

**slide** [9] - 2518:17, 2519:24, 2522:5, 2565:16, 2567:5, 2567:6, 2567:8, 2568:10, 2596:6
**slightly** [1] - 2576:6
**small** [7] - 2519:2, 2532:2, 2532:5, 2532:20, 2532:25, 2533:10, 2536:5
**smaller** [6] - 2508:4, 2554:2, 2555:3, 2576:5, 2580:22, 2580:23
**so-called** [1] - 2569:12
**somewhat** [1] - 2536:15
**somewhere** [1] - 2524:21
**soon** [2] - 2599:23
**sophisticated** [2] - 2524:6, 2529:16
**sorry** [12] - 2500:12, 2502:18, 2566:10, 2571:17, 2575:4, 2575:16, 2576:11, 2581:11, 2585:17, 2590:2, 2590:4, 2595:23
**sort** [2] - 2524:8, 2576:1
**sorting** [2] - 2575:13, 2575:15
**source** [4] - 2506:4, 2567:14, 2567:18, 2580:14
**sources** [3] - 2520:3, 2553:9, 2578:10
**speaking** [1] - 2516:15
**specific** [15] - 2502:25, 2503:1, 2513:3, 2517:12, 2522:25, 2525:12, 2525:21, 2531:15, 2535:12, 2540:15, 2548:1, 2550:21, 2555:19, 2563:23, 2582:23
**specifically** [2] - 2512:16, 2540:22
**specificity** [4] - 2514:21, 2515:1, 2517:2, 2517:6
**specifics** [1] - 2532:14
**specified** [3] - 2587:6, 2588:21, 2596:10
**specifies** [1] - 2519:17
**specify** [1] - 2586:16

**speculative** [1] - 2525:23
**spend** [8] - 2521:16, 2551:4, 2552:13, 2553:3, 2553:14, 2553:18, 2554:14, 2555:7
**spent** [2] - 2521:25, 2602:17
**spread** [1] - 2577:13
**spreads** [9] - 2574:8, 2576:5, 2577:10, 2578:6, 2578:14, 2578:18, 2581:6, 2581:9, 2581:19
**spreadsheet** [17] - 2503:22, 2504:3, 2504:7, 2574:22, 2575:3, 2579:4, 2579:7, 2581:23, 2585:25, 2586:2, 2588:5, 2588:13, 2590:11, 2591:10, 2591:12, 2601:25
**spreadsheets** [2] - 2519:20, 2534:5
**staff** [2] - 2523:25, 2525:20
**stages** [1] - 2516:14
**stagnant** [1] - 2528:6
**stand** [2] - 2513:24, 2600:11
**standard** [2] - 2514:3, 2539:6
**start** [1] - 2541:9
**started** [1] - 2505:16
**starting** [5] - 2503:3, 2515:21, 2520:21, 2529:19, 2582:22
**State** [1] - 2498:20
**statement** [3] - 2534:25, 2559:23, 2560:2
**statements** [2] - 2520:20, 2520:23
**STATES** [2] - 2498:1, 2498:11
**states** [4] - 2502:4, 2502:5, 2573:7, 2573:15
**States** [5] - 2498:3, 2498:15, 2499:14, 2507:16, 2570:7
**static** [1] - 2508:14
**statistical** [2] - 2526:24, 2528:15
**status** [3] - 2559:24, 2562:8, 2586:10
**stay** [2] - 2512:20, 2531:11

