**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 16-1493 (ABJ) |
| ) | |
| ANTHEM, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## <u>MEMORANDUM OPINION</u>

Anthem and Cigna, the nation's second and third largest medical health insurance carriers, have agreed to merge. They propose to create the single largest seller of medical healthcare coverage to large commercial accounts, in a market in which there are only four national carriers still standing. The United States Department of Justice, eleven states, and the District of Columbia have sued to stop the merger, and they have carried their burden to demonstrate that the proposed combination is likely to have a substantial effect on competition in what is already a highly concentrated market. Therefore, the Court will not permit the merger to go forward.

Judgment will be entered in favor of the plaintiffs on their first claim, and the merger will be enjoined due to its likely impact on the market for the sale of health insurance to "national accounts" – customers with more than 5000 employees, usually spread over at least two states – within the fourteen states where Anthem operates as the Blue Cross Blue Shield licensee. So the Court does not need to go on to decide the question of whether the combination will also affect competition in the sale to national accounts within the larger geographic market consisting of the entire United States. The Court also does not need to rule on the allegations in plaintiffs' second claim that the merger will harm competition downstream in a different product market: the sale

of health insurance to "large group" employers of more than 100 employees in thirty-five separate local regions within the Anthem states.  But the evidence has shown that the proposed acquisition will have an anticompetitive effect on the sale of health insurance to large groups in at least one of those markets: Richmond, Virginia.  Finally, given the ruling against the merger, the Court need not reach the allegations in the complaint that the merger will also harm competition upstream in the market for the purchase of healthcare services from hospitals and physicians in the same 35 locations.

What follows is a summary of the ruling on the first claim in the complaint.  The Court finds first that the market for the sale of health insurance to national accounts is a properly drawn product market for purposes of the antitrust laws, and that the fourteen states in which Anthem enjoys the exclusive right to compete under the Blue Cross Blue Shield banner comprise a relevant geographic market for that product.

The evidence demonstrated that large national employers have a unique set of characteristics and needs that drive their purchasing processes and decisions, and that the industry as a whole recognizes national accounts as a distinct market.  Witness after witness agreed that there are only four national carriers offering the broad medical provider networks and account management capabilities needed to serve a typical national account.  Notably, both Anthem and Cigna have established business units devoted to national accounts, and these separate profit and loss centers each have their own executives, sales teams, and customer service personnel.  While various brokers and insurance carriers may draw differing lines to define the boundaries of a "national account," the government's use of 5000 employees as the threshold is consistent with how both Anthem and Cigna identify the accounts within their own companies.  Moreover, when

measured against the appropriate legal standard, the government's definition was sufficient to include reasonable substitutes and to fairly capture the competitive significance of other products.

The geographic market also passes the legal test since the Blue Cross Blue Shield Association rules have a significant impact on the commercial conditions governing the sale of medical coverage to national accounts, and Anthem's exclusive territory is where the acquisition will have a direct and immediate effect on competition.

Next, the Court finds that plaintiffs have established that the high level of concentration in this market that would result from the merger is presumptively unlawful under the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, which courts regularly consult for guidance in these cases.  The evidence has also shown that the merger is likely to result in higher prices, and that it will have other anticompetitive effects: it will eliminate the two firms' vigorous competition against each other for national accounts, reduce the number of national carriers available to respond to solicitations in the future, and diminish the prospects for innovation in the market.

Within the national accounts market, health benefits coverage is a differentiated product, which means that individually customized policies are sold to customers one at a time – in this case, through a bid solicitation process.  National account customers evaluate responses to their requests for proposals based upon a number of factors, including the amount of the fees charged by each carrier for claims administration services; the quality and breadth of the carrier's medical provider network; the extent of the discounts the carrier has negotiated with those providers; whether the carrier is willing to guarantee that the customer's medical costs will not increase by more than a particular percentage; and other features of interest to any particular customer.  The expert testimony as well as the firms' internal documents reflect that while Anthem tends to enjoy

superior discounts, the two companies are competing head-to-head with respect to many of the other aspects of their offerings, all of which can factor into the employer's total cost per employee for medical benefits.

The defense came forward with evidence to rebut the presumption, shifting the burden back to the government, but the Court concludes based on the entire record that plaintiffs have carried their burden to show that the effect of the acquisition may be to substantially lessen competition in violation of Section 7 of the Clayton Antitrust Act.  Defendants insist that customers face an array of alternatives, and that there are many new entrants poised to shake up the market. But entering the commercial health insurance market is not such an easy proposition.  And while third party administrators and new insurance ventures being launched by strong local healthcare systems may be attractive to smaller or more localized customers, it became quite clear from the evidence that the larger a company gets, and the more geographically dispersed its employees become, the fewer solutions are available to meet its network and administrative needs.  Thus, regional firms and new specialized "niche" companies that lack a national network are not viable options for the vast majority of national accounts, and they will not ameliorate the anticompetitive effects of this merger.

While defense economists theorized that large customers are free to "slice" their insurance business and contract with multiple carriers to cover different geographic regions and employee preferences, the record shows that there are substantial costs and administrative burdens associated with fragmentation, so employers do not elect to do it very often.  The national accounts that do slice tend to use no more than two companies, usually chosen from among the big four national carriers and possibly a particularly strong regional option, such as Kaiser, the uniquely popular health maintenance organization in California.  Anthem and its experts made much of the advent

of private exchanges – sets of prepackaged plans that afford customers the opportunity to offer their employees a choice of several options – but those have proved to be largely just another vehicle for delivering the major national carriers' products to the market.  The defense repeatedly drew attention to the existence of third party administrators, provider-sponsored plans, and other specialty firms that have recently begun to populate the insurance marketplace.  But to the extent these so-called new entrants and competitors are owned by, teamed with, rent networks from, or funnel business to the big four national carriers, they do not alter the competitive landscape, and in fact, they represent multiple additional arenas where the constriction of competition will be felt.

Anthem has taken the lead in defending the transaction, and it contends that any anticompetitive effects will be outweighed by the efficiencies it will generate.  It points, in part, to substantial general and administrative ("G&A") cost savings that have been projected to be achieved through the combination of the two companies.  And the centerpiece of its defense is its contention that Anthem and Cigna national account customers will save a combined total of over $2 billion in medical expenditures because Cigna members will be able to access the more favorable discounts that Anthem has negotiated with its provider network, Anthem members will have the benefit of any lower rates that Cigna has obtained, and those costs are paid directly by the employers.  In short, Anthem maintains that the overriding benefit of the merger is that the new company will be able to deliver Cigna's highly regarded value-based products at the lower Anthem price.

But the claimed medical cost savings are not cognizable efficiencies since they are not merger-specific, they are not verifiable, and it is questionable whether they are "efficiencies" at all.  And the projected G&A efficiencies suffer from significant verification problems as well.

The law is clear that a defendant must both substantiate any claimed efficiencies and demonstrate that they are "merger-specific," which means that it must show that the savings cannot be accomplished by either company alone in the absence of the proposed merger.   But here, Anthem and Cigna have already obtained the provider discounts alone.   The medical network savings are not merger-specific because they are based upon the application of existing discounts to an existing patient population that the companies have already delivered to the providers; the calculations do not depend upon the expectation that the volume of patients will increase by virtue of the merger.

Furthermore, it is plain that the companies do not have to merge for customers to be able to access Anthem's lower provider rates:   any customers that value the discounts above other aspects of the contractual arrangement can choose Anthem as their carrier today.   As the Anthem executives responsible for the integration agreed, one of the most likely mechanisms to be employed to achieve the savings – the "rebranding" of Cigna customers as Blue customers – is no different from Anthem's ongoing marketing of its products on a daily basis.  Also, there is nothing stopping Anthem from improving its wellness programs, or any other offerings that Cigna now does better, on its own.

It is also questionable whether Anthem's ability to drive a hard bargain with providers by virtue of its size can be characterized as an "efficiency" at all.  The Guidelines define an efficiency as something that would enable the combined firm to achieve lower costs for a given quantity and quality of product.   Here, the combined firm will not be selling healthcare.   Its "product" in the national accounts market – as Anthem has emphasized since the first day of the trial – is "ASO" or "administrative services only" contracts, which include claims administration, claims adjudication, and access to a network of health providers.   So there is no evidence that the claimed

network savings will arise because the cost of what the merged firm produces, and what it sells in the relevant market, will go down.

Anthem characterizes this scenario as a supply-side efficiency resulting from the merger, but it has not shown that there is anything about the mere combination of the carriers' two pools of patients that will enable doctors or hospitals to treat patients more expeditiously or at a lower cost.  Since the medical cost savings will not be accomplished by streamlining the two firms' operations, creating a better product that neither carrier can offer alone, or even by enabling the providers to operate more efficiently, they do not represent any "efficiency" that will be introduced into the marketplace.

Anthem is asking the Court to go beyond what any court has done before:  to bless this merger because customers may end up paying less to healthcare providers for the services that *the providers* deliver even though the same customers are also likely to end up paying more for what the defendants sell: the ASO contracts that are the sole product offered in the market at issue in this merger.  It asks the Court to do this because it is the insurers that negotiate the in-network provider discounts, access to those rates is part of what the customers are buying when they buy health insurance, and medical costs account for the overwhelming portion of any customer's total healthcare expenditure.  In short, Anthem is encouraging the Court to ignore the risks posed by the proposed constriction in the health insurance industry in the relevant market on the grounds that consumers might benefit from the large size of the new company in other ways at the end of the day.  But this is not a cognizable defense to an antitrust case; the antitrust laws are designed to protect competition, and the claimed efficiencies do not arise out of, or facilitate, competition. Moreover, Anthem's own documents reveal that the firm has considered a number of ways to

capture the network savings for itself and not pass them through to the customers as it insisted in court that it would.

Anthem argues that even if expanding access to provider discounts does not technically qualify as an antitrust efficiency that can offset anticompetitive effects on a dollar-for-dollar basis, it is a factor to be taken into consideration in assessing the overall impact of a merger in a market where it is universally acknowledged that growing costs must be controlled.  In short, the Court should decide that the pressure the merger would place on providers would be beneficial to consumers in general.  But the record created for this case did not begin to provide the information needed to reveal whether all providers, no matter their size, location, or financial structure, are operating at comfortable margins well above their costs, as Anthem's expert suggested, or whether Anthem's use of its market power to strong-arm providers would reduce the quality or availability of healthcare as the plaintiffs alleged.  And the trial did not produce the sort of record that would enable the Court to make – nor should it make – complex policy decisions about the overall allocation of healthcare dollars in the United States.

More important, Anthem has not been able to demonstrate that its plan is achievable or that it will benefit consumers as advertised.  One of the other key strategies Anthem intends to employ to generate the claimed savings is to unilaterally invoke provisions in provider contracts that require physicians or facilities to extend Anthem's discounted fee schedule to Anthem's affiliates. But even the Anthem executives have expressed doubts that the providers will take this lying down, and they have acknowledged that they have no plan in hand for whether they will proceed by rebranding on the customer side, by renegotiating contracts on the provider side, or by enforcing these affiliate clauses in any particular situation.

There was also considerable testimony that an enforced reduction in fees paid to providers through rebranding or contractual mechanisms could erode the relationships between insurers and providers.  It would also reduce the collaboration that industry participants agree is an essential aspect of the growing trend to move from a pure fee-for-service based system to a more value-based model as a means of both lowering the cost and improving the outcome of the delivery of healthcare in this country.  And here, the Court cannot fail to point out that it is bound to consider *all* of the evidence in the record in connection with the question of whether the merger will benefit competition, and in this case, that includes the doubt sown into the record by Cigna itself.

This brings us to the elephant in the courtroom.  In this case, the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger: one of the two merging parties is also actively warning against it.  Cigna officials provided compelling testimony undermining the projections of future savings, and the disagreement runs so deep that Cigna cross-examined the defendants' own expert and refused to sign Anthem's Findings of Fact and Conclusions of Law on the grounds that they "reflect Anthem's perspective" and that some of the findings "are inconsistent with the testimony of Cigna witnesses."  Anthem urges the Court to look away, and it attempts to minimize the merging parties' differences as a "side issue," a mere "rift between the CEOs."  But the Court cannot properly ignore the remarkable circumstances that have unfolded both before and during the trial.

The documentary record and the testimony reflect that the pre-merger integration planning that is necessary to capture any hoped-for synergies is stalled and incomplete.  Much of the work has not proceeded past the initial stage of identifying goals and targets to actually specifying the steps to be taken jointly to implement them.  Moreover, the relationship between the companies is marked by a fundamental difference of opinion over the effect the Anthem strategy to impose

lower rates on providers and move members away from Cigna's network will have on the collaborative model of care that is central to the Cigna brand. Both Cigna witnesses and providers have testified that effective collaboration requires more of the physicians and hospitals, and they expect to be paid for it, and the engagement with members to improve behaviors that can affect wellness requires an investment of resources on the part of the insurer. All of this raises serious questions about when, how, and whether the medical savings can be achieved, whether the G&A savings can be verified, and whether there is any basis in the record to believe in the rosy vision being put forward by Anthem of a new national carrier that delivers the Cigna product at the Anthem price.

In sum, the theme of Anthem's defense is that its greater ability to command discounts from providers will save customers money at the end of the day. At the same time, Cigna says that its collaboration with providers will save customers money at the end of the day. Plaintiffs take the position that customers should continue to have a choice between these options, and the Court agrees.

While Anthem has also moved to incorporate quality and cost savings incentives into its provider contracts, Cigna has sought to differentiate itself with its approach towards reducing costs by increasing health. Its message is that better information and clinical management on the provider side, along with encouraging behaviors that support health on the patient side, can reduce a patient's need to be hospitalized or undergo expensive medical procedures at all, and that this decrease in utilization will reduce the total medical cost per employee over time. For this reason, some customers prefer Cigna notwithstanding its discount disadvantage, and there was some testimony from medical personnel that the approach is working. Eliminating this competition from the marketplace would diminish the opportunity for the firms' ideas to be tested and refined, when

this is just the sort of innovation the antitrust rules are supposed to foster. Considering all of these circumstances, and for all of the reasons set forth in greater detail in this opinion, the Court is persuaded that the merger should not take place.

## OUTLINE OF OPINION

BACKGROUND ........................................................................................................... 13

  I.   The Parties and Proposed Merger ........................................................................13

  II.  Procedural History ...............................................................................................15

  III. Overview of the Commercial Healthcare Industry ..............................................17

       A.  The customers...............................................................................................17

       B.  The plans ......................................................................................................18

       C.  The networks ................................................................................................19

       D.  Other industry participants and options for employers ...............................21

LEGAL STANDARD..................................................................................................... 22

ANALYSIS ...................................................................................................................... 24

  I.   Plaintiffs have met their initial burden to show that the merger is
       presumptively anticompetitive in the market for the sale of health insurance to
       national accounts within the fourteen Anthem states. ........................................25

       A.  The sale of medical health coverage to national accounts within the fourteen
           Anthem states is a relevant market...............................................................25

           1. The sale of health insurance to national accounts with more than 5000
              employees is a relevant product market...................................................26

              a.   The proposed product market ...................................................... 29

              b.   National accounts are a unique set of customers with unique needs. .......... 30

              c.   5000 employees is an appropriate definition. ............................. 32

                   1)  Practical indicia support the definition. .................................. 32

                   2)  Economic expert testimony supports the definition.............................. 34

                        a)  Plaintiffs' expert .......................................................... 35

                        b)  Defense experts .......................................................... 36

      2. The fourteen Anthem states comprise a relevant geographic market. .................. 40

B. Market share and concentrations in the relevant market establish the presumption. ............................................................................................. 48

      1. Plaintiffs' expert's calculations............................................................ 50

      2. Defense experts' critiques.................................................................... 53

C. Evidence of price effects supports the prima facie case............................................ 58

II. Defendants have come forward with evidence to rebut the prima facie case. ................... 60

III. Plaintiffs have carried their burden to establish that the merger is likely to harm competition. ......................................................................................................... 64

A. The merger will have the unilateral effect of eliminating the existing head-to-head competition between Anthem and Cigna. ........................................................ 65

B. The merger will reduce the number of significant competitors in the market. ......... 73

C. National account customer sophistication and bargaining power are not sufficient to ameliorate the anticompetitive effects. .................................................. 74

D. New entrants and expansion will not be a constraint on the new firm..................... 74

      1. There are significant barriers to entry and history shows a lack of success by new entrants. ............................................................................ 76

      2. Large regional carriers are not an option. ........................................... 79

      3. Slicing is not a practical solution. ....................................................... 80

      4. Other options do not serve national accounts' needs and are often alternative distribution channels for the Big Four. ............................... 82

E. The merger will reduce innovation in the market. ..................................................... 89

IV. The claimed efficiencies do not outweigh the anticompetitive effects of the merger. ................................................................................................................ 92

A. Anthem has presented some evidence of efficiencies. .............................................. 92

      1. Medical Cost Savings ........................................................................... 92

      2. General and Administrative Savings .................................................... 97

B. The Court may consider evidence of efficiencies. .................................................... 99

C. The claimed savings are not cognizable efficiencies. ............................................. 102

      1. The medical network savings are not merger-specific. ...................... 102

2. The claimed savings are not verifiable. ............................................................ 112

3. It is questionable whether the medical cost savings can rebut the prima facie case since there is no evidence of "efficiencies" created in the relevant market. ........................................................................................................ 123

D. The potential buy-side savings do not change the analysis of the merger's competitive effects. ........................................................................................... 126

V. The merger is also likely to cause anticompetitive harm in the market for the sale of medical insurance coverage to large group employers...............................................130

A. Plaintiffs have met their initial burden to show that the merger is presumptively anticompetitive in the Richmond, Virginia market. ............................................... 131

1. Relevant market ........................................................................................ 131

2. Market share and concentration establish the presumption. .............................. 134

B. Defendants' rebuttal evidence ............................................................................. 137

C. Plaintiffs have carried their burden to establish that the merger is likely to harm competition in the Richmond market. ................................................................. 137

CONCLUSION.................................................................................................................. 140

# BACKGROUND

## I.    The Parties and Proposed Merger

Anthem is "one of the largest health benefits companies . . . in the United States, serving 38.6 million medical members through [its] affiliated health plans as of December 31, 2015." PX 125, Anthem SEC 10-K Filing, Feb. 19, 2016, at 48.  It offers medical healthcare benefits to a variety of customers including individuals, large and small employers, and Medicaid and Medicare enrollees.  PX 125; PX 701.  The company, which is based in Indianapolis, Indiana, is a member of the Blue Cross Blue Shield Association ("BCBSA"), an association of thirty-six health insurance companies licensed to use the Blue Cross and/or the Blue Shield brands.  *See* Swedish (Anthem) Tr. 222.  Anthem holds the exclusive license to use the Blue brands in all or part of

fourteen states.  PX 125; PX 701.[1]  Anthem also owns and operates non-Blue Cross entities, which market health coverage under the Amerigroup, Simply, and CareMore brands in other states.  PX 125.

Cigna is a health services company based in Bloomfield, Connecticut.  PX 701.  It offers products and services to customers, including large employers, in the fifty states and the District of Columbia, as well as health benefits to employers internationally, operating in more than thirty countries.  Cigna Answer [Dkt. 144] ¶ 11; Cigna SEC10-K Filing, Feb. 25, 2016, PX 284; DX 333. It covers approximately thirteen million medical members in the United States.  Cigna Answer ¶ 11.  Cigna also offers various specialty products and services, such as behavioral health, disability insurance, and dental and vision coverage, among others.  *See* PX 284.

On July 23, 2015, Anthem and Cigna entered into an Agreement and Plan of Merger, which their separate shareholders approved on December 3, 2015.  PX 125; PX 284.  According to Anthem, the transaction is valued at approximately $54.2 billion.  Anthem Answer [Dkt. 15] ¶ 1. The planned equity ownership of the combined company is to be comprised of approximately 67% Anthem shareholders and 33% Cigna shareholders, PX 126, and the new firm is slated to provide medical coverage to more than fifty-three million people across its commercial and government segments.  DX 325.

The two firms are bound by their merger agreement through April 30, 2017.  *See* Anthem's Reply Mem. in Supp. of Mot. for Expedited Status Conf. [Dkt. 17].  But since the initial decision

---

1   The fourteen Anthem service areas are California (Blue Cross license only), Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding thirty counties in western Missouri), Nevada, New Hampshire, New York (excluding certain areas), Ohio, Virginia (excluding certain counties near Washington, D.C.), and Wisconsin.  PX 125.  Throughout the trial, the parties have referred to these territories as the Anthem "states," even though Anthem does not have an exclusive license for all fourteen states in their entirety, and the Court will use that designation in this opinion.

to merge was announced, the relationship between the parties has started to fray.  In December of 2015, the companies began to exchange letters and emails related to the integration, *see, e.g.*, PX 2, PX 8, and they grew more heated over time.  Through its CEO, Jospeh Swedish, Anthem expressed concerns about the pace and quality of the integration effort and the amount of data and information that was being shared.  PX 1; PX 3; *see also* Swedish (Anthem) Tr. 323.   Meanwhile, Cigna complained that Swedish was improperly reducing the role that the current Cigna CEO, David Cordani, would play in the new company, PX 4, and it took issue with Anthem's approach towards medical providers and its plans for the movement of members from Cigna to the Anthem brand. Cordani (Cigna) Tr. 492–93.  By April of 2016, Cigna's participation in the integration activities had slowed, PX 725, and when this lawsuit was filed, it stopped altogether.  *See* Schlegel (Anthem) Tr. 1412–13, 1431–32.  By July 2016, counsel for the two companies began writing letters accusing the other party of breaching the merger agreement.  *See, e.g.*, PX 16; PX 17; PX 18; PX 19.

## II.    Procedural History

On July 21, 2016, plaintiffs the United States, the States of California, Colorado, Connecticut, Georgia, Iowa, Maine, Maryland, New Hampshire, New York, and Tennessee, the Commonwealth of Virginia, and the District of Columbia sued to enjoin the merger.  Compl. [Dkt. 1].  Plaintiffs allege that the Anthem-Cigna merger will violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it will harm competition in the sale of commercial healthcare insurance to two groups of customers:  "national accounts" and "large group employers."  Compl. ¶ 8.

In their first claim, plaintiffs allege that the acquisition will harm competition in the sale of health insurance to national accounts both within a geographic market consisting of the fourteen Anthem states and in a market consisting of the United States as a whole.  Compl. ¶¶ 19–37. The second claim alleges anticompetitive effects in the market for the sale of health benefits coverage

15

to large group employers in 35 separate local regions within those states.  Compl. ¶¶ 38–50.  And in its third claim, plaintiffs allege that the newly formed company will use its market power to pressure doctors, hospitals, and other providers to lower their prices, so the merger will result in harm to competition in the market for the purchase of healthcare services, or a monopsony, in the same thirty-five geographic markets.  Compl. ¶¶ 64–75.[2]

Anthem answered the complaint on July 26, 2016, and Cigna answered on September 19, 2016.  Extensive discovery was undertaken on an expedited schedule under the supervision of a Special Master appointed by the Court with the parties' consent.  *See* Order Appointing Special Master [Dkt. 66], Scheduling Order [Dkt. 68], Interim Case Mgmt. Order [Dkt. 74].  The Court divided the presentation of evidence at trial into two phases: the first dealing with the effect of the merger on competition in the sale of commercial insurance to national accounts, and the second dealing with both its effect on competition in the sale to large group employer accounts in the thirty-five markets and the purchase of healthcare services from providers in those markets.  Order Am. Order Appointing Special Master and Final Case Mgmt. Order [Dkt. 196] at 4.

The bench trial began on November 21, 2016 and ended on January 4, 2017.  The parties presented sixteen fact witnesses in Phase I and thirteen in Phase II, along with deposition excerpts from more than 100 individuals.  Plaintiffs presented the testimony of two experts, one of whom testified in both phases.  Anthem proffered three experts who each testified twice.  Each side introduced more than 800 exhibits in each phase of the trial, and each side submitted two sets of proposed findings of fact and conclusions of law.  [Dkt. 401, 404, 416, 417].

---

2       Plaintiffs also initially alleged that the merger would harm competition for the sale of individual insurance policies on the public exchanges, Compl. ¶¶ 51–63, but they subsequently dismissed that claim.  *See* Stip. re Pls.' Allegations Concerning the Sale of Individual Insurance Policies on Public Exchanges [Dkt. 163].

16

III.     **Overview of the Commercial Healthcare Industry**

This case does not involve healthcare obtained through government programs such as Medicare or Medicaid, or health insurance sold to individuals either directly or through a public exchange.  The allegations that were tried relate solely to the commercial market – the sale of medical benefits coverage to employers.  To analyze the antitrust implications of the acquisition, it is necessary to have a general overview of how the commercial health insurance industry operates.

A.     **The customers**

Millions of people in this country obtain healthcare insurance for themselves and their dependents through their employers.  Commercial health insurance sold to employers is regulated by state and federal statutes;[3] state laws draw a distinction between healthcare insurance sold to "small group" and "large group" employers.  Goulet (Anthem) Dep. 13–16.  In forty-six states, a small group employer is defined as an employer with two to fifty employees, and in the remainder, small group employers are defined as having up to 100 employees.  *See* Bailey (Cigna) Dep. 59–60; Goulet (Anthem) Dep. 14–15.  Employers with more than fifty or 100 employees, respectively, are considered "large group" employers.  Goulet (Anthem) Dep. 15–16.  This case concerns the sale of commercial healthcare insurance to large group employers; the employees and their dependents who are covered by the plans are referred to as "members" or "covered lives."

Because purchasing healthcare coverage can be a complex process, particularly for large group employers, these customers often work with consultants and insurance brokers.  The consultants assist with determining and ranking the employers' needs, identifying the firms that

---

3       The federal Affordable Care Act imposes penalties on large group employers that fail to meet certain minimum value and affordability requirements.  26 U.S.C. § 4980H(b)(1), (c)(3).

can meet those needs, issuing requests for proposals ("RFPs"), negotiating with the top bidders, and making a final a contract decision.  Abbott (WTW) Tr. 65–66.

Within the industry, large group employers are generally divided into two categories according to size, and the larger entities within the large group segment are referred to as "national accounts."  The term is not defined by regulation, and the threshold used varies, but industry participants generally define national accounts by the number of individuals they employ, and many include a requirement that the employees reside in more than one state.  Abbott (WTW) Tr. 157–58.  Regardless of the numerical limits they apply, insurance carriers, consultants, and brokers tend to market, service, and account for their large group accounts and national accounts separately.

### B.      The plans

What health insurance carriers offer employers is a combination of claims administration services and access to a network of medical care providers that have agreed to treat the employees and their dependents at a discounted rate.   Abbott (WTW) Tr. 74–75.   Commercial insurance carriers provide employers with these networks and services through two types of plans: fully-insured plans and self-insured plans.   Self-insured plans are also known as "ASO," or administrative services only, plans.  *Id.*

In either case, the insurer processes and adjudicates the members' claims.  Fully-insured and ASO plans differ, though, with respect to who pays the medical costs and therefore bears the risk connected with those costs.  In fully-insured plans, it is the insurer's obligation to cover the healthcare costs incurred by the employees and their dependents in addition to administering the claims.  Thus it is the insurer that bears the risk of the members' medical costs, and it prices the premiums accordingly.  Abbott (WTW) Tr. 69.

In self-insured plans, the employer takes on the risk of the medical costs itself. Abbott (WTW) Tr. 69–70. It pays the insurer an ASO fee in return for both the access to the provider network and claims administration and adjudication services. But the employer pays the healthcare costs directly, usually by funding a bank account from which the insurer pays the claims as they are submitted by the providers. Abbott (WTW) Tr. 174. Therefore, ASO fees are lower than full insurance premiums. Abbott (WTW) Tr. 175; *see* Hayes (Aetna) 29–31. Larger employers tend to purchase ASO plans because they can spread the risk of the medical costs over a larger number of covered lives,[4] and smaller employers tend to purchase full insurance because they cannot.

Finally, employers may purchase ancillary products such as dental coverage and behavioral health coverage from insurers, as well as other services, including employee wellness programs, data analytics to help employers and providers understand and manage their healthcare costs, and the technology to deliver claims information to members electronically. Generally speaking, the larger and more sophisticated the employer, the more customization it will seek when soliciting proposals from insurers. Abbott (WTW) Tr. 77.

## C.      The networks

Access to a network of medical care providers is an essential component of any commercial health insurance plan. Insurers create networks by entering into contractual arrangements with hospitals, doctors, and other healthcare professionals through which the providers agree to accept payment for services supplied to plan members at a discount in return for the volume of patients that the carrier will deliver to them as in-network providers. Drozdowski (Anthem) Tr. 1643–44.

---

4      Employers may also purchase stop-loss insurance to cap their healthcare expenses at a particular level if they suffer any unusually large claims. *See* Abbott (WTW) Tr. 69; Archer (HealthSMART Benefit Solutions) Dep. 35–36.

Employees who receive care from out-of-network providers face higher fee schedules with no discounts, Kertesz (Anthem) Tr. 538, so the breadth and depth of a carrier's network factors heavily into an employer's contracting decision.

Anthem gains access to a national network for its customers by virtue of its membership in the Blue Cross Blue Shield Association.  Association members enjoy an exclusive license to market insurance under the Blue brands within their individual territories, and therefore, no two Blue companies will ever bid on the same large group or national account, and no Blue licensee may bid on an account headquartered in another licensee's state without receiving a "cede" from that carrier.  Bills (Anthem) Dep. 60, 85, 207–09.

An important feature of the Blue Cross Blue Shield Association is the Blue Card System. Members of any Blue plan – those who carry a "Blue card" – are entitled to access the providers in the Blue networks in every state at the in-network rate.  Swedish (Anthem) Tr. 226–27.  The Blue Card network is the largest national provider network in the country.  PX 208; PX 367.