**steering** [5] - 2520:17, 2592:18, 2592:21, 2597:14, 2597:19
**stenographic** [1] - 2604:6
**step** [3] - 2510:14, 2577:14, 2601:19
**stepson** [1] - 2567:23
**still** [7] - 2503:15, 2505:21, 2508:9, 2516:14, 2528:10, 2553:23, 2580:23
**stipulated** [3] - 2511:8, 2511:13, 2511:19
**stool** [2] - 2513:23, 2513:24
**stopped** [1] - 2584:1
**Street** [4] - 2498:18, 2499:6, 2499:10, 2550:25
**strike** [6] - 2551:9, 2555:14, 2559:6, 2562:24, 2587:17, 2588:5
**strong** [1] - 2577:23
**STRUVE** [37] - 2511:7, 2512:5, 2512:7, 2512:19, 2512:22, 2514:19, 2515:12, 2515:15, 2516:19, 2516:21, 2516:22, 2518:14, 2518:15, 2518:21, 2519:23, 2521:15, 2522:19, 2523:2, 2528:12, 2528:13, 2528:18, 2531:10, 2533:16, 2534:18, 2534:20, 2534:24, 2535:11, 2537:5, 2547:6, 2547:21, 2558:16, 2558:18, 2563:3, 2564:10, 2601:5, 2601:8, 2601:17
**Struve** [2] - 2498:17, 2510:22
**studied** [1] - 2592:4
**studies** [2] - 2564:12, 2577:5
**study** [3] - 2573:21, 2577:11, 2577:16
**sub** [4] - 2543:25, 2594:8, 2598:18, 2598:19
**sub-functions** [3] - 2594:8, 2598:18, 2598:19
**sub-teams** [1] - 2543:25

**subject** [2] - 2570:9, 2594:10
**subjected** [1] - 2586:19
**subset** [4] - 2569:25, 2570:17, 2588:22, 2589:2
**substantial** [3] - 2562:25, 2573:13, 2581:5
**substantially** [4] - 2528:25, 2559:12, 2576:10, 2576:15
**successful** [3] - 2535:14, 2535:15, 2536:24
**successfully** [1] - 2535:21
**suffice** [1] - 2582:16
**suggested** [1] - 2600:20
**suggesting** [1] - 2599:12
**suggests** [1] - 2576:19
**Suite** [2] - 2498:18, 2498:21
**summarize** [1] - 2584:17
**summarized** [1] - 2548:16
**summary** [2] - 2549:12, 2549:16
**superior** [1] - 2565:9
**superiority** [1] - 2527:14
**supplemental** [2] - 2552:24, 2555:15
**support** [4] - 2513:13, 2519:15, 2523:1, 2601:14
**supported** [1] - 2545:15
**supporting** [2] - 2519:21, 2546:7
**surprise** [1] - 2588:25
**surprised** [1] - 2528:24
**suspicious** [1] - 2578:5
**Swati** [1] - 2502:13
**Swedish** [1] - 2543:4
**switch** [1] - 2571:10
**sworn** [1] - 2511:5
**synergies** [17] - 2512:13, 2515:17, 2515:20, 2525:2, 2525:3, 2525:5, 2525:8, 2525:24, 2526:1, 2543:1,

2544:8, 2549:19,
2550:25, 2582:20,
2583:4, 2587:25,
2596:14
**synergy** [1] - 2550:10
**system** [1] - 2505:20
**systems** [4] - 2505:5,
2505:19, 2579:11,
2579:12

# T

**T-I-N** [1] - 2534:18
**Tab** [1] - 2501:1
**tab** [25] - 2503:22,
2503:24, 2504:3,
2505:25, 2506:15,
2509:19, 2509:22,
2549:12, 2549:14,
2566:5, 2566:10,
2566:11, 2571:11,
2572:3, 2572:4,
2578:23, 2590:2,
2590:4, 2595:1,
2595:18, 2595:23,
2595:24
**table** [9] - 2552:23,
2553:3, 2553:15,
2554:14, 2554:18,
2555:15, 2555:18,
2571:25, 2574:25
**tabs** [2] - 2501:11,
2503:20
**tabulate** [1] - 2552:15
**tabulated** [1] -
2552:13
**tabulation** [1] -
2552:22
**tack** [1] - 2595:14
**target** [3] - 2550:10,
2600:22, 2600:24
**targeted** [1] - 2602:13
**targets** [18] - 2511:24,
2516:2, 2516:4,
2516:5, 2516:16,
2516:17, 2525:23,
2550:19, 2550:22,
2583:23, 2587:14,
2598:22, 2599:3,
2599:5, 2599:8,
2599:10, 2599:16,
2600:21
**tax** [5] - 2531:15,
2534:14, 2534:19,
2534:22, 2535:3
**taxes** [1] - 2523:25
**taxpayer** [1] - 2568:13
**team** [52] - 2518:22,
2519:18, 2520:16,