Blue plans refer to members whose employers are located within their licensed territories as "home" members, and members who receive services through the Blue network outside of their plans' service area as "host" members.  Pogany (Anthem) Dep. 89; PX 125.  Anthem has approximately 13 million national accounts members, including both home and host members. Pogany (Anthem) Dep. 87.  Like all other members of the Blue Cross Blue Shield Association, Anthem receives Blue Card fees for network access and administrative services when it "hosts" a member of another Blue plan.  PX 125.  With its fourteen states, Anthem has the largest exclusive territory of any Blue Cross licensee; the second largest licensee has the exclusive rights to sell Blue products in five states.  Swedish (Anthem) Tr. 222.

### D.     Other industry participants and options for employers

There are additional options for employers purchasing commercial health insurance that

are of significance in this case:

- **Slicing:** When a company employs workers in multiple parts of the country, it may choose to purchase a plan from a single carrier with a broad enough network to serve all its employees. These carriers include United Healthcare, Cigna, Aetna, and Anthem, with its Blue Cross Blue Shield network. Or, it may choose to piece together several plans from multiple carriers, either national or regional, that offer attractive networks in the specific areas where the employees reside. This practice is referred to as slicing. Employers may also slice insurance business across types of plans, to offer its employees a choice between more than one carrier with distinctive offerings or cost structures. Abbott (WTW) Tr. 85–86.

- **Private Exchanges:** In recent years, several of the large consultants in the health insurance industry have begun contracting with local, regional, and national insurers to put together packages of standard plans available in particular geographic areas, and then sell them as a whole to employers as an alternative to purchasing coverage directly from a single insurer. Sharp (Aon Hewitt) Dep. 10–11. Private exchanges give employers a means to offer employees choices among plans without assuming the burden of contracting with multiple carriers. *Id.* Aon Hewitt, Willis Towers Watson, Mercer, and Buck Consulting, owned by Xerox, are large consulting firms that that operate national private exchanges, Kertesz (Anthem) Tr. 662–63, and in response to this "disintermediation" by the consultants and brokers, Schumacher (United) Dep. 114; Hayes (Aetna) Dep. 238, the national carriers have begun building and marketing their own exchanges. Employees who choose Anthem or Cigna through an exchange are covered members who may access the network providers.

- **Direct Contracting:** Some very large and centralized employers, such as Boeing and Intel, have brought the task of negotiating discounted healthcare services in-house by "direct contracting" with providers for discounted services, bypassing commercial insurers' networks. *See* DX 9; Abbott (WTW) Tr. 122; Bisping (Caterpillar) Dep. 17–20. Some of these employers utilize consultants to negotiate discounted rates for them, *see* Fowdur Tr. 1351–52, and then retain third-party administrators ("TPA") to administer and adjudicate their employees' healthcare claims. Others work with national carriers to create and administer the network. Kendrick (Anthem) Tr. 1190–91.

- **Provider-Sponsored Plans:** Similarly, some healthcare providers have created provider-sponsored insurance plans ("PSPs") to cover their own large employee populations and then be available for purchase by outside groups. *See, e.g.*, Parker (Indiana University Health) Dep. 21; Adams (Centra Health) Dep. 78–79, 83. One way to accomplish this is through a joint venture with a national carrier, and the Virginia hospital system, Inova Health, formed a provider-sponsored plan with Aetna called Innovation Health. Henderson (Innovation Health) Dep. 17–18.

- **Third Party Administrators:** Some employers also look to third party administrators, or TPAs, to design plans and administer claims. Benedict (Cigna) Dep. 28–29. TPAs typically rent providers networks from insurers, including Anthem and Cigna. *See* Abbott (WTW) Tr. 117; Kertesz (Anthem) Tr. 583–84; Benedict (Cigna) Dep. 30–31.

- **Specialty Services.** Finally, other entities identify a niche and focus on enhancing or replacing particular services that larger carriers offer as an aspect of their plans. For example, Castlight markets a "quality transparency tool" which allows "plan members to understand the cost of services that they're selecting, and the fact that there is price variation among providers, as well as variation in the quality of the outcomes." Abbott (WTW) Tr. 214. It was one of the first companies to "synthesiz[e] that data and to create a consumer-friendly tool designed to better educate the patient or consumer on the variation and cost and potential variations and the quality of care." *Id.* Other examples are Accolade and Quantum, two companies that offer concierge customer services. *See* DX 14 (Accolade is a "[n]iche total population care management carrier" that "performs case management and also advocates employers' turning off DM, nurse line, maternity programs, decision support, etc."); Kertesz (Anthem) Tr. 637; Smith (Cigna) Tr. 786–87 (describing Quantum as a concierge model offering customer service and coaching).

## LEGAL STANDARD

Section 7 of the Clayton Act prohibits mergers or acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. "Congress used the words '*may* be substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (the government is not required to prove the alleged impact on competition "with certainty"). In essence, in a merger trial, the Court is making a prediction about the future. It must engage in a "comprehensive inquiry" into the competitive conditions that will exist in the market in question after the transaction, *United States v. Baker Hughes Inc.,* 908 F. 2d 981, 998 (D.C. Cir. 1990), and to meet their burden, plaintiffs must prove that anticompetitive effects are "sufficiently probable and imminent." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 n.22 (1974), quoting *United States v. Cont'l Can Co.*, 378

U.S. 441, 458 (1964); *see also Heinz*, 246 F.3d at 713, quoting S. Rep. No. 1775 at 6 (1950) (the use of the words "may be" means the statute applies "to the reasonable probability of the pr[o]scribed effect" and not "the mere possibility").

In analyzing whether a transaction violates Section 7, courts in this Circuit apply the burden shifting framework set out by the Court of Appeals in *United States v. Baker Hughes*, 908 F.2d at 982.

Plaintiffs bear the initial burden to prove that the merger would result in "undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982; *Heinz,* 246 F.3d at 715, quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963) ("[T]he government must show that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result[] in a significant increase in the concentration of firms in that market.'"). This showing establishes a "presumption" that the merger will substantially lessen competition, *Heinz,* 246 F. 3d at 715, and the burden then shifts to defendants to rebut the presumption. *Baker Hughes*, 908 F.2d at 982.

If plaintiffs establish the prima facie case, defendants must present evidence to rebut the presumption by "affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.* at 991; *Heinz,* 246 F.3d at 715 ("defendants must produce evidence that 'show[s] that the market share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market'"), quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975). The threshold the defendants must overcome to shift the burden back to plaintiffs is not high; the defendants are not required to "'clearly' disprove anticompetitive effect," but rather to make "a 'showing.'" *Baker Hughes*, 908 F.2d at 990–91, quoting *Marine Bancorporation*, 418

U.S. at 631.  "But the 'more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully.'"  *Unites States v. Aetna Inc.*, No. 16-cv-1494, 2017 WL 325189, at *10 (D.D.C. Jan. 23, 2017), quoting *Baker Hughes,* 908 F.2d at 991.

If defendants are able to make a showing that rebuts the presumption, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times."  *Baker Hughes*, 908 F.2d at 983; *see also Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1340 & n.12 (7th Cir. 1981); *FTC v. Arch Coal, Inc*., 329 F. Supp. 2d 109, 116 (D.D.C. 2004) (plaintiffs "have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined").  Plaintiffs must prove the alleged Clayton Act violation by a preponderance of the evidence.  *United States v. SunGard Data Sys., Inc.,* 172 F. Supp. 2d 172, 180 (D.D.C. 2001).  But "section 7 does not require proof that a merger or other acquisition will cause higher prices in the affected market.  All that is necessary is that the merger create an appreciable danger of such consequences in the future."  *Id.*, quoting *Hosp. Corp. of Am. v. FTC,* 807 F.2d 1381, 1389 (7th Cir. 1986).

## ANALYSIS

Plaintiffs allege that the merger of Anthem and Cigna will substantially lessen competition for the sale of health insurance, first to national accounts in a geographic market consisting of the fourteen Anthem states and in the United States as a whole, Compl. ¶¶ 19–37, and second, to large group employers in thirty-five local markets.  Compl. ¶¶ 38–50.  With respect to the national accounts market, the Court finds that each side has met its respective burden under the *Baker Hughes* framework.  Plaintiffs have established a prima facie case that the merger is presumptively anticompetitive, defendants have introduced evidence to rebut the presumption, and plaintiffs have carried their ultimate burden of showing that the effect of this merger "may be substantially to

lessen competition" in the market for sales to national accounts within the fourteen states. Therefore, the Court will enjoin the merger.

I.      **Plaintiffs have met their initial burden to show that the merger is presumptively anticompetitive in the market for the sale of health insurance to national accounts within the fourteen Anthem states.**

      A.      **The sale of medical health coverage to national accounts within the fourteen Anthem states is a relevant market.**

Because the ultimate determination of the legality of a merger involves an assessment of the new firm's market power, and the prima facie case concerns market concentration, "'a necessary predicate' to deciding whether a merger contravenes the Clayton Act" is defining the relevant market. *Marine Bancorporation*, 418 U.S. at 618, quoting *United States v. E.I. du Pont De Nemours & Co*., 353 U.S. 586, 593 (1957). The relevant market consists of two elements: a relevant product market and a relevant geographic market. *Arch Coal*, 329 F. Supp. 2d at 119; *Brown Shoe*, 370 U.S. at 324 (stating that the two factors are "a product market (the 'line of commerce') and a geographic market (the 'section of the country')"), quoting 15 U.S.C. § 18. A court may enjoin a merger based on proof of probable harm to any market alleged. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) (to prove a violation of Section 7, plaintiffs "may introduce evidence which shows that as a result of a merger competition may be substantially lessened through the country, or . . . that competition may be substantially lessened only in one or more sections of the country").

"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336; *see also Pabst Brewing*, 384 U.S. at 549. This is because "[t]he 'market,' as most concepts in law or economics, cannot be measured by metes and bounds." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953). Thus, plaintiffs' relevant market need not include all potential customers or participants. *FTC v.*

*Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338–46 (3d Cir. 2016) (finding a geographic market definition correct even when 43.5% of a hospital's patients came from outside the defined market).

Here, plaintiffs define the product market as the sale of commercial health insurance to national accounts with 5000 employees or more, and the complaint alleged a diminution of competition for the sale of that product in two geographic markets: the fourteen Anthem states and the entire United States.

### 1. The sale of health insurance to national accounts with more than 5000 employees is a relevant product market.

The relevant product market refers to the "product and services with which the defendants' products compete." *Arch Coal*, 329 F. Supp. 2d at 119. Since in defining the boundaries of the market, the Court is trying to answer the question of whether particular products "are sufficiently close substitutes to constrain any . . . anticompetitive pricing," *H & R Block,* 833 F. Supp. 2d 36, 55 (D.D.C. 2011), a properly drawn market must include all products that are "reasonable substitute[s]" for, but not necessarily exactly the same as, defendants' offerings. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998).

The Supreme Court set out the rules for identifying a relevant product market in *Brown Shoe,* and it started with the proposition that "the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325.  Both of these concepts relate to the availability of any reasonable substitutes, that is, "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." *FTC v. Staples, Inc*., 970 F. Supp. 1066, 1074 (D.D.C. 1997) ("*Staples I*"), quoting *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984).  Functional interchangeability refers to whether buyers view other products available to them as being "similar in character or

use to the products in question;" in other words, are they suitable for use, even if they are not identical products. *Id.*; *see also Brown Shoe,* 370 U.S. at 325; *Arch Coal*, 329 F. Supp. 2d at 119, quoting *SunGard,* 172 F. Supp. 2d at 182. Cross-elasticity of demand incorporates price, convenience, and availability into the analysis and considers "the responsiveness of the sales of one product to price changes of the other." *E.I. du Pont De Nemours & Co.*, 351 U.S. at 400; *see also, e.g., FTC v. Whole Foods Market, Inc*., 548 F.3d 1028, 1037 (D.C. Cir. 2008). Simply put, if a substantial price increase of one product would cause purchasers to switch to a different product, and purchasers can do so easily and conveniently, the two products are considered to compete in the same market.

Courts routinely turn to "practical indicia" as "evidentiary proxies for direct proof of substitutability." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc*., 792 F.2d 210, 218 (D.C. Cir. 1986), quoting *Brown Shoe*, 370 U.S. at 325; *see also FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 38 (D.D.C. 2009) (using these indicia to "augment the analyses of interchangeability and cross-elasticity of demand"). Following the Supreme Court's guidance in *Brown Shoe,* courts have reiterated that "the boundaries of a relevant market within a broader market 'may be determined by examining such practical indicia as industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *H & R Block,* 833 F. Supp. 2d at 51, quoting *Whole Foods,* 548 F.3d at 1037–38. Within the category of practical indicia, defendants' business records are "strong evidence" for defining the relevant product market. *Id.* at 52–53; *see also Whole Foods*, 548 F.3d at 1045; *CCC Holdings*, 605 F. Supp. 2d at 41–42; *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 162 (D.D.C. 2000); *Cardinal Health*, 12 F. Supp. 2d at 49; *Staples I*, 970 F. Supp. at 1076. Courts also consider

economic testimony and utilize the "hypothetical monopolist test" set out in the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Guidelines") to ascertain whether the market has been properly defined to include all appropriate substitute products.[5]

But a broad general market may contain smaller markets which separately "constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. Because the relevant product market in any particular case need only include "reasonable substitutes." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015), the fact that a firm may be considered a competitor "in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Id.*, quoting *Staples I*, 970 F. Supp. at 1075; *Cardinal Health*, 12 F. Supp. 2d at 47. The Merger Guidelines specifically caution that "defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares." Guidelines § 4.

> Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers.

*Id.* Courts have similarly recognized that "[m]arkets must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Aetna*, 2017 WL 325189, at *10, quoting *Times-Picayune*, 345 U.S. at 612 n.31.

---

5       The D.C. Circuit Court of Appeals, and other courts, have approved the use of the Horizontal Merger Guidelines as guidance in merger cases. *See Heinz*, 246 F.3d at 716 n.9; *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353–54 (2d Cir. 1979); *H & R Block*, 833 F. Supp. 2d at 52 n.10.

### a.      The proposed product market

Plaintiffs maintain that the sale of commercial health insurance to national account customers is a relevant product market.  They define a national account as an employer with 5000 or more employees, and their analysis of concentration in the market looks at both employers with 5000 employees and employers with 5000 employees spread over more than one state.  Compl. ¶ 20; Dranove Tr. 877–78; Pls.' Proposed Findings of Fact:  Phase I [Dkt. 416] ¶¶ 65–72. Defendants contend that this product market is invalid because:  (1) there is no uniform industry definition for what constitutes a national account, (2) it is improper to combine ASO and fully insured plans into a single product market, and (3) and the threshold of more than 5000 employees used by plaintiffs' economics expert in analyzing the market is arbitrary and too large.

Case law provides for the distinction of product markets by customer.  *Brown Shoe*, 370 U.S. at 325, citing *E.I. du Pont de Nemours & Co.*, 353 U.S. at 593–95 ("[W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."); Guidelines § 3 ("When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products.").  A submarket exists when sellers can profitably raise prices "to certain targeted customers but not to others," in which case regulators "may evaluate competitive effects separately by type of customer."  *See, e.g.*, *FTC v. Staples*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016) ("*Staples II*") (recognizing "targeted" or "price discrimination" markets in antitrust law); *Whole Foods*, 548 F.3d at 1037–41 (upholding lower court's finding of a narrower market of core customers for premium, natural, and organic supermarkets rather than grocery store customers generally).

### b.     National accounts are a unique set of customers with unique needs.

There was considerable evidence presented to establish that there is a distinct type of large employer that is looking for an insurance plan that can deliver a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. A review of the wealth of practical indicia in the record shows that the industry universally recognizes that national accounts exhibit different needs and characteristics that drive the design and pricing of their products.  As one industry consultant testified:

> Large employers, certainly, are by nature more complex.  They tend to have more locations, they tend to have more sophisticated requirements just by virtue of their size.  Not necessarily so, but generally, they are looking for a broader portfolio of services.  They're looking for that national network, and they are also looking for an ability to customize programs, often to a fairly substantial degree.

Abbott (WTW) Tr. 76–78, 159; *see also* Sharp (Aon Hewitt) Dep.76–78 (large employers require customized solutions and benefit plans and may have different employee populations, such as union and non-union employees).  As Anthem's former President of National Accounts, John Martie, explained, "national account purchasers tend to be more sophisticated and tend to appreciate greater levels of innovation."  Martie (Anthem) Dep. 84; *see also* Kertesz (Anthem) Tr. 535–37.  By the end of the trial, it was crystal clear that just about everyone in the industry, certainly everyone within Anthem and Cigna, has a consistent understanding of exactly what a national account is.

National accounts require carriers that can supply in-network providers in all of the locations where their employees live, work, and travel, and even where they may relocate as retirees.  Cordani (Cigna) Tr. 404; Kertesz (Anthem) Tr. 538; Swedish (Anthem) Tr. 226; Martie (Anthem) Dep. 125; Mascolo (Wells Fargo) Dep. 65–66; Kidd (Sodexo) Dep. 20–21; Loring (Applied) Dep. 40–41; Record (Steel Dynamics) Dep. 30; *see also* Burnell (Buck Consultants)

Dep. 112–13.  The national network is critical; as Anthem's former head of national accounts testified, "you don't really call yourself a . . . national account carrier unless you can cover all 50 states." Goulet Dep. 96.

National accounts are also more likely to demand customized plans, technological platforms that enable employees to access claims information, data reporting so that the customers can understand and manage their healthcare costs, and in light of recent data breaches, sophisticated data security measures.  *See, e.g.*, Schumacher (United) Dep. 226–27 (for large, multi-state national employers "there's more customization . . . more interaction from the account management team and the support efforts"); Bierbower (Humana) Tr. 802 (national accounts typically desire "customized data files, customized plan designs, customized clinical programs"); Sharp (Aon Hewitt) Dep. 75–78 (large market clients with more than 5000 employees "tend to be requiring more customized solutions"); *see also* Abbott (WTW) Tr. 77–79, 159; Guilmette (Cigna) Dep. 73–74; Welch (Cigna) Dep. 25; Martie (Anthem) Dep. 161–62; Bailey (Cigna) Dep. 67–68; Parr (Cigna) Dep. 18–19; PX 94.  In other words, national account customers demand an individualized, or differentiated, product.

National accounts typically work with consultants to navigate the RFP and selection process used to purchase such a product.  *See, e.g.*, Pogany (Anthem) Dep. 34; Martie (Anthem) Dep. 52; Bailey (Cigna) Dep. 66–67; PK 94; Schumacher (United) Dep. 203–04, 228–29.  Thus, they are sophisticated customers who bring the expertise of knowledgeable advisors to the task of procuring coverage for their employees.

Furthermore, both brokers and carriers – including the merging parties – manage this segment separately from the rest of the 50+ employee large group segment.  Both Anthem and Cigna have established separate profit and loss centers for national accounts, with their own

executives and separate marketing, sales, customer relations, and underwriting teams.   *See, e.g.*, Swedish (Anthem) Tr. 224–25; Cordani (Cigna) Tr. 404; Williams (Cigna) Dep. 23; Bailey (Cigna) Dep. 66–67; Guilmette (Cigna) Dep. 73–74; Hayes (Aetna) Dep. 24; PX 118 (Aetna document); Schumacher (United) Dep. 230; Jay (Anthem) Dep. 12, 15; Cheslock (Anthem) Dep. 20.   Thus, the evidence strongly supports the conclusion that national account customers are a distinct subset of the health insurance market, with needs that differentiate them from employers on the smaller end of the large group spectrum.

### c.       5000 employees is an appropriate definition.

Defendants can hardly contest the existence of a category of "national account" customers within the large group market, but they insist that there is no industry consensus for what the term means, "either as to the number of employees or their geographic spread." Anthem's Phase I Pretrial Br. [Dkt. 324] at 6.   So the next question to consider is whether plaintiffs' definition of national accounts as customers with more than 5000 employees is appropriate.

### 1)       Practical indicia support the definition.

Here there is strong evidence coming from the merging parties themselves.   The firms' own business records show that they each use the 5000 employee threshold to define their national accounts and manage their lines of business. PX 125 (Anthem SEC 10-K filing); PX 127 (Anthem website); *see also* DDX 88 (defense demonstrative exhibit listing the thresholds used by various carriers and TPAs to define national accounts).   The CEO of Anthem testified that Anthem defines national accounts as multi-state employers with more than 5000 eligible employees. Swedish (Anthem) Tr. 225; *see also* PX 127 (at least 5% of employees must be located outside of the headquarter state). Cigna also uses the definition of multi-state employers with 5000 or more full-time employees.   PX 284 (Cigna SEC 10-K filing).

Aon Hewitt, a national consulting firm also finds 5000 to be an appropriate dividing line; it groups its large employer clients into "middle market" customers with fewer than 5000 employees and "large market" customers with more than 5000 employees.  Sharp (Aon Hewitt) Dep. 76.  The record does reveal, though, that there is also variation in the way other industry participants define the term.  The largest national carrier, United Healthcare, defines its national accounts as customers with 3000 or more employees, whether in a single or multiple states.  Schumacher (United) Dep. 106.  Aetna uses the same definition.  Hayes (Aetna) Dep. 22–23.  Randall Abbott, a consultant with Willis Tower Watson, agreed that industry participants employ varying definitions:  "2500, 3000 or 5000 is very common.  Some will . . . have a multi-location requirement.  Generally, though, it's a size threshold."  Abbott (WTW) Tr. 157–58.

 The evidence also indicates that the defendants do not always adhere strictly to the definition in their day to day operations.  The Anthem Vice President for National Account Management explained that Anthem has some employers with fewer than 5000 employees managed by its national accounts team because Anthem changed its definition of the segment and some customers were "grandfather[ed]" in as national accounts.  Mathai (Anthem) Tr. 1257.  She also noted that some customers prefer to continue to remain within that segment even after their workforce is reduced in a divestiture. Mathai (Anthem) Tr. 1257.  Similarly, at Cigna, there may be some customers with fewer than 5000 employees managed as national accounts and some with more than 5000 employees managed as regional accounts because those customers have changed in size over time, or because a customer requested to be managed by the other segment in light of a prior customer service relationship.  Thackeray (Cigna) Tr. 740–41.

But these small variations and the existence of some exceptions does not negate the force of the evidence of defendants' own ordinary course of business operations, and the other practical

indicia of the defining characteristics of a national account customer.  This real world evidence reinforced and verified the conclusions reached by plaintiffs' economics expert, notwithstanding the defendants' efforts to counter him with experts of their own.

### 2)       Economic expert testimony supports the definition.

A second category of evidence that courts consider at the market definition stage is testimony from experts, and a primary tool used by economists to determine whether the alleged set of products is relevant for antitrust purposes is called the hypothetical monopolist test.  *See* Guidelines § 4.1.1; *H & R Block*, 833 F. Supp. 2d at 51–52.  This test asks whether a "hypothetical profit-maximizing firm," that was the only seller of all of the products within a proposed market, would be likely to impose "a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms."  Guidelines § 4.1.1.  The Guidelines consider a SSNIP to be a price increase of 5% or more.  *Id.* § 4.1.2.

The test is designed to measure whether a higher price "would drive consumers to an alternative product" or to forego purchases altogether. *Whole Foods,* 548 F.3d at 1038. The question of whether the hypothetical monopolist could profitably impose a SSNIP depends upon the number of substitutes outside the market under consideration.  "If enough customers are able to substitute away from the hypothetical monopolist's product and thereby make a price increase unprofitable," then the market has been drawn too narrowly for purposes of the antitrust laws and more substitutes must be included.  *Sysco*, 113 F. Supp. 3d at 33.  If enough customers would continue to purchase the products in the proposed market despite the price increase rather that switch to an alternative, that set of products constitutes an appropriate product market for antitrust analysis.  *See* Guidelines § 4.1.1.  Only those products that prevent a hypothetical monopolist from

significantly increasing prices should be included in the relevant market. *H & R Block*, 833 F. Supp. 2d at 51–52.

Here, the question is whether it would be hypothetically useful to have a monopoly over all health insurance products sold to national account customers because a monopolist could profitably raise prices for those products by 5% or more; or whether there would be no reason to monopolize the market because substitution and price competition would restrain a potential monopolist from profitably raising prices.

### a)      Plaintiffs' expert

To derive an answer, plaintiffs' economic expert, David Dranove, Ph.D., considered what employers with 5000 or more employees purchasing group health insurance would do in the face of a SSNIP.  His definition of the relevant product market included both ASO and fully-insured group health plans purchased from carriers, as well as coverage obtained through TPA's, private exchanges, or direct contracting.  Dranove Tr. 2245, 2247.  Using this definition, Dr. Dranove concluded that there would be only two alternatives for employers that sought to avoid the price increase:  managing all aspects of their employees' health benefits coverage themselves or foregoing the purchase of commercial insurance entirely, and neither is a reasonable substitute for purchasing commercial health insurance.  Dranove Tr. 861–65.  Therefore, he concluded a hypothetical monopolist in the alleged market would likely be able to impose a SSNIP.[6]  Dranove Tr. 863–66.

---

6      Dr. Dranove calculated the critical elasticity in the market based on data obtained from the insurers, and that exercise led to the conclusion that 6% of national accounts would drop their coverage if the price went up 5%.  Dranove Tr. 864.  But studies of the industry revealed that the marketplace is actually much less responsive, and that insurers do not eliminate this important employee benefit even if the price goes up.  Dranove Tr. 865.

### b)  Defense experts

Defendants challenged plaintiffs' definition of the relevant product market with testimony of the first of its three experts: the economist, Lona Fowdur, Ph.D.  Dr. Fowdur criticized plaintiffs' expert for using the 5000 employee threshold to define national accounts and insisted that the products those customers purchase are "reasonably interchangeable" with insurance products purchased by customers with fewer than 5000 employees.  Fowdur Tr. 1304.  As she put it, "to the extent that the products sold to national accounts of size 5000 plus are alternatives for groups that are less than 5000 in size, the two products' markets become reasonably interchangeable, so this bright line that plaintiffs are arguing about becomes blurry."[7]  Fowdur Tr. 1304.  In Dr. Fowdur's view, including customers with 3000 or 1000 employees in the relevant market would more fairly reflect the presence of the smaller players in the market.  *See* Fowdur Tr. 1303–06.

It is true that some customers with fewer than 5000 employees may have geographically dispersed employees or other needs and characteristics similar to national accounts.  But the question is not simply whether one product competes to some extent with another; it is whether consumers in the market in general view the products as "reasonable substitutes."  *Cardinal Health*, 12 F. Supp. 2d at 46.  Here, the defense critique assumes that an insurance product suitable for a customer with 3000 (or 1000)[8] employees is an adequate substitute in all instances, and that

---

[7]   While Anthem argued there is no economic basis for combining ASO and fully-insured plants into a single product market for national accounts, Anthem Pretrial Br. at 5–6, Dr. Fowdur did not take issue with this particular aspect of Dr. Dranove's hypothetical market.  "I think the source of the confusion is not between ASO and fully insured.  I think the source of the confusion stems from the fact that plaintiffs have arbitrarily established this bright-line threshold at 5000 plus enrollees."  Fowdur Tr. 1303.

[8]   Dr. Fowdur steadfastly resisted offering her own opinion as to what number would have been the correct one to choose, confining her opinion to what was wrong with plaintiffs' selection of 5000 as a place to draw the line.  Fowdur Tr. 1364–65.

theoretical proposition is contrary to the evidence of the actual conditions in the market and the firms' internal business records.

The evidence of industry practice discussed above made it clear that the larger a customer becomes, it requires greater customization, sophistication, and network coverage, and its range of choices narrows.  A parade of industry participants testified that given the distinct requirements of national accounts, only a handful of carriers can serve their needs.  Peter Kilmartin, a partner at Mercer, emphasized that only the four "large national carriers" can deliver effectively in the vast majority of geographies, because they offer the provider networks with the requisite scope along with the necessary level of account management and customer service.  Kilmartin (Mercer) Dep. 123.  He identified United, Anthem, Cigna, and Aetna as the four options, and Tucker Sharp of Aon Hewitt, another consulting firm, agreed.  "[T]he national carriers tend to be Aetna, Anthem, Cigna, and UnitedHealthcare . . . . We don't tend to include anyone else in that list."  Sharp (Aon Hewitt) Dep. 91; *see also* Burnell (Buck Consultants) Dep. 29, 87 (there are only four national carriers, and Kaiser is not a national carrier).

The fact that Anthem and Cigna themselves use the 5000 employees threshold to structure and account for their lines of business is "strong evidence" that supports Dr. Dranove's use of that figure in his analysis.  *H & R Block,* 833 F. Supp. 2d at 53.  And Anthem's own salesforce records revealed that many of its national accounts are considerably larger than the firms Dr. Fowdur opined would be comparable.  As of June 2016, many of Anthem's more than 500 national accounts included more than 20,000 or 50,000 members – significantly more than would be generated by 5000 employees – and some represented membership of over 100,000 and even 200,000.  *See* DX 687.  So the suggestion that what might be good for some would be good for all is not a practical one.

Here, the fact there may be some overlap between plans purchased by some customers with 3000 employees and those sold to customers with 5000 employees does imply that all of the products suitable for smaller customers should be part of the relevant market for the purpose of merger analysis. "[P]roperly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers." Guidelines § 4. The agencies' guidance makes it clear that some substitutes may be excluded – indeed should be excluded – to more accurately reflect the extent of competition between closer, reasonable substitutes.

> The competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market.

*Id.* So while Dr. Dranove's 5000 employee threshold may exclude some products that would meet the needs of smaller employers and even some national accounts, it is more consistent with how the industry actually operates, and it focuses the competitive analysis on the products that industry participants appear to agree are preferred by customers with more than 5000 employees. This narrower definition is "more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes." Guidelines § 4.[9]

---

9      Indeed, the evidence showed that there could be some national accounts of 5000 employees or more that do not require highly individualized plans, or are sufficiently concentrated that regional plans may satisfy their network needs. But products sold to those employers were included in the market even if doing so overstated their significance to the group as a whole.