2521:9, 2533:17,
2543:15, 2544:5,
2544:7, 2544:12,
2544:20, 2545:14,
2546:4, 2547:18,
2548:2, 2551:7,
2552:8, 2552:9,
2560:21, 2565:3,
2565:6, 2565:9,
2565:12, 2566:23,
2567:8, 2568:15,
2568:20, 2569:21,
2571:7, 2571:21,
2572:10, 2572:13,
2575:19, 2578:20,
2581:10, 2581:21,
2582:19, 2583:6,
2586:25, 2587:7,
2587:13, 2587:16,
2588:12, 2588:22,
2590:21, 2592:1,
2592:5, 2594:3,
2596:3, 2597:5,
2598:11, 2598:24
**team's** [5] - 2525:25,
2548:22, 2548:23,
2580:15, 2591:6
**teams** [17] - 2516:1,
2519:4, 2534:2,
2542:25, 2543:25,
2544:4, 2544:11,
2586:11, 2587:24,
2589:16, 2591:14,
2593:11, 2593:19,
2594:1, 2596:25,
2597:6, 2598:20
**teams'** [1] - 2560:19
**technology** [1] -
2524:18
**term** [2] - 2505:15,
2509:5
**termed** [1] - 2592:8
**terminology** [2] -
2505:11, 2505:20
**terms** [9] - 2506:22,
2520:25, 2523:24,
2524:4, 2553:8,
2577:14, 2578:14,
2582:19, 2601:1
**test** [5] - 2504:19,
2504:24, 2505:3,
2528:4, 2528:10
**testified** [31] - 2501:5,
2502:24, 2508:10,
2509:2, 2524:19,
2525:11, 2525:21,
2528:21, 2530:10,
2533:7, 2534:3,
2534:13, 2535:25,
2551:13, 2552:6,

2552:16, 2552:19,
2554:9, 2555:14,
2561:8, 2564:25,
2573:24, 2577:23,
2582:18, 2593:18,
2593:22, 2594:14,
2594:15, 2597:2
**testify** [8] - 2536:11,
2541:1, 2541:11,
2541:16, 2578:22,
2583:18, 2584:24,
2587:21
**testifying** [2] -
2514:14, 2536:7
**testimony** [55] -
2502:10, 2502:12,
2502:15, 2502:16,
2502:17, 2502:25,
2505:4, 2506:15,
2508:19, 2514:16,
2514:24, 2515:25,
2516:9, 2517:22,
2520:16, 2521:18,
2525:3, 2525:25,
2529:11, 2530:21,
2536:19, 2537:3,
2537:17, 2538:22,
2539:2, 2540:8,
2540:16, 2542:8,
2543:6, 2543:20,
2545:13, 2547:23,
2548:1, 2550:7,
2564:1, 2564:11,
2577:19, 2583:11,
2583:22, 2583:25,
2584:5, 2584:12,
2585:4, 2587:18,
2588:1, 2588:11,
2590:12, 2591:13,
2594:16, 2594:19,
2596:22, 2598:5,
2602:3, 2602:20
**THE** [149] - 2498:1,
2498:1, 2498:10,
2498:14, 2500:3,
2500:6, 2500:11,
2500:13, 2501:10,
2509:16, 2509:24,
2510:6, 2510:14,
2510:16, 2510:23,
2511:1, 2511:6,
2511:12, 2511:21,
2512:2, 2514:9,
2514:13, 2515:3,
2515:14, 2516:8,
2516:20, 2517:5,
2518:2, 2518:7,
2518:10, 2518:12,
2519:10, 2519:14,
2519:17, 2519:20,
2519:22, 2522:16,