At one point during the trial, defendants' expert, Dr. Fowdur, complained that plaintiffs had failed to supply "conclusive proof" of the relevant market.  Fowdur Tr. 4211.  And during closing argument, counsel for Anthem cited *United States v. SunGard,* 172 F. Supp. 2d at 172, as support for Anthem's view that plaintiffs' delineation of the product market lacked sufficient economic rigor.  Curran (Def. Counsel) Tr. 4895–96.  However, in that case, the district court did not articulate any new or more stringent standard, and there is no need for "conclusive proof" at this point.  The court recited all of the applicable tests, starting with the statement that a plaintiff must show that a pending acquisition is "reasonably likely" to cause anti-competitive effects, *SunGard*, 172 F. Supp. 2d at 180, and that the court must follow the *Baker Hughes* analytical approach.  *Id.*  The opinion does emphasize the importance of defining the relevant market properly, and the impact that will have on assessing competitive effects, *id.* at 181, but it also quotes *Brown Shoe*, 370 U.S. at 325, for the proposition that in addition to following the Horizontal Merger Guidelines and looking at the hypothetical monopolist and the SSNIP test, the court should consider "practical indicia" because "the determination of the relevant market in the end is a matter of business reality."  *Id.* at 182, quoting *Cardinal Health*, 12 F. Supp. 2d at 46.  And when the court applied the law to the facts, it seemed more affected by the heterogeneity of the customers and the conflicting evidence of how the market is perceived and what the adequate substitutes might be rather than by any failure of economic rigor.  So the observation of the Supreme Court in *Times-Picayune* that the market "cannot be measured by metes and bounds," 345 U.S. at 611, still pertains, and *SunGard* does not require a change in the Court's analysis.  Here, the "business reality" is entirely consistent with plaintiffs' economic analysis, and the Court holds that the market for the sale of health insurance to national account customers, defined as employers with more than 5000 employees, is a relevant antitrust product market.

Anthem also argued there was no economic basis for combining both ASO and fully-insured plans into a single healthcare coverage product market for national accounts.  Anthem Pretrial Br. at 5–6.  But this combination does not invalidate the proposed market. The law is clear that the "product" that comprises the market need not be a discrete good for sale.  "We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."  *United States v. Grinnell Corp*., 384 U.S. 563, 572 (1966); *Phila. Nat'l Bank*, 374 U.S. at 356, (citation omitted) (finding that "the cluster of products . . . and services . . . denoted by the term 'commercial banking'. . . composes a distinct line of commerce").  While most national accounts purchase ASO plans, the narrow distinction between these types of plans does not alter their key elements:  the network being supplied and the claims administration services delivered to the customer.  Neither Anthem nor Cigna carve fully insured customers out of their national accounts divisions or track or manage them separately.  *See, e.g.*, Swedish (Anthem) Tr. 246; PX 123 (Anthem financial document); *see also* Hayes (Aetna) Dep. 30–31, 74–75.  So fully insured plans with carriers that can otherwise handle the national needs of these customers are "reasonable substitutes" for national ASO accounts for purposes of the market definition.  *Cardinal Health*, 12 F. Supp. 2d at 46.  And in the end, this dispute had little practical bearing on the market share calculations that flowed from the market definition since "virtually all" national accounts have ASO plans.  *See* Abbott (WTW) Tr. 169.

## 2.    The fourteen Anthem states comprise a relevant geographic market.

With respect to the second component of the market definition, plaintiffs allege that the fourteen Anthem states combined comprise a relevant geographic market for the sale of healthcare insurance to national accounts.  Compl. ¶¶ 24–25.

A relevant geographic market identifies "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate."  *Phila. Nat'l Bank*, 374 U.S. at

357; *see also Marine Bancorporation,* 418 U.S. at 620–21 (defining it as "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm"); *Cardinal Health*, 12 F. Supp. 2d at 49 (a geographic market is the area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition"), quoting *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994); *Arch Coal*, 329 F. Supp. 2d at 123 (it is "the region in which the seller operates, and to which the purchaser can practicably turn for supplies"), quoting *Cardinal Health*, 12 F. Supp. 2d at 49.

As with a product market, a relevant geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe,* 370 U.S. at 336–37 (footnote omitted) (internal quotation marks omitted).   While this market "must be sufficiently defined so that the Court understands in which part of the country competition is threatened," *Cardinal Health*, 12 F. Supp. 2d at 49, it need not be defined with "scientific precision," since an "element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographical market.'"   *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974), quoting *Phila. Nat'l Bank*, 374 U.S. at 360 n.37.

When analyzing the proposed geographic market, the Court may again consider economic testimony, which often also consists of the results of a hypothetical monopolist test that asks whether a hypothetical firm that sells all the relevant products sold in that particular geographic area could profitably impose a SSNIP.  *See* Guidelines § 4.2.

Plaintiffs allege that the fourteen Anthem states combined are a single relevant geographic market.  Compl. ¶ 24.  The defense contends that this proposed market is "gerrymander[ed]" and "lacks economic coherence."  Anthem Pretrial Br. at 8.

Dr. Dranove testified that the fourteen Anthem states comprise a relevant geographic market because that is where Anthem is licensed to use the Blue brand and so the merger will directly affect competition by eliminating Cigna as a competitor.  Dranove Tr. 866–68 ("[T]he Anthem territories are the territories where Anthem has the right to sell and, therefore, this merger eliminates head-to-head competition between Anthem and Cigna.  It's the market that has the greatest potential, therefore, for direct, competitive harm.  If you are headquartered in this area and you want a national accounts vendor, you want one of the big four, you now get a choice of one of the big three.").

The economist also conducted a hypothetical monopolist test on the geographic market.  Again, he defined the product market as all health insurance purchased by national accounts, whether from carriers, direct contracting, TPAs, or other channels.  Dranove Tr. 868–69.  Using this definition, he concluded that national accounts headquartered in the Anthem states could only respond to a SSNIP by forgoing providing health insurance for their employees or relocating their headquarters to a non-Anthem state, neither of which is a realistic option.  Dranove Tr. 868.

The defense objects to the geographic market on the grounds that aggregating the fourteen states into a single geographic market improperly diminishes the competitive significance of regional firms.  Its economist, Mark A. Israel, Ph.D. testified that there are regional competitors, such as Kaiser in California or Harvard Pilgrim of Massachusetts, within the geographic market as a whole that account for a significant share in their localities but are not a factor elsewhere.  Israel Tr. 2001–02.

Dr. Fowdur also opposed the combination of the fourteen states into one market, and she opined that the geographic market is "ill-defined" because it is "very geographically dispersed" and national accounts with sufficient enrollees outside the Anthem states could slice or move to a

private exchange "to impose competitive discipline on this hypothetical monopolist."  Fowdur Tr. 1311–14.

Finally, Robert D. Willig, Ph.D., found the 5000 employee definition to be problematical, too.  Willig Tr. 2224–25.  He pointed out that the studies Dr. Dranove relied upon to determine the elasticity of the market were based on companies of 1000 employees or more, and therefore, in his view, there was no proper SSNIP test supporting the use of 5000.  Willig Tr. 2224–25.

The Court finds that the fourteen Anthem states comprise a relevant geographic market.  It has everything to do with how Anthem conducts its business on a day to day basis.  The Blue Cross Blue Shield association imposes exclusivity rules, which are defined by geography.  They bar other Blue licensees from pursuing national account customers within the Anthem territory, and they prohibit Anthem from competing for customers headquartered outside its fourteen states without a "cede," that is, permission from the Blue licensee in that state to do so.  Swedish (Anthem) Tr. 235–36; Kendrick (Anthem) Tr. 1205; Bills (Anthem) Dep. 60, 85–86, 207–09.  This means that right now, Anthem competes directly against Cigna for national accounts in the fourteen states at the very least, and that the merger would eliminate Cigna as a direct competitor there.  Since the fourteen Anthem states comprise an "area of competitive overlap, the effect of the merger on competition will be direct and immediate."  *Phila. Nat'l Bank*, 374 U.S. at 357.  Indeed, the Anthem executive heading the integration team referred to the fourteen states as the "overlap markets" when describing the new company's strategy for achieving saving or going to market.  *See* Matheis (Anthem) Tr. 1483, 1524.  As Dr. Dranove put it, "[f]or companies headquartered in those markets, this is effectively, slice business notwithstanding, a four to three merger."  Dranove Tr. 2251.

Furthermore, there is no evidence that the lack of contiguity of the fourteen states matters, especially since the employees of national accounts may be scattered across non-contiguous geographies.  Abbott (WTW) Tr. 68 (some employers are "very, very centralized," with "a home office and then perhaps a couple of manufacturing locations, there may be a distribution facility" and others like a retail bank might have "hundreds, if not thousands of locations"); *see also* Dranove Tr. 871.  Defendants did not articulate any way in which the shape of the market should be viewed as significant in light of the undeniable fact that the fourteen states are exactly where Anthem competes with Cigna and the other major national and regional carriers for national account business, and they are where the new firm's products will be marketed to a significant degree.

While a proposed geographic market would be too narrow if customers could respond to a SSNIP by shifting to products produced outside the geographic area, *Arch Coal*, 329 F. Supp. 2d at 123, citing Guidelines § 1.21, there was no testimony that customers could avail themselves of that option in this case.  Geography is a significant constraint on the purchase of health insurance; while someone in the market for a new car might head to a neighboring state to avoid a price gouging hypothetical monopolist in his own, medical care is local, and a large group employer headquartered in a particular state must purchase insurance from a carrier licensed to do business in that state that offers its employees a network in the same state.[10]

---

[10]    There is evidence that healthcare providers in the fourteen Anthem states draw some patients from outside the fourteen states.  *See* Wilhelmsen (SNHHS) Dep. 77, 176 (approximately 5% of patients at the Southern New Hampshire Health System's Nashua hospital came from Massachusetts and its service area includes four Massachusetts towns).  But the relevant question is not how patients (employees) would respond to a SSNIP in the market for national accounts health insurance but how the employers that are the customers – would.  *See, e.g.*, *Penn State Hershey Med. Ctr.*, 838 F.3d at 338–46 (holding that basing geographic market on patient flow data in a hospital merger case "failed to properly account for the likely response of insurers in the face of a SSNIP").  Dr. Fowdur frequently blurred this distinction.  Fowdur Tr. 4215–16.

Dr. Fowdur's assertion that national account customers can defeat a price increase does not posit that there is any means to solve the problem when buying coverage for employees residing within the hypothetical monopolist's fourteen states. But she calculated the critical loss in this instance to be 9.2%, which means that if 9.2% of the monopolist's business moved to plans offered in another geographic region, the 5% price increase would become unprofitable. Fowdur Tr. 1319–20. Since a large number of employees covered by plans issued to employers within the fourteen states live outside those states, she reasoned that slicing the dispersed employees would be enough to reach the critical loss figure. *See* Fowdur Tr. 1319–20. But even if this is sensible as a matter of economic theory, it ignores the practical impediments involved in slicing and cannot be reconciled with the persuasive testimony that the current trend in the industry is to avoid this kind of fragmentation.

Randall Abbott, a healthcare consultant with Willis Towers Watson, detailed the "frictional cost" involved in contracting with a new entity:

> [T]here's simply the cost of change. It's setting up new data interfaces, it's printing new communication material, it's typically changing open enrollment materials, it's adjusting all needed filings under ERISA, it's staff time required to redefine the plans with a new partner. Often there are minor variations in plan design that have to be adjusted for. And increasingly now, with larger companies, there's a focus on contract negotiations that can be very extensive, and, also, data security considerations, technology interfaces, information security penetration testing and the like that all require time. But I would say the primary frictional concern is the risk of change for employees and their families, because . . . healthcare is very immediate for . . . a company's people.

Abbott (WTW) Tr. 71. He added that each of the major health plans has a set of in-network providers, and that if an employee's provider is not in the new plan's network, "that would create a disruption in the doctor-patient relationship, which would be a concern. The same could hold true of specialist relationships or hospital facilities or outpatient facilities, as well." Abbott (WTW) Tr. 72. Similarly, "[t]he disadvantages of slicing are those frictional costs . . . . Every

relationship requires contracting, every relationship requires data interfaces.  There will be some variations, perhaps, in the plan of benefits offered.  There will be differences in the various wellness care management, condition management services.  And to the extent there are differences, those have to be reflected in either . . . required statutory filings . . . or in employee communication material.  Each additional health plan requires added effort at open enrollment . . . ."  Abbott (WTW) Tr. 111–12; *see also* Kilmartin (Mercer) Dep. 137 ("[I]t takes effort and resources for an employer to maintain and actively manage the carrier relationships.").

Given these costs and administrative burdens, there has been a "pendulum swing" by national accounts towards using fewer carriers, and "since the mid-'90s the focus has been on consolidating with one national health plan."  Abbott (WTW) Tr. 111.  According to Peter Kilmartin of Mercer, 73% of his clients use only one carrier.  Kilmartin Dep. 137.  Customers agree.  *See* Monti (Kroger) Dep. 31–32 (using one carrier to cover as many associates as possible provides "administrative simplicity":  having more insurers is more expensive to administer due to such issues as the need for multiple data feeds and additional communications to employees); Loring (Applied) Dep. 37–38.

It is also important to consider that Dr. Fowdur's point was that national account employees are spread broadly throughout the United States – not that customers tend to have one or two discrete satellite locations.  But the national accounts that do slice typically do so among only one or two national carriers, or they incorporate one large regional carrier such as Kaiser or Harvard Pilgrim; they do not slice among multiple carriers.  Abbott (WTW) Tr. 199 ("[T]he vast majority [of major employers] use one national health plan with occasional regional solutions . . . ."); *id.* at 207 (offering four or more carriers is "rare"); Kilmartin (Mercer) Dep. 68 (slicing for national accounts is typically one large national with one regional).

Dr. Fowdur's vision of the slicing that is possible also stood in contrast to what the Anthem executives testified is more probable. John Martie, currently the Senior Vice President of Integration for the Cigna acquisition and formerly the Anthem President of National Accounts, observed that the customer trend today is to reduce the number of carriers, Martie Dep. 257–58, and Ken Goulet, the former Anthem President of Commercial and Specialty Business, which includes national accounts, repeated that the trend is moving towards consolidation, usually with two big carriers side by side.  Goulet Dep. 122.  Vice President and Head of New Sales for Anthem National Accounts, Jerry Kertesz, also avowed that national accounts are consolidating relationships, and that it is "rare" for a customer to contract with more than two carriers.[11]  Kertesz (Anthem) Tr. 560, 588.

Further, Dr. Fowdur's testimony that as an abstract matter national accounts could avoid a SSNIP by turning to private exchanges does not comport with the evidence detailing the drawbacks of these relatively new products and their failure to take hold in the marketplace.  *See, e.g.*, Schumacher (United) Dep. 182; Hayes (Aetna) Dep. 144–52 (reported in October 2015 Quarter Business Review that only 4% of the national accounts market will have adopted an exchange for 2016); section III.D.4 below.  Moreover, if the hypothetical monopolist in the relevant market were to raise prices on all plans sold to national account customers, prices would go up on the exchanges as well, since the exchanges are just an alternative means to bring plans sold by the existing carriers in the market to the customer.  *See* Kilmartin (Mercer) Dep. 27–28 (Mercer's Marketplace is a private exchange "is a technology-enabled platform that allows carriers to compete for business"); Kertesz (Anthem) Tr. 636.

---

11      None of this is inconsistent with Dr. Fowdur's conclusion, based on Dr. Dranove's data, that 60% of the 126 Anthem national accounts she reviewed were sliced.  Fowdur Tr. 1347.

47

Finally, while aggregating the fourteen states when calculating market share may understate the local power of a particular regional carrier, it does not give an inaccurate picture of the overall conditions in the national accounts market, and therefore, it does not fall short of the relatively flexible standard imposed by the Guidelines and the case law. Both Anthem and Cigna generate internal reports that discuss national accounts in the aggregate. *See, e.g.*, DX 697. Although the record shows that competitive conditions across the fourteen states may vary, *see* Mathai (Anthem) Tr. 1263,1270, some oversimplification is inevitable when defining a geographic market, *see* Guidelines § 4.0, and aggregating across the fourteen states will provide a useful measure of the competitive impact of this acquisition in the territory in which Anthem and Cigna compete most directly. Therefore, plaintiffs have established the existence of both a relevant product and geographic market.[12]

### B. Market share and concentrations in the relevant market establish the presumption.

Having defined the relevant market, the next step in analyzing the prime facie case is to calculate the market share and level of concentration in the market. *Heinz*, 246 F.3d at 716; Guidelines §§ 5.2–5.3. The level of concentration in a market "is a function of the number of firms in a market and their respective market shares." *Staples II*, 190 F. Supp. 3d at 128, quoting *Arch Coal*, 329 F. Supp. 2d at 123.

---

12      Ultimately, Dr. Fowdur's theory that reducing the number of employees to 3000 or 1000, or disaggregating the states, would radically alter the picture and reveal the strength of numerous smaller market participants, was not borne out by the evidence introduced in Phase II. Since the allegations in the second phase of the trial concerned all large group employers, the market share data that was introduced related to employers with as few as 50 or 100 employees, and tightly drawn geographic regions. Yet the dominance of the four national carriers, and therefore, the level of market concentration that would exist in the wake of a merger of two of them remained striking in the majority of plaintiffs' thirty-five sample markets. *See* PDX 28; PX 751; Dranove Tr. 3719–23.

Merger law "rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *FTC v. PPG Indus.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986). Market concentrations above certain levels are thought to raise the likelihood of "interdependent anticompetitive conduct." *Id.* A merger that produces "a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363–64 (holding that "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat").

The Herfindahl-Hirschmann Index ("HHI") is a formula used by the U.S. Department of Justice Antitrust Division and the Federal Trade Commission to employ market shares to calculate the level of concentration in a particular market. *See* Guidelines § 1; *Staples I*, 970 F. Supp. at 1081 n.12. "The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market." *Heinz*, 246 F.3d at 716 n.9.[13] According to the 2010 Horizontal Merger Guidelines, a post-merger market is "highly concentrated" when the HHI is 2500 or greater. Guidelines § 5.3. Further, if the HHI increases by more than 200 points as the result of a merger, the merger is "presumed to be likely to enhance market power," Guidelines § 5.3, and is presumptively unlawful. *H & R Block*, 833 F. Supp. 2d at 71–72; *see also Heinz*, 246 F.3d at 716

---

[13]    For example, a market with four firms having market shares of 45%, 30%, 18% and 7% has an HHI of 3298 ($45^2 + 30^2 + 18^2 + 7^2$). If the firms with 18% and 7% market shares were to merge, the new HHI would be 3550 ($45^2 + 30^2 + 25^2$), so the HHI would increase by 252 points (3550 - 3298). *See Heinz*, 246 F.3d at 716 n.9.

("Sufficiently large HHI figures establish the [plaintiffs'] prima facie case that a merger is anti-competitive.").

While economic measures play a role in antitrust analysis, plaintiffs "need not present market shares and HHI estimates with the precision of a NASA scientist. The 'closest available approximation' often will do." *Sysco*, 113 F. Supp. 3d at 54, quoting *PPG Indus.*, 798 F.2d at 1505. This makes sense because as the President of Anthem Virginia cautioned, "[i]t's very difficult to track market share or to have an accurate market share estimate in health insurance, because it's difficult to know which market segment customers are in; and it's difficult to know what the entire population is, which you need for the denominator in order to calculate market share." King (Anthem) Tr. 3041.

### 1.      Plaintiffs' expert's calculations

Dr. Dranove calculated the market shares and HHI for the national accounts market in the fourteen Anthem states based largely on the data gathered during the Antitrust Division's investigation. The Department of Justice issued twenty-eight Civil Investigative Demands ("CIDs") to health insurance carriers and received twenty-six responses. *See* Dranove Tr. 1102–03. To determine market shares, Dr. Dranove used carrier enrollment numbers, which is how carriers determine their own market shares. *See* Dranove Tr. 1107–08; PX 36. Since some industry participants define national accounts purely based on number of enrollees and others include a geographic requirement, *see, e.g.*, PX 36; Abbott (WTW) Tr. 157–58, Dr. Dranove calculated market shares two ways: based on enrollment in plans sponsored by employers with more than 5000 employees ("NA5") and based on enrollment in plans sponsored by employers with more than 5000 employees and at least 5% of members residing outside of the state with the largest proportion of employees ("NA5G"). Dranove Tr. 876–78. Since both definitions are

consistent with how the industry defines the term, Dr. Dranove ran the numbers both ways as "a robustness check" to ensure accuracy.  Dranove Tr. 878.

The numerator in Dr. Dranove's individual market share fraction is each carrier's number of national account enrollees who reside within the geographic market.  Dranove Tr. 884–88.  In calculating Anthem's market share, he combined Anthem's enrollees in the fourteen states, Anthem's home lives, with the enrollees of other Blues carriers located in the fourteen states, Anthem's host lives.[14]

The denominator in Dr. Dranove's market share fraction is an estimate of the total number of national account enrollees who reside in the geographic market.  Dranove Tr. 888.  Dr. Dranove used two alternatives data sets to generate a denominator.  The first set identified was potential enrollees based on publicly-available census data.  Dranove Tr. 888.  Dr. Dranove used this approach to capture small regional insurers that did not receive or respond to the CIDs and therefore did not appear in the data collected by the government.  Dranove Tr. 889–90.  Dr. Dranove called this the census approach.  Dranove Tr. at 888 ("There's a lot of different data reported in a number of different censuses . . . that allows one to estimate the total number of enrollees in a given geographic area who work for large employers.  And so, I took the combination of the data from these different censuses to estimate the total size of the national accounts market in the Anthem footprint . . . .").  The second approach was to generate a sum derived from the enrollment data produced to the United States by the twenty-six insurers that responded to the CIDs.  Dranove Tr. 890–91.  This group included the four national carriers, many of the other

---

14      Dr. Dranove made an exception for Blue Shield of California, which competes against Anthem in California under a separate Blue Shield license, and is therefore treated as a distinct competitor from Anthem in calculating market shares.  Dranove Tr. 883–84.

Blues, and several major regional carriers, including Humana, Kaiser, Harvard Pilgrim, and Health Net. *Id.* at 891; *see* DDX 2. Dr. Dranove called this the build-up approach. Dranove Tr. 890–92.

To include the largest possible number of market participants in his denominator, Dr. Dranove used the larger of the sums derived from the two approaches, which in five of the six calculations turned out to be the build-up method total. Dranove Tr. 891–92, 1115. He described this as a "conservative approach" since a larger denominator would result in "smaller estimated market shares and smaller estimated measures of market concentration." Dranove Tr. 891–92.

Armed with these numbers, Dr. Dranove calculated market shares for the national accounts market in the fourteen Anthem states and concluded that the market shares that would result from the merger would be presumptively anticompetitive. Dranove Tr. 940. For the NA5 definition of national accounts with 5000 employees that does not include a geographic component, Anthem's share combined with the lives of other Blues carriers in the Anthem states is 41%, and Cigna's share is 6%, so their combined market share would be 47%. Dranove Tr. 899; PDX 5.

Looking at the NA5G definition of national accounts that includes the geographic element, Anthem's share is 40%, Cigna's share is 8%, and their combined share would be 48%. Dranove Tr. 899; PDX 5.

Dr. Dranove also calculated the merging companies' share of the national accounts market for ASO products alone – "[w]ithout speculating on whether ASO constitutes [a] well-defined market, because [he] did not do the SSNIP test specifically to ASO . . . ." Dranove Tr. 899. He found that the post-merger shares would be even higher than with ASO and fully-insured plans in combination: a post-merger combined share of 54% using the NA5 data, and 50% using the NA5G (geographic spread) data. Dranove Tr. 899–900; PDX 5.

Dr. Dranove used these market shares to calculate market concentration using the HHI, and he concluded that the concentration resulting from the merger would be presumptively anticompetitive. *See* Dranove Tr. 940. According to the Merger Guidelines, market concentration in excess of HHI over 2500 is a highly concentrated market and is presumed to be anticompetitive, and an increase in market concentration of 200 or more will also trigger the presumption. Guidelines § 5.3.

For national accounts using the NA5 definition – based solely on the number of employees – the post-merger HHI will be 3000, and the increase in HHI is 537. Dranove Tr. 898–99, 941; PDX 5.

For the NA5G national accounts with 5000 employees, 5% of whom reside outside the state where the employees are most concentrated, the post-merger HHI will be 3124, with an increase in HHI of 641. Dranove Tr. 899, 941; PDX 5.

The post-merger HHIs for the market for the sale of ASO products alone were even larger than with ASO and fully-insured combined. Dranove Tr. 899–900, 941; PDX 5 (showing for NA5 a post-merger HHI of 3663 and an increase of 771 and for NA5G a post-merger HHI of 3675 and a change of 880).[15]

All of these numbers are well over the presumptive limits in the Merger Guidelines.

## 2.  Defense experts' critiques

Anthem criticizes Dr. Dranove for doing a market share calculation in the first place, asserting that the Horizontal Merger Guidelines recommend using tools other than market share,

---

15      Dr. Dranove also calculated market shares and the HHI with looking at Anthem's share alone, without combining it with any host lives covered by the other Blues. He testified that "the merger would still put the market concentration above the presumptive threshold [and] . . . the [change in] HHI would also still be above the presumptive thresholds." Dranove Tr. 1169.

such as econometrics, diversion ratios, and merger simulation models, to assess the competitive effect of a merger in an industry involving differentiated products. *See* Willig Tr. 2164–66. The Guidelines do recommend using those tools to look at competitive effects, Guidelines § 6.1, but at this stage of its analysis, the Court is not assessing the competitive effect of the merger. It is only assessing whether plaintiffs have made out a prima facie case.

The Merger Guidelines make clear that calculating market shares and applying them in the HHI is a predicate step to determining whether agencies need to investigate a potential merger further.

> [The HHI] thresholds . . . provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration. The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood that the Agencies will request additional information to conduct their analysis.

Guidelines § 5.3. Further, controlling authority provides that "[s]ufficiently large HHI figures establish the [plaintiffs'] prima facie case that a merger is anti-competitive." *Heinz*, 246 F.3d at 716. So it was entirely proper for Dr. Dranove to begin with market shares and an HHI analysis.

Anthem also raises a number of concerns about how plaintiffs' economist went about calculating the shares. Dr. Willig testified that combining the enrollment of Anthem and the other Blues improperly overstates the competition between Anthem and Cigna and inflates the share of the post-merger entity. Willig Tr. 2213–14. But as was the case with the objection to the use of the 5000 employee cut-off, or the consideration of both ASO and fully-insured plans in one market, the refutation of the defense expert's criticisms can be found in Anthem's own files.

First of all, Anthem counts these lives itself. Anthem covers the home lives within its territory and receives income from the other Blues for allowing their members – the host lives – to

access the Anthem network, and when analyzing its national accounts enrollment, it takes both

sets of lives into account.  Kertesz (Anthem) Tr. 559; PX 63 (Anthem internal document tracking

national account market shares for United, Cigna, Aetna, and "BCBS"); *see also* PX 494 (Anthem

document reporting combined market share of "We the Blues"); Martie (Anthem) Dep. 190 (when

an Anthem business record refers to the national accounts market as "Blue, UHC, Aetna, and

Cigna," "Blue" means "Blue plans, wherever they competed").

Second, the Blue network is an integral part of Anthem's ability to win and woo national

accounts and the source of Anthem's greatest competitive strength:  its discounts.  The evidence

shows that Anthem and the other Blues work together to win national business; as the company

stated in litigation in another court:  "[a]bsent cooperation, Blue Plans could not effectively service

(and thus would not  compete effectively) for national employers . . . ."  *See* PX 216 (discussed at

Swedish Tr. 233).  It is the combination of Blue networks that enables Anthem's customers to

obtain a single national network for their employees.  *See* PX 216; Swedish Tr. 233 ("BlueCard

also allows multi-state employers to gain access to multiple Plans' networks in a single transaction

rather than cobble together the needed coverage.").  And the discounts Anthem can offer, no matter

where the customer's employees reside, factor prominently into any Anthem bid for a national

account.  *See* Abbott (WTW) Tr. 90, 107–08; PX 310, 494.

A key selling point, according to Anthem's Ken Goulet, is that Anthem is offering its own

assets plus the Blues' networks.  Goulet (Anthem) Dep. 117 (if Anthem decides it is competitively

necessary to do so, "we will go out and just offer a zero trend guarantee.  What customer wouldn't

want to avoid future trends by switching to Anthem and Blue Cross Blue Shield networks and

that's what we instituted in 2014").  Certainly industry participants view them in tandem, often

lumping them together as "the Blues" or referring to the four national carriers as "BUCA" – Blues,

United, Cigna, and Anthem.  *See, e.g.*, Kilmartin (Mercer) Dep. 122–23 (if multistate employers want a single carrier, "[t]ypically it falls back to Cigna, United, Blue Cross and Aetna").  Given this evidence, the Court holds that it was appropriate for Dr. Dranove to combine the Blues when calculating market shares.

Dr. Willig testified that using the build-up method improperly excluded many competitors.  Willig Tr. 2219–20 (stating "the 26 CIDs understates the market because it leaves out hundreds of market participants," including all TPAs).  But while the Merger Guidelines consider "[a]ll firms that currently earn revenues in the relevant market" to be "market participants," Guidelines §5.1, they permit market concentration to be measured using the "significant competitors" in the market, particularly "when there is a gap in market share between significant competitors and smaller rivals . . . in the relevant market."  Guidelines § 5.3.

There is no dispute that many healthcare insurance carriers and TPAs in the market did not receive CIDs from the government.  But the evidence at trial showed conclusively that there are not hundreds of participants gaining any significant traction in the national accounts market, and that the Big Four carriers are by far the most significant competitors for national accounts.  *See* PX 63 (internal Anthem document showing that the Big Four account for more than 80% of the market for commercial health plans sold to national accounts); *see* section I.A.1.c.2)b) above.