2522:17, 2526:14,
2526:15, 2527:24,
2528:1, 2532:11,
2532:15, 2532:17,
2532:21, 2533:2,
2533:22, 2534:17,
2534:19, 2534:21,
2535:1, 2535:2,
2536:7, 2536:21,
2537:7, 2537:10,
2537:13, 2537:14,
2537:17, 2537:21,
2538:1, 2538:9,
2538:12, 2540:23,
2541:19, 2542:6,
2542:15, 2542:19,
2547:11, 2547:24,
2548:8, 2548:11,
2548:13, 2549:3,
2552:1, 2554:22,
2558:3, 2558:5,
2558:8, 2558:17,
2558:24, 2560:3,
2560:7, 2560:20,
2560:25, 2561:13,
2561:21, 2562:7,
2562:13, 2562:16,
2562:18, 2563:7,
2563:22, 2563:25,
2564:14, 2565:17,
2566:6, 2566:16,
2570:13, 2570:17,
2571:15, 2571:18,
2572:16, 2572:22,
2572:25, 2573:15,
2575:19, 2575:22,
2577:17, 2580:17,
2580:21, 2580:25,
2581:4, 2583:13,
2583:22, 2584:12,
2585:13, 2585:16,
2589:3, 2589:7,
2589:9, 2589:11,
2589:18, 2589:20,
2589:22, 2591:21,
2594:13, 2594:18,
2594:22, 2595:3,
2595:12, 2597:16,
2597:18, 2599:12,
2600:7, 2600:10,
2600:15, 2600:18,
2600:25, 2601:4,
2601:6, 2601:18,
2601:20, 2602:2,
2602:8, 2603:1,
2603:2, 2603:3
**themselves** [1] -
2502:2
**thereafter** [1] -
2566:15
**thinking** [1] - 2583:3

**third** [8] - 2509:3,
2509:21, 2509:22,
2521:6, 2566:12,
2576:2, 2576:14,
2590:3
**thousands** [1] -
2569:10
**three** [25] - 2508:17,
2509:18, 2512:25,
2513:18, 2513:19,
2513:20, 2513:23,
2515:16, 2515:18,
2520:7, 2524:7,
2524:14, 2526:24,
2531:14, 2531:18,
2535:15, 2549:18,
2554:15, 2597:24,
2597:25, 2598:1,
2598:2, 2598:6,
2598:8
**three-legged** [1] -
2513:23
**three-quarters** [1] -
2597:25
**throughout** [3] -
2507:16, 2545:21,
2602:20
**tie** [1] - 2521:3
**tied** [3] - 2520:14,
2526:10, 2526:16
**ties** [2] - 2520:22,
2550:24
**TIN** [2] - 2534:14,
2534:18
**TINs** [2] - 2568:12,
2569:2
**title** [1] - 2568:4
**today** [12] - 2500:20,
2503:10, 2505:21,
2506:8, 2548:4,
2548:24, 2549:1,
2549:2, 2549:8,
2562:23, 2577:12,
2578:15
**together** [4] - 2534:11,
2557:8, 2560:17,
2565:13
**tomorrow** [2] -
2602:10, 2602:21
**took** [1] - 2594:18
**tool** [1] - 2591:15
**top** [23] - 2510:2,
2511:23, 2568:11,
2584:7, 2586:4,
2592:12, 2592:14,
2592:17, 2592:21,
2593:12, 2593:19,
2596:7, 2596:16,
2596:19, 2596:25,
2597:13, 2597:15,

2598:17, 2599:1,
2599:3, 2599:7,
2599:8, 2599:20
**top-down** [17] -
2511:23, 2592:14,
2592:17, 2593:12,
2593:19, 2596:7,
2596:16, 2596:19,
2596:25, 2597:13,
2597:15, 2598:17,
2599:1, 2599:3,
2599:7, 2599:8,
2599:20
**top-up** [1] - 2584:7
**total** [9] - 2514:24,
2521:16, 2552:4,
2554:10, 2554:14,
2575:8, 2576:2,
2577:21, 2588:18
**totality** [1] - 2569:24
**Toto** [1] - 2499:4
**towards** [2] - 2528:17,
2550:22
**TPAs** [1] - 2506:11
**training** - 2517:15,
2525:19
**transaction** [5] -
2513:10, 2519:9,
2557:15, 2557:23,
2599:24
**TRANSCRIPT** [1] -
2498:9
**transcript** [5] - 2542:3,
2544:25, 2590:10,
2604:5, 2604:7
**translate** [1] - 2525:9
**treated** [2] - 2534:11,
2535:6
**Trial** [1] - 2498:4
**trial** [5] - 2501:22,
2505:9, 2515:22,
2538:3, 2543:11
**TRIAL** [1] - 2498:9
**true** [6] - 2511:12,
2528:10, 2529:12,
2534:6, 2604:5,
2604:6
**truly** [1] - 2528:17
**truncate** [1] - 2517:10
**truth** [1] - 2510:3
**try** [5] - 2507:15,
2517:10, 2527:5,
2563:11, 2582:23
**trying** [4] - 2562:14,
2582:24, 2583:20,
2602:12
**turn** [20] - 2501:9,
2503:20, 2505:25,
2506:14, 2506:15,
2552:23, 2562:14,