Anthem, Cigna, Aetna, and United were among the twenty-six companies that responded to CIDs, so they were included in Dr. Dranove's buildup method.  Dranove Tr. 891; DDX 2.  The CID data included the company generally viewed as number five on the national scene, or at least, a particularly strong regional company:  Humana.  The buildup method also included data from Kaiser and Harvard Pilgrim, the key carriers that came up most often in testimony as strong regional forces.  According to Dr. Dranove, adding the regional firms' membership to the

denominators understated the national carriers' market shares across the Anthem territory since Kaiser and Harvard Pilgrim only compete for national accounts in their limited geographic areas. Dranove Tr. 891–92, 894.  But they were included nonetheless.  Since the buildup denominators account for the most significant carriers, as required by the Merger Guidelines, § 5.3, and they go even further to include an additional twenty-two carriers, the Court holds that Dr. Dranove's methodology appropriately measured market concentrations.   Dr. Dranove tested his results against the census data, and that examination did not expose the presence of a major competitor that had not been accounted for.  Use of the 26 CIDs was not only appropriate as a matter of practice, but it leads to a conclusion that is entirely consistent with the ordinary course evidence and testimony of market participants.[16]  The build-up approach was conservative, if not outright generous, and if anything, it understated the power of the two merging parties.

Dr. Fowdur stated that the calculations fail to account for slicing, and therefore, Dr. Dranove overstated the merging parties' market share. Fowdur Tr. 1349–51.  The economist added that her own analysis of 126 Anthem and Cigna national accounts revealed that 40% were sliced with Kaiser and about 15% are sliced with other carriers.  Fowdur Tr. 1349–51.  But Kaiser was included in the CID data along with the other logical slice recipients.  Dr. Dranove testified that his review of Anthem's internal data showed that when national accounts sliced, "they almost always sliced to the big four."  Dranove Tr. 2254–56.  This is borne out by a review of the company's Salesforce records depicting all of Anthem's national account slice business.  DX 697.

The data available on this issue for the economists to analyze may have been imperfect with respect to the smallest participants in the market,  but given that "scientific precision" is not

---

16      While plenty of industry witnesses agreed that TPA's exist, none supplied evidence of anything other than anecdotal evidence of their connection to a handful of national accounts.  Thus, they appeared to be "significant" competitors in this market only to defendants' economists.

required in calculating market shares, *Conn. Nat'l Bank*, 418 U.S. at 669, Dr. Dranove's market shares and market concentration figures include the significant competitors, and the expert analysis fairly reflects the actual business conditions, defendants' concerns do not undermine Dr. Dranove's conclusions.[17]

### C. Evidence of price effects supports the prima facie case.

Dr. Dranove was asked to consider whether the merger would lead to "static harm," that is, effects on prices, as well as "dynamic" or long term effects, such as impacts on quality or innovation. As part of his economic analysis then, in addition to calculating market share and concentration, he conducted a merger simulation to analyze the merger's likely effects on price in the relevant market. *See* Dranove Tr. 956–57; *Sysco*, 113 F. Supp. 3d at 67 (evidence of a merger's likely price effects through economist's merger simulation "strengthen[ed] the FTC's prima facie case"); *H & R Block*, 833 F. Supp. 2d at 88 (stating that merger simulations have "some probative value in predicting the likelihood of a potential price increase after the merger").

Based upon several different economic analyses, Dr. Dranove concluded that the merger will lead to static harm in the Anthem states in the form of higher health insurance premiums and ASO fees. Dranove Tr. 844–45. His merger simulation resulted in a calculation of $219.7 million of static harm in the fourteen Anthem states. Dranove Tr. 845, 959–60. Using an Upward Pricing Pressure (UPP) analysis, Dr. Dranove predicted static harm totaling $383.8 million. *Id.* And when he performed the UPP analysis again, this time incorporating the fact that win/loss data suggests

---

17      Dr. Willig also testified that Dr. Dranove's census method is improper because the census number was lower than the buildup number in five out of six of Dr. Dranove's calculations, which suggests that census-based denominators understated the total market size. Willig Tr. 2219; *see also* Fowdur Tr. 1330–31. But if even both sets of data were imperfect, the fact that they mirrored each other is important.

that Anthem and Cigna are close competitors, the exercise led to a total of $930.3 million in static harm in the relevant market.  *Id.*

Anthem's expert, Dr. Israel, criticized Dr. Dranove's merger simulation and UPP model because they focus on the fees to be charged by the newly formed carrier for claims administration services and do not account for any of the savings in medical costs that Anthem claims will flow to the customers from its greater network discounts.  Israel Tr. 1867–69.  He informed the Court that if just 33% of the medical cost savings he had calculated were factored into Dr. Dranove's model, the merger would turn out to be procompetitive.  Israel Tr. 1867, 2012–13.  Dr. Israel then described his own merger simulation.  It was performed considering all large group employers, not just the national account customers which the Court has found to comprise the relevant market, because the witness rejected the distinction.  Israel Tr. 2017.  He reported his conclusion that in the fourteen Anthem states, the merger would result in a net average cost of care savings of $4.50 per member per month ("PMPM"), or $1.5 billion in net consumer benefits.  Israel Tr. 2017–19; DDX 15.  He explained that the savings would apply to all 27 million ASO customers in the Anthem states, not only those that choose the new company, because his models "take into account that . . . a stronger Anthem or Cigna will put more competitive pressure on United and Aetna."  Israel Tr. 2018.  When he limited the analysis to the national account market, he found that the merger would remain procompetitive, and he predicted a total PMPM cost savings of $5.04.  Israel Tr. 2025–26; DDX 15.

All of Dr. Israel's calculations assume that it is appropriate to factor in differences in provider rates obtained by Anthem and Cigna for members in their networks.  So his entire critique of Dr. Dranove's conclusions rises and falls with Anthem's efficiencies defense, which the Court rejects for a number of factual and legal reasons in section IV below.

There were also more nuanced differences in the manner in which each expert structured his analysis, but regardless of the particular methodology employed, both economists found that the merger will result in some level of anticompetitive effects if one sets the medical cost savings aside.  Dranove Tr. 2285–86, 2295 ("[B]oth approaches predict there will be price effects in the absence of substantial efficiencies."); *see also* Israel Tr. 2017–19 (medical cost savings were balanced "against the loss of Anthem/Cigna competition").  Therefore, plaintiffs' evidence of price effects bolsters the presumption created by the market shares and market concentration evidence, and plaintiffs have established their prima face case.

## II.   Defendants have come forward with evidence to rebut the prima facie case.

Because plaintiffs have established the prima facie case, the Court must next determine whether defendants have presented evidence to rebut the presumption that the likely effects of the merger will be anticompetitive.  The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low.  *Baker Hughes*, 908 F. 2d at 991, quoting *Phila. Nat'l Bank*, 374 U.S. at 363 (defendants are not required to "'clearly' disprove anticompetitive effect," but rather to make merely "a 'showing'").

Defendants may rebut the presumption either by "affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor."  *Id.*; *see also Heinz*, 246 F.3d at 715; *Citizens & S. Nat'l Bank*, 422 U.S. at 120.  They may rely on "[n]onstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences . . . ."  *Heinz*, 246 F.3d at 715 n.7, quoting *Kaiser Aluminum*, 652 F.2d at 1341.  To rebut the presumption established by the government's prima facie case, Anthem presented evidence on a number of relevant issues.

**Competition between Anthem and Cigna:**  The defense presented evidence to show that United, not Cigna, is Anthem's closest competitor for national accounts and that Cigna competes more directly with Aetna.  *See, e.g.*, Curran (Def. Counsel) Tr. 53, 2703–04; Kendrick (Anthem) Tr. 1198 (United is "clearly [Anthem's] most formidable competitor"); Schell (Anthem) Dep. 233 (Anthem's closest competitor for national accounts business is United); Goulet (Anthem) Dep. 97, 108–11 (United and Anthem have the best discounts and  United is a "formidable competitor" for national accounts business, while Aetna and Cigna are "second tier" competitors); DX  35 (internal win/loss data); Manders (Cigna) Dep. 207 (Aetna's "value proposition historically has been more aligned to [Cigna's]" and thus Aetna has been one of the hardest competitors for Cigna because they are "more similar to [Cigna] than others").

Anthem also presented economic testimony to show that Cigna is not Anthem's closest competitor.  Dr. Israel conducted a diversion analysis and testified that the level of direct competition between the merging parties for national accounts is smaller than their market shares would imply.  Israel Tr. 1995–96; DDX 15.

**Customer sophistication and bargaining power:**  The defense presented evidence that national accounts have the level of sophistication to thwart any effort by the merged company to raise prices.  National accounts rely upon experienced and sophisticated consultants to advise them, and they are well-informed about industry trends, and pricing in the marketplace, and the array of competitive offerings, including non-carrier options.  Abbott (WTW) Tr. 64–66, 155; Kendrick (Anthem) Tr. 1212–13; Fowdur Tr. 1360; Thackeray (Cigna) Tr. 751.

**New entrants and expansion:**  The defense presented evidence that new entrants in the market will also constrain the ability of the merged company to increase prices.  It showed that some existing regional competitors compete for national accounts or slices of national account

61

business, and that they are expanding or seeking to expand.  *See* Fowdur Tr. 1319–20; Gray (Key

Benefit Administrators) Dep. 43–44; Edwards (HealthSCOPE Benefits) Dep. 54.  Witnesses also

offered proof that TPAs, provider-sponsored plans, and other firms have recently entered the

market or are expanding their existing share.  *See* DX 2 (showing that twenty-five new PSPs

entered in sixteen states between 2012 and 2014); Batniji (Collective Health) Dep. 85–86; DX 19

(identifying acquisitions by a TPA to facilitate its expansion beyond its existing geographic

region).  They also presented evidence that some of these entities have been successful in securing

national accounts business:  some TPAs have won some national accounts,  Schumacher (United)

Dep. 305; Kendrick (Anthem) Tr. 1197; providers, such as hospital systems, have teamed with

health plans to offer their own provider networks to national accounts, Henderson (Innovation

Health) Dep. 26–27; Spooner (Tufts Health Plan) Dep. 36, 155–56; and some very large national

accounts have bypassed insurance carriers altogether by directly contracting for certain services.

Bisping (Caterpillar) Dep. 12–13; McHugh (HTA) Dep. 13–1, 19–20, 40–42; *see also* Batniji

(Collective Health) Dep. 58–61, 63–64; Hatch (AmeriBen) Dep. 21–22; Edwards (HealthSCOPE

Benefits) Dep. 15, 87; Horvath (CoreSource) Dep. 63; *see also* section III.D.4.  Defendants also

showed that other specialized entities, innovators, or "niche players" are competing for portions

of the services that the major carriers offer to national accounts.  *See* Thackeray (Cigna) Tr. 746–

47, 760; *id.* at 748–49 (Quantum and Accolade are beginning to offer utilization management

services); *see also* DX 2 (BCBS presentation on emerging competitors and market innovators).

And, as discussed above, Dr. Fowdur testified that her critical loss calculation shows that the mere

presence of the other national competitors, along with the additional regional and newly emerging

competitors, will impose price discipline on the market since customers can slice, or even simply

threaten to slice or move their business entirely.  Fowdur Tr. 1319–20, 1324, 1330, 1361–63 (bluffing "imparts competitive discipline").

To demonstrate the ease of entry into the marketplace, the defense presented evidence about the legal and regulatory requirements for serving ASO customers.  *See* Gray (Key Benefit Administrators) Dep. 43–44, Edwards (HealthSCOPE Benefits) Dep. 54; Major (UCHealth) Dep. 76–78.  The defense presented testimony that fully-insured plans can receive state regulatory approval in less than a year, *see* Spooner (Tufts Health Plan) Dep. 79–80; Roberts (Harvard Pilgrim) Dep. 114, and that provider networks can be rented or created within a few months to a year.  Fowdur Tr. 1336; Archer (HealthSmart Benefit Solutions) Dep. 140–41; Bierbower (Humana) Tr. 836.

**Innovation:**  The defense presented evidence in an effort to show that the merger will enhance innovation.  Beginning with Joe Swedish, the Anthem witnesses touted Anthem's leadership in innovation, particularly in the fields of value-based and accountable care.  Swedish Tr. 295–96; Drozdowski (Anthem) Tr. 1670; Kendrick (Anthem) Tr. 1200–01 (discussing Anthem's innovation laboratory in Atlanta); *see also* DX 106; DX 155.  Anthem's economist testified that after the merger, the new company will have increased incentive to continue innovating.  Israel Tr. 2032–33 (the merged company will be a stronger competitor with "more opportunity to recoup the investments in innovation . . . [because] their innovations become more profitable").  This would be consistent with the trend across the industry towards value-based care and provider collaborations, DX 362 (Kaiser document on growth of ACOs and provider-owned health plans);  Austen (MVP Health Care) Dep. 31–33 (discussing plans to increase value-based reimbursements), and the need to respond to the new entrants offering innovative programs to national accounts.  Fowdur Tr. 1353–54; Guptill (Kaiser) Dep. 103–04 (non-traditional players

such as UberHealth, CVS Health, and Walmart are launching "consumer friendly tactics that have the potential to disrupt traditional care of delivery models"); *id.* at 117–18 (providers such as Inova, MedStar, Johns Hopkins, and Sentara, that have or are developing insurance products).

Anthem also presented evidence of efficiencies to be discussed in greater detail in section IV below.  Applying the *Baker Hughes* burden-shifting rubric, the Court finds that the defense has rebutted the presumption that the merger will likely result in anticompetitive effects in the market, and the burden of persuasion shifts back to plaintiffs.

## III.    Plaintiffs have carried their burden to establish that the merger is likely to harm competition.

The Supreme Court has adopted a "totality-of-the-circumstances approach to the statutes, weighing a variety of factors to determine the effects of particular transactions on competition." *Baker Hughes*, 908 F.2d at 984.  These factors may include:  ease of entry in the marketplace, the significance of market shares and concentration; the likelihood of express collusion or tacit coordination; prevalent marketing and sales methods; the absence of a trend toward concentration; industry structure; any weakness of the data underlying the prima facie case; elasticity of industry demand, product differentiation; and the prospect of efficiencies from the merger.  *Id.*

Courts examine two types of effects that may arise from mergers:  coordinated effects and unilateral effects.  Coordinated effects refer to markets with few competitors, in which firms may "coordinate their behavior, either by overt collusion or implicit understanding in order to restrict output and achieve profits above competitive levels."  *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014), quoting *H & R Block*, 833 F. Supp. 2d at 77.  An example of this would be parallel pricing by two gas stations located across the street from each other in a remote small town.  *Id.* at 568–69.  Unilateral effects refers to a merger's elimination of competition between the two merging companies, which "may alone constitute a substantial lessening of

competition." *Id.*, quoting Guidelines § 6.  "The most obvious example of this phenomenon is a 'merger to monopoly' – *e.g.*, where a market has only two firms, which then merge into one – but unilateral effects 'are by no means limited to that case.'" *Id.*, quoting Guidelines § 6.

Relevant evidence of a merger's potential unilateral effects include the merging companies' ordinary course of business documents, testimony of industry participants, and the history of head-to-head competition between the two merging parties.  *See, e.g.*, *Staples II*, 190 F. Supp. 3d at 131–33; *H & R Block*, 833 F. Supp. 2d at 73–75, 81–82; *Heinz*, 246 F.3d at 717–18; *Swedish Match*, 131 F. Supp. 2d at 169–70.

The Court finds that the merger will have the anticompetitive effects of eliminating direct competition between the two firms, reducing the number of national carriers from four to three, and diminishing innovation, and that new entrants and other market conditions identified by the defense are not sufficient to forestall price increases and ameliorate these effects.

### A.    The merger will have the unilateral effect of eliminating the existing head-to-head competition between Anthem and Cigna.

The Horizontal Merger Guidelines advise that "[u]nilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice."  Guidelines § 6.1.  But "mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *Staples II*, 190 F. Supp. 3d at 131; *Staples I*, 970 F. Supp. at 1083 (holding that "the elimination of a particularly aggressive competitor in a highly concentrated market [is] a factor which is certainly an important consideration when analyzing possible anti-competitive effects").  And this is true even where the merging parties are not the only two, or even the two largest, competitors in the market. *Aetna*, 2017 WL 325189, at *29; *see also Sysco*, 113 F. Supp. 3d at 62; *Heinz*, 246 F.3d at 717–19; *H & R Block*, 833 F. Supp. 2d at 83–84.

65

Given this standard, Anthem's insistence that United, not Cigna, is its "closest" competitor, is beside the point. The acquired firm need not be the other's closest competitor to have an anticompetitive effect; the merging parties only need to be close competitors. *Staples II*, 190 F. Supp. 3d at 131; *see also* Guidelines § 6.1 ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition.").

The evidence in this case, including Anthem records and testimony from Anthem witnesses, firmly establishes that United, Cigna, Aetna, and the Blues compete against each other for national accounts, and that together, they dominate the market. *See* PX 63 (internal Anthem document reporting that BCBS, United, Cigna, and Aetna have 83% of the market share for commercial health plans sold to national accounts); PX 121 (Anthem affiliate WellPoint document describing market as "consolidated"); Abbott (WTW) Tr. 109–11; Martie Dep. 177–81, 186, 189–91, 193–200; PX 259; Guilmette (Cigna) Dep. 187–88; Mascolo (Wells Fargo) Dep. 156–57.

But insurance products are not sold off-the-shelf to every customer for a single price; health benefits coverage sold to national accounts is a "differentiated product," and the carriers compete by submitting bids to individual customers.  Therefore, both sides engaged in economic analyses to ascertain what the level of direct competition between Anthem and Cigna has been within the tightly packed national accounts environment. *See* Guidelines § 6.1 (in differentiated product industries, "the extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects").

Dr. Dranove conducted a diversion analysis, which is used in markets with differentiated products, to examine the level of competition between merging companies.  Dranove Tr. 2257–80.  He explained that customers buying group health insurance are "trying to play the top bidders against each other," economists consider the procurement process for group health insurance to be

what the Guidelines and economists refer to as an "auction," and this means that this merger will affect competition most significantly when Anthem and Cigna are both among the top bidders. Dranove Tr. 2280–84.

For that reason, Dr. Dranove analyzed the company's internal data to first isolate the occasions when the two companies had been the top two bidders for any national account's business and then determine how often each won or lost against the other in that situation. *See* Dranove Tr. 2280–81.[18] He then compared the data to the market shares he had calculated for the prima facie case.

Dr. Dranove looked first at situations when the merging companies lost business to each other. He determined that the market shares for national accounts in the Anthem territories indicate that Anthem should win 44% of the contracts where Cigna is the incumbent and loses. Dranove Tr. 952–53; PDX 5. But Cigna's internal win/loss data showed that Anthem wins those contracts more than the market shares predicted: Anthem won 60% of those solicitations. Dranove Tr. 952–53 (using Cigna's SalesForce.com win/loss data from 2011 to 2017); PDX 5.

Similarly, the market shares indicated that Cigna should win "about 10 percent" of the contracts when Anthem is the incumbent and loses. Dranove Tr. 953–54; PDX 5. But Anthem's internal win/loss data showed that Cigna won "about 17 percent" of those sales. Dranove Tr. 953–54 (using Anthem's iAvenue win/loss data); PDX 5.

---

18    Dr. Dranove testified that each company tracks when it wins or loses business and who the incumbent is when it bids for business, but they do not track when they were the top two bidders for an account. Dranove Tr. 2281–82, 2285. To approximate that information, Dr. Dranove narrowed the competitive situations he analyzed to those situations where Anthem was the incumbent and a customer switched away to Cigna and vice versa. *Id.* at 2281–82. He reasoned that if Anthem or Cigna "bid and lost and they were the incumbent, they were more likely to be second and third than they were to be fourth and fifth" since ordinarily, "the incumbent doesn't lose because it's not well-liked" but "because somebody jumped over them." *Id.* at 2285.

Looking at situations when the merging companies won business away from each other, Dr. Dranove testified that market shares predict that Cigna should have won business from Anthem 44% of the time.  Dranove Tr. 954; PDX 5.  But Cigna's data showed that when Cigna wins an account, it does so about 54% of the time from Anthem.  Dranove Tr. 954–55 (using Cigna SalesForce.com win data from 2011 to 2017); PDX 5.  And looking at Anthem's wins, its market share for national accounts would give rise to the prediction that 11% of the wins would be in situations where Cigna was the incumbent and lost.  Dranove Tr. 954–55; PDX 5.  But Anthem's data showed that when Anthem won a contract from an incumbent, Cigna was the incumbent almost 35% of the time.  Dranove Tr. 954–55 (using Anthem's SalesForce data from 2015 to 2017); PDX 5.  In sum, the data showed that Anthem and Cigna are winning business from and losing business to each other more than their market shares would predict.

Given these results, Dr. Dranove concluded that his HHI calculations – which are dramatic in and of themselves – actually understate the competitive significance of the merger, because the underlying market shares understate the closeness of competition between the merging firms. Dranove Tr. 953.

Not surprisingly, Anthem's expert conducted a diversion analysis that reached the opposite conclusion:  the level of competition between the merging parties for national accounts is smaller their market shares imply.  Israel Tr. 1995–96 (referencing DDX 15).  To calculate his diversion ratios, Dr. Israel matched Anthem's and Cigna's bid information from 2015 and 2016 to identify instances in which both companies bid.  *Id.* at 1995, 2004.  Using each company's win/loss bid data and customer lists, he calculated how often Anthem and Cigna lost a solicitation that the other company won.  *Id.* at 1995, 1997 (referencing DDX 15).

Dr. Israel testified that if Anthem and Cigna were particularly close competitors, then when they both bid for an account, Anthem would be expected to lose more frequently to Cigna than the rate implied by Cigna's overall market share and, similarly, Cigna should lose more frequently to Anthem than the rate implied by Anthem's overall market share. *See* Israel Tr. 1996. But his diversion ratio calculations found that they lost to each other less frequently than the market shares would suggest. *Id.* at 1996.

Dr. Israel's diversion analysis also examined each company's pricing patterns to discover whether one reacted to the presence of the other as a competitor by offering more competitive ASO bids. Israel Tr. 2006–07. He concluded that Anthem's presence or absence as a competitor on a given bid had no statistically detectable effect on Cigna's bids, and that the same was true for Anthem's bids with respect to Cigna's presence. *Id.* at 2007. So, he found that the loss of direct competition between the two would have little or no effect on the merged company's bids. *Id.* at 2007–08.

In addition, Dr. Israel searched Anthem's data to cull out the competitive situations in which Anthem must have viewed Cigna as a particularly weak competitor because Cigna's discounts were six to eight percentage points lower than Anthem's. Israel Tr. 2010–11. He explained that if Cigna were a close competitor, Anthem would be expected to raise its price when Cigna's discounts were not competitive to its own. Israel Tr. 2011. But he found that Cigna's competitiveness on the discount factor had no statistically significant effect on Anthem's bid. Israel Tr. 2011.[19]

---

19     This analysis does not take into account the fact that even with its discount advantage, Anthem has been forced to fend off Cigna not by lowering its ASO fees, but by offering trend guarantees or making other concessions. *See, e.g.*, Kertesz (Anthem) Tr. 575–76.

Each witness went to great lengths to discredit the other's economic evaluation of the intensity of the direct competition between the two companies.  As noted above, Dr. Dranove compared the RFP bidding situation to the economic model of an auction, *see, e.g.*, Dranove Tr. 943 ("[I]t's the competition between the two top bidders that ultimately drives the price."), while Dr. Israel favored the model of a negotiation.  Dr. Dranove maintained that Dr. Israel's negotiation model unrealistically assumed that customers would be armed with perfect knowledge about the carriers' actual costs and profit margins when responding to a bid, and that they would know "exactly how much the insurance company is willing to sell the product for."  Dranove Tr. 2291–93.[20]  According to Dr. Dranove, incorporating this assumption into the merger simulation meant that Dr. Israel's calculation "dramatically reduce[d] the amount of harm resulting from the price increases."  Dranove Tr. 2294.  Dr. Dranove also criticized Dr. Israel for failing to factor in incumbency, and the role that would play in the outcome of any solicitation.  Dranove Tr. 2281–82, 2284–85, 2415–16 ("There's a final two bidders in every single RFP . . . .  What's relevant for the win-loss is finding out when they are one and two.  As I've testified, we don't know who's two, so I conditioned on incumbency.").  In response, Dr. Israel insisted that it was important to consider all instances where one of the carriers bid and lost instead of just those situations when an incumbent was unseated.  He characterized Dr. Dranove's diversion analysis as a switching study that used too small a sample and inappropriately assumed that the incumbent was always the

---

20      In the Court's view, neither economic model provides a perfect analogy.  Dr. Dranove's criticism that customers would not have the level of information assumed in Dr. Israel's model has some force; notwithstanding the evidence that customers were aided by brokers who gather considerable intelligence concerning discounts and other factors, the notion that customers would be certain of a carrier's bottom line was not established by the evidence.  But there was testimony from brokers in Phase II to support Dr. Israel's supposition that at least in some instances, the customer may initiate another round of negotiation after the final two bids have been submitted and ranked.  *See, e.g.,* Hawthorne (Scott Insurance) Tr. 2992–93.

customer's second best option. Israel Tr. 2003–05. Meanwhile, Dr. Dranove observed that Dr. Israel's regression analysis, which was based on the ASO fees in Anthem bids, did not take into account occasions when Anthem may have made other concessions to improve its offer without reducing its fees. Dranove Tr. 2274, 2279.

Faced with these differences of opinion, the Court notes that these were both highly qualified and articulate economists. As Dr. Israel was wont to emphasize, he has been retained by the Department of Justice in other merger cases. *Sysco*, 113 F. Supp. 3d at 34. Putting aside the technical differences in the two approaches, one thing the diversion analyses had in common was that they were predicated on economic assumptions underlying the various methodologies, and not on the internal communications that shaped and chronicled these events in real time. And, here again, Anthem's ordinary course documents tell a consistent story that contravenes the firm's litigation position.

The documentary record shows that Anthem unquestionably competes directly and aggressively against Cigna for national accounts. *See* PX 47; PX 59; PX 62; PX 63; PX 77. In 2011, Anthem found itself losing national accounts to Cigna. *See* PX 138; *see also* PX 59 (internal email stating that Anthem needed to be more aggressive; "Aetna and Cigna should not exist"). In 2012, Anthem specifically set out to win national accounts from Cigna and Aetna by offering zero percent trend guarantees to customers moving to Anthem from either company. Kertesz (Anthem) Tr. 575–76; Martie Dep. 235 (Anthem was offering trend guarantees against Cigna pre-merger even though it already beat Cigna on cost); PX 62 ("[W]e will guarantee a 0% trend whenever replacing Cigna or Aetna."). And in 2014, Anthem encouraged this direct competition by offering "strategic alignment bonuses" to national accounts team members who were able to fully replace Cigna, Aetna, or United business with Anthem. Kertesz (Anthem) Tr. 578–79; *see also* PX 77

(March 2015 sales meeting:  "develop strategy to bury Cigna and Aetna in the national space");

Goulet (Anthem) Dep. 306 (Cigna was a competitor in provider collaborations and accountable

care relationships).  As late as February of 2016, Anthem's head of sales for national accounts

proclaimed, "we are viewing Cigna as a competitor until we are not."  PX 348.[21]  In light of this

evidence, and the considerable volume of material presented at trial that exposed the ongoing,

direct competition between Anthem and Cigna, the Court finds that Dr. Dranove's analysis is more

persuasive, and the merger will in fact result in the loss of head-to-head competition between Cigna

and Anthem for national accounts in the fourteen Anthem states.[22]

---

[21]     The Phase II evidence told similar story.  The Vice President and General Manager of California large group business exhorted her sales team to go after Cigna ("Wanted – Dead or Alive!") at both the 2015 and 2016 Annual sales and management workshops, as Cigna was identified as a top competitor and Cigna's level funded plan posed a "new competitive threat."  PX 548, PX 737; Rothermel (Anthem) Tr. 4123–28.

[22]     Because the Court is enjoining the merger on the basis of the national accounts market in the fourteen Anthem states, it does not need to consider and its decision does not turn on a finding related to the national accounts market for the entire United States.  The Court notes that while it does credit the testimony of Anthem representatives that they look forward to competing under the Cigna brand without needing to obtain a cede, *see* Kertesz (Anthem) Tr. 656 (it would be "exhilarating" to be a national plan that operates in fifty states); *see also* DeVeydt (Anthem) Tr. 1689, 1735–36; Mathai (Anthem) Tr. 1259, there is no question that merger will also eliminate some head-to-head competition in the thirty-six non-Anthem states as Anthem has historically sought cedes to sell to prospective customers headquartered there.  Dranove Tr. 992–93; PX 136 (discussing a potential cede); PX 56 (showing Anthem sought permission of Blue licensee to bid on account in non-Anthem state); PX 135 (showing Anthem sought the permission of Blue licensee in non-Anthem states to compete against Cigna).  It was also established that there are important aspects of Blue Cross Blue Shield Association membership – in particular, the mutuality and cooperation involved in the cedes, the potential for Blue Card revenue, and the best efforts rules – that redound to the benefit of the Association as a whole, and that these give rise to an inherent conflict of interest that could affect Cigna's competitive conduct in the 36 states.

**B.     The merger will reduce the number of significant competitors in the market.**

In light of the consolidation already present in the national accounts segment, the Court

also finds that reducing the number of national carriers from four to three is significant.  As the

Merger Guidelines explain:

> [a] merger between two competing sellers prevents buyers from playing
> those sellers off against each other in negotiations. This alone can
> significantly enhance the ability and incentive of the merged entity to obtain
> a result more favorable to it, and less favorable to the buyer, than the
> merging firms would have offered separately absent the merger.