2565:16, 2567:5,
2571:11, 2571:25,
2578:23, 2585:7,
2590:2, 2590:9,
2591:22, 2595:1,
2595:18, 2595:23,
2596:6
**twice** [1] - 2575:22
**two** [20] - 2504:10,
2520:3, 2523:8,
2535:7, 2543:4,
2552:13, 2553:4,
2553:19, 2554:14,
2555:9, 2555:22,
2557:7, 2559:22,
2560:16, 2569:4,
2570:8, 2578:16,
2592:11, 2593:23,
2601:22
**type** [5] - 2513:25,
2524:8, 2528:2,
2535:10, 2582:4
**types** [4] - 2515:16,
2573:11, 2578:14,
2578:18
**typical** [1] - 2573:22
**typically** [1] - 2565:7

## U

**U.S** [1] - 2498:17
**ultimate** [4] - 2524:12,
2526:23, 2577:1,
2597:9
**ultimately** [2] -
2519:9, 2547:18
**unaffected** [1] -
2513:7
**unavailable** [1] -
2568:12
**unclear** [1] - 2500:21
**uncommon** [1] -
2577:12
**undeniable** [1] -
2563:16
**under** [6] - 2505:1,
2534:9, 2534:11,
2541:10, 2570:7,
2596:10
**undergo** [1] - 2517:14
**underlay** [1] - 2541:10
**underlying** [16] -
2516:24, 2518:20,
2519:25, 2521:7,
2523:11, 2526:16,
2527:9, 2528:24,
2530:20, 2533:3,
2557:1, 2557:2,
2564:13, 2565:11,

2581:8, 2596:23
**undermines** [1] -
2522:18
**undermining** [1] -
2542:7
**underneath** [1] -
2518:20
**underscores** [1] -
2560:18
**Understood** [2] -
2584:6
**understood** [5] -
2518:2, 2550:6,
2558:7, 2563:10
**undertaken** [1] -
2573:21
**undertook** [3] -
2568:21, 2581:21,
2596:25
**unfolded** [1] - 2602:20
**unique** [1] - 2532:24
**unit** [2] - 2580:1,
2580:18
**UNITED** [2] - 2498:1,
2498:11
**United** [5] - 2498:3,
2498:15, 2499:14,
2507:16, 2570:6
**universe** [3] - 2576:9,
2576:13, 2588:16
**unless** [1] - 2536:14
**unlikely** [1] - 2524:6
**unnecessary** [1] -
2537:18
**unrealistic** [3] -
2509:5, 2509:14,
2555:3
**unsuccessful** [1] -
2536:24
**untied** [1] - 2547:22
**unvarnished** [1] -
2588:14
**up** [48] - 2502:18,
2503:12, 2505:6,
2512:19, 2516:16,
2517:25, 2518:14,
2518:21, 2520:18,
2521:15, 2524:9,
2528:3, 2528:12,
2531:10, 2531:23,
2537:24, 2546:10,
2549:12, 2553:2,
2555:19, 2558:11,
2560:1, 2562:4,
2562:23, 2568:10,
2571:12, 2574:11,
2574:12, 2574:14,
2583:24, 2584:7,
2585:9, 2586:3,
2586:4, 2586:7,

2588:2, 2591:6,
2592:12, 2595:9,
2595:10, 2596:20,
2597:6, 2598:24,
2598:25, 2599:3,
2599:9, 2599:18
**updating** [1] - 2591:14
**upper** [1] - 2573:3
**upward** [5] - 2527:1,
2528:14, 2528:15,
2530:3, 2566:14
**upwards** [2] - 2531:8,
2533:9
**usefulness** [1] -
2547:7
**uses** [2] - 2501:24,
2527:20
**utilize** [1] - 2547:4
**utilized** [1] - 2548:16