Guidelines § 6.2.  The courts have echoed this assessment:  "[i]f two competitors merge, buyers

will be prevented from playing the sellers off one another in negotiations."  *Sysco*, 113 F. Supp.

3d at 61–62.

 Industry participants confirm that in this market in particular, the combination of Anthem

and Cigna will affect the solicitation of proposals and reduce the avenues for negotiation with the

bidder for national accounts.  Robert Burnell of Buck Consulting explained during his deposition

that once responses to proposals are received, the potential candidates are not immediately reduced

to the two lowest bidders; often, the bidders are first informed of how they are positioned compared

to all of the others, and they are encouraged to revise their proposals.  Burnell (Buck Consultants)

Dep. 144–46.  If one of the four major carriers exited the market, and another chose not to bid for

any reason, customers would lose "that interim step of where we tell them where they're ranked

and then try to push them down."  *Id.*; *see also id*. at 57–58 (stating "[t]he more vendors we have,

the more competitive . . . the responses are going to be"); Sharp (Aon Hewitt) Dep. 92–95

(discussing the importance of more competition at the RFP stage).

Reducing the number of national carriers from four to three also shrinks the number of

options available to be packaged and sold via the private exchanges, spreads the rent paid by TPA's

to gain access to networks over a smaller group, and decreases the number of potential joint

partners for the innovative "new entrants" in the industry, all of which serve to concentrate the market even further.

### C.     National account customer sophistication and bargaining power are not sufficient to ameliorate the anticompetitive effects.

In some cases, customer sophistication may avert the effects of a merger on competition in the relevant market.   *Baker Hughes*, 908 F. 2d at 986 (stating highly sophisticated customers can "promote competition even in a highly concentrated market"); Guidelines § 8 ("The Agencies consider the possibility that powerful buyers may constrain the ability of the merging parties to raise prices.").   However, "the presence of powerful buyers alone" is not presumed to prevent adverse competitive consequences from the merger.   Guidelines § 8.   "Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer."   *Id.*

As set forth above, the evidence established that national account customers are typically sophisticated companies with substantial resources, and that they benefit from the assistance and advice of brokers and consultants.   *See generally* Abbott (WTW) Tr. 63–66; 155, and section III.A above.   Plaintiffs do not appear to contest this proposition.   But as noted above, the evidence also shows that loss of one competitor from the four major carriers alters the RFP and negotiating dynamic, even with strong advocates on the other side.   This loss of leverage undermines the defense contention that customers will be able to wield their seasoned human resource managers and consultants to counteract the anticompetitive effects of the merger.

### D.     New entrants and expansion will not be a constraint on the new firm.

As part of the effort to predict the likely future effects of a merger, courts also consider the existence and significance of barriers to entry or expansion into the relevant market by new competitors:   "In the absence of significant barriers, a company probably cannot maintain

74

supracompetitive pricing for any length of time." *Baker Hughes*, 908 F. 2d at 987.  If barriers to entry are low, even "the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs." *Id.* at 988.

Entry or expansion into a relevant market must be "timely, likely, and sufficient in its magnitude, character, and scope" to counteract a merger's anticompetitive effects. *H & R Block*, 833 F. Supp. 2d at 73 (quoting Guidelines § 9).  Determining ease of entry requires "an analysis of barriers to new firms entering the market or existing firms expanding into new regions of the market." *CCC Holdings*, 605 F. Supp. 2d. at 47 (quoting *Cardinal Health*, 12 F. Supp. 2d at 55). Defendants bear the burden of demonstrating ease of entry into the relevant market. *See Swedish Match*, 131 F. Supp. 2d at 170–71.

To be timely, "entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect" and "rapid enough that customers are not significantly harmed by the merger, despite any anticompetitive harm that occurs prior to the entry."  Guidelines § 9.1.

To be likely, entry must be "profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits." *Id.* § 9.2.  "The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future." *Cardinal Health*, 12 F. Supp. 2d at 56; *see also CCC Holdings*, 605 F. Supp. 2d at 47–49 (finding past entrants unpersuasive because they either were unsuccessful or gained only a small market share relative to defendants, among other reasons).  Also, "[r]eputation can be a considerable barrier to entry where customers and suppliers emphasize the importance of reputation and expertise," *CCC Holdings*, 605 F. Supp.

2d at 54–55, as can the expense of entry into a market that requires significant upfront investment. *See Sysco*, 113 F. Supp. 3d at 80.

Finally, to have the magnitude, character, and scope to counteract a merger's anticompetitive effects, the entry must "fill the competitive void that will result" if the merger proceeds. *Id.* Entrants must be significant enough to "compete effectively, *i.e.*, affect pricing," *CCC Holdings*, 605 F. Supp. 2d at 59, and be "of a sufficient scale to compete on the same playing field" as the merged firm. *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 430 (5th Cir. 2008).

The defense's evidence of entry does not outweigh the evidence of the merger's likely anticompetitive effects, and it particularly fell short in connection with the third factor. The defense did not produce persuasive statistical evidence of the significance of potential entry or expansion. Much of the information it presented was anecdotal, and not necessarily tied to the relevant geography. And what was presented established the mere existence, and not the growing market significance, of any of the alternatives to the major carriers. Plaintiffs, on the other hand, presented significant evidence, including from defendants' ordinary course documents, showing that at best, potential entrants nip at the heels of the Big Four in competing for national accounts, and that in many instances, these "entrants" *are* the Big Four, merely repackaged and selling their services through alternative channels.

### 1. There are significant barriers to entry and history shows a lack of success by new entrants.

A would-be insurance carrier cannot simply hang out a shingle. First and foremost, to sell health benefits coverage to national accounts, a firm must offer a provider network with a geographic footprint large enough to cover employees and their dependents spread across the country. *See, e.g.*, Kertesz (Anthem) Tr. 538 (these customers want providers where their employees live and work). And, once it has associated with those providers, it must be able to

76

offer competitive provider discounts.  *See, e.g.*, Bierbower (Humana) Tr. 796–97, 799–800 ("[I]f

your discount isn't competitive comparable to the competition, then you can't win the case. The

employer would be leaving too much money on the table.").  In addition, the new firm must be

able meet the complex administrative, analytical, and technological demands of today's national

accounts at a competitive fee, while protecting the privacy of the members' data.  *See* Bierbower

(Humana) Tr. 803; Guilmette (Cigna) Dep. 269–75; PX 251.  To sell to national accounts, the

insurer must develop a strong enough reputation to be recommended by the consultants guiding

the employers through the contracting process, *see* Abbott (WTW) Tr. 67, and be backed by a

brand recognized by their workers.  *See, e.g.*, Edwards (HealthSCOPE Benefits) Dep. 113–14

("Members like having a name they recognize on their ID card . . . .").

It is clear that building this capability from scratch takes time and resources.  Developing

a provider network alone can take months, if not years, and that is not all there is to the process.

Bierbower (Humana) Tr. 793, 797 (it takes a large and experienced regional carrier nine to twelve

months on average to establish a network); Roberts (Harvard Pilgrim) Dep. 184 (it took "multiple

years" to establish a complete network in New Hampshire); Spooner (Tufts Health Plan) Dep. 57–

58, 151, 155, 157, 177–78, 186 (it took two years to enter New Hampshire even with existing

provider contracts and membership).

And developing a network with attractive discounts takes more than time – it also takes

membership.  Bierbower (Humana) Tr. 801 (negotiating competitive provider discounts requires

membership volume); PX 378 ("[T]he more patients doctors and hospitals see from a carrier, the

more leverage that carrier has to negotiate the best arrangements in the market.").  In a metaphor

that may have been repeated a bit too often during the trial, Dr. Dranove called this "the chicken-

and-the-egg" problem.  *See, e.g.*, Dranove Tr. 1004.  All of this is contrary to Dr. Willig's breezy

assurances that "[i]t's really not all that difficult to assemble a network . . . it's not a big barrier to entry or expansion, it seems to me."  Willig Tr. 4566.

The history of entry in the national accounts market, as presented by the defendants' expert, also demonstrates that entry is not particularly easy.  Dr. Willig created a chart that was meant to show that there has been plenty of "meaningful" entry into the large group customer market, which includes not only national accounts, but also companies with as few as 50 or 100 employees.[23] Willig Tr. 4566–70; DDX 497.  Companies were considered "entrants" when they achieved 1% of the market share, and the chart listed thirty-two companies that had entered in twenty-three states between January 2012 and January 2016.  *See* DDX 497.  Notably, seven of the names on the list were all the same company, which had entered seven different states at once.  *See* DDX 497.  Four "new entrants" actually represented acquisitions of existing plans, and one was a provider-sponsored plan whose executive testified at trial that its own employees made up 80% of its membership.  *See id.*; Berfiend (IU Health) 2860.

Of the thirty-two entrants listed, only one had grown during that time period to attain a double digit market share, and the company with the second highest share stood at 6%.  *See* DDX 497.  The other thirty all still had less than 3% of the market share in their states – and several of them had lost market share over the five-year period and were hanging on with less than 1%.  *See id.*  Dr. Willig also conceded on cross examination that one of the firms does not sell large group

---

23    This chart was presented during Phase 2 of the trial, which addressed competition in the market for the sale of health insurance to large groups.  A large group customer was defined based on the applicable state regulation for large group insurance:  employers with 50 or more employees or 100 or more employees *including* those with 5000 or more employees.  *See* Dranove Tr. 4689–90.  Accordingly, while Dr. Willig's chart concerns entry into a broader market, that market includes national accounts.

insurance at all, and one that had entered in 2015 is going out of business completely.  Willig Tr. 4643–47.

Dr. Willig sought to downplay the implications of this trend, emphasizing that the *number* of entrants – both coming and going – showed "dynamism" in the market.  Willig Tr. 4569.  But mere movement in the market – and especially movement down or out – cannot be equated with the achievement of "character" or "magnitude."  And the inability of new firms to gain traction within the entire large group segment, which includes customers that are much smaller and more localized than national accounts, does not bode well for their prospects on the big stage.  Thus, the data supplied by the defense reinforces the testimony describing how difficult it is for new entrants to "compete on the same playing field" as the merged firm in this market.  *Chi. Bridge & Iron Co.*, 534 F.3d at 430.

### 2.   Large regional carriers are not an option.

Even large, established regional carriers have not succeeded in taking significant national accounts business from the Big Four.  *See* Martie (Anthem) Dep. 198–200 (estimating that from 2011 to 2015, Anthem lost ten or fewer national accounts to Kaiser and fewer than five to Humana);[24] Guilmette (Cigna) Dep. 113–14 (Cigna does not lose entire national accounts to Kaiser because Kaiser cannot offer health plans everywhere that national accounts have employees); Hayes (Aetna) Dep. 211–12, 283–84 (was unfamiliar with Harvard Pilgrim and could not recall any instance in which it competed with Aetna for a national account); Manders Dep. 203–04 (Cigna does not "really run into Humana" except in the individual and small group markets); ▮▮▮▮▮▮▮▮ Dep. 283 ("I didn't know [Humana] competed in the national account space."); Burnell (Buck Consultants) Dep. 90–91 (no employer in his experience has

---

24      Anthem has approximately 550 national accounts.  Mathai (Anthem) Tr. 1257.

switched to Kaiser from a national carrier on a full replacement basis).  Smaller regional players

also do not contend for national accounts business.  *See* Martie (Anthem) Dep. 196–97; Hayes

(Aetna) Dep. 284.

The executives from two of the most prominent regional carriers confirmed that they are

not positioned to enter the national accounts market on a full replacement basis.  ███████████

of  ██████  testified that  ██████  is a regional player that cannot expand  ███████████████

███████████████  nationally, and she explained that the company's preferred provider

organization and point of service products do not cover employees that live outside of its

geographic territory.  ███████████  Dep. 53, 151–53.  Beth-Ann Roberts of the New England

carrier, Harvard Pilgrim, agreed that Harvard Pilgrim is not "a viable option for employers who

need a national network."  Roberts (Harvard Pilgrim) Dep. 79, 178–79.  At most, these carriers

can bid for a portion of a national account's business, if it falls within their geographic area.  *See*

Abbott (WTW) Tr. 84 ("[B]ecause [Kaiser], generally, ha[s] a limited footprint, they would be

bidding on a portion."); DX 724; DX 591.  Indeed, another large regional carrier, Humana, has

stopped competing for new national accounts all together.  Bierbower (Humana) Tr. 794; *see also*

Abbott (WTW) Tr. 109–10 (Humana is "not a national player with a network breadth and depth to

fall in the national category").

### 3.      Slicing is not a practical solution.

The defense asserts that national accounts can easily satisfy their needs by creating a

patchwork of coverage across the country supplied by regional and local players.  But only the

economists seemed to believe this was actually going to happen.  As discussed in section I.A.2.

above, the evidence established that on the whole, national accounts prefer to use fewer carriers,

not more.  Abbott (WTW) Tr. 78–79 ("Larger employers, typically, like to consolidate their plans.

They like to have one service provider, for all of the reasons I mentioned, contracting, data security,

data reporting and the like.  That's a general statement, but that's, certainly, been the preference in the last several decades."); *id.* at 86 ("[T]here's been a strong preference, again, to one national provider and a preference not to do slicing . . . ."); *see also* Bierbower (Humana) Tr. 807; PX 63 (internal Anthem document stating that "National accounts are consolidating their carrier relationships"); Guptill (Kaiser) Dep. 181 (in the last "five to seven years, the trend has been to eliminate as many carriers as possible").

This is because slicing is more expensive and cumbersome for employers.  National carriers offer better rates to customers that can deliver more members to them and charge higher fees to customers that do not.  As Jerry Kertesz of Anthem testified, when Anthem competes for a new account and "think[s] there's a chance" of winning only "a portion of the membership rather than all the membership," it provides "pricing that is segmented into rating bands."  Kertesz (Anthem) Tr. 546.  Cigna ███████  do the same.  *See* Thackeray (Cigna) Tr. 726–27; ███████ ███████████.  Utilizing multiple carriers also multiplies the employers' internal administrative costs and burdens.  Abbott (WTW) Tr. 71, 111–12 (having multiple carriers requires managing additional data interfaces, communication materials, ERISA filings, contract negotiations, technology interfaces, and data security protections).

The evidence shows that when national accounts slice, they do so to offer their employees unique plan options, such as an HMO, or to access a highly regarded network or superior discounts in a particular area, not to lower their premiums or ASO fees.  Bierbower (Humana) Tr. 837; Guilmette (Cigna) Dep. 133–34.  And as detailed above, customers generally usually slice only among the four national carriers, or possibly with a strong regional firm like Kaiser.  Abbott (WTW) Tr. 85–86.

This phenomenon suggests that defendants have vastly overstated the likelihood that slicing will operate as a competitive force dampening the effects of the merger.  And while the fracturing of a national account relationship may mean that a carrier will end up with less than the 100% of the membership it had before, it also presents a carrier with the opportunity to harvest a share of new members from a customer it had previously failed to penetrate at all.  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████  Cain Hayes, the President of National Accounts at Aetna, confirmed that Aetna benefits from slicing.  Hayes (Aetna) Dep. 248.  And as for Anthem, Swati Mathai summarized the slicing state of affairs in the national accounts profit and loss center as "net/net we are slightly positive."  Mathai (Anthem) Tr. 1263.  So while slicing can have an impact on an incumbent's share of any particular customer's membership, overall it is not likely to alter the market share picture dramatically, and it presents just one more example of how reducing the number of national carriers from four to three limits the options available to employers.

### 4.    Other options do not serve national accounts' needs and are often alternative distribution channels for the Big Four.

The defense points to TPAs, private exchanges, and other vehicles for the delivery of health coverage as potential competitive forces that will expand in the market and impose price discipline on the merged company.  But the weight of the evidence shows that these "disintermediators" inserting themselves between traditional health insurers and their customers, *see* Abbott (WTW) Tr. 209, are not market participants of the "magnitude, character, and scope" sufficient to fill the void that Cigna's acquisition will create.  *See H & R Block* at 73, quoting Guidelines § 9.  And the coverage they deliver is often obtained from the Big Four in any event.

**TPAs:**  National accounts generally do not use TPAs.  Burnell (Buck Consultants) Dep. 115–16 (he is not aware of national accounts that use TPAs); Sharp (Aon Hewitt) Dep. 91 ("[l]ess than 1 percent" of its 1100 clients use TPAs); Abbott (WTW) Tr. 116 ("For our large employer segment, TPAs are not commonly used."); Kilmartin (Mercer) Dep. 167 (only a "minority" of his clients use TPAs); Monti (Kroger) Dep. 96–97; Record (Steel Dynamics) Dep. 28–29; Martie (Anthem) Dep. 197–98 (in five years Anthem has lost fewer than five national accounts to TPAs on a full replacement basis).

Why would national accounts steer clear of TPAs?  They tend to be more expensive than the national insurers because they typically have to rent provider networks from other insurers. ████████████████ explained, "when you rent a network, the economics are not as competitive as when you have your own proprietary network," and it is difficult for a TPA to be "competitive on a unit cost basis" if it must rely upon a rental network. ████████████ Dep. 197–99; *see also* Kertesz (Anthem) Tr. 583–84; Kilmartin (Mercer) Dep. 167 ("[T]he provider networks that the TPAs have access to don't have the depth of discounts that a carrier provider network might. So the discounts aren't as deep, which could results in claim costs that are more costly from the employer's perspective."); ████ (internal email from a national carrier stating it is "hard to believe" a TPA renting a network would offer a "positive position from a unit cost perspective"); Archer (HealthSmart Benefit Solutions) Dep. 106–07, 115 (the Cigna and Aetna networks offer larger provider discounts than the HealthSmart TPA); Record (Steel Dynamics) Dep. 28–29 (a national provider can offer "a deeper discount and better claims processing" than a TPA).  Also, TPAs generally do not offer the full suite of medical benefit and administrative services that national accounts demand. *See, e.g.*, Hayes (Aetna) Dep. 272, 285–88 (TPAs do not provide care

management services); Austen (MVP Health Care) Dep. 105 (unlike the "standard" competitors "that offer[ ] a full array of products[,]" TPAs are "folks that just do third-party services").

Accordingly, most TPAs do not target national accounts, and national brokers and consultants do not seek them out for that purpose.  *See* Major (UCHealth) Dep. 12–15; Archer (HealthSmart Benefit Solutions) Dep. 32–33, 56–57, 74 (HealthSmart serves primarily employers with 150 to 1500 employees); Edwards (HealthSCOPE Benefits) Dep. 104–105 (HealthSCOPE's average client has between 500 and 1000 members).

**Private exchanges:**  While private exchanges were initially thought to be the wave of the future, national accounts have not migrated to them as expected.  Pam Kehaly of Anthem testified that in early 2014, "everybody was rushing" to explore private exchanges, but "customers just never really flocked to it like people were thinking they would."  Kehaly (Anthem) Dep. 105–107, 109–10; *see also* Hayes (Aetna) Dep. 152–53 (he has no reason to believe that the adoption by national account customers of private exchanges has grown past 4%);[25] Hayes (Aetna) Dep. 235–36 ("I haven't seen anything to indicate that there's been significant uptake in private exchanges.");

████████████████ Dep. 182, 317 (private exchange projections were written by the consultants who were creating them but their membership has not expanded at the estimated pace); PX 125 (internal Anthem document stating that "adoption levels" of private exchanges by employers "have been lower than analyst predictions"); Kertesz (Anthem) Tr. 596; Guptill (Kaiser) Dep. 167; Mascolo (Wells Fargo) Dep. 148.  One explanation for this is that with a private exchange, the customer loses the ability to select the carriers to choose from, control of its benefit plan design, and negotiating leverage with the carrier.  *See* Kidd (Sodexo) Dep. 145–46, 160.

---

[25]     Aetna defines national accounts to mean 3000 employees or more, Hayes (Aetna) Dep. 221–22, so this estimate would be even smaller using a definition of 5000 employees or more.

Further, the testimony shows that to date, neither private exchanges nor the threats to move to an exchange that Dr. Fowdur considered to be so important have imposed price discipline on the market.  The Vice President and Head of New Sales for Anthem's National Accounts division stated:  "[H]owever I price on the private exchange has no impact on how I'm pricing in an environment where I'm responding to an RFP and being selected as one of – more than one carrier or just one carrier."  Kertesz (Anthem) Tr. 598.  David Guilmette, who has served as both President of National Accounts and President Global Employer and Private Exchanges at Cigna was similarly definitive that Cigna does not change pricing strategy or set ASO fees based on whether a customer is considering moving to a private exchange.  Guilmette (Cigna) Dep. 178–79; *see also* Martie (Anthem) Dep. 277–78 (customer's interest or lack thereof in a private exchange is "irrelevant" to Anthem's ASO pricing).  And any cost savings an employer may realize from moving to a private exchange is not a result of additional competition in the market, but rather, benefit "buy down," as employees will receive fewer benefits from the pre-packaged, more limited plan offerings available on the exchange than they could before.  Kertesz (Anthem) Tr. 676–77; DX 100.

**PSPs:**  Provider-sponsored plans also do not serve the market in a meaningful way, and the evidence does not show them poised to compete with the merged company.  *See* Abbott (WTW) Tr. 120–21 (he does not offer PSPs as an option to national accounts independent from a national health plan); Mascolo (Wells Fargo) Dep. 80 (there is a trend of provider-sponsored competitors entering the market but "acceptance has been slow" and advisers are cautioning clients "to go slow"); *see also* Berfiend Tr. 2860 (approximately 80% of Indiana University Health's commercial membership is made up of its own employees).

**Direct Contracting:**  A handful of very large national accounts do contract directly with certain providers, but they do so under limited circumstances: an employer must have a very large concentration of employees in one geographic area to contract directly with providers effectively. Abbott (WTW) Tr. 121–22.  And even those companies that are positioned to contract themselves may still offer their employees a national plan; they do not necessarily use direct contracting as a complete substitute for a national health insurer.  *See* Bisping (Caterpillar) Dep. 10, 12–15; Kilmartin (Mercer) Dep. 187–88 (health insurers drive better provider discounts "than any individual employer could obtain on [its] own"); Torcom (Sentara Healthcare) Dep. 43–44.  Thus, while defense witnesses could point to isolated success stories, notably Boeing, Mathai (Anthem) Tr. 1268, consultants are not presenting direct contracting as a practical option to their clients.  *See* Abbott (WTW) Tr. 122–24 (he has recommended direct contracting to his clients "very rarely;" direct contracting for specified medical procedures is much more common than contracting directly as a complete substitute for a national insurer); Burnell (Buck Consultants) Dep. 142–43 (Buck does "not consider direct contracting to be a viable complete solution," but only a supplement or slice to existing coverage).

Even if some of these alternatives to traditional insurance coverage eventually do catch on in the national accounts market, they will not put the membership in the hands of anyone new. The evidence revealed that often, these types of new "entrants" in the market are not really entrants at all, but just the same four national carriers selling their plans through different "storefronts" or "distribution channels."

The Big Four carriers own TPAs, including the two largest:  UMR, which is owned by United, and Meritain, which is owned by Aetna.  Schumacher (United) Dep. 128, 134–35; Hayes (Aetna) Dep. 271.  Further, three of the Big Four rent their networks to TPAs, including Cigna and

Anthem, which sells access to the entire Blues network.  Benedict (Cigna) Dep. 30–31; Kertesz (Anthem) Tr. 584; Hayes (Aetna) Dep. 271.[26]  And these rental agreements contain contractual provisions that specifically prohibit TPAs involved from competing against the carriers for national accounts.  Kertesz (Anthem) Tr. 584; Novack (Cigna) Dep. 78 ("[T]he rules of engagement are that a TPA will not compete with us when . . . it's an existing piece of business."); Espinoza (CNIC Health Solutions) Dep. 90 (TPAs cannot bid for an account where Aetna or another TPA administering the Aetna network is the incumbent).

The same names appear again in connection with private exchanges.  Both Anthem and Cigna offer health plans on the major private exchanges.  *See* Fontneau (Cigna) Dep. 33–34; PX 125; Burnell (Buck Consultants) Dep. 109–10 (estimating that on the Buck private exchange, half of the customers use Anthem, 20% use Cigna, and 25% use Aetna); PX 109 (Cigna document showing that national carriers had practically all the share of the WTW private exchange in September 2015); *see also* PX 287; DX 207.  Anthem executives are well aware that while consultants created private exchanges to get their own piece of the healthcare dollar, "ultimately they're our distribution channel for our products." Kertesz (Anthem) Tr. 636; *see also* Mathai (Anthem) Tr. 1287–88; Dranove Tr. 1006–07; Abbott (WTW) Tr. 114–15; Guilmette (Cigna) Dep. 179–80; Martie (Anthem) Dep. 115–16; Fontneau (Anthem) Dep. 121–22.

Not only do the four national carriers sell plans on the national consultants' private exchanges, but United and Aetna responded to the consultants' assault on their territory by creating their own private exchanges.  Schumacher (United) Dep. 114; Hayes (Aetna) Dep. 238.  Aetna has found its private exchange to be an "opportunity for growth," Hayes (Aetna) Dep. 239–40,[27] and

---

[26]    United does not rent its network to TPAs.  Schumacher (United) Dep. 164, 265.

[27]    So while the defendants emphasized the fact that Starbucks went onto an exchange, Kertesz (Anthem) Tr. 634, it turned out to be Aenta's exchange.  Hayes (Aetna) Dep. 238.

Anthem has a strategy to develop or acquire its own private exchange for the same reason.  Martie (Anthem) Dep. 113; PX 125 (Anthem sees the private exchanges as a growth opportunity); *see also* Kidd (Sodexo) Dep. 107–09 (carriers are forming their own exchanges to retain clients).

Provider-sponsored plans and direct contracting can also be connected to the national carriers.  Provider-sponsored plans often team with a big national carrier to obtain administrative services or a broader network.  *See* Abbott (WTW) Tr. 120–21 (national customers may access PSPs "through the major health plans" because "several of the large national health plans" have brought provider-sponsored plans "into their network," and then offer those plans to national accounts "within the [national health plans'] network configuration").  So rather than competing with national carriers, they may become part of the national carriers' networks.

And the record shows that national carriers will not be entirely displaced when employers seek to engage in direct contracting with providers.  Anthem's current President of National Accounts, Charles Kendrick, explained that the role of the carrier would be to carve a local network out of the carrier's broad national network exclusively for the employer.  It would receive, at the very least, fees for administering the network, and the carrier might also handle claims administration, dispute resolution, and other customer service and clinical management functions such as managing the web portal for the employees.  Kendrick (Anthem) Tr. 1190–92.  He added that Anthem has been "in discussion with existing business and prospective employers on direct contracting on their behalf."  Kendrick (Anthem) Tr. 1992.

So while the Court recognizes that new participants have indeed entered the commercial health insurance market to some extent, and that they are disrupting the relationship between the carriers and some customers, they do not possess the capacity to take on the larger, more geographically dispersed employers, and they do not offer a viable, complete solution to customers

seeking a unified plan.  These alternative arrangements do not replace national carriers; at most, they have shown themselves to be able to garner a small slice of a national account's business. And national carriers have been nimble in finding ways to reinsert themselves back into the relationship.  Thus, the Court finds that the new and existing entities that the defense predicts will enter or expand into the national accounts market and impose price discipline are simply not "of a sufficient scale to compete on the same playing field" as the merged firm.  *Chi. Bridge & Iron Co.*, 534 F.3d at 430.

### E.  The merger will reduce innovation in the market.

A merger can substantially lessen competition by diminishing innovation if it would "encourag[e] the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger."  Guidelines §§ 1, 6.4; *H & R Block*, 833 F. Supp. 2d at 79 (finding that the relevant market would lose an "aggressive competitor" with an "impressive history of innovation" and its "history of expanding the scope of its high-quality, free product offerings has pushed the industry toward lower pricing"), quoting *Staples I*, 970 F. Supp. at 1083.

Witnesses from both of the merging parties, and executives from the other major carriers who were deposed, incorporated a fair amount of public relations into their testimony, trumpeting their firms' leadership in bringing new approaches and value to the commercial health insurance industry.  Fortunately, the Court does not need to decide who was first to move in a particular direction or which company innovates more.  The question to be decided is whether the transaction would reduce the new firm's incentive to innovate in the relevant market, and in connection with that issue, it is important to note that national accounts in particular are considered to be the "innovation incubators" for the entire industry.  Kendrick (Anthem) Tr. 1180.  They push carriers to enhance plan design, customer service, technology, and data security, and the innovations they spur are often deployed to other customers and segments.  *See, e.g.*, PX 94; Cordani (Cigna) Tr.

403–04 (national accounts demand innovation and are early adopters of value-based programs such as health engagement incentive programs, biometric screenings, and other innovative, cost-saving programs).

Because innovation is important to national accounts customers, Anthem emphasizes its leadership and creativity in its efforts to win their business. PX 174 (presentation to large national account stating "[w]e are changing how we reimburse providers to drive better quality while increasing access" and highlighting "[o]nline & mobile resources," "transparency tools," and an innovation credit "[u]seable for projects, pilots, communications, etc."); Kendrick (Anthem) Tr. 1199–1201 (describing Anthem's focus on innovation within national accounts). Cigna markets itself this way too, highlighting its value based reimbursements and customer engagement. Guilmette (Cigna) Dep. 48–50; Phillips (Cigna) Dep. 174–75; Cordani (Cigna) Tr. 401–02, 407.