## V

**valid** [2] - 2528:4,
2528:17
**value** [2] - 2505:23,
2566:23
**Varanini** [1] - 2498:20
**variability** [1] -
2530:11
**variable** [27] - 2513:5,
2514:22, 2515:1,
2517:19, 2517:23,
2518:4, 2518:6,
2518:9, 2518:12,
2521:6, 2521:8,
2521:12, 2552:9,
2553:22, 2553:24,
2554:1, 2554:6,
2554:10, 2554:18,
2554:20, 2554:23,
2555:2, 2598:9,
2598:12, 2598:16,
2598:21
**variation** [1] - 2528:1
**variety** [1] - 2525:18
**various** [11] - 2508:5,
2529:14, 2543:25,
2551:10, 2567:18,
2570:7, 2573:7,
2579:10, 2597:8,
2598:13, 2598:18
**ventures** [1] - 2502:2
**verifiability** [3] -
2514:21, 2518:16,
2522:6
**verifiable** [3] - 2513:8,
2559:6, 2563:14
**verification** [2] -
2513:9, 2513:14

**verified** [2] - 2515:2,
2563:25
**verify** [1] - 2520:25
**versa** [3] - 2521:2,
2526:5, 2527:10
**version** [1] - 2572:19
**versus** [4] - 2521:6,
2598:9, 2598:12,
2598:21
**via** [2] - 2517:25,
2525:18
**vice** [3] - 2521:2,
2526:5, 2527:10
**viewed** [3] - 2527:17,
2588:14, 2598:20
**views** [2] - 2527:13,
2588:10
**violate** [1] - 2504:24
**virtue** [1] - 2577:23
**volume** [7] - 2513:6,
2513:7, 2532:23,
2533:11, 2534:4,
2534:6, 2546:22
**vs** [1] - 2498:5

## W

**walk** [1] - 2531:13
**walked** [1] - 2584:14
**Wall** [1] - 2550:25
**Washington** [5] -
2498:5, 2498:19,
2499:6, 2499:10,
2499:15
**ways** [6] - 2506:10,
2533:2, 2533:6,
2557:12, 2557:21
**website** [2] - 2509:19,
2510:3
**wedge** [1] - 2519:3
**week** [2] - 2505:4,
2567:24
**weekly** [2] - 2594:3,
2597:5
**weeks** [1] - 2537:11
**weight** [2] - 2508:4,
2510:9
**weightings** [1] -
2508:4
**Weiss** [1] - 2499:9
**well-defined** [1] -
2505:3
**well-known** [1] -
2593:6
**Wharton** [1] - 2499:9
**wheeler** [1] - 2540:6
**whereas** [2] - 2504:22,
2532:2
**whichever** [2] -

2556:23, 2560:8
**white** [4] - 2517:21, 2552:11, 2567:15, 2601:14
**WHITE** [1] - 2499:5
**whole** [2] - 2522:9, 2589:9
**Willig** [1] - 2502:9
**Willig's** [1] - 2501:19
**willing** [2] - 2509:1, 2532:25
**willingness** [1] - 2509:9
**wipes** [1] - 2524:25
**witness** [20] - 2501:2, 2502:12, 2510:19, 2510:21, 2510:25, 2511:4, 2516:18, 2532:13, 2536:10, 2538:6, 2538:8, 2548:4, 2561:7, 2563:12, 2564:15, 2584:3, 2584:4, 2589:22, 2600:19, 2601:2
**WITNESS** [16] - 2499:18, 2518:7, 2518:12, 2519:14, 2519:20, 2522:17, 2526:15, 2528:1, 2532:17, 2533:2, 2535:2, 2537:13, 2542:19, 2589:11, 2601:20, 2603:1
**witness's** [2] - 2511:9, 2514:16
**witnesses** [5] - 2511:21, 2536:22, 2563:17, 2584:13, 2602:6
**word** [1] - 2600:22
**words** [5] - 2509:4, 2521:24, 2524:24, 2529:7, 2530:1
**world** [1] - 2561:10
**worth** [3] - 2524:15, 2530:4, 2560:19
**written** [1] - 2525:11
**wrote** [1] - 2522:15

# Y

**year** [3] - 2520:6, 2545:21, 2590:6
**years** [3] - 2520:11, 2536:2, 2583:8
**yield** [1] - 2508:15
**yourself** [2] - 2539:21, 2577:16

# Z

**zero** [5] - 2531:5, 2559:5, 2559:6, 2563:14, 2576:6