Indeed, because its provider discounts were not as strong as other carriers' discounts, particularly those offered by Anthem and the Blues, Cigna has relied upon innovation to compete, directing its focus on ways to improve member health and employer cost outcomes. Cordani Tr. 406–08 (Cigna offers "differentiated value" to customers "seeking more of the full engagement of resources than a thin administrative service"); Dranove Tr. 968, 984 (Cigna could not compete based on provider discounts alone and had to innovate to bring different value to the market); Dranove Tr. 2302 ("[C]ollaborative accountable care, working interactively kind of a true collaboration between insurer and provider, that's new and exciting. It's something that Cigna was in on the ground floor on a decade ago"); *see also* Drozdowski (Anthem) Tr. 1666–69 (competitors who do not have the same discounts that Anthem has have had to find other ways to compete; "if you don't have strong discounts, you need to either achieve strong discounts or be

creative"); Hayes (Aetna) Dep. 217 (a "compelling value proposition" can differentiate Aetna from a competitor, and help against a Blue carrier).

Cigna's innovation in the market, in turn, spurred even those carriers with strong provider discounts to improve their products. *See, e.g.*, PX 572 (internal Anthem e-mail chain in which Anthem personnel, after learning about a national account was happy with its Cigna collaboration, inquired about doing "something more collaboratively, along the lines of . . . the 'Cigna' model"); *see also* Hurst (Piedmont) Dep. 39–41 (suggesting that Anthem became more willing to discuss its provider collaborations because of competition from Cigna). And testimony from industry participants indicates that clinical engagement and value-based contracting will continue to expand. Hayes (Aetna) Dep. 133 (medical management is a means to improve business: the ability to deliver solutions to improve health is important to larger national account customers); *id.* at 221–22 (employer group surveys indicate "a high interest in adding value-based contracts in the next five years").

Finally, the Court notes that there was evidence that the planned movement of Cigna members to the Blue brand that will be necessary to accomplish the integration in accordance with the rules of the Blue Cross Blue Shield Association, *see* section IV.C.2 below, will also inhibit Cigna's incentive to innovate. As executives from both defendants testified, efforts to move members out of Cigna's network, or to require Anthem network providers to apply Anthem rates to Cigna patients, will erode Cigna's relationships with it providers. *See* Matheis (Anthem) Tr. 1602–07; Cordani (Cigna) Tr. 436–441. Because these relationships are fundamental to Cigna's ability to advance its model of collaborative care, Cigna's capacity to innovate in this area will be harmed as well.

For all of these reasons, the Court finds that the merger is likely to slow innovation in the market.[28]

## IV. The claimed efficiencies do not outweigh the anticompetitive effects of the merger.

### A. Anthem has presented some evidence of efficiencies.

#### 1. Medical Cost Savings

The central element of Anthem's efficiencies defense is the projection that the newly merged company will be able to realize more than two billion dollars worth of medical cost savings that, according to counsel, will be entirely passed through to consumers. *See, e.g.,* Curran (Def. Counsel) Tr. 40-41 (opening statement); Anthem Pretrial Br. at 1–3; Israel Tr. 1831. The analysis is based on the fact that virtually all of the national accounts self-insure. Abbott (WTW) Tr. 69–70. That is, large multi-state employers contract with an insurance carrier to provide claims administration and adjudication, but with respect to the payments to doctors and hospitals for medical care rendered to the employees, the employer is the "true payer" that "is actually paying the actual cost of the claim." Bisping (Caterpillar) Dep. 39; Drozdowski (Anthem) Tr. 1641. The medical costs are paid out of a bank account funded by the employer, Abbott (WTW) Tr. 174;

---

28      The likelihood of greater risk of collusion or coordination is also a basis upon which a court may prohibit a merger. *See PPG Indus.*, 798 F.2d at 1503. Plaintiffs presented evidence about Blue licensees discussing "strategy" within the BCBSA and allegedly exchanging competitive intelligence, arguing that coordination between Cigna and non-Anthem Blues is a "likely" anticompetitive effect. *See* PX 145; Pls.' Proposed Findings of Fact: Phase I ¶ 196. But plaintiffs accord too much significance to references in Anthem's files to our "Blue brethren" or "comrades in arms," Kertesz (Anthem Dep. 206); Pogany (Anthem) Dep. 122, and certain discussions of "strategy" within the Association. Swedish (Anthem) Tr. 269–70. Defense expert Dr. Israel testified that the health insurance industry is not conducive to coordination because of confidential bidding, powerful buyers, highly differentiated products, and many different firms with different footprints and different offerings. Israel Tr. 1986. And plaintiffs' own expert Dr. Dranove found no evidence of collusion, price-fixing, or bid-rigging among any competitors in the healthcare industry, including by Anthem and the other Blues licensees. Dranove Tr. 1018–21. Therefore, the Court is not predicating its decision on a finding that plaintiffs have meet their burden to prove that the merger results in a greater risk of collusion or coordination.

Israel Tr. 4359, and they constitute approximately 90 to 95% of the customer's total medical "spend." Abbott (WTW) Tr. 175; Dranove Tr. 1057.

Anthem maintains that after the merger, Cigna customers will enjoy the benefits of the larger discounts that Anthem has been able to negotiate with medical care providers due to the volume it delivers – along with the other Blue licensees – to the providers in the Blue Cross Blue Shield network.  It points to three sources for its evidence of these savings:  the testimony of the Anthem members of the integration planning team and their consultants; the testimony of Anthem's expert, Dr. Israel, and the government's own allegations.

As part of the pre-merger integration planning effort, a team comprised of Anthem and Cigna representatives was tasked to work with consultants from McKinsey & Co., led by Shubham Singhal, to develop an estimate of the anticipated medical cost savings based upon a review of actual claims data.  Matheis (Anthem) Tr. 1480–84; Drozdowski (Anthem) Tr. 1644–47.  This resulted in a calculation of $2.6 to $3.3 billion in projected annual savings.  Matheis Tr. 1487; Drozdowski Tr. 1649.

Dennis Matheis, Anthem's Senior Vice President for Integration Planning, and Colin Drozdowski, the Anthem Vice President for National Provider Solutions, who led the network cost savings team for Anthem, described the process that was used to calculate the network savings. The analysis started with a substantial volume of raw claims data from both companies from January through August of 2015.  This data was made available to the McKinsey actuaries cleared to review the sensitive business material the two companies had deposited into a "clean room." Singhal (McKinsey) Tr. 1784, 1786–87; Matheis (Anthem) Tr. 1481.  For each provider within the fourteen states with whom both insurers had more than $100,000 of claims experience, the team determined which insurer received the "better net-effective rate."  Matheis Tr. 1482–83.  It

then applied the claims data to those rates to calculate the value of moving Cigna members to Anthem rates where Anthem rates were lower and Anthem members to Cigna rates where Cigna rates were lower.  Matheis Tr. 1481–83; Drozdowski Tr. 1645–48, 1652.[29]  The integration team also quantified the savings that could be achieved outside of the fourteen states if Anthem took Cigna customers headquartered within the Anthem states and "branded them Blue," and their employees spread across the country could access the local Blue Cross Blue Shield licensees' networks through the BlueCard system.  Matheis Tr. 1484, 1487–88; Drozdowski Tr. 1660.  This category of savings represents approximately $500-700 million of the integration team's $2–3 billion total estimate.  Matheis Tr. 1487–88.

When asked how the transfer of the Anthem fee structure to Cigna members could be accomplished, Matheis explained that Anthem "could turn on our affiliate language" in its contracts with providers, and that the merged company could also enter into new contracts with providers to establish new combined rates.  Matheis Tr. 1484–85.  A typical Anthem fee agreement with a provider states:

> "Affiliate" means any entity that is:  (i) owned or controlled, either directly or through a parent or subsidiary entity, by Anthem, or is under common control with Anthem, and (ii) that is identified as an Affiliate on Anthem's designated web site as referenced in the provider manual(s). Unless otherwise set forth in the Participation Attachment(s), an Affiliate may access the rates, terms and conditions of this Agreement.

*See* DX 393; DX 395; DX 396; DX 397.  And Matheis testified that Anthem has a similar provision authorizing it to require providers to extend the Anthem fee schedule to its affiliates "in the

---

29      The calculation was based on claims experience that both companies had in common and was not limited to use of claims from providers who participated in both networks. While the majority of the providers overlapped, there were some Anthem providers who were not part of the Cigna network. In those cases, the difference between the Anthem price and the Cigna out-of-network price would have been even more significant.  *See* Drozdowski Tr. 1652.

predominance of [its] agreements."  Matheis Tr. 1485.[30]  Anthem's Drozdowski stated that the company's current intention is to proceed with a hybrid approach of both enforcing the affiliate provisions in contracts with providers and "convert[ing] [Cigna customers] to Blue."  Drozdowski Tr. 1656. He added that the company could achieve 80% of the Cigna to Anthem rate savings unilaterally by invoking the affiliate clause.  *Id.* at 1657–58, 1681.

According to Matheis, the fact that Cigna disengaged from the integration planning effort in the spring of 2016 should not undermine confidence in the projected medical cost savings since they were based on actual claims data.  Matheis Tr. 1484.  But he acknowledged that it has not yet been determined how the merged company would go about achieving the savings; deciding which "levers to pull" to generate the savings will require collaboration and discussion between the two firms as circumstances will vary from region to region and provider to provider.  Matheis Tr. 1489–90, 1596–1600; *see also* PX 723.

The medical cost savings calculation was repeated by one of the defendants' economic experts, Dr. Israel, who reached similar results.  Using a methodology he called a "best-of-best" approach, Dr. Israel reviewed actual claims data for a twelve month period.  Israel Tr. 1845, 1853. He matched claims by provider, provider location, service type, and insurance product, and he compared the discount rates for Anthem and Cigna for each matched line item.  Israel Tr. 1843–46, 1855. Utilizing only these claims submitted by identical providers treating both Anthem and Cigna members in identical venues, Dr. Israel then calculated what the savings would be if the lowest provider rates already negotiated by Anthem were made available to existing Cigna customers, and if the prevailing Cigna rates were made available to existing Anthem customers in

---

30    According to Matheis, initially Anthem "just assumed, whole cloth, [it] would turn on the affiliate language, regardless of the net effective value."  Matheis Tr. 1489–90.  But with Cigna's input, it refined the calculation to include a value for where Cigna had the better rates.  *Id.*

the few instances where the Cigna rates were lower.  *See* Israel Tr. 1846–54.  He assumed that in

any future negotiations with providers, the combined firm, with its combined patient volume,

would be able to achieve the best price that either firm had obtained separately, and the "combined

firm will close the gap."  Israel Tr. 1848, 1851.  Dr. Israel testified that medical costs for current

Cigna customers would thereby be reduced by approximately $1.5 billion, and medical costs for

current Anthem customers would be reduced by $874 million, for a total of $2.4 billion in savings.

Israel Tr. 1854, 4396; DDX 15.[31]

Although Dr. Israel offered his view that the merged company would ultimately be able to

achieve even larger discounts, his best-of-best model assumes only that the merged firm will

achieve the better of the two rates that existed prior to the merger.  Israel Tr. 1854.[32]  The

economist explained that his calculation was not premised upon any additional volume; he

---

31      To put that figure in context, Dr. Israel also said that while medical costs are 95% of the
employer's total healthcare spend, the discount differential is actually an extremely small percent
of that expenditure – less than 1%.  Israel Tr. 4417, 4420–21 ($2.4 billion is less than 1% of
medical spending in the fourteen states).

32      Beyond pointing to "basic economics," Dr. Israel did not detail how the merged company
would actually be able to improve upon the current Anthem volume-based discounts.  He stated,
"I certainly don't think that the reduction in Anthem pricing comes from Anthem pushing its
current provider rates below where they are today . . . ," Israel Tr. 1835, and one of Anthem's
other experts, Dr. Willig, also testified that Anthem has already achieved the benefits of scale in
its dealings with providers, and that increased volume would not enable it to obtain greater
discounts.  Willig Tr. 2230–31 ("Anthem's already past the threshold of having enough size to do
what it needs to do in terms of offering volume to providers.").  This is consistent with the
testimony of the Anthem CEO, Joe Swedish, who insisted that the merger would not result in the
new company's paying less to all providers – "certainly not less than what we are paying now as
Anthem."  Swedish Tr. 294; *see also id.* at 290 ("Q:  [I]f this merger goes through, your plan is to
use the merger to get even bigger discounts, right?  A:  I don't think that's the plan.").  In the end,
Dr. Israel's calculation of savings for Anthem customers is based solely on the limited number of
instances in which Cigna's rate is lower, and according to him, those savings amount to a reduction
of substantially less than 1% of Anthem customers' provider costs.  Israel Tr. 1835.  And the record
is devoid of any evidence explaining what steps would actually be taken to enable Anthem
customers to avail themselves of those Cigna rates.

attributed the savings to "bulk buying."  Tr. 1849.  And Anthem's expert made it clear that his calculation did not depend in any way upon the details of what the strategy would be use to implement these savings; it was based purely on the application of the economic principle that the merged firm will do no worse than the two firms did separately.  Israel Tr. 1847; *see also* Israel Tr. 4383 (the affiliate language "isn't part of my analysis at all").

Finally, Anthem points out that plaintiffs' monopsony allegations also depend upon the factual premise that the merger will result in the reduction of provider prices.  *See* Compl. ¶ 71; Israel Tr. 4365–66 ("[T]here seems to be agreement that provider rates will go down . . . .  And I would say agreement that [the reduction] is merger-specific from the point of view that the allegation is that the merger will cause those lower rates to occur.").  According to Anthem, these reduced medical costs more than offset the alleged amount of anticompetitive harm, and the savings to customers at the end of the day are efficiencies that weigh heavily against enjoining the merger.

## 2.    General and Administrative Savings

Anthem maintains that the merger will result in other cognizable efficiencies as well. The executives heading the integration effort testified concerning the approach taken to calculate estimated general and administrative ("G&A") savings arising out of the combination of the two firms.  The planning process began in approximately October of 2015 with the creation of multiple teams consisting of representatives from both Anthem and Cigna with expertise in specific subject areas.  Their task was to analyze actual data from both organizations to identify and quantify potential synergies and eliminate duplication, utilizing first a "top down" approach to develop savings targets, followed by a "bottom up" approach to identify the specific steps to be undertaken to achieve them. Matheis (Anthem) Tr. 1493–98; DX 690.  The analysis was facilitated by the McKinsey team that had access to each firm's confidential material.  Singhal (McKinsey) Tr.

1783–84.  Singhal explained that the goal of the effort was to identify costs that would be made redundant by the merger or by adopting the better practices and cost structures either firm had to offer.  Singhal Tr. 1782–84.

By February of 2016, the combined leadership team had approved the integration team's top-down projection of $2.36 billion in G&A cost savings (separate and apart from the projected medical cost savings), and it directed the integration teams to develop plans to capture those savings through the bottom-up process.  Matheis (Anthem) Tr. 1499–1500, 1505–10; DX 238.  The companies calculated a range of synergy savings of $1.7 to $2.3 billion, and it was announced to Wall Street that "the mid point of that range, $2 billion" would benefit shareholders.  Schlegel Tr. 1399–1401, 1444; Matheis Tr. 1611.  The estimate includes $515 million in annual variable cost savings, based on a "best-in-breed" approach that builds on the functions that each of the merging parties manages more efficiently or successfully.  Matheis Tr. 1502–03; *see also* Singhal (McKinsey) Tr. 1783–84.  This figure was factored into the experts' merger simulations.  Israel Tr. 4409.

Both Matheis and Singhal emphasized the rigor, the volume of actual data, and the level of detail that went into the top down analysis and the bottom up work that has been done to date.  *See, e.g.*, Matheis (Anthem) Tr. 1480–84, 1508–09; Singhal (McKinsey) Tr. 1783–84.  Matheis testified that a significant chunk of bottom up work has already been completed and that the teams supporting the eight project work streams have already identified over 400 cost savings initiatives, such as utilizing Cigna's more efficient system for generating ID cards.  Matheis Tr. 1494, 1502, 1508–09.  But the record reflects that Cigna began to disengage from the process in April of 2016, *id.* at 1587, and Cigna ceased participation completely in July when the Antitrust Division sued to stop the merger.

### B.    The Court may consider evidence of efficiencies.

Anthem correctly observes that while the Supreme Court has yet to recognize an efficiencies defense in a Section 7 case,[33] several circuit courts and courts in this district have stated that, in some circumstances, evidence of efficiencies may be introduced to rebut the government's prima facie case.  *Sysco*, 113 F. Supp. 3d at 81, citing *Heinz*, 246 F. 3d at 720.  As the Department of Justice and the Federal Trade Commission recognize in their own Horizontal Merger Guidelines:

> [A] primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.  For example, merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, e.g., by combining complementary assets.

Guidelines  §10.    But the agencies credit only "merger-specific" efficiencies, i.e., "those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects."  *Id.; see also* U.S. Dept. of Justice & Fed. Trade Comm'n Merger Commentary § 4 (2006) ("Merger Commentary") ("Any efficiency that enables the combined firm to achieve lower costs for a given quantity and quality of product than the firms likely would achieve without the proposed merger is merger-specific.").  The classic example of such a circumstance would be "if a merged firm would combine the production from two small or underutilized facilities (one from each of the merging firms) at one facility that has lower costs, and if such a cost reduction could

---

33      The Supreme Court stated in *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 579 (1967), that "[p]ossible economies cannot be used as a defense to illegality" in Section 7 merger cases, and as the court observed in *Staples I*, 970 F. Supp. at 1088–89, this statement has prompted some courts and commentators to question whether economic efficiencies will ultimately be found to be a viable legal defense.

not practically be achieved without the merger (e.g., by one of the merging firms combining two of its own underutilized facilities or through rapid internal growth) . . . ."  Merger Commentary § 4.

The Horizontal Merger Guidelines also require that the claimed efficiencies be verifiable: "it is incumbent upon the merging firms to substantiate the efficiency claims."  Guidelines § 10. This admonition has been echoed by the courts:  the opinions that discuss the potential availability of the defense underscore that courts must "undertake a rigorous analysis of the kinds of efficiencies being urged by the parties to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior."  *Heinz*, 246 F.3d at 721.  The court in *Arch Coal* reiterated that "the government will only consider those efficiencies that are merger-specific and verifiable by reasonable means."  329 F. Supp. 2d at 150.[34]

Finally, as the court considering the merger of health insurance carriers Aetna and Humana recently noted, "high market concentration levels . . . require, in rebuttal, proof of extraordinary efficiencies."  *Aetna*, 2017 WL 325189, at *70, citing *Heinz*, 246 F.3d at 720; *see also id.* at *72 (reiterating the need for "extraordinary" efficiencies); Guidelines § 10 ("The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to consumers.").

None of the courts that recite the general principles set forth in the efficiencies section of Anthem's Conclusions of Law ultimately concluded that the claimed efficiencies were sufficiently verifiable or merger-specific to offset the competitive harm, *see, e.g.*, *Arch Coal,* 329 F. Supp. 2d

---

34    In a somewhat misleading citation, Anthem points to this general statement in *Arch Coal,* but asserts:  "[t]o be cognizable, merger efficiencies *need only* be 'merger-specific' and 'verifiable by reasonable means.'"  Anthem COL ¶ 64 (emphasis added).

at 151–53;[35] *H & R Block*, 833 F. Supp. 2d at 90–92, and the defense has not pointed the Court to a single litigated case in which the merging parties were successful in overcoming the government's case by presenting evidence of efficiencies.

Here, the efficiencies evidence fails to supply a defense for several reasons:  the medical cost savings are not merger-specific; a significant portion of the medical cost savings and the G&A savings have yet to be verified; and it is questionable whether the medical cost savings can be characterized as an "efficiency" at all.[36]  Thus, the defense has not presented evidence that could outweigh the anticompetitive harm, no matter which expert's method for calculating competitive

---

[35]     In the merger of coal companies in *Arch Coal*, the court declined to recognize the claimed savings that would have resulted from actions the companies could have taken alone on the grounds that they were not merger-specific.  329 F. Supp. 2d at 151–52.  Savings related to inventory reduction, the need for fewer haul trucks, and the anticipated elimination of equipment were found to lack evidentiary support.  *Id.* at 152–53.  In short, while the court agreed that some efficiencies would result from the combined operation of adjacent mines, it concluded that most of the purported savings had "been called into question as either non-existent or overstated" and that therefore, the efficiencies defense was not sufficient alone to overcome the evidence of anticompetitive effects.  *Id.* at 153.  The court did state that the fact that Arch would "achieve some measure of lower costs and higher productivity" was relevant to an assessment of the post-merger market, and that those efficiencies "provide[d] some limited additional evidence to rebut the claim of post-merger anticompetitive effects" even though they had not been quantified.  *Id.*  Ultimately, though, the court concluded on other grounds, including the relative weakness of the acquired company, that defendants had rebutted the presumption that the merger would substantially lessen competition.

[36]     Anthem directs the Court to a statement in the recent *Aetna* opinion that efficiencies must be shown to benefit the consumer.  *See* Anthem's Supp. Conclusions of Law [Dkt. 495] ¶ 1, quoting *Aetna*, 2017 WL 325189, at *70, which quotes *Sysco,* 113 F. Supp. 3d at 82.  It is true that this language in both the *Aetna* and *Sysco* opinions means that any claimed savings must inure to the benefit of the customer in order to *qualify* as an efficiency, but neither court altered the test in the Guidelines to single out pass through as the defining touchstone of an efficiency.  So even if the savings and the pass through could be verified – and both are questionable – the entire theory fails because the medical cost savings are not merger-specific.

effects is adopted.[37]   Courts have noted that "even where evidence of efficiencies in the relevant

market will not support an outright defense to an anticompetitive merger, such evidence is relevant

to the competitive effects analysis of the market required to determine whether the proposed

transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 151.   But the

Court finds that the United States has carried its burden notwithstanding Anthem's introduction of

this evidence, and there is no support for Anthem's contention that the Court should consider

claimed benefits to consumers or society in general when assessing the legality of a proposed

merger's impact on competition within the relevant market under the antitrust laws.

### C.   The claimed savings are not cognizable efficiencies.

#### 1.   The medical network savings are not merger-specific.

Anthem asserts that the medical cost savings "relate to this merger."   Anthem FOF ¶ 301.[38]

But that is not the relevant inquiry.   The courts that have considered efficiencies evidence insist

that the defendants bear the burden of demonstrating that their claimed efficiencies are "merger-

specific."   *Sysco*, 113 F Supp. 3d at 82, citing *H & R Block,* 833 F. Supp. 2d at 90.   This means

that the defendants must show that the "efficiencies . . . cannot be achieved *by either company*

---

37     *See* Israel Tr. 4406–10 ("[T]he real bottom line difference between the two simulations is whether you include the medical cost savings or you don't . . . .   The single most important thing is medical cost savings.").

38     *See also* Israel Tr. 4372 ("[L]ower costs *are a result of* the merger.") (emphasis added).

alone . . . ." *Heinz*, 246 F. 3d at 722 (emphasis added);[39] *see also H & R Block*, 833 F. Supp. 2d at 89 (a "'cognizable' efficiency claim must represent a type of cost saving that could not be achieved without the merger" and without the loss of a competitor).

In the merger of coal companies in *Arch Coal,* the court rejected the notion that plans made by Arch, the acquiring company, to recover coal from mines operated by Triton, the acquired company, would be a merger-specific efficiency since Triton could mine the coal on its own, albeit on a slower schedule. 329 F. Supp. 2d at 151–52. The court also concluded that the fact that Triton could be covered more cheaply under Arch's insurance policy was not a merger-specific efficiency, since Triton could have purchased its own policy on similar terms. *Id.* at 152. Similarly, in the *H & R Block* case, the court emphasized that "[i]f a company could achieve certain cost savings without any merger at all, then those stand-alone cost savings cannot be credited as merger-specific efficiencies." 833 F. Supp. 2d at 90. The court then found that the post-merger plans to adopt more rigorous cost-cutting practices and improved IT procedures were not merger-

---

39    Counsel for Anthem argued at the close of the case that this is no longer the governing standard because the *Heinz* court lifted it from a version of the Horizontal Merger Guidelines that was subsequently modified. Curran (Def. Counsel) Tr. 4900. ("DOJ and the FTC said they have learned from their experience and that they are, therefore, modifying their standards."). But while *Heinz* cited the 1992 Guidelines for the proposition that efficiencies must be merger-specific, it cited a leading antitrust treatise for its explanation of what that means. *See* 246 F. 3d at 722, citing 4A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law*, ¶ 973 (1998). No court has revised the legal test in the wake of the 2010 revision to the Guidelines. *H & R Block*, cited by Anthem, still used it in 2011, *see* 833 F. Supp. 2d at 52, and *Sysco* also relied upon by Anthem, set forth the same test in 2015. 113 F. Supp. 3d at 81–82. Indeed, it is not at all clear what counsel was referring to when he told the Court that this particular aspect of the Guidelines had been changed; in *Cardinal Health,* 12 F. Supp. 2d at 60, the court quoted the requirement in the 1992 Guidelines that a cognizable efficiency must be "unlikely to be accomplished in the absence of . . . the proposed merger" which is identical to the language that appears in the 2010 Guidelines, and is the very standard that Anthem urged the Court to apply. Curran Tr. 4900–01. Therefore, the admonition in *Cardinal Health* that "[i]n light of the anti-competitive concerns that mergers raise, efficiencies, no matter how great, should not be considered if they could also be accomplished without a merger," 12 F. Supp. 2d at 60*,* still pertains today.

specific since the companies could independently implement such internal improvements at any time.  *Id.*  More recently, the court in *Sysco* also refused to credit a substantial portion of the claimed efficiencies because the defendants had failed to show that the savings could not be achieved independent of the merger; each of the companies had already separately initiated the "category management" efforts that were expected to generate savings in the merchandising category, and either could have adopted the merged company's planned e-commerce platform for customer orders on its own.  113 F. Supp. 3d at 84–85.

Applying all of these principles, the Court finds that the projected medical cost savings are not merger-specific and therefore, are not cognizable efficiencies.  The integration team's $2.6 to $3.3 billion calculation of medical cost savings is expressly based upon the application of existing provider rates to those providers' existing patient volume, largely through the means of contractually forcing providers to extend the fee schedules that Anthem has already secured.  Not one penny of these savings derives from anything new, improved, or different that the combined company would bring to the marketplace that neither company can achieve alone; to the contrary, the medical network calculation is specifically based on pricing that one or the other of the companies *has already achieved* alone.  *See* Matheis Tr. 1485–86 ("I guess the important point here is this is all, again, the assumption, and I believe it's a sound one, is it's not requiring us to renegotiate. It's already rates that providers have agreed to in the marketplace with both organizations.").  And Anthem's Colin Drozdowski confirmed that the predicted savings are not dependent upon the delivery of new members to the providers; they are derived from moving the providers' existing Cigna population to the Anthem rates.  Drozdowski Tr. 1675–76; PX 54.

Dr. Israel also simply calculated what the difference would be if existing Cigna enrollees received the existing Anthem rates from providers where Anthem's rates were already lower, and

if existing Anthem members received the existing Cigna rates from those providers that charge Cigna lower rates right now.  Israel Tr. 1846–54.  So his $2.4 billion number does not depend on any rate structure or increased volume that will flow from the merger either.  Indeed, a second defense expert specifically opined that Anthem has already obtained the lowest provider rates it can achieve; it is not anticipated to secure lower ones, even if it attracts additional volume.  Willig Tr. 2230–31.  Thus, with respect to the medical costs, the merger introduces no new opportunity to the marketplace; any national account customer that values the superior discounts that Anthem receives from providers is free to purchase health insurance from Anthem today.

It is true that Dr. Israel posits as part of his economic model that there would be a hypothetical negotiation with providers, and he points to economic principles that suggest that the two companies' combined volume will affect the outcome.  *See, e.g.*, Israel Tr. 4392 ("[T]he larger payer is going to get at least as good or better rates than the smaller payer."); *id.* at 4370 ("[T]he prediction of that economic framework is that the combined firm will get prices at least as good as what Anthem gets.").  But even if he is envisioning that the new health insurance company will eventually end up across the bargaining table from the healthcare providers, his calculations turn upon the application of the lowest rate that one carrier or the other has already received, and he is simply applying that to claims of patients that the providers already treat.  And while negotiation may be part of the model he brings to bear as an academic matter, one cannot assume that it will take place given the testimony of Anthem's own witnesses that the company plans to achieve a significant portion of these savings by unilaterally invoking affiliate provisions in Anthem's contracts with providers.[40]

---

40      When Dr. Israel acknowledged that he was not even taking the affiliate clauses into account, Israel Tr. 4383, he revealed his analysis to be largely abstract and diminished its relevance to the actual business circumstances at hand.

Even if Anthem elects to attempt to capture this claimed value through rebranding Cigna customers downstream, rather than through use of the affiliate clause with providers upstream, the savings would not be not merger-specific.  Rebranding is nothing more than marketing the Anthem product to existing Cigna customers and persuading them to buy it, and Cigna customers can do that now.  *See* Matheis Tr. 1599 (in the short term, rebranding is "no different than if you're out selling new business in the market on a day-to-day basis").  So to the extent that any of the Cigna customers within the fourteen Anthem states move their business to Anthem and realize reduced medical costs, one cannot include those dollars in an estimate of merger-specific savings.

This is important because the evidence has established that there will be a significant push for the new company to implement a unified brand strategy within the geographic market at issue. This strategy is necessary to ensure compliance with the Blue Cross Blue Shield "best efforts" rules that are designed to strengthen and protect the Blue brand.

Under the terms of the licensing agreement between Anthem and the Blue Cross Blue Shield Association, 80% of the revenue Anthem earns within its fourteen state exclusive territory must be branded Blue, and 66% of the revenue it takes in nationwide must also be Blue-branded. Swedish Tr. 237; Dranove Tr. 996; Schlegel (Anthem) Tr. 1406.  Anthem executives testified that the company will be out of compliance the moment the merger is consummated, Swedish Tr. 237; Schlegel Tr. 1411; PX 79, and it will be required to submit a plan for achieving compliance to the

association's Brand Enhancement and Protection Committee, within 120 days. Schlegel (Anthem) Tr. 1412, 1415.[41]

Given that imperative, Anthem's stated intention is to move as many Cigna customers within its fourteen states to Anthem as it can. *See* Matheis (Anthem) Tr. 1600 ("[C]ertainly we have to get a lion's share of the Cigna customers in our local 14 markets to migrate to the Blue brand to ultimately be compliant."); *see also* Swedish Tr. 241, citing Swedish Dep. 135–36 (acknowledging that he agreed in his deposition that Anthem "planned to move as many Cigna members as possible"); Schlegel (Anthem) Tr. 1431 (agreeing that rebranding is "high on the list" of "levers" to be utilized to attain compliance).[42]  Schlegel explained that while Anthem's planning documents reveal that the company is contemplating rebranding Cigna lives outside of the fourteen

---

[41]      A failure to comply with the best efforts rule could result in Anthem's loss of its license to do business under the Blue Cross and Blue Shield brands, and the company would face the sanction of a fee of close to $3 billion to fund the establishment of a replacement Blue plan in its exclusive service area. PX 704, PX 125; Schlegel Tr. 1423–24. CEO Joe Swedish specifically testified that given the importance of the Blue brand to Anthem's business, Anthem has every intention of complying. Swedish Tr. 223. So there is no evidentiary basis for Dr. Willig's speculation that the best efforts rules do not constitute a credible threat that would influence Anthem's behavior. *See* Willig Tr. 2160.

[42]      This is another area in which the expert's economic model diverges from the reality of the business circumstances. Dr. Israel testified, "[i]n my analysis, it's not really a rebranding . . . it's the combination of the volumes from the two firms." Israel Tr. 1847. But this is not an academic exercise, and the fact of the rebranding makes a difference to the legal analysis. Dr. Israel also opined, "[i]f you think about [it] from the point of view of the Cigna network, there are going to be some providers where Cigna just has more volume today, the better cost position . . . , my analysis would say, those are going to stay Cigna, the Cigna contract is going to be what it's built from." Israel Tr. 4382. But the actual requirements of the Blues' best efforts rules militate against sustaining or building upon the Cigna business within the 14 states, so this aspect of the analysis is not supported by the facts. *See* PX 79 (detailing the ways in which the national best efforts requirement "restricts growth post compliance;" "NewCo must manage total revenue growth to not outpace Blue revenue growth").

states as well,[43] rebranding the existing Cigna business within the fourteen states alone would be enough to meet the two-thirds threshold.  Swedish (Anthem) Tr. 237; Schlegel (Anthem) Tr. 1414, 1418–19.   According to Schlegel, this could be accomplished by offering such an attractive Anthem product that Cigna customers would choose to switch, or by simply declining to renew existing Cigna contracts.  Schlegel (Anthem) Tr. 1429–30.[44]  Anthem witnesses emphasized that the choice of carrier would be left up to the customer, Schlegel Tr. 1417–18; DeVeydt (Anthem) Tr. 1696, 1699–1700, but that is not consistent with any plans to decline to renew existing contracts.  And Cigna CEO David Cordani cast doubt on whether there would be much value to the choice if it were offered:  "[t]he current plan has it such that the only way a client of Cigna, current client of Cigna, would get access to the improved medical costs of NewCo is to migrate the business to a Blue Cross offering.  So . . . the choice would be limited."  Cordani (Cigna) Tr. 491.

Thus, a large portion of the projected $1.5 million of Cigna customer medical cost savings is attributable to the planned transfer of existing Cigna customers to the Anthem brand to comply with the best efforts rules, and since rebranding cannot be considered to be merger-specific, those dollars should not have been included.

Furthermore, the record includes testimony that Cigna has been successful in some markets in negotiating lower provider prices on its own, which, in accordance with the teaching of *H & R*

---

43      Schlegel testified that the Anthem synergy estimates include not only those employees of rebranded Cigna customers headquartered within the Anthem states who live within the 14 states, but also the employees who live elsewhere.  Schlegel (Anthem) Tr. 1414.  He explained that rebranding those lives would be automatic if a customer insured all of its employees nationwide under a single contract and did not slice out other geographic regions.  *Id.* at 1436–37.

44      Schlegel did note that the more successful Anthem turns out to be at growing its Blue-branded Medicare Advantage business, or selling Cigna specialty products to its Blue customers, the less it would need to rely on rebranding.  Schlegel (Anthem) Tr. 1416–17.

*Block* and *Arch Coal*, would also indicate that obtaining favorable discounts is not a merger-specific outcome. *See, e.g.*, Huggins (Cigna) Dep. 235 (Cigna has a competitive cost position in Richmond, Virginia). Through the implementation of a "Go Deep" strategy of identifying markets in which it was best positioned, and committing more sales and clinical resources there, Cigna has been able to produce higher than average growth in certain locations, Cordani (Cigna) Tr. 409–11, and its ability to use its leverage to negotiate provider discounts in the future has been enhanced.

Dr. Israel likens the network savings to a bulk discount, but using that approach is still not enough to transform the claimed savings into merger-specific efficiencies. Israel Tr. 1945. First, his comparison is not apt since the numbers utilized to derive the efficiency calculation were equal to the number of each carrier's members who were already utilizing the providers in question – the calculation does not depend upon delivering new volume. Dr. Israel maintains that the savings are merger-specific nonetheless because the *combination* of patient volume is a result of the merger even if the total number of patients remains the same. Israel Tr. 1848. But it has not been shown that it is the combination of the two pools of members under a single blue banner that will lead to the application of the improved rates; invoking a contractual provision that requires providers to settle for a lower fee no matter how much Cigna volume is added can hardly be characterized as bulk purchasing.

Moreover, the evidence established that Anthem has already attained the benefits of scale and any increase in volume is not likely to depress the fee schedule further. *See* Willig Tr. 2230–31; Israel Tr. 1835 ("I certainly don't think the reduction in Anthem pricing comes from Anthem pushing its current provider rates below where they are today . . . ."). Even if the combined firm

is able to grow its business within the fourteen states beyond its substantial combined share, there is no evidence that further volume will change the per-patient cost for any provider.[45]

Dr. Israel's bulk discount theory is also at odds with his attempt to paint the outcome of the merger as the delivery of the Cigna product at a lower Anthem price.  Israel Tr. 1837 ("In a nutshell, the key competitive benefit of the merger . . . is that you can combine the Cigna innovative products and wellness programs and whatever else people like about the Cigna offering . . . with a more effective discount structure.").  He testified that "the merger-specific benefit is the creation of a Cigna product with whatever people value about Cigna combined with an Anthem discount structure," Israel Tr. 1871, and explained that this opportunity to buy Cigna's offerings at the Anthem price would not be available absent the merger.  Israel Tr. 1838 ("By bringing those things together, that creates an offering that isn't in the marketplace today.  That's a product that doesn't exist today, is Cigna's offerings with Anthem's discounts."); *see also* Schlegel (Anthem) Tr. 1417 ("The plan is to, of course, integrate the capabilities of both organizations and develop compelling value options for the customer . . . .  [Y]ou're putting a Blue brand on an enhanced product offering, or we could also . . . put the Blue brand on existing business in our 14 states, as well.").

---

45   Thus, the situation can be distinguished from the bulk discount referenced in the Guidelines.  *See* Guidelines §12 ("A merger that does not enhance market power on the buying side of the market can nevertheless lead to a reduction in prices paid by the merged firm, for example, by reducing transactions costs or allowing the merged firm to take advantage of volume-based discounts.  Reduction in prices paid by the merging firms not arising from the enhancement of market power can be significant in the evaluation of efficiencies from a merger, as discussed in Section 10.").  There is no evidence of any reduced transaction costs for the providers – it costs what it costs to treat a patient, Berfiend (IU Health) Tr. 2873 – and the defense calculation does not depend upon the negotiation of new rates based on the carriers' combined volume or bulk purchasing.  No provider testified that it would be appreciably cheaper to deal with one carrier instead of two; they stated that there would be no difference at all.  *See* Brendt (Sutter Health Plus) Dep. 120; Hurst (Piedmont) Dep. 47–48; Atwood (Stanford Health) Dep. 25–26.

This reveals the second problem with the economist's best-of-best cost savings analysis. One could only obtain a "bulk purchasing" discount if one were actually combining two sets of purchases of identical products – two "buckets" into one.  *See* Israel Tr. 1848.  Yet when Dr. Israel makes his Cigna-product-at-the-Anthem price argument, or Anthem executives tout an "enhanced" product, they are tacitly acknowledging that what Cigna is selling is different from what Anthem is selling.  And that means that what Cigna is buying from the providers is often different from what Anthem is buying.  Both Cigna CEO David Cordani and the succession of healthcare providers who testified in Phase II made it clear that the Cigna model depends upon collaboration, and that it takes a higher level of compensation to encourage and enable physicians and hospitals to participate in the arrangements that are aimed at lowering utilization and are central to the value based approach and medical cost trend guarantees that Cigna is selling.  *See, e.g.*, Cordani Tr. 415–423; Rowe (Granite Health) Tr. 2808–10; Berfiend (IU Health) Tr. 2877–78.

If Anthem and Cigna are not buying the same service from providers – and the record reflects that they are not – the bulk purchasing analogy falls apart.  So the savings cannot be categorized as merger-specific based on a combined volume discount theory.

Nor do the announced synergies become merger-specific based on Anthem's assertion that the combination will give it the opportunity to offer its customers the popular specialty services such as behavioral health, population health, disease management, and disability management that Cigna offers and it does not. *See* Israel Tr. 1840 (right now, customers who prefer Anthem discounts cannot contract for the full set of front-end services that Cigna offers); Israel Tr. 4371–73.  There has been no testimony that these are patented or proprietary concepts, and if the health benefits market is as easy to enter as Anthem says it is, it would not be very difficult for one of the biggest and most well-established carriers in the business to expand into related product areas,

especially given the Anthem executives' confidence that it is Anthem that continues to lead the way in bringing innovative, value-based products to the market. *See, e.g.*, Drozdowski (Anthem) Tr. 1670; 1634–35; Swedish (Anthem) Tr. 295–96; Kendrick (Anthem) Tr. 1200–01. So the merger does not need to take place to enable Anthem to offer the programs that Cigna is selling that customers value – it just needs to develop and offer them. The failure to do so to date may relate more to corporate culture than to barriers in the marketplace, and any lack of cultural alignment around these issues makes the promised post-merger scenario somewhat less verifiable as well. Furthermore, the marketing of additional products would not represent an increase in value for the consumer dollar: the customers will of course have to pay extra for any "ancillary" programs they choose to add to their medical benefits contracts. *See* Gidley (defense counsel) Tr. 4793 (responding to question from the Court: "Sure they'll pay for it."). So the fact that the merger may afford Anthem access to a broader range of Cigna offerings is not an "efficiency" that offsets the competitive harm, even if it would be an attractive aspect of the combination for both the new firm and Anthem customers.

## 2. The claimed savings are not verifiable.

The evidence gives rise to a number of concerns about whether the projected medical cost savings or the G&A efficiencies can actually be achieved. Putting aside the conspicuous chill in the relationship between the merging parties for a moment, there is much in the record to indicate that obtaining the proclaimed medical cost savings may be easier said than done. Anthem internal memoranda reflect concerns that providers may not accept the obligation to extend lower Anthem fee schedules to Cigna patients without a fight. *See* PX 89; *see also* PX 54 (email from Colin Drozdowski, stating, "In all circumstances, I would expect strong provider resistance, as they view this as an incremental discount with no corresponding incremental value (no new members).").

And physician contracts may be terminated by either party with only 90 days' notice, so the doctors could rebel and negotiate for more favorable terms.  Drozdowski (Anthem) Tr. 1684; PX 296.

Cigna personnel recognize the problem as well.  CEO David Cordani testified that Anthem's predicted cost savings are unreliable in part because they are based on an unproven assumption that providers will not react and renegotiate their fee schedules upwards.  Cordani Tr. 443.  Alan Muney, Cigna's Chief Medical Officer, expressed considerable skepticism about the reliability of the projections and characterized them as "nirvana."  PX 716; *see also* PX 717 (email from Muney stating, "I think . . . the execution risk is high . . . large delivery systems . . . could push back hard."); PX 722 (email from Muney stating, "I would add the adjective 'potential' to any estimates of savings as obviously there are a lot of variables that play into whether it's achievable or not.").

Also, Anthem witnesses were not particularly reassuring about the time it would take to realize any medical cost savings.  Anthem CEO Joe Swedish, who adamantly resisted the government's suggestions that Anthem would promptly "drop the hammer" on its providers and unilaterally enforce its contractual rights, warned that any reduction in provider costs will take years to come to fruition.  Swedish Tr. 337–38 (closing the discount gap "would play out over a lengthy period of time because . . . our contracts with providers may span three years, and maybe in some cases five years.  So a lot of these providers are not subject to renegotiated arrangements for a considerable period of time."); *see also* Drozdowski (Anthem) Tr. 1684 (facility agreements are on three year cycles and cannot be terminated); Matheis (Anthem) Tr. 1521 (discussing a document predicting a 4 year time frame post-merger: "from date of close to actually getting all of the products aligned for large group market is going to take us some time.").  What's more, neither invoking the affiliate clause nor renegotiating provider contracts would do anything to enable

Anthem to come into compliance with the best-efforts rules, Drozdowski (Anthem) Tr. 1678, so Anthem may be unable to rely on contractual approaches as a means of achieving savings to the extent originally predicted.

Finally, Cigna's David Cordani testified that Anthem's cost savings calculation is "narrow-minded" and "incomplete" since it is based solely on a comparison of discounted fees for services and does not factor in utilization – that is, the savings realized when clinical programs and accountable care relationships improve health and medical management and reduce the need for services altogether. Cordani Tr. 442.[46] Dr. Dranove identified this and other flaws in the medical cost savings calculation, Dranove Tr. 2310–39, and plaintiffs' expert Ronald G. Quintero also identified several reasons why the estimates were unreliable, including the fact that they were based solely on invoices and not a comparison of the fee schedules themselves. Quintero Tr. 2529. According to Dr. Dranove, error problems with measuring discounts and assumptions underlying the calculations affect the totals significantly. *See, e.g.*, Dranove Tr. 2327–29.

Not only are there difficulties verifying the Anthem assumptions that Cigna customers will be able to utilize the Anthem rates, and that they will save money by doing so, but the record is devoid of plans specifying what method could be employed to enable existing Anthem members – or Cigna members who rebrand as Blue members – to enjoy any existing superior Cigna

---

[46]     Despite the fact that he was testifying as the defense expert, Dr. Israel was subjected to a not particularly friendly cross examination conducted by counsel for Cigna. Israel Tr. 2068–69 ("In this case, . . . you've been retained and are being paid exclusively by Anthem; is that correct? . . . And Cigna did not participate in the preparation of your report or your trial testimony?"). This unusual exercise underscored that the expert's analysis of Anthem's cost advantage was based strictly on Anthem's fee schedules and that it did not take into account any savings generated by the reductions in utilization that result from Cigna's collaborative approach. Rule (Cigna counsel) Tr. 2082–83 ("[W]ouldn't you say that in order to compare utilization, you have to adjust it for the different risks and features of the population that is being compared as Anthem versus Cigna at a particular provider?"); *see also id.* 2086 ("You can't determine whether Anthem programs versus the Cigna programs were more successful in lowering utilization, can you?").

discounts.  Even if Cigna's provider contracts contain affiliate provisions, the Blue Cross Blue

Shield Association rules would bar the merged company from invoking them. PX 721; Matheis

(Anthem) Tr. 1608.  Also, the record includes testimony that some providers have historically

offered Cigna lower rates to help it sustain its collaborative model and compete against the more

dominant Anthem and United.  *See* ████████████ ██ ██████.  Nothing in the expert's

negotiation model explains why providers would continue to be willing to provide that sort of

support after a merger.  So the $800 to 900 million in supposed savings on the Anthem side of the

equation is largely unverified.

There is no question that the integration involved in this case would involve, as Anthem

CEO Joe Swedish called it, a "[H]erculean effort."  Swedish Tr. 359.[47]  But, getting to the nub of

the verification problem, while Anthem witnesses were confident that once the merger is approved,

the suspended integration efforts will resume, the leadership team will step into place, and the

synergies will be achievable, *see, e.g.*, Drozdowski (Anthem) Tr. 1673, Anthem's internal

documents make it clear that the effort has not yet proceeded from general "high level" planning

---

[47]    Based on his many years of merger and acquisition experience working on "hundreds" of
transactions at ████████████████ explained that "when you've got two really significant
organizations looking to come together, it's hard work to sort out all of the efforts around
integration and alignment and ownership and governance and process.  And so that's challenging."
████████████████ Dep. 275.  He predicted that the Anthem/Cigna transaction will be
complicated by Anthem's membership in the Blue Cross Blue Shield Association:  "you've got
. . . somebody that is a Blues licensee and they participate in a subset of the states and you marry
that with a company that's trying to serve a broader set of states . . . .   How do you sort that out?
What are the rules of being a Blues licensee . . . ? . . . [H]ow are the economics going to work?"
*Id.* at 276–77.  He added:  "[I]t's hard work.  And it takes time to bring together companies, to
bring together cultures, to bring together people, to bring together management structures, to bring
together governance structures.  And then that doesn't say anything about the technology that
underlies both businesses and how you bring those together, the data structures . . . and then you
get into the relationships that exist in the market and how do you draw those together, whether it's
with brokers or consultants or with care providers or with lab companies or medical device
manufacturers or pharmacies . . . there's a lot."  *Id.* at 277–78.

to the essential process of detailing actual strategies and "budget level" initiatives.  *See* DX 712. That is because Cigna's input is required before the real work can be done, and the two parties have not been working together for some time.  Swedish Tr. 359–60 ("There's still a lot of work to be done in terms of the integration process after day one go live."); Cordani Tr. 428 (parties have not resolved their differing views about the go-to-market strategy, and how the new company will sell its products and provide value to clients is "mission critical"); *see also* Drozdowski (Anthem) Tr. 1671–73; DX 712 (slides titled "Progress on integration planning impacted due to inconsistent Cigna engagement" contrasting "where we could be" with "where we are now;" and "Integration planning is at a point where further refinement of value capture requires significant Cigna input.").[48]

The record contains compelling evidence of the deterioration of the merging parties' relationship.  On December 29, 2015, five months after the two firms publicly announced their plans to combine, Joe Swedish voiced a series of complaints to David Cordani at Cigna.  *See* PX 1 ("With the passing of the fifth month since the announcement and reflecting on what has been accomplished and what requirements remain, I can only conclude that the implementation and execution of our integration plan has been unacceptable.").  In an email in early March, he reiterated his concerns that the companies were not yet aligned.  PX 3 ("Anthem believes that the work associated with Day 1 and synergy capture is not currently on track.").  Cigna responded with its objections to Anthem's proposals for the new company's organization and management

---

48     The PowerPoint presentation prepared for the July 11, 2016 Anthem Board meeting contains such dour pronouncements as:  "Day 1 scope minimized due to delayed engagement model; 40% of minimized scope completed; remainder needs strong collaboration NOW." "Talent selection process not allowed to proceed." "Culture work stalled – Leadership team beginning with (L2) not named." "Focus limited to only High Level G&A; full scope G&A targets and plans limited to Anthem without full risk mitigation plan."  DX 712.

structure, PX 4, and by April 2016, Cigna's disengagement was so complete that Anthem established an independent team to proceed with integration planning on its own.  PX 725. Meanwhile, the two companies, through counsel, began to exchange increasingly heated letters accusing the other of being the first to breach the terms of the merger agreement.  PX 16; PX 17; PX 18; PX 19; PX 20.

All of these circumstances impair the Court's ability to credit the total estimated network cost savings and G&A efficiencies.  Anthem's former CFO Wayne DeVeydt testified that having the leadership in place is fundamental to undertaking an integration, *see* DeVeydt Tr. 1695, 1701, but the two firms here have not yet agreed on the identity of a single member of the new company's management structure beyond naming the "NewCo" President (Anthem's Swedish) and  CEO (Cigna's Cordani).  Swedish Tr. 367–68; DX 712.  And even that basic allocation of authority has not been fully negotiated; the parties have been at odds since March of 2016 over Swedish's proposed diminution of Cordani's span of control.  PX 4.

What's more, Anthem's own leadership has predicted that given those circumstances, it may be extremely difficult to get back on track.  In December of 2015, the Anthem CEO warned his counterpart at Cigna, "[h]ow we integrate our companies based on the pre-close efforts will dictate whether we can capture and realize the expected value for our members and shareholders." PX 1.  He made the same point in a presentation to the Anthem Board seven months later pointing to notable large acquisitions that had failed in the past:   "[i]nsufficient collaboration and misalignment between acquirers and targets have [been] shown to erode value."  DX 712.  So Anthem is hard pressed to argue that a green light from the Court will be sufficient to cure the problems caused by the disruption in the integration effort.

Anthem internal documents detail the highly unfinished nature of the planning to capture the G&A efficiencies in particular; the Board was told in July of 2016 that the focus is "limited to only high level G&A." DX 712. Meanwhile, the final quantification of the synergies, the development of detailed implementation plans, and the establishment of an organizational structure remain in abeyance. DX 712. Plaintiffs' economic expert, Dr. Dranove, found flaws in Anthem's methodology and set forth a number of reasons to be skeptical about the result of the calculations of the savings. Dranove Tr. 2324. But it is not necessary to delve into them in much detail since even under Dr. Israel's calculations, the claimed savings would not be sufficient to offset the anticompetitive effects if one does not include the medical cost savings in the total. Dranove Tr. 2285–86.

With respect to the projected medical cost savings, the numbers may be based on some actual claims data, but Anthem has yet to detail a plan for how to achieve those savings for Cigna customers. Matheis (Anthem) Tr. 1598–99; Drozdowski (Anthem) Tr. 1672–73; *see* DX 712 (firms still need to "[a]lign on provider contracting strategy and medical management policy"). Similarly, the company only has a "general plan" for coming into compliance with the best efforts rules; "it ultimately requires some input from Cigna and some confidential information from Cigna." Schlegel (Anthem) Tr. 1413. These obstacles leave the Cigna personnel, and even some Anthem executives, pessimistic about the outcome. PX 722; *see also* PX 75 (July 17, 2015 email from Anthem Senior Vice President Douglas Wemmers to Joe Swedish noting the conflict between Anthem's stated plans to increase provider collaboration and to "drop the hammer" on providers with lower rates, and expressing concerns that NewCo "will not be as effective or fast moving" as originally envisioned).

This evidence also suggests that the "Cigna product at the Anthem price" or "best of both worlds" scenario touted by Anthem and Dr. Israel, *see, e.g.*, DeVeydt (Anthem) Tr. 1697–98, Israel Tr. 1946–48, is a dubious proposition.[49]   Anthem's own witnesses recognized that there are reasons to doubt that providers will be willing to engage in the collaborative efforts embodied in their contracts with Cigna if they are forced to accept lower Anthem rates at the same time. Matheis (Anthem) Tr. 1602 (invoking the affiliate clause will cause "provider abrasion," making collaboration more difficult in the short run); *see also* Drozdowski Tr. 1666 (acknowledging the expected "enhanced tension with the provider"); PX 89.  So this key tool of the integration strategy is inconsistent with the harmonious picture of the merged company's future that Anthem has endeavored to paint throughout the trial.

Anthem's planned rebranding efforts also run counter to its optimistic predictions.  The testimony of the CEO of Cigna, David Cordani, inflicted significant damage on the synergies defense when he advanced his opinion that both rebranding Cigna customers and imposing lower fee structures would unravel the collaborative relationships with providers that are essential to accountable care and better clinical outcomes.  Cordani Tr. 492–93.

Cordani explained that given the rate and the amount that healthcare costs have been rising, the healthcare industry recognized that it had to change.  In his view, the approach could not be limited to lowering the cost of care when a patient got sick – the effort had to be refocused on encouraging and sustaining health.

---

49      While Anthem's Schlegel described rebranding as "the opportunity to have a Blue-branded Cigna product," and he made the claim that Cigna customers would "enjoy the exact same benefits and services they're getting" today, he acknowledged that the customers would lose the Cigna provider network and cost structure, and that "you would have to meld some of that together . . . utilizing our contracts and utilizing our licenses."  Schlegel (Anthem) Tr. 1430.

> We have essentially 17 percent of the GDP is being expended on health
> care, so we could either continue to just pay when people get sick or we
> could add to that and try to help people avoid being sick in the first place.
> We could try to optimize the outcomes when somebody's dealing with a
> chronic disease, to make it a more manageable, high-quality outcome. And
> that's both better quality of life for the person, but a lower cost event.

Cordani (Cigna) Tr. 393.[50]  This shift is part of a growing trend in the industry, *see* Abbott (WTW)

Tr. 96–97, Swedish Tr. 283, and Cigna has endeavored to differentiate itself and become more

competitive with a two-sided model that engages both the customer and the provider around these

---

[50]    This approach includes engaging with individual members so that they can become more
actively aware of how their behavior and lifestyle can affect their health, and offering diagnostic
screenings for free to an employer's entire workforce, as well as collaborating on the provider side
of the relationship.  Cordani explained that such an accountable care arrangement can include
placing nurses in doctors' offices so that medical professionals can spend the necessary time with
patients explaining their diagnoses and how to manage them, or notifying doctors when their
patients are not refilling their prescriptions on schedule and are therefore at greater risk of
experiencing complications.  Cordani (Cigna) Tr. 393–97, 442–43 (reducing emergency room
visits for asthma patients by ensuring they use controller therapies).  Rachel Rowe of Granite
Health testified that since 2012, her hospital consortium has had an ACO value-based overlay
contract with Cigna aimed at population health. The collaboration involves care coordination and
the sharing of raw patient data which can be analyzed to identify opportunities to reduce
unexplained variations in medical practice.  Cigna and Granite Health worked together to develop
the shared services model and identify the particular metrics that would make the biggest
difference in how patients are treated.  Cigna pays a per-patient per-month care coordination fee
separate and apart for any fees charged for specific services, and it funds a pool that the provider
may share if it achieves its medical cost and quality goals.  Rowe (Granite Health) Tr. 2807–15.

issues, with an emphasis on customer satisfaction and clinical program quality.[51]  Cigna identifies

its accountable care relationships as the centerpiece of this growth strategy, and Cordani

maintained that replacing an old structure of remuneration based on volume with a new structure

of value based care requires working closely with providers to be sure that the risk is shared and

both parties' incentives are aligned.  Cordani (Cigna) Tr. 441–50.  It also requires a consistent

delivery of volume to those providers in order to be sustained.

    Therefore, Cordani voiced concerns that a post-merger Blue Bias strategy to rebrand Cigna

lives – especially if it included lives outside the fourteen states as part and parcel of the rebranding

of their employers headquartered within the fourteen states – would reduce the volume Cigna could

bring to its providers. Cordani (Cigna) Tr. 447.  This would, according to Cordani, "dramatically

unwind" Cigna's collaborative relationships, and rapidly destroy the Cigna value proposition,

---

51    There was certainly evidence adduced to show that Anthem is also very involved in the
health insurance industry's transition from a pure fee-for-service model to a more value-based
approach, and that its numbers of value based or ACO arrangements are growing.  *See, e.g.,*
Swedish (Anthem) Tr. 295–98; Drozdowski (Anthem) Tr. 1638; Dranove Tr. 975–77; Kehaly
(Anthem) Dep. 113–16, 118–22.  But the testimony revealed that at this time, that effort consists
largely of incorporating incentive provisions in contracts with healthcare providers that enable the
providers to earn financial rewards or kickers when their invoices fall below pre-established
targets. *See, e.g.*, Berfiend (IU Health) Tr. 2875–76.  This can be a mixed blessing when Anthem
insists upon contracts that "rebase," and last year's successes thereby become next year's targets.
Berfiend Tr. 2876.  The providers who testified in the second phase of the trial also described a
very different attitude on the part of Anthem towards the data sharing necessary for collaborative
care as well as a lack of meaningful consultation in establishing the operative medical cost and
quality goals. Compared to Cigna's individually negotiated model, Anthem's value based program
was depicted as more of a take it or leave it option.  Berfiend (IU Health) Tr. 2877–89; *see also*
Hurst (Piedmont) Dep. 39–41 (Cigna is the most collaborative of the commercial payers in terms
of setting quality based targets).

diminishing Cigna's prospects for growth in the non-Anthem states and weakening its offerings to its existing customers. Cordani Tr. 492–93.[52] It would also diminish Cigna's ability to innovate.

Even if one discounts the Cordani testimony in recognition of the fact that a certain amount of marketing, along with some positioning for potential breach litigation, was on display on the part of both companies in the courtroom, it becomes clear when one considers the entire record, including the testimony of consultants, customers, providers, and even Anthem's own experts, that people "like something Cigna offers." Israel Tr. 1842; *id.* at 1841 ("people have indicated today that they like that package of services that Cigna offers"); *see also* Goulet (Anthem) Dep. 87 ("Cigna has a much better clinical presence, a much better process of helping individuals get back to work."). The evidence shows that that the current trend to shift the focus to population health requires an initial investment of resources by the carrier, and providers have been quite clear that one cannot ask them to do more but pay them less at the same time. Therefore, the Anthem prediction that the merger will make the Cigna product available to more customers at a lower cost – "it's the opportunity to have a Blue-branded Cigna product, if you will, the customer may enjoy the exact same benefits and services they're getting currently today . . . it's just it would happen that their ID cards would be a Blue-branded ID card" Schlegel (Anthem) Tr. 1430 – is an oversimplification that is not supported by the evidence. *See* Cordani (Cigna) Tr. 437 ("[C]ertain of the service offerings that we have for our clients are enabled on technologies that have been built over time. They just can't be plugged and played into a different technology."). So this

---

52    Ken Goulet, the former Anthem President of Commercial and Specialty Business, also predicted that Cigna provider discounts would deteriorate over time for any customers who chose to remain with the Cigna brand due to the migration of volume away from those providers. Goulet (Anthem) Dep. 138.

aspect of the efficiencies defense remains unverified, because a Cigna product with a Blue label on it is not the Cigna product anymore.

### 3.   It is questionable whether the medical cost savings can rebut the prima facie case since there is no evidence of "efficiencies" created in the relevant market.

The nature of the defense in this case has raised an additional question: what is an "efficiency," anyway?

The Merriam Webster dictionary defines efficiency (not "an" efficiency) as: "effective operation as measured by a comparison of production with cost (as in energy, time, and money)." The Merger Commentary describes a merger-specific efficiency as something "that enables the combined firm to achieve lower costs for a given quantity and quality of product."  Merger Commentary § 4; *see also id.* ("Merging parties may reduce *their costs* by combining complementary assets, eliminating duplicate activities, or achieving scale economies. . . . [S]ufficiently large reductions in the marginal *costs of producing and selling the products of one or both of the merging firms* may eliminate the unilateral incentive to raise prices that the merger might otherwise have created.") (emphasis added).  But the medical cost savings that are being touted here do not relate to *the new company's* ability to produce anything, and they do not derive from a reduction of the new company's costs, or result in a reduction of the price of the new firm's products.

From the very start of the national accounts phase of the trial, Anthem emphasized that these defendants do not sell "health insurance" – they sell ASO.  Under the circumstances that pertain to national accounts and ASO arrangements, the medical costs are not "costs" paid upstream by the insurers to "produce" anything that is sold downstream – the carriers do not pay them at all.  They are paid directly out of the customers' bank accounts.  This means that while the total healthcare cost that a national account customer will incur at the end of the day may be

reduced if the network savings can actually be realized, there is no evidence that the merger will enable the combined firm to offer the only "product" it sells in the relevant market – that is, claims administration, claims adjudication, etc. – at a lower price because its own "costs" are going to be reduced. The "product" being sold is not the employer's entire healthcare spend – ASO is only one portion of that expenditure – and Anthem is not arguing that either its costs of production or the price of what *it* is selling will go down.[53]

The Court is not aware of any reported case in which any court has found that the anticompetitive effects of a merger were outweighed by the combined firm's ability to buy supplies more cheaply due to its size (and therefore to produce or sell something at a lower cost), although there are hints in the Horizontal Merger Guidelines and the case law that those circumstances could qualify as an efficiency under some circumstances. *See* Guidelines §12; *see also Staples I,* 970 F. Supp. at 1089–90.

In the 1997 Staples and Office Depot merger case, the defendants argued that as their suppliers grew more efficient due to the increased sales volume attributable to the merged retailers, they would be able to lower prices, and the combined company would pass these savings on to its customers. *Staples I*, 970 F. Supp. at 1089. The court rejected this and other claimed efficiencies because it did not find the defendants' methodology to be reliable, or the evidence concerning the amount of the savings or the pass through rate to be credible. *Id.* at 1089–90.[54] But it appeared to

---

53    Certainly, *access* to a network that offers the customer's desired attributes is something that insurers are selling. But that "product" – the network access, combined with the claims administration – is factored into and paid for by the ASO fees; the fees paid to the providers are not part of the insurers' "costs" that get factored into their "product," i.e., the medical coverage. They are simply part of the *customers'* costs – their total healthcare spend.

54    The *Staples* court also objected to the fact that the parties had included in their calculation price reductions that they would have received from suppliers separately and therefore, were not merger-specific. *Staples I*, 970 F. Supp. at 1090.

accept the proposition that some verifiable savings based on obtaining better prices from vendors could be considered to be merger-specific.

Even if increased purchasing power on the supply side can be viewed as an efficiency in some scenarios, the facts of this case do not fit the paradigm. The defendants are not making the argument advanced in *Staples*; they are not saying the providers themselves will become more efficient by virtue of the new combined volume – the calculations are based on the volume the providers already serve. And the claimed savings are not attributed to production by healthcare providers at a lower cost either. It will still take the same amount of energy, time, or money for providers to treat the patients. *See* Berfiend (IU Health) Tr. 2873; Atwood (Stanford Health) Dep. 25–26 (stating that "there is no difference in the cost that it takes the physician or the provider to provide services to the same patients" whether they are covered by Anthem or Cigna). And at most, there will only be small transactional savings realized when a provider contracts with one carrier instead of two. Brendt (Sutter Health Plus) Dep. 120.

So while the Court has ruled that the claimed efficiencies fail as a defense because they are not merger-specific and a substantial portion are not verifiable, it also has serious doubts about whether they fall within the category of efficiencies at all. The promised reduction in customers' total medical costs does not result from either company doing anything better, or from the elimination of duplication or the creation of new demand. It does not result from the carriers' or the providers' operating more efficiently, and there has been no showing that the merger will result in increased output or enhanced quality at the same cost. There is also reason to question whether the combined firm will be producing "a given quality and quantity" at a lower cost as the Merger Commentary specifies, or whether the quality of the Cigna offering will in fact degrade. *See* Cordani (Cigna) Tr. 448. There is evidence that suggests that customers and providers are likely

to lose the opportunity to choose between contracts that emphasize cost as the number one factor and those that are more focused on the nature of the collaborative offering, and that testimony supplies another reason to reject the defense. *See* Guidelines § 10 ("[P]urported efficiency claims based on lower prices can be undermined if they rest on reductions in product quality or variety that customers value.")

For all of these reasons, the situation here cannot be compared to the "reduction in costs and increase in productivity" that was found to have some limited significance in *Arch Coal*, 329 F. Supp. 2d at 153.

**D.     The potential buy-side savings do not change the analysis of the merger's competitive effects.**

Anthem maintains that the Court should view the evidence of reduced medical costs as a factor to be considered in assessing the overall competitive effect of the merger even if it does not rise to the level of an offsetting efficiency. *See Arch Coal*, 329 F. Supp. 2d at 151. But this does not change the outcome.

First of all, there is reason to doubt that the claimed savings will be entirely passed on to consumers as Anthem has repeatedly ensured the Court that they would. *See* Curran (Def. Counsel) Tr. 40 (opening statement) ("As to the medical cost savings, those are guaranteed to flow through to the ASO customers."). Anthem's internal documents reflect that the company has been actively considering multiple scenarios for capturing any medical cost savings for itself, and the corporate executives responsible for that exercise listed "pass all savings through to customers" as the last of seven potential options. PX 727; *see also* PX 214; King (Anthem) Tr. 3071–76 (now that Anthem has created value for its ASO customers with its Enhanced Personal Healthcare Program, it can seek to capture some of the savings by raising its ASO fees).

Dr. Israel posited that an insurance company could raise its ASO fees to capture some of the savings, Israel Tr. 4360, and his network savings estimate was calculated based on a 98%, not 100%, pass through.  This may be a very small percentage, but it assumes that $48 million of the projected difference will end up in the coffers of the new firm.  Since the integration planning is not yet complete, there is no evidentiary basis to draw a conclusion one way or the other about how the merged company will ultimately proceed.

Counsel for Anthem argued at the closing of Phase II that the defining characteristic of an efficiency is "consumer welfare," pointing to that portion of the *Heinz* opinion that cites *University Health*, 938 F. 2d 1206 (1991).  Curran (Def. Counsel) Tr. 4888.  He stated that the D.C. Circuit's citation of *University Health* "is interesting because *University Health* says when we're analyzing efficiencies, the touchstone is consumer welfare," and he characterized the citation in *Heinz* as an "endorsement" of the consumer welfare test for efficiency.  Curran Tr. 4888.  But the *University Health* opinion did not say that; the court held that a defendant seeking to overcome the presumption "must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit *competition,* and, hence, consumers."  938 F. 2d at 1223 (emphasis added).  And *Heinz* quoted that sentence as support for its admonition that "high market concentration levels . . . require, in rebuttal, proof of extraordinary efficiencies," 246 F.3d at 720; it did not mention consumer welfare at all.

There has been no showing made here that the claimed medical cost economies would enhance competition, so *University Health* is inapposite.  Moreover, no court has held that a potential general benefit to consumers at the end of the day can negate competitive harm; what precedent there is states precisely the opposite.[55]  As the Supreme Court stated in *Philadelphia*

---

[55]     *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 2000).

*National Bank*, 374 U.S. at 371, a merger that may substantially lessen competition is not saved because "on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial."  Nor may one justify the loss of competition in one market with an argument that it would countervail market power in another.  *Id.* at 370.

That admonition is of particular importance here where there is no evidence that the rates charged by the thousands of providers in Anthem's network – which range from individual family doctors, to sophisticated physician groups and urgent care facilities, and from non-profit, rural, or community hospitals to advanced tertiary care centers and large for-profit hospital "systems" – are inflated due to the providers' market power.  There was certainly testimony from all sides that medical costs are high and increasing and that the situation is unsustainable, but this trial did not venture into uncovering the causes or cause.  Anthem claims that the customer's pocketbook is its number one concern, and it urges the Court to embrace the merger as a means to bring down the rising cost of healthcare in America.  That exhortation does not necessarily square with the evidence that Cigna's efforts to reduce utilization are reducing its customers' medical cost trends right now notwithstanding the company's discount disadvantage.  And Anthem is not exactly an unbiased observer – the large insurer comes to healthcare economics from the perspective of its own profit-maximizing interest and the interests of its shareholders.  What the defense is asking the Court to do is to elevate Anthem's ability to sustain its margins over the need or ability of physicians and hospitals to do the same, and Supreme Court precedent indicates that courts should not be in the business of making policy determinations about the appropriate allocation of healthcare dollars; those are value judgments that are better directed to the legislature.  *See Arizona*

*v. Maricopa Cnty Med. Soc.*, 457 U.S. 332, 354–55 (1982).[56]  Moreover, these choices certainly cannot be made based on this record, which does not begin to supply the evidentiary basis needed to determine whether any, much less all, of the providers are operating so far above their costs that Anthem's hard bargaining can be viewed as a public service.  Nor is there sufficient evidence in the record to reach a determination on whether the buying power that would accompany the proposed merger would result in a reduction in the availability or quality of service as plaintiffs have suggested.  *See* Pls.' Proposed Findings of Fact:  Phase I ¶¶ 399, 401.

Finally, if consumer benefit is indeed the touchstone, there is ample evidence in the record that the merger would harm consumers by reducing or weakening the Cigna value based offerings which aim to reduce medical costs by reducing utilization and by engaging with, rather than simply reducing the fees paid to, providers.  For instance, for instance, Rachel Rowe, the President and CEO of New Hampshire's hospital consortium, Granite Health, agreed that the Cigna value-based program has working well for the Cigna patients and "achieving savings."  Rowe Tr. 2827.  "The Cigna Collaborative Accountable Care Agreement that we've had in place for four, almost five years is important to us.  It's been important to our providers; important for our patients; important for Granite Health. . . . [It] has really been foundational to our population health management program."  Rowe Tr. 2827–28.  She added that losing it "would be a problem for our chief medical officer group in understanding, really, how we care for the majority of our commercial patients across Granite Health."  Rowe Tr. 2828.

---

56      Even in *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984), where a court declined to strike down an insurer's restrictions on provider billing practices, in part because it expressed the view that antitrust law is aimed at high prices, not low ones, one circumstance found to "militate strongly . . . against any effort by an antitrust court to supervise the Blue Shield/physician price bargain" was that the cost of medical care "is an area of great complexity where more than solely economic values are at stake."  749 F.2d at 930–31.

Since the Court has determined that the claimed medical cost efficiencies are not sufficiently merger-specific or verifiable to offset the anticompetitive effects of the merger, and that the government has carried its burden to demonstrate that there is a substantial likelihood of an effect on competition if the merger proceeds, it need not reach the third question posed by the complaint:  whether the merger should be enjoined on the grounds that it would create a monopsony on the buying side of the equation.  But since the efficiencies defense is based not on any economies of scale, reduced transaction costs, or production efficiencies that will be achieved by either the carriers or the providers due to the combination of the two enterprises, but rather on Anthem's ability to exercise the muscle it has already obtained by virtue of its size, with no corresponding increase in value or output, the scenario seems better characterized as an application of market power rather than a cognizable beneficial effect of the merger.  As Dr. Israel candidly put it, his calculations "quantify the benefit of being a larger insurer."  Israel Tr. 1880–81.[57]

## V.     The merger is also likely to cause anticompetitive harm in the market for the sale of medical insurance coverage to large group employers.

Plaintiffs' second claim is that the market for the sale of commercial insurance to large group employers in thirty-five local markets will be harmed by the merger.  Compl. ¶¶ 38–50. Phase two of the trial addressed this claim, and plaintiffs focused their presentation in the courtroom on five of those local markets: Portland, Maine; the New Hampshire markets; Richmond, Virginia; Indianapolis, Indiana; and northern California.  The Court concludes that the

---

57     *See also* Israel Tr. 4413 (the implication of the economic model is that "bigger players get better prices.").  Here there can be no argument that when the expert talks about "bigger," he means greater market share:  he was talking about the ability to deliver more patient volume to providers, and increased patient volume is exactly the same thing as increased market share since the denominator of the market share fraction is the number of insured lives.  The total number of patients to be covered in the marketplace is fixed, and there will not be increased demand.

merger is likely to lessen competition substantially in Richmond, Virginia at least, and it does not reach any of the other markets.

A.   **Plaintiffs have met their initial burden to show that the merger is presumptively anticompetitive in the Richmond, Virginia market.**

1.   **Relevant market**

**Product Market:**  Plaintiffs allege a product market of health insurance sold to large group employers. Compl. ¶¶ 39–40.  State statutes distinguish between "small group" and "large group" employers.  In forty-six states, a small group employer is defined as an employer with two to fifty employees.  Bailey Dep. 59–60; Goulet (Anthem) Dep. 15.  In California, Colorado, New York, and Vermont, a small group employer is defined as an employer having between two and 100 employees.  Bailey Dep. 59.  Employers with more than fifty or 100 employees, respectively, are considered "large group" employers.  Goulet (Anthem) Dep. 16.

The defense asserts that this product market is improper because it includes the national accounts that are at issue in plaintiffs' first claim.  *See* Defs.' Pretrial Brief [Dkt. 324] at 6.[58]  But the industry recognizes a clear distinction between small group and all large group insurance since small group insurance is defined by state regulation and subject to state and federal statutes.  *See, e.g.*, Bailey Dep. 59; King Tr. 3040.  The fact that the Court found insurance sold to national accounts to be a valid product market in the first part of the case does not preclude it from finding insurance sold to the entire set of large groups to be a separate valid product market.  *See Brown Shoe*, 370 U.S. at 325 (within a product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"), citing *E.I. du Pont de Nemours*

---

58      The defense also argues that combining both fully-insured and ASO plans in the product market is invalid.  *See* Defs.' Pretrial Brief at 6; Israel Tr. 4444.  As set forth below, however, plaintiffs presented market share and concentration calculations for Anthem and ASO business separately.

*& Co.*, 353 U.S. at 593–95.   Accordingly, the Court finds that the relevant product market is appropriate.

**Geographic Market:**   The defense also challenges the delineation of the thirty-five geographic markets.   There is no dispute that, as it was often stated in this case, "healthcare is local." *See, e.g.*, Dranove Tr. 3785. Employers purchase coverage with access to providers where their employees live and work. *See, e.g.*, Guertin (Anthem) Tr. 3582–83; Rothermel (Anthem) Tr. 4150–51; Kendrick (Anthem) Tr. 1181–82.   But the defense insists that plaintiffs' local markets were too tightly drawn, and it maintains that they do not properly account for patient travel patterns.   Fowdur Tr. 4202–06.

Plaintiffs used Core-Based Statistical Areas or "CBSAs" to define their thirty-five local geographic markets.   Dranove Tr. 4754.   CBSAs, which are "aggregations of zipcodes," Willig Tr. 3710, were developed by the Office of Management and Budget and are geographic areas that the federal government uses for a variety of purposes.   *See Bellevue Hosp. Ctr. v. Leavitt,* 443 F.3d 163, 167 (2d Cir. 2006) (upholding the use of MSAs by the Department of Health and Human Services in calculating Medicare payments to hospitals); *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 147–48 (D.C. Cir. 2015) (EPA guidance recommending CBSAs as an option for geographic boundaries used in regulating certain air quality standards).   CBSA replaced MSAs after the 2000 census and "are roughly equivalent to the previous groupings." *Lawrence & Mem'l Hosp. v. Sebelius*, 986 F. Supp. 2d 124, 128 (D. Conn. 2013).   Both groupings "are based on census data and use counties as building blocks to roughly approximate the local labor market."   *Id.* at 127–28.

In the healthcare insurance industry, MSAs are "an agreed-upon geographic basis that is well defined both for employers, [consultants], and for the health plans."   Abbott (WTW) Tr. 107.

The industry uses them in the ordinary course of business when examining local markets.  For example, consultants use them when analyzing provider discounts, *id.* at 107–08, and Anthem and Cigna use them to analyze where members live and work to understand their access to healthcare. Weber Dep. 27–28; Thackeray (Cigna) Tr. 722; *see also* Cordani Tr. 409–12 (Cigna evaluates MSAs, "which are essentially cities," to identify where to place more resources).

The defendants argues that the geographic markets in Phase II are too small, but these complaints ring somewhat hollow in light of their insistence that the geographic market in Phase I was too big because it did not accord sufficient attention to firms that might be of significance on a regional or local basis.  Dr. Fowdur testified that Dr. Dranove did not conduct a proper SSNIP test for each geographic market to determine if a price increase by the hypothetical monopolist could be "defeated by substitution, for example, by customers in the region traveling outside of that region to purchase the relevant product."  Fowdur Tr. 4211–12.  She provided data in connection with the New Hampshire markets identified in the complaint that patients often travelled within the small state to larger cities nearby for visits to physicians or access to hospital services.  Fowdur Tr. 4205; DDX 493 at 12.  But the patients are not the "customers;" their employers are.  So it is the response of employers, not patient travel patterns, that is relevant here. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 338–46 (geographic market based on a patient flow data in a hospital merger case failed to "account for the likely response of insurers in the face of a SSNIP"). [59]

---

[59]     Furthermore, Dr. Fowdur did not even attempt to present evidence that enough people would brave the traffic between Richmond and Washington, DC to make northern Virginia providers a real part of the competitive picture, and the providers she mentioned in Lynchburg and the Tidewater area are also too far to the east or the west of Richmond's central location to make a difference either.

The Court finds that plaintiffs' use of CBSAs to outline their thirty-five relevant geographic markets is "economically significant" and corresponds to "commercial realities." *Brown Shoe,* 370 U.S. at 336–37. Dr. Dranove testified that he defined the relevant market for large groups in the same manner that he did for the national accounts market, to include all types of commercial health insurance plans, products, and funding arrangements. Dranove Tr. 3695. He further testified that large group employers faced with an SSNIP could respond by forgoing the purchase of group health insurance altogether, directly contracting with providers, or shrinking their employee base so they become eligible to purchase small group coverage. *Id.* He testified these options are not viable. *See* Dranove Tr. 861, 3695. Moreover, there is no evidence that a large group would reduce its employee base in response to an SSNIP.[60]

The Court holds that the thirty-five geographic markets approximate the geographic areas the industry uses when analyzing local markets for medical services and were drawn in a way that does not diminish the role of regional and local players that could serve as reasonable options. Accordingly, they are valid relevant geographic markets.

## 2. Market share and concentration establish the presumption.

Dr. Dranove measured shares in the large group segment using the number of enrollees residing within each CBSA, Dranove Tr. 3709–10, which is how insurers typically measure their own large group market shares. *See, e.g.*, PX 603; Tallman (Centene) Dep. 31. For each CBSA,

---

[60]   To confirm his conclusion, he utilized a critical elasticity approach and calculated the critical elasticity to be 1.18, which means that a 5% price increase by a hypothetical monopolist would become unprofitable if it resulted the loss of 6% of its business or more. Dranove Tr. 3695–97. Relying on the same academic literature he used in his analysis of national accounts, Dr. Dranove found that employers do not drop their coverage, and the estimated actual elasticity is much lower than the critical elasticity – "implying, as our intuition would tell us, that in response to a 5 percent increase in insurance premiums, these employers are not going to stop purchasing insurance." Dranove Tr. 3697.

the numerator in Dr. Dranove's calculation is the number of a particular insurer's large group enrollees in the CBSA, and the denominator is an estimate of the total number of large group enrollees who reside in the CBSA. Dranove Tr. 3710, 3712. As he did for national accounts, Dr. Dranove used both a census and a build-up and approach to calculate this number and then used the larger in his market share denominator. Dranove Tr. 3710.[61]

Combining Anthem with the other Blues and combining ASO with fully-insured products, Dr. Dranove calculated Anthem's market share in Richmond to be 65% and Cigna's 13%, for a combined share of 78%. PX 751. The pre-merger HHI for Richmond is already quite high – 4594 – and after the merger, it would reach level of 6277, reflecting a change of 1683, both of which are well in excess of what the Guidelines would deem to be presumptively unlawful. PX 751; *see also* App. A to Pls.' Proposed Findings of Fact: Phase II [Dkt. 483] (depicting the market shares and HHI data appearing in PX 751 as bar graphs) ("Phase 2 App. A").

Dr. Dranove also anticipated some of Anthem's objections, and he calculated what Anthem's share would be alone, without including any lives covered by the rest of the Blues. When both ASO and fully-insured products are combined, the results of a combination are still presumptively anticompetitive: Anthem's market share in Richmond is 53%, Cigna's is 13%, and their combined share is 66%. The pre-merger HHI is 3190, and the post-merger HHI will be 4561, with a change of 1371. PX 751; Phase 2 App. A.

What if you take fully insured plans out of the picture? This is not necessary since they become more prevalent at the smaller end of the large group spectrum and represent part of the

---

61      The Court notes that in the ordinary course of business, Anthem calculates market share similarly to the census approach. *See* PX 567 (calculating state commercial market share by dividing group membership resident in the state by the census's estimate of the number of individuals insured on an employer sponsored basis in the state).

Phase II product market, but calculating market shares in that manner would not save the day in any event.  Combining the Blues as a single competitor and looking at ASO only, the market shares in Richmond are 61% for Anthem and 16% for Cigna, leading to a combined share of 77%.  The pre-merger HHI is 4227, and the post-merger HHI would be 6145, with a difference of 1918.  PX 751; Phase 2 App. A.

Finally, calculating Anthem's share separately from the rest of the Blues and looking at only the ASO market, Anthem's market share in Richmond remains substantial, at 48%, Cigna's is 16%, and their combined share would be 64%.  The pre-merger HHI is 2840, and the post-merger HHI increases to 4350, with a change of 1511.  PX 751; Phase 2 App. A.

The defense criticizes these calculations because the data the expert used did not extend beyond January 2015, and because he supplemented the CID data obtained directly from the carriers with data from industry sources – HealthLeaders and Mark Farrah – that defendants claim is deficient in various ways.[62]  But the Court notes that the defense itself cites HealthLeaders data. Willig Tr. 4566–70 (using HealthLeaders data to identify entrants in the market).  Also, Dr. Dranove turned to the Mark Farrah database for only 3% of his enrollment numbers.  Dranove Tr. 704.  Finally, the shares Dr. Dranove calculated are consistent with testimony from industry participants that Anthem has the largest share of the market in Richmond.  *See, e.g.*, Hilbert (Optima) Dep. 83 (Anthem has more than 50% share in Richmond); *see also* Hawthorne (Scott Insurance) Tr. 2989 (stating that he has more clients with Anthem and Cigna than any other insurer); PX 424.

---

[62]    The defense also criticizes the numbers because Dr. Dranove's build-up approach did not include other carriers or any TPAs and because he combined the market shares of the other Blues for some of the calculations.  But the Court rejects these arguments for the same reasons it gave when they were made with respect to the national accounts claim.  *See* section I.B. above.

Even if the data Dr. Dranove used for his calculations was not perfect, the resulting market share and concentration figures were sufficiently large in the Richmond CBSA to be unaffected by minor discrepancies.   Since the expert's determinations comport with the other evidence describing the market and appear to closely approximate market conditions as required by law, the Court finds that plaintiffs have established their prima facie case for the Richmond market.

### B.    Defendants' rebuttal evidence

In Phase II, the defense presented some evidence related to each of the 35 markets, including evidence showing that there are new entrants in New Hampshire and Indiana positioned to be successful, *see* Rowe (Granite Health) Tr. 2852; Berfiend (IU Health) Tr. 2860, and that the market is somewhat less concentrated in those states and in California, where there is a more active presence of another Blue licenses, along with TPAs, and Kaiser.   PX 751.   With respect to Richmond in particular, defendants presented evidence to show that Dr. Dranove's calculations overstate Anthem's market share because Anthem participates in the Federal Employee Program, which accounts for about 20% of Anthem's total commercial enrollment in Richmond.   PX 419; *see also* Dranove Tr. 3840.   It also presented evidence about other competitors in the state that may be able to serve customers in Richmond, pointing to carriers and other alternative sellers of group insurance in Lynchburg, the Virginia Beach/Tidewater area, and northern Virginia.

Because only an evidentiary "showing" is necessary to shift the burden back to plaintiffs, *Marine Bancorporation*, 418 U.S. at 631, the Court must go on to consider whether plaintiffs have met their ultimate burden of persuasion.

### C.    Plaintiffs have carried their burden to establish that the merger is likely to harm competition in the Richmond market.

Plaintiffs have presented sufficient evidence to show anticompetitive harm from the merger in the Richmond, Virginia market for large group insurance.   The Richmond market topped or

came in second on the list of thirty-five markets on every measure of market share or concentration, whether calculated with or without the other Blues, and whether calculated including both ASO and fully insured plans or only ASO.  PX 751; Phase 2 App. A.

Anthem witnesses did little to refute these undeniable statistics.  Burke King, the President of Anthem Virginia, testified that Anthem is the largest health insurer in Virginia across individual, small group, and large group segments, and that it has the highest market share.  Burke (Anthem) Tr. 3041.  He admitted that Anthem competes head-to-head with Cigna in Richmond, and that Cigna is the second strongest player in that market.  Burke Tr. 3043–44.  King also worked to advance what appeared to be a well-rehearsed Anthem motif that the company does not view Cigna as a strong competitive threat, King Tr. 3042–43, *see also, e.g.,* Rothermel (Anthem California) Tr. 4091, 4092–93, 4107; Guertin (Anthem New Hampshire) Tr. 3485–87, 3512, but this testimony was not credible, as it was contradicted by numerous Anthem documents referring to Cigna as one of Anthem's closest competitors.  *See* King Tr. 3046 (discussing PX 579), Rothermel Tr. 4125–29 (discussing PX 737); Guertin Tr. 3484 (discussing PX 734).[63]

Further, the defense evidence did not do much to show that other players in and around the Richmond market will provide the necessary competition to overcome the anticompetitive effects of the merger in that market.  First, the Court finds unpersuasive the defense's arguments that competitors outside the Richmond market will affect competition in the market.  As one Virginia-based broker testified, his Richmond-based clients want a network with providers conveniently

---

[63]    King tried to dull the impact of the expert testimony and described the tracking of market share to be "an inexact science."  King Tr. 3014.  Other Anthem witnesses went further but did not advance the cause when they professed – somewhat incredibly and contrary to their ordinary course records – that they do not pay much attention to market shares at all.  Rothermel (Anthem) Tr. 4111–14; Guertin (Anthem) Tr. 3486–87.

located near where their employees live, and they would not find a network with providers only in northern Virginia to be attractive.  Hawthorne (Scott Insurance) Tr. 2982–3.

Further, the firms that the defense identified do not appear interested in entering the Richmond market or able to compete at a level that could dull the merger's anticompetitive effects. Piedmont Community Health Care is a small health plan owned by a Lynchburg-based provider Centra that does not compete or have members in Richmond, and is not looking to expand into Richmond.  Adams (Centra) Dep. 11–12, 29, 72–73; Hilbert (Optima) Dep. 89; PX 419.  ████ is an insurer ████████████████████████████████████████████████ Dep. 11–12.  Although ██████ has membership in Richmond, it does not appear able to compete on the same field as the merged company.  *See* ████████████ Dep. 79–80, 91–92, 98.  Wheeler (Bon Secours) Tr. 3398 (██████ has "struggled in the Richmond marketplace relative to their home base").  Bon Secours, a large health system in Richmond, does not sell insurance and its executive explained that it does not have a provider-sponsored plan.  Wheeler (Bon Secours) Tr. 3404–06.  Innovation Health and Gateway Health are insurers that operate elsewhere in Virginia, but not in Richmond.  Henderson (Innovation Health) Dep. 52, 157; Jackson (Gateway) Dep. 50–51, 61.  Although █████████████████████████████████████, has approached ████████ about expanding ████████████ into the ██████ market, there is no evidence that ████████████████████, much less that the entry would be sufficiently imminent to counteract the effects of the merger in a timely manner.  Further, Gateway Health has no plans to enter the Richmond market.  Jackson (Gateway) Dep. 28, 50–52, 61–62, 66, 76–77.

Finally, using the same types of merger simulation and UPP models that he used to analyze the national accounts market, Dranove Tr. 3734, Dr. Dranove calculated the static harm for the

large group market and found that the merger would result in aggregate harm for all thirty-five local markets and in the Richmond market alone.  Dranove Tr. 3734–39, PX 752.  Significantly, he testified that even if he factored 100% of Dr. Israel's claimed efficiencies into his analysis, the merger would still have an anticompetitive effect in the Richmond market.  Dranove Tr. 4736–38 (discussing PX 760).

In light of this evidence, the Court holds that plaintiffs have met their burden to prove by a preponderance of the evidence that the merger will have anticompetitive effects on the Richmond, Virginia market for the sale of large group health insurance.

## CONCLUSION

Because the effect of Anthem's acquisition of Cigna may be substantially to lessen competition in the market for the sale of medical health insurance to national accounts in the fourteen Anthem states and the sale of medical insurance to large group employers in the Richmond, Virginia CBSA, the Court will enjoin the merger.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 8, 2017

140